**IN THE U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| BRYAN J. PESTA,<br><br>*Plaintiff,*<br><br>- against -<br><br>CLEVELAND STATE UNIVERSITY,<br>LAURA BLOOMBERG, HARLAN M. SANDS,<br>BENJAMIN WARD, CHRISTOPHER MALLETT, CONOR<br>McLENNAN, and WENDY REGOECZI, in their individual<br>and official capacities;<br><br>*Defendants.* | CASE №<br><br><br>**JUDGE:**<br><br><br>**COMPLAINT FOR<br>MONEY DAMAGES AND<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

## NATURE OF THE ACTION

1)      This case presents claims based on the Defendants' violation of Dr. Pesta's First

Amendment rights to academic freedom, freedom of speech, and freedom of association.

2)      It involves a flagrant violation of First Amendment rights in the heart of an institution

which by its very nature is supposed to be "peculiarly the marketplace of ideas." Instead of that

marketplace of ideas, Defendants herein threw a "pall of orthodoxy" over speech which is both

controversial and critical of government policy.

## PARTIES, JURISDICTION, AND VENUE

3)      Plaintiff Bryan J. Pesta is a resident of Cuyahoga County, within the Northern District of

Ohio.

4)      Defendant Cleveland State University (CSU) is a public research university, organized

and existing under the laws of the State of Ohio, located in Cleveland, Ohio within the Northern

District of Ohio.

5)      Defendant Harlan M. Sands was at all times herein the President of CSU and was the chief executive officer of CSU, and as such is a final policy maker in his own right, rendering his behavior an act or acts of official government policy.

6)      Defendant Laura J. Bloomberg was at all times herein the Provost of CSU, although she has now succeeded to the presidency of CSU; moreover, as Provost her recommendations are nearly final decisions, binding on CSU, and rendering her behavior an act or acts of official government policy.

7)      Defendant Dr. Benjamin Ward was at all relevant times herein the Director, Research Development & Ethics in CSU's Office of Research and a participant in a committee investigating Dr. Pesta.

8)      Defendant Dr. Christopher Mallett was at all relevant times herein a Professor of Social Work at CSU and a participant in the committee investigating Dr. Pesta.

9)      Defendant Dr. Conor McLennan was at all relevant times herein a Professor of Psychology at CSU and a participant in a committee investigating Dr. Pesta.

10)     Defendant Dr. Wendy Regoeczi was at all relevant times herein the Chairman of, and a Professor in, the Department of Criminology, Anthropology, and Sociology at CSU and a participant in a committee investigating Dr. Pesta.

11)     Venue is therefore appropriate in the Northern District of Ohio.

12)     This claim involves constitutional rights and is brought pursuant to 42 U.S.C. §1983, as well as 28 USC §§2201-2202.

13)   This Court therefore has subject matter jurisdiction pursuant to 28 U.S.C. §1331.


## FACTUAL BACKGROUND

14)   Dr. Pesta holds a Ph.D. in psychology from the University of Akron; an undergraduate and master's degree in psychology from CSU, and a master's degree in human resource management and labor relations, also from CSU.

15)   For over 36 years, from 1986 until March 4, 2022, Pesta was associated with Defendant CSU, first as a student, and then later as a faculty member for well over two decades.

16)   Dr. Pesta was granted tenure at CSU in 2010, and promotion to full professor in 2016.

17)   Indeed, Dr Pesta was, at the time of the events herein, not only a tenured full professor, but he was also the most senior member of his department, with excellent student evaluations.

18)   As a psychologist, Dr. Pesta has conducted research and published peer-reviewed papers on the subject of human intelligence (IQ).

19)   Some of Dr. Pesta's research has focused on questions relating to the hereditability of IQ—the extent to which individual differences in human intelligence can be attributed to either genetics, environmental factors, or both.

20)   This area of research is well founded, with IQ in particular being one of the most rigorously investigated metrics in psychology, and with racial differences in average IQ being well documented for over one hundred years.

21)     Indeed, among the most replicated findings in social science is that the mean IQ of American Blacks (M = 85) lies about one standard deviation below the mean IQ of American Whites (M = 100). We note that these are averages and say nothing necessarily about any given man's IQ, whether he is White or Black.

22)     Nevertheless, in the field of statistics, a one standard deviation difference between two groups is widely accepted as being "very large."

23)     Moreover, the average IQ difference here between Blacks and Whites is unfortunately stubborn and has persisted in the research literature for well over one century.

24)     In various research articles, Pesta and colleagues have shown that these gaps correlate strongly with critically important life outcomes, such as income and education levels, propensity to engage in criminal activities, and even a person's levels of health and overall well-being.

25)     But despite (a) the gravity of race / IQ gaps, (b) the critically important consequences that they predict, and (c) a century's worth of research, their cause(s) remain unknown.

26)     And yet researching and discussing the cause of the gaps is difficult in part because controversy is generated by even asking questions about this subject.

27)     Indeed, controversy has so consistently followed inquiry in the area of race, genetics and intelligence that many psychometricians have recognized that phenomenon with a shorthand term – to wit, the "Gould Effect" which refers to the deliberate "controversialization" of intelligence research, which then chills not only the specific subject of race, genes and intelligence, but also more generally the willingness of writers to tackle even less controversial issues related to intelligence research, such as those related to behavior genetics in general.

4

28)     Thus, the causes of racial gaps in IQ have been controversial for decades.

29)     However,  in the last 15 years or so the whole-genome revolution (driven by the advent of low-cost DNA testing) has made it possible to do scientifically compelling tests on this topic.

30)     Dr. Pesta's research, which resulted in the paper referred to below as "Global Ancestry and Cognitive Ability" (a/k/a "Lasker et al. 2019"), was the first to do so with a large sample size (over 9,421 subjects) of excellent data provided by the National Institute of Health.

31)     It was the first known study using actual DNA samples (as opposed to measures utilized in the past, such as estimates of probable genetic material inferred from family relationships) while also controlling for the socio-cultural "baggage" of self-identified race.

