IN THE U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

-------------------------------------------------------------------------X

BRYAN J. PESTA,

                                                  Case No 1:23-cv-00546

                    Plaintiff,

    - against -

                                                  Assigned Judge:

CLEVELAND STATE UNIVERSITY,         Daniel Aaron Polster

LAURA BLOOMBERG, HARLAN M. SANDS,

BENJAMIN WARD, CHRISTOPHER MALLETT,

CONOR McLENNAN, and WENDY REGOECZI,

in their individual and official capacities;

                                        Defendants

-------------------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DISMISSAL**

Dated: Goshen, New York      Respectfully submitted,
        June 20, 2023

                                         <u>/s/ Frederick C. Kelly</u>

                                         Law Office of Frederick C. Kelly, Esq.

                                         *Attorney for Plaintiff Bryan J. Pesta*

                                         One Harriman Square

                                         Goshen, New York 10924

                                         (845) 294-7945

                                         fckellylaw@protonmail.com

                                         Bar No. NY4377297

STANDARD OF REVIEW:

The inquiry here merely tests the sufficiency of the complaint. That "means we must accept the complaint's factual allegations as true and draw all reasonable inferences in" Pesta's favor. *Meriwether v. Hartop*, 992 F3d 492, 498 (6th Cir. 2021), *citing Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). Furthermore, "[u]nder this standard," any dismissal would be reversed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id. (quotations omitted)*.

> I: DEFENDANTS FAIL TO MAKE ANY SHOWING OF ELEVENTH AMENDMENT IMMUNITY UNDER THE PROPER NINE PART TEST ADOPTED BY THE SIXTH CIRCUIT.

We concede at the outset that many state colleges do in fact qualify for 11th Amendment Immunity. Thus, it may eventually transpire that CSU (and the individual defendants in their official capacities) are immune to Pesta's claims of monetary damages in the federal courts.

Even so, the showing here does not quite meet the bar. Defendants merely assert a right to 11th Amendment Immunity for CSU and the individual defendants in their official capacities, citing *Hall v. Medical College of Ohio at Toledo*, 742 F.2d 299 (1984); *McCormick v. Miami Univ.*, 693 F.3d 654 (6th Cir. 2012); *Kovacevich v. Kent State Univ.*, 224 F.3d 806 (6th Cir. 2000); and *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000).

But their own case law indicates that "[e]ach state university exists in a unique governmental context, and each must be considered on the basis of its own peculiar circumstances." *Hall v. Medical College of Ohio at Toledo* at 302, *quoting Soni v. Board of*

*Trustees*, 513 F.2d 347, 352 (6th Cir.1975), *cert. denied*, 426 U.S. 919 (1976). An actual demonstration of immunity requires Defendants to weigh CSU's unique context under the nine factor test the Sixth Circuit adopted from the Third in *Blake v. Kline*, 612 F.2d 718 (3rd Cir.1979), *cert. denied*, 447 U.S. 921 (1980). *Hall v. Medical College of Ohio at Toledo* at 302. While all nine factors are to be considered, two in particular are entitled to the most weight, *viz.* "To what extent does the institution, although carrying out a state mission, function with substantial autonomy from the state government?" and "To what extent is it financed independently of the state treasury?" *Id.*

Defendants fail to run this gamut. The lone factor they marshal for the Court is that CSU is a public university under Ohio Revenue Code §3344. But this bare fact tells us nothing about CSU's autonomy from the state government, nor does it provide any insight on the extent to which CSU is financed independently from the state; nor does it bear on any of the other *Blake v. Kline* factors. And Defendants do not proffer any authority that specifically addresses the status of CSU. Therefore, Defendants' moving papers demonstrate, at most, that the Medical College of Ohio at Toledo, Miami University, Kent State University, and the University of Cincinnati are entitled to 11th Amendment immunity. We can say nothing definitive about CSU on this showing. Nor can Defendants come back on reply to attempt to supply the defects of their moving papers. *Meriwether v. Hartop* at 518; *Sanborn v. Parker*, 629 F3d 554, 579 (6th Cir. 2010).

Furthermore, even if Defendants ever do make a successful showing of 11th Amendment immunity, it will not spare Defendants from Pesta's claims for prospective injunctive and declaratory relief, nor will it operate to absolve the individual defendants in their personal

capacities. These points are addressed below.

### II: ELEVENTH AMENDMENT IMMUNITY DOES NOT EXTEND TO THE DECLARATORY AND PROSPECTIVE INJUNCTIVE RELIEF IN PESTA'S COMPLAINT.

