IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRYAN PESTA, | ) | |
| | ) | Case No. 1:23-cv-00546 |
| Plaintiff, | ) | |
| | ) | Judge Dan Aaron Polster |
| v. | ) | |
| | ) | OPINION & ORDER |
| CLEVELAND STATE UNIVERSITY, *ET AL.*, | ) | |
| | ) | |
| Defendants. | ) | |

Before the Court is the Defendants' motion to dismiss. ECF Doc. 5. This case concerns the Plaintiff's First Amendment rights to academic freedom, freedom of speech, and freedom of association as a professor at Cleveland State University ("CSU"). ECF Doc. 1, ¶ 1. The Plaintiff alleges that the Defendants violated his constitutional rights when they investigated and fired him for advancing a "genetic hypothesis of the cause of the racial IQ gap" between black and white Americans in a published academic article. *Id.* at ¶¶ 80, 162, 174. The Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 8. *Id.* at p. 2. The Plaintiff opposes the Defendants' motion to dismiss. ECF Doc. 7. For the following reasons, the Court GRANTS IN PART and DENIES IN PART the Defendants' motion to dismiss.

Background

The Plaintiff, Bryan Pesta ("Professor Pesta"), was a Professor in the Department of Management at CSU. ECF Doc. 1-1, p. 1. Professor Pesta received tenure at CSU in 2010 and promotion to full professor in 2016. ECF Doc. 1, ¶ 16. In March 2022, CSU fired Professor Pesta. *Id.* at ¶ 132.

The Defendants are CSU and six members of its faculty and leadership. ECF Doc. 1. CSU is a public research university, organized and existing under the laws of Ohio. *Id.* at ¶ 4.

The individual Defendants are: Harlan Sands, former President of CSU ("President Sands"); Laura Bloomberg[1], former Provost of CSU ("Provost Bloomberg"); Benjamin Ward, Director of Research, Development, and Ethics in CSU's Office of Research ("Professor Ward"); Christopher Mallett, Professor of Social Work ("Professor Mallett"); Conor McLennan, Professor of Psychology ("Professor McLennan"); and Wendy Regoeczi, Professor of Criminology, Anthropology, and Sociology ("Professor Regoeczi"). *Id.* at ¶¶ 4-10. The Plaintiff brings this suit against the six CSU employees in their individual and official capacities. ECF Doc. 1.

In August 2019, the Plaintiff co-authored and published in the peer reviewed journal, *Psych*, an article entitled "Global Ancestry and Cognitive Ability." *Id.* at ¶ 36; ECF Doc. 1-1, p. 1. The article essentially concluded that an IQ gap between white and black Americans was, at least in part, hereditary and the result of genetics. *Id.* at ¶¶ 38, 39. This conclusion is called a "hereditarian hypothesis." *Id.* at ¶ 174. Professor Pesta asserts that he "spoke as a citizen and not as an employee" in contributing to the article. *Id.* at ¶¶ 142, 156. In conducting research for the article, the Plaintiff used National Institute of Health ("NIH") data that consisted of over 9,000 individuals' actual DNA samples. ECF Doc. 1, ¶¶ 30, 31. The Plaintiff's article concluded that this data supported the belief that "genetics played a role in the mean differences in general intelligence between White and Black Americans." *Id.* at ¶ 39.

The Plaintiff acknowledges that the article "proved controversial." *Id.* at ¶¶ 37, 38. In the aftermath, CSU students and faculty, along with non-affiliated individuals and groups, publicly criticized the article and petitioned CSU to discipline Professor Pesta. *Id.* at ¶¶ 64-74. One notable critic was Dr. Kent Taylor ("Dr. Taylor"). In April 2021, Dr. Taylor—a UCLA

---

[1] Laura Bloomberg is the current President of CSU. ECF Doc. 1. ¶ 6.

Professor of Pediatric Medicine—wrote President Sands and alleged that the article's "[u]se of NIH data for studies of racial differences in this way [was] both a violation of data use agreement and unethical." *Id.* at ¶¶ 76, 77.

