Page 1

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN DISTRICT OF OHIO

3                        EASTERN DIVISION

4                   ~~~~~~~~~~~~~~~~~~~~

5       BRYAN J. PESTA,

6                     Plaintiff,

7            vs.            Case No. 1:23-cv-00546-DAP

8       LAURA BLOOMBERG, etc.,

9       et al.,

10                    Defendants.

11                  ~~~~~~~~~~~~~~~~~~~~

12                    Deposition of

13                    BRYAN J. PESTA

14                      Volume I

15

16

                        January 29, 2024

17                      10:03 a.m.

18

19                      Taken at:

20                    Perez Morris, LLC

21            1300 East Ninth Street, Suite 1600

22                    Cleveland, Ohio

23

24

25               Cynthia Sullivan, RPR

Page 2

1  APPEARANCES:
2
3       On behalf of the Plaintiff:
4       Law Office of Frederick C.
5        Kelly, by
6       FREDERICK C. KELLY, ESQ.
7       One Harriman Square
8       Goshen, New York 10924
9       (845) 294-7945
10      fckellylaw@protonmail.com
11
12   On behalf of the Defendants:
13      Perez Morris, by
14      KAREN L. GIFFEN, ESQ.
15      KERIN L. KAMINSKI, ESQ.
16      PAUL J. NEEL, ESQ.
17      1300 East Ninth Street
18      Suite 1600
19      Cleveland, Ohio 44114
20      (216) 621-5161
21      kgiffen@perez-morris.com
22      kkaminski@perez-morris.com
23      pneel@perez-morris.com
24          ~ ~ ~ ~ ~
25

Page 3

1  APPEARANCES, Continued:
2
3  ALSO PRESENT:
4       Dr. Benjamin Ward
5
6          ~ ~ ~ ~ ~
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            TRANSCRIPT INDEX
2
3  APPEARANCES.............................   2
4
5  INDEX OF EXHIBITS ......................   5
6
7  EXAMINATION OF BRYAN J. PESTA:
8  By Ms. Giffen.............................   8
9
10  REPORTER'S CERTIFICATE................... 305
11
12  EXHIBIT CUSTODY
13  EXHIBITS RETAINED BY COURT REPORTER
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

INDEX OF EXHIBITS

NUMBER         DESCRIPTION          MARKED

Exhibit 1   The Curriculum Vitae of ...... 15
            Bryan J. Pesta, Ph.D.

Exhibit 2   An Editorial by Dr. Pesta in .  43
            Psych

Exhibit 3   An Article Entitled Global ... 51
            Ancestry and Cognitive
            Ability

Exhibit 4   Sabbatical Documentation...... 56

Exhibit 5   The Research Misconduct ...... 60
            Investigation Final Report

Exhibit 6   A One-Page Document from a ... 76
            Zoom Interview Submitted by
            Dr. Pesta,

Exhibit 7   Project Request 18007......... 79

Exhibit 8   A Document Entitled NIH ...... 85
            Security Best Practices for
            Controlled-Access Data
            Subject to the NIH Genomic
            Data Sharing Policy

Exhibit 9   Project Request No. 19090..... 87

Exhibit 10  A Timeline Regarding BJP's ... 88
            Data Access Requests

Exhibit 11  A Project Renewal ............  96
            Application for Project
            19090

Exhibit 12  Project Request for Project ..  99
            19747

Exhibit 13  Project Renewal Request for .. 118
            Project 19747

Exhibit 14  Project Request 26271......... 134

Exhibit 15  An Email String with ......... 137
            Attachments

2 (Pages 2 - 5)

Page 6

Exhibit 16  An Email String............... 149

Exhibit 17  A Document Entitled .......... 185
            Interview (10/11/21)
            Supplement, Bryan Pesta

Exhibit 18  An Email From Bryan J. Pesta . 186
            Dated 1/15/22

Exhibit 19  A Letter from the Office of .. 187
            the Provost Dated 1/13/22

Exhibit 20  An Email From Bryan Pesta .... 190
            Dated 1/25/22 with
            Attachment

Exhibit 21  An Email From Bryan Pesta .... 190
            Dated 1/28/22 with
            Attachment

Exhibit 22  A Document Entitled Final .... 195
            Consideration Dated 2/14/22

Exhibit 23  A Letter to Dr. Bloomberg .... 197
            Dated 2/28/22

Exhibit 24  A Letter from the Office of .. 199
            the Provost Dated 2/28/22

Exhibit 25  An Unfair Labor Practice ..... 200
            Charge Document

Exhibit 26  A Letter to Judy Knapp dated . 203
            5/25/22

Exhibit 27  The Affidavit of Linda Quinn.. 204

Exhibit 28  The Affidavit of Birch ....... 204
            Browning

Exhibit 29  A Document Labeled ........... 208
            Investigator's Memorandum

Exhibit 30  A Document Labeled Dismissal . 208
            of Unfair Labor Practice
            Charge

Exhibit 31  Policy 3344-28-01............. 211

Page 7

Exhibit 32  Plaintiff's Response to ...... 216
            Defendants' First Requests
            for Documents

Exhibit 33  A Letter for Dr. Pesta from .. 227
            Dr. Faison and Dr. Kahn

Exhibit 34  A Form 990EZ.................. 228

Exhibit 35  An Email String............... 239

Exhibit 36  An Email String............... 269

Exhibit 37  An Email String............... 279

Exhibit 38  An Email String............... 282

Exhibit 39  An Email String............... 292

Exhibit 40  An Email String............... 293

Exhibit 41  An Email String............... 297

Exhibit 42  An Email String............... 303

            AFTERNOON SESSION............. 133

Page 8

1     BRYAN J. PESTA, of lawful age, called for
2   examination, as provided by the Federal Rules
3   of Civil Procedure, being by me first duly
4   administered the affirmation, as hereinafter
5   certified, deposed and said as follows:
6         EXAMINATION OF BRYAN J. PESTA
7   BY MS. GIFFEN:
8     Q.   Dr. Pesta, my name is Karen Giffen.
9   We met via Zoom and here in person for the
10  first time today.  I am representing the
11  individual defendants in the matter that you
12  filed against originally CSU and those
13  individual defendants some time ago.
14        We're about to do a deposition, and
15  I'd like to describe for you -- well, first let
16  me ask you have you ever --
17    A.   Yeah, I did it I think twice as an
18  expert.
19        MR. KELLY:  Let her finish her
20  questions.
21    Q.   That's one of the things that's
22  important.
23    A.   Yeah, I'm hyper, so just smack me
24  down if I do that.
25    Q.   So one thing is, because the court

Page 9

1   reporter can't write down when we talk over
2   each other, it's important to let me finish the
3   question.  So to finish the question, have you
4   ever given a deposition before?
5     A.   Yes.
6     Q.   Now answer.
7     A.   Yes.
8     Q.   Okay.  In what circumstance?
9     A.   I was an expert witness for
10  HR-related stuff, like disparate impact.  This
11  would have been in the 2000s and I think maybe
12  early like 2012.
13    Q.   Did that involve the City of
14  Cleveland?
15    A.   Two of them did.  I think I've been
16  an expert for five cases.  Two of them were
17  related to the City of Cleveland.
18    Q.   Okay.  We may talk about those more
19  in a minute.  All right.  So given that you've
20  been through this before, then you'll know that
21  what happens is I'll ask questions, and you'll
22  respond.  Cindy, our court reporter, will take
23  down everything.  Your attorney, Mr. Kelly, may
24  interject when he feels it's appropriate to do
25  so.

Page 10

1      What I will tell you is I'm going
2  to do my best to ask questions that are
3  understandable.  I ask you that if I've asked a
4  question that you have difficulty understanding
5  or I don't talk loudly enough or I've used a
6  word that doesn't make any sense to you,
7  please, let me know, and I'll try to rephrase
8  it; all right?
9      A.   Sure.
10     Q.   Second, this isn't a marathon,
11 we're going to be here for a while, but in the
12 event that you need a break for some reason,
13 I'm happy to accommodate that.  I just ask that
14 you complete the question that's been posed,
15 and then we'll go off the record.
16     A.   Not a problem.
17     Q.   Okay.  Dr. Pesta, you have some
18 materials in front of you?
19     A.   Correct.  I should have waited.
20 I'm sorry.
21     MR. KELLY:  Catch the ball, Bryan.
22 Catch the ball before you start to run with it.
23     Q.   What have you brought with you
24 today?
25     A.   So one thing I copied based on I

Page 11

1  think it was the final report, and it was the
2  dbGaP application.  I just gave that to
3  Attorney Kelly.  There was also one is a
4  double-sided document that I'd like to use to
5  refresh my memory because the dates are really
6  complicated for the applications, and the other
7  has to do with expertise -- oh, the official
8  NIH data publication, and I assume that you're
9  going to get copies of these, so that's not a
10 problem.
11     Q.   So let's talk about that first.  So
12 I ask now when I ask you a question, don't
13 refer to any documents, but it is fine to tell
14 me I can't answer that without referring to a
15 document, and then we'll see.
16     MS. KAMINSKI:  Karen, would you
17 like me to take that and get it copied since he
18 brought it in?
19     MS. GIFFEN:  It's okay with me if
20 it's okay with you guys.
21     MR. KELLY:  It's okay with us.
22     THE WITNESS:  I don't have a
23 problem.  I think I gave it to Fred, though.
24 There should be one page that's double-sided.
25     MR. KELLY:  These are the two

Page 12

1  documents that he brought.  In there are a
2  couple copies if you want.  I'm sorry.  Do you
3  want me to copy them?
4      THE WITNESS:  I was running out of
5  toner.  I apologize.
6      MR. KELLY:  I apologize.  I really
7  do apologize.
8      THE WITNESS:  There is nothing else
9  in here.
10     MS. GIFFEN:  We're on the record.
11 Should we say something about that?
12     MR. KELLY:  The record should
13 reflect I alerted Ms. Giffen last night I'm
14 starting to develop conjunctivitis/pinkeye in
15 my right eye, and I wanted to know if all
16 parties would still consent in light of that
17 with proceeding with the deposition today, and
18 it seems we are proceeding, but it may make for
19 a bit of an awkward moment at times with regard
20 to passing documents back and forth.
21     MS. GIFFEN:  We'll figure it out.
22 We appreciate that heads-up notice.
23     THE WITNESS:  Do you mind if I turn
24 my cell phone off?
25     MS. GIFFEN:  Oh, please, do.  Good

Page 13

1  reminder.
2      THE WITNESS:  Okay.  Thank you.
3      Q.   Dr. Pesta, could you please tell us
4  whether you are currently employed?
5      A.   I am not.
6      Q.   And by whom were you previously
7  employed?
8      A.   Cleveland State University.
9      Q.   Are you married?
10     A.   Divorced twice.
11     Q.   I'm sorry?
12     A.   Divorced twice.
13     Q.   What years were you married and to
14 whom?
15     A.   Her name was Michelle Oblinger,
16 O-B-L-I-N-G-E-R.  I was very young, so it had
17 to be in like the 1990s.  That was for three
18 years.
19     Q.   For three years?
20     A.   Correct.
21     Q.   Okay.  You said you were divorced
22 twice did you say?
23     A.   Correct.  So the next one was Kathy
24 McClintock.  Kathy with a K.  Do you want me to
25 spell that?

4 (Pages 10 - 13)

Page 14

1    Q.    Sure.
2    A.    M-C-C-L-I-N-T-O-C-K.  That was from
3 '98 until, it was fourteen years, so it was
4 like 2012.
5    Q.    Do you have any children?
6    A.    I have an adopted daughter from
7 that second marriage and a biological son.
8    Q.    How old are they, and what are
9 their names?
10    A.    Anthony is my son.  He's 25.
11    Q.    Is it Anthony Pesta?
12    A.    Correct.
13    Q.    And how about your daughter?
14    A.    Krystal, K-R-Y-S-T-A-L, was Pesta,
15 but she got married, so it's Kearny,
16 K-E-A-R-N-Y.
17    Q.    And how old is she?
18    A.    Thirty-one.
19    Q.    Do either of those children reside
20 with you?
21    A.    My son does, yes.
22    Q.    What is your home address?
23    A.    26845 Chapel Hill Drive, North
24 Olmsted, Ohio, 44070.
25    Q.    How long have you resided there?

Page 15

1    A.    Since '25, so almost twenty
2 years -- 2005.  I'm sorry.
3    Q.    I was going to say '25?  And you
4 say that your son resides with you.  Does
5 anybody else live with you there?
6    A.    No.
7    Q.    Okay.  You were kind enough to
8 provide for us a copy of your CV in response to
9 our request.
10         - - - - -
11         (Thereupon, Deposition Exhibit 1,
12         the Curriculum Vitae of Bryan J.
13         Pesta, Ph.D., was marked for
14         purposes of identification.)
15         - - - - -
16    Q.    Dr. Pesta, handing you what's been
17 marked as Exhibit 1, could you confirm for us
18 that this is your CV?
19    A.    Yes.
20    Q.    Okay.  And it appears if we just
21 run through this quickly -- first of all, is
22 the information contained on Exhibit 1 correct?
23    A.    Yes.
24    Q.    All right.  And you got your Ph.D.
25 in 1997, correct?

Page 16

1    A.    Yes, at the University of Akron.
2    Q.    Right.  And you also got a
3 postdoctorate degree of a Master in Labor
4 Relations from CSU, right?
5    A.    Correct.
6    Q.    And your other two degrees you got
7 at CSU, correct?
8    A.    Correct.
9    Q.    According to your CV, you became
10 employed at CSU as a visiting assistant
11 professor in 1998, correct?
12    A.    I was also an adjunct, but it
13 didn't seem appropriate to put it in my vita.
14 It's in the psych department if that's helpful.
15    Q.    So from 1998 to 2001 you were in
16 the psych department?
17    A.    Correct.
18    Q.    Then what is term assistant
19 professor?  What does that mean?
20    A.    It's not even a distinction at CSU
21 anymore, but it used to be you would have a
22 one-year contract, and every year they could
23 renew it or not, so it was a full-time temp.
24    Q.    So that was from 2001 to 2004 you
25 were a contract professor?

Page 17

1    A.    Correct.
2    Q.    Assistant professor I should have
3 said.  Now, this time it's of management and
4 labor relations?
5    A.    This time meaning?
6    Q.    Previously it was assistant
7 professor of psychology?
8    A.    Oh, correct.  Yes.
9    Q.    All right.  Is this when you moved
10 over to the business school?
11    A.    Correct.
12    Q.    So let's talk about that.  So when
13 you were the professor of psychology from '98
14 to 2001, what college were you associated, with
15 what college?
16    A.    I know they realigned.  I think it
17 was arts and sciences back then.
18    Q.    Okay.  And then how about beginning
19 in 2001 when you became a professor of
20 management and labor relations?
21    A.    It used to be called the -- I'm
22 sorry.  I didn't let you finish.  It used to be
23 the MLR, management and labor relations.  Maybe
24 about eight years ago it changed to just
25 management.

Page 18

1    Q.    That was the department of what
2  college?
3    A.    College of Business.
4    Q.    I know now it's the Monte Ahuja
5  College of Business, I think?
6    A.    Correct.
7    Q.    Is that the right name?
8    A.    Correct.
9    Q.    Was it at that time?
10    A.    No. It was Nance. I think he was
11  a CSU vice president or something like that.
12    Q.    It changed names somewhere, but it
13  was fundamentally the College of Business
14  throughout, correct?
15    A.    Yes.
16    Q.    So you became an assistant
17  professor?
18    A.    Well, visiting, which is full-time
19  temp, but then in 2005 or '06, I landed the
20  tenure-track job in management.
21    Q.    Okay. And then 2010 to 2016 was
22  associate professor, right?
23    A.    2010 to 2016?
24    Q.    Yes.
25    A.    Correct.

Page 19

1    Q.    And you got tenure in 2010; is that
2  right?
3    A.    Correct.
4    Q.    When you became an associate
5  professor, that was approximately at the same
6  time you got tenure?
7    A.    I think they are granted at the
8  same time.
9    Q.    You went through an application
10  process and had a tenure review committee, et
11  cetera?
12    A.    Yeah. It went all the way through
13  department, college, and university.
14    Q.    Okay. And at that time in 2010
15  were you requested to submit to them, to the
16  tenure review committee, what publications you
17  had done and what research you were involved
18  in, et cetera?
19    A.    Yes.
20    Q.    Did you have recommending outside
21  academicians?
22    A.    Yeah. It's external review. I
23  believe I had five.
24    Q.    Who were they?
25    A.    Oh, my God. People who publish in

Page 20

1  intelligence research for the most part. I
2  think I picked three, and they picked two, the
3  committee. This would have been the college
4  PRC.
5    Q.    Who were the three you picked?
6    A.    I don't remember. I would have to
7  go back and look. It was I guess 14 years ago.
8    Q.    Do you remember who the two were
9  the college picked?
10    A.    I have no idea. I mean, I have it
11  at home in my computer, I think.
12    Q.    That's all right.
13    A.    All right.
14    Q.    So now you've got tenure, you're an
15  associate professor, and then you are promoted
16  to full professor in 2016?
17    A.    Correct.
18    Q.    Was the review process associated
19  with becoming --
20    A.    The same deal. It's the same. I
21  don't think I went to the university on that
22  one, but it was department, college, and then I
23  was granted it, but there were external
24  reviews, also.
25    Q.    And who were the external reviewers

Page 21

1  for that one?
2    A.    It would be -- I don't remember. I
3  would have to check.
4    Q.    Okay. But same process in that you
5  would have been asked to submit to those
6  reviewing entities the work that you had done,
7  the research you were involved in, and the
8  papers that you --
9    A.    So they don't care about teaching,
10  it's all about research, so the external
11  reviewers were focused on that, but I did have
12  to submit a dossier with teaching and service
13  statements, too.
14    Q.    Let's talk about that a minute. So
15  what do you understand is highly valued at
16  Cleveland State among professors? Was that too
17  vague of a question?
18    A.    I'm sorry.
19    Q.    You're giving me a look that tells
20  me that was too vague.
21    A.    What I valued?
22    Q.    No, no, no. I'll ask it more
23  directly. Were both your teaching skills and
24  your research and publication accomplishments
25  and skills, were both of those important when

—

Page 22

1   you went through getting hired, getting
2   tenured, and getting full professor, and if you
3   need to break it down, feel free to do so.
4       A.   Certainly.  Also, service, like
5   serving on committees, professional service,
6   stuff like that.
7       Q.   So service like within Cleveland
8   State as well as service --
9       A.   It could be outside, too.
10      Q.   Okay.  All right.  So you'd agree
11  that all three of those things were important
12  for each of those steps?
13      A.   Not equally important, but yes.
14      Q.   What in your mind was given more
15  emphasis?
16      A.   It's only about research.
17      Q.   And what do you understand is the
18  reason for that?
19      A.   Publish or perish.  The university
20  gets money for -- you know, grant money and
21  stuff like that based on the faculty's
22  reputation.  I think it's fairly well known
23  among professors that research gets you to the
24  next level.
25      Q.   Okay.  Now, you mentioned this a

Page 23

1   minute ago, and now I need to clarify this a
2   bit.  You said that the department was
3   originally called management and labor
4   relations, and now it's just called management?
5       A.   MGT.
6       Q.   When did that change?
7       A.   I'm guessing around eight years
8   ago, but I'm -- I mean, I don't know what the
9   margin of error is on that.
10      Q.   No problem.  Did the focus of the
11  group change when the name changed?
12      A.   A little bit, yeah.  That was our
13  motivating factor.  Just labor relations, it's
14  picking up now which is good, but back then it
15  was almost dead.  I think it was only like
16  8 percent of the labor force was even
17  unionized, and we didn't hire replacement
18  professors who had expertise in that, so we
19  just felt we needed to rebrand it and call it
20  management.
21      Q.   Is there a separate labor relations
22  department now?
23      A.   No.  They are still with us, or
24  they are still in the management department.
25      Q.   I see.  I see.  Okay.  How many

Page 24

1   faculty are in the now management department?
2       A.   Now?
3       Q.   Or when you left.
4       A.   When I started there was a lot
5   more, I would say maybe 20, maybe even more
6   like in the early 2000s.  When I left, just
7   full-time people, like tenure-track?
8       Q.   Let's start there.
9       A.   Ten or 12.
10      Q.   Okay.  So almost half, reduction by
11  almost half?
12      A.   It wasn't -- oh, like not
13  reduction, but I'm thinking of a better word.
14  Like they left, yeah.
15      Q.   Right.  I didn't mean to suggest
16  they had been terminated or something, but the
17  number of faculty in the department was reduced
18  significantly?
19      A.   By approximately 50 percent.
20      Q.   Okay.  At the time that you left,
21  where would you put yourself among your
22  colleagues in terms of the amount of research
23  and publication that you did as compared to
24  others?
25      A.   Okay.  That's a fair question.  I

Page 25

1   won merit pay specifically for research at
2   least twice, maybe three times, more awards I
3   won for teaching.  I think in my department,
4   not college, I was up there.  I think there is
5   a professor named Ken Dunegan who retired.
6   He's got a good record.  I think the current
7   chair, unless he left, is Timothy DeGroot,
8   D-E-G-R-O-O-T.  He had a really good record.
9           So, yeah, by impact factors and
10  stuff like that and at a school like CSU, I
11  definitely deserved both promotions.
12      Q.   And if you would flip to the very
13  last page of Exhibit 1, you'll see your awards
14  and honors list, and I'm seeing merit pay
15  winners.  Is that what you're referring to?
16      A.   Correct.  And there is also this
17  legacy award, and, well, the Excellence in
18  Humanist, that's irrelevant.
19      Q.   All right.  Do you have any
20  academic or teaching experience outside of CSU?
21      A.   So when I was a student at Akron
22  getting my Ph.D., they make you be student
23  teachers, and so I had that experience.
24      Q.   Is Akron an AAUP or other union --
25      A.   Maybe five years ago, maybe ten,

Page 26

1 they voted the union in.
2    Q.   Fred wants to tell you you started
3 to answer before I finished.
4    A.   I've been good so far.  I'm sorry.
5       MR. KELLY:  Let her finish the
6 question.
7    Q.   It's okay.  So the end of the
8 question was going to be, was there a
9 collective bargaining representative for the
10 faculty at Akron while you were there?
11    A.   When I was there, I don't believe
12 so, but I know they got one voted in
13 thereafter.
14       MR. KELLY:  Just answer the
15 question, Bryan.
16       THE WITNESS:  Okay.  Thank you.
17    Q.   Okay.  Next page, is this all of
18 the classes that you taught?
19    A.   I don't include Akron because, I
20 mean, this is a CSU thing.
21    Q.   Got it.  And then there is a
22 three-and-a-half to four-page list of
23 publications, right?
24    A.   Correct.
25    Q.   Were all of these published?

Page 27

1    A.   That's the question?
2    Q.   Yes.
3    A.   You mean at CSU or just -- all of
4 these are publications, yes.
5    Q.   All of these papers were published?
6    A.   Correct.
7    Q.   I guess what I'm really asking are
8 any of the papers cited here only submitted for
9 publication, but not yet published or accepted
10 for publication?
11    A.   No.  I don't like to put that stuff
12 on my vita.
13    Q.   Okay.  One of the things I note and
14 you make reference to it in other
15 correspondence and various notations is of a
16 paper that you did, I think the principal
17 author or at least the first named author was a
18 person named Woodley, Genomic Versus
19 Self-Identified Ancestry, and it goes on from
20 there which was in 2018, and that was not
21 listed.  Was that paper ever published?
22    A.   I'm not familiar with it honestly.
23 Woodley?  Do you know who the other authors
24 were?
25    Q.   You.

Page 28

1    A.   The -- oh, there is one.  Let me
2 see where it's at.  Yeah, so I think it's
3 number nine.  But there are some authors on the
4 paper that APA style says you list the first
5 seven, so Woodley would be in there somewhere.
6    Q.   I see.  Okay.  All right.  Now, one
7 of the things that, and we'll take a look at it
8 at some time, you submitted at various points
9 during this process a statement with respect to
10 your research involving intelligence?
11    A.   Correct.
12    Q.   You mentioned in there that you had
13 been interested for a long time in that subject
14 and also attempting to determine that research
15 in connection with variables including race and
16 ethnicity.
17    A.   Correct.
18    Q.   When did you become interested in
19 that as a subject area?
20    A.   So if you look at my undergrad
21 transcript at CSU, I took a class called Human
22 Abilities with Professor John Burns, it was in
23 either '89 or '90, and I was just fascinated by
24 how powerful cognitive ability is in predicting
25 success in life and how reliable and valid

Page 29

1 these tests are, and then there was like maybe
2 a week lecture on group differences, and I was
3 totally fascinated with that.  But I was trying
4 to be a cognitive psychologist at that point,
5 so I never did research on it back then.
6    Q.   Okay.  So if we take a look at the
7 list of publications, I want to identify,
8 because you know the nature of this much better
9 than I do, which of the publications reference
10 that subject area that we just discussed.
11    A.   Can I separate it by -- go ahead.
12       MR. KELLY:  Object to the form of
13 the question.  I think it's a little bit vague.
14 What subject area are we talking about?  Never
15 mind.
16    A.   I was going to say do you want just
17 intelligence articles or ones that focus on
18 intelligence and race?
19    Q.   Yes.  Let's focus on intelligence
20 and race or intelligence and some other
21 population separately.
22    A.   Sure.
23    Q.   So with that caveat, let's go
24 through these lists.  No. 1 fits, yes?
25    A.   Correct.

8 (Pages 26 - 29)

Page 30

1  Q.  No. 2, how about that one?
2  A.  Correct.
3  Q.  No. 3?
4  A.  Yes.
5  Q.  No. 4?
6  A.  Yes.
7  Q.  No. 5?
8  A.  Correct.
9  Q.  No. 6?
10  A.  Yes.
11  Q.  No. 7?
12  A.  That's the controversy here.
13  Q.  We'll spend more time talking about
14  that one.
15  A.  Yes.
16  Q.  So yes on that one, right?
17  A.  Correct.
18  Q.  No. 8?
19  A.  Yes.
20  Q.  No. 9?
21  A.  Yes.
22  Q.  No. 10?
23  A.  No.
24  Q.  No. 11?
25  A.  Yes.

Page 31

1  Q.  No. 12?
2  A.  That's marginal.  I mean, it's
3  bibliometrics.
4  Q.  What is bibliometrics?
5  A.  It's where you study articles and
6  authors for productivity and look for trends on
7  who is most impactful.  So it's mostly
8  bibliometrics, but it's on the field of
9  intelligence.
10  Q.  So put that in the maybe category?
11  A.  Maybe.
12  Q.  No. 13?
13  A.  Yes.
14  Q.  No. 14?
15  A.  Yes.
16  Q.  No. 15?
17  A.  Yes.
18  Q.  No. 16?
19  A.  No.
20  Q.  No. 17?
21  A.  Yes.
22  Q.  No. 18?
23  A.  Yes.
24  Q.  No. 19?
25  A.  Yes.

Page 32

1  Q.  No. 20?
2  A.  Yes.
3  Q.  No. 21?
4  A.  No.
5  Q.  No. 22?
6  A.  Yes.
7  Q.  No. 23?
8  A.  No.
9  Q.  No. 24?
10  A.  No.
11  Q.  No. 25?
12  A.  Yes.
13  Q.  No. 26?
14  A.  Yes.
15  Q.  No. 27?
16  A.  No.
17  Q.  No. 28?
18  A.  Yes.
19  Q.  No. 29?
20  A.  Yes.
21  Q.  Thirty?
22  A.  Yes.
23  Q.  Thirty-one?
24  A.  Yes.
25  Q.  Thirty-two?

Page 33

1  A.  No.
2  Q.  No. 33?
3  A.  No.
4  Q.  Thirty-four?
5  A.  No.
6  Q.  Thirty-five?
7  A.  No.
8  Q.  Thirty-six?
9  A.  No.
10  Q.  Thirty-seven?
11  A.  No.
12  Q.  Thirty-eight?
13  A.  No.
14  Q.  Thirty-nine?
15  A.  The rest of these are not
16  intelligence.
17  Q.  Oh, is that right?  Thank you.
18  A.  Okay.
19  Q.  The rest are not on intelligence
20  and analysis with respect to race or some other
21  population subgroup; is that right?
22  MS. KAMINSKI:  Just so the record
23  is clear, the numbers you are reading off of
24  are from Exhibit 1; is that right?
25  MS. GIFFEN:  Thank you for that

9 (Pages 30 - 33)

Page 34

1  reminder.  Yes, I'm reading from Exhibit 1, and
2  each of those numbers represent a specific
3  publication.
4      Q.   So if I'm reading it correctly, the
5  first publication that you had that related to
6  that subject matter was in 2008, correct?
7      A.   There is two there that both relate
8  to that subject matter.  So page 4 starts my
9  intelligence stream.
10     Q.   Okay.  All right.  Then there is,
11  at least for the period of 2008 to 2014, about
12  half relating to intelligence and race or some
13  other population subgroup and about half that
14  did not relate?
15     A.   The date was 2000 to 2014?
16     Q.   2008 to 2014.
17     A.   That seems fair.  I didn't count
18  it.
19          MS. KAMINSKI:  There is more.
20     Q.   All right.  Let's count them up.  I
21  got nine, Kerin is right, nine papers that
22  related to that subject matter and four that
23  did not.
24     A.   Okay.
25     Q.   Is that right?

Page 35

1      A.   I didn't mark them, so I'd have to
2  go back and look.
3      Q.   Then for the period 2015 to 2020,
4  your CV is conveniently page by page noted, and
5  you have the year.
6      A.   That's good.
7      Q.   It's much easier to read that way,
8  so thank you.  From 2015 to 2020, most of the
9  papers except two, maybe two-and-a-half, are
10  related to the issue of intelligence and race
11  or some other population subgroup?
12     A.   Correct.
13     Q.   Is that right?
14     A.   Correct.
15     Q.   And then all of them were from 2021
16  to 2023, correct?
17     A.   Could you repeat that?
18     Q.   So all of the remaining
19  publications are related to that subject
20  matter?
21     A.   No.  I think there was one on
22  bibliometrics.  Let me check really quick.  Oh,
23  I'm sorry.  You're right.  Let me see here.
24          MS. KAMINSKI:  No. 12.
25     A.   There is a more recent one.

Page 36

1  No. 10, I'm sorry, but you're right.  I just
2  forgot the date.  That was 2018.
3      Q.   All right.  This would have been
4  the list of publications that you would have
5  presented, obviously it wouldn't have been this
6  long, it would have been the publications list
7  that you presented when you sought employment
8  with CSU, when you sought your tenure, and when
9  you sought your full professorship, correct?
10     A.   My memory is you could pick five,
11  maybe seven articles that you think are most
12  impressive, I guess, to send to the external
13  reviewers.
14     Q.   But you would --
15          MR. KELLY:  Answer the question,
16  Bryan.
17          THE WITNESS:  I thought I did.  I'm
18  sorry.  Maybe I didn't understand it.
19          MR. KELLY:  You didn't answer her
20  question.  You volunteered.
21          THE WITNESS:  Okay.  Thank you.
22     Q.   So let's take it step by step now.
23  When you sought tenure, you certainly would
24  have provided a list of the publications you
25  had or the papers that you had published to

Page 37

1  date, correct?
2      A.   Correct.  You have to submit your
3  CV.
4      Q.   All right.  So at least the
5  internal tenure review people would have had
6  that list?
7      A.   Yes.
8      Q.   All right.  Now, you just mentioned
9  that you thought maybe you wouldn't have
10  submitted the entire list to the external
11  reviewers.
12     A.   The list, yes; but the actual
13  publications --
14     Q.   I see.  Okay.  Do you remember what
15  publications you sent to your reviewers at each
16  of those stages?
17     A.   Yeah.  So I got that in 2010.
18  Let's start there.
19     Q.   So it had to be what was on the
20  possibilities list would have been 25
21  through --
22     A.   The rest.
23     Q.   -- the rest, through 44.  Do you
24  remember which ones you submitted?
25     A.   To the external reviewers?

10 (Pages 34 - 37)

Page 38

1    Q.   Yes.
2    A.   I think the -- where is it at?  I
3  just lost it.  No. 26 I'm not positive, I think
4  it was submitted, but I thought it was a good
5  article, so I'm pretty sure, and this is my
6  memory.
7    Q.   Sure.
8    A.   I'm pretty sure I submitted that
9  one, 26.  I would have done the No. 30.  Then,
10  you know, I needed more purely business
11  publications, so I'm trying to think.  Let me
12  see.  So I think 32.
13    Q.   Okay.
14    A.   And maybe 36.
15    Q.   And then how about when you became
16  a full professor which would have been 2016?
17    A.   Okay.  So --
18    Q.   First of all, let's establish that
19  what would have been on the list was items 14
20  through the remainder of the list, yes?
21    A.   I'm wondering if any of these were
22  in process.  No, I would say you're correct.
23    Q.   All right.  So that list would have
24  been submitted to the internal reviewers and to
25  external reviewers, but not necessarily the

Page 39

1  papers, correct?
2    A.   Just to clarify, the internal
3  reviewers got everything, all the papers.  The
4  external got five or seven.
5    Q.   Okay.  And when papers were
6  submitted to the external reviewers?
7    A.   I have this all at home.  I don't
8  remember.  I mean, I'd have to --
9    Q.   Okay.  All right.  So it appears to
10  me then that at the time that you applied for
11  tenure at CSU, both the internal reviewers at
12  CSU and whatever external reviewers were
13  employed to consider those questions were aware
14  that you were interested in and publishing
15  papers regarding intelligence and race or
16  intelligence and some other population
17  subgroup?
18    A.   Yes.  I have a specific memory of
19  31 being announced, congratulations, you got
20  this high impact journal publication, at a
21  department meeting way back then.
22    Q.   And the same can be said of when
23  you became a full professor, that both the
24  internal reviewers for that purpose inside CSU
25  as well as the external reviewers would have

Page 40

1  known that you were interested in researching
2  questions posed about intelligence or
3  intelligence and other population subgroups;
4  agreed?
5    A.   Well, they are expert researchers,
6  and if you just see the names and the titles,
7  yes, I would agree.
8    Q.   You actually wouldn't have to
9  really read the papers to know this given what
10  the title was of each of them?
11    A.   Maybe not all of them, but yes.
12    Q.   All right.  One question that I
13  have, if we look at page 6, Dr. Pesta, and
14  page 6 includes your presentations to various
15  conferences, did any of these conference
16  presentations involve the issue of intelligence
17  and race or intelligence and some other
18  population subgroup?
19    A.   I've only been to two, I believe,
20  and yes for both.
21    Q.   Which one or both?
22    A.   We're on page 16.  The first one I
23  don't have a number.
24    Q.   Could you tell us what that -- for
25  the record, what are you talking about?