32)     Indeed, "Global Ancestry and Cognitive Ability" (a/k/a "Lasker et al. 2019") might rightfully be regarded as landmark study for several objective reasons:

a)   First, an entity called "Altmetric (www.altmetric.com")  evaluates articles (across all of science) and ranks them on how impactful they are. The Lasker et al. paper scores in the 99th percentile for "High Attention," and in the 95th percentile for all research outputs that Altmetric tracks, across disciplines in both "hard" (e.g., chemistry) and social science (e.g., psychology).

b)   Second, the journal that published Lasker et al. (*Psych*) reports that the article has been individually viewed by 53,174 persons to date. This count represents the most in the journal's history.

c)   Third, Google Scholar reports that the Lasker et al. paper has already been cited 25 times, further illustrating the paper's relative impact and importance.

5

33)     Like all science, Dr. Pesta's research is not the last word on the topic, but it is far more sophisticated and revealing than previous research and should be seen as a landmark of sorts. Instead of being greeted as an academic landmark, Dr. Pesta's research has been the occasion for violations of academic freedom and First Amendment outrages.

34)     Pesta's research and publishing herein constitute attempts to communicate his views about a public matter.

35)     Furthermore, Pesta's research herein contains premises which challenge those of powerful government policies.

36)     On August 30, 2019, Dr. Pesta (along with three other individuals) caused to be published an article entitled "Global Ancestry and Cognitive Ability" (a/k/a "Lasker et al. 2019") in the peer reviewed journal *Psych*. A true and accurate copy of "Global Ancestry and Cognitive Ability" is attached hereto as Exhibit 1.

37)     "Global Ancestry and Cognitive Ability" proved controversial.

38)     "Global Ancestry and Cognitive Ability" proved to be controversial because it openly included data showing that European American (EA) and African American (AA) populations differ in mean general cognitive ability (or general intelligence, "g") by about one standard deviation—a fact which has long been established among expert psychometricians, but one which has nevertheless been interdicted by powerful taboos, such as those related to the "Gould Effect."

39)     More controversial still, "Global Ancestry and Cognitive Ability" cited earlier studies showing reasonably strong evidence that genetics played a role in the mean differences in

6

general intelligence between White and Black Americans, and concluded that the data supported those earlier studies, *viz.*:

> "Rushton and Jensen [9] called for modern genetic studies to test the hereditarian model. They predicted that 'for those Black individuals who possess more White genes, their physical, behavioral, and other characteristics will approach those of Whites ([9], p. 262). In the present study, we confirmed that this was the case for general cognitive ability. Moreover, we showed that the association between European ancestry and g was substantially mediated by eduPGS [a genetic estimate of IQ] rather than skin color PGS. These results provide support for a hereditarian model…

> "…We found that European ancestry was a consistent predictor of cognitive ability, even after entering various controls into our models."  Exhibit 1, pdf. p. 23 "4.4. General Conclusion."

40)     These premises conflict directly with those which underly the civil rights policies of the government at all levels, which civil rights policies are based on the premise that the observable differences between Blacks and Whites in general intelligence are due primarily or even exclusively to environmental factors.

41)     Thus, when Thurgood Marshall briefed the seminal case of the civil rights movement (*Brown v. Board of Ed*, 347 U.S. 483 (1954)), he included an appendix "drafted and signed by some of the foremost authorities in sociology, anthropology, psychology and psychiatry who have worked in the area of American race relations."

42)     In that very appendix, Thurgood Marshall's experts opined that "The available scientific evidence indicates that much, perhaps all, of the observable differences among various racial and national groups may be adequately explained in terms of environmental differences."  Brief for

7

Petitioner (dated September 22, 1952), *Brown v. Board of Ed*, 347 U.S. 483 (1954), 1952 WL 47265 "III" of the appendix. pdf p.13 (*12).

43)     Notably, this statement regarding "observable differences" referred in particular to general intelligence, for the citations thereto were Professor Otto Klineberg's studies on race differences in IQ – see Klineberg, Negro Intelligence and Selective Migration (Columbia University Press: New York, NY 1935, reprinted Greenwood Press Publ: Westport, CT, 1974), or Klineberg, Race Differences (Harper & Brothers: New York, 1935) – which were two of the works specifically cited by Marshall's experts.

44)     Thus, even over 70 years ago, when Marshall briefed his famous appeal in *Brown*, average cognitive differences among the races were facts that had long been established in the scientific literature relied upon by the foremost authorities of the field, including the experts relied upon by impeccable progressives such as Thurgood Marshall and the NAACP.

45)     The Warren Court which instituted the civil rights movement followed the lead of Marshall and his "foremost authorities" in locating the cause of intelligence differences in environmental factors (rather than the innate factors shown in Dr. Pesta's studies) – hence *Brown's* conclusion that "Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system." *Brown v. Bd. of Educ.* at 494.

46)     Other instances of civil rights cases which have doubled down on the Marshall/Warren Court's environmental explanation for intelligence differences include, but are not limited to,

*Gaston County v. United States*, 395 U.S. 285, 295-297 (1969) and *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971).

47)     Nor was the Warren Court the only purveyor of civil rights policies based on the premise that the observable differences between Blacks and Whites in general intelligence are due primarily or exclusively to environmental factors.

48)     As another example, on June 4, 1965, President Lyndon Johnson gave the Commencement Address at Howard University.

49)     In said speech, President Johnson specifically celebrated the civil rights laws of 1957, 1960, 1964 and 1965, noting that he himself had overseen the passage of much of that law.

50)     In doing so, President Johnson once again made clear that such governmental policies were premised on the notion that inequality between Blacks and Whites, including intellectual inequalities, were due to environmental differences, rather than any innate differences: thus President Johnson stated that Blacks had been "trapped... in inherited, gateless poverty" and devastated by the "heritage of long years of slavery; and a century of oppression, hatred, and injustice."

51)     In said speech, President Johnson made clear that environment alone, rather than any innate genetic differences, could account for all of the inequalities:

> "These differences are not racial differences. They are solely and simply the consequence of ancient brutality, past injustice, and present prejudice…
> "Men are shaped by their world."

9

52)    Yet on the contrary, if Pesta's research in "Global Ancestry and Cognitive Ability" is accurate, then these differences are in part based on genetics; and men are not only shaped by their world, but men also, in turn, shape their world — and they shape it from the powers and deficits bequeathed by their genes.

53)    There is thus a direct conflict between the speech of Dr. Pesta and powerful government policies.