In the event that the Court does grant 11th Amendment Immunity, it still cannot dismiss CSU (and the individual defendants in their official capacities) entirely from this case. Defendants invoke *Mikel v. Quin*, 58 F.4th 252, 256 (6th Cir. 2023) and *McCormick v. Miami Univ.* at 661–62 for the blanket assertion that "Eleventh Amendment immunity 'bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments," but the law is actually more nuanced than they allow. The key word from *Mikel* is "generally" (as in, ""[s]overeign immunity generally bars lawsuits against States [and] their agencies" *Mikel, Id.)* which is the crucial qualification.

The rule is that 11th Amendment immunity "limits, but does not entirely prohibit, lawsuits against state officials in their official capacity." *Mikel v. Quin* at 256. Indeed, although Defense Counsel failed to note it, their own case law is against them, for *Mikel* itself went on to clarify:

> Under *Ex parte Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908), federal courts may award injunctive and declaratory relief against state officials when the relief is "designed to end a continuing violation of federal law."... Put differently, *Ex parte Young* applies only when a plaintiff targets "an ongoing violation of federal law and seeks" prospective relief.
>
> *Id.* at 256-257 (quoting and citing *Green v. Mansour*, 474 U.S. 64, 68 (1985); *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437–38 (2004); and *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

The *Mikel* court noted that plaintiff had alleged violations of federal law and sought declaratory and prospective injunctive relief. *Id.* at 257. As such, sovereign immunity was no bar because, "That kind of claim sits well within the heartland of *Ex parte Young*." *Id*.

But here, too, Pesta, who was a fully tenured professor, has alleged ongoing violations of federal law and sought declaratory and prospective injunctive relief to end those violations. *DKT 1, at ¶¶16–17, 126–131, 170–171, 174–176, 179–186, and 187–191*. Defendants' violation of Pesta's tenure, their maintenance of an atmosphere of suspicion, their ongoing refusal to maintain links to Pesta's scholarship on the CSU webpage, as well as the *de facto* policy of refusing to extend academic freedom for those holding Pesta's viewpoint, are ongoing and continuing violations. His claim, too, therefore "sits well within the heartland of *Ex parte Young*."

*Kovacevich v. Kent State University*, which is also cited by Defendants, does not help their cause. It also explicitly recognizes an *Ex parte v Young* exception to sovereign immunity. *Id.* at 817.

It "makes no difference whether" Pesta's "§1983 claim fails on the merits" as to CSU and the individual defendants in their official capacities. *Mikel v. Quin* at 257. For at this procedural junction, "we ask only whether the action alleges an ongoing violation of federal law. We do not ask whether the allegation is true." *Id., citing Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.* at 646.

Defendants make no argument in their moving papers that Pesta has not alleged an ongoing violation of federal law, nor have they argued that prospective injunctive and declaratory relief would not offer redress to Pesta. They have therefore waived any such argument, and again

cannot remedy such fatal defects in their moving papers by springing an ambush on reply. *Meriwether v. Hartop* at 518; *Sanborn v. Parker* at 579.

> III: THERE IS NO QUALIFIED IMMUNITY FOR STATE ACTORS WHO ABUSE GOVERNMENT REGULATIONS TO PRACTICE VIEWPOINT DISCRIMINATION, PARTICULARLY WHEN THOSE STATE ACTORS ARE SEASONED ACADEMICS.

Defendants make the startling assertion that Pesta "has not alleged sufficient facts to show that his interest outweighs the Individual Defendants' interest in promoting the efficiency of the public services they perform for the University." *DKT. 5, p. 8*. They invoke, of all things, *Buddenberg v. Weisdack*, 939 F.3d 732, 740 (6th Cir. 2019) a case which rests on the balancing test from *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)[1].

But with the Sixth Circuit's decision in *Meriwether v. Hartop*, the law in this circuit was that *Garcetti* had no application to cases alleging First Amendment retaliation within an academic setting, *viz. Meriwether* at 504: "Here, the threshold question is whether the rule announced in *Garcetti* bars Meriwether's free-speech claim.  It does not."  The Sixth Circuit thereby joined the Fourth, Fifth, and Ninth Circuits in rejecting *Garcetti* when presented with a professor's speech in an academic setting*. Id.* at 505, *citing to and quoting Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 563 (4th Cir. 2011), *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 694 n.11 (4th Cir. 2007),  *Buchanan v. Alexander*, 919 F.3d 847, 852–53 (5th Cir.