At some point after the article's publication but before the Plaintiff's firing, CSU removed online access from its website to Professor Pesta's prior academic work. *Id.* at ¶¶ 126-131. Specifically, CSU removed the online link to Professor Pesta's 2008 published article, "Black-White differences on IQ and grades: The mediating role of elementary cognitive tasks" from its "Engaged Scholarship at CSU" website. *Id.* at ¶ 130. CSU never provided a website link to the Plaintiff's article "Global Ancestry and Cognitive Ability." *Id.* at ¶ 131.

In Spring 2021, CSU formed a committee to investigate Professor Pesta. *Id.* at ¶ 80. The committee included Professors Mallet, McLennan, Regoeczi, and Ward. *Id.* at ¶ 85. In September 2021, the CSU committee interviewed the Plaintiff. *Id.* at ¶ 91. Later that same month, the committee contacted Dr. Taylor and then interviewed him in October 2021. *Id.* at ¶ 111. Dr. Taylor took issue with the final sentence of the article's abstract that read, "Results converge on genetics as a potential partial explanation for group mean differences in intelligence." *Id.* at ¶ 109. In email correspondence with the committee, Dr. Taylor wrote, "In my opinion, this statement conflicts with the NIH policy NOT-OK-07-088 on taking care that data avoids stigmatization of US population sub-groups." *Id.* Dr. Taylor further explained during his interview why he believed that the Plaintiff's use of the NIH data violated the NIH data use agreement, why it was unethical, and why he was professionally opposed to Professor Pesta's research into the hereditability of intelligence traits. *Id.* at ¶¶ 106-115.

In January 2022, the committee issued a report that recommended terminating Professor Pesta. *Id.* at ¶¶ 120, 121. Provost Bloomberg accepted the committee's recommendation and

3

fired the Plaintiff, effective on March 4, 2022. *Id.* at ¶ 132. The Plaintiff does not clearly state the specific basis that CSU gave him for his firing, and neither side provided the Court with his termination letter. Nevertheless, the Plaintiff alleges that he suffered injury to his "good name, vocation, and well-being" as a proximate result of the Defendants' actions. *Id.* at ¶¶ 151, 165.

Procedural History

On March 16, 2023, Professor Pesta filed his complaint. ECF Doc. 1. He brings Counts 1 and 2 under 42 U.S.C. §§ 1983 and 1988 and Count 3 under 28 U.S.C. §§ 2201-2202. *Id.* at ¶ 12. Count 1 alleges that CSU and the six individual Defendants retaliated against the Plaintiff, in violation of the First Amendment, when they "caused an investigation and investigated Dr. Pesta" after the publication of his article. *Id.* at ¶ 148. Count 2 alleges that CSU, Provost Bloomberg, and President Sands retaliated against the Plaintiff, in violation of the First Amendment, when they fired him. *Id.* at ¶ 162. The Plaintiff contends that the CSU investigation and his firing were "motivated at least in part by Dr. Pesta's protected conduct in contributing to [the article]." *Id.* at ¶¶ 151, 164. In Counts 1 and 2, the Plaintiff seeks compensatory damages in excess of $25,000, punitive damages, exemplary damages, and attorneys' fees. *Id.* at ¶ 191.

In Count 3, the Plaintiff seeks declaratory judgement and preliminary injunctions solely against CSU. The four declaratory judgment matters are:

1) the hereditarian hypothesis "is worthy of study, but is presently under assault;"
2) individuals seeking to advance a hereditarian hypothesis "are entitled to academic freedom;"
3) CSU must extend full academic freedom to the Plaintiff and those who "advance a hereditarian hypothesis in the study of race, genetics, and intelligence;" and

4) CSU may not utilize any aspect of its post-article investigation "to interfere with Pesta's academic freedom."