Page 41

1    A.   It's a paper in 2010 called
2  Differential Epidemiology: Intelligence,
3  Neuroticism, and Chronic Disease by the 50 U.S.
4  States.
5    Q.   I see.  So you presented that; is
6  that right?
7    A.   Correct.
8    Q.   And what was the second one?
9    A.   So the second one, Bommer, I mean,
10  they presented, I wasn't there, but I'm an
11  author of the paper.
12    Q.   I see it.  Okay.  All right.  And
13  then flip over to the last page again for me.
14    A.   Uh-huh.
15    Q.   You mentioned a little bit ago that
16  you served as an expert?
17    A.   Yes.
18    Q.   So the general subject matter about
19  which you were asked to testify, was it the
20  same for each of these cases?
21    A.   Essentially.  It was like Civil
22  Rights Act law, disparate impact for
23  statistical analysis.
24    Q.   Did you have to testify in a trial
25  in any of those?

1    A.   No.
2    Q.   Okay.  Thank you, Dr. Pesta.  One
3  of the things that might happen is we might
4  have to go back and refer to prior exhibits.
5  That's why we keep them here, so they are
6  accessible to you.
7         Tell me about the open source.
8  What is an open source?  Strike all of what I
9  just started that question with.
10         What is an open source journal?
11    A.   It's one where you have immediate
12  access to the articles.  Most of them are
13  behind a pay wall, but not open source.
14    Q.   I'm not sure I understood what your
15  answer was.
16    A.   So for the open source articles,
17  you can right now pull them up, but if you want
18  one -- like the Journal of Intelligence is not
19  open source, so technically to get their
20  version, you'd have to log into their website
21  and pay them.
22    Q.   Okay.  So an open source journal
23  means it is not behind a pay wall?
24    A.   Correct, to the best of my
25  knowledge.

1    Q.   That's all right.  Is there
2  anything else that differentiates an open
3  source journal from a non-open source journal?
4    A.   Not that I know of.
5         - - - - -
6         (Thereupon, Deposition Exhibit 2, an
7         Editorial by Dr. Pesta in Psych, was
8         marked for purposes of
9         identification.)
10         - - - - -
11    Q.   I'm handing you what's been marked
12  as Exhibit 2, Dr. Pesta, and feel free to take
13  a moment, but I think this is an editorial that
14  you published on Psych, so if you need to take
15  a moment.
16    A.   No.  Yes.
17    Q.   Yes, it is?  Okay.  So let me ask a
18  couple of questions first.  What is MDPI?
19    A.   Multidigital publishing, something
20  like that.  It's just a for-profit business
21  that publishes.  I think they have over 100
22  journals across various fields.
23    Q.   And are all of them open source?
24    A.   Yes.  That's their model.
25    Q.   So they provide the platform that

1  that's where you log in to get it; is that
2  right?
3    A.   You don't even have to log in.  I
4  mean, you can just go to mdpi.com and see them
5  all.
6    Q.   And search it, okay.  What is
7  Psych?
8    A.   It was a journal that just started,
9  what year is this, I guess in '19, and I was I
10  guess the founding editor.  I didn't -- let me
11  clarify.  They selected me to be the first
12  editor.  I had nothing to do with setting the
13  journal up, though.
14    Q.   And you said was.  Is it no longer?
15    A.   I'm no longer the editor there.
16    Q.   Okay.  All right.  So you're not
17  suggesting that it doesn't exist any longer?
18    A.   No.  It does.
19    Q.   All right.  Who are the they who
20  started it?
21    A.   It would have been MDPI, their
22  agents.
23    Q.   Any particular individuals?
24    A.   It was a lady named Daisy, I have
25  no idea what her last name is, who contacted me

1  and invited me to not be editor, but to submit,
2  what do you call it, like a series of papers,
3  like a topical issue for the journal.
4    Q.   Okay.  How did you become editor
5  then?
6    A.   They asked me to be editor.
7    Q.   And who is the they?
8    A.   It would have been Daisy, but I
9  think she was more clerical, so I don't
10  remember who the lead person was.
11         MR. KELLY:  Can we take a few
12  minute break?
13         MS. GIFFEN:  Sure.
14         (Brief recess.)
15    Q.   Dr. Pesta, we were talking about
16  how you became associated with Psych and how
17  you became its editor.  Exhibit 2 appears to
18  me, and, please, correct me if I'm wrong,
19  appears to me to be sort of your introduction
20  to the world of what Psych was intended to be,
21  right?
22    A.   Correct.
23    Q.   And you're doing so on behalf of
24  the editorial board, correct?
25    A.   Well, on behalf of MDPI, I guess.

Page 46

1　The journal's editorial board?
2　　Q.　I'm just reading.  The first
3　sentence says, "It is my great pleasure on
4　behalf of the editorial board and myself to
5　introduce Psych, MDPI's new multidisciplinary
6　open," and then it goes on, right?
7　　A.　I don't think we had an editorial
8　board back then, so I don't remember what the
9　concept --
10　　Q.　Did it ever have an editorial
11　board?
12　　A.　It does now, and it just launched,
13　so it grew over time, you know.
14　　Q.　Were there any other editors
15　besides yourself?
16　　A.　There is now after I got fired from
17　editor.
18　　Q.　When did you get fired?
19　　A.　It would have been probably late
20　2019, early 2010 -- 2020.  I'm sorry.
21　　Q.　What happened with that separation?
22　Tell us about it.
23　　A.　So before I was editor, this is how
24　I got introduced to Psych.  Daisy sent me a
25　letter saying, you know, we appreciate your

Page 47

1　research.  Would you like to do a special
2　issue?
3　　　　So I did a special issue on race
4　and IQ and solicited papers from anybody who
5　wanted to submit one, and we published.  I
6　think there was like maybe 12 papers published.
7　But then someone external complained about one
8　of the papers, and they fired me.  I did
9　appeal, but they fired me.
10　　Q.　Which paper were they complaining
11　about?
12　　A.　It was by Richard Lynn.
13　　　　(Discussion off record.)
14　　Q.　So I asked which paper were they
15　concerned with, and your answer is?
16　　A.　It was a paper by Richard Lynn.  I
17　don't remember the title, but it was like
18　60 -- reflections on 60 years researching this
19　stuff, so it was almost an autobiography.
20　　Q.　What was the -- let's see how to
21　ask this question.  So I'm used to non-open
22　source journals that publish issues, and then
23　there are -- in what I would consider an issue,
24　then there are X number of papers inside that
25　issue.  Is that how Psych works?

Page 48

1　　A.　It did for me initially.  Before I
2　was editor, I was invited to do a special
3　issue, and I took them up on their offer.  Then
4　after while that was in progress, they said,
5　hey, do you want to be the editor in chief?
6　　Q.　Oh, so this special issue happened
7　before you became editor?
8　　A.　Correct.
9　　Q.　When was the special issue?
10　　A.　It had to be early 2019, but I'd
11　have to go back and check.  It's all on line if
12　you just type in Psych MDPI.
13　　Q.　This says that your editorial,
14　which is Exhibit 2, was received June 19th,
15　2019, which would have been your submission,
16　right?
17　　A.　Correct.
18　　Q.　Accepted June 19th, 2019, which
19　would have been the acceptance of the paper?
20　　A.　Correct.
21　　Q.　And then the last reference is
22　published June 20th, 2019, right?
23　　A.　Correct.
24　　Q.　Okay.  If you'll look down in the
25　left-hand corner of Exhibit 2, I see Psych

Page 49

1　2019, 1, and then page references, right?
2　　A.　Correct.
3　　Q.　Is that referencing the first --
4　　A.　That would have been my special
5　issue after -- the first two pages would have
6　been my special issue.  Maybe there was another
7　article that somebody submitted unrelated to
8　IQ.
9　　Q.　So this editorial appears at the
10　same time as the special issue; is that
11　correct?
12　　A.　Around the middle of it.
13　　Q.　Around the middle of what?
14　　A.　So the special issue started first.
15　Maybe three months later, I'd have to check,
16　they asked me to be editor.  So the special
17　issue was still ongoing while I became editor.
18　　Q.　How long did it take for the
19　special issue to begin and end?
20　　A.　Until they fired me it was just
21　open.  So it's not like, you know, bound copies
22　of a journal that you'd have to have just an
23　issue.
24　　Q.　Got it.  Which is what I think of
25　when I think of a journal, a scientific journal

13 (Pages 46 - 49)

Page 50

1  of the nature that we're talking about.  That's
2  not true anymore; is it?
3      A.   Correct.
4      Q.   Okay.  What was the problem with
5  Richard Lynn's article?
6      A.   My opinion?  Somebody complained
7  that it was racist.  Richard Lynn is a big time
8  researcher.  He's got over 100 publications on
9  this stuff.  Like the SPLC lists him as a hate
10  person or whatever.  So I think they were just
11  offended by -- I didn't see the complaint.  I
12  think whoever complained was just offended by
13  Richard Lynn.  That's my belief.
14      Q.   Okay.  Is he still alive, Richard
15  Lynn?
16      A.   I think a year ago he passed away.
17      Q.   Okay.  He's connected with the
18  Ulster Institute?
19      A.   Yes.
20      Q.   What is the Ulster Institute?
21      A.   It's an affiliation of researchers.
22  As far as I know they just do IQ research, but
23  maybe there is more.
24      Q.   Have you ever been associated with
25  them?

Page 51

1      A.   I think in between getting fired
2  from CSU and today there might be one paper
3  where I list it, but I'd have to check.
4      Q.   Okay.
5          - - - - -
6          (Thereupon, Deposition Exhibit 3, an
7          Article Entitled Global Ancestry and
8          Cognitive Ability, was marked for
9          purposes of identification.)
10          - - - - -
11      Q.   Dr. Pesta, you've been handed
12  Exhibit 3 which I believe to be the paper that
13  you wrote with John Lasker, John G.R. Fuerst,
14  and Emil Kirkegaard entitled Global Ancestry
15  and Cognitive Ability; is that correct?
16      A.   I think you said John Lasker.  It's
17  actually Jordan Lasker.  I may have misheard
18  you.
19      Q.   Thank you for correcting me.
20  Jordan Lasker, is that correct, that's the
21  paper that you published?
22      A.   Correct.
23      Q.   This was published in Psych, right?
24      A.   Yes.
25      Q.   And I note now this says it was

Page 52

1  received for publication on June 8th, 2019,
2  accepted August 28th, 2019, and then published
3  August 30th; is that right?
4      A.   Correct.
5      Q.   Does that check with your memory of
6  the sequence of events?
7      A.   August 13th is a critical date.
8      Q.   13th?
9      A.   I'm sorry, 30th.  It's one of the
10  handouts that I produced today.
11      Q.   This was in many regards the
12  subject matter of what we're going to spend the
13  rest of the day talking about in terms of what
14  happened at Cleveland State, right?
15      A.   Correct.
16      Q.   Before we get into those pieces, I
17  note that if you look down on the bottom
18  left-hand corner, it says Psych 2019, 1, and
19  then it says 431 to 451.
20      A.   459.
21          MR. KELLY:  459.
22      Q.   459.  I should ask this just as an
23  open question.  What does that mean?
24      A.   So the one indicates -- well, it
25  was published in 2019.  One is the first issue

Page 53

1  of the journal.  It's the founding issue if
2  that's what they call it.  The page numbers in
3  issue one were 431 to 459.
4      Q.   If we look back at Exhibit 2, it
5  was Psych 2019, 1?
6      A.   Correct.
7      Q.   So same issue, but different page
8  numbers, right?
9      A.   Yes.  So -- okay, yes.
10      Q.   Now, was Exhibit 3, Global Ancestry
11  and Cognitive Ability, was that part of the
12  special issue?
13      A.   I honestly don't remember.  I mean,
14  it would be easy to check.  It was definitely
15  consistent with the theme of it.
16      Q.   Okay.  Is it unusual for the editor
17  of a journal to also have a submission to the
18  journal?
19      A.   You just don't want to be the
20  reviewer for it, so no, or involved in the
21  review decision.
22      Q.   Who were the reviewers for
23  Exhibit 3?
24      A.   I have no memory of who they were.
25  In fact, they are not even identified.  They

Page 54

1  are anonymous.
2      Q.   So tell me how that works.
3      A.   So you submit an article like this
4  one.  The action editor who handles the
5  document, you know, looks at it, reads it, and
6  says who do I know who would be experts in
7  these areas?  Then they send out invitations to
8  review for the journal.
9      Q.   So does MDPI keep a record of who
10 the reviewers were?
11     A.   Yeah, I'm sure they do.
12     Q.   Does the editor take part in
13 obtaining reviewers for articles?
14     A.   So I guess that I was the top of
15 the pyramid, editor in chief.  Then I can't
16 remember who the subeditors, the next level
17 were.  Those would be the action editors.
18         Now I just blanked on your
19 question.  Could you repeat it?
20     Q.   Does the editor take part in
21 finding reviewers?
22     A.   It's -- I don't think it's
23 mandated, but occasionally.  I mean, if it's
24 the article is within the editor's expertise,
25 he or she might just be a reviewer or at least

Page 55

1  know where to send it to or at least suggest
2  who should review it.
3      Q.   Did you review papers that were
4  submitted to Psych for publication while you
5  were editor?
6      A.   Not all of them.  I usually
7  deferred to the action editors, but I think I
8  had to rubber stamp their decisions at the end.
9      Q.   Did you review any other papers in
10 which Jordan Lasker, John Fuerst, or Emil
11 Kirkegaard were involved?
12     A.   No.
13     Q.   All right.  So now I want to take
14 us -- let me ask before we move to that, you
15 took a sabbatical in the fall of 2019, right?
16     A.   '19?  I thought I took it -- right.
17 I took one right after getting tenure.  Maybe
18 I'm confusing it with that.  I guess I did.  I
19 don't really remember.
20     Q.   It was --
21         MR. KELLY:  Let me just caution the
22 witness if you don't know, don't speculate.
23 Just tell her you don't know or you're not
24 certain or you need something else to remind
25 you.

Page 56

1         THE WITNESS:  Thank you.
2      Q.   Do you remember taking a sabbatical
3  in 2019 to actually work on the writing of --
4         MR. KELLY:  Global Ancestry and
5  Cognitive Ability?
6         MS. KAMINSKI:  Exhibit 3.
7      Q.   -- Exhibit 3?
8      A.   I don't have a strong memory of it,
9  but I'm not denying it.
10             - - - - -
11         (Thereupon, Deposition Exhibit 4,
12         Sabbatical Documentation, was marked
13         for purposes of identification.)
14             - - - - -
15     Q.   If you, Dr. Pesta, would take a
16 look at Exhibit No. 4 which is, I believe, but
17 you can tell me if this is wrong, your
18 application for a sabbatical in the fall of
19 2019?
20     A.   It does appear to be that, so yes.
21 So this jogs my memory for sure.
22     Q.   And that the purpose behind the
23 sabbatical was to engage in the research we
24 have just been talking about including writing
25 Exhibit 3?

Page 57

1      A.   Well, what's the date on this?
2  '18?  Does it mention it?  Yeah, so you're
3  correct.
4      Q.   You were granted that sabbatical,
5  right?
6      A.   Yes.
7      Q.   How long did you take?
8      A.   It would have to be six months,
9  because if you go a year, they dock some of
10 your salary.
11     Q.   What's the point of a sabbatical?
12 Describe it in laymen's term what sabbaticals
13 are used for.
14     A.   I'm kind of a cynic.  I think it's
15 just a vacation for faculty.  But theoretically
16 you propose to either improve your teaching,
17 design a new course, or you could focus more on
18 research.
19     Q.   You get paid during the sabbatical,
20 right?
21     A.   Six months 100 percent.
22     Q.   But you're not eligible to do it
23 all the time.  There is some limitation.  Tell
24 me, if you know, what is that?
25     A.   I think it's seven years which sort

15 (Pages 54 - 57)

1 of makes sense if I took one in '11 and now I'm
2 applying again in '18.
3     Q.    So it's my understanding that most
4 faculty members try to do a sabbatical because
5 of what you just described.  It really does
6 sound like a great opportunity.
7     A.    Right.
8     Q.    Did you have to make a report at
9 any point about what happened with your
10 sabbatical?
11    A.    Yes.  I believe the semester you
12 come back or maybe the next year, I don't
13 remember, you have to submit what was
14 accomplished to the department chair.
15    Q.    Did you do that?
16    A.    To the best of my memory, yes.
17    Q.    Did you describe then the paper you
18 had published during that time frame?
19    A.    Beyond just listing it, I don't
20 know that I would have described it.
21    Q.    Okay.  So that would have meant if
22 you started in the fall and when you say six
23 months, are we talking about --
24    A.    A semester.
25    Q.    -- a semester or two semesters?

1     A.    Yeah.  I'm sorry to interrupt you.
2 A semester, one semester.
3     Q.    A semester.  So you would have been
4 back to work by the spring of 2020; is that
5 right?
6     A.    I've got to do the math on that.
7 Let's see.  Yeah, that sounds right.
8     Q.    Did anybody say anything to you
9 that they had a problem with your proposal for
10 your sabbatical or that they didn't like the
11 research that you were going to do in your
12 sabbatical?
13    A.    No.
14    Q.    When you provided your report about
15 the sabbatical and what you'd accomplished, did
16 anybody indicate to you that they were upset
17 about it?
18    A.    No.
19    Q.    Who was the dean at that time?
20 Excuse me.  Let me before you answer that
21 question, how do you get a sabbatical?  What do
22 you do?
23    A.    So it's in the collective
24 bargaining agreement.  There is an application
25 form and procedure.  You submit it to your

1 department chair.  I think the college PRC
2 committee approves it, but I'm going on my
3 memory.
4     Q.    PRC?
5     A.    Peer review committee.
6     Q.    Which would have been a group of
7 your colleagues, I assume?
8     A.    One from each department in the
9 business college.
10    Q.    Does the dean take part?
11    A.    I suspect he probably has to
12 approve the final, you know, sabbatical
13 request, but I don't know.
14    Q.    Is Exhibit 4 roughly to your
15 knowledge generally what you -- what you're
16 required to -- what information you're required
17 to provide in order to get the sabbatical?
18    A.    You mean this whole packet?
19    Q.    Yes.
20    A.    Yes.
21    Q.    All right.  Now I'd like to go to
22 Exhibit 5.
23          - - - - -
24          (Thereupon, Deposition Exhibit 5,
25          the Research Misconduct

1          Investigation Final Report, was
2          marked for purposes of
3          identification.)
4          - - - - -
5     Q.    Dr. Pesta, I'm handing you what's
6 been marked as Exhibit 5, which I understand is
7 the final investigative report of the
8 investigation committee that concerned
9 allegations of research misconduct involving
10 you.  Is that what you believe Exhibit 5 to be?
11    A.    Correct.
12    Q.    And if we go through it, the first,
13 there is a cover page, and then -- I'll start
14 over again.  The first ten pages is the report
15 itself, correct?
16    A.    Yes, but the first page is not
17 numbered, so it's probably nine.
18    Q.    Good point.  And then beginning on
19 page 11 are a list of attachments to the
20 report, correct?
21    A.    Correct.
22    Q.    All right.  Prior to the time that
23 the investigative committee was convened, you
24 received notification from CSU that the
25 committee was being formed, right?

Page 62

1    A.   Yes, from Dr. Ward.
2    Q.   Okay.  And you received a copy of
3  the charge to the committee from Dr. Ward,
4  correct?
5    A.   Yes.
6    Q.   And if we look, the charge to the
7  committee is pages 12 through 15 of the
8  attachments to the report, correct?
9    A.   Correct.
10    Q.   And the individuals who were going
11  to serve on that committee were Christopher
12  Mallett, Conor McLennan, and Wendy Regoeczi,
13  and I may not have pronounced that properly.
14    A.   Regoeczi.
15    Q.   It's R-E-G-O-E-C-Z-I, and McLennan
16  is M-C-L-E-N-N-A-N, and Mallett is
17  M-A-L-L-E-T-T.
18        And the charge to the committee is
19  dated July 26th, 2021, correct?
20    A.   What page are you on now?
21    Q.   I'm on page 12.
22    A.   July 26th, 2021, yes.
23    Q.   Just in your own words, what do you
24  understand was the impetus for convening the
25  committee?

Page 63

1    A.   Yeah, so on 9-19-2019, I was
2  alerted, the NIH emailed me and CSU
3  administrators saying we have got several
4  complaints about the Lasker paper, Exhibit 3,
5  and here is 20 allegations that you need to
6  defend.  By the very next day, 9-20-2019, I had
7  a very detailed email explaining everything,
8  and I was waiting for them to reply.  It only
9  took them 615 days to reply to it, but that was
10  the impetus.  That's what I believe.
11    Q.   Okay.  So, as you understand it,
12  what prompted the convening of the
13  investigation committee was the NIH
14  communication that they were concerned
15  about --
16    A.   Yeah, I don't have proof of that,
17  but, yes, that's correct.
18    Q.   All right.  How many times did you
19  meet with the committee; do you remember?
20    A.   Twice on Zoom.  There is another
21  committee, too.  The first investigative
22  committee twice on Zoom.
23    Q.   You were represented by counsel
24  before the committee?
25    A.   I think at the first meeting my

Page 64

1  prior attorney, Jay Carson, was present on
2  Zoom.  I don't think he was there for the
3  second one.  That's my memory.
4    Q.   But he could have been if he wanted
5  to?
6    A.   I think he had a conflict or
7  something.
8    Q.   Don't hear any of my questions as
9  asking for communications between you and
10  Mr. Carson.  Mr. Carson assisted you in
11  communicating with the committee from time to
12  time?
13    A.   One specific would be challenging
14  the expertise of the members, but that's the
15  only one, I think.
16    Q.   Asking for a delay of the
17  committee's work?
18    A.   Oh, he did do that, too.  I just
19  didn't remember.
20    Q.   That's okay.  Anything else that
21  you can think of?
22    A.   Delay, a stay of the investigation,
23  that was one of them.  Then appealing I guess
24  or objecting to the committee composition.
25    Q.   Describe for me, what was the

Page 65

1  objection to the committee?
2    A.   They are not experts.  They have no
3  publications in genetics or intelligence, and
4  they didn't even know what they were doing in
5  my opinion.
6    Q.   Why was it important that they be
7  experts in genetics or intelligence?
8    A.   Because the CSU policy says the
9  RIO, research integrity officer, must ensure
10  that the necessary expertise to evaluate this
11  case is present on the committee.  It says it
12  in two places, but I don't have the policy
13  numbers memorized.
14    Q.   Why would they need that expertise?
15    A.   Because they are trying to evaluate
16  whether my research is I presume racist or
17  pseudoscience or appropriate.
18    Q.   Why did they have to consider that
19  at all?
20    A.   Well, it is highly technical stuff.
21  I mean, they didn't even understand it to the
22  extent they read it.  I think that is unfair,
23  so I objected.
24    Q.   You'll agree with me that the
25  nature of the violations, the potential

17 (Pages 62 - 65)

Page 66

1 violations that the committee was undertaking,
2 concerned allegations of research misconduct,
3 right?
4    A.    Yes.
5    Q.    Much of which had to do with your
6 communications, requests, et cetera, with the
7 NIH, right?
8    A.    Correct.
9    Q.    Why would they need to know
10 anything about genetics for that purpose?
11    A.    How do you evaluate whether the
12 paper is no good or junk science? Can you
13 repeat the question again? I want to make
14 sure.
15    Q.    Yes. You've indicated to me the
16 objection to there not being an expert on the
17 committee, and you told me that they didn't
18 have expertise, I think you said, in genetics
19 or intelligence, and I assume you mean research
20 in those areas.
21    A.    Correct.
22    Q.    My question to you is, I understand
23 from the committee's report what they were
24 investigating is whether you engaged in
25 research misconduct much of which was in your

Page 67

1 connection with NIH?
2         MR. KELLY: Object to the form of
3 the question, ambiguous. You can answer.
4    A.    It just came out of my mind. Give
5 me a second.
6         Oh, because their lack of
7 expertise, and I think I can prove it later,
8 made them make several --
9         THE WITNESS: Don't say that? I'm
10 sorry.
11    A.    Make several -- made them make
12 several mistakes, blatant mistakes, regarding
13 my fate.
14    Q.    What were they?
15    A.    Let me see. I have it. They
16 didn't even know what dbGaP was first of all.
17 There is a comment where Christopher
18 Mallett -- did I get his first name right?
19 Christopher Mallett like maybe a third of the
20 way into my first interview, he's like, I have
21 no idea what research topic you are -- what
22 topic you research. There are others that I'm
23 trying to recall. Oh, the IRB issue, too.
24    Q.    So it's your view that the
25 committee wasn't going to be able to evaluate

Page 68

1 the allegations of research misconduct unless
2 they had an expert in those two areas?
3    A.    According to CSU policy, yes.
4    Q.    Where does it say that?
5    A.    I'd have to dig it up. It's 34.
6 The policy number is like 34.
7    Q.    What I heard you say is the policy
8 says that the university is supposed to make
9 sure that the people conducting the
10 investigation have expertise in the area at
11 issue, right?
12    A.    I don't know if that's verbatim,
13 but yes.
14    Q.    So the area at issue is research
15 misconduct as described in the charge, right?
16    A.    No. I mean, even the dates for
17 when I reported or didn't report articles they
18 couldn't grasp I think because of lack of
19 expertise, so I think it unfairly biased the
20 investigation.
21    Q.    But you did not have an objection
22 that any of the committee members had conflicts
23 of interest or bias?
24         MR. KELLY: Object to the form of
25 the question. When? You can answer.

Page 69

1    Q.    You can answer.
2    A.    I'm sorry. Can you repeat it?
3    Q.    You did not raise an objection that
4 the committee members had a conflict of
5 interest or were biased?
6    A.    I don't remember the biased part.
7         MR. KELLY: Same objection.
8    A.    I don't remember the biased part.
9 I did not make an objection to conflict of
10 interest.
11    Q.    I think you said this before, but I
12 want to make sure it's right. The specific
13 objection that you made was communicated to the
14 committee by Mr. Carson, correct?
15    A.    I think it was to Dr. Ward. I
16 don't know if the committee saw it. There is
17 an email in -- I think it's in the binder maybe
18 or maybe the final report that says exactly
19 what you said.
20    Q.    Okay. That forms the basis for the
21 objection that was raised?
22    A.    Correct.
23    Q.    Confirm for me, if you will, that
24 you were given several opportunities to -- in
25 addition to the two times you were interviewed

18 (Pages 66 - 69)

Page 70

1  by the committee, that you were given several
2  opportunities to present written statements or
3  supplements to the committee, right?
4      A.   In some cases, yes; in some cases,
5  no.
6      Q.   So let's go through quickly the
7  report.  If you switch to page 26, that is an
8  opening statement that you presented to the
9  committee, right?
10     A.   Correct.
11     Q.   And that preceded immediately your
12  interview, the first interview that you had,
13  right?
14     A.   It was either the night before or
15  the same day of the interview that I sent this
16  in my memory.
17     Q.   Okay.  Did you request that the
18  interview be via Zoom?
19     A.   I think it was COVID era, so it had
20  to be, I think.
21     Q.   And during that initial meeting,
22  you were offered the opportunity to make an
23  opening statement, right?
24     A.   I sent the opening statement.  I
25  don't know if there was an offer.

Page 71

1      Q.   When you were informed that the
2  investigation was going to happen and you were
3  provided a copy of the charge, Dr. Ward
4  communicated with you and gave you access to a
5  share file which contained the information that
6  had also been provided to the committee, right?
7      A.   I think it was a PDF file.  We
8  called it the binder during the interviews, and
9  it contained all the allegations there.
10     Q.   And it was on line?
11     A.   I don't think so.  I think it was
12  emailed to me.
13     Q.   You got it in print?
14     A.   In your share file.
15          MR. KELLY:  Object to the form of
16  the question.
17     A.   Can we start over?
18          MR. KELLY:  It's muddled.
19     Q.   What were you provided by Dr. Ward
20  in connection with the materials provided to
21  the committee?
22     A.   We called it informally the binder,
23  the investigative binder.  It was maybe half
24  this size.  It had all my dbGaP applications.
25  It had the complaint letter from Bird, et al.

Page 72

1  It had something from something Taylor,
2  Dr. Taylor at UCLA, and maybe other stuff.  Oh,
3  the Lasker paper, too.
4      Q.   And then subsequently you were
5  provided additional information as the
6  committee's investigation happened, right?
7      A.   The only other thing I can think of
8  is their report.
9      Q.   How about the interviews?
10     A.   Oh, yeah, for sure.
11     Q.   Each time there was an interview by
12  the committee, whether it was an interview of
13  you or an interview of somebody else, there was
14  a transcription of the --
15     A.   Yeah, see, I didn't even get notice
16  of these interviews until after the fact, so I
17  couldn't submit questions as the CSU policy
18  says I should have been able to.
19     Q.   Let's focus on the questions that I
20  ask.  You were provided a transcription of the
21  interviews following the interviews, correct?
22     A.   I need to be specific.  I know I
23  got, it's in here, the Bird interviews with
24  those five people, whatever it was, and I know
25  I have the interview with Kent Taylor from UCLA

Page 73

1  and of course my two interviews.  If there were
2  other interviews, I didn't get them.
3      Q.   After you received those, did you
4  review them to make sure they were correct?
5      A.   Yes.
6      Q.   Did you ever raise an objection of
7  no, that's not what happened?
8          MR. KELLY:  Objection to the
9  question, ambiguous.  You can answer.  Unless I
10 instruct you not to answer, you can always
11 answer after my objection.  Go ahead.
12     A.   Sorry.  You'll have to repeat it.
13 He knocked the question out of my head.
14     Q.   After reading the transcriptions of
15 your interviews with the committee, did you
16 ever find that they were incorrect in any way?
17     A.   I guess can you give me an example
18 of what incorrect means?  I mean, there is
19 typos in here from the Zoom auto transcriber.
20 I honestly don't know how to answer that.
21     Q.   Did you find that they were
22 substantively incorrect?
23          MR. KELLY:  Object to the form of
24 the question, ambiguous.
25     A.   I think what happened -- because I

19 (Pages 70 - 73)

Page 74

1  saw the video, too.  There's a link to it.  So
2  I watched the video and read the transcript.
3  What I said was pretty accurately laid on
4  paper.
5      Q.   All right.  So the transcriptions
6  that we have are, as you say, pretty accurate
7  to what the video of the interviews said?
8      A.   Yes.
9      Q.   Okay.  If you turn to page 34, are
10  you with me?
11     A.   Yes.
12     Q.   You're asked by Conor McLennan, "Do
13  you believe your handling of the data set is
14  controversial?  Please, explain."
15         And you said, "Absolutely not.  I
16  believe, like, to the best of my ability, I
17  tried to follow the NIH's policy and
18  guidelines.  And when I reported stuff, I to
19  the best of my ability tried to report exactly
20  what they wanted.  Nothing more, nothing less.
21  I did not share data with anyone not authorized
22  to use it.  I do believe that the data I -- the
23  Lasker paper -- is inconsistent with the
24  applications I produced."
25     A.   You said inconsistent?

Page 75

1      Q.   Excuse me.  "Is consistent with the
2  applications that I produced.  And the one
3  problem that everyone stuck on is it's the same
4  data, TCP.  I had three applications for the
5  same data, but I was screwed up, and I reported
6  the Lasker paper in the one application that
7  didn't mention intelligence, and so I think a
8  lot of the issues arise from that."
9          What did that mean.
10     A.   Okay.  So --
11         MR. KELLY:  Object to the form of
12  the question, ambiguous.  Go ahead and answer.
13     A.   So at the time of the interview,
14  this is what I concluded.  After the interview
15  in preparing for this lawsuit, I did more
16  research, and I will just say that I did not
17  violate NIH policies at all with one exception
18  we can get to whenever you want.
19     Q.   Okay.  So how is it that you didn't
20  violate the policy with respect to the Lasker
21  paper as described on page 34 of the interview?
22     A.   So Deputy Director of NIH, Michael
23  Lauer, L-A-U-E-R, one of the things he accused
24  us of is how we reported these articles or
25  didn't report them, but he's provably wrong,

Page 76

1  and it's the handout that I have, one of them.
2          The official date of publication,
3  the NIH director didn't know it.  We had to
4  point it out to him.  It would be that one
5  there (indicating).  I think it's that one.  Is
6  that it?
7          MR. KELLY:  Do you want to mark
8  that?
9          - - - - -
10         (Thereupon, Deposition Exhibit 6, a
11         One-Page Document from a Zoom
12         Interview Submitted by Dr. Pesta,
13         was marked for purposes of
14         identification.)
15         - - - - -
16     A.   I don't think this is the one.  I'm
17  sorry.  No, this is the one.
18         MS. GIFFEN:  So, first of all, let
19  the record reflect Exhibit 6 is a document that
20  Dr. Pesta brought with him today to his
21  deposition.
22     Q.   Dr. Pesta, what is Exhibit 6?
23     A.   Okay.  It shows that -- so one of
24  the things they said is you didn't report
25  Lasker, the publication, when you should have,

Page 77

1  and there was a semi lengthy debate about when
2  it should be reported.  This first paragraph
3  here illustrates an example of that.
4          So I think it was in my first
5  interview, Conor is like, You know, what's
6  important for you to report is when it's
7  accepted, and this is an example of how lack of
8  expertise hurt me.  So according to Conor, his
9  opinion, when the paper is accepted for
10  publication obligates you to report it.  He's
11  flatly wrong.  There is the NIH policy
12  underneath it.
13     Q.   Oh, I see, the official date of
14  publication?
15     A.   Yes, which appears on the journal
16  article.
17     Q.   So the reference here that you're
18  making is the when it should have been
19  reported, right?
20     A.   And if, when and if.
21     Q.   This appears to me to be only about
22  when.  How is it --
23     A.   It's really complicated.  So every
24  year -- once you get approved for the data, you
25  can use it for one year, and then you've got to

Page 78

1  either renew it if you want to continue using
2  it for another year or you have to close it out
3  meaning I'm done with the research and I'm
4  going to delete everything.
5        Whenever for the three applications
6  I submitted -- in fact, this is the other
7  handout. I don't know if we would refer to it
8  now. So every time I submitted an application,
9  and there were three, for the same TCP data
10 set, three dates would be generated; the date I
11 submitted it to CSU, the date CSU approved it
12 and forwarded it to NIH, and then the date NIH
13 approved it.
14       So even more complicated, when
15 you're renewing an article -- or a data access
16 and want to use this again for another year,
17 you have to report any officially published
18 articles, and that's it. That's what we did.
19       When you're closing out an
20 application, you have to report everything
21 which includes preprints, conference
22 presentations, and publications.
23    Q.  Let's look at something else. What
24 was the data set that you were interested in
25 acquiring?

Page 79

1    A.  Okay. It's from dbGaP, database of
2  phenotypes and genotypes, and a subset -- so it
3  just houses a bunch of genetic data. The
4  specific data we wanted was TCP, trajectories
5  of complex phenotypes.
6    Q.  From here on out we're going to
7  refer to that as TCP, okay?
8    A.  Okay. Yes.
9    Q.  And there were three different
10 requests that you made to the NIH that involved
11 TCP data, correct?
12   A.  I think there was a fourth one, but
13 it was after Lasker was published and I was
14 being investigated or during that time.
15   Q.  Let's hold off on that, and let's
16 focus on those first three.
17       - - - - -
18       (Thereupon, Deposition Exhibit 7,
19       Project Request 18007, was marked
20       for purposes of identification.)
21       - - - - -
22       MR. KELLY: If I may, you should
23 probably spell that, dbGaP.
24       MS. GIFFEN: Hold on. Now you can
25 begin. She wasn't at her machine yet.