54)    Yet criticism of government and government policy is not simply a right, but even a duty in our constitutional order.

55)    Furthermore, criticism of government actors and government policy is at the very core of the First Amendment.

56)    Consideration of Dr. Pesta's point of view is necessary if we would uphold the fundamental First Amendment right of canvassing public men and public measures and maintaining (in Madison's words) "the censorial power" of "the people over the Government, and not in the Government over the people."

57)    Furthermore, government policies tend to generate both vested interests and even taboos, and the civil rights policies of our government are no exception.

58)    Open discussion of race is confined by powerful taboos – the very opposite of the "uninhibited, robust, and wide-open debate" our First Amendment supposedly fosters.

59)    Notable examples of the taboo at work in popular culture go back decades and include the repercussions against Al Campanis in April of 1987 (who was widely reported as fired for raising skepticism about the innate ability of Blacks as team managers, a task requiring

significant intellect); Jimmy "the Greek" Snyder in January of 1988 (who was widely reported as fired for raising the subject of genetic physical differences between Blacks and Whites, a subject that inevitably bears on intellectual differences as well because of the fact that intellectual activity occurs in the brain, a patently physical organ); Dusty Baker in 2003 (who was widely reported as causing controversy for the same reasons as Jimmy "the Greek"); Rush Limbaugh in 2003 (who was widely reported as fired for stating Black Quarterback Donovan McNabb was promoted because of "…social concern in the NFL. The media has been very desirous that a black quarterback do well. There is a little hope invested in McNabb, and he got a lot of credit for the performance of this team that he didn't deserve."); Patrick Buchanan in 2012 (who was widely reported as fired for comments on race, with his former boss reported as saying "The ideas he put forth aren't really appropriate for national dialogue, much less the dialogue on MSNBC,"); John Derbyshire in 2012, a former editor at the National Review (who was widely reported as fired because of a column that discussed Black intelligence and crime rates in uninhibited, robust, and wide open fashion); and Jason Richwine in 2013 (who was widely reported as fired from the Heritage Foundation for having researched the link between race and IQ).

60)     The academy itself is not immune from such taboos. Thus, even well recognized and accomplished scholars such as Pulitzer Prize winner E.O. Wilson, Noble Prize winner William Shockley, Nobel Prize winner James Watson, and Charles Murray have all suffered controversy for discussing the link between intelligence, genetics, and race, with both Wilson and Murray being physically attacked on campus (Wilson at Harvard in February 1978; Murray at

Middlebury College on March 2, 2017), and Watson being forced out of the Cold Spring Harbor Laboratory (which he had helped found) in 2007.

61)     Less well known, but no less germane examples of the taboo at work in the academy include reprisals suffered by Professor Michael Levin (at CUNY) in 1990; the reprisals suffered by Dr. Stephen Hsu at Michigan State University in June of 2020, who was driven from the administration after renewed controversy over Hsu's remarks that race had a biological component and for Hsu's raising the question of whether there were more-than-superficial differences between racial groups in areas such as intelligence, personality and athletic prowess; a demand by numerous faculty and staff at Princeton, as evidenced by a July 4, 2020 "Faculty Letter" to "Constitute a committee composed [to investigate and discipline allegedly racist] research, and publication on the part of faculty…"; and Professor Amy Wax at University of Pennsylvania's Carey Law School, who had, for several years prior to the incident herein, incurred censure and harassment from the UPenn Dean and Administration over her remarks concerning race and intelligence.

62)     Upon information and belief, these and similar incidents were known and understood by the hierarchy at CSU at the time of the events herein, including President Sands, Provost Bloomberg, and others, including Dr. Benjamin Ward, Dr. Christopher Mallett, Dr. Conor McLennan, and Dr. Wendy Regoeczi.

63)     Thus, the controversial nature of openly discussing intelligence differences among the races and the evidence for an innate or genetic explanation for such differences was well known to the above individuals.

64)     Turning back to Dr. Pesta's controversy, in response to "Global Ancestry and Cognitive Ability," individuals from both inside and outside of the CSU community claimed said article was "racist," and launched a campaign to have him fired over the said article.

65)     Four such individuals who complained to CSU are Dr. Jedidiah Carlson, Dr. Cathryn Townsend, Kevin Bird, and Os Keyes.

66)     Specifically, on or about September of 2019, Dr. Jedidiah Carlson, Dr. Cathryn Townsend, Kevin Bird, and Os Keyes sent a letter to CSU citing Dr. Pesta's contribution to "Global Ancestry and Cognitive Ability" and complained that the study by Dr. Pesta which resulted in "Global Ancestry and Cognitive Ability" involved "extremely sensitive phenotypic information about ethnicity, cognitive ability, mental health, and educational attainment."

67)     Said letter by Dr. Jedidiah Carlson, Dr. Cathryn Townsend, Kevin Bird, and Os Keyes stressed the "extremely sensitive" information as a way of enforcing these taboos, a point which was not lost on the CSU Administration.

68)     Furthermore, on or about the Fall/Winter of 2019, in response to "Global Ancestry and Cognitive Ability," a CSU masters student named Liam O'Brien began to organize other students to petition the CSU administration to censor Dr. Pesta because of the content and viewpoint presented in his research, which agitation bore fruit.

69)     Further still, by July 1, 2020, in response to "Global Ancestry and Cognitive Ability," a student group at CSU known as the "Student Socialist Society CSU" had an ongoing campaign in which they were petitioning the CSU Administration to fire Dr. Pesta on the basis of his speech.

70)     Further still, on September 1, 2020, in response to "Global Ancestry and Cognitive Ability," an individual identified as Theo Desmond – purporting to be with a group known as the "Concerned Citizens Against Race Science" – sent an email to the CSU Department of Management, Provost Jianping Zhu, and the CSU Board of Trustees, accusing Dr. Pesta of "white nationalism and racism in science."

71)     Said September 1, 2020, email by Theo Desmond attacked the speech and associations of Dr. Pesta and then rhetorically asked that Dr. Pesta be fired with the words, "Is this the type of person the CSU Monte Ahuja School of Business wants its faculty to have professional collaborations with?"