---

[1] *Buddenberg's* debt to *Garcetti* is explicitly acknowledged even in Defendants' moving papers.  *DKT. 5, p. 8.*

2019), and *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014). (*Buddenberg v. Weisdack*, decided on September 20, 2019, preceded *Meriwether* by well over a year, but it was readily distinguishable because it analyzed government action in the context of "the Geauga County Health District," decidedly not an academic setting. *Id*. at 735.)

*Meriwether* was decided on March 26, 2021. The committee by which CSU conducted their sham investigation of Pesta was not even instituted until June 29, 2021. *DKT. 1 at ¶ 86.* Thus, the *Garcetti* framework offered no excuse to the CSU Defendants at the time of their unlawful actions, and it is certainly an erroneous standard for CSU's attorneys to invoke before this Court now.

As noted above, Defendants erroneous legal framework is coupled with the assertion that Pesta "has not alleged sufficient facts to show that his interest outweighs the Individual Defendants' interest in promoting the efficiency of the public services they perform for the University." *DKT. 5, p. 8*. But in the first place, "'the efficient provision of services' by a university 'actually depends, to a degree, on the dissemination in public fora of controversial speech implicating matters of public concern'" (*Meriwether* at 510, *quoting Blum v. Schlegel*, 18 F.3d 1005, 1012 (2nd Cir. 1994)) – and Pesta has certainly pled that his speech was both controversial and a matter of public concern, *e.g. DKT. 1, ¶¶21–27, 34–37, 39–40.*

More importantly, Pesta has plausibly alleged that his research constituted controversial speech, by an academic, which challenges the premises of powerful and pervasive government policy, *e.g. DKT. 1, ¶¶19, 20, 21, 24, 28, 30, 34, 35, 36, 38, 39, 40, 533, 54, and 55*. As such, it is speech within the core of the area protected by the First Amendment.

*Rosenblatt v. Baer*, 383 US 75, 85 (1966) succinctly states the point: "Criticism of government is at the very center of the constitutionally protected area of free discussion." But an even more prestigious First Amendment case would be *New York Times Co. v. Sullivan*, 376 US 254 (1964). Justice Brennan appears to have mined the same vein in both opinions; hence *Sullivan's* recurring theme of the citizen-critic, *viz. New York Times Co. v. Sullivan* at 282-283 (especially the citation to *Whitney v. California*, 274 U.S. 357, 375(1927) (J. Brandeis, concurring); *but see also, New York Times Co. v. Sullivan* at 291, 292. As Professor Kalven observed in the wake of that landmark decision, *New York Times v. Sullivan* was supposed to reveal the following:

> The Amendment has a "central meaning"– a core of protection of speech without which democracy cannot function, without which, – in Madison's phrase, "the censorial power" would be in the Government over the people and not "in the people over the Government." This is not the whole meaning of the Amendment. There are other freedoms protected by it. But at the center there is no doubt what speech is being protected and no doubt why it is being protected. *Kalven, "The New York Times Case: A Note on 'The Central Meaning of The First Amendment,'" Supreme Court Review 191, 208 (1964).*

And we are presented here not simply with government criticism, but with criticism undertaken by a tenured professor in an academic setting. If the Court needed yet another reason to protect Pesta's speech, precedent from within the Sixth Circuit supplies it because "'a professor's rights to academic freedom and freedom of expression are paramount in the academic setting.'" *Meriwether* at 505, *quoting Bonnell v. Lorenzo*, 241 F.3d 800, 823 (6th Cir. 2001).

As government criticism emanating from an academic in a state university, Pesta's speech clearly merits the most comprehensive protection available under the First Amendment. The CSU Defendants come close to offering nothing to weigh against it. At best, they vaguely

suggest that CSU somehow needed to fire Pesta because of "research-ethics violations." *DKT. 5, pp. 9-10*.

But even if Pesta had committed "research-ethics violations," the CSU defendants do not even attempt to show that such alleged violations "either impeded the teacher's proper performance of his *daily duties in the classroom* or to have interfered with the *regular operation of the schools generally*.'" *Meriwether* at 511 (*emphasis supplied*), *quoting Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 680 (6th Cir. 2001), *quoting in turn Pickering v. Bd. of Educ.*, 391 U.S. 563, 572-73 (1968). And again, such a purported showing cannot be reserved for their reply.

Defendants also argue that the complaint itself reveals that their actions were not retaliatory, but motivated by Pesta's alleged misuse of NIH data, "in contravention of basic research ethics." *DKT. 5, p. 9*. This spin does violence to both FRCP 12 and the First Amendment.