*Id.* at ¶ 186. The Plaintiff seeks a preliminary injunction prior to judgment and a permanent injunction thereafter on the following seven matters:

1) reestablish the website link to the Plaintiff's earlier article ("Black-White differences on IQ and grades") on the CSU "Engaged Scholarship at CSU" page;

2) establish a link to the Plaintiff's article "Global Ancestry and Cognitive Ability" on the "Engaged Scholarship at CSU" page;

3) "extend academic freedom to those, like Pesta, who advance a hereditarian hypothesis in the study of race, genetics, and intelligence;"

4) award the Plaintiff "full back pay from the date of termination to the date his pay becomes reinstated;"

5) pay the Plaintiff's full salary during the pending litigation of this lawsuit;

6) prevent CSU from "relying on any part of the [CSU] investigation . . . to justify terminating Pesta's tenured professorship;" and

7) reinstate the Plaintiff to his full tenured professorship "with no further interference of his academic freedom and First Amendment rights based on the [CSU] investigation."

*Id.* at ¶ 187.

On May 5, 2023, the Defendants filed a motion to dismiss, which is the subject of this opinion and order. ECF Doc. 5. On June 20, 2023, the Plaintiff filed his response in opposition. ECF Doc. 7. On July 5, 2023, the Defendants filed their reply. ECF Doc. 8.

The Defendants assert three bases for their motion to dismiss: (1) under Rule 12(b)(1), because CSU and the individual Defendants in their official capacities are entitled to immunity

under the Eleventh Amendment; (2) under Rule 12(b)(6), because the individual Defendants in their individual capacities are also entitled to qualified immunity; and (3) under Rule 8, because the Plaintiff's complaint "is not a short and plain statement" of his claims. ECF Doc. 5, p. 2.

The Plaintiff opposes the Defendants' motion to dismiss. ECF Doc. 7. He argues that: (1) the Defendants failed to make an actual showing of Eleventh Amendment immunity under the nine-part test articulated in *Hall v. Medical College of Ohio at Toledo*, 742 F.2d 299 (6th Cir. 1984); (2) Eleventh Amendment immunity does not extend to the Plaintiff's declaratory and prospective injunctive relief sought in Count 3; (3) qualified immunity does not protect state actors who abuse government regulations to practice viewpoint discrimination; and (4) the complaint does not warrant repleading or dismissal. ECF Doc. 7, PageID # 122, 124, 126, 132.

## Rule 12(b)(1) Standard and Analysis

First, the Court analyzes the Defendants' Rule 12(b)(1) basis for dismissal and whether CSU is entitled to immunity under the Eleventh Amendment from the Plaintiff's § 1983 claims. Eleventh Amendment immunity operates as a jurisdictional bar that must be decided before a court may reach the merits. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015). The proper vehicle to raise an immunity argument is a Rule 12(b)(1) motion. *Koukios v. Ganson*, No. 99-4060, 2000 U.S. App. LEXIS 21040, at *4 (6th Cir. Aug. 11, 2000). Rule 12(b)(1) allows dismissal when a court lacks subject matter jurisdiction over the claims asserted in the complaint. Fed. R. Civ. P. 12(b)(1). Here, the Defendants mount a facial challenge, which "goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). Under a facial challenge, "the court takes the allegations of the complaint as true for purposes of Rule 12(b)(1) analysis." *Id.*

6

The Defendants challenge this Court's jurisdiction over CSU and the individual Defendants in their official capacities. ECF Doc. 5, p. 4. Both sides agree that CSU is a public university and that it exists under the laws of Ohio. ECF Doc. 1, ¶ 4; Doc. 5, p. 6; *see also* Ohio Revised Code § 3344.01(A) ("There is hereby created the Cleveland state university."). But they disagree on whether CSU is an "arm of the state" and whether it qualifies for immunity under the Eleventh Amendment. ECF Doc. 5, p. 6; Doc. 7, PageID # 122. The Defendants argue that CSU is entitled to immunity because it qualifies as an arm of the state due to its status as a public university. ECF Doc. 5, p. 6. The Plaintiff admits that "many state colleges do in fact qualify for 11th Amendment Immunity," but contends that the Defendants failed to make "[a]n actual demonstration of immunity" under the nine-factor test used in *Hall v. Med. Coll. of Ohio*, 742 F.2d at 299. ECF Doc. 7, PageID # 122-23.