Page 80

1    A.  I'm sorry. Lower case D, lower
2  case B, upper case G, lower case A, upper case
3  P.
4        MR. KELLY: This is 7?
5        THE NOTARY: Yes.
6        MR. KELLY: These are three
7  documents here.
8        MS. GIFFEN: Yes. I want them all
9  as one exhibit because it's too confusing to
10 have them separate.
11   Q.  Can CSU confirm for me, Dr. Pesta,
12 that Exhibit 7 is your first request for the
13 TCP data from NIH?
14   A.  Correct.
15   Q.  Okay. And that was --
16       MS. GIFFEN: I don't know, Fred, if
17 you want to -- we've got this if you want to
18 put it together (indicating).
19       MR. KELLY: I'm not going to touch
20 it.
21       MS. GIFFEN: Thank you. Let me
22 have the exhibit so we can do this.
23       THE WITNESS: Okay. Thank you.
24   Q.  So this is the first request that
25 you had made to the NIH for the TCP data?

Page 81

1    A.  Correct.
2    Q.  This was the first request that you
3  had made at any time in your career for data
4  from NIH, correct?
5    A.  I've used some publicly available
6  NIH data for other publications. First
7  genetic, first restricted access data.
8    Q.  First restricted. So we should be
9  clear that all of what we're talking about is
10 restricted access data, correct?
11   A.  I agree.
12       MR. KELLY: Object to the form of
13 the question.
14   Q.  This refers to the project name is
15 Sex Differences in Cortical Volume and G in a
16 Large Adolescent Sample, right?
17   A.  Right.
18   Q.  The request date is noted as
19 April 12th, 2018?
20   A.  So I had to reverify these things,
21 and I'm pretty sure the sex differences dates
22 here for this application are all correct.
23 Some of the other ones aren't, but, yes,
24 4-12-18.
25   Q.  You are what's called the principal

21 (Pages 78 - 81)

Page 82

1  investigator, right?
2     A.   Correct.
3     Q.   And the principal investigator is a
4  term of art used by NIH for purposes of making
5  data requests, right?
6     A.   Yeah.  I guess it's their
7  terminology.
8     Q.   And let's also make clear that the
9  application that you're making is on line,
10  right?
11     A.   Correct.
12     Q.   So you go to NIH.  You use a
13  special ID number I suspect?
14     A.   I think it's just a user.  It was
15  my name, Bryan Pesta, no spaces.
16     Q.   And so then you log in, right?
17     A.   Uh-huh.
18     Q.   And you then fill in the project
19  request?
20     A.   Correct.
21     Q.   And there are forms that come up
22  that you then fill in?
23     A.   Correct.
24     Q.   And what we're looking at in
25  Exhibit 7 is the physical printout of those

Page 83

1  questions that you answered as part of the
2  request; is that right?
3     A.   The on-line --
4        MR. KELLY:  Object to the form of
5  the question, ambiguous.
6     A.   The on-line, you know, it was like
7  you're filling out a form, and you don't see
8  like the bubbles, but, yes, this is I, agree.
9     Q.   And on the second page of
10  Exhibit 7, you write, and this is the use
11  statement for the data, right?
12     A.   Correct.
13     Q.   Therein there is a non-technical
14  study?
15     A.   Summary.
16     Q.   Non-technical summary, right?
17     A.   Correct.
18     Q.   And in the form it says that use of
19  the data --
20     A.   What page are you on?  I'm sorry.
21     Q.   I think it's actually the third
22  page.
23     A.   Okay.
24     Q.   There is reference to, "Use of the
25  data is contingent upon compliance with the

Page 84

1  model data use certification agreement," right?
2     A.   Correct.
3     Q.   Sometimes called a DUC?
4     A.   They are the same thing, correct.
5     Q.   The DUC is attached to Exhibit 7 on
6  pages --
7     A.   It renumbers.
8     Q.   It renumbers.  You are exactly
9  right.
10     A.   One to seven.
11     Q.   All right.  There is also -- I
12  don't think there is on this one.
13     A.   The addendum?
14     Q.   Oh, there is.
15     A.   Okay.
16     Q.   There is also an addendum to the
17  data use certification agreement.  Do you see
18  that?
19     A.   Yes.
20     Q.   Okay.  And in those you agree to
21  comply with both what's in the DUC as well as
22  the NIH security best practices for
23  controlled-access data?
24     A.   Correct.
25        - - - - -

Page 85

1        (Thereupon, Deposition Exhibit 8, a
2        Document Entitled NIH Security Best
3        Practices for Controlled-Access Data
4        Subject to the NIH Genomic Data
5        Sharing Policy, was marked for
6        purposes of identification.)
7        - - - - -
8     Q.   This, Exhibit 8, is a copy of those
9  best practices I just referred to, right?
10     A.   I could have swore that our DUC was
11  from October of 2012, the original when
12  we -- so I think this is newer.  I don't know
13  if there is any changes, but --
14     Q.   Well, if this was updated March of
15  2015 and your request was 2018?
16     A.   Yeah.  So when I printed them
17  out -- I don't have them -- it said, I'm
18  positive on this, I think it said October.  Now
19  I'm blocking on the date, but it was a
20  different date.  Yeah, October 12th, 2012.
21     Q.   Which was what?
22     A.   You see where it says updated on
23  Exhibit 8, updated March 9th?
24     Q.   Yes.
25     A.   Mine didn't say that.  It said

22 (Pages 82 - 85)

Page 86

1 updated in 2012. I don't know that there is
2 differences between the two.
3     Q.   Okay. Wait a second. Hold on. So
4 let me refer you to the DUC which is contained
5 in Exhibit 7.
6     A.   Okay. What page?
7     Q.   It's where it's renumbered. It's
8 the model data use certification agreement.
9     A.   Got it.
10     Q.   That's dated October 12th, 2012,
11 right?
12     A.   Yeah. So maybe my memory confused
13 the two. I agree.
14     Q.   But the DUC agreement refers to the
15 best practices for controlled-access policy,
16 right?
17     A.   Correct. Which is the March 9th.
18     Q.   Yeah okay. So are we in agreement
19 that those were the two things that applied to
20 the request for information from NIH?
21     A.   Yes.
22     Q.   I understand that when you get an
23 approval to have access to the data like TCP,
24 you have it for one year?
25     A.   Correct.

Page 87

1     Q.   You have to either get a renewal at
2 that point or you have to close it out?
3     A.   Correct.
4     Q.   And so, and I think this is what
5 you were referring to earlier in terms of
6 noting whether papers had been published?
7     A.   Yeah, the when or if, remember
8 that?
9     Q.   Yeah. But so then the renewal
10 dates become important, right?
11     A.   Plus the closeout dates.
12          - - - - -
13          (Thereupon, Deposition Exhibit 9,
14          Project Request No. 19090, was
15          marked for purposes of
16          identification.)
17          - - - - -
18     A.   Okay.
19     Q.   Handing you what's been marked as
20 Exhibit 9, can you confirm for me that this is
21 the second request you made for the TCP data?
22     A.   Yes.
23     Q.   And it appears that that request
24 was made July 15th of 2018?
25     A.   I would need to check that

Page 88

1 refresher double-sided thing that I gave you
2 guys.
3          - - - - -
4          (Thereupon, Deposition Exhibit 10, a
5          Timeline Regarding BJP's Data Access
6          Requests, was marked for purposes of
7          identification.)
8          - - - - -
9     Q.   I'm sorry. We're now on
10 Exhibit 10. First of all, Dr. Pesta, what is
11 Exhibit 10?
12     A.   It shows a detailed timeline of
13 events, when I should have reported what, when
14 I shouldn't have reported, and footnotes of
15 explanations on the back.
16     Q.   You prepared this?
17     A.   I did.
18     Q.   When did you prepare this?
19     A.   Believe it or not, this table took
20 me 100 hours to create, just this double-sided
21 thing, so it took months. I probably had it
22 finished maybe two months ago. I don't
23 remember.
24     Q.   And what did you do with this?
25     A.   So I wanted to confirm that what

Page 89

1 you have there as Exhibit 9 and 7, the dates
2 are accurate because I noticed NIH will throw
3 in weird dates that make no sense. So I went
4 back to my NIH account on line, downloaded the
5 applications again, and just made doubly sure
6 that these dates are correct.
7     Q.   Okay. So this is a compilation
8 that you made of the data that --
9     A.   Of the applications that I got off
10 the dbGaP website.
11     Q.   Okay. Let's see. We'll go back to
12 Exhibit 7 which is the sex differences paper.
13 The project ID No. Is 18007, and it says the
14 request date was April 12th, 2018, right?
15     A.   Which is consistent with the CSU
16 Exhibit 7.
17     Q.   Okay. Now let's look at Exhibit 9
18 which is the 19090 application.
19     A.   Okay.
20     Q.   And it says it was applied for on
21 July 15th, 2018?
22     A.   Correct.
23     Q.   And your table shows it was applied
24 for on July 15, 2018?
25     A.   Correct.

23 (Pages 86 - 89)

Page 90

1    Q.   Okay.  So that appears to be the
2  same, right?
3    A.   Yes.
4    Q.   Okay.  So now let's examine
5  Exhibit 9 a little more carefully.  This is to
6  collect the TCP data again, correct?
7    A.   Yes.
8    Q.   And you note here on page 2 of the
9  request, "Note, I've already received access to
10  these data (18007)" which is the reference to
11  the sex differences request, correct?
12    A.   Correct.  So this would have been
13  in the -- in the renewal of Exhibit 9.
14        MR. KELLY:  Just answer the
15  question.  Just let her ask the question.
16        THE WITNESS:  Okay.
17        MR. KELLY:  Reply to the question.
18    Q.   This note is in the project request
19  that you did?
20    A.   Yeah.  So NIH is a strange thing.
21        MR. KELLY:  Just answer the
22  question.
23        THE WITNESS:  It's not going to
24  make sense, though.
25        MR. KELLY:  She'll figure it out.

Page 91

1  That's what her job is.
2    A.   Can you repeat, please?
3    Q.   So when you made the request in
4  Exhibit 9 for project ID 19090, you said to the
5  NIH, "Note:  I've already received access to
6  these data," and then you made reference to the
7  project which is specifically sex differences
8  in cortical volume meaning the prior request
9  for data to NIH, correct?
10    A.   I don't think so.
11        MR. KELLY:  Go ahead.
12    A.   No.  Can you repeat?  I'm sorry.
13  I'm getting flustered.
14        MR. KELLY:  I'm going to instruct
15  the witness to just listen to the question, see
16  if you can answer it.  Catch the ball before
17  you try to start running with it.  Just listen
18  to it.  If it's a yes or no question, you can
19  answer yes or no.
20        (Record read.)
21        THE WITNESS:  I can answer?
22    A.   Yeah, so I just screwed up a minute
23  ago.  I thought I was like at 18007 when you
24  asked the question.  That's what confused me.
25  But now I understand that you're talking about

Page 92

1  Exhibit 9, not Exhibit 7, so I say yes to your
2  question.
3    Q.   So this is going to be challenging,
4  so I'd like to agree on some nomenclature.
5    A.   Sure.
6    Q.   So when we talk about the request
7  involving sex differences, we're talking about
8  project ID 18007?
9    A.   Correct.
10    Q.   And when we talk about the request
11  involving the admixture analysis purpose, we're
12  talking about 19090?
13    A.   Correct.
14    Q.   And when we're talking about
15  transracial validity --
16    A.   Yes.
17    Q.   -- we're talking about the third
18  that we haven't yet gotten to --
19        MR. KELLY:  Objection.
20    Q.   -- which is 19747.  Are you all
21  right with that?
22        MR. KELLY:  Object to the form of
23  the question, ambiguous and confusing.
24    A.   Yes.
25    Q.   All right.  So this Exhibit 9

Page 93

1  refers to the admixture analysis, correct?
2    A.   Yes.
3    Q.   And we've now determined that, as
4  part of your initial request, you noted that
5  you'd already received access to the data from
6  the sex differences request, correct?
7    A.   Correct, which was the first.
8    Q.   But this time the purpose for using
9  that data is different, correct?
10    A.   A different topic, yes.
11    Q.   And that related to, "I will employ
12  admixture analysis to determine if global
13  ancestry predicts mental health outcomes.  I
14  will also apply admixture mapping to determine
15  which regions of the genome are most strongly
16  associated with the outcomes."
17    A.   Correct.
18    Q.   In the non-technical summary of
19  your request, the mental disorders, actually
20  it's in both places that you were referring to
21  that what you're interested in studying
22  includes schizophrenia and depression, correct?
23    A.   I'm looking for depression.  You
24  said non-technical summary?
25    Q.   It's actually in both.

24 (Pages 90 - 93)

Page 94

1    A.    Oh, yeah, and low IQ, but I admit
2 we weren't explicit.
3    Q.    Is there some way where you made
4 reference to IQ that isn't explicit?
5    A.    19747, which we haven't gotten to
6 yet, has all that.  There might be something in
7 here.  Let me check.
8    Q.    Please, do.
9    A.    Thank you.  Yeah, no, I think 19747
10 is going to be a lot more relevant.
11   Q.    So for our purposes we can agree
12 that the request for NIH data in Exhibit 9 does
13 not relate to low IQ?
14        MR. KELLY:  Object to the form of
15 the question.
16   A.    Not directly for sure.
17   Q.    Where does it indirectly?
18   A.    I mean, I didn't read through the
19 whole thing.  I scanned through it.
20   Q.    Please, do.
21        MR. KELLY:  Read it.
22   Q.    I would like you to tell me if in
23 any way it refers to IQ.
24        MS. KAMINSKI:  Do you want to go
25 off the record while he reads it?

Page 95

1        MS. GIFFEN:  Sure.  Let me know
2 when you're done, and we'll go back on the
3 record.
4        (Brief recess.)
5        MS. GIFFEN:  Back on the record.
6    Q.    Dr. Pesta, have you completed
7 reviewing Exhibit --
8    A.    Nine.
9    Q.    -- 9?
10   A.    Yes.
11   Q.    Can you tell me does it either
12 directly or indirectly refer to a purpose that
13 involves IQ?
14   A.    Yeah.  The indirect reference would
15 be about one-third down where it says key
16 words, and then it says cognitive disorders.
17   Q.    Okay.  You perceive that low IQ is
18 a cognitive disorder?
19   A.    Yeah.  So there is that, what is
20 it, Virginia versus Atkins where if your IQ is
21 not 70 or higher you can't be executed.
22   Q.    And so you're suggesting that that
23 was to alert NIH that one of the purposes that
24 you were going to use this data for --
25   A.    No.  I was answering your question

Page 96

1 about direct or indirect reference to cognitive
2 ability.
3    Q.    I actually said IQ, but --
4    A.    Okay.
5    Q.    -- that is your best indication,
6 right?
7    A.    For the specific project, yes.
8    Q.    All right.
9        - - - - -
10       (Thereupon, Deposition Exhibit 11, a
11       Project Renewal Application for
12       Project 19090, was marked for
13       purposes of identification.)
14       - - - - -
15   A.    Can I ask you a question?  I think
16 it's a duplicate of 19090.
17       MR. KELLY:  Yes, it is.  This is --
18   A.    Eleven and Exhibit 9 appear to
19 be --
20   Q.    No.  This is the renewal.
21   A.    Oh, okay.  Thank you.
22   Q.    All right.  Dr. Pesta, can you
23 confirm for me that Exhibit 11 is the form that
24 you filled out to get a renewal of the
25 admixture analysis --

Page 97

1    A.    Of 19090.
2    Q.    -- data request?
3    A.    Correct.
4    Q.    And that shows a request date of
5 August 29th, 2019?
6    A.    Correct.
7    Q.    And is that correct?
8    A.    Yes.  The next two dates in the
9 same column are irrelevant.
10   Q.    Why do you say they are irrelevant?
11   A.    They don't -- I mean, look at the
12 previous renewal date, 9-9-19.  I didn't do
13 that.  It just makes no sense, the previous
14 renewal date.  I mean, I put in this
15 application on 8-29-19, and I just don't know
16 what that means, the middle guy.
17   Q.    Well, if we go back to Exhibit 9,
18 and this relates to the same project number,
19 right, the admixture analysis project number?
20   A.    Yes.  Okay.
21   Q.    All right.  And that original
22 request was July 15th, 2018, correct?
23   A.    Correct.
24   Q.    And Exhibit 11 relates to that same
25 project number?

25 (Pages 94 - 97)

1    A.   Correct.  But my point is -- well,
2  I mean, I just want to clarify.  So it says I
3  did that on 8-29-18.  How could the previous
4  renewal date be later in time?
5    Q.   Oh, you're just objecting to the --
6    A.   Dates.
7    Q.   -- how the subsequent dates are
8  populated?
9    A.   Yes.  I agree with the request
10  date, but not the other two.
11    Q.   Okay.  I actually hadn't asked you
12  about the other two dates.  I just want to note
13  that for our purposes.
14    A.   All right.  I'm sorry.
15    Q.   All right.  And should we check to
16  see if that date is consistent with your
17  Table 1?
18    A.   Yes, it is.
19    Q.   Okay.  So at least with respect to
20  project 18007 and project 19090, we have both
21  the original request date and the renewal
22  dates, correct?
23    A.   Correct.
24    Q.   When were you supposed to have your
25  renewal request done by for project 19090?

1    A.   You have to do it within a year.  I
2  mean, I guess you could close it out two weeks
3  after getting it, or you could wait 364 days
4  and then submit it.
5    Q.   Do you know what the date was that
6  you had to do that for project 19090?
7    A.   Well, I don't think it's reflected
8  in these documents because I applied for that
9  on 7-15-18, but it took time for CSU to approve
10  it and the NIH.  So whatever that NIH date is
11  where I was granted access, a year from there
12  would be the deadline for renewing it or
13  closing it out.
14    Q.   Do you remember that that was
15  September 1st, 2019?
16    A.   No, I don't remember.
17    Q.   Okay.
18         - - - - -
19         (Thereupon, Deposition Exhibit 12,
20         Project Request for Project 19747,
21         was marked for purposes of
22         identification.)
23         - - - - -
24    Q.   Handing you what's been marked as
25  Exhibit 12, can you confirm for me, Dr. Pesta,

1  that Exhibit 12 relates to the third
2  application you made for the TCP data?
3    A.   Correct.
4    Q.   And that the nomenclature we
5  determined to use with respect to that is the
6  transracial validity data or, excuse me,
7  purpose, correct?
8    A.   Correct.
9    Q.   So this shows that the request, the
10  initial request for 19747, was dated
11  September 19th, 2018; is that correct?
12    A.   Correct.
13    Q.   And does that check with your
14  Table 1?
15    A.   Yes, it does, column three.
16    Q.   Okay.  All right.  What was the
17  purpose for this data request?
18    A.   So it was to study whether genetics
19  plays a partial -- it was the focus of the
20  Lasker paper.  This one produced that.  This
21  RUS -- wait, we're on Exhibit 12, right?
22    Q.   Yes.
23    A.   Yeah.  So, I mean, it's technical
24  jargon.  I can explain it if you want.
25    Q.   Go ahead, please.

1    A.   Am I looking at the right one?
2  Yeah, if you look at page 2.
3    Q.   Yes.
4    A.   It looks like the middle paragraph.
5    Q.   What?
6    A.   There is the three paragraphs up
7  top.  The second and third are relevant.
8  Actually, the first is, too.  I'm sorry.
9    Q.   All right.  So if you could state
10  in laymen's terms, what was the research use
11  for which you sought the data?
12    A.   Transethnic validity means you have
13  these polygenic scores, which in this case
14  would be a genetic estimate of your IQ, and
15  they're developed almost mostly on white
16  people.
17         So the issue is can you take a PGS
18  score developed on primarily white people and
19  have it still be valid with black people,
20  because if it's not valid, you can't even do a
21  comparison.  So that's the first thing.
22         Yeah, so that's basically the first
23  paragraph.  All right.  The second, did you
24  want me to continue?
25    Q.   Please.

Page 102

1    A.   The second paragraph, this is
2 statistical technical stuff, but Lee, et al.,
3 where we got the PGS scores from, they did
4 their transethnic validity validation different
5 than how we did it, and our argument was that
6 our approach was better.
7    Q.   What was the approach you were
8 using?
9    A.   Well, it says that; doesn't it?
10    Q.   Pardon me?
11    A.   I'm just reading it.  Yeah, it's
12 the choice of which, the terminology is SNP,
13 single nucleotide polymorphisms, were used as
14 our estimates.
15    Q.   Estimates of what?
16    A.   Genetic IQ.
17    Q.   So the SNPs, what you wrote here
18 was, "This means that the authors included all
19 SNPs associated with education regardless of
20 the significance of the association."
21    A.   I can explain that, but it's
22 technical.
23    Q.   Sure.
24    A.   Okay.  So if you think of DNA, you
25 see the complicated 3-dimensional molecule.

Page 103

1 But if you think of it as just being a ladder,
2 it makes more sense to explain to people.
3      So you have this ladder.  It's DNA.
4 Obviously ladders have rungs.  So there is
5 3 billion of them in the human genome.
6 Something like 90 percent -- 97 percent are the
7 same across every human being.  The 3 percent
8 that differ are what causes me to be short, you
9 to be tall, you to have green eyes, or him to
10 have brown.
11      What you do then is -- this is
12 useful.  It might be long winded.  First one
13 has to conduct what's called a GWAS study,
14 G-W-A-S, a genome-wide association study.  So
15 let's suppose I want to see if diabetes has a
16 genetic basis.  What I would do is get two
17 groups of people.  This group is not diabetic.
18 This group is diabetic.  Then you would scan
19 the genomes of people in each group and look
20 for differences in the rungs, and you would
21 basically sum them.  So this third rung is a
22 difference.  That's one.  Rung 22 is a
23 difference.  That's two.  The end result is to
24 summarize a score that predicts in this case
25 your propensity for diabetes, but --

Page 104

1    Q.   Hold on a second before you keep
2 going.  So you would deduce -- and when you say
3 you are looking for the rungs that are
4 different, that's the SNP, right?
5    A.   Yes.  Exactly, yes.
6    Q.   If you note that everybody with
7 diabetes has a difference in seven SNPs, then
8 you would suggest then that that's the key to
9 determining whether somebody is likely to have
10 diabetes?
11    A.   So it's a probability.  The start
12 of your question made it seem like you said for
13 sure.  No.  It's a probability argument, and
14 seven wouldn't be enough.
15    Q.   You would need a lot more than
16 seven?
17    A.   Correct.  That creates the problem
18 with the sentence.
19    Q.   Hold on.  So the seven would be
20 ridiculous because, as you just mentioned a
21 moment ago, there are did you say a billion or
22 billions?
23    A.   Three billion total, and 3 percent
24 differ across humans, but that's still like a
25 couple million.

Page 105

1    Q.   Right.  Right.  So the idea that
2 seven SNPs would be responsible for any single
3 manifestation is pretty remote; isn't it?
4    A.   So I'm trying to balance between
5 being technically accurate and explaining it to
6 you.  For like Mendelian disorders, it could be
7 just one, but we're looking at polygenic stuff.
8 IQ is determined by multiple, multiple genes,
9 so in that context yes.
10    Q.   That's helpful.  Because there may
11 be certain things where you really only have to
12 look at one gene, and then you're more likely
13 to have fewer SNPs that would show us the
14 difference, right?
15    A.   Correct.
16    Q.   Because we're dealing with
17 intelligence, do we even know how many genes
18 are associated with intelligence?
19    A.   It's a work in progress.  So these
20 are revised, and every revision has more SNPs
21 that you can use to scale the score.
22    Q.   But at the moment we don't know
23 precisely the number of genes or even the
24 location of genes that are associated with
25 intelligence?

27 (Pages 102 - 105)

Page 106

1    A.    With certainty, no.
2    Q.    And that means we can't possibly
3  know the number of SNPs that you'd have to find
4  differences in in order to make an accurate
5  determination of intelligence, right?
6    A.    I would disagree with that because
7  I don't think anyone claims that intelligence
8  is 100 percent genetic.  There are
9  environmental influences that affect it.  So
10  the best you can do by getting more SNPs is
11  increase the reliability of your measure which
12  then lets you find -- then you want to
13  correlate those PGS scores with like a real
14  paper and pencil IQ test.
15    Q.    I'm sorry.  I didn't hear what you
16  just said.
17    A.    Okay.  So once you have the genetic
18  estimate of IQ, then you want people to take
19  actual IQ tests, and then you want to see if
20  the genes predict the scores.
21    Q.    So what were you proposing to do in
22  your request which we see as 1974?
23    A.    So, yeah, you were asking
24  specifically about, I believe, the first
25  sentence of the second paragraph on page 2.  So

Page 107

1  the problem is when you're scanning the genome
2  to try to identify these SNPs, you're doing a
3  ton of statistical tests, and often when you do
4  a statistical test, you have to worry about
5  false alarms.  It's a statistically significant
6  difference at this rung, but it's a fluke.
7        With traditional measures of values
8  of significance, it's .05.  If you use that and
9  you're looking at millions of, you know, rungs,
10  you're going to get a lot of false alarms.  So
11  what you do is you tweak the P value.  Instead
12  of .05, you might only accept a rung if it's
13  got a probability of .001.  So that's basically
14  what the first part of the second paragraph is
15  getting at.
16    Q.    Okay.  What was the nature of the
17  TCP data?
18    A.    Yeah, so it was collected like in
19  29 -- 2009 in Philadelphia.  It was a bunch of
20  like early teenage, I think the age range was
21  like eight to 18.
22    Q.    I think it was eight to 21; does
23  that sound right?
24    A.    Okay.  I'd have to check.
25    Q.    Go ahead.

Page 108

1    A.    And they were looking at -- well,
2  they gave a really good IQ test, a battery of
3  tests that we use to calculate the phenotypic
4  IQ, the paper and pencil score, and they also
5  had their DNA and many other variables like
6  gender, age, SES.
7    Q.    SES, what's that?
8    A.    Socioeconomic status.
9    Q.    That was as reported by the parents
10  or participants?
11    A.    I would imagine parents, but I
12  would have to go back and look.
13    Q.    Okay.  Go ahead.
14    A.    Yeah, and the IQ test.  So you have
15  a spreadsheet with genetic data over here, the
16  SNPs and their PGS score, and then you have
17  phenotypic data like, well, your IQ test score,
18  paper and pencil.  I don't know if we had
19  income, we didn't, but, you know, like age,
20  gender, that kind of stuff.
21    Q.    So how did you determine the
22  ethnicity of the participants?
23    A.    In that -- so we didn't collect the
24  original data.  The researchers did it in
25  Philadelphia.

Page 109

1    Q.    I'm aware of that.
2    A.    Yeah.  Could you repeat the
3  question?
4    Q.    How did you determine the ethnicity
5  or race of the participants?
6    A.    Two ways, and this was the point of
7  the paper.  One, the researchers back then
8  asked them.
9    Q.    They call it SIRE, right?
10    A.    Self-identified race ethnicity.
11    Q.    So that information was contained
12  in the original NIH data, right?
13    A.    Correct.
14    Q.    Go ahead.
15    A.    And then we had to do what's called
16  admixture analysis to get a genetic estimate of
17  ancestry which is different from
18  self-identified race ethnicity.
19    Q.    How did you do that?
20    A.    It's a statistical technique.
21  Basically it clusters people into the origin of
22  ancestry.  It's a complicated technique, but
23  basically you can say that Joe here is
24  75 percent white ancestry, maybe 20 percent
25  African, and 5 percent something else.

28 (Pages 106 - 109)

Page 110

1    Q.    How do you determine that?
2    A.    It's called factor analysis
3  principal components analysis.  I wonder if we
4  have a plot?  Can I show you the Lasker paper?
5  You can see a plot of it.
6    Q.    Okay.
7    A.    Which exhibit is that?
8    Q.    It's Exhibit 2 or 3.
9    A.    Yeah, here it is.  Okay.  So look
10  at page 436.
11    Q.    I lost my own.  Page 436 of
12  Exhibit 3?
13    A.    Correct.  Okay.  So this plots
14  admixture analysis results on the X axis.  So,
15  you know, for any subject in that study, we
16  would know from zero to 100 percent how much
17  European ancestry they have, and then we're
18  plotting that against the self-report, the
19  SIRE, on the Y axis.  As you can see, it maps
20  on very nicely.
21       For example, the probability that
22  you have no European ancestry but you
23  self-identify as -- well, can I reverse that?
24  European ancestry -- wait a minute.
25       Yeah, so the probability that you

Page 111

1  have zero European ancestry and report being
2  black is essentially zero.  That's on the left
3  side of the graph.  On the right side, if your
4  European ancestry is 100 percent, then you can
5  see this top curve, there is 100 percent chance
6  or pretty close to it that you self-identify as
7  white or European.
8    Q.    What is a PNC data set?
9    A.    PNC.  Oh, the data set that was
10  collected in Philadelphia in '09 or whatever,
11  the Philadelphia neurodevelopmental cohort, but
12  that's the TCP data.  I know it's confusing.
13    Q.    But how did you determine what the
14  admixture results were?
15    A.    It's -- it looks at the SNPs, and
16  so people who are predominantly African would
17  light up a different set of SNPs than people
18  who are predominantly white or any other
19  ethnicity or race that you want to look at.
20       And you can see that on page, I
21  want to make sure -- no, that's not going to
22  help us.  We'll probably get to it.  But did
23  that answer your question?
24    Q.    Well, if you're getting to the skin
25  color reference, that is where I'm going.

Page 112

1    A.    Okay.  I'll wait then.
2    Q.    No, that's all right.  You can tell
3  me now.  What happened in that part of the
4  study.
5    A.    Okay.  So the 2009 data set, can we
6  just call it PNC to not be confusing?
7    Q.    Sure.
8    A.    So the PNC original data set
9  didn't -- it had self-identified race, but it
10  didn't have measures of eye color, hair color,
11  or skin color.
12    Q.    Just let me interrupt you for one
13  second, and then we'll go back to that.  It
14  also didn't do the admixture analysis that you
15  just described?
16    A.    No.
17    Q.    So now proceed.  So it didn't have
18  eye, skin, or hair color?
19    A.    Correct.  And so there is a theory
20  about race IQ gaps called colorism, and it's
21  totally environmental.  It's due to
22  discrimination, the race IQ gap, and so it
23  predicts that the darker your skin, the more
24  discrimination you'll experience.
25       So we wanted to pit that social

Page 113

1  construct of race against genetic ancestry,
2  DNA, to see which best predicted the paper and
3  pencil gap.
4    Q.    Okay.  So what does eye, hair, and
5  skin color have to do with it?
6    A.    So colorism is not my theory.  We
7  tested it.  But if you're a colorist theorist,
8  then you predict that IQ scores will decrease
9  with darker skin tones, not because of
10  genetics, but because they experience more
11  discrimination.
12    Q.    And how did you determine the eye,
13  hair, and skin color?
14    A.    Yes, this was a mistake.  We
15  uploaded it to a server, but I had an
16  oversight.  I didn't report it in this
17  application.  But there is a server, HIrisPlex
18  that you can input I think it's like 32 SNPs,
19  which is not enough to identify people, but it
20  is enough to reliably predict color of hair,
21  eye, and skin.
22    Q.    And so then what happened?
23    A.    So then we put it all into a model,
24  and that was the table I was going to show you.
25  Yeah, it's on page 438.

Page 114

1    Q.   Okay.  That's the one I'm looking
2  at.  So what does the chart on 438 tell us?
3    A.   Okay.  So on the X axis is genetic
4  ancestry.  So you're either not at all European
5  or 100 percent European, and this is sort of a
6  validation check under skin color measures.  On
7  the Y axis is skin color, and you can see, if
8  you look at European ancestry equals zero, then
9  your skin color is pretty dark which makes
10  sense.  If your skin color is pretty dark,
11  you're probably not European.  On the other
12  extreme, if you're 100 percent European, your
13  skin is much lighter.  So this graph shows that
14  the skin color has some reliability.
15         Then we combine all this.  Now we
16  have all our measures calculated.  Now we run
17  the analysis to see.  We have your IQ score.
18  We know on the environmental side your
19  self-identified race -- race is just a social
20  construct, I agree with that -- and predictions
21  from colorism theory, that's the environmental
22  side.  On the other side, the genetic side, you
23  have these PGS scores.  So you enter them both
24  predicting paper and pencil IQ scores and see
25  what wins.

Page 115

1    Q.   And what won?
2    A.   They both do.
3    Q.   You said they both do.  There were
4  three.
5    A.   So, well, we lumped colorism and
6  skin color together as one camp or hypothesis
7  and the PGS DNA stuff as the other camp or
8  hypothesis, entered them into a regression
9  model predicting phenotypic IQ, and both were
10  significant, meaning each has some influence on
11  the IQ gaps.  But, if I remember correctly, the
12  genetic side was a little higher in this study.
13    Q.   Okay.  You believe that in
14  Exhibit 12 you told the NIH those were the
15  things that you wanted to do and to study with
16  respect to the TCP data?
17    A.   Yeah.  But I think if you
18  lack -- this goes back to an earlier point.  If
19  you lack expertise in this area, I don't know
20  that you would get that.
21    Q.   But clearly, however, your request
22  in 19747 --
23    A.   Is this Exhibit 12?  Okay.
24    Q.   Clearly your request in Exhibit 12
25  which is identified as 19747 which I think we

Page 116

1  agreed to call the transracial --
2    A.   Validity.
3    Q.   -- validity, that the concepts
4  you've just described, most of them are in here
5  somewhere; aren't they?
6    A.   In where?
7       MR. KELLY:  Objection to the form
8  of the question, ambiguous.
9    Q.   In your research use statement.
10    A.   What I just explained to you?
11    Q.   Right.
12    A.   Yes.  Did you want me to go to the
13  third paragraph?
14    Q.   Sure.  I didn't mean to cut you
15  off.  If you want to say more about the use
16  statement, by all means.
17    A.   Okay.  If you look in the third
18  paragraph on page 2 of Exhibit -- let me
19  straighten out my documents here -- page 2 of
20  Exhibit 12, third paragraph, now, this is where
21  lack of expertise in this area might hurt me.  Transethnic
22  validity, you can't do that analysis unless you
23  compare races.  I mean, the word trans there
24  indicates that.  So we're using the TCP data
25  set.