72)     Said September 1, 2020, email by Theo Desmond also included the following attack on Dr. Pesta because of his speech and associations:

> "Because of this and Pesta's many papers on scientific racism, we demand to know if Pesta is teaching people of color in the classroom. We demand to know if grading is anonymized in the classroom to control for Pesta's biases against students of color. We demand to know if Pesta is following the correct university, state, and federal protocols when sharing data with Kirkegaard and other collaborators."

73)     On September 11, 2020, Dr. Pesta met with CSU's Dean Kenneth Kahn over zoom because of Theo Desmond's demands.

74)     Instead of defending Dr. Pesta's First Amendment rights from would-be censors like Theo Desmond, Dean Kahn indicated that the CSU Administration would be subjecting Dr Pesta to an investigation along the lines suggested by Theo Desmond.

14

75)     Upon information and belief, just such an investigation was undertaken at the behest of the CSU Administration in the wake of the meeting on September 11, 2020, which yielded no evidence of any malicious animus on the part of Dr. Pesta.

76)     Further still, on or about April 6, 2021, another individual identified as Dr. Kent Taylor, hailing from the Lundquist Institute, and purporting to be a professor of pediatrics at UCLA School of Medicine wrote CSU's President Sands.

77)     In said letter, the individual identified as Dr. Kent Taylor referenced "Global Ancestry and Cognitive Ability," and stated that "The authors offered the conclusion that, 'Results converge on genetics as a potential partial explanation for group mean differences in intelligence.' Use of NIH data for studies of racial differences in this way is both a violation of data use agreement and unethical."

78)     Thus, Dr. Kent Taylor: a) identified a conclusion of Dr. Pesta's work which happens to be at variance with government policy and is interdicted by powerful taboos; and b) instead of squarely disputing the truth or falsity of the conclusion at variance with government policies, accused Dr. Pesta of ethical violations as a means of silencing Dr. Pesta without having to refute his conclusions.

79)     The activists succeeded as CSU buckled under the pressure of the controversy of the generated by the censors identified as Dr. Jedidiah Carlson, Dr. Cathryn Townsend, Kevin Bird, Os Keyes, Liam O'Brien, Theo Desmond, Dr. Kent Taylor, as well as the "Student Socialist Society CSU."

80)     On or about the Spring of 2021, the CSU Administration, including President Sands, Provost Bloomberg, Dr. Benjamin Ward, and others instituted a committee to investigate Dr. Pesta because of his part in "Global Ancestry and Cognitive Ability."

81)     In taking such action, the CSU Administration, including President Sands, Provost Bloomberg, Dr. Benjamin Ward, and others, were acting at the behest of the censors identified as Dr. Jedidiah Carlson, Dr. Cathryn Townsend, Kevin Bird, Os Keyes, Liam O'Brien, Theo Desmond, Dr. Kent Taylor, as well as the "Student Socialist Society CSU," all of whom had taken issue with the content and viewpoint of Dr. Pesta's speech.

82)     The CSU Administration, including President Sands, Provost Bloomberg, Dr. Benjamin Ward, and others, did not take any adverse actions against any CSU students or faculty who were critical of Dr. Pesta's speech, such as Liam O'Brien, or any students or faculty connected to the "Student Socialist Society at CSU."

83)     However, in taking such action against Dr. Pesta, the CSU Administration engaged in viewpoint discrimination.

84)     In taking such action, the CSU Administration, including President Sands, Provost Bloomberg, Dr. Benjamin Ward, and others, all knew they were working to silence a controversial and unpopular point of view.

85)     The committee so instituted consisted of Dr. Christopher Mallett, Dr. Conor McLennan, and Dr. Wendy Regoeczi, with the cooperation of Dr. Benjamin Ward, and others.

86)     The committee members investigating Dr. Pesta accepted their appointments on or about June 29, 2021.

16

87)     Prior to conducting any of the interviews related below, the committee members all read through and familiarized themselves with the September of 2019 joint letter from Dr. Jedidiah Carlson, Dr. Cathryn Townsend, Kevin Bird, and Os Keyes, as well as the April 6, 2021, letter from Dr. Kent Taylor.

88)     So too did Provost Bloomberg read through and familiarize herself with the September of 2019 joint letter from Dr. Jedidiah Carlson, Dr. Cathryn Townsend, Kevin Bird, and Os Keyes, as well as the April 6, 2021, letter from Dr. Kent Taylor.

89)     So too did President Sands read through and familiarize himself with the September of 2019 joint letter from Dr. Jedidiah Carlson, Dr. Cathryn Townsend, Kevin Bird, and Os Keyes, as well as the April 6, 2021, letter from Dr. Kent Taylor.

90)     Thus, even before any interviews were undertaken, the committee of Dr. Christopher Mallett, Dr. Conor McLennan, and Dr. Wendy Regoeczi, along with Dr. Benjamin Ward, and Provost Bloomberg, and President Sands all understood that content-specific and viewpoint specific considerations loomed heavily over the investigation that was being undertaken.

91)     On September 7, 2021, CSU, through its agents Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward, conducted an interview with Dr. Pesta.

92)     In the course of said interview, CSU's agents specifically acknowledged that Pesta was working and publishing in a controversial field.

93)     As such, CSU, through its agents Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward, all had notice that Pesta would need the maximum protections offered by academic freedom.

94)     On September 7, 2021, CSU, through its agents Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward, were informed by Pesta that he had already been intimidated to such an extent that he was willing to retract his controversial research, regardless of the fact that it had not been squarely disputed.

95)     CSU, through its agents Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward, were therefore on notice that they were failing to effectively secure Pesta's academic freedom.

96)     Indeed, CSU, through its agents Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward, understood that they themselves had effected the violation of Pesta's academic freedom and First Amendment rights.

97)     Indeed, CSU, through its agents Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward, understood that their actions could result in the diminution of knowledge and would contribute to ignorance.

98)     Instead of reversing course, CSU, through its agents Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward, continued on an unlawful path with the conscious intent to foment ignorance.

99)     On September 30, 2021, CSU, through its agents Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward, interviewed Dr. Jedidiah Carlson, Dr. Cathryn Townsend, and Kevin Bird, who had previously complained about Pesta.