In the first place, Pesta's complaint concedes no such thing. Indeed, *none* of the specific allegations referenced by Defense Counsel support such an inference (*viz. DKT. 1, Pesta's complaint at ¶¶30, 38, 77, 101-102, 107, 109-112, and 114*; *Cf. DKT. 5, p. 9*). To be clear, at no point has Pesta ever conceded that he actually violated "basic research ethics" (though the record may eventually disclose *de minimis* hyper-technicalities, which are certainly no concern under Rule 12). With regard to NIH data agreements on "stigmatizing subpopulation groups"/ NIH policy NOT-OD-07-088 – *which is the only specific charge Defendants make in their moving papers* – it must be said that even Pesta's censors, bad as they were, knew he never conceded any

such violation. Hence Dr. Taylor's acknowledgment at *DKT. 1, ¶¶109-110*:

> ...In my opinion, this statement [*viz*. Pesta's conclusion on genetic differences] conflicts with the NIH policy NOT-OD-07-088 on taking care that data avoids stigmatization of US population sub-groups... In my opinion use of dbGaP data to support the conclusion that there are genetic differences in intelligence is an unethical use of the data that my colleagues and I work so hard to collect to advance medial science. *I do recognize that Dr. Pesta disagrees with me on this issue, well documented by the various articles published in [the journal "Psych"]*. *Id.* at ¶¶109-110 (emphasis supplied).

It thus appears that Pesta's censors, who openly called for viewpoint discrimination, present a more generous and open minded stance than Defendants can muster here.

What Pesta's complaint *does* state is that Pesta's censors "accused Dr. Pesta of ethical violations as a means of silencing Dr. Pesta without having to refute his conclusions." *DKT. 1 at ¶78*. Pesta's censors were quite open about their ill-found motivations, which is why the CSU Defendants "all understood that content-specific and viewpoint specific considerations loomed heavily over the investigation that was being undertaken." *Id.* at ¶90; *Cf. Fantasy Book Shop, Inc. v. City of Boston*, 652 F.2d 1115, 1125 (1st Cir. 1981): "...where significant evidence of content-specific considerations looms in the background, courts must scrutinize the reasons asserted in support of a decision with the care necessary to preserve the First Amendment interests at stake..."

These allegations, which claim that Pesta's censors openly aimed at stifling debate on a controversial issue, doom any reliance by the CSU Defendants on their "investigation," at least at this juncture. The CSU Defendants are clearly alleged to have adopted, or at least acquiesced to, the motives of Pesta's censors. *DKT. 1, ¶¶79, 81, 83, 84, 87-90, 95–98, 117–119, 122–124,*

*133–135, 136–138*.  Under the pleadings, then, Pesta has plausibly alleged that an "unconstitutional animus infected the proceedings" from the very start.  *Meriwether* at 517.  That hostility permits (if it does not compel) the "plausible inference that the university was not applying a preexisting policy in a neutral way," but was rather using their policies "as pretexts for targeting" Pesta.  *Id*. at 515.

The pleadings only show that Pesta's censors did not have the courage to make a frontal attack on his politically explosive research – one which could always have been mounted by "more speech" which directly challenged Pesta's conclusions.  *Bible Bible Believers v. Wayne Cnty.,* 805 F.3d 228, 234 (6th Cir. 2015) (*quoting Whitney v California* at 377 (Brandeis, J., concurring)).  The complaint makes clear that they therefore worked backwards from his (allegedly illicit) conclusions, explicitly asking CSU to investigate Pesta *because of* the viewpoint disclosed in Pesta's research conclusions.  *DKT. 1, ¶¶77, 78, 102, 109*.  But that is forbidden: "If listeners react to speech based on its content and the government then ratifies that reaction by restricting the speech in response to listeners' objections, then the restriction is content-based."  *Center for Bio-Ethical v. Los Angeles County*, 533 F.3d 780, 789 (9th Cir. 2008).  The CSU defendants knew they were being asked to use purportedly neutral policies to transform their institution of higher learning into an "enclave of totalitarianism."  *Meriwether* at 510; *Cf., DKT 1 at ¶¶90, 100–102, 109–110, 113–119* .  Borrowing from a slightly different context, we might say that the First Amendment (no less than the Fifteenth) "nullifies sophisticated as well as simple-minded modes of discrimination."  *Lane v. Wilson*, 307 U.S. 268, 275 (1939).