A state's immunity from suit "flows from the nature of sovereignty itself as well as the Tenth and Eleventh Amendments to the United States Constitution." *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (citing *Alden v. Maine*, 527 U.S. 706, 713, 119 S. Ct. 2240, 2246 (1999)). Eleventh Amendment immunity is "far reaching." *Thiokol Corp. v. Dep't of Treasury, Revenue Div.*, 987 F.2d 376, 381 (6th Cir. 1993). It "bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments, by citizens of another state, foreigners or its own citizens." *McCormick v. Miami Univ.*, 693 F.3d 654, 661–62 (6th Cir. 2012) (citation omitted). Consequently, "federal courts have no jurisdiction over 'any suit in law or equity' filed against one of the United States." *Qiu v. Univ. of Cincinnati*, 803 F. App'x 831, 837 (6th Cir. 2020) (citing U.S. Const. amend. XI).

Since its 1984 opinion, *Hall v. Med. Coll. of Ohio*, the Sixth Circuit has modified the framework for determining whether a public university is an "arm of the state," and thus immune

7

from suit. *See Ernst v. Rising*, 427 F.3d at 359 (describing the evolving "arm of the state" analysis articulated in prior cases). The former nine-factor test now consists of four factors. *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 775 (6th Cir. 2015) (citing *Ernst*, 427 F.3d at 359).

This Court need not rehash the Sixth Circuit's changing framework over the last thirty years nor belabor the application of these factors to CSU because the Sixth Circuit has answered the exact question before this Court. It held that "Cleveland State is an arm of the State of Ohio for eleventh amendment purposes." *Breckenridge v. Mitchell*, 734 F.2d 13 (6th Cir. 1984). The Sixth Circuit upheld the dismissal of CSU as a defendant in a plaintiff's civil rights case where a Northern District of Ohio district court held that the Eleventh Amendment's grant of immunity extended to CSU as an arm of the state. *Id.* The Sixth Circuit explained:

> We agree with the district court that Cleveland State is an arm of the State of Ohio for eleventh amendment purposes. Whether a state school shares the State's eleventh amendment immunity "depends, at least in part, upon the nature of the entity created by state law." *Id.* In this case, state law unequovically [*sic*] indicates that Cleveland State shares in the eleventh immunity of the State of Ohio. Cleveland State came into existence by virtue of a legislative act. *See*, Ohio Rev. Code Ann. § 3344.01 (Page 1972). Control of the university is vested in a board of trustees which is appointed by the governor of Ohio, subject to state senate approval. *See id.* The State of Ohio also maintains a high degree of fiscal control over the university. *See id.* § 3345.05 (Supp. 1982) ("All receipts and expenditures are subject to the inspection of the auditor of state."). The university is empowered to acquire land by bond financing but state law provides that such land "shall be taken in the name of the state." *Id.* § 3345.12(P). Similarly, all facilities owned by Cleveland State are "public property used exclusively for a public purpose, and such property and the income therefrom is exempt from all taxation and assessment within this state. . . ." *Id.* § 3345.12(N). Finally, a recently enacted law provides that the "Attorney General shall be the authority for each state college and university and shall provide legal advice in all matters relating to its powers and duties." *Id.* § 3345.15 (Supp. 1983). Ohio courts have consistently held that state universities share the State of Ohio's common law sovereign immunity from suit in state courts. *See Thacker v. Board of Trustees of Ohio State University*, 35 Ohio St.2d 49, 51-52 (1973); *Wolfe v. Ohio State University Hospital*, 170 Ohio St. 49 (1959).