Page 117

1       Okay, here's another thing,
2  educational attainment.  I'm sorry.  The second
3  sentence, educational attainment is the same
4  thing as intelligence in the literature.  I
5  don't know if anybody knew that.  So just right
6  off the bat there are three things that mention
7  IQ.  If you'd like to, you can look at it.  PGS
8  and cognitive ability, the end of the third
9  line; cognitive data, end of the fourth line;
10  general and broad ability indexes, the start of
11  the fifth line; demographic data.  Yeah, so, I
12  mean, it's all over the place in that
13  paragraph.
14    Q.   Okay.  Did you do anything with
15  schizophrenia?
16    A.   No.  We -- I started with the sex
17  difference paper, didn't work, closed it out,
18  and we decided to do this before the
19  schizophrenia paper.
20    Q.   Why did you include schizophrenia
21  in the use statement?
22    A.   Well, we wanted to be open to
23  looking at it.  We just never got around to it
24  because everything blew up.
25    Q.   Got it.

30 (Pages 114 - 117)

Veritext Legal Solutions
www.veritext.com                    888-391-3376

Page 118

1            - - - - -
2         (Thereupon, Deposition Exhibit 13,
3         Project Renewal Request for Project
4         19747, was marked for purposes of
5         identification.)
6            - - - - -
7      Q.   Dr. Pesta, you've been handed
8  Exhibit 13. Will you confirm for me that this
9  is the renewal application for project 19747
10  for which we used the nomenclature transracial
11  validity?
12      A.   Yes.
13      Q.   That request date says
14  December 3rd, 2019; is that right?
15      A.   Correct.
16      Q.   Let's make sure that that's
17  consistent with your table.
18      A.   It is.
19      Q.   It is, okay.  So we've got the
20  table all right thus far, right?
21      A.   Correct.
22      Q.   So now I'd like to look at and do a
23  little comparison of the two project renewals.
24      A.   Okay.
25      Q.   So I want you to have Exhibit 11

Page 119

1  and Exhibit 13 in front of you.
2      A.   Got it.
3      Q.   With regard to Exhibit 11 which is
4  the admixture analysis --
5      A.   Correct.
6      Q.   -- this project renewal asks you to
7  say what your research progress is including
8  whether you've done any scientific
9  presentations or publications, right?
10      A.   No. I disagree with that. When we
11  did -- I think they changed their policy partly
12  because of what happened with me. This is a
13  renewal. We saw it on line. We very carefully
14  followed it. When it's a renewal, they only
15  want officially published articles. They don't
16  want -- which makes sense. They don't want
17  preprints. They don't want presentations.
18  They just want official publications.
19      Q.   So you are saying you weren't asked
20  for scientific presentations or research
21  summaries?
22      A.   Only for closeouts, not for
23  renewals.
24      Q.   Are you saying then that this form
25  is wrong, you weren't asked for those things?

Page 120

1  Because it says --
2      A.   Yes.
3      Q.   -- right there research summaries,
4  scientific presentations, publications,
5  intellectual property.
6      A.   Well, we did this on line. I mean,
7  we can -- my colleague, John, will testify to
8  this, too. It said for renewals just report
9  official publications on line. For closeouts
10  it said report everything.
11      Q.   All right. And I believe you've
12  taken the position that because the Lasker
13  paper was not published until August 30th and
14  you made your renewal request on August 29th,
15  both of 2019, you did not report the paper,
16  correct?
17      A.   Yeah. We weren't sneaking anything
18  by it. It wasn't officially published. NIH
19  policy says report officially published
20  articles. We didn't have it. We knew it was
21  accepted, but it wasn't officially published,
22  so we didn't report it.
23      Q.   But you did report the Lasker paper
24  when you closed out 19090, the admixture
25  analysis, when you closed out that project,

Page 121

1  right?
2      A.   Well, so our interpretation was
3  it's all TCP data, all these applications. So
4  when we went to close that one out, it said
5  report everything from using the TCP data. So
6  we reported it on the wrong form, but we really
7  just followed verbatim what the NIH wanted.
8      Q.   But that was, according to your
9  Table 1, that was reported at the closeout on
10  August 31st, 2021, right?
11      A.   I think 2020, correct?
12      Q.   I'm sorry. You're right. Thank
13  you for that correction. August 31st, 2020.
14      A.   Correct.
15      Q.   Now let's look again at Exhibit 13
16  which is 19747, and you made that renewal
17  request on December 3rd, 2019, right?
18      A.   Correct.
19      Q.   Okay. And the project renewal
20  form, and I'm looking at page 3 of Exhibit 13,
21  says, "Research Summary: We have no new
22  publications nor submissions from this data
23  set. We are waiting to hear back from NIH as
24  to whether we are still able to use this. We
25  were told not to run further analyses until we

31 (Pages 118 - 121)

Page 122

1  had heard back." Then for scientific
2  presentations it says none, publications none,
3  intellectual property none.
4       First of all, have I read that
5  correctly of what you reported?
6       A.  Yes.
7       Q.  So this renewal was on
8  December 3rd, 2019. Why didn't you report the
9  Lasker paper?
10      A.  Yeah, this is complicated. If you
11  look at footnote B, it's all laid out there.
12  I'll try to summarize it.
13      Q.  Okay.
14      A.  One year after having it, renew,
15  closeout. Renew says just publications,
16  official publications. Closeout says report
17  everything. And with that in mind, what date
18  was that, 8-31? So I was closing out the
19  application on 8-31-20. Is that consistent
20  with what this says?
21      Because I was closing it out, I
22  should have reported everything, but in this
23  interim -- so Lasker was -- so we renew on the
24  29th 070.
25      Q.  Yes. Not 070. It was 090.

Page 123

1       A.  Thank you, 090. So we had our
2  renewal in. The next thing we had to do -- can
3  I refresh my memory?
4       Q.  Sure.
5       A.  Okay. Note C there is consistent
6  with what I just said. So on 8-31-20 -- is
7  this the right thing? Just double-checking.
8  Yeah, we went to close out -- I'm confusing
9  myself. Can we take a break? Maybe I'm --
10      Q.  Hold on a minute. Let's work
11  through this.
12      A.  Okay.
13      Q.  So on your Table 1 -- let's just
14  take it. We don't have anything in front of us
15  to show the closeouts, but let's just use your
16  Table 1 as the dates.
17      A.  Okay.
18      Q.  So the 18007 which is the first
19  request for NIH data, that's the sex
20  differences, and when I say NIH data I should
21  be clear, the TCP data, that you never made a
22  renewal. You closed that on June 25th, 2019.
23      A.  And there was nothing to report
24  because Lasker wasn't published.
25      Q.  Okay. Then the next thing is the

Page 124

1  19090 which is the admixture analysis?
2       A.  Correct.
3       Q.  Which you made a renewal on
4  August 29, '19. You did not cite the Lasker
5  paper?
6       A.  Because it wasn't officially
7  published.
8       Q.  Because it wasn't officially
9  published until the following day?
10      A.  Correct.
11      Q.  Then for the 9-19-18, which is the
12  transracial validity paper, which, by the way,
13  that use statement you'll agree with me comes
14  closest to what is described in the Lasker
15  paper; do you agree?
16      A.  Yes.
17      Q.  And that you made a renewal of
18  December 3rd, 2019, but you didn't report the
19  Lasker paper on December 3rd, 2019; did you?
20      A.  Because there is a reason for that,
21  I think it's in the footnote, but let me see if
22  I can refigure it out, but that's an important
23  point.
24      MR. KELLY: Take your time.
25      THE WITNESS: Yeah.

Page 125

1       A.  Can you throw out those dates again
2  while I'm reading?
3       Q.  Sure. I'm just reading your
4  Table 1 that says 090 renewal was August 29th.
5       A.  Okay.
6       Q.  And we know there wasn't a report,
7  but you've described why, meaning there wasn't
8  a report of the Lasker paper, but you've
9  described why.
10      A.  Renewal versus closeout, yes.
11      Q.  Yes. And because the publication
12  hadn't happened until after.
13      A.  We renewed that one.
14      Q.  Correct. And now we're looking at
15  19747, the transracial validity use statement.
16  That renewal was December 3rd, 2019, but there
17  was no report of the Lasker paper.
18      A.  Yeah. So, I'm sorry, I didn't spot
19  this earlier, but it's the second to last full
20  paragraph on the back. They last approved our
21  use of the TCP data on the renewal of what
22  we're calling the admixture analysis one, so
23  there was nothing to report. It was like a
24  fuzzy time window.
25      Q.  How is that a fuzzy time window?

Page 126

1    A.   Because the complication here is
2  that these are the same data identical for all
3  three applications, but when you close out this
4  one that's maybe not IQ related, it says report
5  this stuff about the TCP data. It's hard to
6  explain.
7    Q.   So I want to get this straight,
8  Dr. Pesta.
9    A.   Sure.
10   Q.   Your contention is the reason why
11 we didn't report Lasker on the 090 is because
12 the paper was published a day later?
13   A.   It looks like two days.
14   Q.   Okay, two days. The reason why we
15 didn't report it on --
16   A.   12-3-19.
17   Q.   -- the 747 which is a couple of
18 months after Lasker is published, right?
19   A.   Correct.
20   Q.   Is because we hadn't reported it on
21 the earlier?
22   A.   Could you maybe take a minute to
23 read that second to last paragraph?
24   Q.   Actually, I have read that
25 paragraph because you've written this in other

Page 127

1  documents.
2    A.   I'm sure I did, yes.
3    Q.   And I don't understand it, and I'm
4  trying to understand it. I don't understand
5  how if the point of this request by NIH is to
6  know what papers are being published using this
7  data how it's possible to on the one hand not
8  report the data because the paper is published
9  a day later, but the next time you have a
10 renewal, you also don't report the paper well
11 after the paper has been published?
12   A.   Yeah, and it's explained right
13 there. Okay. On 12-3 -- well, let me try to
14 make it clear. I didn't know this was going to
15 be unclear.
16      On 12-3-19 I applied to renew 747,
17 the transracial guy. When we did that,
18 verbatim NIH required me to report any official
19 publications, and you see how I underline it,
20 since NIH last approved use of the TCP data.
21 That was after Lasker was published. So if you
22 follow this verbatim, I didn't -- I'm not being
23 sneaky. We were just getting --
24   Q.   Dr. Pesta, do you believe the NIH
25 means by this just don't tell us about it until

Page 128

1  closeout when they clearly want to know at
2  renewal time whether there has been any papers
3  published?
4        MR. KELLY: Objection to form.
5    A.   Only official. Only official
6  publications for renewals.
7    Q.   Okay. I'm giving you that. For
8  purposes of this discussion, I'll give you that
9  the publication was two days later, so arguably
10 you didn't have to do it with respect to that.
11   A.   Okay.
12   Q.   But your explanation for why it
13 wasn't reported with respect to 747 is because
14 you had already renewed it without describing
15 the paper?
16   A.   This date, 12-3, was after this all
17 blew up. NIH was complaining to me. My job
18 was probably threatened at that point even. So
19 we wanted to make sure we followed these things
20 verbatim so that nobody could come back and
21 raise questions like this. So I'm going to try
22 to explain this clearly. Give me like 30
23 seconds to put it together.
24      Okay. So on 9-23-19 the NIH, that
25 was the last time they approved a TCP data set

Page 129

1  renewal or closeout, but Lasker was published
2  before that. So if you follow verbatim what
3  they said, we didn't need to report it.
4        MR. KELLY: Well --
5    Q.   Say that again.
6        MR. KELLY: This is -- don't get
7  worried about this.
8        THE WITNESS: Who, me?
9        MR. KELLY: Yes.
10       THE WITNESS: Worried about?
11       MR. KELLY: You're just very
12 anxious.
13       THE WITNESS: Yeah, I'm a hyper
14 person, and I'm kind of hungry and tired, but I
15 agree we should get through this question.
16   Q.   All right. So as I understand what
17 that paragraph says -- let's read the
18 paragraph.
19   A.   Can I see it?
20   Q.   "Earlier on December 3, 2019, BJP
21 applied" -- that's you, right?
22   A.   Correct.
23   Q.   -- "applied to renew 9747. Here
24 verbatim NIH required BJP to report any
25 official publications since NIH last approved

33 (Pages 126 - 129)

Page 130

1 his use of the TCP data.  The last NIH
2 approval, however, was for 19090 on
3 September 23rd, 2019.  Since Lasker was
4 published prior to this date, BJP appropriately
5 did not report it for the renewal of 19747."
6     A.   Exactly.  I don't know how to say
7 it better.
8     Q.   If you ask me, what you're doing
9 here is you're reading together all three of
10 the requests, right?
11     A.   You have to.  It's the same data.
12 So even if I'm working on the sex project, for
13 example, when I go to renew the transracial
14 one, I have to report stuff related to the sex
15 one, too, because it's the same data set.
16     Q.   So we're reading it all together,
17 and that's why you didn't have to report it
18 until the first closeout report which isn't
19 until August 31st, 2020, like nine months
20 later, right?
21     A.   I didn't report it because the NIH,
22 if you follow what they said verbatim, anything
23 since the last approval by NIH.  The last
24 approval was on 9-23-19.  Lasker was published
25 on what, 8-30?  I shouldn't have reported it.

Page 131

1     Q.   Do you remember when CSU --
2     A.   Am I --
3         MR. KELLY:  It's just --
4     Q.   Just answer the question.  Do you
5 remember when CSU asked you what you were going
6 to do with the TCP dataset, and you replied
7 that you were going to put it on your CSU
8 computer behind the firewall, and you were
9 going to be the only person using it?
10     A.   That's a -- that's wrong, patently
11 wrong.  It's in the binder and maybe even the
12 final report in two places that I was going to
13 use it at my home locked up to my desk, no
14 internet access except to get the data
15 initially, so it was approved.
16         And there is two examples of that
17 in it's either Exhibit 5, and I don't think we
18 have the binder as an exhibit yet.
19     Q.   So --
20     A.   And moreover, to answer your
21 question, that -- it was the provost who said
22 that, she quoted it in my discipline letter,
23 you're the one who wrote to Terri Kocevar that
24 only you will have access, and blah, blah,
25 blah.  That was my first application, the sex

Page 132

1 differences one.  I never downloaded the data
2 for it.
3     Q.   Aren't we supposed to read these
4 all together, Dr. Pesta?
5     A.   I thought I was just doing that.
6         MR. KELLY:  Okay.  The
7 question is -- it's up to you, but the question
8 has been answered now.  It's 12:46.
9         MS. GIFFEN:  I'm fine to take a
10 break.
11         MR. KELLY:  Thank you.  How long do
12 you guys want to break for lunch?
13         MS. GIFFEN:  There is so much more
14 to go.  Off the record.
15         (Luncheon recess taken.)
16            - - - - -
17
18
19
20
21
22
23
24
25

Page 133

1         AFTERNOON SESSION
2     CONTINUED EXAMINATION OF BRYAN J. PESTA
3 BY MS. GIFFEN:
4     Q.   Dr. Pesta, we had discussed both
5 the description of the research use statements
6 that we went over, and we also discussed the
7 timing of the report to NIH about the Lasker
8 paper on your submissions, and you have
9 provided to us Exhibit --
10     A.   Eleven I think it was.
11     Q.   There is two of them.  I should
12 have pulled them out.
13     A.   One is six.
14     Q.   You just passed it.  The one with
15 your table on it.  I'm sorry I didn't note
16 this.
17     A.   It's not a big deal.  Did you --
18     Q.   It's there for sure.  Keep going.
19         MS. KAMINSKI:  Six and 10.
20     Q.   It's 6 and 10.  So you brought with
21 you Exhibit 6 and 10 that refer to those
22 subjects.  Did you have anything more you
23 wanted to add to that?
24     A.   I think I was confusing explaining
25 the timeline.  I don't think you want to

Page 134

1  revisit it. I'm happy to, though, if you do.
2      Q.   That's okay. I'm satisfied if
3  you're satisfied with what you said.
4      A.   Okay.
5      Q.   I now want to turn to a question,
6  you mentioned earlier that you told NIH that
7  you were going to put the data onto a home
8  computer.
9      A.   Correct.
10     Q.   And you made mention of an occasion
11  where you knew that that was part of the
12  record. I want to ask you if this is what you
13  were referring to.
14          - - - - -
15          (Thereupon, Deposition Exhibit 14,
16          Project Request 26271, was marked
17          for purposes of identification.)
18          - - - - -
19     MR. KELLY: Object to the form of
20  the question. I don't know that he testified
21  to that. You can answer.
22     A.   I'm sorry. Could you repeat that?
23     Q.   She's getting it. Handing you
24  what's been marked as Exhibit 14, do you
25  recognize that as the project request for

Page 135

1  262710, that being the project ID number?
2      A.   I don't think there is a zero at
3  the end, or it's blocked out here. But, yes,
4  this is it.
5      Q.   The request date is July 16th of
6  2020, correct?
7      A.   Correct.
8      Q.   What data is being requested in
9  this NIH project request?
10     A.   It's a different data set. It's
11  not TCP. It's called Add Health.
12     Q.   And it's capital A, D-D, capital H?
13     A.   It's adolescent something
14  development.
15     Q.   In your research use statement on
16  page 2 of the document, you write, "To meet the
17  Add Health secure storage and handling
18  requirements, we plan to follow the steps
19  outlined in the following link." Then there is
20  a reference to a link. "Specifically we plan
21  to store the data on a desktop model hard
22  drive. This will be kept in a locked cabinet
23  at Bryan J Pesta, the investigator's, home
24  office. All analyses will be conducted on a
25  desktop in the investigator's home, following

Page 136

1  the protocols outlined in the link above."
2          Do you recall that?
3      A.   Yes.
4      Q.   Is that what you were referring to
5  earlier?
6      A.   There is another one, but yes.
7      Q.   When was the other one?
8      A.   There was another one. I tried to
9  find it, but I couldn't. This is Add Health.
10  Probably ABCD. I don't know what the number
11  was.
12     Q.   ABCD was?
13     A.   A different non-TCP data set.
14     Q.   We'll get that date. You submitted
15  that request around August of 2020. Does that
16  sound right?
17     A.   So looking at my tabled footnotes,
18  is that 026? Oh, 7-4-20, yes.
19     Q.   All right. Did that
20  relate -- neither the project request that
21  we're looking at, Exhibit 14, nor the project
22  request with respect to ABCD relate to the TCP
23  data; is that true?
24     A.   They are all dbGaP, but not TCP.
25          - - - - -

Page 137

1          (Thereupon, Deposition Exhibit 15,
2          an Email String with Attachments,
3          was marked for purposes of
4          identification.)
5          - - - - -
6      Q.   Dr. Pesta, I'm handing you what's
7  been marked as Exhibit 15. This is I believe
8  the communication with Terri Kocevar that you
9  referred to in your earlier testimony. First
10  of all, can you confirm that? You can take a
11  minute to read through it if you need to.
12     A.   Uh-huh. Yes.
13     Q.   Okay. And if we work from
14  backwards to forwards, which is always
15  confusing, the first email is actually between
16  Lisa Franklin and Jack Kraszewski?
17     MR. NEEL: Kraszewski.
18     A.   Page 4 of 5?
19     Q.   Page 4 of 5. Five is the request
20  that Lisa is making, right?
21     A.   Correct.
22     Q.   And then there is an email that is
23  forwarding it to Jack, and then Jack responds
24  on April 13th and says that he doesn't know
25  whether we can confirm the data use certificate

35 (Pages 134 - 137)

Page 138

1 because we don't know the answers to these
2 questions, right?
3    A.   Yes.
4    Q.   And then on April 17th, Mary
5 Kocevar -- or actually I think she goes by
6 Terri?
7    A.   Terri.
8    Q.   Sends the questions to you, right?
9    A.   Correct.
10    Q.   So the first request for that
11 information -- well, there is only four days
12 difference between those two, and then on it
13 looks like April 18th you respond, right?
14    A.   2018, where is that?  Yes.  Wait a
15 minute.  Are you on page 1?  I'm sorry.
16    Q.   Yes.  Page 1 at the very bottom,
17 that's your response.
18    A.   Gotcha.
19    Q.   Beginning of your response email.
20 Item No. 4 says, "I will be the only one who
21 has access to these data.  They will be stored
22 on my CSU computer which is password and
23 firewall protected," right?
24    A.   Yes.
25    Q.   And then Terri then saves that to

Page 139

1 the file on May 2nd, 2018, correct?
2    A.   Correct.
3    Q.   So this related specifically at the
4 time, and the timing is right if we look back
5 to when you were making requests, to the sex
6 differences requests for the TCP data, correct?
7    A.   Yes.  It's within a couple days of
8 the application that I sent.
9    Q.   Okay.  Do you have any record that
10 you told anybody at CSU that you were going to
11 keep the data, the TCP data --
12    A.   Well --
13    Q.   Let me finish the question.
14    A.   Uh-huh.
15    Q.   That you were going to keep the TCP
16 data on your home computer between when you
17 communicate with MaryTherese Kocevar on
18 May 2nd, 2018, until you reported in July of
19 2020?
20    A.   I didn't download data for this
21 project, so there was nothing to store, genetic
22 data.
23    Q.   But there is -- but you did
24 download TCP data, right?
25    A.   Not for this project.

Page 140

1    Q.   I understand.  But you did download
2 TCP data into the home computer?
3    A.   Oh, sure, yes.
4    Q.   Is there any record of you telling
5 CSU between your communication of May of 2018
6 and July of 2020 that you had sensitive data,
7 restricted access data, on the home computer?
8    A.   I couldn't find it, but I thought I
9 had approval.  That's my memory.  I did search
10 for it.
11    Q.   Okay.  And, in fact, the two
12 instances we just discussed was the ABCD data
13 and the Add Health data, not TCP, correct?
14    A.   Correct.  We didn't check the ABCD,
15 or did we do that already?  I assume there's a
16 similar line on the ABCD data.
17    Q.   We didn't check it.  I'm going with
18 you that it's in there, okay?  But that does
19 relate to a different data set, correct?
20    A.   DbGaP, different data set.
21    Q.   Okay.  What was the computer
22 specifically that you purchased?
23    A.   A desktop.  We built it, so it was
24 off Newegg I think it's called.
25    Q.   Say it again?

Page 141

1    A.   Newegg, E-G-G.  It's on line.
2    Q.   New A-G-G?
3    A.   Egg, like crack an egg.
4    Q.   And correct me if I'm wrong, but I
5 understand the reason why you wanted to put
6 this on the desktop is because the computing
7 power that was available to you at CSU wasn't
8 sufficient to do what you needed to do?
9    A.   Yeah.  I was supplied with a CSU
10 laptop, and it just didn't have the processing
11 power.
12    Q.   Why didn't you ask anyone at CSU to
13 get you equipment that would?
14    A.   I mean, I don't know.  It was
15 just -- plus it was more convenient to do at
16 home.  I remember getting permission.  I just
17 don't have proof of it.
18    Q.   Pardon me?
19    A.   I'm pretty sure I got permission to
20 do this, but I don't -- I can't show you a
21 document.
22    Q.   Who did you get it from?
23    A.   I'd have to go back.  I don't know.
24    Q.   So what was the computing power of
25 the Newegg?

36 (Pages 138 - 141)

Page 142

1    A.   It was an Intel IA Core I want to
2 say 9.  It might have been a 7.
3    Q.   Was the problem with the laptop
4 that it wouldn't do the tasks or that it would
5 take forever?
6    A.   Well, even on the new computer, the
7 powerful one, it literally took ten days to
8 download the data running non-stop.
9    Q.   How did you physically -- how did
10 you download the data?
11    A.   Once NIH approves you for any
12 project, you go into it, and it's -- extracting
13 it was a pain in the neck.  There is several
14 steps you take, and then it downloads.
15    Q.   So was it downloaded directly onto
16 that desktop, the Newegg?
17    A.   Correct.
18    Q.   When did you actually begin working
19 with the data?
20    A.   Can I look at these notes of the
21 dates?
22    Q.   Sure.
23    A.   So we didn't download the data for
24 the sex difference one.  It looks like we got
25 approved for 19090 which we're calling mental

Page 143

1 health or admixture on 7-15, so I would say
2 maybe it takes a month or no more than six
3 weeks for the NIH to approve it, so I would
4 guess the end of August.  That's a guess.
5    Q.   End of August 2018?
6    A.   Correct.
7    Q.   So my understanding is the desktop
8 was not connected to the internet, right?
9    A.   It had to be to download the data.
10 Thereafter we took it off.
11    Q.   Okay.  So it had the capacity to be
12 on the internet obviously?
13    A.   Well, yeah.  That's the only way
14 you can get the data.
15    Q.   How comfortable are you with the
16 download itself, that that was secure?
17    A.   Well, indirectly they approved it
18 for ABCD and Add Health, both CSU and NIH.
19 They didn't have a problem with it, albeit
20 those are different data sets, but it's the
21 same thing.
22    Q.   So do you have any other basis for
23 concluding that that was an acceptable way to
24 download the data?
25    A.   What else could I have done?  I

Page 144

1 mean, I guess I could have done it at CSU, but
2 not on my laptop.
3    Q.   Yes, and then it could have been
4 physically transferred; couldn't it?
5    A.   I didn't know this was going to
6 blow up three years later.  I just tried to
7 follow the rules.
8    Q.   Because you knew the rules were
9 important, right?
10    A.   Yeah, and this is my first rodeo
11 for this.
12    Q.   Was it the first rodeo for John
13 Fuerst?
14    A.   He doesn't have an affiliation, so
15 I assume so.  I don't know.  With CSU, yes.
16    Q.   Do you know whether John Fuerst
17 ever got NIH data before the Lasker paper?
18    A.   I don't know.
19    Q.   Okay.  So do you still have the
20 Newegg?
21    A.   We reformatted the hard drive when
22 everything was closed out.  It's in my
23 basement.  I don't even know if it's
24 operational.
25    Q.   You described that computer as

Page 145

1 being owned by HBD --
2    A.   PDF, Human Phenome, P-H-E-N-O-M-E
3 Diversity Foundation, HPDF.
4    Q.   Which we're going to talk about?
5    A.   Uh-huh.
6    Q.   So HPDF owns that computer.  When
7 you built it, did you only build the computing
8 portion?  Did you have to get the display,
9 keyboards, et cetera?
10    A.   No.
11    Q.   Peripherals?
12    A.   No.  I just have a main desktop
13 computer.  My personal one, the Newegg one was
14 sitting behind the desk, so I just, you know,
15 plugged in the keyboards whenever I wanted to
16 use it.
17    Q.   Got it.  You just said a second ago
18 we reformatted the hard drive of the Newegg.
19 Who is we?
20    A.   Actually, it was me.  But we, I
21 mean, we worked on this as a project, but the
22 physical act of reformatting (indicating).
23    Q.   And when you say we worked on this
24 as a project, you're talking about John?
25    A.   Correct.

37 (Pages 142 - 145)

Page 146

1   Q.   John Fuerst?
2   A.   Correct.
3   Q.   But you personally reformatted the
4 hard drive?
5   A.   Format C colon, the physical act of
6 doing that, yes.
7   Q.   When did you do that?
8   A.   I don't remember the exact date,
9 but it would have been right when Dr. Ward
10 requested us to do it or the administration.
11   Q.   Okay.  And at that time what data
12 sets were on the Newegg hard drive?
13   A.   I don't -- I don't remember if ABCD
14 was or not because the focus has always been on
15 TCP here, so I would say just TCP, maybe ABCD,
16 and I don't think we ever got to Add Health.
17 Everything was shut down before they approved.
18   Q.   So at the time after Dr. Ward
19 requested that the data be deleted, you think
20 there was TCP data, but you're unsure about the
21 ABCD data?
22   A.   Well, we were reformatting the hard
23 drive to wipe out TCP, and I don't remember.
24   Q.   I don't know how you reformat a
25 hard drive without getting rid of everything.

Page 147

1 Can you do that?
2   A.   Yes.  But your question was, if I
3 understood it correctly, was the ABCD -- was
4 the ABCD data on that hard drive.
5   Q.   Yes, that is my question.
6   A.   I don't remember.
7   Q.   Okay.  Do you recall that John
8 Fuerst objected to the deletion of the data?
9   A.   I do.
10   Q.   Do you recall that on May 27th of
11 2021 the NIH told both you and CSU that they
12 wanted confirmation of the deletion of all of
13 the data within 30 days?
14   A.   I remember that date.  That's the
15 email I got, the 615-day-late email.
16   Q.   Yes.  But it said delete all the
17 data and let us know by June 27th, right?
18   A.   I don't remember June 27th, but it
19 did.
20   Q.   All right.  John Fuerst raised an
21 objection saying I'm not done with this and I
22 am in the process of publishing and you're
23 wrong, NIH, so this data should not be deleted?
24   A.   I think the better characterization
25 of his argument was that data analyses was

Page 148

1 done, so he didn't need the data anymore, but
2 he had to keep it anyway for reporting
3 requirements.  He just wanted to pursue
4 publishing after data analysis.
5   Q.   He disagreed with NIH's position
6 that the data should be deleted at all?
7   A.   At that time.
8   Q.   Okay.  And you'll recall that CSU
9 suggested sort of as an interim step, well,
10 transfer the data to CSU's computer, and then
11 if you all are successful in the NIH appeal,
12 then you won't have lost it all.  Do you
13 remember that suggestion?
14   A.   Yes.
15   Q.   Why did you not accept that
16 suggestion?
17   A.   I'm not sure I remember.  I mean,
18 I'd have to think about it.  It was a lot of
19 data.  I suppose I could have maybe took the
20 hard drive out and drove it to CSU.  I mean, it
21 took us ten days to download it, so it was
22 massive amounts of data.  I don't remember why
23 or what my reasoning was at that point.  I
24 don't think I ever said no.  I just didn't
25 upload it or didn't send it to CSU.

Page 149

1       - - - - -
2       (Thereupon, Deposition Exhibit 16,
3        an Email String, was marked for
4        purposes of identification.)
5       - - - - -
6   Q.   Dr. Pesta, you've been handed
7 Exhibit 16, if you want to take a look at it
8 just to refresh your recollection, about the
9 option to transfer the data and segregate it.
10   A.   I do remember this, yes.
11   Q.   Okay.  And your email to Dr. Ward
12 says you have terabytes of data?
13   A.   On the hard drive, yes.
14   Q.   What was the storage capacity of
15 it?
16   A.   I honestly don't remember.  I mean,
17 it's at home in my basement.  I can go look at
18 it.
19   Q.   Who actually bought it, you or
20 John?
21   A.   It was ordered through the mail, so
22 it just was delivered to my house.
23   Q.   Who ordered it?
24   A.   I don't remember.  Probably me.
25   Q.   That hard drive on the Newegg

38 (Pages 146 - 149)

1  that's in your basement would still have a
2  record of the date of reformatting; wouldn't
3  it?
4      A.   I'm not a tech person to that
5  level.  I don't know.
6      Q.   Let's go back to Exhibit 5 if you
7  would.
8      A.   It will probably be the last one I
9  get to.
10     Q.   Are you with me?
11     A.   Yes.
12     Q.   Okay.  Thank you.  Flip over to
13  page 40 of the report, please.
14     A.   Okay.
15     Q.   In this section the committee
16  members are inquiring about John Fuerst and
17  whether he'd be willing to come in and talk to
18  the committee.  Do you remember them asking
19  that?
20     A.   Yes.
21     Q.   And you said at this time that
22  you'd be willing to try to talk to him to get
23  him to come in, and I think one of the things
24  you said at that time was he was in Spain or
25  out of the country on a vacation?

1      A.   Correct.
2      Q.   So it might take a little time to
3  get to him, but you agreed that you would try
4  to discuss it, yes?
5      A.   Yes.
6      Q.   Okay.  And then you said at the top
7  at page 41, "Yeah, so I don't want to make it
8  seem like John is the problem and everything is
9  John's fault because I've made mistakes, but
10  he's sort of gone a little bit rogue, and I
11  suspect there is no way he would talk to any
12  CSU people, but I could ask."
13         Why did he not want to talk to CSU
14  people?
15     A.   You'd have to ask John that.  I
16  don't know.
17     Q.   But you thought he wasn't going to?
18     A.   Yeah.  Well, his personality is
19  such that I suspected that he wouldn't, but it
20  was speculation.
21     Q.   Okay.  Flip over to page 42.
22     A.   Okay.
23     Q.   Conor McLennan asks you, "So,
24  Bryan, just following up on that last question
25  which is how have you and your research team

1  handled any confidentiality or anonymity
2  concerns surrounding the data set.  So my
3  understanding is that John still has the data
4  set, and it's not clear with whom he is sharing
5  it or what websites the data might be stored
6  on.  So he was part of the original team and I
7  understand is no longer affiliated with CSU,
8  but he gained access to the data set under your
9  supervision at CSU.  Is that right?"
10     A.   Correct.
11     Q.   And you said, "Yeah, I agree with
12  you, Conor.  I'm responsible for that, but I
13  don't know that he still has the data."  You go
14  on to say, "I do know that he wants to publish
15  more studies that do not have my name on them,
16  but you can do that without the data if the
17  analyses are done.  The only risk is if a
18  reviewer wants additional analysis, you
19  wouldn't have the data to do that."
20     A.   Yeah.  That's the rogue comment
21  reference.
22     Q.   Because he wanted to keep it in
23  order to be able to respond to reviewers, too,
24  unless somebody needed to do a different
25  analysis?

1      A.   Correct.
2      Q.   You're aware, are you not, that he
3  has never confirmed that he doesn't have the
4  data?
5      A.   I talked to him after the fact, I
6  think, and he doesn't have it, but I didn't
7  know that for sure, so I didn't want to say
8  that I'm absolutely betting my job that he
9  doesn't have it.
10     Q.   When did you discuss that with him?
11     A.   Maybe two years ago.  I don't know.
12  It was a while ago, though.
13     Q.   What exactly did you ask him?
14     A.   I can't quote the verbatim, but do
15  you have the data, I don't know, something like
16  that, the restricted access data.
17     Q.   And what did he say?
18     A.   I don't remember, but it was a no
19  basically.
20     Q.   Can you nail down a year when you
21  had this conversation?  Where was it?  On the
22  phone?  In person?
23     A.   We'd occasionally, maybe every four
24  months, go out to lunch just to catch up.  I'm
25  pretty sure it would have been one of those

Page 154

1 occasions.
2     Q.    And he said no or words to that
3 effect?
4     A.    Correct.
5     Q.    Does he have derivatives of the
6 data?
7     A.    I don't even know what that is.
8 This came up in the committee.  Can you define
9 what you mean by derivatives?
10     Q.    No.
11     A.    Can you ask the question again
12 then?
13        MR. KELLY:  Object to the question,
14 ambiguous.
15     Q.    Does -- what are R Notebooks?
16     A.    So they are statistical packages,
17 software programs, that will do your
18 statistical analyses, and R is the one we used
19 for TCP.
20     Q.    Do R Notebooks contain derivative
21 data from the underlying data set?
22     A.    No.  They're more -- it's almost
23 like computer programming.  They are code on
24 how you should run the analyses, what tests you
25 want to conduct, and stuff like that.