100)    In the course of said interview, Dr. Jedidiah Carlson, Dr. Cathryn Townsend, and Kevin Bird again made clear that their chief complaint against Pesta lay with his conclusions on the genetic basis for the mean differences in general intelligence between White and Black Americans.

101)    Thus, in the course of said interview, Dr. Jedidiah Carlson, Dr. Cathryn Townsend, and Kevin Bird made statements such as "I pay attention to racist applications of genetic data and groups that do publish research aligning one way, especially the many of the co-authors on this paper [viz. Pesta's ""Global Ancestry and Cognitive Ability" a/k/a "Lasker et al. 2019"]."

102)    Indeed, Dr. Jedidiah Carlson, Dr. Cathryn Townsend, and Kevin Bird made clear that they only began looking into the methodology of Pesta's research because they were hostile to the conclusions Pesta had reached, stating "And so we started looking into, [sic] was this actually inappropriate use of NIH data? Are there, or was there, something kind of gone wrong when it was used for a paper like this?"

103)    Kevin Bird in particular took issue with what he said was "[testing] basically the genetic hypothesis of the cause of the racial IQ gap."

104)    Indeed, on September 30, 2021, Kevin Bird and his colleagues repeatedly acknowledged that there is in fact a "racial IQ gap," but made clear to the CSU agents that what they took issue

19

with was any probing of the point of view that such "racial IQ gap" was caused by genetic as opposed to environmental factors, *e.g.*:

> "something like the hereditarian hypothesis, kind of a long-standing racist theory, would probably not be within their purview of ethical research."
>
>  And:
>
> "[T]here would need to have been some kind of justification for why the research provided some kind of benefit that outweighed any potential risk to this research, which I don't really see. I don't see any kind of plausible argument that they could have made for that, if they had been truthful about the purpose."

105)    Kevin Bird and colleagues made clear that they wanted no testing of "the hereditarian hypothesis" of "the racial IQ gap," meaning that they expected CSU to throw a "pall of orthodoxy" over this subject.

106)    On September 28, 2021, CSU, acting through Dr. Wendy Regoeczi, sent an email to another person who had complained about Pesta, Dr. Kent Taylor; specifically,  Dr. Wendy Regoeczi contacted Dr. Taylor in anticipation of an interview that would be held on October 5, 2021.

107)    In said email of September 28, 2021, CSU, acting through Dr. Wendy Regoeczi, asked Dr. Taylor to expand on his earlier letter to President Sands and explain how Pesta's use of NIH data for studies of racial differences was "both a violation of the data use agreement and unethical."

108)    On September 29, 2021, Dr. Taylor responded with an email of his own.

109)     In said response, the very first thing Dr. Taylor mentioned was his concern with the conclusion of "Global Ancestry and Cognitive Ability" (a/k/a "Lasker et al., 2019"), *viz.* "…my concern is with the final sentence of the abstract of Lasker et al., 2019, 'Results converge on genetics as a potential partial explanation for group mean differences in intelligence.' In my opinion, this statement conflicts with the NIH policy NOT-OD-07-088 on taking care that data avoids stigmatization of US population sub-groups."

110)     Dr. Taylor went on: "In my opinion use of dbGaP data to support the conclusion that there are genetic differences in intelligence is an unethical use of the data that my colleagues and I work so hard to collect to advance medial science. I do recognize that Dr. Pesta disagrees with me on this issue, well documented by the various articles published in psych[sic] …"

111)     Moreover, during Dr. Taylor's October 5, 2021, interview with CSU agents Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward, Dr. Taylor made clear that he was firmly in the "environment only" camp that is ideologically opposed to Dr. Pesta's point of view, *e.g.*:

> "….there's lots of things missing [from "Global Ancestry and Cognitive Ability"]. And there's lots of things that would address the issue.[sic] There's a lot of things on socio-economic status that are missing, there's a lot of considerations that are most likely in the data set that are not here in this paper."

112)     Also during CSU's Zoom interview of Dr. Taylor on October 05, 2021, committee members asked:

"Would an [Institutional Review Board] be required to approve [the ethics of Pesta's research]?"

To which Dr. Taylor replied:

"I'm sorry, I don't know that an IRB would approve it…[Lasker et al.] is stigmatization, and we're very careful not to do this sort of thing, quite frankly, it's a misuse of the data. We have so many research questions – why are we doing this?"

Thereafter, at that same meeting, committee members asked Dr. Taylor:

"I'm wondering in your professional opinion if you think the work from Dr. Pesta and his colleagues deviates from commonly accepted practice in the academic community for proposing, conducting, and reporting research?"

To which Dr. Taylor replied:

"In my work, this is clearly outside of what you should be doing."

113)    In both his email to CSU, and his Zoom interview, Dr. Taylor was therefore confirming for CSU that what alarmed him most was the viewpoint expressed in Pesta's conclusion about the link between genetics, race, and intelligence.

114)    Indeed, on October 5, 2021, Dr. Taylor made clear, for the benefit of CSU, that his intent was to interdict any inquiry into the subject of genetics, race, and intelligence, flatly stating:

"The reason I wrote to the President was it was just concerning that this is not something that could be done.. [sic]… We have cognitive data as well, I could not use it for this kind of a study in MESA or TOPMed.[sic] Any study that I know.

22

But I did notice that we (MESA, TOPMed) specifically say it can't be used for

this in the agreements as part of the dbGap documentation… That it can't be used

for this kind of study of the subpopulations in the county."

115)    In the above statement, Dr. Taylor betrayed the fact that even in the hard sciences there

are powerful constraints against "uninhibited, robust and wide-open debate" where the subject is

genetics, race, and intelligence.

116)    Furthermore, in the above statement Dr. Taylor made clear that he expected those

constraints to take hold even in the academy, where he and those of his ideological persuasion

would throw a "pall of orthodoxy" over this subject and prohibit inquiry.

117)    Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin

Ward understood that Dr. Taylor was demanding a "pall of orthodoxy."

118)    Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin

Ward understood that Dr. Taylor's pall of orthodoxy was a flagrant violation of academic

freedom and Dr. Pesta's First Amendment rights.

119)    Nevertheless, CSU, through Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy

Regoeczi, and Dr. Benjamin Ward intentionally violated Dr. Pesta's academic freedom and First

Amendment rights by acceding to Dr. Taylor's unlawful and totalitarian demands.