That is certainly the law in the Sixth Circuit, where the rule is that "[W]hen passing on the validity of a regulation of conduct, which may indirectly infringe on free speech, [the Court]

weigh[s] the circumstances in order to protect, not to destroy, freedom of speech." *Bible Bible Believers v. Wayne Cnty* at 234. Pesta's complaint, insofar as it mentions the CSU investigation at all, makes clear that CSU Defendants did exactly the opposite: they deployed purportedly neutral policies to transform their institution of higher learning into an "enclave of totalitarianism." *DKT. 1 at ¶¶90, 100–102, 109–110, 113–119; Cf. Meriwether* at 510.

That fact pattern, taken directly from the complaint, precludes any defense of qualified immunity. *Bible Believers v. Wayne Cnty, supra.*, which can rightly be cited as something of a landmark First Amendment case within (and without) the Sixth Circuit, held that public officials vested with discretion cannot invoke even neutral regulations where they do so in response to "hostile opposition" to the speech. *Id.* at 247 and 252.

If the police, confronted with a potentially angry mob, were held to that standard as state actors, there is no colorable reason why seasoned academics should not be held to at least as strict a mandate when their duty was to protect the life of the mind in a sedate, academic setting. *Bible Believers v. Wayne Cnty* had been on the books for several years when the CSU Defendants undertook their actions. If a more recent reminder was necessary, then *Meriwether v. Hartop*, drawing on much the same tradition, should have sufficed. Both cases bind the CSU Defendants here and preclude any hope of qualified immunity.

> IV: NO RE-PLEADING OF THE COMPLAINT IS EVEN WARRANTED,
> LET ALONE THE DRASTIC REMEDY OF DISMISSAL.

Defendants complain about the length and detail of Pesta's complaint, but the crucial

issue is "whether 'the complaint is so 'verbose, confused and redundant that its true substance, if any, is well disguised.'" *Kensu v. Corizon, Inc.*, 5 F.4th 646, 651 (2021) (quotations omitted).

Pesta's complaint is not so disguised, and the CSU Defendants should have no trouble responding to each discrete allegation with the simple answers of "admit," "deny," or "deny knowledge or information..." provided by FRCP 8. There is no colorable argument that they cannot effectively do so. Indeed, Defendants' effort here (much like their "investigation" – leopards do not change their spots) appears to be a subtle, if not deceptive, attack on the true status of Pesta's speech.

As stated above (*Sullivan, Rosenblatt,* and *Kalven*), while the First Amendment protects many different kinds of speech, there is nevertheless a kind of speech which, by its character and quality, stands at the very center of the area protected by First Amendment, *viz. Kalven, supra.*: "There are other freedoms protected by it. But at the center there is no doubt what speech is being protected and no doubt why it is being protected."

Pesta asserts that his speech is of this character and quality. And good thing, too: there are strong institutional prejudices against Pesta at all levels of government. Even our state sponsored universities, those alleged "fierce guardians of intellectual debate and free speech" (*Meriwether* at 503), are obviously not immune to what Alexander Bickel once referred to as "the totalitarian tendency of the democratic faith." *Bickel*, <u>The Morality of Consent</u> (Yale Univ Press: New Haven, 1975), p. 12; *Cf. DKT. 1 at ¶¶60-62*. There is no reason to assume that even the courts are wholly immune from such influence. Indeed, it is telling that there are no opinions from our Supreme Court which openly weigh the evidence for, and possible consequences of,

significant genetic differences between the races. Unlike, say First Amendment cases presenting pornographic themes (*e.g., A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney Gen. of Mass..*, 383 U.S. 413, 446 (J. Clark, dissenting)), candid examination of the issues has been shunned. Yet as Justice Frankfurter observed long ago, "If adjudication is to be a rational process, we cannot escape a candid examination of the conflicting claims with full recognition that both are supported by weighty title-deeds." *Dennis v. United States,* 341 U.S. 494, 519 (1951)(J. Frankfurter, concurring). That silence, that escape from candid examination by the courts when the issue is racial differences, speaks volumes, and not necessarily to Pesta's benefit. We do well then, to remind the courts that as government actors, they too, must abide Justice Holmes famous dictum. *United States v. Schwimmer*, 279 U.S. 644, 65-655 (1929) (J. Holmes, dissenting). Pesta's complaint makes that point in detail.