*Id.* The Court adopts the Sixth Circuit's analysis and holding as it relates to CSU's status as an arm of the state.

The Court's finding that CSU is an arm of the state is consonant with past precedent. Whether under the nine-factor test or the more recent four-factor test, the Sixth Circuit has consistently held that Ohio public universities—including Miami University, University of Cincinnati, Kent State University, and Medical College of Ohio at Toledo—are arms of the state and immune under the Eleventh Amendment. *See McCormick v. Miami Univ.*, 693 F.3d at 654; *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000); *Kovacevich v. Kent State Univ.*, 224 F.3d 806 (6th Cir. 2000); and *Hall v. Med. Coll. of Ohio*, 742 F.2d at 307. Therefore, the Plaintiff's claims in Counts 1, 2, and 3 against CSU are barred because CSU is an arm of the state and entitled to Eleventh Amendment immunity. Accordingly, CSU is dismissed with prejudice.

Second, the Court analyzes the Defendants' second Rule 12(b)(1) basis for dismissal and whether the individual Defendants are immune in their official capacities from the Plaintiff's § 1983 claims. The Defendants argue that the six individual Defendants, in their official capacities, are immune from suit under the Eleventh Amendment. ECF Doc. 5, p. 6. The Plaintiff generally opposes immunity for the individual Defendants in their official capacities. ECF Doc. 7.

The immunity framework for an individual defendant centers on the Eleventh Amendment and the § 1983 statutory requirement that a wrongdoer is a "person." Section 1983 creates a private cause of action where a "person," acting under color of state law, violates another's constitutional rights. 42 U.S.C. § 1983. Importantly, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Haddad v. Gregg*, 910 F.3d 237,

9

243 (6th Cir. 2018) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312 (1989)). Additionally, "the Eleventh Amendment bars § 1983 suits seeking money damages against states and against state employees sued in their official capacities." *Rodgers v. Banks*, 344 F.3d 587, 594 (6th Cir. 2003) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. at 58) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself.").

In Counts 1 and 2, the Plaintiff seeks monetary damages and attorney's fees from the individual Defendants in their official and individual capacities. The fact that the Plaintiff named the individual Defendants in their official capacities controls, not whether they acted in their official capacities when investigating and firing the Plaintiff. *See Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 637 n.3 (6th Cir. 2005) (citing *Hafer v. Melo*, 502 U.S. 21, 27, 112 S. Ct. 358, 363 (1991) (rejecting plaintiff's argument "that § 1983 liability turns not on the capacity in which state officials are sued, but on the capacity in which they acted when injuring the plaintiff")). Therefore, Eleventh Amendment immunity extends to the individual Defendants in their official capacities insofar as the Plaintiff seeks monetary damages from them in Counts 1 and 2.

The Court's conclusion is consistent with this Circuit's precedent to dismiss public university officials named as defendants in their official capacities in claims for money damages. *See McCormick v. Miami Univ.*, 693 F.3d 654, 662 (6th Cir. 2012) (finding the Eleventh Amendment barred a plaintiff's civil rights claims for monetary damages against a public university's dean and professors in their official capacities); *Qiu v. Univ. of Cincinnati*, 803 F. App'x 831, 837 (6th Cir. 2020) (same); *McKenna v. Bowling Green State Univ.*, 568 F. App'x

450, 455 (6th Cir. 2014) (same). Accordingly, the Plaintiff's claims for monetary damages in Counts 1 and 2 against the individual Defendants in their official capacities are barred and dismissed with prejudice.