Page 155

1     Q.    So they aren't the tests
2 themselves.  They are just how do you do the
3 tests?
4     A.    Yeah.  It's the software that runs
5 the tests.
6     Q.    Okay.  So do you believe that the
7 only data that had to be deleted was the
8 original data received from NIH?
9     A.    The TCP data you mean?
10     Q.    Correct.
11     A.    Everything related to it, even the
12 phenotypic stuff, my understanding was you had
13 to delete everything.  I think the NIH decision
14 is where you can keep something for a
15 conference presentation, but we didn't -- that
16 didn't apply.
17     Q.    So when you said that John deleted
18 the data, or that's the question that you asked
19 him, did it include everything?
20     A.    It's all or nothing.  I mean, that
21 presumes that John had his own copy which I
22 don't think he did.
23     Q.    I'm sorry?
24     A.    I think your question presumes that
25 he had his own copy, but he did not.

Page 156

1     Q.    How do you know that he did not?
2     A.    I saw no evidence of it, and he
3 told me no when I asked him whenever that day
4 was.
5     Q.    So you asked him two questions?
6     A.    I don't remember.  There was a
7 conversation where I asked, not verbatim, did
8 you ever have a copy of the data, and he said
9 no.  I didn't qualify it all data, phenotypic
10 data, genotypic data.
11     Q.    All right.  So do you recall that
12 in the committee interview you were asked this
13 question about whether John still had the data,
14 and you said not that I know of?  Do you recall
15 that?
16     A.    Not that I know of.  I think that's
17 verbatim, yeah.
18     Q.    And then subsequently you were
19 asked how he would have had access to the data,
20 and your answer was something, and we can go,
21 we'll look for it if you want to, but something
22 on the order of I supervised him, and I don't
23 think he took the data unless he stole it.  Do
24 you remember that?
25     A.    Yes.

Page 157

1     Q.    And then later on -- and now look
2 at page 98, please.  This is the second
3 interview.
4     A.    Okay.
5     Q.    They recall that, those earlier
6 questions from the first interview, and they
7 are really asking the question why was the
8 answer not that I'm aware of instead of, no, he
9 didn't have the data, and you said, "Well, if
10 he has it, I don't know of it.  If he's
11 bluffing that he has it, but I think he's
12 bluffing."  And then Mallett asks, "Why would
13 John be bluffing, any idea?"  And you said,
14 "Well, I think his life's mission is to get
15 this research published."
16        What did you mean by that?
17     A.    Not Lasker, et al., specifically,
18 but he wants to answer the question why are
19 there IQ gaps across races.
20     Q.    Pardon me?
21     A.    His mission I guess is to research
22 and answer the question why are there race
23 differences on IQ tests.
24     Q.    And that is so important to him
25 that he might have stolen the data?

Page 158

1    A.   So this was a stressful situation.
2  I didn't -- I couldn't say 100 percent sure
3  that he didn't have it, so I -- that's what I
4  said.
5    Q.   Okay.  And this conversation that
6  happened sometime in the last two years, and we
7  don't know when, but it might have happened at
8  a lunch with him, and so you asked him if he
9  deleted the data, and he said yes?
10   A.   I asked -- no, I don't think I
11  asked that.  I asked him if he had the data or
12  ever had the data unauthorized, yeah.
13   Q.   Okay.  All right.  Did you ask him
14  how come he wouldn't confirm that information
15  as requested by CSU?
16   A.   No.
17   Q.   Why not?
18   A.   I think John had the right to
19  appeal, and I thought the NIH would reply.
20  They didn't give him one.  He appealed to two
21  other NIH committees.  They didn't reply.  So
22  until that happened -- can you repeat the
23  question?
24   Q.   Sure.  Did you ask John at
25  this -- when you asked him have you ever had

Page 159

1  the data or whatever the phrasing of the
2  question was, did you ask him, well, why don't
3  you just tell that to CSU and to NIH?
4    A.   No.
5    Q.   Why not?
6    A.   I think he did tell it to NIH.
7  Well, I don't know.  I mean, I just didn't ask.
8  I mean, he refused to be interviewed so.
9    Q.   During the interview with the
10  committee, you indicated to the committee that
11  you had distanced yourself both professionally
12  and personally from John Fuerst.  Do you recall
13  that?
14   A.   At that time that was true, but
15  I've since reengaged.
16   Q.   After the termination?
17   A.   Yes.  I can't be fired again.
18   Q.   Two years ago you wouldn't have
19  been fired.
20   A.   March 4th, 2021, right?
21   Q.   Yes.
22   A.   So can you repeat the question?
23   Q.   Did you have this lunch or wherever
24  it was that you talked to John about the data,
25  was that before or after you were fired?

Page 160

1    A.   So I'm just verifying I was fired
2  March 4th of '21?
3        MR. KELLY:  '22.
4    Q.   '22.
5    A.   I'm sorry.  I don't know.  I
6  suspect after, but I'm just --
7    Q.   Okay.  Did you reengage with John
8  Fuerst after you were terminated?
9    A.   Yes, to collaborate on unrelated
10  research.  He might have reached out to me.  I
11  don't know which way it went.
12   Q.   How did you meet John?
13   A.   Initially you mean?
14   Q.   Yes.
15   A.   Physically meet him or meet him on
16  the internet?
17   Q.   Either.
18   A.   So we publish in the same area.
19  Around I want to say 2016 we published like a
20  point-counterpoint piece where John and Emil
21  published a paper arguing that and I tried to
22  rebut it.
23   Q.   What was the paper?
24   A.   Could I see my vita?
25   Q.   Sure.

Page 161

1    A.   Oh, Does Race Differences
2  Cause -- Does IQ Cause Race Differences in
3  Well-Being.  That would be number 15 published
4  in 2016.
5    Q.   So you would have been -- did you
6  meet him in person during that time or just on
7  line?
8    A.   No.  I don't even know if I had a
9  lot of direct contact with him, but we were
10  invited to publish his piece attacking my
11  research and then my rebuttal.
12   Q.   In what publication was that?
13   A.   I think Mankind Quarterly, yes.
14   Q.   I'm sorry?
15   A.   The journal is called Mankind
16  Quarterly.
17   Q.   And that was run by Richard Lynn,
18  right?
19   A.   Phil Rushton and then Richard Lynn,
20  correct.
21   Q.   You're aware that Fuerst was a
22  student at CSU for some period of time, right?
23   A.   Yeah.  I thought he graduated, but
24  I know he had like 130 credits, so I just
25  assumed he was graduated.  I didn't scroll to

41 (Pages 158 - 161)

Page 162

1 the bottom to see degree conferral. So it's my
2 understanding he had enough credits to graduate
3 but never did.
4     Q.    While he was an undergraduate at
5 CSU, did you have him in any of your courses?
6     A.    I didn't even know him back then.
7     Q.    What do you understand about John
8 Fuerst's educational attainment?
9     A.    I don't think he has a degree
10 since -- I incorrectly told the provost I
11 believe that he graduated CSU, but that was a
12 mistake in reading his transcript.
13     Q.    Does he have a degree from
14 anywhere?
15     A.    I don't -- he might. I don't know.
16 It would only be an undergrad.
17     Q.    A baccalaureate?
18     A.    Yes.
19     Q.    What are other institutions of
20 higher education with which he has been
21 associated to your knowledge?
22     A.    John?
23     Q.    Yes?
24     A.    I don't know.
25     Q.    NC State?

Page 163

1     A.    Somewhere in North Carolina sounds
2 familiar, but I don't know if that was the
3 specific school, nor do I know if he
4 registered.
5     Q.    I'm sorry?
6     A.    I don't know if he registered.
7     Q.    I see. What is his field of
8 expertise?
9     A.    Both him and Emil are self-taught,
10 it's my expertise, too, in differential
11 psychology and statistics.
12     Q.    What is a biometrician?
13     A.    I think he wanted to get a Ph.D. in
14 that. Maybe that was North Carolina. It's
15 just high level computing to analyze data to my
16 understanding.
17     Q.    Do you know whether he has done any
18 coursework in that?
19     A.    I don't know.
20     Q.    And what is differential
21 psychology?
22     A.    So it's the study of why people
23 differ; some are tall, some are short, some are
24 smart, some are not.
25     Q.    He isn't a geneticist; agreed?

Page 164

1     A.    I think you could argue that he is.
2 I mean, I think he passed the Daubert test with
3 his vita.
4     Q.    Meaning the Daubert test for expert
5 testimony?
6     A.    Yes.
7     Q.    Based on what?
8     A.    I mean, you have to get these
9 things approved. If you're not a good
10 researcher, you're going to get rejected. He's
11 got a pretty good vita, CV.
12     Q.    Yes. Where did you acquire his CV?
13     A.    Google Scholar has them all. I
14 mean, you can just search anyone's name.
15     Q.    Google Scholar is primarily
16 prepared by the subject, meaning the scholar?
17     A.    No. I mean, I have papers on
18 memory and cognition which is not differential
19 psychology, but if you go to my page, it will
20 show all my publications. It's not broken down
21 by a discipline.
22     Q.    What led you to conclude that
23 either Emil or John had the requisite expertise
24 to be a coauthor on the Lasker paper?
25     A.    It got approved. It got accepted.

Page 165

1 I'm sorry, I misunderstood your question. My
2 interactions with them.
3     Q.    How often have you published papers
4 with coauthors who are not degreed?
5     A.    Can I take a quick scan?
6     Q.    Sure.
7     A.    Well, not counting Emil or Fuerst?
8     Q.    Yes.
9     A.    And Lasker is a Ph.D. student. I
10 don't know what degrees he has.
11     Q.    We're going to talk about him in a
12 second.
13     A.    Probably none, but just let me
14 double-check. No. 16, I don't think Omasta,
15 that's O-M-A-S-T-A, had a degree, and that
16 would be it.
17     Q.    And that's your personal
18 experience. How about more broadly, other
19 scholars besides yourself, how usual is it?
20     A.    I never thought about it. I think
21 what matters is you produce a quality
22 manuscript that survives peer review. It
23 doesn't matter if you're someone in the street.
24 If the science is good, that proves your
25 qualifications, and by good I mean survives

42 (Pages 162 - 165)

1 peer review.

2    Q.   What do you know about Jordan
3 Lasker, I keep calling him John, Jordan Lasker?

4    A.   Jordan I had never heard of.  The
5 problem is it's a really complicated
6 statistical technique, and neither John nor I
7 knew how to do it, so we brought him on aboard.

8    Q.   Who did know of him if neither you
9 nor John knew of him?

10    A.   We -- what we didn't know is how to
11 do the statistics.  I didn't know Jordan, but I
12 guess John did.

13    Q.   Was it John who invited Jordan to
14 be a coauthor?

15    A.   I don't know.  It wasn't me.

16    Q.   Who invited Emil to be a coauthor?

17    A.   I think he was involved from the
18 beginning, but he's -- he didn't have access to
19 the genetic data, so I don't think he appears
20 on these applications.

21    Q.   Yes, I'm aware of that, but that
22 wasn't my question.  Who invited Emil to be
23 part of the project?

24    A.   It probably was just John and I,
25 one of us or maybe both of us.

1    Q.   Did you know Emil before?

2    A.   I had never met him, but through
3 interactions on the internet, yes.

4    Q.   Where on the internet?

5    A.   Well, it would be our publications
6 and that point-counterpoint, number 15.

7    Q.   Oh, he was on that as well?

8    A.   Correct.

9    Q.   Not just John?

10    A.   I'll -- yes, I think it was Fuerst
11 and Kirkegaard one paper, and my rebuttal the
12 second paper.

13    Q.   Do you know whether the people who
14 peer reviewed your papers at Psych were
15 degreed?

16    A.   Yeah.  It's hard -- I mean, you can
17 publish without a degree, and it just depends
18 on the quality of the science, but I don't
19 think an editor would let you peer review
20 without that, but that's speculation.

21    Q.   Did you ever permit that when you
22 were the editor at Psych?

23    A.   Not -- I don't know.  I mean, it's
24 not that I had the CVs of the reviewers; you
25 know what I mean?  I didn't verify their

1 educational degrees.

2    Q.   Why would you not care whether
3 the --

4    A.   I care, but you recognize their
5 names.  I mean, they are people who publish in
6 the field.  That makes them experts to do the
7 peer review.

8    Q.   And you mentioned before that it
9 would have been the action editors who would
10 have been making the review assignments?

11    A.   Yeah.  I don't think I ever did.

12    Q.   Pardon me?

13    A.   I'm not sure I ever did do that.
14 But, yeah, the action editors, but I'm going on
15 my memory.

16    Q.   I think your testimony was you
17 would have had to approve it, you would have
18 rubber stamped it, but it would have been the
19 action editors who decided.

20    A.   I would have approved the final
21 decision as recommended by the action editors.

22    Q.   But you wouldn't have independently
23 gone and redone the work of the action editors
24 to determine who was best.  You would have
25 relied upon them for those decisions.  Is that

1 what you're saying?

2    A.   My philosophy was don't trump the
3 action editors unless you have a good reason,
4 and there was no good reason for any paper that
5 was published in Psych that I was the editor in
6 chief at.

7    Q.   Okay.  Do you know the names of
8 anybody at MD --

9    A.   MDPI?

10    Q.   Yes, who have control over Psych.

11    A.   I know there is a new editor.  I
12 don't even know who he is.  So I don't know,
13 no.

14    Q.   What do you understand is the
15 function of IRB?

16    A.   To make sure that your research
17 participants will be safe.

18    Q.   Human subjects?

19    A.   Human subjects, yes.  I think even
20 for animals, too.  They will be safe.  They
21 have privacy.  They won't have any violations
22 like privacy, et cetera.

23    Q.   Okay.  And I believe it's your
24 contention that none of the studies that you
25 were interested in --

Page 170

1    A.   TCP.
2    Q.   -- relating to TCP required that it
3 go through the IRB approval process; is that
4 right?
5    A.   That's what it says right on the
6 NIH website.
7    Q.   Did you consider that, even if the
8 NIH did not require going through the IRB
9 process, CSU's policy would have required that?
10        MR. KELLY:  Object to the form of
11 the question, assumes facts not in evidence.
12    A.   Could you repeat that?  I'm sorry.
13    Q.   Do you know whether independent of
14 NIH's requirements for IRB approval, do you
15 know whether CSU's IRB approval process
16 required you to go to IRB to either get
17 approval or an exemption?
18    A.   See, it's NIH's data.  Suppose CSU
19 says approve it, but NIH doesn't want to
20 approve it?  I'm not getting it.  So the
21 ultimate authority, the only authority, the
22 only decider is NIH.
23    Q.   So CSU's research policies don't
24 matter if it's NIH data?
25    A.   TCP data.  It says it doesn't need

Page 171

1 it.  I didn't get it because it said it didn't
2 need it.
3    Q.   So if NIH's policy requires a
4 specific threshold of protection for the
5 subjects, and we'll just call it threshold A,
6 but CSU says, okay, but we want threshold B so
7 we're going to provide more protection, why
8 would that mean that you wouldn't have to
9 comply with CSU's --
10    A.   The data --
11        MR. KELLY:  Object to the form of
12 the question.
13    Q.   Hold on.
14    A.   I'm sorry.
15    Q.   Let me finish and let him have his
16 objection, and then you can answer.
17        MR. KELLY:  Thank you, Ms. Giffen.
18    Q.   So let's start over again.  If
19 NIH's policy to protect the subjects is at
20 level A, but CSU wants to employ a higher level
21 of protection for the research that comes out
22 of its institution, why would you not comply
23 with CSU's requirements?
24        MR. KELLY:  Object to the form of
25 the question, assumes facts not in evidence.

Page 172

1 You may answer, Bryan.
2    A.   I have two answers that I think
3 both address your question.  The first is just
4 logical.  I didn't know this was going to blow
5 up on me in 2019, it was like a year and a half
6 after we accessed the data, and it was an
7 oversight to not report to NIH that I was
8 uploading to the external server.
9        So I would have had to be psychic,
10 I think, that back in 2018 that someone was
11 going to say two years later I needed an IRB
12 approval when they don't even have -- that's
13 it, yeah.
14    Q.   Do you dispute the following
15 statement, CSU policy requires that anytime you
16 are doing research involving human subjects
17 that you must either get from CSU's IRB an
18 exemption or an approval?
19        MR. KELLY:  Object to the form of
20 the question, ambiguous, and I believe it also
21 assumes facts not in evidence.  You may answer,
22 Bryan.
23        THE WITNESS:  I'm sorry to do this
24 to you, but can you repeat it?
25        (Record read.)

Page 173

1        MR. KELLY:  Same objection.
2    A.   These are archival data.  I never
3 met the participants of the study that was
4 collected in --
5    Q.   Wait.  You're answering a different
6 question than I just asked.
7    A.   No.  I do not agree for TCP data
8 specifically.
9    Q.   You believe that because why?
10    A.   I think there is like four good
11 arguments.
12    Q.   Give them all to me.
13    A.   The first, they are archival data.
14 I came in contact with no human.  So the
15 concern is it's really sensitive data, and
16 theoretically if somebody got it, they could
17 say that line number three of the spreadsheet
18 is Jane Doe, so that needs to be protected.
19 That's all through the NIH.  There is nothing
20 CSU could have added that was needed given what
21 NIH -- you know, the application process for
22 NIH.
23    Q.   I don't think you listed four
24 things, and you said there are four arguments.
25    A.   How many did I list?

1    Q.   I feel unsure because you could
2 have put it all together.
3         MS. KAMINSKI:  I think there was
4 two; no human contact and nothing CSU could
5 add.
6    A.   Archival data.  CSU is irrelevant
7 because it's the NIH's data.  It doesn't matter
8 what CSU says.  If NIH doesn't want to give it
9 to me, they are not.  If NIH does want to give
10 it to me, they will.  Now, of course it has to
11 go through CSU on these initial applications,
12 but they approved I think everything I did.
13    Q.   So let's just -- let's take a for
14 instance then with what you just said.
15    A.   Sure.
16    Q.   If NIH said, yes, you can have the
17 data, and we don't think you need to run it by
18 your institution's IRB approval.
19    A.   It's not a thing.  That's what it
20 says on the website.
21    Q.   CSU says, yeah, we don't agree.  At
22 this institution that is not enough.  You have
23 to either get an IRB approval or an exemption,
24 and you don't get to decide between those two,
25 only IRB does.

1    A.   Yeah, but the problem is they made
2 that determination two years after I got -- I
3 applied for the data.  How could you go back in
4 time and apply for IRB?
5    Q.   That begs the question of shouldn't
6 you have found out in the first place?
7    A.   No.  I mean, I complied with
8 everything that NIH wanted me to do, and it
9 clearly says, and I don't know how many times I
10 have to say it, and it's even in the --
11 committee even included it in the -- report.
12 There is a table that says is IRB needed, no,
13 so why would I go through CSU's IRB?
14    I did for a later data set, ABCD,
15 because it said it's needed.
16    Q.   Meaning NIH said it's needed?
17    A.   Yes.
18    Q.   Did you get an exemption, by the
19 way?
20    A.   I did for either it was Add Health
21 or ABCD.  I don't remember.
22    Q.   So actually going through CSU IRB
23 doesn't mean you have to go through the
24 rigamarole of the approval process because you
25 can get an exemption, right?  That's an option?

1    A.   I did get it for a later data set.
2    Q.   That's right.  So the option here
3 with all of the TCP data was to go to the IRB
4 and then you could point out that NIH doesn't
5 require IRB approval and ask for an exemption?
6    A.   Why would I go to CSU's IRB when
7 clearly, and I think everybody admits it, NIH
8 says it's not needed?
9    Q.   Isn't that, Dr. Pesta, just saying
10 CSU doesn't matter?
11        MR. KELLY:  Object to the form of
12 the question.
13    A.   I don't think so because they have
14 to approve my initial application.  They could
15 have pointed it out then.  They didn't.  Go
16 ahead.
17    Q.   Do you agree with this statement or
18 disagree with this statement, the policy of CSU
19 is that only IRB gets to decide that research
20 involving human subjects requires IRB approval
21 or is exempt?
22        MR. KELLY:  Object to the form of
23 the question.
24    A.   Not for TCP.  It's irrelevant.
25 It's like they are out of jurisdiction for TCP

1 data, archival data collected like 12 years
2 ago.  I had no contact with the human subjects.
3 I did have their a DNA.  That's it.
4    Q.   Wouldn't a careful researcher who
5 was using human subject data have just gone to
6 IRB and said I think we're exempt, but I'm
7 doing -- I'm crossing my Ts and dotting my Is?
8        MR. KELLY:  Object to the form of
9 the question, assumes facts not in evidence and
10 is ambiguous as well.  You can answer, Bryan.
11    A.   No.  I mean, NIH says you don't
12 need it.  Why would I go through it?
13    Q.   It doesn't matter if CSU's policy
14 says otherwise?
15    A.   I'm not saying that.  I think NIH
16 realizes that it's archival data.  You're not
17 interacting in real life with these people.
18 That is their only interest is in preserving
19 the anonymity of the participants.  So what
20 could I have said to CSU in 2018?  I don't
21 know.
22    Q.   Isn't part of what you do is take
23 into question whether the data would remain
24 anonymous?
25    A.   According to CSU.  I strongly

45 (Pages 174 - 177)

Page 178

1 disagree with that.
2     Q.   Why do you disagree with that?
3     A.   Because it's all BS.  I didn't do
4 these things they are charging me with -- they
5 charged me with.
6     Q.   You didn't upload the data to a
7 Dutch website?
8     A.   Yeah, the one exception is that,
9 and I've admitted that throughout this whole
10 investigation.
11     Q.   And, as you described earlier when
12 you described what that website did, added
13 information that wasn't originally in the TCP
14 data with respect to the participants?
15         MR. KELLY:  Object to the form of
16 the question, assumes facts not in evidence,
17 ambiguous.
18     Q.   You can answer the question.
19     A.   Yeah, it was an oversight.  That
20 could be like number three if we're keeping
21 track still.  It just did not occur to me that
22 I should have gotten prior approval as it's
23 called from NIH to upload to an external
24 server.
25     Q.   Let's talk about that.  That is you

Page 179

1 pretty consistently conceded that that should
2 have been disclosed to NIH, that you were going
3 to upload that data and what you were going to
4 do with it, right?
5     A.   Yes.  It was an oversight.
6     Q.   So why wasn't that research
7 misconduct?
8     A.   It was a mistake, I mean, unless
9 you think there was some devious purpose behind
10 it.  But I don't see what advantage I would
11 have got by hiding it from NIH that I was
12 estimating skin color.  It just did not occur
13 to me that we had to do that until after it was
14 pointed out two years later at which time I
15 couldn't go back and reget -- to 2018 and get
16 IRB approval.
17         The only thing that matters then
18 was I was sincerely sorry for that and I am
19 still, but the question is did it cause any
20 harm, and it did not.
21     Q.   So is that the standard we should
22 use is whether the misconduct caused harm?
23     A.   I think --
24         MR. KELLY:  Object to the form of
25 the question, assumes misconduct.

Page 180

1     A.   I think it's the NIH's data.  If
2 they say IRB is not needed, it's not needed.
3     Q.   We're actually talking about the
4 upload of the data to the website right now.
5     A.   Well, I mean, it was an oversight.
6 If I was wise enough or whatever the word is in
7 2018 to realize that that should be reported,
8 then maybe I'd agree with that, but I wouldn't
9 have reported it to CSU.  I would have reported
10 it to the NIH.
11         Can I follow-up real quick?
12     Q.   Sure.
13     A.   Even Kent Taylor retracted his
14 initial complaint that I needed the IRB because
15 he actually then looked at it and saw that I
16 didn't, so he retracted it.  It's got to be in
17 Exhibit 5.
18     Q.   Where does Kent Taylor work?
19     A.   UCLA.
20     Q.   Would he know anything about the
21 CSU IRB approval process or when it's required
22 to submit to CSU IRB?
23         MR. KELLY:  Object to the form of
24 the question.
25     A.   So he starts out with a negative

Page 181

1 attack focused on not getting IRB.
2     Q.   My question is, do you know whether
3 Kent Taylor knows anything about CSU's IRB
4 approval process?  Not NIH's, CSU's.
5     A.   They are reasonably standardized
6 across universities, so I don't know how to
7 answer that.
8     Q.   So you don't know whether he knows
9 or he doesn't know; is that the answer?
10         MR. KELLY:  Object to the form of
11 the question, mischaracterizes the testimony.
12     A.   I don't know for sure, yeah.
13     Q.   Okay.  What trainings were you
14 involved in at CSU to engage in research?
15     A.   In general research?
16     Q.   Yes.
17     A.   I mean, I was educated there for
18 three degrees.
19     Q.   Did you have any specific education
20 about research policy or research ethics?
21     A.   Yeah, I was even on the IRB
22 committee at the university level 15 years ago.
23     Q.   Okay.  Any specific training
24 courses?
25     A.   Yeah, so you have to take a

46 (Pages 178 - 181)

Page 182

1 research methods and design course undergrad,
2 master's, and Ph.D., and it would be a chapter
3 in that course.
4     Q.   Do you recall what the name of the
5 text was that was used in the courses that you
6 took?
7     A.   For the graduate classes it was
8 probably more journal articles.  I have no idea
9 what the book was in 1988 or whenever I took
10 it.
11     Q.   I understand that you have an
12 objection that you were not permitted to
13 cross-examine the complainants during the
14 committee investigation process; is that right?
15     A.   The external like Bird and Taylor,
16 correct?
17     Q.   Yes.  Is that right?
18     A.   Correct.
19     Q.   What makes you think you have a
20 right to cross-examine?
21     A.   It's there in the policy.  I mean,
22 we can pull it up.  I don't have the specific
23 number memorized.  But it says -- I don't think
24 it uses the word cross-examine, but it says
25 something like, paraphrasing, the defendant has

Page 183

1 the right to write out questions to be
2 submitted to these witnesses and to get their
3 replies.
4     Q.   Did you do that?
5     A.   I didn't know they were being
6 interviewed until I got the transcripts of
7 their interview.
8     Q.   Right.  Did you do that afterwords?
9     A.   I sent a rebuttal to CSU.
10     Q.   You know that the committee
11 received that rebuttal, right?
12     A.   It's in the final report.
13     Q.   So you were permitted to provide
14 your questions, concerns, statements of
15 disagreement with anything the complainants
16 said during their interviews, right?
17         MR. KELLY:  Object to the form.
18     A.   That's not the policy, though.
19         MR. KELLY:  Objection.
20     Q.   What is the policy?
21     A.   The policy was that I was allowed
22 to write out questions before the interview to
23 have it submitted to like Bird and Taylor and
24 then get replies from them.
25     Q.   What policy are you referring to?

Page 184

1     A.   It's 34.  I wonder if the policy is
2 in here.  We could pull it up.
3     Q.   Okay.  Well, we're going to have to
4 wait to do that because it's not easily
5 available.
6     A.   Okay.
7     Q.   It's the Ohio Administrative Code
8 sections that include breaking research policy?
9     A.   Well, I don't know if the ORC is
10 incorporated into CSU's policy, but it's on
11 there.  If you go to mycsuohio.edu and type in
12 academic research misconduct, the first thing
13 that comes up is a long policy on how it all
14 works.
15     Q.   I want to be clear, I didn't say
16 the Ohio Revised Code, the Ohio Administrative
17 Code.
18     A.   Okay.  I didn't catch that.
19         MR. KELLY:  Object to the form.  I
20 don't think the witness knows what you're
21 referring to.
22         MS. GIFFEN:  Okay.
23         MS. KAMINSKI:  I think so.
24     Q.   All right.  After the report comes
25 out, right?

Page 185

1     A.   The committee's report?
2     Q.   Yes.
3     A.   Yes.
4     Q.   On --
5     A.   Do you I mind?  I want to take my
6 tie off.
7         - - - - -
8         (Thereupon, Deposition Exhibit 17, a
9         Document Entitled Interview
10         (10/11/21) Supplement, Bryan Pesta,
11         was marked for purposes of
12         identification.)
13         - - - - -
14     Q.   Handing you what's been marked as
15 Exhibit 17, Dr. Pesta, can you confirm to me
16 this is one of the documents that you provided
17 to the committee, and it's specifically a
18 supplement that you provided after your
19 October 11th interview, right?
20     A.   Was that the first or second
21 interview?
22     Q.   That was the second interview.
23     A.   Correct.
24     Q.   Okay.
25         - - - - -

47 (Pages 182 - 185)

Page 186

1    (Thereupon, Deposition Exhibit 18,
2    an Email From Bryan J. Pesta Dated
3    1/15/22, was marked for purposes of
4    identification.)
5    - - - - -
6    Q.   I should say before we go to this
7  next one, you were provided a draft copy of the
8  final report in December of 2021, correct?
9    A.   I don't remember the exact date,
10 but it sounds like December is correct.
11   Q.   And you on December 2nd provided a
12 rebuttal to that report, correct?
13   A.   I'm sure I did.
14   Q.   Okay.  And then the committee on
15 January 13th issues its final report which is
16 Exhibit 5?
17   A.   Is it Exhibit 5?
18   Q.   Yes.
19   A.   Okay.
20   Q.   I mean, you can check.  You don't
21 have to take my word for it.
22   A.   You're talking about the ad hoc
23 committee?
24   Q.   No, no, the final investigative
25 committee report.

Page 187

1    A.   This big document?
2    Q.   Correct.
3    A.   And what date did you say that was?
4    Q.   I said January 13th, 2022.
5    A.   That sounds correct.  I thought you
6  were talking about the ad hoc committee.
7    Q.   So after the committee issued its
8  report, you received --
9        MS. GIFFEN:  I need to pull out the
10 provost letter of January 13th.  I'm glad
11 you're here (indicating).
12       - - - - -
13       (Thereupon, Deposition Exhibit 19, a
14       Letter from the Office of the
15       Provost Dated 1/13/22, was marked
16       for purposes of identification.)
17       - - - - -
18   Q.   Dr. Pesta, is that a copy of the
19 letter from Provost -- then Provost Bloomberg
20 of January 13th indicating her acceptance of
21 the final report and her intention to terminate
22 you?
23   A.   Correct.
24   Q.   And then if you will refer now to
25 Exhibit 18, you then sent a letter to your

Page 188

1  colleagues, right?
2    A.   Yes.
3    Q.   And when you say colleagues, who
4  got this?
5    A.   Well, I don't know.  It's a -- it
6  doesn't show.  We're on 18, right?
7    Q.   Yes.
8    A.   It doesn't show.  You see the --
9    Q.   I know.  That's why I'm asking you,
10 because I don't know.
11   A.   Probably a lot of people in
12 management that I am more collegial with.  I'm
13 pretty sure I copied the department chair who
14 at that time was Timothy DeGroot.  He might
15 still be there as department chair.  I don't
16 know.
17   Q.   Anybody else that you know?
18   A.   I'm sure I sent it to people
19 outside of CSU, too.  No, I don't know.  I
20 don't know.
21   Q.   Okay.  All right.  Do you have
22 something that would show to whom you sent it?
23   A.   You guys should because this was
24 sent through CSU email.
25   Q.   You're looking at what we have.

Page 189

1    A.   I mean, I don't have a record.
2  This is all I've got.
3    Q.   That's all right.  That's the
4  answer.  All right.  So you are aware that
5  following the provost's letter of January 13th
6  that an ad hoc committee was convened pursuant
7  to the collective bargaining agreement?
8    A.   Correct.
9    Q.   And do you remember who the people
10 were who were on the committee?
11   A.   No, because they had their backs
12 turned to me.  They wouldn't even talk to me or
13 address any of my questions.  I don't remember.
14   Q.   They had their backs turned to you?
15   A.   They were sitting at a table.  I
16 was on Zoom.  Everybody else was present at
17 some room in CSU.  I felt like I was almost
18 completely ignored.  They did ask me some
19 questions, but, yes, I don't remember who they
20 were right now.
21   Q.   They were informed that the ad hoc
22 committee was going to be convened, and you
23 were given an opportunity to present a rebuttal
24 to the provost's letter, right?
25   A.   Yes.

48 (Pages 186 - 189)

Page 190

1               - - - - -
2          (Thereupon, Deposition Exhibit 20,
3      an Email From Bryan Pesta Dated
4      1/25/22 with Attachment, was marked
5      for purposes of identification.)
6               - - - - -
7      Q.   Handing you what's been marked as
8  Exhibit 20, Dr. Pesta, is that your rebuttal
9  that went to the ad hoc committee?
10     A.   It's definitely my rebuttal.  Let
11  me read the first thing.  Yeah, this is --
12     Q.   If you need time to read it, you
13  can take it.
14     A.   I got it.  This is it.
15     Q.   Okay.
16               - - - - -
17          (Thereupon, Deposition Exhibit 21,
18      an Email From Bryan Pesta Dated
19      1/28/22 with Attachment, was marked
20      for purposes of identification.)
21               - - - - -
22     Q.   If we look back at Exhibit 20 just
23  for a second, so this is addressed to Michael
24  Artbauer, Elizabeth Lehfeldt, Eric Allard,
25  Debbie Jackson, Stephanie Kent, Andrew Resnick,

Page 191

1  and R.E. Ingersoll.  Did you raise any
2  objection with respect to the makeup of the
3  committee?
4      A.   I don't even remember.  I'm sure I
5  was told, but I don't have a memory of it.  No,
6  for this ad hoc committee, no.
7      Q.   Okay.  And you know that half of
8  them were appointed by the administration and
9  half by the AAUP, right?
10     A.   I have a vague recollection of
11  that.
12     Q.   Okay.  I think the provost sent you
13  or Cheryl, the vice provost, sent you a
14  description of the makeup of the committee and
15  how things would work, right?  Do you recall
16  that?
17     A.   Vaguely.
18     Q.   Who was Birch Browning?
19     A.   He's the AAUP rep, my union rep, I
20  guess.
21     Q.   Okay.  And in addition to providing
22  the rebuttal that we just looked at in
23  Exhibit 20, you also appeared before the
24  committee, right?
25     A.   Not physically.  I was on Zoom.