120)    CSU's Investigatory Committee would go on to issue a report dated January 13, 2022,

which stated, "The Committee members were, of course, aware of the research topics

investigated and the controversial nature of the scholarship in which Dr. Pesta and his colleagues

examined race/ethnicity, heritable traits, and intellectual ability; a controversy with a long history

and a more recent undercurrents," which again serves to underscore the fact that CSU knew of the controversial nature of Dr. Pesta's work when taking action against him.

121)    The said committee of Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward recommended terminating Dr. Pesta.

122)    The said committee of Dr. Christopher, Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward recommended terminating Dr. Pesta's as a way to appease censors such as Dr. Jedidiah Carlson, Dr. Cathryn Townsend, Kevin Bird, Os Keyes, Liam O'Brien, Theo Desmond, Dr. Kent Taylor, as well as the "Student Socialist Society CSU," or for other illicit reasons.

123)    The said committee of Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward thereby undertook viewpoint discrimination against Dr. Pesta.

124)    The said committee of Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward knowingly and intentionally undertook such invidious viewpoint discrimination against Dr. Pesta.

125)    Indeed, throughout the interviews on both September 30, 2021, and October 5, 2021, CSU, through its agents Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward signaled their intent to placate Dr. Pesta's critics by failing to ever defend his rights; and even going so far as to plead with, and fawn over, the censors calling for viewpoint discrimination against Dr. Pesta, *e.g.* in response to the clear calls for viewpoint discrimination on September 30, 2021, Dr. Christopher Mallett assured Pesta's censors that "Hopefully, you can see that we, as a university take this very seriously…"

126)    One of the ways, amongst others, that CSU signaled its intent to appease Dr. Pesta's

critics was by removing links to prior work by Pesta on its "Engaged Scholarship at CSU" page.

127)    CSU maintains a webpage exhibiting the socially relevant scholarship of scholars

affiliated with CSU at a web page found at " https://engagedscholarship.csuohio.edu/.

128)    Prior to the complaints of would be censors Dr. Jedidiah Carlson, Dr. Cathryn Townsend,

Kevin Bird, Os Keyes, Liam O'Brien, Theo Desmond, Dr. Kent Taylor, as well as the "Student

Socialist Society CSU," CSU had maintained a link to another article Pesta had authored that

dealt with the Black-White IQ gap.

129)    That earlier article was entitled "Black-White differences on IQ and grades: The

mediating role of elementary cognitive tasks" which Pesta had published in 2008, in the elite

academic journal Intelligence (*viz*. Intelligence, 36, 323-329).

130)    However, in the wake of the controversy over "Global Ancestry and Cognitive Ability,"

CSU removed the link to Dr. Pesta's "Black-White differences on IQ and grades: The mediating

role of elementary cognitive tasks" article from its "Engaged Scholarship at CSU" page.

131)    Nor has CSU ever linked to "Global Ancestry and Cognitive Ability" on its "Engaged

Scholarship at CSU" page, which is another manifestation of CSU's censorious hostility to Dr.

Pesta and its intent to maintain the unlawful palls of orthodoxy demanded by censors such as Dr.

Jedidiah Carlson, Dr. Cathryn Townsend, Kevin Bird, Os Keyes, Liam O'Brien, Theo Desmond,

Dr. Kent Taylor, as well as the "Student Socialist Society CSU."

132) By decision dated January 13, 2022, which was effected March 4, 2022, Provost Bloomberg accepted the recommendation of the said committee and terminated Dr. Pesta's employment at CSU.

133) In taking such action, Provost Bloomberg also acted to appease the censors identified as Dr. Jedidiah Carlson, Dr. Cathryn Townsend, Kevin Bird, Os Keyes, Liam O'Brien, Theo Desmond, Dr. Kent Taylor, as well as the "Student Socialist Society CSU," or for other illicit reasons.

134) In taking such action, Provost Bloomberg had monitored and then reviewed the investigation of Dr. Pesta by Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward, including the interviews on September 7, 2021, September 30, 2021, October 5, 2021, and October 11, 2021.

135) In taking such action, Provost Bloomberg knew that she was taking part in viewpoint discrimination, which she understood was an egregious First Amendment violation.

136) President Sands was aware of the actions taken against Dr. Pesta, as he had been monitoring Dr. Pesta's situation at least since October 7, 2020, when he received two letters from the Foundation for Individual Rights and Expression (FIRE) sent on behalf of Dr. Pesta, which defended Pesta's First Amendment rights with respect to the controversy being instigated by the likes of Pesta's would be censors over "Global Ancestry and Cognitive Ability."

137) At any time throughout, President Sands, as the chief executive officer of CSU, held authority over Provost Bloomberg, and the investigative committee of Dr. Pesta by Dr.

Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward, and could have halted or overruled their actions.

138)    However, President Sands either acquiesced in the actions taken against Dr. Pesta or even countenanced such actions.

139)    At all times described above, Defendants President Sands, Provost Bloomberg, Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward were clothed with authority from the state and acted under color of law and were state actors.

140)    Nevertheless, as state actors operating under color of law, Defendants President Sands, Provost Bloomberg, Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward came into conflict with the superior authority of the Constitution, the First and Fourteenth Amendments, and were therefore stripped of their official or representative character and are rightly subjected in their persons to the consequences of their lawless conduct.

**COUNT I: FIRST AMENDMENT RETALIATION AGAINT CSU AND PROVOST BLOOMBERG, PRESIDENT SANDS, AND PROFESSORS MALLETT, McLENNAN, REGOECZI, AND WARD FOR THE INVESTIGATION OF DR. PESTA**

141)    Dr. Pesta restates the allegations of Paragraphs 1 through 140 and incorporates them here as if fully rewritten.

142)    Dr. Pesta spoke as a citizen and not as an employee in his contributions to "Global Ancestry and Cognitive Ability."

143)     In the alternative, it is irrelevant whether Dr. Pesta was speaking as a citizen and not an employee by his contributions to "Global Ancestry and Cognitive Ability."

144)     Dr. Pesta's speech in "Global Ancestry and Cognitive Ability" involved matters of public concern.