In any event, Pesta cannot simply assert that his speech merits the maximum protection afforded by the First Amendment. If he would maintain that "There is thus a direct conflict between the speech of Dr. Pesta and powerful government policies" (*DKT.1, ¶35*), or show that his research was well founded and rigorously scientific, although politically unpopular (*e.g., DKT.1, ¶20-33*), and thereby afford himself the most comprehensive protections offered by this Court, he must plead enough facts under the *Twombly/Iqbal* standard to show that his claims are plausible.

That is what Pesta has done. At worst, his complaint presents what the Sixth Circuit referred to as "fat" that can and should be typically overlooked. *Kensu v. Corizon, Inc.* at 652. Notably, certain of allegations that Defendants specifically complain of consist of events that are alleged to have been "widely reported." *DKT. 1, ¶59.* But Pesta here is simply following the

- 13 -

example of the courts. The Sixth Circuit itself, when attempting to shows the cultural status of an issue (*viz*. the debate over pronouns) reached for media reports on the issue. *Meriwether* at 508 and N2 and N3. That is precisely what Pesta has referenced in his complaint: that in April of 1987, for example, there were widespread reports in the media on Al Campanis being fired for transgressing racial taboos. The existence of such media reports presents a straightforward, factual question. They, either do or do not exist. (*Nota Bene*: Pesta will be happy to supply such evidence as part of his initial disclosures, as he will on any other issues Defendants complain about "wading through", such as the "Gould Effect;" Klineberg's works on race and I.Q., which are widely available, including in the office of Pesta's counsel; and reprisals against various other people, which are often simply a matter of public record.)

Pesta has alleged that the prevailing cultural taboos, which are kin to powerful government polices, were known to the CSU Defendants (*DKT. 1, ¶¶62-63*), but rather than protecting Pesta's speech by affording him a forum "where controversial ideas are discussed and debated," they deliberately chose "to stifle debate by picking sides." *Meriwether* at 498. He cannot make that allegation in a vacuum. There is no one size fits all standard for measuring compliance with FRCP 8. *Kensu v. Corizon* at 651. Pesta's complaint answers the needs of this complex First Amendment case.

In any event, even if the Court were inclined to agree with Defendants, outright dismissal would not be warranted, for "the appropriate remedy is rarely immediate dismissal." *Id.* at 652. Indeed, Defendants proffer no case in which dismissal was ever ordered after an initial violation of FRCP 8. The remedy has apparently always been leave to re-plead after an initial finding that FRCP 8 was violated, with dismissal only reserved for repeated, persistent and vexatious

violations of the rule. *Kensu* at 653; *see also, U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003) (fourth amended complaint dismissed, which totaled 23 single-spaced pages plus 25 new attachments, *which cross referenced a third amended complaint totaling 109 pages containing 345 numbered paragraphs and 74 attachments*); *Schied v. Daughtrey*, 2008 WL 5422680 at *2-3 (complaint spanning 194 pages, 374 paragraphs, 80 footnotes, and 80 exhibits dismissed *with leave to re-plead*); *Plymale v. Freeman*, 930 F.2d 919 (6th Cir. 1991) (third *pro se* complaint dismissed, which raised numerous allegations in a rambling fashion over 119 pages long, which relied on "the principle of "lex talionis," i.e., "an eye for an eye and no constitutional rights for no constitutional rights"; *916 Radio v. FCC*, 2005 WL 2114187 *(no dismissal or re-pleading whatsoever* because plaintiff's fourteen page complaint, although accompanied by 42 pages of exhibits, was not "so verbose, confused, or redundant that its true substance is disguised. Though plaintiffs may have provided more facts than required to state their claims for relief, federal notice pleading does not bar this type of detail.")

CONCLUSION:

    For the above reasons, Defendants' motion should be denied entirely; or if it is not denied entirely, Plaintiff should be granted leave to re-plead to address any deficiencies determined by this Honorable Court.

CERTIFICATE OF COMPLIANCE WITH LR 7.1(f)

The undersigned certifies that the within case is currently unassigned to any track, and the foregoing memorandum thus adheres to the 20 page limitation of LR 7.1(f). Furthermore, the foregoing memorandum does not exceed fifteen pages in length; pursuant to LR 7.1(f) no table of contents, table of authorities cited, brief statement of the issue(s) to be decided, or summary of the argument presented, are necessary.

Dated: Goshen, New York
      June 20, 2023

Respectfully submitted,

/s/ Frederick C. Kelly
Law Office of Frederick C. Kelly, Esq.
*Attorney for Plaintiff Bryan J. Pesta*
One Harriman Square
Goshen, New York 10924
(845) 294-7945
fckellylaw@protonmail.com
Bar No. NY4377297