Turning to Count 3, the Plaintiff seeks declaratory judgement and injunctive relief solely from CSU, not any of the individual Defendants. ECF Doc. 1. He asserts that even if the Court grants immunity to the individual Defendants, "it will not spare Defendants from Pesta's claims for prospective injunctive and declaratory relief." ECF Doc. 7, PageID # 123-24. The Plaintiff is incorrect. Sixth Circuit precedent is unequivocal: the sovereign immunity exception under *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908) applies to claims for prospective injunctive or declaratory relief against state officials in their official capacities—not to states or arms of the state like CSU. *Mikel v. Quin*, 58 F.4th 252, 256 (6th Cir. 2023) ("Under *Ex parte Young* . . . federal courts may award injunctive and declaratory relief against state officials when the relief is designed to end a continuing violation of federal law.") (internal quotations and citation omitted). The *Ex parte Young* doctrine operates as an exception to sovereign immunity because "a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with federal law." *S&M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. at 71 & n.10). Therefore, the *Ex parte Young* exception does not apply to Count 3 because the Plaintiff seeks declaratory and injunctive relief against CSU alone. Accordingly, this is a second basis for dismissing Count 3 with prejudice.

Rule 12(b)(6) Standard and Analysis

Third, the Court analyzes the Defendants' Rule 12(b)(6) basis for dismissal and whether the individual Defendants in their individual capacities are entitled to qualified immunity. Rule

12(b)(6) permits a court to dismiss a claim when a party fails to plead facts on which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The Plaintiff is not required to include "detailed factual allegations," but must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citation omitted). In reviewing a complaint, this Court "must construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Doe v. Miami Univ.*, 882 F.3d 579, 588 (6th Cir. 2018) (citation omitted)

Eleventh Amendment immunity for a § 1983 claim does not extend to individual defendants in their individual capacities. Instead, "[q]ualified immunity shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Elliott v. Golston*, No. 22-5323, 2023 U.S. App. LEXIS 3244, at *4 (6th Cir. Feb. 9, 2023) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). At the motion to dismiss stage, courts "review an assertion of qualified immunity to determine only whether the complaint 'adequately alleges the commission of acts that violated clearly established law.'" *Back v. Hall*, 537 F.3d 552, 555 (6th Cir. 2008) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815 (1987)). While the Defendants bear the burden of pleading the defense, the "ultimate burden of proof is on the plaintiff to show that the [individual Defendants] [are] not

entitled to qualified immunity." *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002) (citation omitted). To do so, the Plaintiff must demonstrate that: 1) the individual Defendants violated a statutory or constitutional right; and 2) the right was "clearly established" at the time they investigated and fired him. *Back v. Hall*, 537 F.3d at 555.

The Defendants' primary argument lies with the first prong. The Defendants do not dispute the second prong, that the Plaintiff had a "clearly established" First Amendment right to speak as a private citizen on matters of public concern without retaliation from his state employer. *See* ECF Docs. 5, 8; *see also Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S. Ct. 1951, 1957 (2006) ("The Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."). Therefore, the Plaintiff satisfies the second prong.

Returning to the first prong, the Court analyzes whether the Plaintiff has pleaded facially plausible claims for relief. A First Amendment retaliation claim requires the Plaintiff to prove three elements, that: (1) his speech was protected by the First Amendment; (2) he suffered an adverse employment action; and (3) the adverse action was motivated at least in part in response to the exercise of his constitutional rights. *See Nailon v. Univ. of Cincinnati*, 715 F. App'x 509, 513-14 (6th Cir. 2017) (citing *Savage v. Gee*, 665 F.3d 732, 738 (6th Cir. 2012)). The Plaintiff's firing satisfies the second element. The Defendants' arguments center on the first and third elements.

Under the first element, courts determine whether protected First Amendment speech is at issue by applying the "longstanding *Pickering-Connick* framework," which involves two additional questions: A) whether the Plaintiff was speaking as a citizen, on a matter of public

concern; and B) whether the Plaintiff's interest in doing so outweighs the individual Defendants' interest in promoting the efficiency of the public services they perform through their employees. *Meriwether v. Hartop*, 992 F.3d 492, 507, 509 (6th Cir. 2021) (internal quotations and citations omitted).