Page 192

1  Everybody else was in a room at CSU.
2      Q.   That was at your request?
3      A.   Yes.
4      Q.   Why did you not want to appear in
5  person?
6      A.   Can I consult with my lawyer?  It's
7  kind of private.  I'll just say it.  I made a
8  reasonable accommodation request through the
9  Americans with Disabilities Act.
10     Q.   Can you describe more fully why you
11  needed an ADA accommodation?
12     A.   A lot of anxiety, nervousness.  I
13  mean, go figure.  That's why I requested it.
14  There is a letter I sent to Dr. Bracken that
15  explains why I did it, and I don't remember the
16  details.
17          MR. KELLY:  Can we stop right
18  there?  He wanted to talk to me, and there is
19  no question pending.
20          MS. GIFFEN:  Right at the moment
21  there is no question pending.
22     A.   Just for privacy, medical reasons,
23  I didn't know if I was obligated to answer it,
24  but that's okay.  I did answer it.
25     Q.   I don't intend to put that letter

Page 193

1  into evidence.
2      A.   Okay.  Fine.
3      Q.   But I want to make it clear that
4  this is something you requested.  This wasn't
5  something the committee imposed upon you that
6  you couldn't be there live in person.
7      A.   I understand.  No, you're right.
8      Q.   On the day in question, you -- and
9  I think it was February 28th; was it?
10          MS. KAMINSKI:  January 28th.
11     A.   Which one?
12     Q.   I'm looking for when the hearing
13  was.  No, February is way too late.  It's
14  January 28th.
15     A.   Okay.
16     Q.   At that time you also provided to
17  the committee a PowerPoint presentation that
18  supported your position, correct?
19     A.   Yes.
20     Q.   I understand this is the PowerPoint
21  that you presented to the committee, correct?
22     A.   Right at the beginning of the
23  meeting, yes.
24     Q.   Was there any point during the ad
25  hoc committee hearing that you were not able to

1 present evidence or argument supporting your
2 position?
3    A.   If you count questions not being
4 answered, it's not true.
5    Q.   What do you mean?
6    A.   I asked specific direct questions
7 even to the provost, and she just stared at me
8 with her hands behind her back and didn't say
9 anything.
10    Q.   What were those questions?
11    A.   It's in the rebuttal which I think
12 is 20?  Yeah, so can I?
13    Q.   Sure.
14    A.   In her discipline letter, she
15 almost starts out making four claims having to
16 do with Terri Kocevar, blah, blah, blah, and
17 she is just wrong in all four of her claims, so
18 I addressed that.  I asked her about that, and
19 she just ignored me.
20    Q.   So what did you ask her
21 specifically?
22    A.   I don't remember the specific
23 question.  In the rebuttal, though, it says get
24 your facts straight or something like that.
25    Q.   Did the ad hoc committee members

1 ask any questions?
2    A.   I remember them asking one.  A lady
3 asked about IRB.  That's all I remember.
4    Q.   What did she ask?
5    A.   Just if I had any experience with
6 it.  I don't remember what else.
7    Q.   What did you answer?
8    A.   Yes.
9    Q.   Did you describe your experience?
10    A.   I know I told them that I was on
11 the university committee at some point.  That's
12 all I remember.
13    Q.   You have submitted to IRB before?
14    A.   Every project that needed it
15 throughout my career has IRB approval.
16    Q.   Okay.  Have you ever done a paper
17 involving human subjects where you didn't seek
18 IRB approval?
19    A.   So I use a lot of archival data.
20 Like if I get it from the census people
21 data -- no, the answer is no.
22    Q.   Okay.  And I think, but you will
23 tell me if I'm wrong --
24         - - - - -
25         (Thereupon, Deposition Exhibit 22, a

1    Document Entitled Final
2    Consideration Dated 2/14/22, was
3    marked for purposes of
4    identification.)
5         - - - - -
6    Q.   Handing you what's been marked as
7 Exhibit 22, you presented this to the
8 committee.  Was this after the hearing?
9    A.   I'm trying to refamiliarize myself.
10    Q.   Feel free to look.
11    Q.   Do you remember the date you threw
12 out for when the committee met?
13    Q.   It was January -- no, you're right,
14 it's the 28th, so this was after
15    MS. KAMINSKI:  No.
16    A.   No, this would be --
17    Q.   I'm terribly sorry.  You are right.
18    A.   So March 4th I would be fired, so
19 it's got to be after.
20    Q.   February 14th is after the ad hoc
21 hearing?
22    A.   Correct.
23    Q.   But before the ad hoc committee
24 issues their letter which we're going to look
25 at in a minute.

1    A.   Correct.
2    Q.   You mentioned here burden of proof?
3    A.   Uh-huh.
4    Q.   "That CSU must prove clearly and
5 convincingly that I intentionally, knowingly,
6 or recklessly conducted academic research
7 misconduct."
8    A.   Correct.  That's from the policy.
9    Q.   What policy?
10    A.   The one you said you would deal
11 with later, CSU's.  If you type academic
12 research misconduct on the CSU website, it's in
13 there.
14    Q.   The letter from the ad hoc
15 committee is not in my stuff.  Do you have that
16 quickly?  Do you know where that is?
17    A.   It might be in Exhibit 5.
18    Q.   No.  It can't be Exhibit 5 because
19 this is after the fact.
20    MS. GIFFEN:  You do have it
21 (indicating).  You are so good.
22         - - - - -
23         (Thereupon, Deposition Exhibit 23, a
24         Letter to Dr. Bloomberg Dated
25         2/28/22, was marked for purposes of

1        identification.)
2           - - - - -
3      Q.   Handing you what's been marked as
4  Exhibit 23, was this the letter that you
5  received from the ad hoc committee upholding
6  Provost Bloomberg's decision to terminate you?
7           MR. KELLY:  Object to the form of
8  the question, assumes facts not in evidence, is
9  ambiguous, and I don't believe the terminology
10  upholding is appropriate, but go ahead and
11  answer.
12      A.   This is the letter from the ad hoc
13  committee.
14      Q.   Yes.  You see that in the ad hoc
15  committee's conclusions, they specifically
16  determine that the conclusions drawn by the
17  investigative committee and the provost were
18  arrived at irrespective of the content of
19  Dr. Pesta's research?
20           MR. KELLY:  Where are you at?
21      A.   Yes, I'm sorry.
22           MS. GIFFEN:  The third paragraph of
23  the second page.
24      A.   What was your question there?
25      Q.   You'll agree with me that the

1  committee concluded that the conclusions drawn
2  by the investigative committee and by Provost
3  Bloomberg were arrived at irrespective of the
4  content of your research?
5      A.   That's what they claim.
6      Q.   Will you agree with me that the ad
7  hoc committee confirmed each of the bases for
8  Provost Bloomberg's determination of the
9  sanction to be levied against you?
10           MR. KELLY:  Object to the form of
11  the question.
12      A.   I guess it's in here, so that's
13  what they wrote.
14           - - - - -
15           (Thereupon, Deposition Exhibit 24, a
16           Letter from the Office of the
17           Provost Dated 2/28/22, was marked
18           for purposes of identification.)
19           - - - - -
20      Q.   Dr. Pesta, handing you what's been
21  marked as Exhibit 24.  Can you confirm that
22  this is the letter you received from Provost
23  Bloomberg that terminates your employment with
24  CSU effective March 4th, 2022?
25      A.   Correct.

1      Q.   You said correct?
2      A.   Yes.
3           - - - - -
4           (Thereupon, Deposition Exhibit 25,
5           an Unfair Labor Practice Charge
6           Document, was marked for purposes of
7           identification.)
8           - - - - -
9      Q.   All right.  Dr. Pesta, you've now
10  been handed Exhibit 25.  Is that the Unfair
11  Labor Practice Charge you filed with the State
12  Employee Relations Board against the
13  AAUP-Cleveland State?
14      A.   Correct.
15      Q.   Pardon me?
16      A.   Yes.
17      Q.   Okay.  And that that was filed on
18  April 26th, 2022?
19      A.   Correct.
20      Q.   And then beginning on page 1 of the
21  attachment to the charge which consists of --
22      A.   Statement of facts.
23      Q.   I think it goes all the way through
24  to page 11, and then there is a letter from
25  your then attorney, Jay Carson, to SERB, right?

1      A.   Can you tell me what page you're
2  starting on?  Is it page 1?
3      Q.   There is the two pages of the
4  charge, right?
5      A.   Correct.
6      Q.   The next thing is marked at the
7  bottom page 1.
8      A.   Correct.
9      Q.   And then it goes all the way to
10  page 10 -- excuse me -- 11 and concludes with a
11  letter to SERB from your attorney?
12      A.   You are correct.
13      Q.   So pages 1 through 11 are headed
14  No. 6, statement of facts.  Now, does that
15  refer to the charge form itself if you look at
16  page 2?
17      A.   Yeah.  When you need more space,
18  you've got to --
19      Q.   Sure.  There is nothing the matter
20  with it.  I'm just confirming that that was
21  your statement of the charge as listed in pages
22  1 through 11 referred to that statement of
23  facts section of the charge.
24      A.   Correct.
25      Q.   And you'll note that you presented

1 that statement to SERB as statements it
2 contains are true and correct to the best of my
3 knowledge and belief. Do you see that in the
4 declaration section?
5     A.   Could you tell me the page?
6     Q.   That's page 2.
7     A.   Okay.
8     Q.   No, no, no. Page 2 of the charge
9 form right under Section 6.
10    A.   Yes. I see it.
11    Q.   Okay. All right. And you can
12 confirm that the statements contained in the
13 statement of facts, meaning 1 through 11, are
14 your position with respect to the SERB charge
15 against the AAUP?
16    A.   Yeah. It's been a while since I
17 looked at this, so can I just briefly scan it?
18    Q.   Of course.
19         MS. GIFFEN: Let's go off the
20 record because it's quite lengthy.
21         (Brief recess.)
22    Q.   Dr. Pesta, you've had an
23 opportunity now to review Exhibit 25.
24    A.   Yes.
25    Q.   I believe my question was, as you

1 sit here today, do you have anything that you
2 want to add to or retract from the description
3 of the statement of facts that you have in the
4 Unfair Labor Practice Charge in Exhibit 25?
5     A.   I didn't peruse it, but no.
6     Q.   Did you ever receive a copy of the
7 union's response to your Unfair Labor Practice
8 Charge?
9     A.   Yeah. I believe we produced that
10 in one of the folders to you guys.
11    Q.   You didn't, but that's okay.
12    A.   Okay. There is a bunch of emails
13 in there, though.
14         - - - - -
15         (Thereupon, Deposition Exhibit 26, a
16         Letter to Judy Knapp dated 5/25/22,
17         was marked for purposes of
18         identification.)
19         - - - - -
20    Q.   Is that a copy of the position
21 statement that the union filed in response to
22 the Unfair Labor Practice Charge?
23    A.   This doesn't look familiar to me.
24         MR. KELLY: This is exhibit what?
25         THE WITNESS: Twenty-six.

1     A.   Yes. This is it.
2     Q.   Yes, you've seen this before?
3     A.   Yes.
4     Q.   And were you able to see the
5 affidavits that were submitted by the union?
6     A.   Back when I read it I'm sure, yeah.
7     Q.   Okay. What page are those on?
8     A.   I haven't given them to you. I've
9 only given you the position statement. Well,
10 we can put these in.
11         - - - - -
12         (Thereupon, Deposition Exhibit 27,
13         the Affidavit of Linda Quinn, was
14         marked for purposes of
15         identification.)
16         - - - - -
17         - - - - -
18         (Thereupon, Deposition Exhibit 28,
19         the Affidavit of Birch Browning, was
20         marked for purposes of
21         identification.)
22         - - - - -
23    Q.   You've been handed now Exhibits 27
24 and 28. Exhibit 27 appears to be the affidavit
25 of Linda Quinn, and Exhibit 28 appears to be

1 the affidavit of Birch Browning. Have you
2 received those before?
3     A.   I don't remember ever
4 reading -- was this the first one, Linda Quinn,
5 Exhibit 27?
6         MR. KELLY: The question is have
7 you ever received it before.
8     A.   No.
9     Q.   In particular would you please read
10 the affidavit of Birch Browning which is
11 Exhibit 28 and tell us whether you disagree
12 with the statements made by Mr. Browning in the
13 exhibit?
14    A.   The whole document?
15         MR. KELLY: Hold on. He just said
16 he hasn't seen this before, I believe.
17         MS. GIFFEN: I think he did, too.
18         MR. KELLY: And you want him to
19 read now all 21 paragraphs and say whether he
20 agrees or disagrees with it? I have to object.
21         MS. KAMINSKI: Just go paragraph by
22 paragraph.
23         MS. GIFFEN: I don't want to waste
24 all that time.
25    A.   So do you want me to read it?

Page 206

1    Q.   I'm going to pick out a couple.
2  Look at paragraph 10.
3    A.   Of 28 or 27?  Twenty-eight, okay.
4    Q.   Twenty-eight.  Mr. Browning states,
5  "Dr. Pesta did not inform the CSU-AAUP about
6  the October 11th interview with the
7  investigation committee, invite them to attend,
8  or invite them to review the transcript;" is
9  that correct?
10       I'm sorry.  I worded that
11  improperly.  Do you agree or disagree with that
12  statement by Mr. Browning?
13    A.   I don't remember.  I know he was
14  present at the second, not the first.
15    Q.   Now, I don't want you to feel
16  tricked later on.  This is referring to the
17  investigation committee, not the ad hoc
18  committee.
19       MR. KELLY:  Yes.
20    A.   That's my understanding, correct.
21    Q.   So this is -- are you saying that
22  Birch Browning was at the first interview of
23  the investigation committee?
24    A.   I thought I said second, or maybe
25  it was the ad hoc.  I don't remember.  I think

Page 207

1  it was the second meeting, but I'm not
2  positive.
3    Q.   I will tell you that I have no
4  record that Birch Browning was at either of the
5  interviews in front of the investigation
6  committee.
7    A.   Well, it must have been the ad hoc.
8    Q.   He was at the ad hoc committee
9  hearing.
10    A.   Okay.  Thank you.  I agree.
11    Q.   So but this paragraph,
12  paragraph 10, refers to the investigation
13  committee, and what he's saying there is that
14  you did not inform the CSU-AAUP about that
15  interview, invite them to attend, or invite
16  them to review the transcript; is that true?
17    A.   I don't remember.
18    Q.   In paragraph 19, Mr. Browning
19  refers to another occasion where there was a
20  recommendation of a dismissal of a faculty
21  member.  Are you familiar with that instance
22  that he is referring to?
23    A.   No.
24    Q.   How about the reference in
25  paragraph 20?

Page 208

1    A.   I have no idea.  I've never seen
2  this before.
3    Q.   How about 21?
4    A.   No.  I'm not familiar with it.
5    Q.   Okay.  Okay.
6       - - - - -
7       (Thereupon, Deposition Exhibit 29, a
8       Document Labeled Investigator's
9       Memorandum, was marked for purposes
10       of identification.)
11       - - - - -
12    Q.   If you could, take a moment to
13  review 29, Exhibit 29, and tell me whether you
14  ever saw the investigator's memorandum in
15  connection with your Unfair Labor Practice
16  Charge.
17    A.   This is from SERB, right?
18    Q.   Correct.
19    A.   Yes, I have seen this before.
20    Q.   Okay.  And then finally
21  (indicating).
22       - - - - -
23       (Thereupon, Deposition Exhibit 30, a
24       Document Labeled Dismissal of Unfair
25       Labor Practice Charge, was marked

Page 209

1       for purposes of identification.)
2       - - - - -
3    Q.   Have you seen Exhibit 30 before?
4    A.   Yes.
5    Q.   And what is Exhibit 30?
6    A.   It is SERB's in the matter of me
7  versus the AAUP dismissal of the Unfair Labor
8  Practice Charge.
9    Q.   Okay.  Did you take any further
10  action with respect to the State Employee
11  Relations Board complaint?
12    A.   No.  I don't think so, no.
13    Q.   Have you followed any -- filed or
14  proceeded in any other forum to object to your
15  dismissal or the union's handling of the
16  dismissal?
17    A.   No.  It's just this lawsuit and the
18  SERB thing.
19    Q.   Okay.  Have you been a party to any
20  other lawsuits?
21    A.   You mean party listed, like as a
22  defendant or plaintiff?
23    Q.   Yes.
24    A.   A long time ago I witnessed a car
25  accident I think when I was 18 years old.  I

53 (Pages 206 - 209)

Page 210

1    was deposed.
2        MR. KELLY: A party.
3    Q.    I actually mean, I'll be specific,
4    as either a plaintiff or defendant in a
5    lawsuit.
6    A.    Not that I can remember.
7        MR. KELLY: You were divorced
8    twice, right?
9        MS. GIFFEN: I was about to ask.
10    A.    Yes, divorce, correct.
11    Q.    Bankruptcy?
12    A.    Chapter 11 I want to say right
13    after I got divorced, like 2010, maybe 2011.
14    Q.    Any criminal prosecutions?
15    A.    I think it was Chapter 13. I'm
16    sorry. No.
17    Q.    By the way, what was -- you said
18    the divorce was when and the bankruptcy was
19    when?
20    A.    To the best of my memory, 2010,
21    official 2011. The bankruptcy might have been
22    a year before.
23    Q.    Around the same time?
24    A.    Around the same time.
25        - - - - -

Page 211

1        (Thereupon, Deposition Exhibit 31,
2        Policy 3344-28-01, was marked for
3        purposes of identification.)
4        - - - - -
5    Q.    Handing you, Dr. Pesta, what has
6    been marked Exhibit 31, is this the research
7    misconduct policy that you've referred to a
8    couple of times today?
9        MR. KELLY: If you know. Look it
10    over first.
11    A.    I don't know if these numbers come
12    from CSU or Ohio Administrative Law, but it
13    looks like the policy I got off of CSU's
14    website.
15    Q.    Okay. I'm interested in two
16    particular sections because you said at some
17    point that in order to be found responsible for
18    research misconduct under the policy, you had
19    to be found to have knowingly, recklessly, or
20    intentionally engaged in that misconduct,
21    right?
22    A.    Correct.
23    Q.    Where is that in the policy?
24        MR. KELLY: If you know.
25    A.    It's the definition of academic

Page 212

1    research misconduct. I mean, if this was
2    electronic, I could just search for that
3    phrase.
4    Q.    If you turn to page -- it's the
5    fourth page of the document. It's Ohio
6    Administrative Code 3344-28-02 definitions.
7    A.    Uh-huh.
8    Q.    And is that the definition of
9    academic research misconduct to which you
10    refer?
11    A.    So it's the burden of proof I was
12    talking about with intentionally, knowingly,
13    recklessly, but this does define academic
14    misconduct.
15    Q.    That doesn't say it has to be
16    intentional or knowing or reckless; does it?
17    A.    I think it's in the policy, but, I
18    mean, I haven't looked at this in a while.
19    Q.    The other thing --
20    A.    So can I ask just for
21    clarification? I don't know if this is from
22    CSU or not. Whatever CSU has on the website is
23    what I used.
24    Q.    I'll represent to you that this
25    is --

Page 213

1        MS. GIFFEN: Let's go off the
2    record.
3        (Discussion off record.)
4        MS. GIFFEN: Back on the record.
5    Q.    The second piece that I'm
6    interested in is you said you believe that you
7    had a -- that the investigative committee had a
8    requirement to allow you to pose questions to
9    the complainants. Pardon me?
10    A.    I know it's on the website. I
11    mean, I took it right from the website, but I
12    haven't looked at it in a while. My confusion
13    is that I don't remember ever seeing -- you
14    know, you said it's ORC or OAC or whatever, but
15    that's not on the website, so I just wanted to
16    make sure the document is the same.
17    Q.    If you go to --
18        MR. KELLY: Six R.
19    Q.    Halfway down, Rule 3344-28-06.
20    A.    What page? I'm sorry. Oh, got it.
21    Do you have the page number? Yeah, I got it.
22    Q.    Okay. And if you could, this
23    section, as far as I understand, is about
24    conducting the investigation.
25    A.    Uh-huh.

54 (Pages 210 - 213)

1    Q.   And I'm wondering if this is the
2  section where you saw a right to cross-examine
3  the witnesses.
4         MR. KELLY:  Read through it
5  carefully.  I don't want to put words in,
6  either, but it's --
7         MS. GIFFEN:  Pardon?
8         MR. KELLY:  The provision I believe
9  Dr. Pesta is referring to is in here twice at
10  3(K) and -- I'm sorry -- not 3(K), at 3(I) and
11  at 6(K).
12        MS. GIFFEN:  3(K) and 6(K), okay.
13        MR. KELLY:  3(I).
14        MS. GIFFEN:  So if we read 3(I),
15  you think it's in here somewhere?
16        MR. KELLY:  It's in here twice.
17    A.   Can we manually number the pages?
18  Would that help?  I don't find it.
19    Q.   All right.  Well, we'll leave it.
20        MR. KELLY:  One place you will find
21  it is 6(K).
22        MS. GIFFEN:  Yeah, that's about
23  inquiry, though.  It's not the investigation.
24        MR. KELLY:  I disagree.  That's
25  about investigation.

1         MS. GIFFEN:  Pardon me?
2         MR. KELLY:  Five is about inquiry.
3  Six is about the investigation.
4         MS. GIFFEN:  That's what I'm
5  saying.  Oh, you think it's in 6(K)?
6         MR. KELLY:  Yes.
7         MS. GIFFEN:  6(K) is comments on
8  the draft investigation report.
9         MR. KELLY:  Hold on.  We'll go over
10  this tomorrow.
11        MS. GIFFEN:  All right.
12        MR. KELLY:  I must say, Ms. Giffen,
13  this is not -- I take your representation for
14  what it is, but it looks different from what we
15  have.
16        THE WITNESS:  It does.
17        MR. KELLY:  From what we pulled off
18  the website.
19        MS. GIFFEN:  The CSU website?
20        MR. KELLY:  Yes.
21        MS. GIFFEN:  Okay.  We'll get it
22  straightened out.
23    A.   If it helps, I'm sure I cite the
24  specific policy in Exhibit 5.  I think it is
25  the big fat one in one of my rebuttals.

1    Q.   Well, we'd have to read through all
2  of the rebuttals.
3    A.   Fair enough.
4         - - - - -
5         (Thereupon, Deposition Exhibit 32,
6         Plaintiff's Response to Defendants'
7         First Requests for Documents, was
8         marked for purposes of
9         identification.)
10        - - - - -
11    Q.   Handing you what's been marked as
12  Exhibit 32, Dr. Pesta, and can you confirm that
13  this is your responses to the requests for
14  documents that we made to you in this case?
15    A.   Yes, it is.  Yes.
16        MR. KELLY:  Thirty-two?
17        THE WITNESS:  Thirty-two.
18    Q.   I'm specifically referring to
19  Request No. 2 that asks for any websites and/or
20  social media accounts concerned or relating to
21  Global Ancestry, and after an objection was
22  interposed, you made reference to a dormant
23  funding campaign regarding your termination.
24  What is that?
25    A.   That's the HPDF -- oh, wait a

1  minute.
2    Q.   That is not?
3    A.   No, it is not.  I'm sorry.
4    Q.   Okay.
5    A.   So it's a charity for me to help
6  pay legal bills.
7    Q.   In common parlance can we call it a
8  GoFundMe site?
9    A.   We can, but it's GiveSendGo if it
10  really matters.
11    Q.   I realize that I'm using probably a
12  trademark reference to a different site.
13    A.   Okay.
14    Q.   And what is the publication of on
15  undark.org?
16    A.   So they contacted me, the author,
17  Angela, I have no idea, it's something like
18  S-I-I-N-I-A or something, asked if I would
19  answer some questions, and so I did.
20    Q.   Are you sure that that's the
21  correct URL for the site because it would not
22  come up when I tried it.
23    A.   I could double-check at home.
24    Q.   Would you, please?
25    A.   But I'll say I don't come

1 into -- it's a long article. I'm somewhere in
2 the middle somewhere. But you haven't seen it,
3 the article, at all?
4    Q. No, I haven't at all.
5    A. If I don't write it down, I'm going
6 to forget.
7    Q. Also, did you have -- was there an
8 article published in Quillette?
9    A. Yes.
10    Q. What is Quillette?
11    A. It's a magazine, an on-line
12 magazine in Australia. That's it. They
13 publish stories.
14    Q. All right. I'm asking specifically
15 about the undark one because your counsel
16 provided us a couple of other references
17 including the Quillette article.
18    A. Okay.
19    Q. So that's the one we don't have.
20 And you said that what I'll call the GoFundMe
21 page is dormant. What do you mean?
22    A. Well, I mean, initially I got, you
23 know, people to donate, but that was what, a
24 year, almost two years ago. So it just dried
25 up, and I just decided to close it or make it

1 dormant.
2    Q. Tell me about what were your
3 communications with Ken Kahn about the
4 investigation and the NIH request for
5 information, anything having to do with the
6 subject matter of this lawsuit?
7    A. I thought we uploaded one email
8 that I have because that was more -- it was on
9 Zoom, the actual meeting. Other than that, I
10 mean, I don't remember. I'd have to refresh my
11 memory on that email.
12    Q. Okay. But so let's first go back
13 in time, that in June of 2021 after the NIH
14 letter of May 27th finding the violation, you
15 communicated with Ken Kahn about the subject
16 matter of the investigation, right?
17    A. Yes.
18    Q. Did you meet with him in person, or
19 it was on Zoom?
20    A. It was Zoom.
21    Q. Do you remember anything about the
22 substance of that conversation with Ken Kahn?
23    A. I remember the email. This might
24 not be the one you're talking about.
25    Q. I'm not actually referring to an

1 email right now.
2    A. Oh.
3    Q. Whatever your conversation or
4 communication was with him.
5    A. No. On that date, I mean, I know I
6 had a Zoom meeting. I don't remember the
7 context.
8    Q. Do you remember anything about what
9 he told you or asked you about in connection
10 with the investigation?
11    A. If I could see the email that set
12 up the meeting, the topic would be there.
13    Q. Well, I have it somewhere in this
14 mass of paper.
15    A. Yeah, I'm just blocking on that
16 right now. Oh, it had to do with destroying
17 the data, I believe. Yes, I'm pretty sure it
18 did, yeah.
19    Q. That's one of the things that he
20 requested that you do because the NIH said in
21 its May 27th letter that it had to be done,
22 right?
23    A. Correct.
24    Q. And what did you tell him at that
25 time?

1    A. Well, I think we were working on
2 it. I don't remember.
3    Q. Did you have any other
4 communications with Ken Kahn about the subject
5 matter of the lawsuit?
6    A. Yeah. Early on, maybe even before
7 the investigation formally started, he sent me
8 an email saying that this student complained
9 and I think even made a FOIA request and
10 demanded to look at my grades and whether I
11 treat African-Americans poorly in grading.
12    Q. Okay. And what did he say about
13 that?
14    A. He said that the central
15 administration was going to investigate that.
16    Q. Do you know what happened with that
17 investigation?
18    A. I never got any feedback after that
19 I don't think.
20    Q. And no action was taken with
21 respect to that complaint as far as you know?
22    A. Well, I think it's a part of this,
23 too, but it's not in any of the documents we
24 reviewed today.
25    Q. It's a part of it how?

1   A.   My understanding and memory is the
2  motivation of whoever wrote that letter was
3  based on the Lasker publication.
4   Q.   I guess my question is, did any
5  part of the investigation that we've been
6  spending the last however many hours talking
7  about incorporate any questions to you or
8  concerns about your teaching, what you were
9  teaching in your classes?
10   A.   No.
11   Q.   Isn't it true that you never taught
12  in the classroom, you did not base any of your
13  curriculum on the publications listed in your
14  CV that relate to the subject matter of the
15  lawsuit?
16       MR. KELLY:  Object to the form of
17  the question.  That's ambiguous.  You can
18  answer it if you can.
19   A.   I don't really understand it.
20   Q.   Let me ask this, have you
21  introduced to your students this Lasker paper?
22   A.   No.
23   Q.   We went through a list of --
24   A.   Forty-five.
25   Q.   -- of 45 of your publications, and

1  I have -- I no longer remember what the count
2  was.
3   A.   Neither do I.
4   Q.   About those papers that dealt with
5  your research involving race or other
6  population subgroups and intelligence, have you
7  used those papers in any of your teaching?
8   A.   I do talk about disparate impact in
9  hiring situations and focus on race for
10  cognitive ability tests, physical tests for
11  sex, but I don't think I specifically
12  referenced a paper of mine.
13   Q.   Do you discuss with them the
14  controversial nature of your research?
15   A.   I am -- I give like a ten-minute
16  lecture on IQ, and it depends on student
17  interest in that particular class.  If they ask
18  questions, it goes longer.  But, yeah, I don't
19  get into my research.
20   Q.   Okay.  It's interesting that you
21  said a ten-minute lecture, so you know what the
22  ten minutes must be.
23   A.   I've taught class like over 100
24  times.
25   Q.   What is the class we're talking

1  about?
2   A.   It's just Intro to HR either at the
3  undergrad or grad level, human resource
4  management.
5   Q.   What does your ten-minute lecture
6  consist of if the students are interested?
7   A.   Yeah, I give the ten-minute lecture
8  whether they are interested or not.  If there
9  are more questions --
10   Q.   I see.  It could get longer than
11  ten minutes?
12   A.   Correct.
13   Q.   I see.  Tell us what the ten
14  minutes consist of.
15   A.   I give a general overview on the
16  hierarchy of cognitive abilities.  There is a
17  hierarchy with cognitive abilities with g.  Are
18  you familiar with the concept, with g, lower
19  case g, at the top, and that it's the general
20  mental ability part of this hierarchy that
21  really predicts, nothing else does, like level
22  2 and level 3 abilities.
23   Q.   It's what you were referring to
24  earlier, that that score -- or maybe this is
25  different.  I was going to say that that score

1  strongly correlates with success or well-being.
2  I think well-being is what you said.
3   A.   Oh, yes.  So I get into some of the
4  correlations, and then I explain when you use
5  cognitive ability -- it's like a two-sentence
6  part.  When you use cognitive ability tests,
7  you will create adverse impact against
8  minorities.
9   Q.   Do you use in any other way in that
10  lecture whether genetics form the basis for the
11  differences in intellectual ability?
12   A.   So my philosophy is this is the
13  most applied degree there is, the MBA.
14   Q.   The most what?
15   A.   The applied degree.  Students don't
16  want to get into Lasker.  I don't usually get
17  that technical in an Intro to HR class.
18   Q.   Uh-huh.  Okay.  Have you ever done
19  any coursework in genetics?
20   A.   No.  Maybe as an undergrad.  I
21  don't know.
22   Q.   Do you consider yourself an expert
23  in genetics?
24   A.   You know, I think expert is not all
25  or nothing.  You know, you can rank people on

Page 226

1  their expertise.  I think moderately, but no.
2      Q.    Okay.  Would you consider yourself
3  an expert in analysis of intelligence and
4  testing for intelligence?
5      A.    That's kind of general.  I mean, at
6  what part of it?
7      Q.    I know.  I'm trying to figure it
8  out.
9      A.    Yeah.  Can you repeat?  I'm sorry.
10      Q.    Maybe this is the way I'll ask the
11  question.  What did you contribute to the
12  Lasker paper?
13      A.    What did I contribute?
14      Q.    What was your particular area of
15  expertise?
16      A.    I did some of the statistical
17  analyses, a lot of the write-up.  It turns out
18  my coauthors aren't very good writers.  So,
19  yeah, and just the strategic planning on the
20  article itself, you know, you break it up into
21  parts.
22      Q.    Did you retain any of the drafts of
23  the paper?
24      A.    I don't think so.  I mean, I could
25  check.

Page 227

1          MS. GIFFEN:  Okay.  We are about to
2  go to a different subject, and I need about
3  five minutes to get my act together again.
4          (Brief recess.)
5          MS. GIFFEN:  Back on the record.
6      Q.    Dr. Pesta, we were talking a little
7  bit ago about communications that you had with
8  Ken Kahn.
9          - - - - -
10          (Thereupon, Deposition Exhibit 33, a
11          Letter for Dr. Pesta from Dr. Faison
12          and Dr. Kahn, was marked for
13          purposes of identification.)
14          - - - - -
15      Q.    We're handing you what's been
16  marked as Exhibit 33.  Did you ever receive
17  this communication from Ken Kahn?
18      A.    I'm refreshing my memory here.
19  This was from Kahn?
20      Q.    Yeah.  He's one of the authors.  I
21  didn't want -- because I asked you that
22  question and we didn't talk about it, I didn't
23  know if you got it from Ken Kahn or not.
24      A.    I don't know who I got it from, but
25  this is familiar to me.

Page 228

1      Q.    Okay.  All right.  Dr. Pesta, is
2  this letter familiar to you because it was
3  produced during the investigation or because
4  Ken Kahn or Forrest Faison gave it to you in
5  June of --
6      A.    I think it was in the binder or
7  this final report, Exhibit 5.  That's my
8  memory.
9      Q.    All right.  So you don't remember
10  actually getting it at the time in June?
11      A.    No, I don't remember.
12      Q.    Okay.
13          - - - - -
14          (Thereupon, Deposition Exhibit 34, a
15          Form 990EZ, was marked for purposes
16          of identification.)
17          - - - - -
18      Q.    I'm handing you what's been marked
19  as Exhibit 34.  Do you recognize this document?
20      A.    Yes.
21      Q.    And this is an income -- actually,
22  it's an exemption from income tax form for the
23  Human Phenome Diversity Foundation, correct?
24      A.    Correct.
25      Q.    Did you file this?  And let me tell

Page 229

1  you that this was printed off oddly.  It should
2  go the other way, but it contains, as far as we
3  can tell, all of the right information.  Did
4  you file this on behalf of HPDF?
5      A.    I did.
6      Q.    Tell me about when was HP --
7      A.    I didn't make the name up.
8      Q.    Who did by the way?
9      A.    John.
10      Q.    When was it formed?  Who was it
11  formed by?  What was its purpose?
12      A.    So the when, I'm guessing probably
13  2018 or early 2019.  What was its purpose?  Oh,
14  who?  You asked who?  Me and John.  What was
15  its purpose?  Two purposes; one was to support
16  researchers who want to research this area, and
17  the other was to help John further his
18  education.
19      Q.    Are you allowed to have a 501(c)
20  that seeks to help a specific individual with
21  their educational expenses?
22      A.    All I can say is the IRS approved
23  it.  They gave us the tax exempt status.
24      Q.    Do you have the articles of
25  incorporation of HP --

Page 230

1    A.   DF.
2    Q.   -- DF?
3    A.   I don't think so, but I could check
4  my computer.
5    Q.   We'd appreciate if you would do
6  that.  And also if there is a code of
7  regulations or any registrations with the
8  Secretary of State's Office with respect to
9  HPDF -- I got it right that time.
10   A.   Yes.
11   Q.   Do you have any of those?
12   A.   I'd have to check.
13   Q.   Okay.  If you would, please, we'd
14 appreciate it.
15   A.   You know, if I don't
16 write -- because there was another thing that
17 you wanted me to produce, and I don't remember
18 what it was.
19   Q.   Afterwards we'll send an email
20 because we've described a couple of things, and
21 we'll correspond with your counsel.
22   A.   Thank you.
23   Q.   Okay.  Now, so the two purposes
24 that you described to me was to support
25 specific research.

Page 231

1    A.   I'm waffling on the word specific.
2    Q.   Okay.  You describe it again.
3    A.   Research related to intelligence
4  and group differences.
5    Q.   Now I hear what you're saying.  It
6  wasn't to fund a specific research paper.  It
7  was to fund research in that area; is that
8  right?
9    A.   Correct.
10   Q.   Why did you think that was
11 necessary?
12   A.   Because it's -- I don't know.  I
13 mean, first, it's very controversial research,
14 and there was a demand for donations.  So
15 business professionally, we capitalized on it.
16   Q.   There was a demand for donations
17 from whom?
18   A.   Private people.
19   Q.   I'm not understanding what you're
20 saying.  People said, oh, get a 501(c)(3), and
21 then I can give you money?
22   A.   I don't know if they said get a
23 501(c)(3), but people wanted to give money for
24 this purpose.
25   Q.   So you were encountering folks that

Page 232

1  said I want to support your research?
2    A.   Research in this area.
3    Q.   And it's always advantageous to do
4  that through a 501(c)(3) because then it's tax
5  deductible to the donor, right?
6    A.   Correct.
7    Q.   And the second purpose was to help
8  John further his education.  What did that
9  mean?
10   A.   I don't think he used this fund for
11 his tuition, but that could be an example.
12   Q.   And the tuition you're referring to
13 is the tuition that he had to pay to Cleveland
14 State for the one credit hour?
15   A.   I think he did it at least twice,
16 two semesters.
17        (Discussion off record.)
18   Q.   All right.  So it could have been
19 used to pay -- and that would have been for one
20 credit hour, right?
21   A.   Correct.
22   Q.   So it could have been used for that
23 purpose, but you're unsure?
24   A.   Correct.
25   Q.   Who keeps the books of HPDF?