145)     CSU, Provost Bloomberg, President Sands, and Professors Mallett, McLennan, Regoeczi, and Ward lacked any justification for treating Dr. Pesta differently from the general public based on CSU's needs as an employer under any balancing tests.

146)     Indeed, on the contrary, said Defendants owed an affirmative duty to Dr. Pesta to provide an atmosphere of free speech where controversial positions could be probed without regard to offending the likes of Dr. Jedidiah Carlson, Dr. Cathryn Townsend, Kevin Bird, Os Keyes, Liam O'Brien, Theo Desmond, Dr. Kent Taylor, the "Student Socialist Society CSU, or any other person or entity offended by "Global Ancestry and Cognitive Ability."

147)     Dr. Pesta therefore engaged in protected speech when he contributed to "Global Ancestry and Cognitive Ability."

148)     CSU, Provost Bloomberg, President Sands, and Professors Mallett, McLennan, Regoeczi, and Ward took adverse action against Dr. Pesta that would deter a person of ordinary firmness from continuing to engage in such conduct when they caused an investigation and investigated Dr. Pesta.

149)     Furthermore, President Sands acquiesced in or even countenanced Dr. Pesta's investigation.

150)    That investigation was motivated at least in part by Dr. Pesta's protected conduct in contributing to "Global Ancestry and Cognitive Ability."

151)    As a proximate result, Dr. Pesta was injured in his good name, vocation, and well-being; and is entitled to damages from Defendants.

152)    The above individual Defendants are all academics of decades long standing within the academy and as such fully understood the importance of freedom of speech and academic freedom for the proper functioning of a state university.

153)    In taking such actions, the above individual Defendants were motivated by conscious ill will or malice, or at the very least, a reckless disregard of Dr. Pesta's rights, warranting punitive damages.

154)    Furthermore, the above individual Defendants were conscious of the fact that they were acceding to viewpoint discrimination, one of the most egregious forms of First Amendment violations, which warrants punitive damages.

## COUNT II: FIRST AMENDMENT RETALIATION AGAINT CSU, PROVOST BLOOMBERG, AND PRESIDENT SANDS FOR THE TERMINATION OF DR PESTA.

155)    Dr. Pesta restates the allegations of Paragraphs 1 through 154 and incorporates them here as if fully rewritten.

156)    Dr. Pesta spoke as a citizen and not as an employee in his contributions to "Global Ancestry and Cognitive Ability."

29

157)     In the alternative, it is irrelevant whether Dr. Pesta was speaking as a citizen and not an employee by his contributions to "Global Ancestry and Cognitive Ability."

158)     Dr. Pesta's speech in "Global Ancestry and Cognitive Ability" involved matters of public concern.

159)     CSU, Provost Bloomberg, and President Sands lacked any justification for treating Dr. Pesta differently from the general public based on CSU's needs as an employer under any balancing tests.

160)     Indeed, on the contrary, said Defendants had an affirmative duty to Dr. Pesta to provide an atmosphere of free speech where controversial positions could be probed without regard to offending the likes of Dr. Jedidiah Carlson, Dr. Cathryn Townsend, Kevin Bird, Os Keyes, Liam O'Brien, Theo Desmond, Dr. Kent Taylor, the "Student Socialist Society CSU, or any other person or entity offended by "Global Ancestry and Cognitive Ability."

161)     Dr. Pesta therefore engaged in protected speech when he contributed to "Global Ancestry and Cognitive Ability."

162)     CSU, Provost Bloomberg, and President Sands took adverse action against Dr. Pesta that would deter a person of ordinary firmness from continuing to engage in such conduct when Dr. Pesta was fired by decision dated January 13, 2022, which was effective March 4, 2022.

163)     Furthermore, President Sands acquiesced in or even countenanced Dr. Pesta's firing.

164)     That firing was motivated at least in part by Dr. Pesta's protected conduct in contributing to "Global Ancestry and Cognitive Ability."

165)    As a proximate result, Dr. Pesta was injured in his good name, vocation, and well-being; and is entitled to damages from Defendants, including but not limited to both back pay and front pay.

166)    The above individual Defendants are all academics of decades long standing within the academy and as such fully understood the importance of freedom of speech and academic freedom for the proper functioning of a state university.

167)    In taking such actions, the above individual Defendants were motivated by conscious ill will or malice, or at the very least, a reckless disregard of Dr. Pesta's rights, warranting punitive damages.

168)    Furthermore, the above individual Defendants were conscious of the fact that they were acceding to viewpoint discrimination, one of the most egregious forms of First Amendment violations, which warrants punitive damages.


**COUNT III: DECLARATORY AND INJUNCTIVE RELIEF AGAISNT CSU**

169)    Dr. Pesta restates the allegations of Paragraphs 1 through 168 and incorporates them here as if fully rewritten.

170)    There is presently at CSU a *de facto* policy of refusing to extend academic freedom to those such as Dr. Pesta who research and publish on the controversial topic of race, genes, and intelligence from the hereditarian point of view.

171)     This *de facto* policy has directly harmed Pesta through the investigation and termination detailed above, as well as in the refusal of CSU to link to Pesta's research on its "Engaged Scholarship at CSU" page.

172)     Accordingly, there is an actual controversy between Pesta and CSU.

173)     Scholarship and education cannot survive in an atmosphere of suspicion.

174)     Yet such an atmosphere hangs over any, like Pesta, who advance the "genetic hypothesis of the cause of the racial IQ gap" or the "hereditarian hypothesis" (*viz*. Pesta's censor, Kevin Bird, at Paragraphs 103 and 104 above).

175)     Moreover, in Pesta's case, the anti-intellectual forces have progressed (or declined) from an atmosphere of suspicion to outright persecution, which now holds sway at CSU.

176)     What is at stake is not simply Pesta's point of view, but the viability of all scholarship and education in this field at CSU, and likely elsewhere.

177)     "Freedom of speech has become a central concern of the Western society because of the discovery among the Greeks that **dialectic, as demonstrated in the Socratic dialogues, is a principal method of attaining truth..** 'The ability to raise searching difficulties on both sides of a subject will,' said Aristotle, 'make us detect more easily the truth and error about the several points that arise.'"" – all of which is true.

178)     But yet: "The method of dialectics is to confront ideas with opposing ideas in order that the pro and con of the dispute will lead to true ideas." – which is also true.