The first sub-element is met. The Defendants do not dispute that the Plaintiff was speaking as a citizen and addressing a matter of public concern. ECF Doc. 5, p. 8. The Court agrees. The Plaintiff spoke as a citizen—and not as a CSU employee—because his speech occurred publicly, outside his office, and his expressions were not made pursuant to his duties as a CSU professor. *See Garcetti v. Ceballos*, 547 U.S. at 420-21 (analyzing whether the plaintiff expressed his views inside or outside his office, their subject matter, and whether he made them pursuant to his official duties). Moreover, his speech addressed matters of public concern because the subject matter broadly related to communities' social and racial concerns. *See Meriwether v. Hartop*, 992 F.3d at 508 ("When speech relates to any matter of political, social, or other concern to the community, it addresses a matter of public concern." (internal quotations and citation omitted)).

The second sub-element is the crux of the Defendants' argument. They contend that the Plaintiff has not alleged facts sufficient to establish that his interests outweigh the Individual Defendants' interests in executing their public services efficiently. ECF Doc. 5, p. 8. Specifically, the Defendants argue that they had "adequate justification" to fire the Plaintiff and that the Plaintiff himself appears to concede that his termination resulted from unethical research methods, not "for exercising his First Amendment right to publish on race-based issues." *Id.* at pp. 8-9. The Plaintiff disputes this assertion and maintains that he "plausibly alleged that his

research constituted controversial speech by an academic" that "fit[s] within the core of the area protected by the First Amendment." ECF Doc. 7, PageID # 127.

While the Plaintiff's speech relates to academic scholarship, his interests center on his right as a private citizen to write publicly on contentious academic topics without retaliation from his employer. The Plaintiff was a state employee, but he nevertheless retained the right to speak as a citizen. *See Garcetti v. Ceballos*, 547 U.S. at 419 ("The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens."). The individual Defendants' interests center on upholding CSU's academic standards and integrity, ethical code of conduct, and professional reputation. This naturally extends to ensuring that academic instructors—especially a tenured professor—use sound research methodologies. Essentially, the weighing of interests turns on the reason CSU investigated and fired the Plaintiff, and that question is a factual one that requires discovery. Both sides dispute why Professor Pesta was fired, and neither side provided the Court with his termination letter. Certainly, evidence of the Plaintiff's unethical or unsound practices for proposing, conducting, and reporting research could affect CSU's operation and could tip the scale in the Defendants' favor. *See Meriwether v. Hartop*, 992 F.3d 492, 511 (6th Cir. 2021) ("[A] school's interest in limiting a teacher's speech is not great when those public statements are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally." (internal quotations and citation omitted)). The Plaintiff contends that he did not use unethical and unsound research techniques, but that the Defendants fired him for his viewpoint. ECF Doc. 1, ¶¶ 81, 83, 90, 123,124. At this stage, construing the complaint in the light most favorable to the Plaintiff and

accepting his allegations as true, the Plaintiff has alleged sufficient facts that his interests outweigh the individual Defendants' interests. *See Doe v. Miami Univ.*, 882 F.3d at 588. Accordingly, the Plaintiff has satisfied the first element—and the two *Pickering-Connick* sub-elements thereunder—and the second element of a First Amendment retaliation claim.

Moving to the third element, the Plaintiff has alleged sufficient facts that the Defendants were motivated, at least in part, to investigate and fire Professor Pesta for exercising his constitutional rights. The Defendants maintain that "[i]t is clear from the face of his Complaint that Pesta was investigated and terminated for misrepresenting to the NIH how he would use the data he requested in violation of NIH policy and basic research ethics." ECF Doc. 8, p. 4. The Court disagrees. The Plaintiff alleges that the Defendants never provided an online link to his controversial article, removed online access to his other works before rendering an official decision to fire him, waited more than a year and a half to investigate his alleged wrongdoing, and initiated an investigation only after weathering considerable public criticism. Accepting these allegations as true, the Plaintiff alleged sufficient facts that the Defendants were motivated, at least in part, to investigate and fire him for his protected speech. While this analysis may change with additional facts after discovery, at this point, the Plaintiff satisfies the third element.