Page 233

1    A.   KeyBank.  Not officially, but we
2  just log into KeyBank, and every dollar we
3  spent was through the HPDF account at KeyBank,
4  so you can just track the history.
5    Q.   Are you the principal party
6  responsible for the account at Key?
7    A.   Yeah.  I'm listed first, and John
8  is second.
9    Q.   Okay.  Okay.  As I understand it,
10 the HPDF funds were used to acquire that
11 computer that we were talking about earlier?
12   A.   Correct.
13   Q.   The desktop that housed --
14   A.   The Newegg desktop.
15   Q.   Yeah, the Newegg desktop.  And I
16 also understand that HPDF funds were used for
17 Uber rides and pizza; is that right?
18   A.   Food and Uber rides, correct.
19   Q.   Other than maybe John's tuition,
20 the computer, the Uber, and the pizza or other
21 food, what were HPDF funds expended for?
22   A.   Grant money to -- we didn't
23 formalize the process, but researchers would
24 apply for grants, and we'd review them and give
25 out awards.

59 (Pages 230 - 233)

Page 234

1    Q.    How many grants have been awarded?
2    A.    All I know is we had something like
3  $100,000 in there, and there is nothing now.
4    Q.    Did you keep a record of what grant
5  requests came in and what money went out?
6    A.    KeyBank would have that, you know,
7  if we sent that out.
8    Q.    For the grant requests?
9    A.    No, but the amount that --
10    Q.    Did you require potential grantees
11  to send to you applications for grants, tell
12  you what it was for, et cetera?
13    A.    It was more informal than that.  We
14  were going to stream -- you know, scale up and
15  be more bureaucratic, but everything blew up
16  with it.
17    Q.    Why did everything blow up with it?
18    A.    Well, it got me into trouble here.
19  We just didn't think it was worth pursuing.
20    Q.    Okay.  Has it been dissolved?
21    A.    Yes, about five months ago.
22    Q.    Did you file articles of
23  dissolution with the Secretary of State's
24  Office?
25    A.    And we got the certificate back or

Page 235

1  whatever it's called.
2    Q.    We'll add that to the list of
3  stuff.
4    A.    Okay.
5    Q.    This 2019 tax form says that you
6  had received $21,470 in contributions that
7  year, right?
8    A.    Correct.
9    Q.    And if it was formed in 2018, do
10  you think most of the $100,000 that you
11  referred to came in after 2019?
12    A.    Yeah.  So this logically implies
13  that we started it in -- that doesn't make
14  sense.  But, yes, to your question the answer
15  is yes.
16    Q.    What do you mean logically it
17  doesn't make sense?
18    A.    Just looking at 2019, I said we
19  started it in 2018.  That was my guess.
20    Q.    That was what you said, yes.
21    A.    But, oh, this would be for that
22  time.  That makes sense.  I retract that.
23  Strike it.
24    Q.    What do you mean?
25    A.    This is filed 2019 for 2018, I

Page 236

1  presume.  Oh, no, it's not.
2       MR. KELLY:  This is for the 2019
3  calendar year.
4       THE WITNESS:  Yeah, okay.
5    A.    So I just -- I was wrong logically.
6  I thought I could make an inference here, but I
7  can't.
8    Q.    As I understand it, you would
9  have -- because this was for the tax year 2019,
10  you would have filed it sometime in 2020.
11    A.    Okay.
12    Q.    That's usually what happens.  I'm
13  not saying it did in this circumstance, and
14  this is not a signed copy.
15    A.    Okay.
16    Q.    Not as far as I can tell.
17       MS. GIFFEN:  We don't have it?
18       MR. NEEL:  No.
19    Q.    All right.  So my question was, it
20  would make sense that most of the money,
21  because you said there was a total of $100,000,
22  most of the money came in after 2019?
23    A.    Correct.
24    Q.    Help me understand why John Fuerst
25  was not listed as a user with access to the TCP

Page 237

1  data or as a collaborator --
2       MR. KELLY:  Object to form.
3    Q.    -- for the TCP data?
4    A.    Okay.
5       MR. KELLY:  Object to the form of
6  the question, ambiguous, confusing.
7    A.    I believe he was listed for TCP not
8  as a collaborator, but as a student researcher.
9  The rules are complicated.  Even though we
10  collaborated, he was not a collaborator
11  according to NIH's policy.  But for later
12  applications, not TCP, we added external people
13  from different universities, and in that case
14  NIH policy is your student researcher now
15  becomes a collaborator.
16    Q.    Do you know what NIH rules you're
17  referring to when you say that?
18    A.    The specific numbers, no.
19    Q.    Okay.  But I don't want to go
20  through it now.
21    A.    Uh-huh.
22    Q.    But it's referred to in your
23  various rebuttals as I understand it.
24    A.    Correct.
25    Q.    And you would rely on those now for

Page 238

1 the support for that conclusion?
2      A.    Correct.
3      Q.    And you mentioned earlier that when
4 you were in I think it was the first interview
5 with the committee that you didn't think John's
6 personality was consistent with him wanting to
7 talk to CSU.  What was it about his personality
8 that leads you to that conclusion?
9      A.    Maybe it was the position that he
10 was in, because he spent a lot of time on this,
11 and he wanted to see it through, and he
12 believed that his interpretation of the NHI
13 contract was correct, and then we were waiting
14 for an appeal, but they never -- they never
15 addressed it.
16      Q.    Anything about the way he is or his
17 viewpoint that led to that conclusion?
18      A.    No.
19      Q.    Okay.  Who was the principal
20 drafters of the DARs?
21      A.    For TCP?
22      Q.    Yes.
23      A.    John and I co-drafted.
24      Q.    Okay.
25                - - - - -

Page 239

1          (Thereupon, Deposition Exhibit 35,
2          an Email String, was marked for
3          purposes of identification.)
4                - - - - -
5      Q.    I realize this writing is a bit
6 small.
7      A.    Yeah.
8      Q.    Can you confirm, Dr. Pesta, that
9 this is communications between you and John
10 Fuerst in April of 2018?
11      A.    Yeah.  This is from the CSU
12 account.
13      Q.    And this --
14      A.    Email account.
15      Q.    This is Exhibit 35.  How do you
16 differentiate between what is your personal
17 account email?
18      A.    I don't have access to it anymore,
19 but it was.
20      Q.    Not the CSU.
21      A.    Oh, personal?  Bpesta22, first
22 initial last name.
23      Q.    Do you have any other personal
24 email accounts that you use?
25      A.    I looked.  I have an Outlook that I

Page 240

1 rarely used, but I did search it for the
2 document requests.
3      Q.    When we asked for -- because we
4 asked you for your correspondence with Fuerst
5 and your other coauthors, right?
6      A.    Yes.
7      Q.    And you provided us what you found?
8      A.    What I found, yes.
9      Q.    If you refer to, and, again, this
10 is going backwards, so if we look on the first
11 page of the whole thread, it begins on
12 March 2nd, 2018, is the first email, and the
13 last one appears to be April 4th, 2018.
14      A.    March 2nd.
15      Q.    Yes.
16      A.    And then April 4th, correct.
17      Q.    Yeah.  And I notice in the very
18 first email of March 2nd, 2018, you said the
19 preferred email address was what you just said,
20 right, B Pesta?
21      A.    By preferred you mean my private
22 email?
23      Q.    I don't know.  You wrote it.
24      A.    I'm having trouble seeing it.
25      Q.    The very first -- I'm sorry.  It

Page 241

1 isn't the very first.  It's the next to the
2 last.  Let's do it the way I started doing it
3 instead of starting in the middle which that
4 question would have done.  Go to the very last
5 page.
6      A.    Okay.
7      Q.    And this is an email from John to
8 you, right?
9      A.    Yes.
10      Q.    And he's referring to a meeting at
11 a Pho restaurant and how nice it was to get
12 together with you, right?
13      A.    I do remember this.  This is when I
14 first met with him in person.
15      Q.    We're going all the way back in
16 time to the beginning of when you're talking
17 about the research project, right?
18      A.    Correct.
19      Q.    He refers to following up on the
20 genome data sets.  Did that include the TCP
21 data set?  Were you discussing specifically the
22 TCP data set at that point?
23      A.    When we were at the Pho restaurant,
24 that's when we agreed to collaborate and apply
25 for TCP.

61 (Pages 238 - 241)

Page 242

1    Q.   Okay.  And then about in the
2  middle, he says, "We wish to start with
3  trajectories of complex phenotypes," which is
4  TCP, right?
5    A.   Correct, and he said it does not
6  require.
7    Q.   "It does not require IRB approval
8  and since the sample characteristics are
9  ideal."  Right, that's what he says?
10    A.   Correct.
11    Q.   So when he was talking about the
12  IRB approval at that point, he was referring to
13  the NIH --
14    A.   Yeah.  It's in the Exhibit 5 where
15  it's a table.
16    Q.   I just want to finish the question.
17  I know it's late.  We're almost through.
18    A.   No, go ahead.
19    Q.   He was referring to the IRB
20  approval section of the NIH rules, right?
21    A.   Correct.
22    Q.   He wasn't saying and I'm sure
23  Cleveland State doesn't require it, either?
24    A.   I don't know why he would.  I mean,
25  he didn't say any other place didn't.  I mean,

Page 243

1  no.  I don't see why he would, though.
2    Q.   Okay.  And then he said, "To apply
3  for dbGaP access, a proposal is not needed.
4  For trajectories one might be."
5        So is that differentiating
6  controlled-access data from publicly available
7  data for dbGaP?
8    A.   DbGaP.
9    Q.   Yes.  I'll do that next time.
10    A.   I'm not sure what he's getting at
11  here.  I mean, this was what, six years ago?
12  Let me read it real quick.
13    Q.   Sure.
14    A.   Now, what was the question?  I'm
15  sorry.
16    Q.   It was he seems to suggest that you
17  would not need an access proposal with
18  respect -- I'm actually adding.  I'm trying to
19  understand at least what you understood, that
20  he was differentiating between getting to the
21  TCP data as opposed to some other publicly
22  available data for --
23    A.   I don't read it like that.
24    Q.   You don't?  Okay.  You tell me.
25    A.   I think this was an ambiguous

Page 244

1  paragraph.  I don't know what he was getting at
2  there.
3    Q.   Okay.  Then he says he attaches a
4  proposal nominally to test for sex differences
5  in relation to brain differences, and that
6  is --
7    A.   18070.
8    Q.   That's right.  That's the original
9  request, right?
10    A.   The first one, yes.
11    Q.   Okay.  And then he says, "This
12  would represent a genuinely interesting
13  replication study and a sneaky way to request
14  and possibly present the ancestry x cognitive
15  outcome data."  What did you take from that?
16    A.   Yeah, I don't remember.  I remember
17  reading this letter, but it was six years ago.
18  Let me read it again.  Well, it was on sex
19  differences, so we wouldn't -- I mean, we
20  didn't even access the data for this first
21  project, but it was on sex differences, so I
22  don't know why he says cognitive outcome data,
23  or, I'm sorry, ancestry.
24    Q.   So is what was really going on,
25  Dr. Pesta, is the ultimate goal was to get to

Page 245

1  the ancestry data, and you could get that
2  assuming you had the TCP data whatever your
3  stated use purpose was?
4    A.   When we met at Cleveland Pho, we
5  talked about various projects, and I agreed to
6  collaborate with him conditioned upon not every
7  application focusing on race.  So I proposed
8  the sex difference study.  He made the first
9  draft.  We edited it and submitted it.
10    Q.   But you'll agree with me that the
11  reference to "a sneaky way to get to the
12  ancestry information" isn't consistent with
13  trying to protect the sensitive nature of the
14  TCP data; would you agree?
15        MR. KELLY:  Object to the form of
16  the question.
17    A.   Those are two separate issues in my
18  mind, or can you repeat it?
19    Q.   I'm actually focusing on the words
20  he uses.  He says, "A sneaky way to request and
21  possibly present the ancestry x cognitive
22  outcome data," which doesn't seem to me to be
23  consistent with the sex differences that's
24  described earlier in the email.
25        MR. KELLY:  Object to the form of

62 (Pages 242 - 245)

1 the question. Is there a question?
2     Q.   I'm asking if you agree with that
3 or not.
4     A.   I don't know.
5         MR. KELLY:  Object to the form of
6 the question.
7     A.   I don't know.  I mean, we'd have to
8 ask him.  I read this six years ago.  Either I
9 missed that section, or I don't know, or maybe
10 I thought -- I don't remember.
11     Q.   Right.  Then in the upper part of
12 the email he refers you to several different
13 videos and on-line sources which appear, and
14 you tell me if you looked at these steps to how
15 to gain access to the control.
16     A.   Yeah.  It was like an FIQ type
17 video, I believe.
18     Q.   All right.  All right.  Then the
19 next email, so let's go back one page, Friday,
20 March 2nd.
21     A.   March 11th.
22     Q.   No, page 2.
23     A.   Got it.  Sorry.
24     Q.   See it?  Okay.  This is in
25 response, and you tell him essentially that it

1 will be a couple of days before you get back to
2 him, right?
3     A.   Uh-huh.
4     Q.   And then you say, "Please note my
5 preferred email address is bpesta22@csu.com,
6 right?
7     A.   Yes.
8     Q.   And that's your personal email
9 address?
10     A.   Correct.
11     Q.   Did you want to do that because he
12 was saying that he wanted to be sneaky and you
13 didn't want it --
14     A.   No.  I hate CSU's email system.  I
15 don't like Outlook.  So if you see, you'll
16 see -- when I got it -- whenever you see Bryan
17 Pesta to Bryan Pesta, that's because I
18 automatically forwarded CSU emails to my
19 private email so I wouldn't have to deal with
20 two email accounts.
21     Q.   Did you forward these emails to
22 your private email account?
23     A.   Well, he sent it to me at CSU, and
24 there is a script or something in Outlook or
25 maybe, yeah, there is a way to do it, I don't

1 remember how, but every email I guess from
2 CSU's account is automatically forwarded to
3 this CompuServe account.
4     Q.   So did you -- were these emails
5 forwarded to your CS account?
6     A.   Yeah, because I had it
7 automatically doing that.  So every email I'd
8 get from CSU was forwarded to CS.
9     Q.   I will tell you that we obtained
10 these emails from your CSU email account.
11     A.   Understood.
12     Q.   We did not receive these emails in
13 response to our document request.  Did you do a
14 search?
15     A.   From the cs.com account?
16     Q.   Well, we asked for all your
17 communications with John Fuerst or any of your
18 collaborators.
19     A.   I couldn't get inside CSU, I don't
20 have access, so I searched CompuServe for John,
21 Emil, and Jordan.  I searched just their last
22 names, and then I searched their email
23 addresses, and then I searched their full name
24 in quotes, and I don't know how long CompuServe
25 keeps emails, but all I found is what I

1 produced.
2     Q.   So were you using a web-based
3 platform for your email?
4     A.   CompuServe.  It's America Online
5 basically.
6     Q.   And do you have the ability to tell
7 it how long it should keep emails?
8     A.   Yeah.
9         MR. KELLY:  What was the question?
10         (Record read.)
11     Q.   Did you have -- I'll repeat it.  Do
12 you have a setting on your or did you in 2018
13 have a setting on your account to delete emails
14 after a certain time?
15     A.   No.  I think CompuServe does that.
16 I know they don't store every single email you
17 wrote.  I even scrolled through -- I even
18 searched my own email to see if there was some
19 older stuff that would come up, and everything
20 I found I produced.
21         MS. GIFFEN:  All right.  Excuse me
22 one second.
23         (Brief recess.)
24     Q.   Dr. Pesta, when you did the search
25 of your CompuServe -- is that it?

Page 250

1     A.    Correct.
2     Q.    -- account, did you include in your
3 request or did you include in your search terms
4 the names of the individuals if they would
5 appear in the body of the email?
6     A.    Yes, and their emails and last name
7 only.
8     Q.    Okay.  All right.  Then on
9 March -- going back to the document on
10 March 11th, you write to Bryan?
11    A.    John writes to me.
12    Q.    I'm sorry.  No, it's you writing
13 to --
14    A.    March 11th?
15    Q.    Yes, March 11th.  Let's go back
16 because we went through that whole deal.  So
17 let's go back to the document.  We have just
18 discussed the please note my preferred email
19 address, and you give your cs.com email
20 address, and then on March 11th you again write
21 to John.  I think that's what that says.
22    A.    Yeah, you're right.  I
23 misinterpreted it.
24    Q.    And you say, "Are you still in
25 town?"  And then you say, "I'll do this, but

Page 251

1 what worries me is that it says all
2 collaborators must also apply, Bryan."
3     A.    Yes.
4     Q.    What was the I'll do this?  What
5 were you referring to?
6     A.    So I think we had -- I mean, we
7 weren't an expert on this, this was our first
8 application, and we were confused whether your
9 collaborators -- you brought this up about ten
10 minutes ago, whether John would be a
11 collaborator or not.  So I don't know in
12 specific response to this March 11th email, but
13 we figured out that he's not a collaborator for
14 TCP, but he was for ABCD because we
15 added -- there is a reason for it that I can't
16 remember, but there was a distinction between
17 collaborator and --
18    Q.    I'm sorry.  I don't think my
19 question was clear.
20    A.    Okay.
21    Q.    Because your sentence is, "I'll do
22 this, but what worries me is that it says all
23 collaborators must also apply."  And I
24 understand your view that that's not true, not
25 all collaborators must apply --

Page 252

1     A.    Maybe the word collaborator I'm
2 interpreting --
3     Q.    Hold on.  Let me finish.  What I'm
4 interested in is the I'll do this part.  What
5 are you agreeing to do?
6     A.    I can only speculate.  I mean, this
7 is six years ago.  I guess the issue is should
8 we list Emil and Jordan as collaborators, but
9 then since they weren't accessing the genetic
10 data, we didn't have to.
11    Q.    If you go back to the first email,
12 March 2nd --
13    A.    Okay.
14    Q.    -- he says he's talking about what
15 data set to request to put together a proposal
16 that would be sex differences in relation to
17 brain differences, and he says he recommends
18 looking at those web sites to find out more
19 about how to get control access data.
20         You say you're going to check -- on
21 March 2nd you say, "I'm going to check this all
22 out, but give me at least a few days.  Please
23 send me a reminder in a week if you haven't
24 heard back from me about this."
25    A.    Okay.

Page 253

1     Q.    Then you say use my cs.com address.
2     A.    Correct.
3     Q.    And then the next thing that
4 happens is March 11th you say, "I'll do this."
5 Is that I'll agree to do your proposal with
6 respect to what we ask for in the data?
7     A.    Honestly, I don't remember.
8         MR. KELLY:  Object to the form of
9 the question.
10    A.    It could have been.
11    Q.    Okay.  All right.
12        MR. KELLY:  It's confusing.
13    Q.    Then the next email is his response
14 also on March 11th.  "Thanks for the email.
15 Yes, I am still working with the Clinic."  And
16 that's one of my questions is because he's now
17 referring to working with the Clinic, and
18 that's not the subject of the earlier email
19 trail.
20    A.    So implying that there is other
21 emails?
22    Q.    Yes.  Are there emails in between
23 that went to just the cs.com address?
24    A.    Yes, but they didn't come up in the
25 search.  I think I did a pretty exhaustive

Page 254

1  search and didn't find -- I don't think I found
2  very many older emails.
3      Q.  Yes.  We looked at what your
4  counsel provided, and there weren't very many
5  of those.
6      A.  Yes.
7      Q.  All right.  In any event --
8      A.  Oh, can I add I also downloaded a
9  program that searches CompuServe email to maybe
10  find deleted ones, and it didn't produce
11  anything.
12      Q.  Okay.  All right.  So there is
13  more.  We don't need to get into his medical
14  issues, so I'll just ignore that.  And then
15  John says, "If you could apply, I would
16  appreciate it.  That would really help.  We are
17  simultaneously working with David Becker for
18  him and Rindermann to gain access."
19      MR. KELLY:  Where are you at,
20  counsel?
21      MS. GIFFEN:  I am if you look at,
22  going backwards in time, this is the third page
23  of the document, and I'm reading an email to
24  Bryan from John dated March 11th, and it was --
25      MR. KELLY:  Actually the top of the

Page 255

1  third page?
2      MS. GIFFEN:  Correct.  No, no, no,
3  no.
4      THE WITNESS:  Third page from the
5  back, right?
6      MS. GIFFEN:  Let's do this --
7      MS. KAMINSKI:  It's the fourth
8  page.
9      MS. GIFFEN:  It's the fourth page.
10      THE WITNESS:  From the front or the
11  back?
12      MS. KAMINSKI:  From the front.
13      Q.  So John says, "If you could apply,
14  I would appreciate it.  That would really help.
15  We are simultaneously working with David Becker
16  for him and Rindermann to gain access and also
17  with another group through Woodley."
18      A.  Uh-huh.
19      Q.  Is that the same person that you
20  were on the research paper for earlier in your
21  career?
22      A.  I'm not -- I don't think I've ever
23  published with him.  I know him.  I met him
24  once at a conference.  But you jogged my memory
25  here.  I think what he's asking for on the

Page 256

1  bottom email is for me to submit the formal
2  application.
3      Q.  Okay.  All right.  "This process,
4  though, has been dragging on for months with no
5  end in site as apparently no one in Germany has
6  tried this before."  Is Woodley in Germany?
7      A.  I think he's in -- he's like
8  royalty in England or something.
9      Q.  Really?  What's his first name?
10      A.  Michael Woodley of Menie or Menie,
11  M-E-N-I-E, I believe.  But these other people
12  were university affiliated, so they were going
13  to get legitimate access.
14      Q.  David Becker and Rindermann?
15      A.  I don't really know Becker.
16      Q.  How about Rindermann?
17      A.  Heiner is his first name.  He might
18  even be retired now.  I'm not sure.
19      Q.  Who was he with?
20      A.  I don't know.  I don't think it was
21  in America, or I'm not sure.
22      Q.  John goes on to say, "In the
23  meantime, we would like the data to analyze.
24  How about this proposal?  When you get access,
25  Emil and I will look at it and work out the

Page 257

1  code for analysis and variables, et cetera,
2  i.e., data exploration and cleaning.  You won't
3  even need to send files as we can just remote
4  access your computer or one I could put
5  together for this purpose.  If you are willing
6  to publish on the topic, e.g., the sex
7  difference proposal with hidden ancestry
8  analysis or a straight out ancestry analysis,
9  you will publish with Rindermann and Becker and
10  perhaps Emil, that is, only people who have
11  approved access.  Emil's situation is tricky as
12  while he can get access through his company, he
13  has to be covert about where he works as shit
14  will hit the fan when reporters put two and two
15  together regarding the company's purposes."
16      So that's a whole lot.  This raised
17  a whole bunch of questions.  So, first, let's
18  take the last thing first.
19      A.  Okay.
20      Q.  Do you know anything about Emil's
21  situation is tricky about gaining access?
22      A.  I know he worked for a genomic
23  company, like designer babies-type stuff, and I
24  don't know if he got permission to -- yeah, I
25  don't know, but that's what I think they are

65 (Pages 254 - 257)

Page 258
1 referring to is his private sector job.
2    Q.   And this certainly seems to suggest
3 that if Emil asked for access to the data, he
4 may not get it because of whatever these issues
5 are?
6    A.   Yeah, but he didn't need to because
7 he only focused on --
8    Q.   I understand, but if he did, the
9 concern is that he might not get it?
10    A.   The only way he would get it is if
11 he registered for an independent study at CSU
12 under my supervision.
13    Q.   And that would, under your theory
14 and John's theory, if that's what he did, NIH
15 need never know if he had access to the data,
16 right?
17    A.   He didn't.  Restricted access.
18    Q.   As long as you make somebody your
19 research assistant, under your view of what the
20 NIH rules would require, NIH would never need
21 to know that that person who apparently has
22 some sticky situation had access to the
23 controlled data, right?
24    A.   But he didn't.
25    Q.   I know that that's what you

Page 259
1 steadfastly maintain, I believe.
2    A.   Okay.
3    Q.   But your theory on research, on the
4 meaning of research assistant, is that would be
5 the way that you would get somebody like Emil
6 to get access to that data, right, without
7 revealing who he was?
8    A.   No.
9        MR. KELLY:  Objection to the form
10 of the question, mischaracterizes the
11 testimony.
12    A.   No, I don't agree with that.
13    Q.   And this certainly proposes in this
14 email that both John and Emil will look at it,
15 right, and analyze the variables?
16    A.   I think they are talking about the
17 extraction process.  So you have to get it from
18 the NIH format into like a spreadsheet.
19    Q.   And they are discussing remoting
20 access into your computer, right?
21    A.   That didn't happen.  It might have
22 happened for like the phenotypic data, but I
23 don't remember.
24    Q.   The what data?
25    A.   The non-restricted acces, like the

Page 260
1 IQ, paper and pencil IQ test scores.
2    Q.   But I thought your computer didn't
3 have internet access.  How would they remote
4 in?
5    A.   Well, I could have copied it to
6 my -- I mean, here's my Newegg computer for
7 this project.  Right next to it was my
8 laptop -- my desktop, so USB drive to my
9 personal computer.
10    Q.   And at least it's a theoretical
11 matter that could have happened with the
12 controlled-access data, too.  It just would
13 have been inconsistent with --
14    A.   I don't know because those files
15 are massive.  I just don't think you could send
16 it through CompuServe, you know, through any
17 internet access.
18    Q.   Okay.  All right.  Then on
19 March 11th, again, most of this is happening on
20 March 11th.
21    A.   Okay.
22    Q.   You respond still trying to figure
23 this all out.  "But I know that the length of
24 the specific study is broken, and a search
25 seems to show that they took it off line.  Can

Page 261
1 you confirm?"  And the last sentence is, "Also
2 I mentioned I'm not a geneticist.  Can you link
3 to one or two good primer articles that might
4 get me up to speed on how the study might run?"
5 Yes?
6    A.   That's what it says, correct.
7    Q.   Okay.  Then the next part of the
8 thread is March, again, more March 11th.
9    A.   Uh-huh, bottom of the next page,
10 right.
11    Q.   Correct.  That's the beginning, the
12 bottom of the next page.  This is from John
13 responding, and he refers you -- first of all,
14 he says, "There are a couple of databases that
15 do not require an IRB.  Ideally (which is still
16 up)," and then he sites to it, and then the
17 first thing that he comes up with is the TCP,
18 right?
19    A.   Correct.
20    Q.   Then he says, "You would not need
21 to do the analyses."
22    A.   Where?  I'm sorry.  Going up?
23    Q.   Yeah, on the very next page, right.
24        MR. KELLY:  Going down to the next
25 page.

Page 262

1    A.   Sorry.
2    Q.   He says, "You would not need to do
3 the analyses unless you wish to, though it
4 would be a good idea for you to know what is
5 being done of course.  A straight out -- "
6         Is this a suggestion that you
7 wouldn't really have to be involved or
8 understand what was happening with the
9 analysis?
10   A.   No.  I didn't do the PGS.  I since
11 know how to do it, I think, but John had the
12 genetics expertise.
13   Q.   Okay.  "A straight out global
14 admixture analysis would run like one of the
15 scores of global ancestry x medical outcomes
16 SES analyses we reviewed on the global ancestry
17 x cognitive ability one we previously
18 conducted.  The aim is to replicate previous
19 results using a much larger sample."  And then
20 there is references to papers, I guess?
21   A.   Yeah, I guess.  I don't know.
22   Q.   Did you look at them?
23   A.   I'm sure I did like six years ago.
24   Q.   Did you in any of the statements of
25 purpose in the DAR refer to an intention to

Page 263

1 replicate those articles, those papers?
2    A.   Well, I don't know what the papers
3 are.  I've just got the links here.  Let me
4 see.  I don't know.  Yeah, I mean, I'm sure I
5 looked at the links back then, but I don't
6 remember.  Can you repeat the question?
7    Q.   The question was, did you refer in
8 your purpose statements for the DARs to an
9 intention to replicate those studies?
10   A.   I think we did mention Lee, et al.,
11 but I don't see that here.
12   Q.   And then he says, "In addition
13 there are multiple other possible analyses, for
14 example, as noted the relation between brain
15 size, sex, and IQ controlling for population
16 structure which would work something like
17 this," and then he cites more papers, right?
18   A.   Yeah.  That's for the 18070.
19   Q.   And, I'm sorry, you may have
20 answered this, but I don't remember what you
21 said.  Did you look at each of those papers
22 when you got this email?
23   A.   I presume I did.  I mean, I wanted
24 to learn -- get up to speed on how genetic
25 research works, and I did invest time into it.

Page 264

1 But did I specifically click on these links and
2 read it?  I don't know.
3    Q.   Then he says, "This would just
4 involve adding and switching covarieties."
5 What does that mean?
6         MR. KELLY:  Covariates I believe is
7 what it is.
8    A.   It's more strategic on how to do
9 the analysis, like big picture.
10   Q.   Covariates?
11   A.   Covariates
12        MR. KELLY:  It's covariates.
13   Q.   He said, "Regardless, we want to
14 start by replicating the ancestry and IQ
15 findings," right?
16   A.   For what became 19747.
17   Q.   But this entire conversation is
18 before you got the sex differences DAR file,
19 right?
20   A.   When we met at Pho, we agreed first
21 to do sex differences and then to do I think it
22 was either mental health or, what's the other
23 one, transethnic validity.  So we agreed to do
24 all three of those or that we would submit
25 applications for all three.

Page 265

1    Q.   He started off in the very first
2 email saying what he really wants is the
3 ancestry and IQ.
4    A.   For sure, yes.
5    Q.   And he uses the phrase, "It's a
6 sneaky way to get the data," and he is coming
7 back to the same thing now.  Did it concern you
8 that it appeared based on this email trail that
9 the guy is interested in one topic, and he's
10 trying to figure out every way to get the data
11 supporting that particular purpose and that
12 particular data set?
13   A.   No, I don't agree.  I think the
14 first thing I said, you know, and I already
15 testified to this, but I'll agree to
16 collaborate with you on the race IQ stuff, but
17 I don't want to apply -- I don't want that to
18 be the only thing we do.  So we agreed to do
19 the sex differences thing.  At Cleveland Pho we
20 agreed to do the other two, too, mental health
21 and then the transethnic validity one.
22   Q.   All right.  The beginning of that
23 email that we just described that I skipped
24 over quickly says, "There are a couple of
25 databases that do not require an IRB."  Why was

Page 266

1 it so important to avoid IRB?
2     A.   Hassle.
3     Q.   What's the hassle?
4     A.   Submitting a proposal to the CSU
5 IRB, waiting.
6     Q.   Because they might say no?
7     A.   No.  It's just a hassle.  I mean,
8 it's more convenient to get data sets where
9 it's not required, and also this particular
10 data set, TCP, had a lot of what we were
11 looking at doing which is controlling social
12 race versus genetic ancestry.
13     Q.   All right.  Then there is some
14 discussion, and I'm now on the second page of
15 the document, about logistics.  "Who do you
16 need at the university to be a signatory for
17 the application to NIH?"  And at the very top
18 there is an email from John to you dated
19 March 22nd, so we've now jumped forward 11 days
20 or so.  "Hi Bryan.  Unfortunately I will be in
21 town for a bit since I have to wait for some
22 new appointments.  I can't stand the weather
23 here.  My plan now is to go back to Raleigh by
24 the summer so at least until early June unless
25 something changes."

Page 267

1         So he was living in the Cleveland
2 area at the time?
3     A.   Yeah, and that's how we were able
4 to meet at Cleveland Pho.
5     Q.   Because he went to Cleveland State
6 for a period of time.  Was he a resident of
7 this area back in the early 2000s when he was
8 taking courses at Cleveland State?
9     A.   I know his parents -- he lived in
10 his parents' house which is east side
11 somewhere.
12     Q.   Okay.  And then he suggests that
13 you call the office of research, and he gives
14 you the telephone number.
15     A.   That's Dr. Ward's office, I
16 believe.
17     Q.   Pardon me?
18     A.   That's Dr. Ward's office.
19     Q.   "CSU has seminars on NIH proposal
20 writing, so there must be a designated person."
21        Did you look at the seminars and
22 proposal writing at the time in 2018?
23     A.   Yeah.  I think it's MaryTherese
24 Kocevar who was the contact person that John
25 was talking about here.

Page 268

1     Q.   Did you review any seminars that
2 CSU has about NIH proposals?
3     A.   That specifically CSU has I don't
4 remember.
5     Q.   Did you look for them?
6     A.   I looked for NIH stuff because it's
7 the NIH's data.
8     Q.   Meaning?
9     A.   So those prior links we talked
10 about.
11     Q.   But did you look for anything at
12 CSU with respect to that?
13     A.   I did do research on how to apply
14 for NIH data.  Whether I looked at CSU or not I
15 don't remember.
16     Q.   Okay.  John was not yet your
17 research assistant at this time, correct?
18     A.   No.
19     Q.   Yet he's telling you what the
20 office of research needs at CSU.  Does that
21 make sense to you?
22     A.   Not really.  He's suggesting that I
23 look into that so that I get a better sense of
24 how to accurately apply for the data.
25     Q.   All right.  Then the very first

Page 269

1 page of this document is a whole lot of when
2 are you going to be back in town, here is the
3 NIH coordinator number, so a lot of logistics
4 stuff.
5     A.   Correct.
6     Q.   This was really I think the first
7 email that we found around, and you'll know
8 better than I would, around your communications
9 with Fuerst or the other collaborators about
10 the project that was to come.  Are you aware of
11 anything before this?
12     A.   You mean this whole packet is the
13 first that you found, this whole exhibit?
14     Q.   Yes, I think so.
15     A.   Yeah, so --
16     Q.   But I'm not going to profess to
17 know, so that's why I'm asking you.
18     A.   Okay.  So the first email, does it
19 say "Nice meeting you at Pho."  So I presume
20 we met at Pho on March 1st, 2018.  That's when
21 we agreed to apply for three different topics.
22        - - - - -
23        (Thereupon, Deposition Exhibit 36,
24        an Email String, was marked for
25        purposes of identification.)