179)     To the contrary, the demand of censors such as Kevin Bird and his ilk is that the controversial topic of race, genes, and intelligence be spared the rigors of dialectic, so that the "environmental hypothesis" cannot be challenged.

180)     Under such intellectual and moral cowardice, even Bird's "environmental hypothesis" is reduced to a dead dogma, bereft of any grounding in real scholarship or education which has been spared the rigors of dialectic.

181)     To be sure, Pesta does not maintain that his own research on this controversial topic is the last or definitive word on the topic; nor does he seek a dogmatic declaration that his research has been proved correct.

182)     But Pesta does seek a declaration that such research into the controversial topic of race, genes, and intelligence is under assault for reasons wholly removed from valid scientific criteria, as demonstrated by the statements that CSU itself collected from Dr. Jedidiah Carlson, Dr. Cathryn Townsend, Kevin Bird, and Dr. Kent Taylor which are quoted at Paragraphs 101-104, 109, 110, 112 and 114 above.

183)     Moreover, this anti-intellectual assault is connected to, and draws strength from, broader taboos within American culture, as detailed at Paragraphs 59 through 61 above.

184)     There is thus the danger that even within the academy, which "occupies a special niche in our constitutional tradition," a "pall of orthodoxy" will continue to be thrown over this important topic.

185)     By such declaration, Pesta's case would be transformed from an extremely negative example of exemplary destruction, meant to effectively chill academic freedom, to a ringing

33

endorsement of a professor's right to "to examine all options, no matter how unpopular or unorthodox, without concern that [his] career will be indelibly marred by daring to think along nonconformist pathways."

186)    Accordingly, Pesta seeks a declaratory judgment:

a)  Declaring that the hereditarian hypothesis into the long-standing racial gap in IQ is worthy of study, but is presently under assault for reasons wholly removed from valid scientific criteria; and

b)  Declaring that to those, like Pesta, who advance a hereditarian hypothesis in the study of race, genetics, and intelligence are entitled to academic freedom; and

c)  Declaring that CSU in particular must extend full academic freedom to any, such as Pesta, who advance a hereditarian hypothesis in the study of race, genetics, and intelligence; and

d)  Declaring that CSU may not utilize any aspect of the investigation undertaken by Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward to interfere with Pesta's academic freedom.

187)    Furthermore, Pesta seeks, and is entitled to, a preliminary injunction prior to judgment in this case and a permanent injunction thereafter enjoining CSU:

a)  to re-establish the link to Pesta's earlier article entitled "Black-White differences on IQ and grades" on the CSU "Engaged Scholarship at CSU" page; and

34

b)  to establish a link to Pesta's groundbreaking article "Global Ancestry and Cognitive Ability" on the "Engaged Scholarship at CSU" page; and

c)  to extend academic freedom to those, like Pesta, who advance a hereditarian hypothesis in the study of race, genetics, and intelligence; and,

d)  to award Pesta full back pay from the date of termination to the date his pay becomes re-instated; and

e)  to pay Pesta's full salary during the pending of this lawsuit; and

f)  from relying on any part of the investigation of Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward to justify terminating  Pesta's tenured professorship; and

g)  to reinstate Pesta to his full tenured professorship with no further interference of his academic freedom and First Amendment rights based on the investigation of Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward.

188)  Pesta will suffer irreparable harm absent such injunctive relief, given that the denial of his regular salary is causing and will continue to cause hardship, which cannot be undone.

189)  Pesta is likely to prevail on the merits in this litigation.

190)  The balance of equities favors Pesta.

191)  The public interest favors Pesta as the public interest itself lies squarely with the vigorous exercise of First Amendment rights and the protection of academic freedom.

WHEREFORE, Dr. Pesta demands:

As to Count One, compensatory damages in an amount to be determined at trial, but in excess of $25,000, together with punitive and exemplary damages, and attorneys' fees as provided by 42 U.S.C. §§1983 and 1988;

As to Count Two, compensatory damages in an amount to be determined at trial, but in excess of $25,000, together with punitive and exemplary damages, and attorneys' fees as provided by 42 U.S.C§§1983 and 1988;

As to Count Three, a declaratory judgment:

a)     Declaring that the hereditarian hypothesis into the long-standing racial gap in IQ is worthy of study, but is presently under assault for reasons wholly removed from valid scientific criteria; and

b)     Declaring that to those, like Pesta, who advance a hereditarian hypothesis in the study of race, genetics, and intelligence are entitled to academic freedom; and

c)     Declaring that CSU in particular must extend full academic freedom to any, such as Pesta, who advance a hereditarian hypothesis in the study of race, genetics, and intelligence; and

d)     Declaring that CSU may not utilize any aspect of the investigation undertaken by Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward to interfere with Pesta's academic freedom.

And a Permanent Injunction enjoining CSU:

36

a) to re-establish the link to Pesta's earlier article entitled "Black-White differences on IQ and grades" on the CSU "Engaged Scholarship at CSU" page; and

b) to establish a link to Pesta's groundbreaking article "Global Ancestry and Cognitive Ability" on the "Engaged Scholarship at CSU" page; and

c) to extend academic freedom to those, like Pesta, who advance a hereditarian hypothesis in the study of race, genetics, and intelligence; and,

d) to award Pesta full back pay from the date of termination to the date his pay become re-instated; and

e) to pay Pesta's full salary during the pending of this lawsuit; and

f) from relying on any part of the investigation of Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward justify terminating Pesta's tenured professorship; and

g) to reinstate Pesta to his full tenured professorship with no further interference of his academic freedom and First Amendment rights based on the investigation of Dr. Christopher Mallett, Dr. Conor McLennan, Dr. Wendy Regoeczi, and Dr. Benjamin Ward;

h) together with attorney's fee pursuant to 42 U.S.C§§1983 and 1988.

Dated:      Goshen, New York                  Respectfully submitted,
            March 16, 2023


                                             Frederick C. Kelly, Esq.
                                             Law Office of Frederick C. Kelly
                                             *Attorney for Plaintiff Bryan J. Pesta*
                                             One Harriman Square
                                             Goshen, New York 10924
                                             (845) 294-7945
                                             fckellylaw@protonmail.com
                                             Bar No. NY4377297