Therefore, at this juncture, the Plaintiff has pleaded sufficient facts to allege a First Amendment retaliation claim. Since Professor Pesta has plausibly alleged that the individual Defendants engaged in viewpoint discrimination by firing him for the content of his article, Counts 1 and 2 against the individual Defendants in their individual capacities may proceed. Accordingly, the Defendants' qualified immunity defense and motion to dismiss under Rule 12(b)(6) is denied at this time. The Defendants may renew their qualified immunity defense at the close of discovery.

Rule 8 Standard and Analysis

Fourth, the Court analyzes the Defendants' Rule 8 basis for dismissal and whether the Plaintiff's alleged violation of Rule 8 merits dismissal. The Defendants argue dismissal is warranted because the "37-page, 191-paragraph length [complaint], including a diatribe on the debates over race relations and alleged race-based disparities in human intelligence, obfuscates [the] Plaintiff's claims." ECF Doc. 5, pp. 11-12. The Plaintiff contends that dismissal is unwarranted because his complaint is not so "verbose, confused and redundant that its true substance, if any, is well disguised." ECF Doc. 7, Page ID # 132-33 (internal quotations omitted).

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Additionally, "each allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). Whether a pleading violates these requirements depends on the "totality of the circumstances." *Kensu v. Corizon, Inc.*, 5 F.4th 646, 651 (6th Cir. 2021). Essentially, Rule 8 prohibits "obfuscation of the plaintiff's claims." *Id.* Importantly, "excessive length cannot be the sole factor justifying dismissal." *Id.* The fundamental question is whether the Plaintiff's complaint is so "verbose, confused and redundant that its true substance" is well disguised. *Id.* (citation omitted).

The Defendants accurately note that the Plaintiff dedicates many pages to irrelevant and extraneous historical accounts, political controversies, and philosophical opinions that have no bearing on his claims. Even so, the Plaintiff's complaint does not warrant dismissal on this basis. The Plaintiff's complaint is not so voluminous that it is unintelligible or unmanageable. Moreover, the Plaintiff's gratuitous commentary does not obfuscate the substance of his factual averments. *See e.g. Kensu v. Corizon, Inc.*, 5 F.4th at 651 (upholding dismissal for violation of

17

Rule 8 where the court and defendants would experience "undue difficulty in determining the claims and allegations actually at issue in this litigation").  Even if the Plaintiff violated Rule 8, the appropriate remedy would be to dismiss "a poorly drafted pleading . . . with leave to amend to conform to Rule 8."  *Id.* at 652 (citation omitted).  Accordingly, the Court denies the Defendants' motion to dismiss under Rule 8.

## Conclusion

CSU is an arm of the state of Ohio and entitled to immunity under the Eleventh Amendment from the Plaintiff's § 1983 claims.  Immunity extends to the individual Defendants in their official capacities insofar as it relates to relief for money damages.  The individual Defendants are not entitled to qualified immunity at the motion to dismiss stage.

Accordingly, the Court <u>GRANTS IN PART</u> and <u>DENIES IN PART</u> the Defendants' motion to dismiss.  The motion to dismiss under Rule 12(b)(1) is <u>GRANTED</u> as to CSU (Counts 1, 2, and 3) and the individual Defendants in their official capacities (Counts 1 and 2).  CSU and Count 3 are dismissed with prejudice.  The individual Defendants in their official capacities are dismissed with prejudice in Counts 1 and 2.  The Court <u>DENIES</u> the Defendants' motion to dismiss under Rule 12(b)(6) and Rule 8.  Therefore, remaining before the Court are Counts 1 and 2, against the individual Defendants in their individual capacities.

IT IS SO ORDERED.

Date: July 14, 2023

*/s/ Dan Aaron Polster*
Dan Aaron Polster
United States District Judge