68 (Pages 266 - 269)

Page 270

1         - - - - -
2       Q.   All right.  This is, and let's do
3   the same thing we did with the other one.
4   Okay.
5       A.   Okay.
6       Q.   Because this was April -- the first
7   one is April 8th which I think is after the
8   email thread we were just looking at.
9       A.   In Exhibit 35, correct.
10      Q.   Okay.  And this is an email from
11  Mary Jane Karpinski to you.  Who is Mary Jane
12  Karpinski?  I'm sorry.  I am totally wrong.
13  That is not the first email.
14      A.   Okay.
15      Q.   The first email is from you to
16  Sponsored Programs and Research Services and
17  Mary Jane Karpinski, right?
18      A.   Correct.
19      Q.   April 8th.  Tell me now who Mary
20  Jane Karpinski is.
21      A.   So I did remember MaryTherese
22  Kocevar was one of the coordinators for getting
23  CSU approval for the applications.  I think
24  Karpinski was another, but I'm not positive.
25      Q.   In this email you're asking her for
26  information about the signing officer, right?

Page 271

1       A.   Correct.
2       Q.   This is really taking action on the
3   email thread we just looked at in Exhibit 35,
4   the first task of which was find out who the
5   signing officer is, right?
6       A.   Sounds correct, yes.
7       Q.   Okay.  And she copies Lisa Franklin
8   on your email, right?
9       A.   Correct.
10      Q.   And who is Lisa Franklin?
11      A.   I think she's -- like it was a
12  clerical thing.  She's like the gateway to the
13  people who approve it.  I'm not positive.
14      Q.   All right.
15      A.   Does it say her title?  It does
16  not.  Okay.  No, it does.  She's assistant
17  director.
18      Q.   Yes.  Then on the next page, and we
19  don't have to go through these piece by piece
20  unless you would prefer to, it appears that the
21  Office of Research is setting you up with an
22  account that you can then use to make the
23  application to NIH, right?
24      A.   I thought I created the account, so
25  I'm not sure.

Page 272

1       Q.   At least these are instructions of
2   how you're supposed to do it?
3       A.   Okay.  Yes.
4       Q.   You agree with that?
5       A.   Yes.
6       Q.   And then you tell John on April 9th
7   that you're making some progress, see below,
8   and you send him the email trail that you had
9   with the CSU people from the Office of
10  Research, right?
11      A.   Correct.
12      Q.   And then on April 9th, John tells
13  you --
14      A.   That's got to be good to hear.
15      Q.   Pardon me?
16      A.   I think it's good to hear.  It's a
17  typo.
18      Q.   Oh, I see.  I wasn't focused on
19  that at all.  All right.  What does the next
20  sentence mean?  "We are at about 140 M here,"
21  and then there is a Youtube reference.
22      A.   Yeah.  I would have to click on the
23  link to refresh my memory.
24      Q.   And he says, "You'll have to select
25  the survey that you're applying for which is

Page 273

1   the TCP.  This does not require IRB approval."
2   He says that again.  "So we will be able to
3   skip that step."  And then he says, "Yeah,
4   we'll meet," right?
5       A.   Correct.
6       Q.   So was he also looking at that?
7   Well, we don't know because we don't know what
8   the Youtube --
9       A.   Looking at what, the link?
10      Q.   The Youtube.
11      A.   Well, he sent it, so I presume he
12  looked at it.
13      Q.   Do you remember whether you looked
14  at it?
15      A.   I'm sure I did.  I just have no
16  memory of specifically doing it.
17      Q.   Then the next email is April 10th
18  from you to John.  "John, you sent me a summary
19  abstract a while ago.  Should I be using that
20  when I apply?  Also, what kind of food do you
21  like?"  And you go on to talk about lunching
22  with him.
23          What was the summary abstract that
24  you're referring to?
25      A.   Well, I can only speculate.  I

69 (Pages 270 - 273)

Page 274

1  don't remember.
2      MR. KELLY:  Don't speculate.
3      THE WITNESS:  Okay.  Thank you.
4      Q.  You don't know what summary
5  abstract it was?
6      A.  No.
7      Q.  It certainly sounds like he took
8  the first crack at the summary abstract that
9  was going to go with the DAR, right?
10     A.  He did draft the first.  I don't
11 know if it's called a summary abstract, because
12 there is a technical statement then and the
13 non.  That's why I'm not going to speculate.
14     Q.  What you're referring to is what's
15 in what we've been calling the RUS?
16     A.  Right.
17     Q.  Which is the --
18     A.  Research user --
19     Q.  Statement, I think.  In fact, we
20 are about to come up with the RUS reference in
21 one second.  John replies also on April 10th,
22 "Hi Bryan, I'm not sure they will require one
23 to be submitted.  In case they did, I propose
24 the attached.  If you are comfortable with
25 publishing such a table (and reporting the

Page 275

1  admixture results in a table in the
2  supplementary file), then I say we go with it.
3  If not, I can come up with something else," and
4  then he makes reference to having lunch.
5      Now, we don't have whatever, if
6  there was ever anything attached, because it
7  didn't appear to us that there was something
8  attached.  So did you receive something from
9  him, the proposal about what should be
10 contained with it?
11     A.  I'm not sure.  This is obviously
12 for the race and IQ, 19747, but I don't
13 remember what he's getting at here.
14     Q.  But the race and IQ --
15     A.  Was submitted.
16     Q.  -- DAR is not submitted until?
17     A.  July?
18     Q.  Let's see.  We can use your
19 Table 1.  It's not submitted until July.  The
20 one that is submitted first is April 12th, and
21 that's the sex differences.
22     A.  That was our plan, correct.  We
23 both liked to work linearly on one project as
24 opposed to doing multiple ones at a time.
25     Q.  All right.  I'll tell you that we

Page 276

1  didn't find any emails relating to the sex
2  differences DAR.  The focus appears to be on
3  the --
4      A.  Yes.  In this packet I agree.
5      Q.  Okay.  And I note that the 1909 DAR
6  does not refer directly to IQ and ancestry;
7  does it?
8      A.  19090?
9      Q.  Right.
10     A.  That's the mental health one except
11 for that one indirect thing that I pointed out
12 to you in the morning.
13     Q.  Right.  And the one that does refer
14 to IQ and race or ancestry doesn't get filed
15 until June of 2019, more than a year after this
16 email discussion, right?
17     MR. KELLY:  Object.
18     THE WITNESS:  Pardon me?
19     MR. KELLY:  It mischaracterizes the
20 testimony.  I don't believe it's accurate,
21 Ms. Giffen, with all due respect.
22     Q.  Your counsel is right.
23     A.  Okay.
24     Q.  September of 2018.
25     A.  We're going to have to backtrack

Page 277

1  and repeat the question.  Sorry.
2      Q.  That's all right.  I'll withdraw
3  it.
4      Then in the first email dated
5  April 11th, it's, "Hi John," there is more
6  references to when you're going to lunch.  "I'm
7  making good progress on the application.
8  However, I'm stuck on this part," and then you
9  refer to the RUS, and I assume what you've done
10 there is you've cut and pasted the instructions
11 from the application on the NIH site for the
12 DAR; is that right?
13     A.  I'm not really following that.
14     Q.  Here's what the paragraph says.
15 "Please enter your RUS in the area below.  The
16 RUS should be one or two paragraphs in length
17 and include research objectives, the study
18 design, and an analysis plan including the
19 phenotypic characteristics that will be tested
20 for association with genetic variance.  If
21 you're requesting multiple databases, please
22 describe how you will use them.  Examples of
23 RUS can be found at," and then there is a
24 reference.
25     So that appears to be from the NIH

Page 278

1 website where you're making the DAR, and you've
2 got to put in the RUS data?
3     MR. KELLY: Object to the form of
4 the question.
5     Q. What are you referring to there?
6     A. My concern or confusion is that I'm
7 not sure which application of the three this is
8 for.
9     Q. Okay. So how does that change
10 where you got that paragraph?
11     A. I don't know where I got it.
12 Probably from the NIH.
13     Q. Then you bold this, "I'm requesting
14 permission to use cloud computing to carry out
15 the research that's described in my research
16 use statement." And then there is a
17 non-technical summary, and is this you asking
18 what is a non-technical summary, or is that
19 again from the NIH website?
20     MR. KELLY: If you know.
21     A. I don't know.
22     Q. And you say, "It seems like your
23 summary is for the" -- by the way, all of the
24 questions I'm asking you are only if you know,
25 and if you don't know, feel free to tell me

Page 279

1 that.
2     A. Thank you.
3     MR. KELLY: Don't speculate and say
4 well --
5     Q. "It seems like your summary is for
6 the RUS, but we need something toned down for
7 the non-technical summary. Could you draft
8 this?"
9     And then finally, "In the RUS you
10 attached, should the word brain appear in line
11 four before the words size volume." Does that
12 refresh your recollection about what --
13     A. It's the sex one for sure.
14     Q. It's the sex differences one. So
15 this discussion is about the 18007 project,
16 right?
17     A. Yes.
18          - - - - -
19     (Thereupon, Deposition Exhibit 37,
20     an Email String, was marked for
21     purposes of identification.)
22          - - - - -
23     Q. Handing you what's been marked as
24 Exhibit 37, and this appears to be an email
25 from you -- actually, it's an email trail

Page 280

1 between you and John Fuerst beginning, and I
2 apologize, but we only have to look at a tiny
3 piece of this.
4     A. Okay.
5     Q. Because if you look at Wednesday,
6 April 11th, which is the third email from the
7 first page --
8     A. Okay.
9     Q. -- that actually is a continuation
10 of what we just looked at in Exhibit 36, and if
11 you need to satisfy yourself with respect to
12 that, feel free to do so.
13     A. Okay.
14     Q. This appears to me to be a
15 continuation of that conversation later in
16 time.
17     A. I would agree with that.
18     Q. Okay. So John writes on
19 April 11th, "As for the RUS, are you
20 okay" -- let me make sure that this is making
21 sense.
22     MR. KELLY: Good luck.
23     Q. They are all April 11th. Back to
24 Exhibit 37. So this second email on the first
25 page says from John to you, again, you're

Page 281

1 talking about lunch. "As for the RUS, are you
2 okay with my plan (according to which we look
3 at the sex times G times brain size association
4 and include population structure as a control
5 and note the PC1 ancestry times IQ associations
6 in the supplementary file)? This is a safe
7 analysis. If so, I will write up a simple
8 summary and note the variables needed.
9 Otherwise, I can come up with something else."
10     What was that about?
11     A. This is for the sex difference one.
12     Q. Okay.
13     A. I don't remember him talking
14 about -- I don't remember this email, but -- I
15 don't remember.
16     Q. But he's clearly talking about
17 writing in such a way that you can get the
18 ancestry and IQ associations in a supplementary
19 file, right?
20     A. Well, we applied for it later on in
21 19747, but it could be a big picture thing.
22     Q. Okay. And then you write later to
23 John, "Excellent for the strategy and for noon
24 on Tuesday."
25     A. Okay.

71 (Pages 278 - 281)

Page 282

1    Q.   But as you sit here today, you're
2  unsure exactly how the strategy was to work?
3    A.   No.  We agreed to do at Cleveland
4  Pho the three projects.  We wanted to start
5  with sex differences.  I don't think we picked,
6  prioritized mental health over the transethnic
7  validity one.  So we were going to start with
8  sex, see what happened, but also work on the
9  applications, writing it out for the other two.
10    Q.   But his focus in all of these
11  emails I need to get the ancestry and IQ
12  data, right?
13    A.   The reason he wanted to meet me at
14  Pho is because he wanted primarily to do that
15  study.
16    Q.   Right.  So whatever was on the
17  DARs, he was most interested in how do we get
18  the data so we can do that extra analysis,
19  right?
20    A.   Yeah, as listed in 19747.
21    Q.   Okay.  All right.
22      - - - - -
23      (Thereupon, Deposition Exhibit 38,
24      an Email String, was marked for
25      purposes of identification.)

Page 283

1      - - - - -
2    Q.   Handing you what's been marked as
3  Exhibit 38, this appears to be more
4  communications now, but this time Emil is part
5  of the conversation, right?
6    A.   On the top.
7      MR. KELLY:  Is this 38?
8      THE WITNESS:  This is 38.
9    Q.   This is a one pager, so look all
10  the way at the bottom.  Are you with me?
11    A.   Yes.
12    Q.   Okay.  The first email is Thursday,
13  April 12th, and it's from Emil to you with a cc
14  to John, right?
15    A.   Yes.
16    Q.   It says, "Bryan, cool.  We may want
17  to send some applications to other samples as
18  soon as possible to see how difficult the IRB
19  is to get.  I reckon that if we mask the nature
20  of the study with usual medical terms, one
21  can't get away with a lot."
22    A.   One can.
23    Q.   "One can get away with a lot."
24  Thank you.  "Getting samples for analyses that
25  one doesn't publish to preserve your reputation

Page 284

1  are still useful because they allow us to
2  validate our beliefs privately which is useful
3  because it will tell us how confident one can
4  push ideas in other papers."
5    A.   That is not the way I write.  It
6  sounds like something Emil would say.
7    Q.   You didn't write it.  This is to --
8      MR. KELLY:  It's from --
9    Q.   It's to you from Emil.
10      MR. KELLY:  Yeah.
11    A.   Yeah.
12    Q.   And Kerin just pointed out there is
13  actually an email before that.
14    A.   Okay.
15    Q.   The very first email appears to be
16  from you to John and Emil saying, "The deed is
17  done."
18    A.   That would be an application
19  submitted, probably sex.
20    Q.   Yeah, because this is an email
21  dated April 12th, and it won't surprise you if
22  we look back that the sex differences was
23  submitted on April 12th?
24    A.   That makes sense.
25    Q.   So "the deed is done" refers to

Page 285

1  that.  But the email's response or Emil's
2  response to that refers to "masking the nature
3  of the study and publishing something but
4  validating beliefs privately."
5    A.   Yeah.  So this has to be about the
6  sex differences one because, I mean, it's in
7  the chain.  I don't know what he was getting at
8  there.
9    Q.   So with this language employed by
10  Emil with respect to access to the data and
11  John Fuerst's earlier references to sneaky ways
12  to get at things, why weren't you concerned
13  about the real objectives of these fellows to
14  do the research that you were telling NIH that
15  you were doing?
16      MR. KELLY:  Objection to the form
17  of the question, mischaracterizes his
18  testimony.
19    A.   Because we wanted to do the sex
20  difference one first.  But, yeah, John and Emil
21  were most interested in 19747.
22    Q.   And they are talking about hiding,
23  right?
24    A.   Nothing was hidden.
25    Q.   Well, at least their intention in

Page 286

1 what they were going to do with the data,
2 because it's the same data set, right, TCP is
3 the same data set?
4    A.   Correct.
5    Q.   So what they wanted to do with the
6 TCP data set in these email trails that we've
7 been looking at seem to be inconsistent with
8 the only application that was at that point
9 made to NIH?
10       MR. KELLY:  Object to the form of
11 the question.  That is mischaracterizing the
12 testimony.
13    A.   No.  We had every intention to do
14 the race IQ paper, right, but I told John I
15 want to do something else first.
16    Q.   Why?
17    A.   Because I told him this, and I
18 think it's even in the final report of the
19 binder, I don't want -- I didn't at that time
20 want every line in my vita to be on this topic,
21 plus I'm interested in sex differences.  I even
22 have a paper on it.
23    Q.   But you didn't do anything with
24 that data on sex differences?
25    A.   I didn't even access it because the

Page 287

1 brain imaging files were massive and not
2 processed.  So you could convert them to like a
3 jpeg.  No idea how to do that.
4    Q.   Isn't it true that whatever your
5 intention was with respect to the data requests
6 to NIH, you wanted to do the three, right?
7    A.   Uh-huh.
8    Q.   The only paper that came out of the
9 TCP data was the paper they are talking about
10 in these emails, right?
11       MR. KELLY:  Object to the form of
12 the question.  That's --
13    A.   And the paper didn't exist
14 obviously here.
15    Q.   I know.
16    A.   No.  Well, we didn't even download
17 the data for sex for the reason I just gave
18 you.  I don't know why we didn't pursue the
19 mental health stuff next.  We went to -- yeah,
20 you're right.  We got -- the only paper that
21 came from all this is the Lasker paper.
22    Q.   You write back to Emil when he said
23 we can mask the nature of the study and you can
24 do private research and then publish something
25 different, "Good idea."

Page 288

1    A.   Where?  I don't see where we're at.
2    Q.   Right in the middle of the page.
3 On April 12th you respond to Emil saying, "Good
4 idea.  Do we wait for any feedback on this one
5 or just march on?  I would obviously need you
6 guys to do the write-ups again."
7    A.   Okay.
8    Q.   So you were saying good idea, Emil,
9 to mask the nature of the study?
10    A.   No.  I think I was talking about
11 the timing of doing sex differences first.  So
12 we were -- you know, we were planning to do all
13 three of the studies.  So even though we
14 focused first on sex differences, we did work a
15 little bit on the applications for the other
16 ones.
17    Q.   Emil responds to that email again
18 in the middle of the page.  He's now referring
19 to the TCP data set, I believe.
20    A.   Correct.
21    Q.   And he refers you to the full data
22 dictionary, and he says, "So one will be able
23 to control for parental education, lead
24 exposure, age, sex, self-perceived race, and
25 then (dummies)."  What does that mean?

Page 289

1    A.   It's a statistical technique where
2 the nature of the data are words, black, white,
3 so you need to put numbers to those to run the
4 data.  So zero might be all Africans, and one
5 would be whites.  It's called dummy coding.
6    Q.   I get it.  It's not dummies in the
7 common sense of the word.
8    A.   No.
9    Q.   Then he says, "One can predict skin
10 tone from the genetic data with high accuracy,
11 I think."  Again, his focus on the TCP being
12 skin tone.
13    A.   Yeah.  That's for 19747.  That's
14 the HIrisPlex website, I think.  It's just
15 H-I-R-I-S, and P-L-E-X.
16    Q.   By the way, you mention that, and I
17 should have asked you this earlier, you mention
18 that NIH had approved the use of HIrisPlex?
19    A.   For another article.
20    Q.   What article is that?
21    A.   It was published in Nature.  It's
22 in -- probably several times in the final
23 report.
24       MS. GIFFEN:  Do we have that, Paul?
25       MR. NEEL:  The article?

Page 290

1     MS. GIFFEN:  Or reference so we can
2  find it.
3     THE WITNESS:  It would be in one of
4  my rebuttals.
5     Q.   If we don't have it, we'll get back
6  to it.
7     MR. KELLY:  The hyperlinks are
8  there I'm pretty sure.
9     MS. GIFFEN:  Oh, of what you sent.
10 Maybe that's what we need to do.
11    MR. KELLY:  I think it's in the
12 final report, the hyperlinks to it.
13    MS. GIFFEN:  Okay.
14    Q.   All right.  And then the email
15 second to the top says, "Bryan, what type of
16 papers are you comfortable doing?"  I'm sorry.
17 This is from John, and the email is to you,
18 Emil and to you.  "I would like to go through
19 all the samples and compute the correlations
20 between SES and ancestry to add to the genetic
21 ancestry x SES metaanalysis.  A number of
22 research teams told me to do just this.  Would
23 you be willing to apply on these grounds or
24 even apply on grounds to look at IQ and genetic
25 ancestry correlations?"  And then there is a

Page 291

1  reference to the paper.
2     This is the first time at least
3  that I've seen where there is a specific
4  reference to what we ought to ask for is what
5  everybody seems to be totally interested in
6  which is IQ and ancestry.
7     A.   I wouldn't have agreed to do the
8  study, the collaboration.
9     Q.   Because?
10    A.   I didn't want every line in my vita
11 to be like controversial race and IQ research,
12 and I'm pretty sure I put that in one of my
13 rebuttals or it's in my documentation.
14    MR. KELLY:  That's enough.
15    THE WITNESS:  Okay.  Thank you.
16    Q.   Then the first email says, "Hi all,
17 let's switch discussion to the above/non-school
18 email," which I think you make, I don't know,
19 is that a reference to your --
20    A.   Yeah, so me and John were
21 conversing in cs.com and then obviously Emil
22 sent this to the CSU email.
23    Q.   Well, those other emails we have
24 just been through have all been to the CSU
25 email address.

Page 292

1     A.   Yeah.  The forwarding, I guess.  I
2  don't know.  I mean, I prefer to use the CS
3  email for everything, but you're right, so I
4  was wrong there.
5     - - - - -
6     (Thereupon, Deposition Exhibit 39,
7     an Email String, was marked for
8     purposes of identification.)
9     - - - - -
10    A.   Okay.
11    Q.   There is several -- again, this is
12 going from back to front.  The first page is an
13 email from Emil to you and John suggesting that
14 you look at registered reports.  What does that
15 refer to?  What do you understand registered
16 reports to be?
17    A.   I have no idea.
18    MR. KELLY:  It's on here
19 (indicating).
20    A.   I think it's -- I think -- well,
21 I'm not going to speculate.  I don't know.
22    Q.   All right.  And then on the first
23 page, the second email on the first page is
24 from John to you and to Emil, and you must have
25 been talking about the RUS for the admixture

Page 293

1  DAR?
2     A.   I don't know if it was an email.
3     Q.   But here is the language of, and
4  it's have you ever compared this language to
5  what appears in the actual RUS?
6     A.   I don't know if it's identical, but
7  this is for 19, the mental health one.
8     Q.   Right.  This is the 19090, right?
9     A.   070 maybe.  090, you're correct.
10    Q.   So this is you've already submitted
11 the sex differences one.  This is the admixture
12 one that makes -- and this makes sense because
13 we know that that one refers to mood disorder,
14 schizophrenia, and depression which is what's
15 quoted here, right?
16    A.   Right.
17    Q.   Okay.
18    - - - - -
19    (Thereupon, Deposition Exhibit 40,
20    an Email String, was marked for
21    purposes of identification.)
22    - - - - -
23    Q.   All right.  So this is much later
24 in time, right?
25    A.   August 20th.

74 (Pages 290 - 293)

Veritext Legal Solutions
www.veritext.com                          888-391-3376

Page 294

1    Q.    Right, 2019, right?
2    A.    Correct.
3    Q.    And the first email in this thread
4  begins on August 1st from NIH to you and Lisa
5  Franklin, right?
6    A.    Bottom of the page, first page?
7    Q.    Yeah.
8    A.    Correct.
9    Q.    All right.  And it's saying you
10  need to do a project renewal or closeout for
11  19090, right?
12    A.    Correct.
13    Q.    And that then the next thing, the
14  next email, is you're sending it to Emil and
15  John and saying, "Guys, what are we doing with
16  this one?"  Why were you asking what are you
17  doing with this one?
18    A.    Should we renew it or close it.
19    Q.    Because?
20    A.    Well, we did -- I mean, we were
21  focusing on the sex one initially, and then I
22  think -- I don't know.  We just didn't -- we
23  didn't -- I didn't know what the answer was,
24  should we renew it or close it.  That's what I
25  was asking.

Page 295

1    Q.    And the next email is also on
2  August 19th from John to you.
3    A.    Uh-huh.
4    Q.    He says, "Sorry.  That was somewhat
5  of an email reply."
6    A.    Emil.
7    Q.    Emil.  I'm sorry.
8    A.    You're good.
9    Q.    "Emil reply (i.e., tell you what to
10  do)."  "John's reply, (i.e., tell you what I
11  will do).  Let me prepare something, and I will
12  get it to you by the end of the week.  We will
13  discuss then."
14    A.    Correct.
15    Q.    Did Emil reply in some other email
16  to this?
17    A.    I don't remember.
18    Q.    Okay.  And then you told him that
19  you had until September 1st, right?
20    A.    That was probably the one year
21  deadline for either renewing or closing it out.
22    Q.    Okay.  And actually I think it's
23  probably in the email below.  In fact it is.
24  You're told that you have to either renew or
25  close it out by September 1st.

Page 296

1    A.    Yeah, and I wanted to make the
2  deadline, so what do we do with this, guys.
3    Q.    Okay.  And this is at the point in
4  which the Lasker paper has -- you've submitted
5  the Lasker paper at or about this time, and I'm
6  not sure if it was accepted at that point or
7  not?
8    A.    That would be in the time frame, I
9  agree.
10    Q.    So what was your consideration of
11  whether it should be closed or renewed?
12    A.    It didn't really matter to me.
13  This was before also the initial email from NIH
14  so.
15    Q.    Yeah.  Well, you never really
16  focused your research or prepared a paper that
17  focused on the mental health outcomes; did you?
18    A.    No.  I don't remember if we
19  analyzed it.  Maybe we did, but I think
20  schizophrenia might have been nothing worked.
21    Q.    So why not just close it out
22  instead of renewing, and then you just have to
23  deal with 19747 which does refer to IQ?
24    A.    Correct.  I mean, I didn't know the
25  answer, so I asked them.

Page 297

1    Q.    Then what did they tell you to do
2  then?
3    A.    So what did we do?  Did we close it
4  out?
5    Q.    You didn't close it out.
6    A.    So we renewed it then.
7    Q.    Did they say why renew it when
8  nothing had happened?
9    A.    Well, no, not that I remember.
10    Q.    It sounds like you as the principal
11  investigator are giving them a whole lot of
12  decision power about what to do with the DARs
13  and renewals, et cetera?
14    A.    Yeah.  I had never done it before.
15  Well, neither had they.  It was a
16  collaboration.  I'm not saying that every time
17  John said something, well, okay, let's do it.
18            - - - - -
19            (Thereupon, Deposition Exhibit 41,
20            an Email String, was marked for
21            purposes of identification.)
22            - - - - -
23    Q.    So I'm not sure if this is -- the
24  beginning of this email is the same reminder
25  letter that you had received saying the you had

75 (Pages 294 - 297)

1 to close out or renew the mental health DAR.
2      A.    And consistent with Table 1, was
3 that on July 15th?
4      Q.    Okay.
5      A.    I'd have to check.
6      Q.    Okay.  But my question is because
7 we just looked at a reminder about renewal, so
8 I'm not sure if this is the same one or not.
9      A.    Okay.
10     Q.    Do you know?
11     A.    If you can find out which
12 application.  Go to Table 1 and look at that
13 day, July 15th, because I think that's the date
14 we applied for one of the three.
15     Q.    This clearly is about 19090.
16     A.    Oh, I didn't see that here.
17     Q.    The subject is about 19090.
18     A.    Correct.
19     Q.    After that reminder, and this is
20 August 28th, and now let's look --
21     A.    August 18th?
22     Q.    Because the Exhibit 40 email
23 correspondence which also deals with the what
24 are we going to do, renew or close out.
25     A.    Correct.

1      Q.    Those are all dated between
2 August 1st, which you got a reminder letter on
3 August 1st so I guess this is a new one,
4 meaning Exhibit 41 is a new one, to the last
5 email here is August 20th, right, that's
6 Exhibit 40?
7      A.    The last will be the first on the
8 page.  It says August 19th if I'm looking at it
9 correctly.
10     Q.    On Exhibit 40?  Is that Exhibit 40?
11          MR. KELLY:  Forty-one.
12     A.    Maybe you meant 41?
13     Q.    No, and it's August 20th.
14     A.    I just saw August 19th.
15     Q.    There is an August 19th, but the
16 last one, the last email.
17     A.    Yeah.  That's the same email.
18 You're correct.
19     Q.    My point is that this is, the email
20 trail for Exhibit 40, is about a week before
21 the email trail of Exhibit 41?
22     A.    Yes.
23     Q.    And on August 28th you write to
24 John, "We need," and then you quote, "Please
25 summarize your research on this project since

1 your initial request or most recent renewal in
2 the space below including the potential
3 significance of any findings.  Briefly describe
4 whether and how the data set was used including
5 referencing the data sets by name in your
6 summary.  Please limit your summary to 6,000
7 characters."
8          That is the section of the renewal
9 request that says this is the information we
10 want to know from you.  So you're writing that
11 to John.  Is this you're asking him to prepare
12 that?
13     A.    I don't know what he's talking
14 about here because Woodley wasn't involved in
15 this.
16     Q.    But I'm talking about your email to
17 him which is about are we going to close out or
18 renew the 19090 project.
19     A.    Yeah.  I don't know.  It
20 doesn't -- I don't know.
21     Q.    Well, the middle email which is
22 John's response to you of the same date is, "B,
23 recall I am waiting for you to figure out which
24 DUC that was for.  Please let me know which
25 projected I am supposed to describe progress

1 on.  Woodley, TCP Hispanic, the sex differences
2 one which we never touched.  We have three or
3 four active.  Some we renewed last December.
4 I've been asking you to check this for a week."
5          So what is he talking about
6 Woodley?
7      A.    I don't know.  I would say three is
8 the sex difference one we never touched.  I
9 don't know what he means by Woodley.
10     Q.    But he's waiting for you to figure
11 out what the DUC, which is the data use
12 certification, right?
13     A.    Correct.
14     Q.    That was for referencing 19090.
15 Did you have a DUC involving Woodley or TCP
16 Hispanic?
17     A.    No.  I mean, Woodley wasn't listed
18 on any of our applications.
19     Q.    Did it concern you that he was
20 asking about DUCs that weren't applicable?
21     A.    I'm not sure I understand that.
22     Q.    You understand what?
23     A.    Your question.
24     Q.    Well, you're asking him to
25 collaborate with you on what the renewal or

76 (Pages 298 - 301)

Page 302

1  close out --
2      A.   Correct.
3      Q.   -- of 19090 is going to be, and he
4  responds saying tell me which one is it
5  supposed to be about, and then he lists all of
6  those things, none of which includes the mental
7  health one, right?
8      A.   Yeah.  I don't -- I don't know what
9  he was getting at here.
10     Q.   And then you respond to him on
11  August 28th saying it's the mental disorders
12  one, right?
13     A.   Which implies to me that that's
14  what we're talking about in the middle one.
15     Q.   Even though that wasn't the
16  possibles list that he had about how they
17  were --
18     A.   Possibles?
19     Q.   Well, the possibles of what he
20  thought it might be referencing was Woodley,
21  TCP Hispanic, neither of which seem to exist,
22  and the sex differences one which we never
23  touched, right?
24     A.   Yeah.  I think he's asking me for
25  clarification which -- I don't know.  I'm not

Page 303

1  going to speculate on that.
2      Q.   Okay.
3           - - - - -
4           (Thereupon, Deposition Exhibit 42,
5           an Email String, was marked for
6           purposes of identification.)
7           - - - - -
8           MR. KELLY:  Karen, it's after 6:00
9  now.
10          MS. GIFFEN:  Off the record.
11          (Brief recess.)
12  (Deposition adjourned at 6:18 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 304

1  Whereupon, counsel was requested to give
2  instruction regarding the witness's review of
3  the transcript pursuant to the Civil Rules.
4
5           SIGNATURE:
6  Transcript review was requested pursuant to the
7  applicable Rules of Civil Procedure.
8
9           TRANSCRIPT DELIVERY:
10  Counsel was requested to give instruction
11  regarding delivery date of transcript.
12          Ms. Giffen did not order the
13  transcript at this time.
14
15
16
17
18
19
20
21
22
23
24
25

Page 305

1           REPORTER'S CERTIFICATE
2  The State of Ohio,  )
3                       SS:
4  County of Cuyahoga.  )
5
6           I, Cynthia Sullivan, a Notary
7  Public within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, BRYAN J. PESTA,
10  was by me first duly sworn to testify the
11  truth, the whole truth and nothing but the
12  truth in the cause aforesaid; that the
13  testimony then given by the above-referenced
14  witness was by me reduced to stenotypy in the
15  presence of said witness; afterwards
16  transcribed, and that the foregoing is a true
17  and correct transcription of the testimony so
18  given by the above-referenced witness.
19          I do further certify that this
20  deposition was taken at the time and place in
21  the foregoing caption specified and was
22  completed without adjournment.
23
24
25

77 (Pages 302 - 305)

Page 306

```
1        I do further certify that I am not
2  a relative, counsel or attorney for either
3  party, or otherwise interested in the event of
4  this action.
5        IN WITNESS WHEREOF, I have hereunto
6  set my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 13th day of
8  February, 2024.
9
10
11
12
13
14   Cynthia Sullivan, Notary Public
15      within and for the State of Ohio
16
17  My commission expires October 17, 2026.
18
19
20
21
22
23
24
25
```

Page 308

```
1            DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
      ASSIGNMENT REFERENCE NO: 6425934
3     CASE NAME: Pesta, Bryan J. v. Bloomberg, Laura Et Al.
      DATE OF DEPOSITION: 1/29/2024
4     WITNESS' NAME: Bryan J. Pesta , I
5     In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have made no changes to the testimony
  as transcribed by the court reporter.
8  _____
9  Date              Bryan J. Pesta , I
10    Sworn to and subscribed before me, a
  Notary Public in and for the State and County,
11  the referenced witness did personally appear
  and acknowledge that:
12
      They have read the transcript;
13    They signed the foregoing Sworn
         Statement; and
14    Their execution of this Statement is of
         their free act and deed.
15
  I have affixed my name and official seal
16
  this _____ day of_____, 20____.
17
      _____
18    Notary Public
19    _____
      Commission Expiration Date
20
21
22
23
24
25
```

Page 307

```
1          Veritext Legal Solutions
              1100 Superior Ave
2                Suite 1820
             Cleveland, Ohio 44114
3            Phone: 216-523-1313
4
  February 13, 2024
5
  To: MR. KELLY
6
  Case: Pesta, Bryan J. v. Bloomberg, Laura Et Al.
7
  Veritext Reference Number: 6425934
8
  Witness:  Bryan J. Pesta , I     Deposition Date:  1/29/2024
9
10  Dear Sir/Madam:
11
  The deposition transcript taken in the above-referenced
12
  matter, with the reading and signing having not been
13
  expressly waived, has been completed and is available
14
  for review and signature.  Please call our office to
15
  make arrangements for a convenient location to
16
  accomplish this or if you prefer a certified transcript
17
  can be purchased.
18
19  If the errata is not returned within thirty days of your
20  receipt of this letter, the reading and signing will be
21  deemed waived.
22
23  Sincerely,
24  Production Department
25
    NO NOTARY REQUIRED IN CA
```

Page 309

```
1            DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
      ASSIGNMENT REFERENCE NO: 6425934
3     CASE NAME: Pesta, Bryan J. v. Bloomberg, Laura Et Al.
      DATE OF DEPOSITION: 1/29/2024
4     WITNESS' NAME: Bryan J. Pesta , I
5     In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
  well as the reason(s) for the change(s).
9     I request that these changes be entered
  as part of the record of my testimony.
10
      I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
      that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
  Date              Bryan J. Pesta , I
14
      Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
  the referenced witness did personally appear
16  and acknowledge that:
17    They have read the transcript;
      They have listed all of their corrections
18       in the appended Errata Sheet;
      They signed the foregoing Sworn
19       Statement; and
      Their execution of this Statement is of
20       their free act and deed.
21    I have affixed my name and official seal
22  this _____ day of_____, 20____.
23    _____
      Notary Public
24
      _____
25    Commission Expiration Date
```

78 (Pages 306 - 309)

Page 310

1         ERRATA SHEET
       VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 1/29/2024
3  PAGE/LINE(S) /     CHANGE     /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19

   _____   _____

20  Date         Bryan J. Pesta , I
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23     _____
      Notary Public
24

     _____
25     Commission Expiration Date

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.