# Research Misconduct Investigation Final Report – Dr. Bryan J. Pesta

January 13, 2022

## Contents

I. Background .................................................................................................................... 1

II. Allegations ................................................................................................................... 2

III. Institutional Inquiry: Process and Recommendations ................................................ 3

IV. Institutional Inquiry/Investigation: Analysis ............................................................... 3

   A. Background .............................................................................................................. 3

   B. Analysis .................................................................................................................. 4

   C. Findings of Research Misconduct or No Research Misconduct ............................... 9

V. Institutional Administrative Actions. .......................................................................... 10

VI. Attachments ............................................................................................................. 11

## I. Background

Cleveland State University received allegations from multiple sources external to the University related to the research activities of Dr. Bryan J. Pesta (the "Respondent"), a professor in the Department of Management in Cleveland State University's Monte Ahuja College of Business. The allegations raised concerns that Dr. Pesta misused controlled data from the National Institutes of Health (NIH) database of Genotypes and Phenotypes (dbGaP) and engaged in unethical research practices including misrepresentation of the intended use of the data sets. Access to controlled access dbGaP data requires that the investigator and the investigator's institution agree to NIH's Data Use Certification (DUC) agreement,[1] the Genomic Data User Code of Conduct,[2] and the Security Best Practices for Controlled



DEFENDANT'S
EXHIBIT
5

---

[1] https://osp.od.nih.gov/wp-content/uploads/Model_DUC.pdf

[2] https://osp.od.nih.gov/wp-content/uploads/Genomic_Data_User_Code_of_Conduct.pdf

Access Data Subject to the GDS Policy[3] for protecting the data. Dr. Pesta was the Approved User of the data sets.

The allegations, described in Section II below, cited the use of the dbGaP data for the 2019 publication "Global Ancestry and Cognitive Ability"[4] for which Dr. Pesta was a co-author. Mr. John Fuerst was listed as a co-author on the same paper. Mr. Fuerst was provided access to the dbGaP data through Dr. Pesta's data access requests and performed data analysis of the dbGaP data sets for that paper and other publications. Mr. Fuerst was enrolled at CSU in a 1-credit undergraduate special topics course (BUS 293) in the spring 2019, fall 2019, spring 2020, fall 2020, and spring 2021 semesters, but was not enrolled in any degree program.

Dr. Benjamin Ward, acting as CSU's Research Integrity Officer (RIO), reviewed the allegations raised by the external sources and considered the allegations to have been made in good faith. The University conducted this investigation pursuant to the University's Research Misconduct Policy, 3344-28-01 through 3344-28-10 of the Administrative Code (the "Policy") to determine whether academic research misconduct may have occurred in addition to the violations of NIH's data use policies.

## II. Allegations

Allegations were submitted to the University from researchers Kevin Bird, Dr. Jedidiah Carlson, Dr. Cathryn Townsend, and Os Keyes in September 2019 (see Attachment 2). The allegations raised by Bird et al., alleged that Dr. Pesta misused controlled data from the National Institutes of Health (NIH) database of Genotypes and Phenotypes (dbGaP) and that he specifically:

- Misrepresented his intended use of the dbGaP data

- Used the data to pursue unethical research activity

- Improperly allowed others access to controlled-access data

Many of these allegations were raised separately with NIH. NIH conducted its own investigation regarding whether violations of its data use policies occurred and informed CSU and Dr. Pesta in its letter dated May 27, 2021 of its determination that Dr. Pesta:

- Violated the data use certification (DUC) agreement for dbGaP project #19090 by using the data to examine "intellectual ability" when the description of the research that Dr. Pesta submitted suggested that he would examine mental health outcomes.

---

[3] https://osp.od.nih.gov/wp-content/uploads/NIH_Best_Practices_for_Controlled-Access_Data_Subject_to_the_NIH_GDS_Policy.pdf

[4] Jordan Lasker , Bryan J. Pesta, John G. R. Fuerst and Emil O. W. Kirkegaard (2020). Global ancestry and cognitive ability. *Psych,* 1 (1), 431-459.

- Violated non-transferability terms for dbGaP projects #19090 and 19747 by uploading controlled data or derivatives of controlled data in the form of "coded" Single Nucleotide Polymorphisms (SNPs) to an unapproved online forensic DNA phenotyping service.

- Violated the DUC clause regarding research use reporting by not reporting the publication of Lasker J, Psych Aug. 2019, 1(1), 431-459; https://doi.org/10.3390/psych1010034 at the time of project renewal.

Dr. Pesta and Mr. Fuerst disputed NIH's determination, but NIH reaffirmed its decisions in a letter dated August 16, 2021 (see Attachment 4).

In April 2021, allegations regarding Dr. Pesta's research activities were submitted to the University by Dr. Kent Taylor, a genomics researcher at the Lundquist Institute for Biomedical Innovation. Dr. Taylor raised similar concerns to those of Bird, et al., that data were used unethically, in violation of NIH's data use agreement, and without proper Institutional Review Board (IRB) review (see Attachment 5).

### III. Institutional Inquiry: Process and Recommendations

Based on the review of the allegations and the determinations made by NIH in its May 27, 2021 letter, the RIO determined that the matter should proceed to a formal investigation without conducting a formal inquiry.

### IV. Institutional Inquiry/Investigation: Analysis

#### A. Background

As stated above, this investigation was conducted pursuant to Cleveland State University's Research Misconduct Policy, 3344-2801 through 3344-28-10 of the Administrative Code (the "Policy"). The Policy defines Academic Research Misconduct as follows:

> "Academic research misconduct," herein, also referred to as "misconduct," means "fabrication, falsification, plagiarism, undisclosed conflicts of interest as defined in the policy for managing conflict of interest, or other practices that seriously deviate from those that are commonly accepted within the academic community for proposing, conducting, or reporting research. It does not include honest error or honest differences in interpretations or judgments of data."

The purpose of the investigation was to evaluate the evidence and testimony of Dr. Pesta, the complainants, and all available and related documentation to determine, per the Policy's evidentiary standard, whether there is clear and convincing evidence that academic research misconduct occurred; and, if so, to what extent, who was responsible, and its seriousness. The investigation was also to determine if there were additional instances of possible academic research misconduct by Dr. Pesta that justified broadening the scope beyond the initial allegations.

Per the Policy, the Committee was issued a Charge to determine if Dr. Pesta committed research misconduct by a preponderance of the evidence as established by finding that:

1. research misconduct, as defined in the Policy, occurred. Dr. Pesta has the burden of proving by a preponderance of the evidence any affirmative defenses raised, including honest error or a difference of opinion;
2. the research misconduct is a significant departure from accepted practices of the relevant research community; and
3. Dr. Pesta committed the research misconduct intentionally, knowingly, or recklessly.

The Investigation Committee consisted of the following individuals:
- Conor McLennan, Ph.D. – Professor of Psychology and Interim Associate Dean for Faculty in the College of Sciences and Health Professions at Cleveland State University
- Wendy Regoeczi, Ph.D. – Professor and Chair of Criminology, Anthropology, and Sociology Department at Cleveland State University
- Christopher Mallett, Ph.D., J.D. – Professor of Social Work at Cleveland State University

The Committee members are all experienced faculty, hold the rank of full professor, and have significant experience with research involving human subject data. All Committee members accepted appointment as of 6/29/2021.

Dr. Benjamin Ward, Director of Research Development and Ethics, has served as the CSU RIO for the investigation. Mr. Jack Kraszewski, Esq., Director of the Technology Transfer Office at CSU, provided legal counsel to the Committee regarding the Policy.

The Charge to the Committee, issued on 7/26/2021, is included in the Attachments [see Attachment 1].

The Committee conducted its meetings and interviews over video conference, and per the Policy the meetings were recorded and transcripts were prepared. All transcripts were reviewed by the party who was interviewed and are included in the Attachments.

Witnesses and date of interview:
- Dr. Bryan Pesta, Respondent [9/7/2021]    see Attachment 7
- Mr. Bird, Dr. Carlson, and Dr. Townsend, Complainants [9/30/2021]    see Attachment 8
- Dr. Kent Taylor, Complainant [10/05/2021]   see Attachment 10
- Dr. Bryan Pesta, Respondent [10/11/2021]    see Attachment 12

Mr. Fuerst was contacted regarding an interview with the Committee but refused the invitation.

Electronic records were stored on a secure cloud storage system (HCP Anywhere) and directories were password protected. No physical evidence was sequestered.

**B. Analysis**

This investigation focused on the facts, actions taken by Dr. Pesta, and other objective written and available material. The Committee members were, of course, aware of the research topics investigated and the controversial nature of the scholarship in which Dr. Pesta and his colleagues examined race/ethnicity, heritable traits, and intellectual ability; a controversy with a long history and more recent undercurrents. The Investigation Committee Appointment and Charge letter included an allegation that Dr. Pesta "Used the data to pursue unethical research activity." Dr. Pesta has a Ph.D. in psychology. The

American Psychological Association (APA) has published guidelines on race in psychology. In 2019, the APA Council of Representatives approved APA Guidelines on Race and Ethnicity in Psychology[5], which state:

> "[t]hese guidelines reflect the predominant social science view that race is a social construction rather than a biological reality" and make reference to similar previous conclusions, including: "In 1950, the United Nations Educational, Scientific and Cultural Organization (UNESCO) declared that race is a myth rather than a biological reality, and professional organizations such as the American Anthropological Association (1998) and the American Psychological Association (2003)[6] have declared that there is no scientific basis for the concept of race."

These APA Guidelines on Race and Ethnicity in Psychology also indicate that "Psychologists aim to maintain racially and ethnoculturally responsive ethical standards in conducting research" (Guideline 16), which "draw on and extend the five core ethical principles outlined in the APA Ethics Code … principles [that] are particularly related to race and ethnicity", including: "*Beneficence and nonmaleficence*, in which scientists both minimize their own biases in conducting research and ensure the research does not harm but rather benefits underrepresented racial and ethnic communities."

The controversial nature of the research topics, and the use of protected data (for minors), led outside researchers/reviewers to contact NIH (see Attachment 2: "allegation" document by Carlson, Townsend, Bird, & Keyes) and Cleveland State University's Office of the President with their concerns (see Attachment 5: "allegation" document by Taylor).

The Committee members further recognize that these accusations and subsequent findings by NIH (see Attachment 3: "Allegation and Determination" document finding violations of the DUC agreements, non-transferability agreement for use of the data, and not reporting published research based on the data) are occurring during a time of heightened politicization and polarization with respect to equity, race, and related issues. Nevertheless, and as noted, after acknowledging the gravity of these controversies, the Committee members approached this investigation without regard to the research topics at hand. Instead, the Committee members focused on the policies, regulations, contractual agreements, professional research ethics, and commonly accepted academic research practices in our determination of misconduct. Content matter aside, the focus of the Committee investigation was on the process, decisions, and acts that Dr. Pesta pursued in his research.

---

[5] American Psychological Association, APA Task Force on Race and Ethnicity Guidelines in Psychology. (2019). *Race and Ethnicity Guidelines in Psychology: Promoting Responsiveness and Equity*. Retrieved from https://www.apa.org/about/policy/guidelines-race-ethnicity.pdf

[6] American Psychological Association. (2003). Guidelines on multicultural education, training, research, practice, and organizational change for psychologists. *American Psychologist*, 58, 377–402. doi:10.1037/0003-066X.58.5.377

The Committee reviewed the allegations raised by the complainants, witness testimony, and additional evidence during the investigation to determine that there was clear and convincing evidence that the following instances of research misconduct occurred.

*Instance 1 of 4: Unauthorized Use of Controlled-Access Data*

Dr. Pesta violated the NIH DUC agreement (#19090, see Attachment 16) by using the dbGaP data to examine "intellectual ability" of subgroups of the U.S. population (see Lasker, Pesta, Fuerst, & Kirkegaard, 2019, "Global ancestry and cognitive ability," *Psych*, 1, 431-459) when the description of the research that Dr. Pesta submitted (and NIH approved) suggested that he would examine mental health outcomes. By doing so, Dr. Pesta violated the DUC agreement with NIH for use of the dataset, which seriously deviates from common research practices, and was done, at worst knowingly, and at best, recklessly.

Dr. Pesta violated the non-transferability terms with the NIH DUC agreement for dbGaP projects (#19090 & #19747 see Attachment 17) by uploading controlled data or derivatives of controlled data in the form of "coded" Single Nucleotide Polymorphisms (SNPs) to an unapproved foreign online forensic DNA phenotyping service. The uploading of these controlled data or derivatives seriously deviates from common research practices and was done knowingly. See interview transcripts with Dr. Pesta on 9-7-21 in Attachment 7  and 10-11-21 in Attachment 12. For example, Dr. Pesta commented "I admit that I did do that. I did upload data to that website." on 9-7-21, and "The one thing I did do is upload data to that server without getting permission and I own that." on 10-11-21. Dr. Pesta's repeated defense that NIH would have authorized the use of this outside source because the authors of another study report using the same service is based on flawed logic and does not excuse his failure to report his intentions to NIH before the data were uploaded.

*Instance 2 of 4: Publishing without NIH Permission*

Dr. Pesta violated the agreement with NIH by publishing a research manuscript ("Genetics, ancestry, and intelligence among East Coast Hispanic and European Americans," posted 9-26-2020) using dbGaP data without permission. Co-author, J. Fuerst, asked NIH for publication permission on 2-4-20 which was denied on 2-5-20, and was followed with subsequent requests (by J. Fuerst) over the next week across different NIH offices noting that "analyses [of the dbGaP] were conducted in the spring/summer of 2019…wishing to confirm before submitting for publication." A version of this paper was then, as noted, published seven months later with Dr. Pesta as a co-author; Dr. Pesta has subsequently reported that he had his name removed from this publication. The publishing of this paper seriously deviates from common research practices and was done knowingly by Dr. Pesta, as evidenced in part by his action to remove his name from publication after the controversy and knowing he lacked permission to do so. See, for example, the interview transcript with Dr. Pesta from 10-11-21 in Attachment 12. Dr. Pesta responded: "I think the paper was submitted, and then I wanted to take my name off. So I don't think John - whatever John may have done or didn't do - he didn't stick my name on there, first author, without my knowledge."

*Instance 3 of 4: Failure to Receive IRB Approval*

Dr. Pesta violated the expectation for IRB approval for any research project that uses data in ways outside of an approved DUC agreement and data use permissions. It is known that NIH does not require university

IRB approval for their sharing of dbGaP data through a DUC agreement, as is indicated on the dbGaP web page for study phs000607 (information extracted from that web page is shown below):

Authorized Access

- **Data access provided by:** dbGaP Authorized Access
- **Release Date:** May 17, 2018
- **Embargo Release Date:** May 17, 2018
- Data Use Certification Requirements (DUC)
- **Public Posting of Genomic Summary Results:** Allowed
- **Use Restrictions**

| Consent group | Is IRB required? | Data Access Committee | Number of participants |
|---|---|---|---|
| General Research Use (NPU) @ | No | Joint Addiction, Aging, and Mental Health DAC (JAAMH-DAC@list.nih.gov ) | 9496 |

Here, however, Dr. Pesta did not notify the University's IRB before he uploaded controlled data or derivatives of controlled data in the form of "coded" Single Nucleotide Polymorphisms (SNPs) to an unapproved foreign online forensic DNA phenotyping service, violating NIH DUC agreements (#19090 & #19747). Dr. Pesta knowingly or recklessly seriously deviated from common research practices by not applying for University IRB approval for any data use that falls outside of granted permissions for the researcher and is no longer protected or covered by the NIH posted dbGaP data use policy. These acts posed potential risk of harm and should have received University IRB approval, and in particular when there are datasets that include information for participants who may need additional protections – in this case, minors. (See CSU's IRB for Human Subjects in Research at: https://www.csuohio.edu/sprs/irb.) As Dr. Lauer, NIH Deputy Director for Extramural Research, indicated in his letter dated May 27, 2021 to CSU's Office of Research, Dr. Pesta's "...violation potentially affected over 9,000 participants ages 8-21 represented in the dataset" and that Dr. Pesta's "... violations, taken together, constitute a serious violation of the DUC agreements … raises the potential for harm to the research participants, their families, and groups of which they may be members. This is contrary to the principles of the NIH Genomic Data Sharing (GDS) Policy."

*Instance 4 of 4: Unauthorized Research Funding*

Dr. Pesta seriously deviated from commonly accepted practices within the academic community for proposing, conducting, or reporting research by knowingly using funds from the Human Phenome Diversity Foundation, LLC (see 2019 Ohio 990 EZ tax form, Employer ID #84-2701983) to purchase a computer and pay for research assistant (J. Fuerst) transportation and meals without authorization or involvement with CSU's SPRS office (see 10-11-21 interview transcript with Dr. Pesta; and email from J. Fuerst to C. Faison, 8-23-21).

The use of funding for this research project was confirmed on the pre-print ("Funding for this project was provided by the Human Phenome Diversity Foundation") of a research manuscript by both Dr. Pesta and J. Fuerst ("Intelligence-associated Polygenic Scores Predict g, Independent of Ancestry, Parental Educational Levels, and Color among Hispanics in comparison to European, European-African, and African Americans"). It is common research practice for funds that support University researchers' efforts as employees of the institution do so through the SPRS office (see CSU's SPRS Policies and Procedures at: https://www.csuohio.edu/sprs/policies-and-procedures). By using funding from a personal 501(c)(3) for research purposes, including publishing with his CSU affiliation, without CSU's permission or knowledge seriously deviates from accepted practices.

**Ongoing Concerns**

*Concern 1 of 2: Possible Ohio Ethics Law Violation(s)*

Article 22.1(C) of the contract between CSU and the CSU Chapter of the American Association of University Professors (AAUP) states, *"... outside employment will not be undertaken which violates Ohio's ethics laws governing public employees."* Ohio Revised Code Section 2921.43 *"... prohibits a public official or employee from soliciting or accepting compensation from any source other than his or her public employer for the performance of his or her public duties."* It is recommended that any potential violation(s) of these Ohio ethics laws be pursued by appropriate stakeholders in relation to the establishment and use of the Human Phenome Diversity Foundation, LLC, funds by Dr. Pesta in furtherance of his public employment.

*Concern 2 of 2: Ongoing Research Team Efforts*

Dr. Pesta has been working with a research team since approximately 2016, which includes a former CSU student, J. Fuerst. Some of this team's efforts have been found to violate significant NIH data use policies and other areas as described above. These research endeavors reportedly continue, for example, with the Adolescent Brain Cognitive Development data from the National Institute of Mental Health and use of national and state level data for other research projects. This shows a concerning pattern of collaborating with J. Fuerst (et al.) even when evidence to the contrary might dissuade more objective researchers from doing so (see 9-27-21 & 10-11-21 interview transcripts whereby Dr. Pesta thought J. Fuerst "may be going rogue;" "maybe John stole the [dbGaP] data;" "I think John has an agenda."). With respect to the Adolescent Brain Cognitive Development data, for example, these data were requested by Dr. Pesta, but subsequently led to publications in which he is no longer listed as an author. Consequently, the only authors on the papers are those who did not have approved access to the data.

Dr. Pesta has knowingly collaborated with other individuals who have a track record for irresponsible use of data, including Emil Kirkegaard[7]. In fact, Dr. Pesta listed Mr. Kirkegaard as a member of "Bryan J Pesta's Lab Institution: Cleveland State University Department of Management" on ResearchGate, giving the appearance that Mr. Kirkegaard was affiliated with CSU when that was never the case. To be clear, Mr. Kirkegaard's conduct was not part of this investigation. Dr. Pesta's conduct with respect to academic research, however, was central to the investigation.

In addition, the ongoing use of outside funding through the Human Phenome Diversity Foundation, opaque fundraising for this Foundation, lack of clarity around where dbGaP data were - or may still be - stored (and discrepancies between what was indicated in the data access request and reported to CSU - and where the data ended up being stored), and other potential related problems raise concerns and contribute to an overall pattern of concerning behavior when reviewed objectively by the Committee members. Clearly, the facts are that Dr. Pesta's last five years of research and scholarship have led to serious problems and potential consequences - NIH suspension of data access for three years and denial of any further appeals, and this ongoing CSU Office of Research internal investigation.

### C. Findings of Research Misconduct or No Research Misconduct

The Committee found clear and convincing evidence that Dr. Pesta committed serious academic research misconduct in the following four distinct areas:

1. Unauthorized use of National Institutes of Health (NIH) controlled-access data from the database of Genotypes and Phenotypes (dbGaP);
2. Publishing research findings despite NIH explicitly stating that Dr. Pesta and his colleagues did not have approval to do so;
3. Failure to receive IRB approval for use of NIH data that went beyond what was outlined in a Data Use Certification (DUC) Agreement; and
4. Unauthorized research funding for Cleveland State University (CSU) research efforts without CSU approval (e.g., by College Dean or Sponsored Programs and Research Services).

There are also two remaining areas of concern that are beyond the scope of this Committee but may need further review:

1. Possible Ohio ethics law violation(s) as a public employee with respect to Dr. Pesta's use of Human Phenome Diversity Foundation, LLC, funds; and
2. Ongoing work with research team members who may be violating data use certification (DUC) agreements and NIH research regulations.

_____

[7] See https://journals.sagepub.com/doi/full/10.1177/2056305118768300 regarding a study in which Kirkegaard publicly released data he had scraped from the OkCupid site.

**V. Institutional Administrative Actions.**

Deciding Official's Determination:

Please see the decision letter from Provost Bloomberg dated January 13, 2022.

CONFIDENTIAL

**VI. Attachments**

**List of Attachments**

1.  Charge to the Investigation Committee ................................................................ 12

2.  Allegations Raised by Graduate Researchers Carlson, Townsend, Bird, and Keyes .............................. 14

3.  Allegations and Determination by NIH Regarding Violation of Data Use Agreement ........................... 16

4.  Follow Up Letter from NIH Denying Dr. Pesta's Appeal of May 27 Letter ............................ 20

5.  Complaint Received from UCLA Lundquist Center (Dr. Kent Taylor) ...................................... 24

6.  Opening Statement from Dr. Pesta Prior to Interview on 9/7/2021 ...................................... 26

7.  Interview Transcript  – Respondent Bryan Pesta, 09/07/2021 .............................................. 27

8.  Interview Transcript – Complainants Bird, Carlson, and Townsend, 9/30/2021 ................................... 52

9.  Email from Dr. Kent Taylor Addressing Committee's Initial Questions – 9/29/2021 ........................... 71

10.  Interview Transcript – Complainant Kent Taylor, 10/05/2021 ............................................ 73

11.  Respondent Comments Regarding Interviews with Bird et al. and Kent Taylor ............................... 85

12.  Interview Transcript  – Respondent Bryan Pesta, 10/11/2021 ............................................. 89

13.  Timeline of Data Access Requests for NIH-managed Data Sets ...................................... 131

14.  Respondent's Statement Regarding His Intelligence Research (9/4/2021) ...................................... 132

15.  Respondent's Statement Regarding Reporting for dbGaP Project #19090 (September 6, 2021) .... 134

16.  dbGaP Project #19090; Data Access Request #67931 ...................................................... 135

17.  dbGaP Project #19747; Data Access Request #73948 ...................................................... 141

18.  Human Phenome Diversity Foundation, LLC 2019 Ohio 990 EZ tax form ...................................... 145

19.  Reference to Human Phenome Diversity Foundation Funding Support ........................................ 151

20.  Respondent's Rebuttal to Draft Report ...................................................... 152

21.  Notice of Institutional Decision ...................................................... 163

1. *Charge to the Investigation Committee*



| | Office of Research |

TO:        Dr. Christopher Mallett
           Dr. Conor McLennan
           Dr. Wendy Regoeczi

FROM:      Benjamin Ward, Research Integrity Officer   *Benj J Ward*

DATE:      July 26, 2021

SUBJECT:   Investigation Committee Appointment and Charge


You have been appointed as members of the Investigation Committee to investigate allegations of academic research misconduct related to the research activities of Dr. Bryan J. Pesta (the "Respondent"), a professor in the Department of Management in Cleveland State University's Monte Ahuja College of Business. The allegations raised concerns that Dr. Pesta misused controlled data from the National Institutes of Health (NIH) database of Genotypes and Phenotypes (dbGaP), and that he specifically:

- Misrepresented his intended use of the dbGaP data
- Used the data to pursue unethical research activity
- Improperly allowed others access to controlled-access data

The specific allegations as received by CSU are found in Attachment 1, Attachment 2, and Attachment 3 to this document.

NIH has investigated whether any violations of its data use policies occurred, and determined that Dr. Pesta:

- Violated the data use certification (DUC) agreement for dbGaP project #19090 by using the data to examine "intellectual ability" when the description of the research that Dr. Pesta submitted suggested that he would examine mental health outcomes.
- Violated non-transferability terms for dbGaP projects #19090 and 19747 by uploading controlled data or derivatives of controlled data in the form of "coded" Single Nucleotide Polymorphisms (SNPs) to an unapproved online forensic DNA phenotyping service.
- Violated the DUC clause regarding research use reporting by not reporting the publication of Lasker J, Psych Aug. 2019, 1(1), 431-459; https://doi.org/10.3390/psych1010034 at the time of project renewal.

Dr. Pesta is currently appealing the NIH's determination.

This investigation is to be conducted pursuant to the University's Research Misconduct Policy, 3344-28-01 through 3344-28-10 of the Administrative Code (the "Policy"), The Policy defines Academic Research Misconduct as follows:

"Academic research misconduct," herein, sometimes referred to as "misconduct," means fabrication, falsification, plagiarism, undisclosed conflicts of interest as defined in the policy for

managing conflict of interest, or other practices that seriously deviate from those that are commonly accepted within the academic community for proposing, conducting, or reporting research. It does not include honest error or honest differences in interpretations or judgments of data.

The purpose of the investigation is to evaluate the evidence and testimony of the respondent, the complainants, and key witnesses to determine whether there is clear and convincing evidence that academic research misconduct occurred and, if so, to what extent, who was responsible, and its seriousness. The investigation also will determine whether there are additional instances of possible academic research misconduct that would justify broadening the scope beyond the initial allegations.

The Investigation Committee is advised that in order to determine that the respondent committed research misconduct it must find that a preponderance of the evidence establishes that:

> (1) research misconduct, as defined in the Policy, occurred (respondent has the burden of proving by a preponderance of the evidence any affirmative defenses raised, including honest error or a difference of opinion);

> (2) the research misconduct is a significant departure from accepted practices of the relevant research community; and

> (3) the respondent committed the research misconduct intentionally, knowingly, or recklessly. The committee must prepare or direct the preparation of a written investigation report that meets the requirements of the Policy.

The investigation committee and the Research Integrity Officer (RIO) must:

- Use diligent efforts to ensure that the investigation is thorough and sufficiently documented and includes examination of all research records and evidence relevant to reaching a decision on the merits of each allegation;
- Take reasonable steps to ensure an impartial and unbiased investigation to the maximum extent practical;
- Examine all documentation including, but not necessarily limited to, relevant research data materials, proposals, publications, correspondence, memoranda, and notes of telephone calls. Whenever possible, interviews should be conducted of all individuals involved either in making the allegation or against whom the allegation is made, as well as other individuals who might have information regarding; and
- Pursue diligently all significant issues and leads discovered that are determined relevant to the investigation, including any evidence of any additional instances of possible research misconduct, and continue the investigation to completion.

Pursuant to the Policy, the Investigation Committee is expected to complete the investigation within 120 days of initiation. As the acting RIO, I will convene the first meeting of the Investigation Committee to review this charge letter and the prescribed procedures and standards for the conduct of the investigation.

I appreciate your willingness to serve on the Investigation Committee and undertake this important work, and my office will be available to assist and advise you in the completion of your investigative tasks.

2. *Allegations Raised by Graduate Researchers Carlson, Townsend, Bird, and Keyes*

To whom it may concern,

Recently, Lasker et al. (2019) ( https://www.mdpi.com/2624-8611/1/1/34/htm ) published a study that included a re-analysis of dbGaP data (Study Accession: phs000607.v3.p2). This dataset includes genotypes and phenotype data (consisting primarily of cognitive traits, neuropsychiatric phenotypes, and neuroimaging data) from 9,496 youths aged 8-21 years. We have several concerns with the authors' analysis of this dataset and have catalogued multiple discrepancies between the study as published and the Data Access Request (DAR) by which the authors gained access to this dataset, namely:

1. Certain analyses performed by Lasker et al. are incongruent with the goals and proposed analyses stated in the associated DAR.

2. Two authors of Lasker et al. that were directly responsible for data analysis were not affiliated with the requesting institution and do not appear to have gone through proper channels to gain authorized access to this dbGaP dataset. These individuals do not appear to possess credentials commensurate with status as a Principal Investigator at their listed institutions.

3. The authors imputed personally identifiable information (eye color, skin color, hair color, and sibling status) about samples, apparently without IRB approval, and imputed genotype information that could further contribute to the identifiability of study samples.

4. The authors performed this phenotypic imputation by uploading genotypes to a foreign website, potentially constituting an additional breach of data permissions and security.

5. The authors included samples with ambiguous self-identified ethnicity, despite stating that they would only analyze individuals who self-identified non-ambiguously as White or African-American ethnicity.

6. One author (who is not affiliated with the requesting institution) has stated elsewhere that

he holds an affiliation with a company in the private sector. This affiliation was not disclosed in the published paper, nor does it appear to have been disclosed in the DAR, potentially indicating a conflict of interest.

While these matters are serious in any context, they are particularly worrisome because the majority of human subjects used in the original study performed by Gur et al., (2012) were consented by their parents as children (mean age ~14.8 years old) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3295891/ ; see also https://www.ncbi.nlm.nih.gov/projects/gap/cgi-bin/study.cgi?study_id=phs000607.v3.p2&phv=37 5707&phd=5001&pha=&pht=3445&phvf=&phdf=&phaf=&phtf=&dssp=1&consent=&temp=1 ).

Given that this study involves extremely sensitive phenotypic information about ethnicity, cognitive ability, mental health, and educational attainment, we are deeply concerned about the potential negative impacts for the human subjects involved who were consented as children, as well as the potential for misuse of other dbGaP data by these researchers.

Details about each of our concerns are outlined in the attached document. For reference, this document also includes an appendix containing the Research Use Statement of the DAR that was submitted by the corresponding author of the study, Bryan Pesta (Cleveland State University).

We have reviewed the list of past policy violations at https://osp.od.nih.gov/wp-content/uploads/DMI_Table_No_PII_9_5_18.pdf and note that the scope of the potential violations by Lasker et al. may be unprecedented in both number and severity. Moreover, if Lasker et al. are found to have committed one or more policy violations, it

would appear to be the first instance in which these were discovered *after* a manuscript was submitted, passed peer review, and was published. We therefore advise that it may be necessary to involve the editorial board of the journal *Psych* in subsequent discussions.

Thank you for your attention regarding this matter. Please do not hesitate to contact us if you require any further information or clarification about these concerns.

Sincerely,
Jedidiah Carlson, PhD
Postdoctoral Fellow
Department of Genome Sciences
University of Washington

Cathryn Townsend, PhD
Postdoctoral Fellow
Department of Anthropology
Baylor University

Kevin Bird
NSF Predoctoral Fellow
Department of Horticulture
Ecology, Evolutionary Biology, and Behavior Program
Michigan State University

Os Keyes
Ada Lovelace Fellow
Data Ecologies Laboratory
Department of Human Centered Design & Engineering
University of Washington

*3.  Allegations and Determination by NIH Regarding Violation of Data Use Agreement*

CONFIDENTIAL  p.1

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**    Public Health Service

National Institutes of Health
Bethesda, Maryland 20892

| | |
|---|---|
| **DATE:** | May 27, 2021 |
| **TO:** | Forrrest Faison III, MD, ScD<br>Senior Vice President for Research and Innovation<br>c.faison@csuohio.edu |
| | Roman Kondratov, PhD<br>Associate Vice President for Research<br>r.kondratov@csuohio.edu |
| **FROM:** | Michael Lauer, MD<br>NIH Deputy Director for Extramural Research<br>Director, NIH Office of Extramural Research<br>Michael.Lauer@nih.gov |
| **SUBJECT:** | UPDATE: Data Management Incident |

Dear Drs. Faison III and Kondratov:

I am writing on behalf of the National Institutes of Health (NIH) to notify you that an investigator associated with Cleveland State University (CSU), Dr. Bryan Pesta, is in violation of the Data Use Certification agreement he signed when obtaining access to controlled access data from NIH.  The Data Use Certification agreement, co-signed by Dr. Pesta and the Signing Official, Ms. Lisa Franklin, specifies the conditions for the secondary research use of controlled access data.

Dr. Pesta was approved by CSU and NIH to receive controlled access genomic data from NIH's database of Genotypes and Phenotypes (dbGaP) to carry out research described in dbGaP Projects #18007, 19090, and 19747. In submitting the project requests to NIH, Dr. Pesta—as the Approved User—and CSU agreed to follow terms and conditions for the responsible management and use of genomic and associated phenotypic data from dbGaP described in the Data Use Certification (DUC) agreement, (https://osp.od.nih.gov/wp-content/uploads/Model_DUC.pdf), the Genomic Data User Code of Conduct (https://osp.od.nih.gov/wp-content/uploads/Genomic_Data_User_Code_of_Conduct.pdf), and the Security Best Practices for Controlled Access Data Subject to the GDS Policy (https://osp.od.nih.gov/wp-content/uploads/NIH_Best_Practices_for_Controlled-Access_Data_Subject_to_the_NIH_GDS_Policy.pdf) for protecting the data. Please note, during the course of Dr. Pesta's research, NIH updated the DUC agreement in March 2019 that Dr. Pesta and CSU co-signed to continue research. Throughout the document, DUC agreement terms will specify the 2012 and 2019 DUC agreements.

In September 2019, NIH learned about potential violations of the terms described in the DUC agreements governing the management and use of genomic data from the "Neurodevelopmental

CONFIDENTIAL  p.2

Genomics: Trajectories of Complex Phenotypes Study" (phs000607) associated with dbGaP Projects #18007, 19090, and 19747. NIH also learned of a publication co-authored by Dr. Pesta (Lasker J. et al. *Psych* **2019**, *1*(1), 431-459), citing use of the phs000607 dataset inconsistent with the Approved User's Research Use Statements (RUS) posted publicly on the phs000607 dbGaP webpage (https://www.ncbi.nlm.nih.gov/projects/gap/cgi-bin/study.cgi?study_id=phs000607.v3.p2; Authorized Data Access Requests tab, page 18). Additionally, Dr. Pesta did not report this publication in project progress reports. For example, the publication was not reported in the September 2019 project #19090 progress report nor in the December 2019 project #19747 progress report submitted to NIH. Not reporting this publication violated Term 9 of the 2012 DUC agreement and Term 11 of the 2019 DUC agreement. However, the publication was eventually reported in project #19747 when Dr. Pesta initiated the close out report in February 2021. On February 12, 2021, Dr. Pesta informed NIH that CSU legal needed to approve the close out report and that he had not heard from them. The project is not closed out until the Signing Official submits the close out report to NIH. To date, NIH has not officially received the close out report for project #19747.

NIH contacted CSU and Dr. Pesta via email on September 19, 2019, to request additional information related to the use of data from phs000607 in light of the potential violations of the terms described in the DUC agreements and to notify Dr. Pesta and CSU that access for work related to this dataset was suspended.  NIH requested a response from both Dr. Pesta and CSU's Signing Official confirming receipt of the email and a remediation plan.  Ms. MaryTherese Kocevar, the Director, Sponsored Programs & Research Services at CSU confirmed receipt on September 19, 2019. However, only Dr. Pesta responded on September 20, 2019, and no response was received from a Signing Official at CSU.  However, Ms. Kocevar, later corresponded with NIH to learn whether the matter was closed so a new request could be sent to NIH for consideration. NIH responded that the matter was still under review.

NIH subsequently conducted a review of these potential violations, reviewing relevant materials including additional information received from Dr. Pesta in Projects #19090 and 19747 close-out progress updates that cited pre-print manuscripts. NIH has determined that the Approved User violated the DUC agreements, the principles of management and use of large-scale genomic data and associated phenotypic data outlined in the Genomic Data User Code of Conduct (terms 1, 3, and 4), and the Security Best Practices for Controlled Access Data Subject to the GDS Policy. Specific findings are detailed below.

<u>Summary of NIH Findings of Violations</u>

    **1. Violation of DUC agreements (2012,2019), Term 1:** The Approved User's project #19090 RUS stated, "I will employ admixture analysis to determine if global ancestry predicts mental health outcomes." The pre-print reported by the Approved User upon project close out (Pesta B. Intelligence-associated Polygenic Scores Predict g, Independent of Ancestry, Parental Educational Levels, and Color among Hispanics in comparison to European, European- African, and African Americans. https://doi.org/10.1101/2020.09.24.312074) described "intellectual ability," as stated in the close-out summary. The Approved User also noted that they "examined the relation between polygenic sores for intelligence/education (eduPGDS) and general cognitive ability." The RUS's description of the research suggested an examination of health outcomes, specifically, mental health outcomes, not purported conclusions about intellectual ability based on neurocognitive function. This research, noted in the project close-out progress update and the reported pre-print manuscript, was not described in the Project #19090 RUS. This is a violation of Term 1 of the DUC agreements, "…research use will occur solely in connection with the approved research project described."

CONFIDENTIAL  p.3

2. **Violation of DUC agreements non-transferability (2012, Term 5)(2019, Terms 6 and 7), Genomic Data User Code of Conduct, Security Best Practices for Controlled Access Data Subject to the GDS policy:** In Projects #19090 and 19747 close-out progress updates, the Approved User reported pre-prints (https://www.biorxiv.org/content/10.1101/2020.09.24.312074v2 and https://www.biorxiv.org/content/10.1101/2020.09.24.312074v1.full) describing use of an unapproved online forensic DNA phenotyping service. The service requires the user to upload, through the internet, "coded" versions of 41 Single Nucleotide Polymorphisms (SNPs) (0,1, or 2 to denote SNP allele not present, one copy present, two copies present, respectively) to enable the software service to predict participant phenotypes. Sharing controlled access data with an unauthorized entity violates the non-transferability term in the DUC agreement and violates the Genomic Data User Code of Conduct (terms 1, 3, and 4) and the Security Best Practices for Controlled Access Data Subject to the GDS Policy. This violation potentially affected over 9,000 participants ages 8-21 represented in the dataset.

3. **Violation of DUC agreements research use reporting (2012, Term 9)(2019, Term 11):** The Approved User's research culminated in a publication (Lasker J, Psych Aug. 2019, 1(1), 431-459; https://doi.org/10.3390/psych1010034) that was not reported at the time of project renewals.

These violations, taken together, constitute a serious violation of the DUC agreements. Furthermore, the use of the data described in the publication and pre-prints arising from these projects  raises the potential for harm to the research participants, their families, and groups of which they may be members. This use is contrary to the principles of the NIH Genomic Data Sharing (GDS) Policy.

NIH takes the stewardship of genomic data and the protection of human research participants' interests very seriously, and all Approved Users and their institutions must adhere to the terms of the DUC agreement. This incident causes NIH to be concerned about whether CSU staff have been properly guided and trained in how to responsibly handle scientific data and how to adhere to terms and conditions agreed to when accessing controlled access data.

As explained in DUC agreements (2012, Term 11)(2019, Term 8), NIH may revoke or suspend access to all controlled access datasets if a researcher violates the DUC agreement. After careful consideration, and in light of the serious violations described above, NIH has determined that Dr. Pesta's access to data from dbGaP will be revoked immediately, that he will be ineligible to submit any further requests for three years, and that he is ineligible to be an authorized user on any requests submitted by other investigators, until May 27, 2024. Any further requests submitted after that date from Dr. Pesta will be reviewed to determine whether appropriate controls for the protection of data are in place.

Actions Requested

NIH requests CSU take the following actions by June 27, 2021:

1) Pursuant to data close out and destruction expectations in the DUC agreements (2012, Term 11)(2019, Term 13), and in collaboration with the appropriate institutional officials and the IT Director denoted on the Approved User's Project applications, ensure that the Approved User closes out all open Projects (#19747 and 21243) in dbGaP and **immediately destroys all data and derivatives of the data** (e.g., SNPs, even if imputed) in a manner consistent with the DUC

CONFIDENTIAL p.4

agreements and the Security Best Practices for Controlled Access Data. Please provide NIH with a written, signed letter confirming the date that all data and their derivatives were destroyed.

2) Contact the online forensic DNA phenotyping service to determine (1) whether the data were stored and if so, what is the plan to destroy all data and derivatives of the data within the system; and (2) obtain details from the company on whether data were shared or stored with any additional servers, companies or systems. Please provide a summary of the information received and any actions to be taken.

3) Provide an update on all actions that CSU has taken to-date to address the inappropriate use of the controlled access data, and what measures CSU will put in place to prevent such violations going forward. Describe what steps you currently take to train your staff in the responsible handling of scientific data and what further actions you are planning in light of this incident.

If you disagree with the findings in this letter or the actions requested, you may provide a response to these findings within this same timeframe for NIH's consideration. All correspondence should be sent to me and to the GDS mailbox (GDS@mail.nih.gov).

Thank you for your prompt attention to this matter.

Sincerely,

Michael S. Lauer -S    Digitally signed by Michael S.
                        Lauer -S
                        Date: 2021.05.27 18:17:45 -04'00'

Michael S. Lauer, MD
NIH Deputy Director for Extramural Research
Director, NIH Office of Extramural Research

Attachments: Sept 2019 email exchange between NIH and the PI, Projects 19090 and 19747, 2012 and 2019 Data Use Certification agreement

4. *Follow Up Letter from NIH Denying Dr. Pesta's Appeal of May 27 Letter*

 **NIH** National Institutes of Health
Office of Extramural Research

**DATE:** August 17, 2021

**TO:** Bryan Pesta, Ph.D.
Professor, Cleveland State University
b.pesta@csuohio.edu

**FROM:** Michael Lauer, MD
NIH Deputy Director for Extramural Research
Director, NIH Office of Extramural Research
Michael.Lauer@nih.gov

**SUBJECT:** UPDATE: Data Management Incident

Dr. Pesta,

I am writing on behalf of the National Institutes of Health (NIH) to follow up on your July 11, 2021 request to appeal NIH's decision to suspend access. NIH has reviewed your request and our findings are described below. Based on our assessment, NIH is denying your appeal.

**1. Violation of Data Use Certification (DUC) agreements (2012,2019), Term 1**

In Term 1 of the DUC agreements, you agreed that "research use will occur solely in connection with the approved research project described in the [Data Access Request] DAR." Your self-reported description of your research and the pre-print described in your close-out report relate to conclusions about intellectual ability based on neurocognitive function, which was not described in your approved Research Use Statement (RUS) for project #19090. As stated in our May 27 letter, your RUS for project #19090 stated, "I will employ admixture analysis to determine if global ancestry predicts mental health outcomes."

In your close out report for project #19090, you self-reported:

- "For this DUC (#19090), we set out to conduct two main analyses. First, we examined the relation between polygenic scores for intelligence/education (eduPGS) and general cognitive ability. The ultimate goal is to see if eduPGS can help identify and understand intellectual handicaps."

In your close out report for project #19090, you also self-reported the following pre-print:

- Pesta B. Intelligence-associated Polygenic Scores Predict g, Independent of Ancestry, Parental Educational Levels, and Color among Hispanics in comparison to European, European- African, and African Americans. https://doi.org/10.1101/2020.09.24.312074.

Page 1



**National Institutes of Health**
Office of Extramural Research

The research you described in your close out report for project #19090 is inconsistent with the approved RUS for project #19090, which is a violation of the DUC, regardless of what was proposed in other research projects.  Moreover, your close out report for project #18007 states "I have not worked on this project," and your December 2019 progress report for project #19747 does not list the pre-print as resulting from the project.  <u>Accordingly, NIH sustains this violation.</u>

**2. Violation of DUC agreements non-transferability (2012, Term 5)(2019, Terms 6 and 7), Genomic Data User Code of Conduct, Security Best Practices for Controlled Access Data Subject to the GDS policy**

Sharing controlled access data with an unauthorized entity violates (1) the non-transferability term in the DUC agreement, (2) the Genomic Data User Code of Conduct (terms 1, 3, and 4), and (3) the Security Best Practices for Controlled Access Data Subject to the GDS Policy. As stated in our May 27 letter, you used an unapproved online forensic DNA phenotyping service that requires users to upload, through the internet, "coded" versions of 41 Single Nucleotide Polymorphisms (SNPs) (0,1, or 2 to denote SNP allele not present, one copy present, two copies present, respectively) to enable the software service to predict participant phenotypes.

You do not dispute that you used this service, that it required you to share data with an unauthorized entity, or that you did not disclose this use to NIH. Use of such a service should have been disclosed to NIH so that NIH could evaluate whether its use was appropriate. <u>Accordingly, NIH sustains this violation.</u>

**3. Violation of DUC agreements research use reporting (2012, Term 9)(2019, Term 11):**

The DUC requires you to submit annual reports that provide specific information on how the data have been used, including publications or presentations that resulted from the use of the requested dataset(s) and a summary of any plans for future research use, among other things. As explained in our May 27 letter, you did not report a publication in your progress reports, which is required by the DUC.

In response, you state that you submitted your progress report for project #19090 on August 29, 2019, but your paper was not published until August 30, 2019.  However, the publication itself states that it was received on June 8, 2019, revised on August 26, 2019, and accepted for publication on August 28, 2019.  Accordingly, it should have been reporting on your August 29, 2019 progress report.  Moreover, it was similarly omitted from your December 2019 progress report for project #19747. <u>Accordingly, NIH sustains this violation.</u>

Page 2

 National Institutes of Health
Office of Extramural Research

**4. Additional violations uncovered during our review**

During our consideration of this matter, we learned that your former student, John Fuerst, received a copy of the data under your supervision. According to Forrest Faison, Senior Vice President, Research and Innovation, CSU,

> CSU also directly instructed Mr. John Fuerst, who was listed as an authorized user for Dr. Pesta's dbGaP projects, to provide CSU with a statement certifying that he also has deleted any NIH dbGaP data that he accessed or derivatives he generated. He has acknowledged receipt of this guidance. As of the date and time of this correspondence to you, CSU has not received such a statement from Mr. Fuerst. To this end, we have no choice but to consider him knowingly and willfully non-compliant with the NIH directive regarding deletion of all dbGaP data and derivatives. He is no longer affiliated with CSU.

This raises additional, serious violations of the DUC. As the DUC states, "the Requester agrees that if access is approved, the PI named in the DAR and those named in the 'Senior/Key Person Profile' section of the DAR and any trainee, employee, or contractor working on the proposed research project under the direct oversight of these individuals, shall become Approved Users of the requested dataset(s)" and are expected to abide by the terms laid out in the DUC agreement. Additionally, as the PI, you are responsible for ensuring compliance with the DUC. That Mr. Fuerst is no longer affiliated with CSU yet retains a copy of the data and refuses to destroy it constitutes several violations of the DUC. First, as Mr. Fuerst is no longer under your direct supervision, he is no longer an Approved User of the data and would need to submit his own DAR to access the data. Second, an unapproved user with a copy of the data constitutes a serious breach of data security that should have been reported to NIH within 24 hours pursuant to Term 7 of the DUC. No such report was received. Finally, data is required to be destroyed upon project close-out and Mr. Fuerst refuses to do so.

During the course of our review, Mr. Fuerst independently reached out to NIH on July 1, 2021 objecting to the request to destroy the data. Mr. Fuerst also stated that he has had manuscripts accepted for publication based on analyses of NIH controlled access data, however, as of this letter, no such publications have been reported to NIH.

**Conclusion**

NIH takes the stewardship of genomic data and the protection of human research participants' interests very seriously, and all Approved Users and their institutions must adhere to the terms of the DUC agreement. Each of the violations described above, on its own, is a serious violation of the DUC and could result in a suspension of access to controlled access datasets.

Page 3

 **NIH** National Institutes of Health
Office of Extramural Research

NIH affirms its initial decision to revoke your access to dbGaP, and given the serious additional violations uncovered during our review, you are ineligible to submit any further requests to access or use controlled access data from any NIH repository for a period of three years, and you are ineligible to be an authorized user on any requests submitted by other investigators for the same period.  This period of ineligibility will expire on May 27, 2024.  Any further requests submitted after that date will be reviewed to determine whether appropriate controls for the protection of data are in place.

Further, given the serious additional violations uncovered during our review regarding the failure to confirm destruction of data held by Mr. Fuerst, NIH finds you in continued non-compliance with expectations of the DUC agreements and the Security Best Practices for Controlled Access Data, and therefore your access will remain revoked and you will remain ineligible to submit any further requests to any NIH repository, effective immediately, until the appropriate institutional officials and the IT Director at CSU confirm destruction of the data in Mr. Fuerst's possession or until May 27, 2024, whichever is later.

Sincerely,

Lauer, Michael (NIH/OD) [E]  Digitally signed by Lauer, Michael (NIH-OD) [E]
Date: 2021.08.17 05:53:06 -04'00'



Michael S. Lauer, MD
NIH Deputy Director for Extramural Research
Director, NIH Office of Extramural Research

Page 4

5.   *Complaint Received from UCLA Lundquist Center (Dr. Kent Taylor)*

---

**From:** President Sands <president.sands@csuohio.edu>
**Date:** Thursday, April 8, 2021 at 1:02 PM
**To:** Clinton F Faison <c.faison@csuohio.edu>, Jianping Zhu <j.zhu94@csuohio.edu>
**Cc:** Jeanell N Hughes <j.hughes20@csuohio.edu>
**Subject:** Fwd: Abuse of data from the National Institutes of Health

Please follow up as appropriate. Thanks.

Harlan M. Sands, J.D., M.B.A.
President
Cleveland State University

Begin forwarded message:

> **From:** "Taylor, Kent" <ktaylor@lundquist.org>
> **Date:** April 6, 2021 at 6:50:52 PM EDT
> **To:** President Sands <president.sands@csuohio.edu>
> **Cc:** "Rotter, Jerome" <jrotter@lundquist.org>, "Roll, Kathryn" <kroll@lundquist.org>
> **Subject: Abuse of data from the National Institutes of Health**
>
> CAUTION: This email originated from outside of Cleveland State University! Do not click links,
> open attachments or reply, unless you recognize the sender's email address and know the
> content is safe!



Dear Dr. Harlan M. Sands
President, Cleveland State University

Dear Dr. Sands,
It has come to my attention that an analysis of NIH data was published in 2019
with two co-authors that list affiliation on the paper from your institution, Bryan
J. Pesta, and John G. R. Fuerst.
The paper is "Global ancestry and cognitive ability," Psych 2019, 1, 431-459;
doi:10.3390/psych1010034
The authors offered the conclusion that, "Results converge on genetics as a
potential partial explanation for group mean differences in intelligence." Use of
NIH data for studies of racial differences in this way is both a violation of the data
use agreement and unethical. I am interested in knowing how this data abuse
occurred; in particular, I am wanting to know who signed off on the data access
request to the NIH and where Human Subjects review occurred by a qualified
institutional review board.

As a genomic research investigator I am shocked that data we work so hard to
collect on behalf of the NIH is used in this way in violation of data use

agreements and I would appreciate your help in locating the persons responsible.

Thank you for your attention and help

Kent Taylor
Professor, Pediatrics, UCLA School of Medicine

The Lundquist Institute Warning: This email (and any attachments) is intended for the use of the person to which it is addressed. It may contain information that is privileged and confidential. As the recipient, you are obligated to maintain it in a safe, secure and confidential manner. Unauthorized disclosure or failure to maintain confidentiality may subject you to governmental penalties. Should you not be the intended recipient, please notify us by return email, and delete this message from your computer at once.

6.  *Opening Statement from Dr. Pesta Prior to Interview on 9/7/2021*

## Opening Statement

I want to first apologize for the trouble I got CSU into with the NIH. This was not my intent.

All the present allegations stem from my collaboration with a student research assistant named John Fuerst. I knew of John prior to our collaboration because we published in the same subdisciplines. As it turns out, John was also local to Cleveland, and so we met for lunch back in 2017.

John proposed a potential collaboration using NIH genetic data to study race/ethnicity and IQ. I agreed, conditioned upon us looking at additional variables beyond just intelligence. My partial rationale was that I didn't want every line of my CV to be on this topic, plus I am generally interested in the genetics of other variables as well.

We later agreed on submitting three initial applications to the NIH, one on race and IQ, another on sex differences, for which I also have a published paper on, and one on mental health issues. All three applications were for the same data set, Trajectories of Complex Phenotypes (TCP).

The NIH approved all three applications for the same, TCP dataset.

Our first TCP publication was on race and IQ. This was the Lasker et al. paper mentioned throughout the correspondence here. Shortly thereafter, academics external to CSU objected to this paper and complained to both CSU and the NIH.

My perception is that the complaints, specifically, the one by Bird and colleagues, were fishing expeditions. For example, I counted 21 "bullet point" allegations against me in the Bird complaint. The NIH ultimately agreed with six of these allegations and sent us notice back in 2019.

We sent a detailed reply to the NIH back then, but they failed to respond. Moreover, the NIH kept approving our new renewals and applications for approximately two years, even after their 2019 complaint to us. Given this, we thought we were in good standing with the NIH. This was until they finally replied to our 2019 email, albeit in the spring of 2021.

Here, though, the NIH reduced its number of allegations from about six in 2019 to the three that remain presently.

This is where I think we stand today, unless the committee wants to pursue other issues raised in the Binder. For example, I recently sent you a statement covering why I am interested in doing this type of research, and I am happy to further discuss that or anything else with the committee.

Thank you for your time.

7.  *Interview Transcript – Respondent Bryan Pesta, 09/07/2021*

```
WEBVTT

1
00:01:23.310 --> 00:01:24.120
Bryan: Can you guys hear me.

2
00:01:27.090 --> 00:01:29.130
Christopher A Mallett: yeah how are you doing, can you guys hear me.

3
00:01:29.970 --> 00:01:30.600
Bryan: I can hear you.

4
00:01:31.650 --> 00:01:32.010
Christopher A Mallett: Bryan.

5
00:02:08.550 --> 00:02:11.130
Christopher A Mallett: An order it's been coming or not or no, you should
just.

6
00:02:11.610 --> 00:02:15.660
Jack N Kraszewski: Be on the hallway and he asked me if I was ready so i'd
have to be was ready.

7
00:02:17.040 --> 00:02:18.750
Christopher A Mallett: You guys ready to do intros then.

8
00:02:20.670 --> 00:02:21.000
Jack N Kraszewski: You know.

9
00:02:21.540 --> 00:02:24.540
Christopher A Mallett: Okay yeah we call them during this.

10
00:02:27.120 --> 00:02:28.260
Jack N Kraszewski: Now he's joining now.

11
00:02:30.630 --> 00:02:37.230
Benjamin J Ward: I apologize for that. The Zoom on my desktop decided today
was the day to update and then it disappeared on me.
```

12
00:02:39.480 --> 00:02:42.600
Thanks jack for getting this started.

13
00:02:42.840 --> 00:02:43.590
Jack N Kraszewski: Oh sure Ben.

14
00:02:45.690 --> 00:02:52.470
Benjamin J Ward: Alright, so this is a meeting of the investigation
committee for Dr Pesta and the data management incident.

15
00:02:54.180 --> 00:02:55.860
Benjamin J Ward: My role is just as the research integrity officer so i'm
here for process. Jack Kraszewski is also here serving as legal counsel for
the university if any legal questions come up.

17
00:03:06.540 --> 00:03:16.050
Benjamin J Ward: However, the interview committee is the investigation
committee so i'm going to turn it over to Dr. Regoeczi, Dr. McLennan, and
Dr Mallett to manage the discussion.

18
00:03:17.880 --> 00:03:20.430
Christopher A Mallett: Thanks Ben. Chris Malett here and again.

19
00:03:21.720 --> 00:03:24.390
Christopher A Mallett: As we do some intros, Bryan it's nice to meet you.

20
00:03:25.440 --> 00:03:25.830
Christopher A Mallett: Unfortunate that it's under these circumstances as a
colleague here at CSU, of about 400 of us or so, and not the way I would
want to meet at all.

23
00:03:38.520 --> 00:03:41.190
Christopher A Mallett: I guess Conor, Wendy, Jay?

24
00:03:43.740 --> 00:03:47.520
Jay Carson: Jay Carson. I'm Mr., or Dr. Pesta's attorney.

25
00:03:49.080 --> 00:04:02.790
Jay Carson: I am, again, I'm sort of like CSU's attorney here, just in case
I'm needed. I don't know that I will be and, hopefully, I won't be, but
nevertheless here just to take notes and if needed.

26
00:04:06.000 --> 00:04:09.780

Conor T McLennan: And can I.

27
00:04:09.780 --> 00:04:12.720
Jack N Kraszewski: I'm Jack Kraszewski, I'm actually the director of the
Technology Transfer Office here at CSU, but have been asked to assist the
general counsel's office with research related legal issues, so I like Jay
hopefully will not have to be too involved, other than some note taking but
I'm here as CSU's counsel as needed.

29
00:04:34.590 --> 00:04:35.970
Wendy C Regoeczi: Conor do you want to go next.

30
00:04:37.170 --> 00:04:45.630
Conor T McLennan: Sure. Connor McLennan, I'm the interim associate Dean in
the College of Sciences and Health Professions also professor in the
Department of Psychology.

31
00:04:47.640 --> 00:04:53.670
Wendy C Regoeczi: And I'm Wendy Regoeczi. I'm a professor of criminology
and Chair of the Department of Criminology Anthropology and Sociology.

32
00:04:56.370 --> 00:04:56.910
Christopher A Mallett:

33
00:04:58.050 --> 00:05:08.100
Christopher A Mallett: The kind of good news here is that we as an
investigation committee, fortunately, have not had to do this before.
That's the good news, unfortunately we've been asked to help out the office
of research here.

35
00:05:14.640 --> 00:05:18.180
Christopher A Mallett: And Bryan it looks like when we [*the investigation
committee*] got together a month ago, trying to get our heads around the
last couple of years and it did take us some time. And Ben and Jack were
very helpful understanding all the pieces to the puzzle and we finally got
there, which is good.

40
00:05:34.650 --> 00:05:48.270
Christopher A Mallett: But what we didn't get and we talked last week that
we haven't had a chance to hear your perspective, we have seen written
statements we have read all the documents in the shared drive that we all
have.

41
00:05:49.380 --> 00:06:01.350

Christopher A Mallett: And we've had a chance to you know be impacted by all of that, one way or the other, when we talked last week that we really wanted to opportunities to hear your perspective to hear your.

42
00:06:02.520 --> 00:06:07.620
Christopher A Mallett: Experience over last couple of years, we have a set of seven or eight questions that we'll get to.

43
00:06:09.450 --> 00:06:23.190
Christopher A Mallett: And then we thought from today, we will probably have additional conversations just because it's our first time together that we would plan, we were planning on getting together a second time with you, with everybody. I'm sure with follow up questions and thoughts so.

45
00:06:28.380 --> 00:06:33.150
Christopher A Mallett: I saw this morning, maybe I'll bump it to Ben, you had an opening statement. Is it appropriate to start there?

46
00:06:33.540 --> 00:06:38.460
Bryan: Yes, could we? I could share it. I prefer not to read it out loud, I think that would be not effective.

47
00:06:40.950 --> 00:06:42.870
Christopher A Mallett: I'm fine with that. Wendy, Connor?

48
00:06:44.760 --> 00:06:46.020
Conor T McLennan: Okay that's fine.

49
00:06:46.740 --> 00:06:48.480
Bryan: Okay, so I have it open on my screen.

50
00:06:56.220 --> 00:06:57.630
Bryan: I'll wait a minute and scroll down.

51
00:07:02.160 --> 00:07:03.330
Wendy C Regoeczi: I don't see anything.

52
00:07:03.750 --> 00:07:04.860
Bryan: yeah oh.

53
00:07:04.950 --> 00:07:05.880
I see it, yeah.

54

00:07:06.960 --> 00:07:10.050
Christopher A Mallett: I've got a copy. I'm reading it was emailed to us if you want us to read it that way.

55
00:07:10.320 --> 00:07:11.250
Bryan: That that works to.

56
00:07:11.970 --> 00:07:14.070
Benjamin J Ward: Screen sharing is enabled if you would like to share.

57
00:08:14.760 --> 00:08:15.570
Christopher A Mallett: Thank you for that Bryan.

58
00:08:16.740 --> 00:08:17.010
Bryan: Thank you.

59
00:08:17.130 --> 00:08:18.690
Christopher A Mallett: Give my colleagues, also, a chance to.

60
00:08:31.230 --> 00:08:31.680
Wendy Regoeczi: Okay.

61
00:08:35.280 --> 00:08:43.320
Christopher A Mallett: So I think I'll go ahead and just start with the first question, and these are broad questions for us with you, Bryan.

62
00:08:43.380 --> 00:08:44.040
Bryan: Sure.

63
00:08:44.160 --> 00:08:50.910
Christopher A Mallett: Could you please describe what has happened over the past few years, with your research and research team to get us here.

64
00:08:51.660 --> 00:08:58.440
Bryan: Okay, so I tried to do that in the opening statement, but it resulted from a collaboration with a student of mine named John Fuerst.

65
00:08:59.100 --> 00:09:16.500
Bryan: Well, first of all, we publish in rather controversial sub disciplines, and we both did together, so that's how I knew him or knew of him. But he was local to Cleveland so we met for lunch, I think it was back in 2017 and he proposed that we collaborate on genetic data.

66

00:09:17.700 --> 00:09:24.240
Bryan: On the topic of race and IQ and, as it says in the opening
statement, I agreed with him, but I wanted to also study other variables.

67
00:09:24.960 --> 00:09:34.830
Bryan: So I don't think it was that meeting, but ultimately we agreed to
submit three applications, one on sex differences, one on schizophrenia and
mental health, and one on IQ.

68
00:09:35.460 --> 00:09:48.780
Bryan: And the NIH approved all three of the applications, so we started
extracting the data and analyzing it, et cetera. The first thing we
produced from it was the Lasker paper that's mentioned several times
throughout the documents, the binder.

[*note: the binder refers to a pdf document containing documents provided to
the committee and shared with Dr. Pesta*]

69
00:09:50.490 --> 00:10:00.150
Bryan: Some people outside of CSU, some inside CSU too, but some people
outside of CSU - academics, postdocs - took offense to it and complained.

70
00:10:01.290 --> 00:10:05.850
Bryan: My understanding is a complaint, both to the NIH - well they did,
they complained to the NIH and to CSU.

71
00:10:07.170 --> 00:10:16.680
Bryan: But, as I say in the opening statement, I perceive it to be a
fishing expedition and I suspect, like Bird and his colleagues [*referring
to complaint letter sent by Jedidiah Carlson, Cathryn Townsend, Kevin Bird,
and Os Keyes*] their ultimate goal is to get the paper retracted.

72
00:10:17.250 --> 00:10:25.770
Bryan: Which at this point is fine with me, although I think I can defend
the actions that I took to produce it. So they complained, the NIH
investigated.

73
00:10:26.400 --> 00:10:36.030
Bryan: And I believe it was September 2019, they [*NIH*] sent me a fairly
long email saying you violated the agreement. Here are something like six
concerns we have.

74
00:10:36.660 --> 00:10:45.360
Bryan: You need to reply and address theses. And so I did, and, as you
probably know from reading the documents, the NIH never immediately
replied.

75
00:10:46.020 --> 00:10:57.720
Bryan: In fact it wasn't til about a year and a half later - in May of 21 I
think it was - that they replied, and in the meantime I kept renewing the
new applications renewals stuff like that.

76
00:10:58.260 --> 00:11:10.650
Bryan: So, after some time, John and I felt that we were in good standing
with the NIH because a) they didn't reply back and b) they kept renewing
our new stuff. But then it all exploded May 21st.

77
00:11:12.120 --> 00:11:28.410
Bryan: And I think that's why we're where we're at today. But in the may
21st - the May '21 email, they have a smaller set of allegations, so it
seems like, you know, throwing stuff at the wall to see what sticks. That's
what Bird did, and we're to the point where three are sticking.

[*Note – the email from NIH was dated May 27, 2021*]

78
00:11:31.680 --> 00:11:32.640
Christopher A Mallett: Bryan you mentioned.

79
00:11:33.660 --> 00:11:39.750
Christopher A Mallett: You work or publish in controversial sub
disciplines. I'm not familiar with your area at all.

80
00:11:40.080 --> 00:11:42.420
Bryan: Okay

Christopher A Mallett: Psychology? What do you mean by that.

81
00:11:43.080 --> 00:11:49.740
Bryan: So I focus on - some of my research streams focus on race
differences and intelligence.

82
00:11:50.910 --> 00:12:06.210
Bryan: So, and these go back about 100 years, during World War One we
learned that if you give standardized IQ tests to a bunch of people you'll
get ethnic score average differences. And so we've known that for 100 years
and people have been researching it to death, but no one knows why.

83
00:12:07.320 --> 00:12:11.520
Bryan: And now the field is turning to explore genetic possibilities and
that's what we did there.

84
00:12:15.120 --> 00:12:15.540

Christopher A Mallett: Thank you.

85
00:12:18.240 --> 00:12:29.250
Conor T McLennan: So, Bryan before I ask the next question here, I'm just
wondering if we could follow up from your response here, you said
retracting the paper would be okay with you at this point, can you explain
a little more why.

86
00:12:29.280 --> 00:12:40.200
Bryan: I'm just, i'm just frustrated. I feel I'm being attacked - some of
the fairly, some of it not - and I spent so much time and effort on this
that it's just ruining my research productivity.

87
00:12:41.520 --> 00:12:44.190
Bryan: So if this goes away by retracting it, I'd be happy to do that.

88
00:12:47.280 --> 00:12:55.410
Conor T McLennan: Okay, thank you. So the next question, do you believe
your handling of the data set is controversial, please explain.

89
00:12:56.010 --> 00:13:02.940
Bryan: Absolutely not, I believe, like to the best of my ability, I tried
to follow the NIH's policy and guidelines.

90
00:13:03.360 --> 00:13:12.720
Bryan: And when I reported stuff I - to the best of my ability - tried to
report exactly what they wanted. Nothing more, nothing less. I did not
share data with anyone not authorized to use it.

91
00:13:14.640 --> 00:13:25.740
Bryan: I do believe that the data I - the Lasker paper - is consistent with
the applications I produced. And the one problem that everyone stuck on is
it's the same data - TCP.

92
00:13:26.490 --> 00:13:39.570
Bryan: I had three applications for the same data, but I was screwed up and
I reported the Lasker paper in the one application that didn't mention
intelligence, and so I think a lot of the issues arise from that.

93
00:13:42.540 --> 00:13:47.280
Conor T McLennan: Okay, and can you just say how you've handled any
perceived controversy.

94
00:13:48.600 --> 00:13:50.520
Bryan: I'm not sure I understand the question, Conor.

95
00:13:52.680 --> 00:13:57.720
Conor T McLennan: Do you want to discuss the responses to both CSU and NIH
around it.

96
00:13:58.680 --> 00:14:07.290
Bryan: Yeah. I guess I how I handled it was to write detailed replies,
which in my mind rebutted the allegations that Bird and his colleagues
made.

97
00:14:11.280 --> 00:14:15.450
Christopher A Mallett: I'm trying to piece - going to go back a step, I'm
trying to piece together. One of the charges this summer, one the NIH
outstanding questions was, and help me, committee members, was that the
data set was shared with a private company.

100
00:14:30.030 --> 00:14:39.420
Bryan: No that - that frustrates me because one of my co-authors worked
somewhere, and I don't even know where he worked, but it had absolutely
nothing to do with these projects.

101
00:14:39.930 --> 00:14:47.850
Bryan: So I think that's an example of them going fishing, with throwing
stuff at the wall, because it was completely irrelevant to this paper to
this project.

102
00:14:49.770 --> 00:14:59.250
Benjamin J Ward: The statement from NIH was that some of this data,
potentially personally identifiable data, was uploaded to a third party
website.

103
00:14:59.730 --> 00:15:01.080
Bryan: That's a different issue.

104
00:15:01.380 --> 00:15:03.720
Bryan: Your question Christopher, I interpreted to be.

105
00:15:04.830 --> 00:15:12.120
Bryan: Well, I don't know, I thought the website uploading was a different
issue and I admit that I did do that. I did upload data to that website.

106
00:15:12.660 --> 00:15:15.390
Christopher A Mallett: Yeah, that was my question. I worded it poorly.

107

```
00:15:15.810 --> 00:15:18.690
Bryan: I'm sorry, so I did upload it to the data.
```

108
```
00:15:18.810 --> 00:15:29.610
```
Bryan: But I note a couple of things here, I did upload it to the website, but noting a couple of things here. First, the website's affiliated with the Federal Government, the National Institutes of Justice.

109
```
00:15:30.510 --> 00:15:40.710
```
Bryan: Second, what we uploaded in no way can identify human being, and third, the NIH approved this website for another set of researchers, independent of us.

110
```
00:15:48.330 --> 00:15:52.980
```
Christopher A Mallett: So, what part of that was the troubling part for NIH?

111
```
00:15:54.360 --> 00:16:02.700
```
Bryan: I think the NIH just - their contradicting. In my perception, and I could be wrong, but I think they contradict themselves in a few places.

112
```
00:16:03.030 --> 00:16:18.840
```
Bryan: But i'm not sure why they still think this is an issue with the website. And I apologize, I admit that I should have reported it in the first application, but it didn't occur to me. It was an oversight and I didn't realize that was an issue until what, two years later, when Bird complained?

113
```
00:16:34.110 --> 00:16:36.330
```
Wendy C Regoeczi: Are we ready for the third question or do either of you have more on what we're talking about?

115
```
00:16:39.660 --> 00:16:40.470
```
Christopher A Mallett: I just want to be clear.

116
```
00:16:42.210 --> 00:16:45.240
```
Christopher A Mallett: Where was it uploaded then? Bryan you mentioned, you did.

117
```
00:16:45.360 --> 00:16:45.630
```
Bryan:  Yeah. It's got a very strange-

118
```
00:16:47.070 --> 00:16:48.300
```
Christopher A Mallett: You did it without.

119
00:16:49.410 --> 00:16:53.610
Christopher A Mallett: In looking back you said you needed, you should have
gotten permission.

Bryan: Correct

120
00:16:54.480 --> 00:16:56.700
Christopher A Mallett: To do it, so you did it without.

Bryan: Right

121
00:16:57.060 --> 00:17:00.720
Christopher A Mallett: When we're talking about the upload, where did it go
then? You said it went to-

122
00:17:01.020 --> 00:17:03.570
Bryan: I can send you the link It is a very strange name.

123
00:17:04.230 --> 00:17:05.010
Bryan" Later today.

124
00:17:06.090 --> 00:17:20.880
Bryan: HR plex, something like that, but like I said I could send you the
website, but it's an application, I guess, that allows you to upload SNPs.
It will predict a person's skin color, eye color and hair color, but that's
all it predicts.

125
00:17:22.170 --> 00:17:24.000
Christopher A Mallett: Ben - do we have that in our documents?

126
00:17:24.480 --> 00:17:30.540
Benjamin J Ward: The website is called a HIrisPlex-S. It's located on a
Dutch website.
[*https://hirisplex.erasmusmc.nl*]

127
00:17:33.030 --> 00:17:36.840
Bryan: It does say it's funded by the Federal Government, the US federal
government.

128
00:17:40.380 --> 00:17:42.450
Christopher A Mallett: But it's not a federal, it's not a US [website].

Bryan: It is not

129

00:17:46.110 --> 00:17:47.490
Benjamin J Ward: There's a researcher at Indiana University Purdue
University Indianapolis who has affiliation with it - with that website.
[*Dr. Susan Walsh - https://walshlab.sitehost.iu.edu/*]

131
00:17:56.850 --> 00:17:58.830
Benjamin J Ward: But it is a foreign website.

132
00:18:00.090 --> 00:18:01.140
Bryan: I concede that point.

133
00:18:05.130 --> 00:18:07.350
Christopher A Mallett: Right and when did you know that shouldn't have been
done?

134
00:18:10.230 --> 00:18:13.140
Bryan: And the exact date is September 29 1919 [*2019*].

135
00:18:14.730 --> 00:18:17.880
Bryan: That's when I got the email from - the first email from the NIH.

136
00:18:20.310 --> 00:18:23.610
Christopher A Mallett: Did you know before then that it was - probably
needed permission.

137
00:18:23.760 --> 00:18:26.580
Bryan: No, because the focus of our paper was on the ancestry part of it
and we used that website to control for color. So it was secondary, and
honestly I - it just didn't occur to me when we were filling out the
application that we should include mention of that website.

139
00:18:44.580 --> 00:18:55.770
Conor T McLennan: So can I just jump in and ask Bryan why you think that
NIH originally expected that there was a problem with this website and then
upheld it on the review.

140
00:18:56.430 --> 00:19:08.100
Bryan: Honestly don't know because I thought - I mean, I made a mistake, I
don't think it's academic misconduct, but I admit that mistake. I don't
know why they still insisting that it's a serious violation.

141
00:19:09.300 --> 00:19:17.910
Bryan: But maybe it is a serious violation, but I didn't do it
intentionally. What would I have gained from not reporting the eye color
website in my applications?

142
00:19:30.630 --> 00:19:31.350
Christopher A Mallett: I'm OK. Wendy if you want to...

143
00:19:33.660 --> 00:19:34.020
Christopher A Mallett: If Conor is OK.

144
00:19:36.840 --> 00:19:44.280
Wendy C Regoeczi: Okay, so Bryan, why did NIH suspend your access to NIH
data sets for the next few years.

145
00:19:44.580 --> 00:20:00.990
Bryan: Well, in their mind and I, this is my perception, but maybe... I have
three serious violations, I appealed, and they denied my appeal. So the
next step is punishment. And their punishment was whatever it was - three
years of suspension for dbGaP.

146
00:20:14.280 --> 00:20:18.900
Christopher A Mallett: Let me jump in - and our next question is, what did
you do to safeguard the dbGaP data? And what was your team's process for
safeguarding it?

148
00:20:25.080 --> 00:20:39.480
Bryan: Okay I'm glad you asked that. Because initially, in the application
it said I was going to run it on a CSU computer and we started to do that.
I had a CSU laptop, my laptop. But it wasn't powerful enough to process the
data, so we bought a standalone desktop.

149
00:20:40.500 --> 00:20:55.530
Bryan: And the only thing on the hard drive there was dbGaP stuff. And we
ran the analyses and extracted the data and everything from there, but, at
the time it didn't have Internet access. I mean we had access on it
initially to download the data, then we took it off, and you know processed
the data.

150
00:20:58.950 --> 00:21:01.500
Christopher A Mallett: And were the documents - was that the hard drive at
your house?

151
00:21:01.590 --> 00:21:02.580
Christopher A Mallett: That you kept at your house?.

152
00:21:03.150 --> 00:21:03.450
Bryan: Right.

153
00:21:10.470 --> 00:21:20.190
Conor T McLennan: Okay, so this is related but, again, we want to hear from your perspective, Bryan. Under what circumstances is it acceptable for a researcher to save NIH data to a home computer.

154
00:21:21.660 --> 00:21:35.820
Bryan: I think it's perfectly acceptable, it was totally secure. The only way somebody would have got it is by breaking into my house and stealing it. There was no, it was not connected to the web, it was just sitting here behind my desk.

155
00:21:37.350 --> 00:21:37.980
Bryan: At my house.

156
00:21:39.840 --> 00:21:48.780
Bryan: Now I don't know what the NIH thinks about that and I wasn't, you know, I mean what would I gain from analyzing it at my house versus at CSU? It was just more convenient to do it here.

157
00:22:10.860 --> 00:22:18.510
Wendy C Regoeczi: Bryan, how have you and your research team handled any confidentiality or anonymity concerns surrounding the data set.

158
00:22:19.500 --> 00:22:20.340
Bryan: Okay, so.

159
00:22:21.570 --> 00:22:27.450
Bryan: We didn't share any genetic data. John and I had it, nobody else did. None of the other co-authors or anybody else had it.

160
00:22:28.710 --> 00:22:42.300
Bryan: None of the analyses we reported, we ran and reported, can identify anybody. And I think that does it. Because nothing I did puts the participants in those studies at risk of identification.

161
00:22:49.980 --> 00:23:03.630
Christopher A Mallett: Tangential sort of question. I know John has been in touch with the University for different reasons on the database. I think he said he was done talking university.

162
00:23:05.370 --> 00:23:06.720
Christopher A Mallett: Do you think he'd be willing to talk to the committee here?

164

00:23:08.790 --> 00:23:22.590
Bryan: Yeah so, I don't want to make it seem like John is the problem, and everything is John's fault, because i've made mistakes. But he's sort of gone a little bit rogue, and I suspect there's no way he would talk to any CSU people. But I could ask.

165
00:23:23.970 --> 00:23:30.120
Christopher A Mallett: You could - I know he said he was - he didn't want to speak to Ben's office anymore, a couple weeks ago.

Bryan: Ok, I can ask.

166
00:23:30.840 --> 00:23:34.380
Christopher A Mallett: But this is sort of a different pathway we're on here.

167
00:23:35.670 --> 00:23:36.450
Christopher A Mallett: If it were possible, we would appreciate it.

168
00:23:36.930 --> 00:23:37.320
Okay.

169
00:23:39.390 --> 00:23:44.640
Bryan: One complicating factor is he's in Spain on vacation for I don't know how long.

170
00:23:46.590 --> 00:23:49.410
Bryan: So he might not be responsive, but when he gets back I can ask him.

171
00:23:51.180 --> 00:23:51.810
Christopher A Mallett: We have 90 days or something as the committee.

173
00:23:54.750 --> 00:23:55.470
Bryan: 120

174
00:23:56.430 --> 00:24:04.440
Christopher A Mallett: 120, thank you. Well we'd rather not take 120 days, of course, but if we could hear from John that might be helpful, might not be.

175
00:24:08.550 --> 00:24:17.370
Christopher A Mallett: Bryan, I know your position's hard here in this but you just mentioned [that] you know you've done a couple things wrong. You mentioned a couple things already.

176
00:24:18.510 --> 00:24:20.520
Christopher A Mallett: What would you do different? What would you not have [done]?

177
00:24:21.240 --> 00:24:24.030
Bryan: I wouldn't pursue this kind of research, it's just not worth it.

178
00:24:25.500 --> 00:24:31.590
Bryan: But what specifically if I hypothetically were to do it again? I would have paid more attention to the applications.

179
00:24:33.870 --> 00:24:36.750
Bryan: I would have reported the website that I wanted to upload data to.

180
00:24:38.700 --> 00:24:45.960
Bryan: I would have been absolutely crystal clear that I was interested in, not only in, but that I was interested in looking at intelligence as a variable.

181
00:24:47.400 --> 00:24:52.590
Bryan: I think a lot of the earlier complaints stemmed around that issue, I think I might have resolved that i'm not sure.

182
00:24:57.990 --> 00:24:58.320
Christopher A Mallett: Thank you.

183
00:25:06.900 --> 00:25:12.840
Conor T McLennan: So, Bryan just following up on that last question, which was how have you and your research team handled any confidentiality or anonymity concerns surrounding the data set. So, my understanding is that John still has the data set and it's not clear, with whom he's sharing it or what websites the data might be stored on. So he was part of the original team, and I understand there's no longer affiliated with CSU, but he gained access to the data set under your supervision at CSU. Is that right?

186
00:25:41.310 --> 00:25:46.050
Bryan: I, I agree with you Conor, I'm responsible for that, but I don't know that he still has the data.

187
00:25:47.040 --> 00:26:00.540
Bryan: I do know that he wants to publish more studies that do not have my name on them, but you can do that without the data if the analyses are done. The only risk is if a reviewer wants additional analysis, you wouldn't have the data to do that.

188
00:26:03.090 --> 00:26:04.080
Bryan: Did I answer your question.

189
00:26:04.800 --> 00:26:15.690
Conor T McLennan: Yeah, in part. But I'm just wondering, I guess, since
part of the question was how not only have you but your research team
handled issues of confidentiality and anonymity, if you want to extend that
to...

190
00:26:15.780 --> 00:26:22.110
Bryan: Sure, so, it would only be John, even though I have four authors in
that Lasker paper, only John had access to confidential data.

191
00:26:22.560 --> 00:26:29.520
Bryan: So it would be my and John's relationship. And how we worked it is
he would - he lived on the east side, I live on the West side.

192
00:26:30.090 --> 00:26:42.000
Bryan: He would Uber over to my house and we'd spend hours on the secured
computer extracting, processing, analyzing the data. But unless he stole
it, I didn't give him his own copy.

193
00:26:43.680 --> 00:26:45.570
Bryan: That's why I suspect he still doesn't have the data.

194
00:26:52.710 --> 00:26:53.070
Conor T McLennan: Thank you.

195
00:27:02.760 --> 00:27:04.770
Christopher A Mallett: Last question. You guys want me to go with that?

196
00:27:08.190 --> 00:27:15.060
Christopher A Mallett: Bryan do you believe there are circumstances in
which a researcher should have NIH permission prior to publication? If yes,
what circumstances?

197
00:27:15.390 --> 00:27:16.800
Bryan: I'm sorry, could you repeat that, please?

198
00:27:16.920 --> 00:27:23.520
Christopher A Mallett: Yeah. Do you believe there are circumstances in
which a researcher should have NIH permission prior to publication.

199
00:27:24.330 --> 00:27:27.270
Bryan: I think in all circumstances where genetic data are used.

200
00:27:27.450 --> 00:27:34.140
Bryan: You should get NIH's approval before publication . But I really,
sincerely felt we had that with the Lasker paper.

201
00:27:44.460 --> 00:27:57.510
Conor T McLennan: So can I just follow up on that last point here. You
thought you had approval in the Lasker paper but, wasn't the timing that
you submitted that paper before you reported with NIH? That was something
that they mentioned in their response.

202
00:27:59.100 --> 00:28:05.550
Bryan: Yeah the timing is awkwardly complicated here. But, you think the
time - the paper came out before what?

203
00:28:05.910 --> 00:28:22.230
Conor T McLennan: The paper was submitted, so I think coming… When the
paper, I mean we all know, sometimes you can submit a paper and it can be a
long time before it's actually out. So, at least in my opinion, when the
paper comes out is somewhat irrelevant. It's when you submitted the paper
for publication so…

204
00:28:22.590 --> 00:28:23.280
Bryan: Okay well what happened...

205
00:28:24.090 --> 00:28:27.900
Conor T McLennan: The timeline was you had submitted the paper before it
was reported to NIH.

206
00:28:29.640 --> 00:28:46.500
Bryan: Yeah so every year - so we had three applications, right? Two were
focused on intelligence, one was not. Every year, you have to either close
those out or renew them. So, when it came time to renew, I think it was
[project] 19090, it specifically asked, do you have any publications.

207
00:28:46.800 --> 00:28:48.150
Bryan: It didn't ask about pre-prints or submitted articles or in-press
articles. It asked about publications, so we said no.

210
00:28:55.650 --> 00:28:57.270
Bryan: The next day, the article is published.

211

00:28:58.170 --> 00:29:07.110
Bryan: So there is a time period between that, and I think it was December?
I have to check my notes, there was a void there where I did not report the
article.

212
00:29:07.680 --> 00:29:12.150
Bryan: And I think what happened, but I'm not positive, because I am
suspended with the NIH. I'm restricted on what I can see on the website so
I can see my applications but I can't see anything else. But I think the
difference here is when you renew, it says, do you have any new
publications? Publications only. When you close it out, it asks for
everything. So I think the gap between me not reporting it was the
difference between a renewal versus a closing.

215
00:29:37.650 --> 00:29:38.490
Bryan: I hope that made sense.

216
00:29:46.530 --> 00:29:50.430
Christopher A Mallett: Were you concerned at all, Bryan, about the
publication in NIH's response.

217
00:29:50.520 --> 00:29:51.480
Bryan: Was I concerned about?

218
00:29:51.990 --> 00:29:57.630
Christopher A Mallett: About the paper, in any way, with NIH's response? I
mean, that's what blew this thing up.

219
00:29:57.810 --> 00:30:00.360
Christopher A Mallett: That's my understanding, but were you concerned
about it.

220
00:30:01.980 --> 00:30:06.300
Bryan: Yes, of course I was concerned. I just thought they were incorrect.
I thought a) that I had approval to publish it. And the NIH said no, I
didn't. Its intelligence and you're talking about mental health. That's
because I put it in the wrong application, theoretically, so I was
definitely concerned.

222
00:30:30.720 --> 00:30:31.050
Christopher A Mallett: Wendy, Conor? Any other thoughts?

223
00:30:36.810 --> 00:30:49.110
Conor T McLennan: As you mentioned earlier, Chris, I think, you know,
piecing all of this together - timelines, information I'm confident will

want to circle back and talk to Bryan again, but I think for now that's all
I have.

224
00:30:51.300 --> 00:30:54.120
Bryan: Can I ask a couple quick questions if you guys are done.

225
00:30:59.670 --> 00:31:03.420
Christopher A Mallett: I think we're done. The only last comment I have is
hopefully next time it would be nice to meet in person.

227
00:31:06.000 --> 00:31:09.690
Christopher A Mallett: And zoom keeps us distant too much, and COVID. So,
I'm putting it out there for next time, if we could have an in person
follow up meeting, it would be nice.

230
00:31:15.000 --> 00:31:16.020
Bryan: Okay, I will do that.

231
00:31:24.450 --> 00:31:26.250
Christopher A Mallett: Bryan, do you have questions? Go right ahead, I
think we're good.

232
00:31:26.280 --> 00:31:32.250
Bryan: Yeah. Well first I'm going to confirm that I'm going to ask John to
be interviewed.

233
00:31:33.420 --> 00:31:44.940
Bryan: Second, the Google Scholar. I'm not sure what page, it is. Dr. Ward
put it in the packet. It's towards the end, or the end-ish. There are some
inaccuracies on there that make me look bad so i'd like to correct those.
[*Dr. Pesta's Google Scholar page was provided to the committee and to Dr.
Pesta*]

234
00:31:47.160 --> 00:31:49.320
Bryan: But I don't know what page, you have to page there Dr. Ward?

235
00:31:52.860 --> 00:31:54.630
Benjamin J Ward: You're talking - in the document?
[*this again refers to the collection of documents provided to the
committee, which were combined into a single file named "binder1-Pesta.pdf"
and provided to Dr. Pesta*]

236
00:31:54.960 --> 00:31:56.610
Bryan: In the binder yeah.

237
00:32:18.330 --> 00:32:19.500
Bryan: I'm trying to find it myself. And I can't.

238
00:32:36.300 --> 00:32:46.260
Bryan: Also while we're looking for this, I also sent another document
today looking specifically at one of the applications, and I'm hoping that
you guys could check it out before our next meeting.

239
00:32:48.270 --> 00:32:48.870
Wendy C Regoeczi: Of course.

240
00:32:49.800 --> 00:32:50.280
Bryan: Thank you.

241
00:32:53.670 --> 00:32:59.910
Bryan: Anyways at Google scholar, there are three publications listed with
my name on them that are not my publications.

242
00:33:01.290 --> 00:33:08.430
Bryan: What this was these were pre-prints from 2020 before all this blew
up. After it blew up in May this year, I pulled away. I withdrew from a
research activity in this area.

244
00:33:21.630 --> 00:33:25.560
Benjamin J Ward: If you send me the names of those papers, I can at least
[update for the committee].

245
00:33:26.970 --> 00:33:29.160
Bryan: It's page 271 of the binder.

246
00:33:37.320 --> 00:33:40.140
Bryan: There are three papers that are not mine.

247
00:33:41.730 --> 00:33:43.710
Bryan: I don't know if you're ready for me to state them.

[background noise]

248
00:33:49.320 --> 00:33:51.300
Bryan: If someone's talking I can barely hear you.

249
00:33:53.100 --> 00:33:53.970
Benjamin J Ward: No, I think that's some background noise.

250
00:33:55.140 --> 00:33:57.480
Christopher A Mallett: That's my fault, that's background noise from a
colleague in another room.

252
00:34:00.060 --> 00:34:01.590
Christopher A Mallett: I'll be sure to mute here.

253
00:34:04.680 --> 00:34:06.300
Benjamin J Ward: But I have the Google scholar.

254
00:34:07.650 --> 00:34:15.600
Bryan: Okay, so Dr. Ward, can I just tell you which articles are not mine?

Benjamin J Ward:  yes

Bryan:  Okay, the first one "linear and partially linear models" is not
mine.

255
00:34:17.430 --> 00:34:18.990
Bryan: The fourth one. No, I'm sorry that is the fifth one, "intelligence
associated with polygenic scores predict g."

257
00:34:26.460 --> 00:34:30.870
Bryan: That is not mine. And the one right after it, "more research needed"
is not mine.

258
00:34:36.090 --> 00:34:38.670
Bryan: And I told John to take the pre-prints off, but he hasn't done so.

259
00:34:43.020 --> 00:34:48.090
Benjamin J Ward: So, just for clarity, those papers are withdrawn or your
name is just removed from them?

260
00:34:48.090 --> 00:34:50.640
Bryan: I think they're still pursuing them, but I am not an author.

261
00:34:57.360 --> 00:35:00.300
Wendy C Regoeczi: Bryan, going back to John for a second.

Bryan: Sure

262
00:35:00.420 --> 00:35:09.690

Wendy C Regoeczi: You describe him as sort of going "rogue" here lately, can you just explain a little bit about what you mean.

263
00:35:10.410 --> 00:35:15.090
Bryan: Yeah I suspect he's gonna try to publish data, even though the NIH says don't.

264
00:35:15.960 --> 00:35:27.630
Bryan: But I don't know that for sure. But I just know that John has a lot invested in this, and knowing some of his personality, I think that's what's going to happen. Can I guarantee it? No, but that's what I think's going to happen.

265
00:35:28.470 --> 00:35:28.860
Wendy C Regoeczi:  Okay.

266
00:35:40.500 --> 00:35:57.960
Conor T McLennan: So, Bryan just to build off that response, then, so if if NIH were asked/consulted, can we publish on this topic, and they specifically said no, and then there was a publication after, in that area using those data, would you consider that a serious violation.

267
00:35:58.440 --> 00:36:00.810
Bryan: I would think that it's an extremely serious violation. I think it would lead to, ultimately, retraction.

269
00:36:09.780 --> 00:36:13.470
Bryan: That's part of why I pulled out is, the NIH said you can't have the data.

270
00:36:14.700 --> 00:36:16.350
Bryan: And if you can't have the data, you can't have the data.

271
00:36:29.940 --> 00:36:42.450
Bryan: Okay, so thank you for letting me correct the Google scholar page. This is a minor point, but it could be confusing. In some applications, you see the words educational attainment. In my field, those are synonymous with intelligence and it's not obvious if you're out of field, looking at that.

273
00:36:51.000 --> 00:36:56.010
Bryan: And then the last question I have is, besides maybe John, who else were you planning on interviewing.

274
00:37:00.780 --> 00:37:09.900

Conor T McLennan: We don't know that yet. So we carefully read the CSU policy and that's exactly what we're trying to follow. The policy for who who might be interviewed so, you know, we decided, as Chris mentioned, to give some context for all of the files that we've been reviewing. To give you an opportunity to explain from your perspective and then we'll regroup, continue to review the documents, including recent documents, that you had sent, and then make a decision about who else to possibly interview.

277
00:37:34.410 --> 00:37:34.860
Bryan: Thank you.

278
00:37:42.480 --> 00:37:48.510
Benjamin J Ward: I guess, just as a procedural point, Dr. Pesta you mentioned, you know, it may take a while to get in touch with Mr. [John] Fuerst.

279
00:37:48.900 --> 00:37:50.460
Bryan: Only because he's overseas.

280
00:37:50.820 --> 00:37:57.900
Benjamin J Ward: Right. Just, it would be appreciated if you can reach out to him as soon as possible so that we know whether or not there's the opportunity to interview them.

281
00:37:58.140 --> 00:37:59.010
Bryan: I'll do that today.

282
00:37:59.490 --> 00:38:06.450
Benjamin J Ward: We do have a full 120 days, but obviously that includes everything from writing the report, to your review of the report, all those pieces.

283
00:38:06.690 --> 00:38:08.640
Bryan: Understood I'll contact him today.

284
00:38:11.580 --> 00:38:12.060
Wendy C Regoeczi: Thank you.

285
00:38:12.720 --> 00:38:14.130
Bryan: Thank you for your time, I appreciate it.

286
00:38:19.500 --> 00:38:21.240
Bryan: Mr Carson can I call you in a couple of minutes.

Jay Carson: Sure

287
00:38:27.210 --> 00:38:28.440
Bryan: Well, thank you for your time.

288
00:38:31.950 --> 00:38:32.130
Benjamin J Ward: Thanks.

289
00:38:34.560 --> 00:38:35.100
Christopher A Mallett: You take care.

290
00:38:35.190 --> 00:38:36.510
Conor T McLennan: Everyone Thank you.

8. *Interview Transcript – Complainants Bird, Carlson, and Townsend, 9/30/2021*

WEBVTT

[Attendees signing on to Zoom meeting]

15
00:02:53.820 --> 00:03:03.450
Benjamin J Ward: Ok, I think that's everyone who was on the schedule. Os
Keyes was not able to join us, I believe they're on the west coast, and
that makes it a bit challenging.

16
00:03:04.350 --> 00:03:18.570
Benjamin J Ward: So just to quickly start, my name is Ben Ward. I'm the
research integrity officer for Cleveland State. We are here as part of an
academic research misconduct investigation into Dr Bryan Pesta.

17
00:03:20.340 --> 00:03:31.620
Benjamin J Ward: Just a couple things about this session. The investigation
committee will handle all the questions and the discussion - I'll let them
introduce themselves in a moment - and then you can all introduce
yourselves as well.

18
00:03:32.370 --> 00:03:38.610
Benjamin J Ward: But just for everyone's awareness, this is obviously a
confidential matter, so we ask that you do keep this confidential.

19
00:03:39.060 --> 00:03:52.620
Benjamin J Ward: And also the meeting itself is being recorded and a copy
of the transcript and, if requested, of the recording itself, will be made
available to Dr. Pesta so that he can respond to any matters that were
brought up here.

20
00:03:53.640 --> 00:04:04.710
Benjamin J Ward: So with that I will be here to answer any questions about
procedure, but I'll turn it over to Conor, Wendy, and Chris. So, if you if
you'd like to go ahead and start by introductions, please go ahead.

21
00:04:06.000 --> 00:04:19.410
Conor T McLennan: Okay, we want to do it in that order? Conor, Wendy and
Chris? So I'm Conor McLennan. I'm the interim associate Dean for the
College of Sciences and health professions and a professor in the
Department of Psychology. So thank you all for participating today.

22
00:04:21.300 --> 00:04:28.680

Wendy C Regoeczi: Morning everybody. I'm Wendy Regoeczi. I'm a professor of criminology and Chair of the Department of Criminology, Anthropology, and Sociology.

23
00:04:30.330 --> 00:04:32.730
Christopher A Mallett: And Chris Mallett, professor in the School of Social Work.

24
00:04:34.800 --> 00:04:40.260
Christopher A Mallett: So I guess I'll jump into a few things then if that's okay, team? It's Kevin and Cathryn, and do you go by Jed or Jedidiah?

25
00:04:41.310 --> 00:04:42.420
Jedidiah Carlson: Yeah Jed is fine.

26
00:04:42.690 --> 00:04:43.320
Christopher A Mallett: Jed, okay.

27
00:04:45.240 --> 00:04:47.760
Christopher A Mallett: Clearly, when this came our way, now quite a while ago, it took us a while to get our head around this case. It's quite complicated and it took us the first month to sort of get all the pieces understood. I think we're finally there, which is why we appreciate you joining us.

30
00:05:08.340 --> 00:05:09.870
Christopher A Mallett: The first question we had, when we were talking about a couple days ago, we're not sure… We have the letter that says, "to whom it may concern."

32
00:05:18.270 --> 00:05:24.840
Christopher A Mallett: What role did you guys have when that letter then got sent? Can you fill us in on that a little? There's a gap there for us.

33
00:05:25.230 --> 00:05:37.680
Jedidiah Carlson: Yeah, I can jump in on that. We had originally identified some potential issues and misconduct related to access to dbGaP data. So we had originally sent this to, I guess, your counterparts at NIH who handle data misconduct questions on their end. And I believe we also sent this to the PIs who are responsible for generating the data that we believe was misused in this way.

36
00:05:59.220 --> 00:06:06.780

Christopher A Mallett: How did you come to this issue, are you connected anybody or was it through the publication you saw it? That's where we weren't sure either.

37
00:06:08.430 --> 00:06:10.920
Kevin Andrew Bird: I yeah so I am a PhD candidate studying evolutionary biology and plants, mostly, but I have - interest isn't quite the right word - but I pay attention to racist applications of genetic data and groups that do publish research aligning one way, especially many of the co-authors in this paper.

42
00:06:39.060 --> 00:06:43.920
Kevin Andrew Bird: And recognized that the data they are using was published previously in a major NIH study and was involved for medical research and things that that were far from the application in this paper. And so, I think Jed kind of shares a similar interest or kind of follows a similar beat and knows quite a bit about things in the NIH data use [agreements] and things like that. Cathryn has a similar interest. And so we started looking into, was this actually inappropriate use of NIH data? Are there, or was there, something kind of gone wrong when it was used for a paper like this.

46
00:07:27.690 --> 00:07:38.460
Christopher A Mallett: Would you fill us in more? Because we've kind of pieced some of it together - from the Pioneer Fund, some of the [co-author Emil] Kirkegaard stuff. Can you fill in how you understand those connections, Kevin? Since you have spent some time in this area. And Jed of course?

47
00:07:38.970 --> 00:07:40.830
Kevin Andrew Bird: Yeah, so I'll let Jed chime in and fill anything in or correct anything. My understanding is everything centers back to the Pioneer Fund, since it was the longest institution.

51
00:07:53.790 --> 00:08:06.480
Kevin Andrew Bird: Sometime around 2012, I believe, after J. Philippe Rushton had passed away or just prior to, there were major cash transfers of the Pioneer Fund's balances.

52
00:08:07.080 --> 00:08:13.290
Kevin Andrew Bird: Half of that went to the J Philippe Rushton Foundation, or his Foundation, which is… I can't remember the name of it [Charles Darwin Research Institute]. And then, like half of it went to the Ulster Institute For Social Research which is run by Richard Lynn, a previous board member or Director of the Pioneer Fund. The Ulster Institute for Social Research is now where Mankind Quarterly is published, which was the white supremacist publication of the Pioneer Fund. And it [Ulster Institute for Social Research] has been the affiliation and ostensibly, the source of

income for Emil Kirkegaard. At various points in time, Jonathan Fuerst has
been associated with the Ulster Institute.

56
00:08:49.080 --> 00:08:56.520
Kevin Andrew Bird: Davide Piffer, who is a frequent co-author with Dr
Pesta, has also had that affiliation repeatedly.

57
00:08:57.000 --> 00:09:04.080
Jedidiah Carlson: I'll also add that Kirkegaard is at least the website
administrator for the Mankind Quarterly journal.

58
00:09:05.700 --> 00:09:11.580
Jedidiah Carlson: We can speak more on that journal specifically if you'd
like, but it's all interconnected among this small cabal of people
affiliated with the Ulster Institute For Social Research.

61
00:09:24.240 --> 00:09:29.130
Christopher A Mallett: What is your understanding then with Dr. Pesta's
involvement? From your review here.

62
00:09:33.270 --> 00:09:45.000
Kevin Andrew Bird: So, my understanding is, I don't exactly know what
entails formal affiliation, but he's never identified with it and I don't
think he's formally affiliated.

63
00:09:45.300 --> 00:09:55.350
Kevin Andrew Bird: But, his co-author network is very solidly centered
around people who are affiliated, or sort of like secondary contacts, to
the Ulster Institute.

64
00:09:56.820 --> 00:09:58.170
Jedidiah Carlson: Yeah there was also a - Pesta had a lab website on the
website ResearchGate that listed Fuerst and Kirkegaard as members of the
lab.

68
00:10:13.980 --> 00:10:14.580
Jedidiah Carlson: But Kirkegaard certainly has no affiliation with
Cleveland State, I believe Fuerst formally does since publications have his
email listed as that. But, there's sort of this "formally informal" kind of
embrace the Ulster Institute for Social Research.

75
00:10:43.140 --> 00:10:51.060
Christopher A Mallett: And part of your initial letter questioned whether
that was done fraudulently, to make it look like they were connected to
CSU. Listed under the lab temporarily, I guess.

78
00:10:59.700 --> 00:11:02.970
Cathryn Townsend: I think it's worth pointing out as well that Pesta is involved in a charitable organization called the Human Genome Diversity Foundation [*sic - actual name is Human Phenome Diversity Foundation*], along with Kirkegaard and Fuerst and that he is listed as the administrator of that group and that they have been engaged in fund raising drives.

83
00:11:39.180 --> 00:11:57.300
Cathryn Townsend: To basically fund this research of various papers on race and IQ that have been disseminated on pre-print servers mostly, but then also ending up in places like Mankind Quarterly. So there's that connection.

84
00:11:59.070 --> 00:12:15.030
Christopher A Mallett: And we were, I know that Conor and Wendy also were, I think we saw that in a state filing for an llc. Is that correct? Is my memory working there? That the foundation you mentioned is listed as an Ohio limited liability corporation for fundraising purposes.

85
00:12:17.280 --> 00:12:20.340
Jedidiah Carlson: Yeah - they have listed that as a funding source on their more recent papers.

87
00:12:23.430 --> 00:12:26.100
Jedidiah Carlson: And I forget which one it is. Kevin you probably remember.

88
00:12:27.780 --> 00:12:29.970
Kevin Andrew Bird: I think that's like the "more research is needed" biorxiv, then ported to Mankind Quarterly

[*refers to article titled "More Research Needed: There is a Robust Causal vs. Confounding Problem for Intelligence-associated Polygenic Scores in Context to Admixed American Populations." During interview on September 7 Dr. Pesta informed the committee that he requested that his name be removed from this paper* http://www.mankindquarterly.org/archive/issue/62-1/10]

90
00:12:31.830 --> 00:12:42.900
Christopher A Mallett: So your understanding is the funds are used to, say, pay the higher fees for the open access journals, those sort of situations. Do you know any more about that, or have you been able to…

91
00:12:43.350 --> 00:12:45.600
Kevin Andrew Bird: It's not clear to me, I know I looked over the documents they took in about $21,000 for 2019 and they marked something to the tune of $5,000 to $6,000 as expenses. Over that time, I don't remember any of

them publishing. Actually, there may have been some kind of scam-looking journal like Geographic Research or something that looked like it may have been, one that has a fairly steep open access fee. And so I'm guessing open access fees are part of it, although most of the papers still end up being published in Mankind Quarterly, which I don't believe has - I don't know what their fee structure is.

98
00:13:31.080 --> 00:13:31.560
Kevin Andrew Bird: and

99
00:13:33.420 --> 00:13:45.780
Kevin Andrew Bird: I don't know if it's access to - if these databases have fees to access. If there's computational needs the need for, Google cluster or Amazon clusters like cloud service to do some of these analyses. But I do know that they had officially marked expenses in their tax forms.

101
00:14:00.600 --> 00:14:15.600
Conor T McLennan: Okay, if I could jump in for a minute, so one of the concerns that you listed in your letter was about stating the authors imputed personally identifiable information. So that that accusation there, I wondered if you could say more about that.

102
00:14:18.810 --> 00:14:22.860
Kevin Andrew Bird: Sure anyone want to take a stab at it first or I can go?

103
00:14:26.460 --> 00:14:28.650
Jedidiah Carlson: Go ahead and I can jump in. I have a baby in the background.

104
00:14:28.920 --> 00:14:33.300
Kevin Andrew Bird: Yeah no problem. So in this study, part of it was to test basically the genetic hypothesis of the cause of the racial IQ gap with sort of environmental or cultural aspects and so colorism was the kind of competing hypotheses. And so they used the genetic data with a forensic software to predict skin color values based off of the genotypic data. So that wasn't included in the original study, it was adding - potentially additional identifying information, depending on the accuracy of the of the prediction, but their claim was that the prediction was accurate.

109
00:15:17.850 --> 00:15:18.480
Kevin Andrew Bird: Which.

110
00:15:20.370 --> 00:15:23.370
Jedidiah Carlson: And that included I color and hair color as well.

111
00:15:23.670 --> 00:15:36.090

Kevin Andrew Bird: Yes, thank you Jed. So the same program was used to basically from just the sequence data that was available to them, add more phenotypic data for individuals.

112
00:15:37.620 --> 00:15:41.370
Kevin Andrew Bird: There was also, I believe, the identification of siblings based off of genetic relatedness and so that potentially is another source by which people could be re-identified.

114
00:15:52.110 --> 00:16:06.600
Kevin Andrew Bird: These are things - so I'm mostly an NSF/USDA researcher so I'm not sure exactly what the terms of identifiable information are for NIH - but things like skin color, eye color, hair color, that weren't originally included are certainly providing more information on people involved in the study. On subjects, than what was provided.

117
00:16:16.830 --> 00:16:18.600
Christopher A Mallett: Which is connected to your other claim around approved use of the data versus use of the data. And it looks like pretty clearly in the public documents, if you can confirm or deny, that any of that analysis was not in a pre-approved DAR, I think it's called, from NIH. What's your understanding there?

122
00:16:48.720 --> 00:17:08.760
Kevin Andrew Bird: Yes, that was that was our understanding, so we looked at - when we started kind of digging into this, we were able to find a text file with the summaries of the DARs, the access requests. And the descriptions of the research there were much more neutral and technical than what the actual content of the paper.

124
00:17:17.850 --> 00:17:26.640
Kevin Andrew Bird: I don't believe testing the racial IQ gap which separate points in the paper was explicitly kind of stated as the goal, and especially in discussions surrounding the paper by authors online.

125
00:17:27.480 --> 00:17:38.190
Kevin Andrew Bird: That was not a clearly stated goal or intention of the data use. And my presumption is that, were that clearly stated, it would not have been approved.

126
00:17:40.320 --> 00:17:49.320
Kevin Andrew Bird: There's one thing to add, just so that there's kind of new information, since this happened, about a year ago, is looking through the same text file again.

127
00:17:50.640 --> 00:17:58.620

Kevin Andrew Bird: It appears that Dr. Pesta made another request to dbGaP February 20th of 2020.

128
00:17:59.790 --> 00:18:04.380
Kevin Andrew Bird: For a different project but surrounding kind of similar questions.

129
00:18:06.660 --> 00:18:10.650
Kevin Andrew Bird: As far as I know, no research or products have come from this so far. So it's hard to ascertain how truthfully that work followed the requests or if kind of similar violations occurred - potential violations occur.

131
00:18:25.200 --> 00:18:35.160
Kevin Andrew Bird: And then, there have been additional papers that use this - that follow the same issues in this Lasker 2019 paper. That have been posted on pre-print servers.

132
00:18:36.450 --> 00:18:41.070
Kevin Andrew Bird: Different kinds of studies, with the same problems of data use.

133
00:18:44.880 --> 00:18:58.620
Christopher A Mallet: And Kevin you summarize some of that in some of your writing. Both in your posting and in your peer reviewed critiques on some of what you noted. And that we did get a chance to read through before today.

134
00:18:59.940 --> 00:19:06.300
Jedidiah Carlson: And Kevin, I also want to say I think Pesta made four requests in the last two years for access to that data set.

136
00:19:09.600 --> 00:19:10.920
Jedidiah Carlson: Yeah, it wasn't just two.

137
00:19:13.260 --> 00:19:19.980
Jedidiah Carlson: And I think one or two of them may have been redundant, but it does seem like there had been a pattern of repeated requests to access that data.

138
00:19:20.640 --> 00:19:26.400
Kevin Andrew Bird: Yeah, I'm looking - I have it up right now so June 25 2018.

139
00:19:28.620 --> 00:19:39.690

Kevin Andrew Bird: July 15 2018 December 10 2018 February 20 2020 and for me that's where it ends. Did you have something post February 20 Jed?

140
00:19:41.190 --> 00:19:43.140
Jedidiah Carlson: No - that was my misunderstanding. I thought that there was one more after that.

141
00:19:45.180 --> 00:19:49.800
Kevin Andrew Bird: No totally totally fine, I just want to make sure I didn't have a different version.

142
00:19:52.620 --> 00:20:01.650
Christopher A Mallett: Conor, Wendy, I was gonna go to a related but unrelated topic. Do you guys have any different, additional mining query with where we're at before I do that?

143
00:20:01.800 --> 00:20:14.310
Conor T McLennan: Yeah, just quickly. So, is it your understanding that in any of those requests that he did lay out a plan to use the data in this way? To the relationship between IQ and so on?

146
00:20:18.300 --> 00:20:19.860
Kevin Andrew Bird: Reading - just skimming through them.

147
00:20:22.740 --> 00:20:34.260
Kevin Andrew Bird: The one that that has been the focus that we first brought up was the "effects score construction method on transracial validity," which did not mention sort of this test of the hereditarian hypothesis.

[*refers to dbGaP project #19747 and associated DAR #73948*]

148
00:20:39.600 --> 00:20:48.030
Kevin Andrew Bird: One is about "sex differences in cortical volume." I'm not sure if any published work came from that.
[*"sex differences in cortical volume refers to dbGaP project #18007 and associated DAR #67931*]

149
00:20:48.750 --> 00:21:05.910
Kevin Andrew Bird: And the February 20 one, "Scarr-Rowe Effect on Genetic Expressivity" is about socio economic status. So, none of them, just from looking at them and from my recollection, mention testing a genetic racial cause of IQ differences.

[*"Scarr-Rowe Effect on Genetic Expressivity" refers to dbGaP project #24213 and associated DAR #88567*]

150
00:21:07.530 --> 00:21:07.680
Cathryn Townsend: That hypothesis was not in the request.

153
00:21:16.500 --> 00:21:24.990
Conor T McLennan: And I know you're speculating, but you mentioned Kevin
that you are speculating that had that been laid out that it would not have
been approved.

154
00:21:25.800 --> 00:21:28.350
Kevin Andrew Bird: Yeah. There are several broad ethical principles that
the NIH data use certification approvals lay out.

156
00:21:39.090 --> 00:21:41.850
Kevin Andrew Bird: One of them, generally, is about just ethical use of
data for relevant and important pursuits of justice, and also in research
whose negative implications are outweighed by potential benefits.

159
00:22:00.660 --> 00:22:03.180
Kevin Andrew Bird: I'm trying to pull up… Yeah "recipients must consider
psychological, social, economic and other potentially harmful impacts of
the research could have an individual's communities and society and take
steps to minimize them." So there seems to be a general recognition of what
is ethical use of this data that NIH has. Not so explicitly, but something
like the hereditarian hypothesis, kind of a long standing racist theory,
would probably not be within their purview of ethical research.

163
00:22:42.210 --> 00:22:48.090
Conor T McLennan: Thank you. And one more thing, Chris, before we move on.
Just again revisiting the idea about personally identifiable information
but also in that point you mentioned, "apparently without IRB approval."
Can you just share more about what your understanding is regarding IRB
approval for this type of work.

165
00:23:02.850 --> 00:23:08.430
Kevin Andrew Bird: Yeah I'll let Jed or Cathryn take that, since I have not
had to deal with IRB before.

166
00:23:12.900 --> 00:23:32.790
Cathryn Townsend: So it would definitely have needed some kind of IRB
approval. And there would need to have been some kind of justification for
why the research provided some kind of benefit that outweighed any
potential risk to this research, which I don't really see.

168
00:23:42.060 --> 00:23:48.930

Cathryn Townsend: I don't see a plausible argument that they could have made for that, if they had been truthful about the purpose.

169
00:23:51.210 --> 00:23:59.310
Jedidiah Carlson: Yeah, and in my experience there's some somewhat of a gray area on "do you need IRB approval to re-analyze published data?"

170
00:24:01.110 --> 00:24:01.800
Jedidiah Carlson: and

171
00:24:03.390 --> 00:24:10.530
Jedidiah Carlson: Yeah I think that the answer is usually "talk to the IBM find out beforehand." And you know, usually you should be worried about it in the first place, is my perspective on things. If you don't need full IRB approval, the IRB is happy to grant an exemption and just let the ethical experts actually hash that out on their end.

175
00:24:31.500 --> 00:24:45.780
Christopher A Mallett: Yeah because that was a conundrum still on this side. Because when you look at the dbGaP website, and if you scroll down and look for the general research use, they say "no" to answer "is IRB required?" Which, I'm like, okay. And like you said, Jed, it's been publicly published data set, so they give it a "no." So it kind of threw us. Like, well okay,interesting.

178
00:25:00.150 --> 00:25:01.350
Jedidiah Carlson: Yeah and I think there's different institutional guidelines.

180
00:25:04.170 --> 00:25:19.590
Jedidiah Carlson: During my postdoc at University of Washington I was working on a project that we were looking at publicly available data. De-identified, and you know we expected, we wouldn't need IRB approval, but we still had to go through the process of getting an IRB exemption to keep that above water.

182
00:25:24.900 --> 00:25:29.790
Christopher A Mallett: Do you all consider that sort of a normal expectation across researchers.

183
00:25:32.430 --> 00:25:33.390
Jedidiah Carlson: Yeah I think the expectation is [that] you're familiar with how IRB's work and when their intervention might be necessary or when they should at least be part of the conversation. Even if you don't anticipate needing to go through the full human subjects research [review].

187

00:25:59.220 --> 00:26:05.040
Cathryn Townsend: In my experience, that's one of the first things that you
have to pay attention to when you are planning a research project. And
that's from my experience here in the USA of the IRB process at Rutgers and
now at Baylor University on human subjects research. So definitely you need
to first check with the IRB.

189
00:26:23.550 --> 00:26:32.910
Cathryn Townsend: If you think that the research might be exempt, I can't
see how this particular project would be, but you would need some kind of
explicit exemption to go ahead with research of this kind.

191
00:26:40.170 --> 00:26:52.860
Kevin Andrew Bird: Yeah I think this point where there's at least a very
large question over whether what was done was de-anonymizing and going
against sort of the description of the data use agreement, having someone
like IRB look over that to make sure you're falling within the right
boundaries would be advisable. Good practice just to make sure.

197
00:27:08.460 --> 00:27:14.970
Jedidiah Carlson: Yeah one more thing I wanted to add there. So this was
all in the context of the dbGaP data but with the more recent publications
using the ABCD data.

199
00:27:23.010 --> 00:27:27.240
Jedidiah Carlson: Actually, wait sorry, I'm kind of foggy-brained, Kevin
had you mentioned that study?

200
00:27:27.840 --> 00:27:30.060
Kevin Andrew Bird: I haven't. I can give a quick summary before you jump
in.

201
00:27:30.090 --> 00:27:31.350
Jedidiah Carlson: Yeah how about we do that.

202
00:27:32.100 --> 00:27:47.460
Kevin Andrew Bird: Yeah, so this will just be another new development since
the original letter was sent. In addition to dbGaP data, the "trajectory of
complex phenotypes" data that was used in the Lasker 2019 study that we
documented.

203
00:27:48.840 --> 00:27:58.140
Kevin Andrew Bird: Pesta and others have accessed data from the National
Institute of Mental Health Data Archive for the Adolescent Brain and
Cognitive Development study.

204

00:27:59.940 --> 00:28:17.820
Kevin Andrew Bird: For this data access, there is still a data access
request that has to be filed, but we have not been able to find any public
records of any data access request for this data archive. So it's unclear
to us what was proposed for it, it may be another potential case where the
proposal did not match the actual experiments in this case. Some formal
methods development for admixture correlations correlating the degree of
African ancestry against IQ scores. Again to show a genetically caused
difference for Racial IQ gaps.

207
00:28:41.460 --> 00:28:46.530
Christopher A Mallett: Kevin who do you have connected to that? Who filed
and are there co-authors?

208
00:28:46.950 --> 00:28:50.790
Kevin Andrew Bird: So, we don't know who filed. The two co-authors on it -
at one point, on the pre-print - was Bryan Pesta and Gregory Connor, an
economist at University of Maynooth in Ireland.

212
00:29:03.600 --> 00:29:05.370
Kevin Andrew Bird: It is unclear to us who requested it or what the request
was for. Given that Pesta was the person who requested data 2018 through
2020, I think that there's a likelihood that it was him. And I also don't
know how NIH [manages] requests for international researchers, whether
that's normally done through official US collaborators, or if there's extra
steps for Gregory Connor to do it.

215
00:29:33.060 --> 00:29:34.200
Kevin Andrew Bird: In subsequent iterations of this paper, Bryan Pesta'a
name was removed and John Fuerst was added, and that is how one of the
papers is published in Mankind Quarterly. Although John Fuerst recognizes
Bryan Pesta as an author in a conference presentation he gave about a month
ago.

218
00:29:55.320 --> 00:30:04.890
Jedidiah Carlson: Yeah, so I brought that up first of all because it's more
broadly relevant to this discussion, but looking at the data use terms and
conditions for the NIMH Data Archive, it does say "there may be some
judgment concerning whether derived data can aid in the re-identification
of a research participant, especially for imaging data. Any questions
concerning this issue should be directed to the recipient's IRB or sent to
the NIMH Data Archive help desk." So I guess that establishes that there's
some precedent that, particularly in the context of if you're deriving data
that could contribute to re-identification, that's grounds for IRB
involvement.

222
00:30:43.800 --> 00:30:56.550

Christopher A Mallett: Thank you for that, I guess, then still kind of related – it all connects. What's your understanding or concern - we read, of course, what you've written about those variables, potentially identifying variables, going through to that website that's not based in the US?

224
00:31:04.650 --> 00:31:10.650
Christopher A Mallett: Can you connect some dots for us there or reiterate your concern there?

225
00:31:12.000 --> 00:31:12.840
Jedidiah Carlson: Yeah this was…

226
00:31:14.400 --> 00:31:22.950
Jedidiah Carlson: You know I don't think any of us are particularly experts on international data sharing guidelines for NIH, but I think ultimately the data was submitted to some web server that didn't have clearly defined terms of how that data is retained or protected.

230
00:31:44.520 --> 00:31:46.200
Jedidiah Carlson: It's unclear what data was actually uploaded to that website.

232
00:31:49.410 --> 00:31:51.300
Jedidiah Carlson: Certainly genetic data, which is generally considered very highly protected.

234
00:31:58.530 --> 00:32:00.600
Jedidiah Carlson: That was just something that came up in our conversations that we thought might warrant further investigation by NIH specifically.

238
00:32:15.690 --> 00:32:30.720
Cathryn Townsend: I mean, yes, certainly in my experience of IRBs across different institutions for sharing data, you need to have explicit approval from and an agreement between the different institutions.

239
00:32:31.650 --> 00:32:46.620
Cathryn Townsend: And each institution will have a specific protocol for data protection that needs to be adhered to. So it's possible that this was in breach of those protocols.

240
00:32:47.880 --> 00:32:49.080
Kevin Andrew Bird: Yeah. I think one cause for extra concern about whether good data security was undertaken was, given it appeared that unauthorized users were given access to the data, like Emil Kirkegaard.

242
00:33:05.550 --> 00:33:12.840
Kevin Andrew Bird: And that Emil Kirkegaard has a widely-known track record
of sort of reckless use of data. Most prominently his publishing of, was it
OKCupid data. Scraping the website and publishing a study with that data
that didn't follow, basically, any proper de-anonymization or privacy of
subjects.

247
00:33:34.350 --> 00:33:53.640
Kevin Andrew Bird: Our concern was definitely, we wanted NIH to look into
this because it was likely, in our opinion, that several potential misuses
or negligent uses of the data occurred. And this would be another case
where that could happen with these servers that retain the data or they
don't document how the data is stored or protected.

249
00:34:04.830 --> 00:34:09.600
Conor T McLennan: So, we've been told that the co-authors did not have
access to the data.

250
00:34:11.190 --> 00:34:18.510
Conor T McLennan: And also that the data that was uploaded on the website
were imputed so that they were not actually the data that they were given
access to. And that they were allowed to upload that because they weren't
actually uploading the data that was protected. I'm just wondering what
your thoughts are about that.

252
00:34:44.130 --> 00:34:45.570
Kevin Andrew Bird: So the imputed data would be derived from the original
data, it would be using algorithms to fill in gaps in the data that were
present just from the way sequencing and the SNP genotypes are produced.
There are regions that aren't genotyped and so imputation, is a way to fill
that in based off of a larger library of samples and the variants that are
represented there.

257
00:35:21.090 --> 00:35:21.630
Kevin Andrew Bird: I cannot speak in any official regard on this.
Imputation doesn't change the data itself, it is some additions based off
of algorithms that use the original data.

261
00:35:41.160 --> 00:35:41.850
Kevin Andrew Bird: My expectation would be that derived data like this
would be under the same restrictions or protections of the original NIH
data, because the alterations are minor and the original content of the
data files are still there. Just in addition to the genotypes that have
been imputed.

264
00:36:01.440 --> 00:36:06.000

Conor T McLennan: Ok. Thank you, and I may have misspoken a little bit about the claim of what was uploaded now that I'm recalling my memory. But thank you for filling in those gaps and that's my understanding as well with the approvals on the data or the data derivatives [have] the same protection.

266
00:36:18.660 --> 00:36:20.010
Kevin Andrew Bird: The other part of what you said, though, that the collaborators didn't have access.

268
00:36:26.730 --> 00:36:31.680
Kevin Andrew Bird: I believe our understanding of who may or may not have had access was based off of the section of the manuscript describing contributions of the authors. And so I don't believe that it was a specific of who did which particular computational analyses, but others were listed as doing data analysis.

270
00:36:53.880 --> 00:37:01.470
Kevin Andrew Bird: If the claim from the author is that these users didn't have access to the data I suppose this doesn't challenge that, but there were reasons that we suspected that more than just Dr. Pesta had access to the data.

272
00:37:10.290 --> 00:37:12.360
Kevin Andrew Bird: For some subsequent studies. There, for example, the second paper published using this data. Bryan Pesta's name was eventually removed from the authorship list when it was published in Mankind Quarterly, although it was present during when the pre-print was posted.

275
00:37:32.970 --> 00:37:42.750
Kevin Andrew Bird: That to me would raise questions of who was performing analyses if, at some point, Dr. Pesta was no longer warranting authorship.

276
00:37:44.910 --> 00:37:54.060
Kevin Andrew Bird: And so I don't know what happened with these other papers. Who was using the data, if it was still just Dr. Pesta, and if so, why he wasn't listed as an author on the final paper.

277
00:37:56.010 --> 00:37:59.850
Kevin Andrew Bird: But that may be kind of in a similar vein.

278
00:38:01.260 --> 00:38:01.710
Conor T McLennan: Thank you.

279
00:38:08.400 --> 00:38:26.490

Wendy C Regoeczi: Just going back to the beginning, so you said you notified the PIs who collected the data originally. So I have two sort of related questions, did you hear back from them? And is there anyone else that you think we should be speaking to about Dr. Pesta's research?

280
00:38:33.150 --> 00:38:49.320
Kevin Andrew Bird: I will let Jed elaborate, but I remember after we sent the first email to NIH and to the authors, we did receive a response from the authors that [they] would investigate it. I don't remember hearing a follow up from either NIH or from the original authors.

281
00:38:50.430 --> 00:38:55.110
Jedidiah Carlson: Yeah that's correct. I haven't heard any follow up on any of that and I don't know of any other parties that might be interested or affected by this other than I suppose more, more specifically, the National Institute of Mental Health regarding the ABCD data set that's come up more recently.

285
00:39:19.140 --> 00:39:19.410
Jedidiah Carlson:

286
00:39:19.620 --> 00:39:22.710
Kevin Andrew Bird: There's potentially a second also which is… After Pesta and collaborators access the polygenic score data from the social science genetics association consortium (SSGAC).

289
00:39:39.630 --> 00:39:52.020
Kevin Andrew Bird: That group instituted a new terms of agreement to access and use the data, which included not using them to compare across ancestral groups. So doing these sorts of racial comparisons.

290
00:39:53.730 --> 00:40:00.900
Kevin Andrew Bird: At the time they downloaded the data, there was no agreement, the data was very easy to publicly access and download.

291
00:40:02.070 --> 00:40:15.720
Kevin Andrew Bird: But they use that they have been - what they have been using the state of for since 2018 to now has basically been against the wishes of this research group. And so I'm not sure how that would work out now, given that they accessed it [under] prior terms of agreement, but now there's sort of an explicit term and request by the original authors and that may be another group that would warrant being accessed about the use of these publicly available community resources.

295
00:40:38.340 --> 00:40:38.850
Wendy C Regoeczi: Thank you.

296
00:40:45.210 --> 00:40:51.450
Conor T McLennan: And the original authors - are you referring to the Gur at al. (2012) that you mentioned in your letter?

[*Gur et al., Age group and sex differences in performance on a computerized neurocognitive battery in children age 8-21 Neuropsychology. 2012 Mar; 26(2): 251-265*]

297
00:40:53.100 --> 00:40:57.540
Jedidiah Carlson: Yeah, Gur and Hakonarson at University of Penn.

300
00:41:00.900 --> 00:41:02.250
Cathryn Townsend: One of them's at Penn, yeah.

302
00:41:06.780 --> 00:41:10.290
Jedidiah Carlson: Yeah. One is at Penn and one is at Children's Hospital of Philadelphia.

303
00:41:20.730 --> 00:41:21.180
Christopher A Mallett: Conor, Wendy, any additional inquiries?

305
00:41:29.370 --> 00:41:30.240
Wendy C Regoeczi: Not for me.
ConorNo.

307
00:41:33.840 --> 00:41:42.750
Christopher A Mallett: You have kindly and thoughtfully helped me and my colleagues here in further understanding this, so thank you very much.

308
00:41:43.860 --> 00:41:51.600
Christopher A Mallett: Hopefully, you can see that we, as a university take this very seriously, it took a while for our process to get to this point.

309
00:41:52.920 --> 00:41:58.560
Christopher A Mallett: I think covid and timeline of everything just takes a while to get us to this point so.

310
00:42:00.120 --> 00:42:08.760
Christopher A Mallett: Thank you very, very much for your time today your efforts on behalf of what you've done to help us in our investigation.

311
00:42:10.500 --> 00:42:10.950

Conor T McLennan: Thank you.

312
00:42:11.700 --> 00:42:13.050
Wendy C Regoeczi: Thank you all, thank you, thank you.

313
00:42:13.620 --> 00:42:15.990
Christopher A Mallett: Once you guys have a good day and with your kids and coffee, and i'm going to go frighten some undergraduate students in a few minutes and teach them probability theory.

316
00:42:23.880 --> 00:42:25.560
Christopher A Mallett: It's exciting, but they don't like it.

317
00:42:26.400 --> 00:42:36.960
Benjamin J Ward: Just one quick follow up, I'll work on a corrected transcript. This will have an automated transcript that will be horribly inaccurate, so I will be correcting that and I'll send it out to you so that you can review and comment if there's anything that looks out of whack or needs additional clarification. So, appreciate your time again today, and thank you very much.

319
00:42:45.930 --> 00:42:46.260
Jedidiah Carlson: Thank you.

320
00:42:47.490 --> 00:42:48.150
Christopher A Mallett: Take care everybody.

9.  *Email from Dr. Kent Taylor Addressing Committee's Initial Questions – 9/29/2021*

**From:** Taylor, Kent <ktaylor@lundquist.org>
**Sent:** Wednesday, September 29, 2021 5:13 PM
**To:** Wendy C Regoeczi <w.regoeczi@csuohio.edu>; Benjamin J Ward <b.j.ward@csuohio.edu>
**Cc:** Conor T McLennan <c.mclennan@csuohio.edu>; Christopher A Mallett <c.a.mallett@csuohio.edu>
**Subject:** Re: Cleveland State University Investigation Committee Request

**CAUTION: This email originated from outside of Cleveland State University! Do not click links, open attachments,
or reply, unless you recognize the sender's email address and know the content is safe!**

Your process looks considerably more formal to me so I did more homework in support of my initial email
as referenced below. I have attached the research data use statements filed for the use of phs000607 from
dbGaP. Please note that I am an active investigator in the National Heart Lung and Blood Institute projects
Multi-Ethnic Study of Atherosclerosis and TOPMed, well-versed in the use of data from dbGaP and the
analysis of genetic data, but with limited time to spend on other interests or investigations or to review
papers and so provide a complete critique of the statistical methods of the published research.

Your question 1.

a. An example of my concern is with the final sentence in the abstract of Lasker et al, 2019, "Results
converge on genetics as a potential partial explanation for group mean differences in intelligence." In my
opinion, this statement conflicts with the NIH policy NOT-OD-07-088 on taking care that data use avoids
stigmatization of US population sub-groups.

b. In my document I have included the research use statements filed by Dr. Pesta for download of the data
from dbGaP and there is no mention of the use of the data to study the genetic differences of US
population sub-groups. In my opinion use of the data for Lasker et al 2019 is outside of the research use
and so avoided  scrutiny by the NIH data use committee responsible for oversight of the particular dataset.

c. In my opinion use of dbGaP data to support the conclusion that there are genetic differences in
intelligence is an unethical use of the data that my colleagues and I work so hard to collect to advance
medical science.  I do recognize that Dr. Pesta disagrees with me on this issue, well documented by the
various articles published in *psych*, the journal that Dr. Pesta edits. These may be seen in the Table of
Contents for the journal since its first issues in 2019.

d. Use of the dbGaP data in this manner also violates the trust that our research participants place in our
integrity. They participate in our research based on this trust. I doubt that in the study referenced above
the participants would have provided consent for the use of their data to support the conclusions in Lasker
et al, 2019, had this research objective been clearly spelled out during the consenting process.

Your question 2.

It is unclear from the dbGaP website that IRB oversight is required for the use of data related to
phs000607.v3.p2; consequently I would like to withdraw statement number 2 at this time.

Your question 3.

Loss of trust with the US population will result in the impossibility of recruiting participants for medical research.


Your question 4.

I have also contacted these NIH officers:

shuhui.chen@nih.gov

dina.paltoo@nih.gov


Thank you for providing the questions beforehand. Consequently at our meeting, the first question  is now on your side if you have any questions about this email.

Kent

---

**From:** Wendy C Regoeczi <w.regoeczi@csuohio.edu>
**Sent:** Tuesday, September 28, 2021 4:16 PM
**To:** Taylor, Kent <ktaylor@lundquist.org>; Benjamin J Ward <b.j.ward@csuohio.edu>
**Cc:** Conor T McLennan <c.mclennan@csuohio.edu>; Christopher A Mallett <c.a.mallett@csuohio.edu>
**Subject:** Re: Cleveland State University Investigation Committee Request

That is no problem. Here is our initial list of questions for you.


1. We are aware of your email to CSU President Sands on April 6, 2021. In your email, you state that "Use of NIH data for studies of racial differences in this way is both a violation of the data use agreement and unethical." Please expand.
2. In your email, you ask about "where Human Subjects review occurred by a qualified institutional review board." Please say more about your understanding of the expectation for Human Subjects review on this project.
3. Are there any additional perspectives or concerns you would want to share with us about these incidents and Dr. Pesta's research, or is there any information you would like to share related to the investigation?
4. Are there other individuals you believe we should be reaching out to concerning this matter?


Best,
Wendy

---

Wendy C. Regoeczi, Ph.D., MPH
Professor and Chair
Director, Criminology Research Center

Department of Criminology, Anthropology, and Sociology
Cleveland State University
(216)-687-9349


    *10. Interview Transcript – Complainant Kent Taylor, 10/05/2021*


WEBVTT

[*Participants logging in*]


25
00:02:54.930 --> 00:03:05.640
Benjamin J Ward: So just, really quickly at the top, my name is Ben Ward.
I'm the director of research development, now I'm the director of research
development and ethics at Cleveland State. I'm serving as the research
integrity officer.

26
00:03:06.810 --> 00:03:12.510
Benjamin J Ward: Obviously we're all here as part of an academic research
misconduct investigation into Dr Bryan Pesta.

27
00:03:13.680 --> 00:03:22.530
Benjamin J Ward: So I'll let the committee members introduce themselves,
but just wanted to make it clear at the top that this is a confidential
matter so we appreciate that you keep this confidential.

28
00:03:22.950 --> 00:03:34.680
Benjamin J Ward: And also that this meeting is being recorded as part of
our policy for research misconduct investigations. So I'll turn it over to
Chris, Conor and Wendy to take over the question and answer period.

29
00:03:39.240 --> 00:03:39.810
Christopher A Mallett: Ladies first.

30
00:03:41.190 --> 00:03:41.700
Wendy C Regoeczi: Thank you.

31
00:03:42.870 --> 00:03:44.070
Wendy C Regoeczi: Hi Dr Taylor. Thank you so much for joining us. I'm Wendy
Regoeczi. I'm a professor of criminology and Chair of the Department of
Criminology Anthropology and Sociology.

33

00:03:57.000 --> 00:03:59.340
Christopher A Mallett: Chris Mallett. Professor in the School of Social
Work.

34
00:03:59.430 --> 00:04:02.970
Christopher A Mallett: Dr. Taylor, thanks for joining us, and thanks for
your already extensive help and responses.

36
00:04:07.890 --> 00:04:19.860
Conor T McLennan: Conor McLennan. I'm the interim associate dean of the
College of Sciences and Health Professions and a professor in the
Department of Psychology. So yes, like my colleagues, thank you for joining
us today, we appreciate it.

37
00:04:20.850 --> 00:04:33.420
Christopher A Mallett: And i'm going to just put this out there, that I
know this has been a longer process. We were asked to become involved per
our university policy back in August. So it's new to us and getting our
heads around the issues and our investigation. And we're pretty well there.
We've got a pretty good handle on everything at this point and we want to
let you know, if it's not apparent, that we take this very seriously. I
know it's been delayed over time, for various reasons, so.

40
00:04:53.190 --> 00:04:58.230
KENT TAYLOR: Delays for Covid, so we just do what we can right?

41
00:04:59.070 --> 00:05:11.010
Christopher A Mallett: Yeah and I was curious I was trying to - I was
walking back from teaching and the one thought I had is I don't remember
your initial involvement. What did you see that got you initially involved
here? I couldn't remember that and I thought i'd start there, Dr Taylor.

42
00:05:11.520 --> 00:05:12.450
KENT TAYLOR: I saw the paper.

43
00:05:13.650 --> 00:05:20.940
KENT TAYLOR: It came across my desk or someone mentioned it to me, and so
we started looking at it.

44
00:05:27.090 --> 00:05:41.250
Wendy C Regoeczi: And I know you mentioned that there are other things in
the journal Psych that are sort of consistent with his view on this type of
research, and I was just wondering if you were aware of any other work
by Bryan Pesta and his colleagues that use these data to look at those
questions about race and intelligence that have been published elsewhere.

46
00:05:52.560 --> 00:05:54.240
KENT TAYLOR: Well, yes.

47
00:05:55.770 --> 00:06:03.480
KENT TAYLOR: One of the co-authors published a separate paper. No, I'm
sorry it's in the same journal.
49
00:06:08.550 --> 00:06:11.040
KENT TAYLOR: The first paper for the journal, volume one page one.

51
00:06:17.040 --> 00:06:20.280
KENT TAYLOR: I don't know if you're aware of that one as well, that's
Kirkegaard.

52
00:06:27.810 --> 00:06:35.160
Christopher A Mallett: Actually, I was curious, not all of us, I was
unaware of this area of the literature, or this area of study - psychology
and race.

53
00:06:35.250 --> 00:06:39.900
KENT TAYLOR: No, mine is cardiology.

54
00:06:40.140 --> 00:06:53.430
KENT TAYLOR: And I study - I'm a TOPMed investigator - TOP Medicine project
of the NHLBI of the NIH and also a MESA investigator and so.

[*NHLBI Trans-Omics for Precision Medicine (TOPMed); Multi-Ethnic Study of
Atherosclerosis (MESA)*]

55
00:06:54.660 --> 00:07:01.440
KENT TAYLOR: Mostly because of MESA, which is a multi ethnic study of
atherosclerosis, we've been thinking about what I call African continental
ancestry for quite a while.

57
00:07:09.360 --> 00:07:12.990
KENT TAYLOR: And debating and thinking how to look at this, what to look
at, what's important.

59
00:07:21.720 --> 00:07:23.070
KENT TAYLOR: And that's for 20 years [I've] been doing MESA study. So I'm a
statistician. Bioinformatics and statistical analyses.

63
00:07:39.750 --> 00:07:41.160

KENT TAYLOR: Big data, you know. All those buzzwords.

65
00:07:44.580 --> 00:07:46.230
Christopher A Mallett: And your reputation speaks for itself from our own just quick review of your background.

67
00:07:52.080 --> 00:08:02.220
Christopher A Mallett: Are you aware of any - I know you're concerned and, as we all are, when it comes to research on human subjects and databases like these, and related databases - are you aware of any harm that's happened  due to what we're looking at here? At Dr. Pesta's research team and work?

69
00:08:08.280 --> 00:08:15.600
KENT TAYLOR: So I don't have the details, but there was a withdrawal from a Native American tribe over misuse of their genetic data fairly early on. I can look up all of those details, but that was very early in all of our discussions on [proper use of genetic data]. The tribe thought they were stigmatized.

And in this case it wasn't over the issue of intelligence at all, it was over the issue of stigmatized as being diabetic as a tribe. Diabetes is higher in the Pimas and other Native American tribes, and they even felt that that was stigmatization.

76
00:08:59.820 --> 00:09:03.360
KENT TAYLOR: So, to come to an intelligence would be would be far worse.

77
00:09:04.770 --> 00:09:08.040
Christopher A Mallett: And was Dr. Pesta or his team involved in that?

78
00:09:08.100 --> 00:09:08.940
KENT TAYLOR: Oh no no.

79
00:09:09.120 --> 00:09:10.620
Christopher A Mallett: But that was a different issue that triggered withdrawal from that study.

81
00:09:14.370 --> 00:09:16.050
KENT TAYLOR: Well that has triggered discussions over 20 years.

83
00:09:23.760 --> 00:09:26.430
Christopher A Mallett: And I know you voiced your concern with the potential impact, because this is on a much more sensitive topic area.

85
00:09:31.530 --> 00:09:39.420
KENT TAYLOR: Well yeah, so the abstract here is saying that there are
genetic reasons for intelligence and a study of African Americans and
comparing them with European descent.

88
00:09:54.660 --> 00:09:58.830
KENT TAYLOR: I'm Sorry, I do have to say that the fact that this is
recording just.

89
00:10:00.030 --> 00:10:01.380
KENT TAYLOR: You know I'm not at ease.

91
00:10:05.250 --> 00:10:10.950
KENT TAYLOR: But I need you to guide exactly really how I can help you
further.

93
00:10:15.150 --> 00:10:15.360
Conor T McLennan: Yeah.

94
00:10:16.320 --> 00:10:19.350
Conor T McLennan: We appreciate that - I just want to say, we appreciate
that and actually, your response to the questions that we had were very
helpful.

97
00:10:24.210 --> 00:10:33.720
Conor T McLennan: And we're trying to do our due diligence here to make
sure that we're giving you an opportunity to share any concerns you have
but I certainly understand your position here.

98
00:10:34.110 --> 00:10:48.240
KENT TAYLOR: No, I get that. That's why I tried to put many things down in
words because, quite frankly, it took me all day to do that email just just
so it was right.

99
00:10:48.750 --> 00:10:49.380
Christopher A Mallett: And we are not experienced investigators ourselves
so we're going on a learning curve during this process, the last couple of
months also and I don't think any of us are comfortable speaking because
you need to record it based on the rights and the policies are University,
which is important.

104
00:11:10.980 --> 00:11:17.280
KENT TAYLOR: I get it. You know, due process. And it's fair but fair enough
that we're all not at ease.

105
00:11:21.210 --> 00:11:25.470
KENT TAYLOR: I did look at - as you saw - so I can just offer you know I did.

106
00:11:27.090 --> 00:11:32.430
KENT TAYLOR: Because this seemed like a more formal process, I did look at this data set.

107
00:11:34.200 --> 00:11:36.660
KENT TAYLOR: And it is not clear to me.

108
00:11:39.120 --> 00:11:45.780
KENT TAYLOR: On the second issue of this being a violation of the data use…

110
00:11:52.530 --> 00:12:00.120
KENT TAYLOR: The policy under which the people - and it's actually turns out to be children, so this is really murky - about the children in this study and how they were consented.

112
00:12:08.250 --> 00:12:13.080
KENT TAYLOR: Without actually putting in a formal request to dbGaP to obtain the data and go through the entire process. That's a question I can't answer, unless I do that, and you know, we're all too busy for that.

114
00:12:27.060 --> 00:12:30.630
KENT TAYLOR: So I did look at his data.

116
00:12:35.040 --> 00:12:42.690
KENT TAYLOR: As you saw I provided you with the copies of what he said he was going to use the data for which is part of the process that was off the website, dbGaP, without a formal application. But it's quite a lengthy application process, actually. And it has to go through my IRB.

119
00:12:57.930 --> 00:13:09.870
KENT TAYLOR: We have institutional people sign off on it, and so that was the original question was, how could this have gone through that many layers - that I have to go through, and come out with this sort of use of the research? That we've really worked very hard to collect from these subjects, these participants.

121
00:13:20.610 --> 00:13:32.280
Conor T McLennan: Yeah, so from my understanding there's really at least two questions here surrounding the IRB. One is was IRB approval required for the data set for the purposes, under which the data agreement was made.

124
00:13:41.370 --> 00:13:48.360
Conor T McLennan: A second issue is would IRB approval be required if there
was any deviation from the use of the data as [written in] the original
agreement.

125
00:13:48.390 --> 00:13:49.830
Conor T McLennan: So, these are two questions.

127
00:13:51.180 --> 00:13:59.160
KENT TAYLOR: I can't tell on the IRB, about the first one, the IRB
requirement, but I can tell you that he's outside the data use that he had
specified that he was going to use it for.

129
00:14:04.350 --> 00:14:17.400
Conor T McLennan: So outside of the data use that he specified for, then
again asks a follow up question about the IRB. Would an IRB required to
approve, then, particularly since it's outside the day to use.

130
00:14:17.820 --> 00:14:21.540
KENT TAYLOR: I'm sorry I don't know that an IRB would approve it.

131
00:14:23.310 --> 00:14:27.990
KENT TAYLOR: I'm sure you've had to go through the same IRB courses I have.

132
00:14:29.130 --> 00:14:29.790
KENT TAYLOR: This is stigmatization and we're very careful not to do this
sort of thing and, quite frankly, it's a misuse of the data. We have so
many research questions - why are we doing this?

136
00:14:53.490 --> 00:15:04.590
Christopher A Mallett: Yeah, that's a challenge on our end. We have two-
fold inquiries. One is to look at this purely methodologically and under
any research standard approval process.

137
00:15:05.040 --> 00:15:25.170
Christopher A Mallett: In any norms of acceptable research practices. And
should I do that notwithstanding the topic area. And so we've been going
through that process in terms of trying to determine what stages, should
you get approval. What stages does the dbGaP allow you not to. That is
murky.

138
00:15:26.430 --> 00:15:30.420
Christopher A Mallett: But then when you layer on top of that the more high
risk population of the data set.

139
00:15:31.740 --> 00:15:39.750
Christopher A Mallett: And if you layer on top the topic also, which we're
trying to keep separate from this, it makes it complicated.

141
00:15:42.630 --> 00:15:51.450
KENT TAYLOR: Right and I'm sorry, without going through the formal process…
Perhaps you could do that, if you have IRB approval for doing research but
short of that…

144
00:16:01.950 --> 00:16:17.370
KENT TAYLOR: The reason I wrote to the President was it was just concerning
that this is not something that could be done. I could not. We have
cognitive data as well, I could not use it for this kind of a study in MESA
or TOPMed. Any study that I know. But I did notice we [MESA, TOPMed]
specifically say it can't be used for this in the agreements as part of the
dbGaP documentation.

146
00:16:33.630 --> 00:16:39.900
KENT TAYLOR: That it can't be used for this kind of study of the
subpopulations in the country.

147
00:16:40.620 --> 00:16:42.240
Christopher A Mallett: The original user agreement did not…

148
00:16:42.810 --> 00:16:45.750
KENT TAYLOR: I did not see that for the study that is used in this. I can't
comprehend why not.

150
00:16:52.650 --> 00:17:01.380
KENT TAYLOR: So that's why I'm hesitant on it. Without actually going
through the process I don't know if it would come up or not.

151
00:17:01.860 --> 00:17:17.760
KENT TAYLOR: So that kind of really murked the whole thing, actually with
me coming to you. Because when I first did, it's like this is clearly a
violation of what we're allowed to do. But I'm not so sure, unfortunately,
on this particular data set itself and that's why I gave you the people
that are in charge in the NHLBI at least, and they can put you in contact
with the data use people committees that would be over this data set.

154
00:17:35.880 --> 00:17:41.520
KENT TAYLOR: But you know, I don't know short of going through the process
to really tell.

155

00:17:42.720 --> 00:17:48.300
KENT TAYLOR: Now, are you able to do do that yourself? Or, where are you in
your investigation abilities?

156
00:17:51.510 --> 00:17:52.320
Christopher A Mallett: Ben? I'm not sure how to answer that question.

158
00:17:56.580 --> 00:18:03.750
Benjamin J Ward: I mean, just in general, the committee is allowed to
follow any and all leads that it deems appropriate.

159
00:18:04.500 --> 00:18:13.110
KENT TAYLOR: Are you allowed to put in a formal request and go through the
process and see, or at least talk to the people and find out? Have you been
able to do that?

160
00:18:15.300 --> 00:18:21.390
KENT TAYLOR: Contacting the government? Now that said, I gave you the two
people that I have also contacted.

161
00:18:22.530 --> 00:18:27.390
Benjamin J Ward: Just for clarity's sake, NIH contacted us about this
matter.

162
00:18:27.600 --> 00:18:29.070
KENT TAYLOR: Oh, they did. Okay.

163
00:18:29.310 --> 00:18:30.690
KENT TAYLOR: Well, that makes me feel better.

164
00:18:30.750 --> 00:18:32.160
Christopher A Mallett:.

165
00:18:33.030 --> 00:18:42.510
KENT TAYLOR: Because I did get an email about six months back that said
well we're handling it and she didn't specify. So that's good. Okay, all
right.

166
00:18:43.050 --> 00:18:44.520
Christopher A Mallett: I presume that's confidential but…

167
00:18:44.880 --> 00:18:51.570
KENT TAYLOR: Yeah. Okay, that's good - we're coming full circle and the
players are involved.

168
00:18:52.500 --> 00:19:00.450
Christopher A Mallett: Yeah and I think we can share it in a confidential
way that you're not the only person outside of our university who notified
stakeholders of concerns.

170
00:19:05.820 --> 00:19:06.360
KENT TAYLOR: Oh okay.

171
00:19:06.390 --> 00:19:08.520
KENT TAYLOR: Okay, good way to put it.

172
00:19:09.990 --> 00:19:12.720
KENT TAYLOR: So, then, I guess it just comes down to how can I help you.

173
00:19:15.570 --> 00:19:24.810
Conor T McLennan: So your familiarity with the underlying data and the use
of such data sets. I'm wondering in your professional opinion if you think
the work from Dr Pesta and his colleagues deviates from commonly accepted
practice in the academic community for proposing, conducting, and reporting
research.

175
00:19:36.660 --> 00:19:41.310
KENT TAYLOR: I have no idea about the economic community, which is another
thing that's weird about this.

Conor T McLennan: The academic community

176
00:19:41.370 --> 00:19:42.120
KENT TAYLOR: Okay.

177
00:19:42.690 --> 00:19:46.680
KENT TAYLOR: In my work, this is clearly outside of what you should be
doing

Conor T McLennan: The academic community.

179
00:19:49.830 --> 00:19:50.310
Yes.

180
00:19:59.280 --> 00:20:09.540
Christopher A Mallett: Dr. Taylor, my questions were answered. They were
answered actually with your email response and documents there and I really
appreciate you still coming forward to talk to us and also knowing that it
was recorded on our end.

182
00:20:15.090 --> 00:20:17.370
Christopher A Mallett: Wendy, Conor, did you have other inquiries?

183
00:20:19.200 --> 00:20:25.410
Wendy C Regoeczi: No, I think the email was extremely helpful that you put
together those responses ahead of time we appreciated that very much.

184
00:20:26.190 --> 00:20:28.470
Conor T McLennan: Again we even discuss should we say this interview is
unnecessary now because we have your responses, but we thought we'll go
ahead with it, and again give you the opportunity if there was anything you
wanted to add.

187
00:20:39.600 --> 00:20:41.370
KENT TAYLOR: No, I don't really want to add.

188
00:20:41.460 --> 00:20:50.790
KENT TAYLOR: Because I really then, knowing that this is your process, set
it out and thought okay, what is it that really bothers me.

189
00:20:51.480 --> 00:21:04.200
KENT TAYLOR: The only other thing I could suggest is that - I'm sorry I
don't have time for it either – the paper could be sent to a statistician
because it is not up to snuff with respect to what I would consider - even
if this is what I was going to say, it is not up to snuff..

192
00:21:18.630 --> 00:21:28.110
KENT TAYLOR: It is not statistically high quality at all. And there's lots
of things missing. And there's lots of things that would address the issue.
There's a lot of things on socio-economic status that are missing, there's
a lot of considerations that are most likely in the data set that are not
here in this paper. And so it has not been a good use of the data.

194
00:21:46.980 --> 00:21:47.340
Conor T McLennan: Thank you.

195
00:21:51.090 --> 00:22:07.320
Christopher A Mallett: Dr. Taylor, I guess, thank you very much then for
your your time today and your commitment to this. We very much appreciate
it as an institution, as a university and as the investigators on the
inside. The committee members here, I know, I'm sure Dr Ward does also as
our integrity integrity officer.

196
00:22:08.310 --> 00:22:20.760

Benjamin J Ward: It's very much appreciated and just to reiterate this was recorded, there will be a transcript prepared, so I will send that to you, Dr. Taylor so that you can make any corrections if anything's wrong. Because the automated transcript is guaranteed to be wrong. That's just the machinery, these days, but that will be made available to you in the next couple days.

199
00:22:26.190 --> 00:22:35.580
KENT TAYLOR: Okay, and if there's any further things, let me know. I mean you know we get that come up then as you're going through. Since we're all amateurs at this.

200
00:22:37.050 --> 00:22:38.220
Conor T McLennan: Thank you, We appreciate that.

201
00:22:38.400 --> 00:22:40.080
KENT TAYLOR: yeah let me know okay.

202
00:22:40.440 --> 00:22:40.680
Benjamin J Ward: Thank you.

203
00:22:41.850 --> 00:22:43.320
Christopher A Mallett: I appreciate it okay.

*11. Respondent Comments Regarding Interviews with Bird et al. and Kent Taylor*

**October 11, 2021**

### Reply to Bird, Carlson, and Townsend

My perception is that the interview process here is unfair. Bird et al. have too much power. They can allege whatever they want without accountability (despite potential defamation), and I am stuck trying to rebut their claims without the luxury of cross examination. This also lets them generate new accusations that I must now deal with, this late into the investigation. Specifically, I counted seven new allegations from this interview that were not previously "on the table". Bird et al. also made several allegations that are wholly irrelevant as to whether I have committed academic misconduct.

Below is my rebuttal of issues raised in their interview.

1. P.3, 37, "…racist applications of genetic data". I object to this statement; my research is not racist, because I employ the same techniques used by medical researchers to study race/ethnic group differences in disease susceptibility, or in neurological traits like sleep depth. Is research on group differences in susceptibility to cancer, or to sleep related neurology, racist?

2. P.3, 47, the Pioneer Fund. I did not receive money from the Pioneer fund. However, John and I applied for funding from Richard Lynn to pay for John's CSU tuition. For the record, I did apply for a Pioneer Fund grant back in 2008, but it was not funded. Even if I were funded (in 2008 or now), how would this be evidence of academic misconduct?

3. P.3, 52. The Ulster Institute. I am not affiliated with the Ulster Institute, but if I were, how would this be evidence of academic misconduct?

4. P.4, 56. Authorship with Davide Piffer. I have no publications with Davide, despite the absurd claim that he is a "frequent co-author" with me. Even if I did co-author with Davide, how is this evidence of academic misconduct?

5. P.4, 64. ResearchGate Lab. How would having or not having a "lab" with John and Emil be evidence of academic misconduct? ResearchGate defines a "lab" as simply "a group of scientists, led by a senior researcher, who conduct experiments and research together on a specific topic."

6. P.4, 75. Fraudulent Listing of Lab Associates. The speculation here is inane and potentially defamatory.

7. P.5, 78. The Human Phenome Diversity Foundation. How is fundraising to support IQ research evidence of academic misconduct?

8. P.5, 88. Mankind Quarterly Publications. I am not an author on the "More research is needed" paper, and Google Scholar now reflects this.

9. P.6, 101. Uploading to the External Website. How is it possible that SNPs predicting just eye, hair, and skin color can be used to genetically identify this study's research participants?

10. P.7, 124. Explicit mention of Race/IQ in our Applications. Bird states: "I don't believe testing the racial IQ gap which separate points in the paper was explicitly kind of stated as the goal [of Pesta's applications] …". However, our Application (Transracial Validity of PGS) explicitly states: "The study will be a correlational analysis of the statistical association between various PGSs and cognitive ability. We will conduct analyses separately in White and African American samples. For these analyses, we will need cognitive data (all available) to create general and broad ability indexes, and demographic data (age, sex, etc.). We will also need SNP genotypes to create PGS scores and to control for genetic relatedness following the protocol of Lee et al. (2018)".

11. P.8, 127. Our Requests for More Datasets. How is also requesting the ABCD and Add Health datasets evidence of academic misconduct?

12. P.9, 147. Mention of Race and IQ in our Applications. We did, please see Point 10 above.

13. P.10, 149. Do our Newer Applications Mention Race/IQ? Bird says: "And the February 20 one, "Scarr-Rowe Effect on Genetic Expressivity" is about socio economic status. So, none of them, just from looking at them and from my recollection, mention testing a genetic racial cause of IQ differences." This is absurd. Our newer applications clearly state that our focus is on cognitive ability and race/ethnicity. We were rather careful with these newer applications, given that we had already received the 2019 complaint from the NIH. Again, despite the Bird et al. complaint in 2019, the NIH still approved our newer applications (leading us to believe that we were in the clear with them).

14. P.10, 154. Ethics of our Research. This is speculation by Bird. Why would the NIH approve our newer applications if studying "…genetic ancestry, education related PGS, and cognitive ability" (i.e., our ABCD Applications) is unethical?

15. P.10, 166. IRB Approval. I wish I were asked about IRB approval beforehand, rather than have Bird et al. speculate at length as to whether I have it. I do have it, for those applications where it was needed, and I attach the approval/exemption letter here. This further illustrates my frustration with the interviews—again, my perception is that these external people can say whatever they want (no cross examination), and I am stuck trying to defend all this, when they have no authority to make most of these kinds of determinations (e.g., whether I had IRB approval).

16. P.13, 208. Connor paper. I am not an author on this paper. Google Scholar now reflects this.

17. P.14, 222. External Sever Upload. We did upload files to this server. So did the paper referenced below, which was published after our (Lasker et al., 2019) paper. The paper below is high-profile and published in the collection of journals from *Nature*. For this paper, the NIH approved the authors use of the same external server that we used, for the same purpose that we used it for. Why?

https://www.nature.com/articles/s42003-020-01461-8/figures/3

### Genetic ancestry, skin pigmentation, and the risk of cutaneous squamous cell carcinoma in Hispanic/Latino and non-Hispanic white populations

- Eric Jorgenson, Hélène Choquet, Jie Yin, Thomas J. Hoffmann, Yambazi Banda, Mark N. Kvale, Neil Risch, Catherine Schaefer & Maryam M. Asgari

*Communications Biology* **volume 3**, Article number: 765 (2020) Cite this article

**Data availability**

Genotype data of GERA participants are available from the database of Genotypes and Phenotypes (dbGaP) under accession phs000674.v2.p2. This includes individuals who consented to having their data shared with dbGaP. The complete GERA data are available upon application to the KP Research Bank (https://researchbank.kaiserpermanente.org/).

**HIrisPlex-S program and predicted skin pigments**

To determine whether the genetic ancestry associations with cSCC were due to differences in skin pigmentation, we predicted skin pigment traits (i.e., "dark skin," "dark to black skin," "intermediate skin," "very pale skin," and "pale skin") using HIrisPlex-S[24,25,26], a program that utilizes known pigment genetic variants to generate probabilities of different pigment traits. The HIrisPlex-S predictive model includes 36 SNPs for skin color (Supplementary Table 3). We did consider using a five-category level (very pale, pale, intermediate, dark, and dark-black) of the HIrisPlex-S skin pigmentation predictions and examined the distribution of all the categories in GERA non-Hispanic whites (Fig. 3). Because the distribution of the categories "very pale" and "dark to black" were not well differentiated from "pale" and "dark," respectively, we decided to combine "dark" and "dark to black skin" into a single category, and "very pale" and "pale" into a single category. Thus, by focusing on a three-category level (very pale + pale, intermediate, dark + dark-black), we improved the predictive values for skin pigmentation compared to the original five-category level. To determine whether predicted skin pigmentation traits explain the observed associations of genetic ancestry with cSCC risk, we included the probabilities for "dark + dark to black," and intermediate skin colors in the logistic regression models. Because the skin pigment probabilities sum to 1, we had to exclude at least one skin pigment probability. We chose to exclude "very pale + pale skin" from our models. As a result, the direction of the effect estimates of the skin pigment probabilities represents darker pigment.

**Fig. 3: Distribution of the five-category level of the HIrisPlex-S skin pigmentation predictions in GERA non-Hispanic whites.**



Skin pigment traits (i.e., "dark skin," "dark to black skin," "intermediate skin," "very pale skin," and "pale skin") were predicted using HIrisPlex-S program based on 36 SNPs known to influence skin color. We did consider using a five-category level (very pale, pale, intermediate, dark, and dark-black) of the HIrisPlex-S skin pigmentation predictions and examined the distribution of all the categories in GERA non-Hispanic whites.

*Please note the additional inference here that if the NIH approved this paper, then obviously the external, HIrisPlex-S, website is not sufficient to genetically identify research participants.*

18. P.15, 240. Complaints about Emil Kirkegaard. How is Emil's past research record (e.g., The OK Cupid study) relevant as to whether I committed academic misconduct here?

**Reply to Kent Taylor's Interview**

1. P.2, 44. The Journal, *Psych*. How are articles from other scholars, albeit edited by me, evidence of my academic misconduct? Moreover, regarding my "view" on whether genetics play a role in IQ / Race gaps, I am currently agnostic.

2. P.7, 127. "Outside the data use". I have no opportunity here to defend against this statement, as Taylor doesn't say why or how I am "outside the data use."

3. P.7, 32. Stigmatization. My understanding is that academic freedom trumps whether people find speech offensive (see the correspondence from FIRE in the binder), but I do not know if "stigmatization" is in a separate category, or merely an exemplar of how something might be offensive. I defer to Jay.

4. P.10, 177. "[my work] is clearly outside what you should be doing". Another reason why I think the process here is unfair is that I cannot call witnesses to rebut statements like these. I could call bona fide experts to testify that our research agenda was scientifically appropriate.

5. P.11, 192. "Not statistically high quality at all."  Why? How? The statistical analyses (e.g., MGCFA) employed in Lasker et al. were a strength of the paper. If given the chance, I could readily defend the statistical expertise of all Lasker et al. co-authors, together with all analyses we conducted.

6. P.11, 192. "There's a lot of things on socio-economic status that are missing". We (Lasker et al.) controlled for SES in our analyses, which we suspect is obvious for people who have read our paper beyond the abstract. Moreover, we clearly note the limitations of our research design in Lasker et al., which are also commonly referenced in the medical epidemiology literature:

While the statistical mediation by PGS scores suggests that genetic factors may be involved, as discussed in detail by Kirkegaard et al. [24], **we cannot rule out many types of confounding environmental variables with this research design. Global admixture analysis results are suggestive and should only be considered a first step for investigating the effects of admixture on a trait**. We suggest to attempt replication of the current results using a nationally representative sample and then, if these findings are confirmed, proceed to admixture mapping (local admixture analysis). This is the standard approach taken in medical epidemiology.

Sincerely,


Bryan

*12. Interview Transcript – Respondent Bryan Pesta, 10/11/2021*

WEBVTT

[Participants connecting to Zoom meeting]

20
00:03:05.040 --> 00:03:10.980
Benjamin J Ward: So obviously this is the follow up to the initial
interview with Dr. Pesta from a few weeks ago.

21
00:03:11.430 --> 00:03:20.520
Benjamin J Ward: In the intervening couple of weeks there have been
interviews with some of the complainants that were included in the charge
letter. And as is part of our process, Dr. Pesta you get to review any
interviews with complainants and then provide your rebuttals. So here's the
opportunity for you to provide rebuttals and then also for the committee to
ask some follow up question.

23
00:03:29.700 --> 00:03:37.770
Bryan: Okay, thank you very much, I sent an email, it was late. I don't
know if anybody had a chance to read it, but I can reference that if you
hadn't had a chance to read it.

24
00:03:38.580 --> 00:03:39.870
Bryan: It was this morning.

25
00:03:40.230 --> 00:03:49.920
Benjamin J Ward: I'll let the committee members state whether or not
they've had a chance to read it. You also referenced an IRB approval in
that [document], so I did find that that [IRB approval] was from 2020.

26
00:03:51.060 --> 00:03:56.340
Benjamin J Ward: So that has been uploaded as well. They have access to it,
but I don't know that the committee would have had time to review it yet.

27
00:03:57.900 --> 00:04:07.980
Benjamin J Ward: So again, this meeting is being recorded, I will correct
the transcript and then obviously Dr. Pesta, you will again have a chance
to correct anything if there are mistakes or if clarification is required.

28
00:04:09.300 --> 00:04:11.610
Benjamin J Ward: And then with that, I'll turn it over to the committee.

29
00:04:13.980 --> 00:04:15.630

Christopher A Mallett: Alright nice to see you all again.

30
00:04:18.060 --> 00:04:23.580
Christopher A Mallett: I guess we'll jump right in with a series of
questions and follow up Bryan.

31
00:04:24.630 --> 00:04:32.520
Christopher A Mallett: A couple of different topics. We'll introduce the
topic first. At first is sort of what was noted there and your rebuttal
about IRB approval and whatnot.

33
00:04:37.350 --> 00:04:52.890
Christopher A Mallett: We had a first question that, back [on] December 10
in one of your correspondence you wrote this in 2020 to Dr. Ward

"please note, we are not required to secure IRB approval for this research"

And that was in response to a request for the dbGaP study. Can you explain
why you believe you were not required to secure IRB approval for that
research?

35
00:05:01.590 --> 00:05:13.920
Bryan: So I think there's three different data sets because TCP -
trajectories of complex phenotypes - that's the one that's been the focus
of this investigation, I think. Then there's ABCD and Add Health.

36
00:05:15.090 --> 00:05:22.350
Bryan: dB - I'm sorry - TCP did not need IRB approval and it says so right
on the website, but Add Health did.

37
00:05:27.480 --> 00:05:30.990
Conor T McLennan: Okay, so Bryan just a follow up question to that, then.

38
00:05:32.400 --> 00:05:33.270
Conor T McLennan: The dbGaP [web site] said it did not require IRB
approval. It says.

40
00:05:37.710 --> 00:05:38.610
Bryan: TCP

41
00:05:38.670 --> 00:05:39.330
Conor T McLennan: TCP.

42
00:05:39.720 --> 00:05:40.980
Bryan: TCP – They're all dbGaP.

*[TCP data set was requested/accessed via https://www.ncbi.nlm.nih.gov/gap/, ABCD data set was requested/accessed via NIMH Data Archive https://nda.nih.gov/]*

43
00:05:41.550 --> 00:05:42.210
Conor T McLennan: Right right right.

44
00:05:43.740 --> 00:05:51.180
Conor T McLennan: But what if the researchers went beyond what was proposed in the data use agreement? Then would the IRB approval be necessary.

45
00:05:51.990 --> 00:05:54.360
Bryan: I'm not sure that we did that but hypothetically.

46
00:05:55.470 --> 00:05:57.540
Bryan: I don't - I have to think about it, I suspect, yes.

47
00:06:00.480 --> 00:06:00.870
Conor T McLennan: Thank you.

48
00:06:04.680 --> 00:06:16.590
Wendy C Regoeczi: So, as you know, [complainants] Carlson, Townsend, Bird, and Keyes claim that you and your colleagues imputed personally identifiable information - eye color, skin color, hair color, and sibling status about samples - apparently without IRB approval and imputed genotype information that could further contribute to the identifiability of study samples. Was imputing all of this information part of your original 2018 DAR [data access request]?

51
00:06:33.090 --> 00:06:51.600
Bryan: I honestly don't know - the color issues: skin color, hair color, eye color stuff, that was all not the focus of the study. We used it as a control variable to rule out environmental - discrimination based explanations for the gap. So I honestly, it was an oversight that we didn't include it.

52
00:06:55.350 --> 00:07:10.350
Conor T McLennan: So just connecting the last two questions, though, Bryan. It looks like there were things that weren't part of the data access request form but you didn't have IRB approval, even though you went beyond what was in the request form.

53
00:07:10.650 --> 00:07:24.750
Bryan: Well, first these are archival data. Second, nothing I did can be used to identify participants. Third, in the email I just sent this

morning, I pasted in part of the article published in the Nature set of
journals that use the same website. And so I think, obviously, if the NIH
allowed that, then there's no way to identify participants from using this
website.

55
00:07:35.550 --> 00:07:38.220
Bryan: And I'm sorry, I don't think I addressed your question, could you
ask it one more time.

56
00:07:40.260 --> 00:07:48.870
Conor T McLennan: Well, so the previous question was about whether imputing
all of this information was part of your original 2018 data access request.

57
00:07:49.380 --> 00:08:02.610
Conor T McLennan: You, I think, just said that it wasn't originally in
there. You left that out, but the previous question was if you went beyond
what was proposed in the data access request wouldn't IRB approval be
necessary?

58
00:08:04.110 --> 00:08:05.790
Bryan: So I think honestly it'd be more NIH approval versus IRB.

60
00:08:08.850 --> 00:08:10.950
Bryan: Because the nature of the data don't change.

61
00:08:13.740 --> 00:08:26.700
Conor T McLennan: So it could be NIH approval or IRB approval or both, but
in any case imputing all of this information wasn't part of the original
data access request, nor IRB approval, for that. Is that correct.

62
00:08:27.420 --> 00:08:29.670
Bryan: No, it was not. Like I said, it was an oversight.

63
00:08:31.650 --> 00:08:32.010
Conor T McLennan: Thank you.

64
00:08:33.930 --> 00:08:35.760
Christopher A Mallett: Thanks Bryan. In sort of the same track. In that
original 2018 DAR

67
00:08:43.350 --> 00:08:45.150
Christopher A Mallett: In the DAR note.

68

00:08:46.200 --> 00:08:53.100
Christopher A Mallett: Did that original DAR note the use of the data to study genetic differences of US population subgroups?

69
00:08:54.540 --> 00:08:55.740
Bryan: I'm not sure I understand that.

70
00:08:57.480 --> 00:09:05.460
Christopher A Mallett: The question is, did your original 2018 DAR note the use of the data to study genetic differences of US population subgroups?

71
00:09:05.580 --> 00:09:12.120
Bryan: Yes, if you look specifically at the - I don't have the numbers memorized, but it's the one that says translational validity of… whatever it says. That one says specifically, and I underlined it in the email I sent this morning, the relevant part.

73
00:09:25.080 --> 00:09:39.900
Conor T McLennan: So if I could just jump in quickly here, I think part of what you had sent, if I'm piecing this together correctly, included the analysis plan, where you said, you will conduct - we will conduct analyses separately in White and African American samples. Was that done.

74
00:09:41.580 --> 00:09:42.030
Bryan: Sure.

75
00:09:44.340 --> 00:09:48.660
Conor T McLennan: So the analyses were not combining the groups, they were done separately for [each subgroup].

76
00:09:48.660 --> 00:09:52.830
Bryan: What I think analyses did both. You know, different analyses did that versus that.

77
00:09:54.300 --> 00:10:09.270
Conor T McLennan: So, again just trying to do our due diligence and piece this together here. What was in the data access request form is not necessarily… So you went beyond what was proposed in the data access request by conducting analyses not separately but also combined. Is that correct?

78
00:10:09.870 --> 00:10:21.540
Bryan: Boy, I don't know. I mean I'm going to - I give up. I don't know it to say to that. We analyzed what we said we're going to analyze. The one thing I did do is upload data to that server without getting permission and I own that. But I see that the NIH approved it for other researchers, so I

don't see a) how it did any harm and b) why they are singling me out when
they approved it after the fact, with other research. But whether we
combine data or did not. I wasn't trying to sneak that. What advantage
would I get from trying to sneak that by?

81
00:10:43.020 --> 00:10:51.240
Bryan: What advantage would I get from trying to upload the IQ paper to the
non IQ application? I don't see how any of this gets at motive or anything
like this.

82
00:10:52.530 --> 00:10:53.880
Bryan: So, I'm a little frustrated I apologize.

83
00:11:03.120 --> 00:11:03.600
Conor T McLennan: Okay.

84
00:11:05.340 --> 00:11:11.940
Conor T McLennan: So I think we'll move on past the IRB in a minute here,
but just one last thing at least from my perspective on the IRB.

85
00:11:12.570 --> 00:11:27.810
Conor T McLennan: Can you please explain your understanding of the
following CSU IRB [policy]. Where it says on the IRB website, "please note
that only the IRB staff have the authority to ascertain which level of
review will be necessary for your particular proposal."

86
00:11:31.470 --> 00:11:33.240
Bryan: I don't understand that. Could you explain it or repeat it?

87
00:11:33.930 --> 00:11:34.380
Conor T McLennan: Sure.

88
00:11:35.580 --> 00:11:44.820
Conor T McLennan: "Please note that only the IRB staff have the authority
to ascertain which level of review will be necessary for your particular
proposal."

89
00:11:45.330 --> 00:11:50.160
Bryan: Sure, that's why we submitted the IRB application for the Add Health
data set.

90
00:11:53.010 --> 00:11:56.550
Conor T McLennan: Can you expand on that? Which is why you did that for
this other data?

91
00:11:56.580 --> 00:12:00.600
Bryan: Well, I mean if dbGaP, or TCP, I'm sorry if TCP says not needed, why
would I bother CSU's IRB with that? But Add Health said "need it," so we
got it.

93
00:12:09.900 --> 00:12:20.490
Conor T McLennan: Right, so again, I think there are a couple things from
my perspective. One is the NIH said that, but there still are local CSU IRB
institutional policies.

94
00:12:21.210 --> 00:12:31.170
Conor T McLennan: That's one issue, but the second issue is, even if it
were true that NIH and CSU's IRB were on the same page that IRB approval
wasn't necessary as submitted in the data access request, as soon as you
start to deviate from that or go above and beyond that, then I think you
just answered a minute ago you would agree that IRB approval would be
necessary.

96
00:12:43.290 --> 00:12:56.160
Bryan: Yeah, but I guess it's a timing issue. I mean if you accept that it
was an oversight to not mention uploading to the external server, then when
we did do that, and then the NIH complained or Bird complained, why would
we go back to the IRB post facto to try to get approval.

98
00:13:03.900 --> 00:13:04.950
Bryan: Am I missing something.

99
00:13:07.080 --> 00:13:12.780
Conor T McLennan: That's a separate question, right? So you're bringing up
the complaint that brought this into the light, which I understand you're
doing, but what I think I'm trying to do or we're trying to do here is
understand the situations in which IRB approval would be necessary and was
IRB approval requested in all of those situations.

101
00:13:28.560 --> 00:13:34.410
Bryan: So honestly, with TCP I neither thought IRB approval was necessary
nor did I seek it out.

102
00:13:35.460 --> 00:13:36.960
Bryan: For the other data sets I did.

103
00:13:40.350 --> 00:13:41.070
Conor T McLennan: Okay, thank you.

104
00:13:46.260 --> 00:13:52.470

Wendy C Regoeczi: So I think we're going to switch subjects briefly here and ask you a few questions about data storage.

105
00:13:54.120 --> 00:14:06.870
Wendy C Regoeczi: So on June 24 2021, Dr. Ward wrote to you,

"your email message to Teri Kocevar dated April 18th 2018 included the statement. 'I will be the only one who has access to these data, they will be stored on my CSU computer, which is password and firewall protected.'"

107
00:14:16.590 --> 00:14:32.520
Wendy C Regoeczi: And then on June 28 2021, Dr. Ward wrote to Mr. Fuerst

"you state in your email, 'the data is encrypted on a password protected desktop which is under Dr. Pesta's guardianship consistent with the NIMH contract. It is not clear to me that that is consistent with the data use agreement and, in any case, it is not consistent with Dr. Pesta's statement that the data would be contained solely on his CSU issued device.'"

109
00:14:46.800 --> 00:14:52.590
Wendy C Regoeczi: So we were hoping that you could address the apparent inconsistency in these statements about where the data would be stored and where the data ended up being stored.

111
00:14:56.460 --> 00:15:07.500
Bryan: Yeah, I thought this came up last in our last interview. I initially wanted to run it on the CSU laptop - provided by CSU to me - but it wasn't powerful enough.

112
00:15:08.520 --> 00:15:10.230
Bryan: So we bought a desktop and ran it off that in my house.

113
00:15:18.930 --> 00:15:23.010
Bryan: And I'd have to dig it up, but I could have swore I mentioned this somewhere to someone at some point.

114
00:15:28.320 --> 00:15:28.710
Wendy C Regoeczi: Okay.

115
00:15:33.180 --> 00:15:38.250
Christopher A Mallett: Switch over a different topic – the data access issue and data access questions.

116
00:15:39.420 --> 00:16:02.520
Christopher A Mallett: Similar line here, in your reply to Dr. [Ota] Wang of the NIH on September 20, 2019, Dr. Pesta you wrote

"I do not give restricted data access to either J. Lasker or E.O.W. Kirkegaard, and so there was nothing to approve"

And then on June 30, 2021 Dr. Faison wrote to Mr. Fuerst the following,
"We have not yet received a signed letter from you certifying that all dbGaP data has been deleted from your computer systems and expect to receive that certification by close of business Friday July 2 2021."

118
00:16:21.180 --> 00:16:22.560
Christopher A Mallett: Further your reply to Dr. Faison on July 2 2021.

"re John still having data, not that I am aware."

was your response.

121
00:16:36.660 --> 00:16:56.370
Christopher A Mallett: And then going back to December 10 2020 in your email to Dr. Ward you wrote the following,

"The NIH additionally asked us about collaborators, as we explained to them only John Fuerst and I had access to restricted data"

and then in our previous interview you indicated the following

"We didn't share any genetic data. John and I had it, nobody else did."
[*Sept. 7 interview paragraph 159, timestamp 00:22:21.570 --> 00:22:27.450*]

and

"only John had access to confidential data."
[*Sept. 7 interview paragraph 190 – time stamp 00:26:15780 --> 00:26:22.110*]

Then you went forward and stated
"unless he stole it, I didn't give him his own copy."
[*Sept. 7 interview paragraph 192 – time stamp 00:26:30.090 --> 00:26:42.000*]

123
00:17:13.890 --> 00:17:21.090
Christopher A Mallett: Can you help address some of the apparent inconsistencies there? About whether John had access to restricted data?

124
00:17:22.530 --> 00:17:29.280
Bryan: John did under my supervision, at my house, with me present. I never gave him a copy of the data set.

125
00:17:30.420 --> 00:17:32.250

Bryan: And I still suspect he does not have it.

126
00:17:33.960 --> 00:17:37.230
Bryan: You threw out a lot of dates there, if you could maybe throw them out again?

127
00:17:40.320 --> 00:17:42.000
Christopher A Mallett: Yeah happy to go back.

128
00:17:43.230 --> 00:17:46.740
Christopher A Mallett: Back in 2019, September 25 2019.

129
00:17:48.480 --> 00:17:54.240
Christopher A Mallett: You noted that you did not give restricted data to either J. Lasker or Kirkegaard and there was nothing to approve.

130
00:17:54.300 --> 00:17:55.980
Bryan: Let's go day by day. That's correct.

131
00:17:56.760 --> 00:18:04.470
Christopher A Mallett: Okay, and then to this year on June 30 2021, Dr. Faison wrote to Mr. Fuerst.

132
00:18:05.310 --> 00:18:24.300
Christopher A Mallett:
    "We have not yet received a signed letter from you certifying that all
    dbGaP data has been deleted from your computer systems and expect to
    receive that certification by close of business Friday July 2 2021"

your reply then, to Dr. Faison on July 2 2021 was about John still having data,
    "not that i'm aware of."

is your response

133
00:18:25.140 --> 00:18:26.790
Bryan: Correct.

134
00:18:27.360 --> 00:18:28.920
Christopher A Mallett: Okay, and then going back…

135
00:18:29.040 --> 00:18:45.360
Conor T McLennan: Can I just jump in here to help understand? I think there is one that I'm trying to wrap my head around here Brian. If John never had

the data, wouldn't the reply of that point have been that John never had
the data?

136
00:18:46.380 --> 00:18:47.640
Bryan: Yeah. What did I say?

137
00:18:49.320 --> 00:18:52.290
Christopher A Mallett: Not that you were aware of, I believe. That's what
we were confused by.

138
00:18:52.410 --> 00:18:56.790
Bryan: Well, if he has it, I don't know of it. If he's bluffing that he has
it, but I think he's bluffing.

139
00:19:03.540 --> 00:19:05.880
Christopher A Mallett: Why would John be bluffing? Any idea?

140
00:19:06.120 --> 00:19:10.170
Bryan: Well, I think his life's mission is to get this research published.

141
00:19:18.180 --> 00:19:20.460
Bryan: Not obviously the Lasker paper, but the other ones.

142
00:19:26.520 --> 00:19:36.810
Conor T McLennan: So, from my perspective, during our last interview when
you said, "unless he stole it, I didn't give him his own copy" That was the
first that I had heard of the claim that John never had access to the data.
In other, you know, in some of this paperwork trail, the emails,
correspondence that Chris is reading in your replies, it was always the
case, my understanding is that it was always the case that you felt that
John could access the data, because he was under your supervision and only
you and john had access to the data.

146
00:20:03.150 --> 00:20:19.680
Conor T McLennan: But then it was only at, toward the end of that last
interview, that discussion, where you said unless he stole it he never had
a copy. And so I'm trying to understand, did he have his own copy and
access, which appears to be what had been said all along; or did he not
have it, only if he stole it.

147
00:20:20.820 --> 00:20:26.160
Bryan: I don't understand that. I'm sorry, I'm not trying to be difficult,
I don't see what you're getting at here.

148
00:20:29.010 --> 00:20:36.990

Conor T McLennan: So your position all along, to me, seemed to be that John had access to the data and he was allowed to have it, because he was…

149
00:20:37.290 --> 00:20:37.980
Bryan: Can I stop you there?

150
00:20:38.400 --> 00:20:42.360
Bryan: He had access to the data only in my house with me present.

151
00:20:48.510 --> 00:20:48.780
Conor T McLennan: Okay.

152
00:20:54.930 --> 00:20:55.410
Conor T McLennan: All right.

153
00:20:57.090 --> 00:20:58.650
Conor T McLennan: So, again on [the] data access question here, can you please explain how your other co-authors, especially those listed as participating in data analyses, did not have access to the data?

155
00:21:13.770 --> 00:21:30.060
Bryan: They had access to the phenotypic data, mainly the IQ test. We didn't really know how to do the multi-group confirmatory factor analysis. It's fairly, at least from my point of view, it's fairly complicated. That's why we got Jordan [*Lasker*] and Emil [*Kirkegaard*] on board so they did that.

156
00:21:32.730 --> 00:21:34.980
Bryan: But that's not restricted access data.

157
00:21:36.810 --> 00:21:43.140
Conor T McLennan: So, none of the analyses required the restricted access data or any of the data derivatives?

158
00:21:43.500 --> 00:21:47.070
Bryan: Oh, no. A lot of the analysis did, but only John and I did those analyses.

159
00:21:48.090 --> 00:21:54.840
Bryan: So the IQ test is not genetic, it's phenotypic and we had them do the factor analysis on that.

160
00:21:58.500 --> 00:22:04.740

Conor T McLennan: And John did the analyses from the protected data, but he never had access to his own copy of the data.

161
00:22:05.430 --> 00:22:07.560
Bryan: To his own copy, correct. As far as I know.

162
00:22:13.380 --> 00:22:13.710
Conor T McLennan: Okay.

163
00:22:17.580 --> 00:22:26.250
Wendy C Regoeczi: And yet, CSU is still trying to get confirmation from John that he destroyed his copy of the data.

164
00:22:26.880 --> 00:22:34.380
Bryan: Yeah, he won't do that. His take is he wants to go through the NIH and appeal further and not through CSU.

165
00:22:37.740 --> 00:22:41.220
Wendy C Regoeczi: So that certainly makes it sound like he has his own copy.

166
00:22:41.880 --> 00:22:47.100
Bryan: It's possible. That's why, I mean this goes back to Conor's question from like 10 minutes ago. I don't know.

167
00:22:48.960 --> 00:22:51.120
Bryan: Why did I change from going no to maybe?

168
00:22:51.210 --> 00:22:51.810
Bryan: I don't know.

169
00:22:52.920 --> 00:22:53.220
Wendy C Regoeczi: Okay.

170
00:22:54.840 --> 00:23:04.800
Conor T McLennan: I'm just still not sure how it would be possible, how do you think it would be possible for him to have the data if he only was able to access it under your supervision at your house on this computer?

Bryan: I don't know.

171
00:23:11.430 --> 00:23:17.310
Bryan: I mean it's possible, maybe when I went to… I don't know. Speculating on this is speculation. I don't know.

172
00:23:21.330 --> 00:23:21.720
Wendy C Regoeczi: Okay.

173
00:23:24.060 --> 00:23:28.080
Wendy C Regoeczi: So I guess we'll move on to our next question, then,
which was did you list.

174
00:23:28.710 --> 00:23:30.960
Christopher A Mallett: Wendy, before we go there

Wendy C Regoeczi:  Oh yes, sorry Chris. Go ahead.

175
00:23:31.290 --> 00:23:39.150
Christopher A Mallett: I'm just sort of piecing it together. Are you still
working with John? Because you have questions about "Hey, this is not about
John, he's not part of CSU."

176
00:23:39.540 --> 00:23:40.800
Bryan: It seems like it is.

177
00:23:41.700 --> 00:23:44.730
Christopher A Mallett: Yeah, and I don't mean to make it that way.

178
00:23:45.780 --> 00:23:49.410
Christopher A Mallett: Are you still currently working with John on
research projects and other…

179
00:23:49.650 --> 00:24:05.250
Bryan: Yeah, that's a good question. There's two papers, I have that are
not at all restricted access data. Nothing to do with the NIH. One just got
rejected at a good journal we're sending it to a lesser journal and we're
going to see that through.

180
00:24:06.600 --> 00:24:15.030
Bryan: And the other one, I think it's a revise and resubmit. So we're in
the process of revision. But again, neither of those are dbGaP stuff.

181
00:24:19.590 --> 00:24:20.970
Christopher A Mallett: Which data set are they, out of curiosity?

182
00:24:22.350 --> 00:24:33.810

Bryan: They're archival data, one is on the United States, the 50 US states. We have IQ scores for all 50 States and they so happened to correlate stronger this other important variables so we're looking at that.

183
00:24:35.130 --> 00:24:39.750
Bryan: The other one looks at test scores in the UK, like standardized test scores. Those are the two papers.

184
00:24:43.740 --> 00:24:45.930
Christopher A Mallett: Thank you. Wendy? I jumped in there…

185
00:24:46.530 --> 00:24:47.250
Wendy C Regoeczi: No problem.

186
00:24:48.270 --> 00:24:55.170
Wendy C Regoeczi: Okay, so did you list Emil Kirkegaard as a research fellow on your CSU lab on ResearchGate or elsewhere?

187
00:24:56.940 --> 00:25:03.780
Bryan: I don't even want to answer that question. I think it's so completely irrelevant to academic misconduct that I'm frankly frustrated.

188
00:25:04.440 --> 00:25:20.280
Bryan: But, so what? He's in my lab. And in the email I sent you this morning, the lab, defined by research gate, is just a bunch of people who do research together. So yeah, he was listed in my lab but it wasn't a physical location that we went to. It was just a collaboration.

189
00:25:26.250 --> 00:25:31.380
Wendy C Regoeczi: Even though it sort of implies that he's got an affiliation to Cleveland State University, by doing that.

190
00:25:31.800 --> 00:25:33.990
Bryan: I never once thought that that was the case.

192
00:25:35.610 --> 00:25:37.230
Bryan: No, I mean that's absurd.

193
00:25:38.880 --> 00:25:44.190
Bryan: Why would I try to pretend he was affiliated with CSU? How can I get away with it, what would I gain from it?

194
00:25:46.860 --> 00:25:47.190
Wendy C Regoeczi: Okay.

195
00:25:50.190 --> 00:25:55.920
Christopher A Mallett: Thank you. Going to switch to different topic that's come up a little bit before. Some of the funding related questions.

196
00:25:58.470 --> 00:26:02.400
Christopher A Mallett: I saw some of your, a little bit of your response this morning. I haven't been able to absorb it.

197
00:26:04.110 --> 00:26:11.550
Christopher A Mallett: But we've got some questions about the fundraising associated with Human Phenome Diversity Foundation and the Human Bio-diversity Research.

198
00:26:11.940 --> 00:26:12.210
Bryan: sure.

199
00:26:13.350 --> 00:26:23.370
Christopher A Mallett: In your 2019 tax form, the Human Phenome Diversity Foundation was listed as a 501C3, showed a total of $21,470.

200
00:26:24.330 --> 00:26:39.240
Christopher A Mallett: The 2020 Human Diversity Research fundraiser raised $2835 of the $2500 goal. Other paperwork show that the 2021 Human Diversity of Research fundraiser raised $2500 of the $2500 goal.

201
00:26:41.160 --> 00:26:50.010
Christopher A Mallett: Funding was noted on the Pesta, Fuerst, is it P-I-F-F-E-R? I don't want to mispronounce Piffer and Kirgegaard 2020 paper.

Bryan: I'm not on that

202
00:26:51.840 --> 00:26:57.180
Christopher A Mallett: It says funding for this project was provided by the Human Phenome Diversity Foundation.

203
00:26:57.450 --> 00:26:59.490
Bryan: It was, but I'm not in that paper.

204
00:27:00.870 --> 00:27:01.410
Christopher A Mallett: Okay.

205
00:27:02.610 --> 00:27:06.090

Christopher A Mallett: That was the one that your name was incorrectly listed, or you…?

206
00:27:06.540 --> 00:27:09.900
Bryan: It was removed after the NIH said no more data.

207
00:27:11.490 --> 00:27:14.100
Christopher A Mallett: So that was published by the other two authors? Okay.

208
00:27:15.150 --> 00:27:22.350
Christopher A Mallett: Question, the first question around some of that is that do the above amounts that I just read capture all such fundraising.

209
00:27:23.040 --> 00:27:30.930
Bryan: No. Interestingly, there's a guy who created the website Adult Friend Finders, and he's given us $50,000.

210
00:27:32.490 --> 00:27:33.330
Bryan: And I don't think you are aware of that.

212
00:27:41.820 --> 00:27:42.420
Christopher A Mallett: Uh, no.

213
00:27:42.570 --> 00:27:45.960
Bryan: Also Charles Murray gave us, I think it was either $1,000 or $10,000.

214
00:27:48.390 --> 00:27:49.290
Bryan: Like last year.

215
00:27:51.180 --> 00:27:52.470
Christopher A Mallett: So total amount is, I don't know $75-80,000 or so.

217
00:27:55.770 --> 00:27:56.880
Bryan: That sounds in the ballpark.

218
00:27:59.250 --> 00:28:04.290
Bryan: But can I ask how is fundraising for research evidence of academic misconduct?

219
00:28:06.210 --> 00:28:10.860

Conor T McLennan: We're trying to piece together just the nature of the fundraising what it was used for.

220
00:28:12.150 --> 00:28:17.100
Conor T McLennan: We're not yet saying anything is. We're trying to get to the truth or the bottom.

221
00:28:17.580 --> 00:28:32.070
Bryan: Okay, thank you. So, we award grants for people who study IQ. So like, Davide Piffer, if i'm saying his name right, we've given him some money for projects that I wasn't involved with. And we've given other people money too, I'd have to look to see who.

222
00:28:34.440 --> 00:28:37.800
Bryan: I haven't taken any money, except like reimbursement for the computer we bought.

223
00:28:40.260 --> 00:28:44.430
Bryan: When John would come over, we would have pizza or whatever. We'd buy it through that fund.

224
00:28:48.300 --> 00:28:53.970
Conor T McLennan: Okay, so next question I guess is, is this type of fundraising allowed by CSU?

225
00:28:56.010 --> 00:29:01.050
Bryan: I think it's independent of CSU, I mean I don't link to CSU at all in the HPDF.

226
00:29:02.880 --> 00:29:05.970
Bryan: Whatever. So I don't know. If it is I'm not aware.

227
00:29:07.350 --> 00:29:08.820
Bryan: If it is not, I'm not aware of it.

228
00:29:11.610 --> 00:29:12.210
Bryan: Do you know?

229
00:29:14.130 --> 00:29:26.580
Conor T McLennan: Well, I think one question is, there are funds raised here in a separate 501c3 that's then used to conduct research and what you're publishing with CSU's affiliation.

230
00:29:27.090 --> 00:29:31.110

Bryan: Not my research. My research wasn't being funded by HPDF.

231
00:29:33.510 --> 00:29:39.030
Bryan: I mean, to the extent that buying a computer that extract data is funding my research.

232
00:29:39.210 --> 00:29:51.420
Conor T McLennan: And I think that would be, right? Like out of any research grants, if you get a research grant, then you purchase a computer or you get reimbursement for research related meetings, for the meals or other things, that is funding research.

233
00:29:52.920 --> 00:29:54.600
Bryan: Okay, I guess, I concede that point.

234
00:29:55.950 --> 00:29:56.220
Conor T McLennan:  Thank you.

235
00:30:00.570 --> 00:30:07.260
Wendy C Regoeczi: Our next question was how are the funds used. I think you've already answered that to some extent is there anything else you wanted to add?

236
00:30:08.040 --> 00:30:14.970
Bryan: So, awarding grants to other researchers is primarily what the money is used for and that's it. You know, reimbursing the computer.

238
00:30:19.710 --> 00:30:31.530
Bryan: Dinners, lunches, whatever. Uber rides, because John would get about $50 in Uber charges every time that he came over. We paid for that through the HPDF.

239
00:30:34.200 --> 00:30:34.590
Wendy C Regoeczi: Thank you.

240
00:30:36.120 --> 00:30:52.020
Christopher A Mallett: So I guess a formal way to ask this, it's come up a couple times here, is that Bryan do you think that creating the 501c3 without what looks like to us to be any formal CSU approval, to support these research activities. Does it seriously deviate from a commonly accepted practice within our community for during research?

242
00:30:55.800 --> 00:31:09.750
Bryan: I do not think that. I think first of all, that CSU is not affiliated with the HPDF nor is my research being funded by it. And we can

quibble about buying a computer and I conceded the point. But no is the answer.

243
00:31:14.310 --> 00:31:24.720
Bryan: I mean, when we gave a check to Davide it didn't have CSU's name on it. It was just our nonprofit, independent of CSU, awarding a grant to a researcher who submitted a proposal.

244
00:31:26.850 --> 00:31:33.330
Bryan: So I don't see how CSU is even relevant in this situation. But I don't know.

245
00:31:34.350 --> 00:31:35.910
Bryan: If there's a policy that says you can't do this, I was not aware.

246
00:31:39.660 --> 00:31:55.920
Conor T McLennan: So, can you explain from your perspective, Bryan, to help us understand this, what the purpose of this fundraising activity was? And also, there seems to be two names, right? There's the Human Phenome Diversity Foundation and the Human Bio-diversity Research.

247
00:31:56.040 --> 00:31:56.400
Bryan: Yeah.

248
00:31:57.690 --> 00:32:07.860
Bryan: HBD - it's not my phrase, it's a catch all phrase for people who do this type of research. HBD, Human Bio-diversity, that has nothing to do with a nonprofit that I founded.

249
00:32:10.200 --> 00:32:12.660
Bryan: Sorry, what was your question again?

250
00:32:12.690 --> 00:32:21.930
Conor T McLennan: Just from your perspective, so, from what I've heard from you just now is that this is a separate activity. It's a separate 501c3, it has nothing to do with CSU.

251
00:32:23.010 --> 00:32:26.100
Conor T McLennan: So what is the purpose of this foundation from your perspective?

252
00:32:27.120 --> 00:32:39.390
Bryan: Okay, so when you do this type of research, it's hard to get it published. Now I'm not saying that we're methodologically sound and the paper is perfect, but it's hard to get this stuff published.

253
00:32:40.410 --> 00:32:53.190
Bryan: So we wanted to help support that. And so we set up as a foundation
for donations and such, to support this type of research. Plus there's also
not that many people doing it, as you might expect.

254
00:32:55.920 --> 00:32:59.940
Bryan: So really the goal, the mission is to facilitate this type of
research.

255
00:33:02.250 --> 00:33:17.880
Conor T McLennan: Okay, and at least some of this, although maybe you
hadn't thought about it in this way, but at least some of the funding is
going to, you know, purchasing a computer, paying for the Uber rides,
paying for pizza. But all of that is to support your own research
activities in this area.

256
00:33:18.690 --> 00:33:31.050
Bryan: Not necessarily. If the mission of the Foundation is to award
grants, then I think the Uber rides and the pizzas were devoted - the money
spent there was toward that mission. It wasn't toward my research.

257
00:33:32.550 --> 00:33:33.090
Conor T McLennan: But was.

258
00:33:33.210 --> 00:33:35.730
Bryan: But maybe the computer was, okay, so I'll say the computer was.

259
00:33:36.570 --> 00:33:46.260
Conor T McLennan: So the computer and then John coming over to analyze the
data that then led to a publication with CSU as the affiliation. Is that
correct?

260
00:33:46.290 --> 00:33:47.520
Bryan: That's correct.

261
00:33:47.670 --> 00:33:48.030
Conor T McLennan: Okay, thank you.

262
00:33:52.170 --> 00:33:52.440
Christopher A Mallett: Right.

263
00:33:53.520 --> 00:33:58.290

Christopher A Mallett: There are some areas of research that are hard to publish in for different reasons. Why is this area challenging to publish in?

264
00:33:59.370 --> 00:34:08.730
Bryan: Well, because people reject it for political reasons. And I'm not saying that my methodology is perfect, I understand that, you know, maybe there's flaws in the Lasker paper.

265
00:34:09.750 --> 00:34:18.060
Bryan: But typically, these papers get rejected like eight times before they find a home. That also explains why the quality of some of the journals we publish in is not really there.

266
00:34:22.410 --> 00:34:22.740
Christopher A Mallett: Thank you.

267
00:34:24.330 --> 00:34:42.900
Conor T McLennan: So one last question, building on the last question, so Chris had asked, do you feel like creating this 501c3 without CSU approval deviates from commonly accepted practice? You said no. Just wondering, are you aware of any other researchers to have done this type of thing?

268
00:34:43.560 --> 00:34:46.950
Bryan: I don't know many other researchers, so I don't know.

269
00:34:49.560 --> 00:35:02.340
Conor T McLennan: I think part of the reason why we asked this question, at least I personally have never heard of this before. I've never heard of someone creating a 501c3 to help them fund research at the university.

270
00:35:04.830 --> 00:35:06.000
Bryan: Yeah, I don't know how to answer that.

271
00:35:06.660 --> 00:35:07.560
Conor T McLennan: Okay, thank you.

272
00:35:14.940 --> 00:35:15.390
Conor T McLennan: All right.

273
00:35:16.980 --> 00:35:20.460
Conor T McLennan: Do you think this type of fundraising causes any conflicts of interest?

274

00:35:22.110 --> 00:35:25.290
Bryan: Honestly, no, I mean, can you give me an example of a conflict of interest?

275
00:35:27.600 --> 00:35:37.740
Conor T McLennan: I could, but I don't think I need to do that here. I think you can imagine what a conflict of interest might be, and so we're asking you, if you feel that this could create any conflict of interest.

276
00:35:37.740 --> 00:35:40.050
Bryan: So unless you can give me an example, I'm not sure I can answer that.

277
00:35:52.590 --> 00:36:05.700
Conor T McLennan: So you're creating this 501c3 to raise funds, at least in part, to support some of the research you're doing - to buy a computer and then publish under CSU's affiliation.

278
00:36:06.390 --> 00:36:17.190
Conor T McLennan: It seems like there's a direct connection here between the fundraising activity and what ultimately gets published. To me at least, it seems like there's a possibility to have the appearance of a conflict of interest. Even if you genuinely believe that there's not one, this is the type of thing that might seem like having the appearance of a conflict of interest.

280
00:36:28.140 --> 00:36:32.850
Bryan: So I have to check, but I wonder if the Lasker paper published in 2019 was published before HDPS was even founded.

282
00:36:38.040 --> 00:36:40.380
Bryan: I don't know that to be a fact. I'd have to check the dates.

283
00:36:41.700 --> 00:36:42.660
Bryan: It was pretty close.

284
00:36:57.240 --> 00:36:59.790
Christopher A Mallett: Wendy, would you like me to move on to publication timeline?

285
00:37:00.210 --> 00:37:01.200
Wendy C Regoeczi: Yeah, I think so.

286
00:37:03.300 --> 00:37:07.500

Christopher A Mallett: Switching the topic, this is a timeline of a publication we're trying to piece together.

287
00:37:08.610 --> 00:37:12.570
Christopher A Mallett: And we've got a question about - a question regarding the timelines between being told to cease all work, requesting permission to publish, and then eventually publishing what looks to be at least one paper, based on the work. So let me piece it together.

289
00:37:26.190 --> 00:37:36.060
Christopher A Mallett: Back in an email dated September 19 2019 Drs. Wang and [Parsian] I don't know the last name of the name of the NIH person. They wrote
    "at this time, you need immediately cease all work and analysis using PHS000607 control access data."
[*phs000607 refers to the TCP data set*]

291
00:37:47.970 --> 00:37:50.760
Christopher A Mallett: And in emails in early February of 2020, Mr. Fuerst asked NIH if he could submit a paper, and in doing so he explicitly mentioned the email from September to stop new research using these data.

293
00:38:03.810 --> 00:38:13.140
Christopher A Mallett: Dr. Parsian from NIH responded
    "I have explained to Bryan Pesta several times through emails, you cannot use that particular data for your…"

294
00:38:13.560 --> 00:38:17.010
Bryan: That's not true, by the way. He never sent me an email saying that.

295
00:38:18.300 --> 00:38:19.680
Bryan: Before that email from John.

296
00:38:21.660 --> 00:38:25.830
Christopher A Mallett: So you're saying that the one from a from Dr. Parsian.

297
00:38:26.490 --> 00:38:26.880
Yes.

298
00:38:28.140 --> 00:38:33.240
Christopher A Mallett: who responded
    "I have explained to Bryan tested several times, through email, you cannot use that particular data for your research."

299

00:38:33.960 --> 00:38:36.870
Bryan: He did it once in 2019, but several times is not true.

300
00:38:37.650 --> 00:38:39.090
Christopher A Mallett: So one time would be accurate.

301
00:38:39.450 --> 00:38:39.870
Bryan: Correct.

302
00:38:40.920 --> 00:38:41.550
Christopher A Mallett: um.

303
00:38:41.640 --> 00:38:44.190
Bryan: But the reason I think John sent that email is, we went several months… So the NIH sent their email, we laid out a rebuttal or an appeal, and then we didn't hear from them. And so, like four months later, I guess, in January of the next year John followed up.

305
00:39:02.640 --> 00:39:07.050
Christopher A Mallett: So then after he wrote that one, after NIH responded to Mr. Fuerst, then Mr. Fuerst continued writing NIH saying that I wish to confirm before submitting for publication the paper entitled "Genetics, Ancestry, and Intelligence among East Coast Hispanic and European Americans".

308
00:39:24.630 --> 00:39:32.070
Christopher A Mallett: This research is later published online on September 26 of 2020. So we were trying to understand that.

309
00:39:32.400 --> 00:39:36.930
Bryan: Sure, so the timeline for that. That's the preprint I think that was published.

310
00:39:37.950 --> 00:39:43.110
Bryan: So, and my name is no longer on that, if I got the right article.

311
00:39:45.600 --> 00:39:47.250
Bryan: So, I'm not sure what else to say about that.

312
00:39:50.190 --> 00:39:51.930
Bryan: What was the title of the paper again.

313
00:39:53.490 --> 00:39:57.660

Christopher A Mallett: "Genetics, Ancestry, and Intelligence among East Coast Hispanic and European Americans."

314
00:39:58.230 --> 00:40:02.040
Bryan: Yeah that's not my paper. I mean it was, until the NIH said no.

315
00:40:05.430 --> 00:40:09.870
Christopher A Mallett: And then you decided - you asked your co-authors to remove your name? Is that how that went.

316
00:40:10.320 --> 00:40:10.920
Bryan: Correct.

317
00:40:12.240 --> 00:40:14.670
Christopher A Mallett: And that was because? Why?

318
00:40:15.060 --> 00:40:18.120
Bryan: The NIH said "you can't use the data."

319
00:40:21.990 --> 00:40:31.170
Conor T McLennan: What data is reported in that paper? What analyses are reported? In other words, which of the remaining authors on that paper had access to that data set.

320
00:40:31.380 --> 00:40:39.720
Bryan: So, here's the thing, and this is why I speculated about whether John has the data or not. The analyses were already done, the paper was submitted.

321
00:40:40.530 --> 00:40:52.950
Bryan: You don't need the data to submit the paper at that point. The only downside or the only risk is if the reviewers come back and say "we want additional analyses." You can't do them because you don't have the data. So that's what happened there.

322
00:40:59.160 --> 00:41:05.130
Conor T McLennan: So that paper, and I thought that was a paper that you were still on here, maybe I could find.

323
00:41:05.310 --> 00:41:06.420
Bryan: If you check my Google scholar it's been recently corrected and updated.

325
00:41:11.370 --> 00:41:14.190

Conor T McLennan: I thought we were referring to a different paper on that.

326
00:41:14.700 --> 00:41:16.110
Bryan: Oh, I'm sorry if I'm confusing you.

327
00:41:24.780 --> 00:41:31.110
Conor T McLennan: Check the link here, yes, let me just - I can drop a link to the paper, just we're on the same page, in the chat.

328
00:41:31.620 --> 00:41:31.980
Bryan: Thank you.

329
00:41:50.580 --> 00:41:51.810
Conor T McLennan: You see that in the chat.

330
00:41:52.680 --> 00:41:53.070
Bryan: Yes.

331
00:41:55.410 --> 00:41:56.130
Bryan: I'm clicking on it.

332
00:41:57.480 --> 00:42:05.280
Bryan: Yeah this is for pre-prints. It's not correct, I'm not an author on this paper anymore. I was obviously when this was posted. I am not now.

333
00:42:07.770 --> 00:42:16.020
Conor T McLennan: So you asked to be removed from this paper because NIH explicitly said not to publish on these data.

334
00:42:16.380 --> 00:42:16.860
Bryan: Correct.

335
00:42:17.940 --> 00:42:33.660
Conor T McLennan: But it seems like NIH had said that long before this pre-print was submitted with your name. And now, if your name is removed from this, it appears that there are no longer any authors who have authorized access to this data set. Is that right?

336
00:42:34.260 --> 00:42:36.840
Bryan: Well, you can debate John's argument that he does.

337
00:42:39.090 --> 00:42:50.100

Bryan: But I didn't know what else to do. I don't - I didn't submit this to the pre-print website there. John did. I don't control what he does - what he submits, what he doesn't. Especially at this point.

338
00:42:51.660 --> 00:42:53.400
Bryan: So the only thing I could do is take my name off it.

339
00:43:06.660 --> 00:43:09.660
Conor T McLennan: The reason we're asking this is, we're piecing together these various timelines. And during our previous interview with you, you were

> "if NIH were asked/consulted, can we publish on this topic, and they specifically said no, and then there was a publication after, in that area using those data, would you consider that a serious violation."
> [*Sept. 7 interview paragraph 266 - time stamp 00:35:40.500 --> 00:35:57.960*]

342
00:43:31.620 --> 00:43:43.920
Conor T McLennan: And you replied,

> "I would think that it's an extremely serious violation."
> [*Sept. 7 interview paragraph 267 - time stamp 00:35:58.440 --> 00:36:00.810*]

So, given the timelines just mentioned and including your reply during our previous interview, do you agree that this is indeed a serious violation.

343
00:43:44.580 --> 00:43:59.790
Bryan: It's not my violation. I've got - ultimately I'm responsible for John and what he does, because if it wasn't for me he wouldn't - this wouldn't be happening. But, I'm not submitting the paper to a journal to get it published, my name is not on it now, and what else can I do?

344
00:44:03.450 --> 00:44:03.930
Christopher A Mallett: Yeah.

345
00:44:05.370 --> 00:44:12.810
Christopher A Mallett: Bryan under the circumstances, you continue to do research with John, right? This is about, not about John, it's about your choices.

346
00:44:13.320 --> 00:44:15.150
Christopher A Mallett:

347
00:44:15.150 --> 00:44:17.970

Bryan: I'm just finishing off the last two papers that we have that are in the pipeline.

348
00:44:25.980 --> 00:44:26.670
Bryan: And again those are not restricted access data.

350
00:44:28.470 --> 00:44:31.980
Christopher A Mallett: Yeah, they're different. They're different from any of the review here.

351
00:44:36.660 --> 00:44:42.990
Conor T McLennan: So you know, I think part of what I've done all throughout this process, Bryan, is tried to put myself in your situation and the decisions that you would make.

352
00:44:43.380 --> 00:44:51.750
Conor T McLennan: And I'm wondering if you could try to put yourself in our situation here if I came to you and said I had, however you want me to phrase this, a student, a research collaborator, or someone who we work together on a project. We asked NIH if we could publish data. They said no. I told the student/collaborator not to submit the paper, but a paper shows up online with me as first author.

354
00:45:14.970 --> 00:45:21.240
Conor T McLennan: And then I asked you, "Bryan, given all of that, do you think I should continue to collaborate with this person?" What advice would you give me?

355
00:45:23.520 --> 00:45:23.970
Bryan: Wow.

356
00:45:26.310 --> 00:45:26.700
Bryan: I don't know.

357
00:45:28.680 --> 00:45:30.960
Bryan: Can you say that again? I hate to do that to you, but.

358
00:45:33.690 --> 00:45:44.100
Conor T McLennan: So, again, we're trying to do our due diligence here to understand this process and how this unfolds, and I think it I won't speak for my colleagues, but at least from my perspective, one way I do that is to try to put myself in your shoes. Try to put myself in your situation, how the timeline unfolded, what decisions you made, so that I could understand the process.

360

00:45:55.980 --> 00:46:02.220
Conor T McLennan: Recreate the process. So I guess I'm asking you to do
that now - to try to put yourself in our position.

361
00:46:03.240 --> 00:46:13.740
Conor T McLennan: And what would you tell me if I said I had a student or a
collaborator, we work together, we asked the NIH if we could publish on a
data set, and they told us no.

362
00:46:14.220 --> 00:46:22.770
Conor T McLennan: Explicitly and repeatedly. So I tell the student and
research collaborator not to submit the papers. We were told by NIH not to
do it.

363
00:46:23.700 --> 00:46:32.970
Conor T McLennan: But then they go ahead and submit a paper. Apparently
without my knowledge, and I'm first author on the paper. Would you advise
me to continue collaborating with such a person?

364
00:46:33.780 --> 00:46:40.830
Bryan: No. No, and I respect that. So here's my problem. My problem is not
with the committee, I think you guys have been very fair and I appreciate
that.

365
00:46:41.280 --> 00:46:50.490
Bryan: My problems is with - I think the accusations that are just throwing
shit on the wall, that I have to defend. And all these new allegations?
It's just, it's too much.

366
00:46:51.780 --> 00:46:53.430
Bryan: But no is the answer to your question.

367
00:46:56.430 --> 00:46:57.300
Conor T McLennan: Okay, thank you.

368
00:47:02.940 --> 00:47:05.820
Wendy C Regoeczi: Chris Connor do we want to move on to the next topic.

369
00:47:07.980 --> 00:47:08.400
Christopher A Mallett: I think so.

370
00:47:09.240 --> 00:47:09.660
Conor T McLennan: Sure.

371

00:47:13.410 --> 00:47:14.880
Wendy C Regoeczi: Okay.

372
00:47:17.280 --> 00:47:28.350
Wendy C Regoeczi: So switching topics a little bit. We just wanted to ask a
couple of questions about the protected data. So in your reply to Dr. Wang
on September 20th 2019, you wrote.

373
00:47:28.890 --> 00:47:39.630
Wendy C Regoeczi:
      "For validation, I refer to the cross-validation analysis of
      concordant SNPs, which are based on tertiary data output, which I have
      attached, for your viewing. These are not restricted access data"
So our, I guess, our first question is - is this true or are these data
derivatives and that's protected?

375
00:47:50.580 --> 00:47:53.250
Bryan: If this for the external website that we uploaded.

376
00:47:55.950 --> 00:47:56.310
Bryan: Yes.

Wendy C Regoeczi: Yes.

377
00:47:56.520 --> 00:48:07.710
Bryan: Yes, Ok. I submit that they are absolutely not protected, and I
think the deductive inference is that the NIH allowed this publication in a
Nature journal where they use the website. So if you can identify subjects
by using the website, there's no way that NIH would have approved their
publication in a prestigious journal like that.

379
00:48:20.790 --> 00:48:27.990
Conor T McLennan: I just need to jump in here because, I think you've done
this a few times. The logic of extending to other things that were
approved.

380
00:48:28.320 --> 00:48:44.190
Conor T McLennan: And I don't think that's appropriate, just like our
committee is trying to keep the focus within the realm of what we were
tasked with here. Saying that other studies received approval and thus,
what you have is fine, I don't think is appropriate.

381
00:48:44.220 --> 00:48:44.790
Bryan: Why not?

382

00:48:45.330 --> 00:48:50.310
Conor T McLennan: So, for example, I need to get IRB approval for my
research right.

383
00:48:50.460 --> 00:48:54.540
Conor T McLennan: I conduct rsearch, research participants come into my
lab, they put on the headphones, they hear some words.

384
00:48:54.810 --> 00:49:09.030
Conor T McLennan: I need to get IRB approval for that. But I think if I
said next time I'm just going to skip it. I'm not going to get IRB approval
and then my response is, well, I always get IRB approval they're fine with
it, or these other researchers…

385
00:49:09.060 --> 00:49:10.680
Bryan: That's not me.

386
00:49:11.190 --> 00:49:17.490
Bryan: You're misrepresenting. That is not me. The dbGaP - TCP data did not
require IRB approval.

387
00:49:17.790 --> 00:49:18.840
Bryan: So I didn't get it.

388
00:49:19.140 --> 00:49:20.790
Bryan: Add Health did, so I got it.

389
00:49:22.350 --> 00:49:30.270
Conor T McLennan: Right, but just now, you were saying that the fact that
some other study received approval means that you were fine with what you
did here.

390
00:49:30.330 --> 00:49:38.760
Bryan: No, it means that you cannot identify people from the data we
uploaded. Doesn't mean I was fine, it means you cannot identify people from
the data we uploaded.

391
00:49:39.540 --> 00:49:53.400
Conor T McLennan: But we don't have the full scope of what was reviewed,
what was presented and what was reviewed, in this other context. Maybe
there were situations that were taken into consideration during that review
process which is beyond the scope of this current.

393
00:49:55.260 --> 00:49:57.270

Bryan: So you can identify for us, but not for them. That's impossible.

394
00:49:59.580 --> 00:50:00.630
Bryan: It literally is.

395
00:50:04.380 --> 00:50:11.490
Conor T McLennan: OK, so I guess the question, though, just to be clear, is were these data derivatives?

396
00:50:15.420 --> 00:50:23.670
Conor T McLennan: So the SNPs that you say were based on tertiary data output and are not restricted access, are these data derivatives?

397
00:50:28.230 --> 00:50:29.760
Bryan: I don't understand the question, I'm sorry.

398
00:50:33.750 --> 00:50:40.920
Conor T McLennan: So, in your reply you wrote
      "For validation, I refer to the cross-validation analysis of
      concordant SNPs, which are based on tertiary data output"

399
00:50:42.780 --> 00:50:48.450
Conor T McLennan: The question is, are these data derivatives?

400
00:50:49.740 --> 00:50:52.050
Bryan: I don't know what you mean by derivative, I guess is my confusion.

401
00:50:53.250 --> 00:50:55.800
Conor T McLennan: Did they derive from the original protected data.

402
00:50:57.540 --> 00:51:05.550
Bryan: No, because they're not in themselves protected. It's like would an IQ score test derive from protected data? I don't think so.

403
00:51:09.960 --> 00:51:11.490
Christopher A Mallett: Bryan, what do you mean by tertiary?

404
00:51:12.360 --> 00:51:13.440
Bryan: I don't know. John wrote that.

Christopher A Mallett: Well,

405
00:51:13.950 --> 00:51:16.710

Bryan: Because he did he's the one that imputed the SNPs to the HR Iris plex [*HIrisPlex-S*] whatever it's called website.

407
00:51:33.600 --> 00:51:34.170
Conor T McLennan: OK.

408
00:51:36.450 --> 00:51:38.910
Conor T McLennan: You can skip to the next one if you want, Wendy.

409
00:51:45.090 --> 00:51:45.900
Wendy C Regoeczi: 16?

410
00:51:47.040 --> 00:51:48.180
Conor T McLennan: Yes.

411
00:51:48.780 --> 00:51:57.900
Wendy C Regoeczi: So in our conversation with the Bird et al. group, research and potential publications related to the Adolescent Brain Cognitive Development [*ABCD*] data set was discussed.

413
00:51:59.130 --> 00:52:06.570
Wendy C Regoeczi: Can you explain this research project? Your involvement, what data was used, and how this was done?

414
00:52:08.730 --> 00:52:17.130
Bryan: Well, I'm no longer on anything having to do with ABCD or Add Health, but for the original Lasker paper we looked at White vs African American, and we did a technique called admixture analysis.

416
00:52:24.600 --> 00:52:41.010
Bryan: For the ABCD and Add Health we want to expand that to other ethnicities, and we wanted to - I don't know if it's been done, well, I don't think it's been done - look at a technique called admixture mapping which gets more specifically into the genome, to see where the differences might lie.

417
00:52:46.350 --> 00:52:50.490
Christopher A Mallett: You're no longer working with the group then [to analyze] ABCD?

418
00:52:50.820 --> 00:52:52.050
Bryan: I don't think anybody is, but I think [that] the research was done. I don't know when, but not recently. And it was submitted, so I don't know where it's at in that pipeline. But I'm not currently - I haven't done research on that in a while. Months.

420
00:53:06.990 --> 00:53:08.310
Christopher A Mallett: What team was that?

421
00:53:08.880 --> 00:53:11.100
Bryan: That's probably going to be John, Emil [Kirkegaard], and I don't
know who else.

423
00:53:16.620 --> 00:53:20.310
Conor T McLennan: How did they access the ABCD data, then?

424
00:53:21.600 --> 00:53:30.930
Bryan: I don't remember ever getting it, to be honest with you. I have to
go back and look. I've been so focused on TCP that I have not re-
familiarized myself with either ABCD or Add Health.

425
00:53:33.210 --> 00:53:43.020
Conor T McLennan: So it looks like from a recent exchange that you had
submitted the request for the ABCD data.

426
00:53:43.110 --> 00:53:45.450
Bryan: Yeah maybe. Maybe it was like in January or February of this year,
Dr. Ward, do you know?

428
00:53:52.860 --> 00:53:55.470
Benjamin J Ward: Not off the top my head, I can look up the request.

429
00:53:56.070 --> 00:53:56.430
Bryan: Thank you.

430
00:53:58.740 --> 00:54:04.320
Conor T McLennan: I guess again this is similar to what it was before so
unless I'm misunderstanding and, if so, I would like to be corrected, it
appears to me that access the ABC data happened because you were the person
that put in the request. You were the authorized user for that.

432
00:54:18.000 --> 00:54:29.820
Conor T McLennan: But now you're saying you're no longer associated with
any of these papers or studies so there may be publications based on these
ABC data from authors that didn't have access to the data, you were the one
that had access.

433
00:54:29.940 --> 00:54:43.950

Bryan: Well, that's true. But the authors that didn't have access, still, I presume, would not have access. This would be John doing this. And John's logic is he's right, the NIH is wrong, and I think he's appealing to whatever the next step is.

434
00:54:45.750 --> 00:54:53.220
Benjamin J Ward: Just to follow up, August of 2020 is when the Data Use Certifications for ABCD data sets are dated.

435
00:54:53.760 --> 00:54:54.180
Bryan: Thank you.

436
00:54:56.370 --> 00:54:59.640
Christopher A Mallett: Bryan the paper that's submitted from there, is your name still on that?

437
00:54:59.670 --> 00:55:08.670
Bryan: My name is on nothing that's not listed, right now, currently in Google Scholar. I think there were two papers that I had to take my name off of because the NIH said don't use the data.

438
00:55:11.040 --> 00:55:11.460
Bryan: And these would be those.

439
00:55:11.850 --> 00:55:18.240
Christopher A Mallett: You mentioned that paper on ABCD may be under review, a journal review, is that…

440
00:55:18.240 --> 00:55:20.820
Bryan: I could find out for sure, and like email you the answer.

441
00:55:21.930 --> 00:55:23.250
Christopher A Mallett: Okay, thank you.

442
00:55:28.830 --> 00:55:30.090
Christopher A Mallett: Let's see, I think that is the last of our formal questions. Is that right?

444
00:55:37.740 --> 00:55:38.400
Christopher A Mallett: Connor, Wendy?

445
00:55:39.660 --> 00:55:40.110
Conor T McLennan: Yes.

446
00:55:41.220 --> 00:55:41.910
Christopher A Mallett: And I have.

447
00:55:42.120 --> 00:55:49.050
Christopher A Mallett: Just one more, one more thought on this Bryan. And
this came up in our last talk a little bit.

448
00:55:51.570 --> 00:56:00.060
Christopher A Mallett: This is a difficult position to be in. Everybody
included. Looking back from today, what would you do different?

450
00:56:03.930 --> 00:56:20.250
Bryan: Yeah it's a good question, I mean I wouldn't get myself involved in
this mess, for sure. It's just not worth it. I mean the publication that we
did get, the Lasker paper, is in a journal that's frankly not that high
quality. So what did I get out of it career wise? Really nothing.

451
00:56:21.300 --> 00:56:23.790
Bryan: What was the negatives? Well, all this.

452
00:56:24.930 --> 00:56:31.830
Bryan: So a) I wouldn't have done this research. The genetic part of race
and IQ, I would not have done. If I had to do it all over again.

453
00:56:36.120 --> 00:56:50.730
Bryan: There are many ways to be misinterpreted, I think, and I'm not
saying I'm a victim, but I would have paid extra close attention to how I
filled out the applications. And this website issue, the external website,
obviously I would have listed that.

454
00:56:52.860 --> 00:57:07.890
Bryan: But I don't regret, you know HPDF. I think it's fine. I don't think
it's linked to CSU at all. But granted, Connor makes good points about the
computer and the Uber rides, but there's nothing explicitly linking my
501c3 to Cleveland State.

456
00:57:11.250 --> 00:57:12.360
Bryan: So I don't regret that.

457
00:57:14.100 --> 00:57:23.940
Bryan: Do I regret collaboration with these two guys? Probably yes. I do
think they're misunderstood. I don't think they're as evil as everyone's
making them out to be. I've known them for three years.

458

```
00:57:24.960 --> 00:57:33.420
```
Bryan: I don't think they're racists, I think they are good scientists. I think the paper we produced is good science. It's just hard to get it published. I think I'm rambling now.

459
```
00:57:34.590 --> 00:57:35.580
```
Bryan: So, I hope I answered your question.

460
```
00:57:37.590 --> 00:57:38.520
```
Christopher A Mallett: Thank you, yeah.

461
```
00:57:42.420 --> 00:57:50.130
```
Bryan: So I apologize for being adversarial here. I'm just frustrated and I think a lot of issues are coming up that are, to me, irrelevant to academic misconduct. And I'm not maybe understanding your questions, as well as I should be. But I'm not trying to be evasive, I'm happy to meet again anytime you want.

463
```
00:58:00.060 --> 00:58:07.350
```
Bryan: Maybe we could like take a timeout, and do this one more time, or whatever you guys want. Again, I apologize, I am not trying to be evasive.

465
```
00:58:13.980 --> 00:58:24.240
```
Conor T McLennan: So, one of the questions, Bryan, that I'm still trying to wrestle with is - on the one hand, you say you wouldn't do this, it's just not worth it. You've really, I think, said that John has engaged in some questionable behavior. Whether that's potentially stealing the data set, whether that's submitting a paper with you as first author for publication when you say you asked him not to do that.

467
```
00:58:38.940 --> 00:58:51.330
```
Bryan: Well, I think the timing's off there Conor. I think the paper was submitted, and then I wanted to take my name off. So I don't think John - whatever John may have done or didn't do - he didn't stick my name on there, first author, without my knowledge.

468
```
00:58:52.200 --> 00:58:53.370
```
Bryan: That's a pre-print from, I guess, 2020

470
```
00:58:56.040 --> 00:58:57.120
```
Bryan: Before this blew up.

471
```
00:58:58.410 --> 00:58:58.620
```
Conor T McLennan: So actually

472

00:58:59.640 --> 00:59:04.380
Conor T McLennan: That's important. So you were aware that you were first
author on this pre-print.

473
00:59:05.430 --> 00:59:10.800
Conor T McLennan: And again, that pre-print, if I have the publications
done correctly, is the one that cites the source of funding [*includes
HPDF*].

475
00:59:15.090 --> 00:59:18.030
Conor T McLennan: So, again there's funding associated with that to
support.

476
00:59:18.030 --> 00:59:27.150
Bryan: Okay yeah, you make a good point there. I didn't realize there was a
connection between that publication and the source of funding, so I see
what you're trying to say now.

477
00:59:28.590 --> 00:59:33.120
Bryan: I see that as a potential problem that again I don't… Go ahead.

478
00:59:33.450 --> 00:59:39.510
Conor T McLennan: So I'm just thinking, so that's one thing. But all of
this, though, that we're talking about and you're saying it's not worth it,
to engage in these behaviors, and you question some of John's actions here.
But then the ABCD data, you submit a request for access to this data, which
you then apparently allow John or whomever to either have access to these
new data or to conduct analyses based on the data that you requested.

481
01:00:04.380 --> 01:00:16.230
Conor T McLennan: And then, now, there may be publications - without your
name - but it's a data set that you requested, and probably none of the
authors or co-authors could get access to that data.

482
01:00:16.650 --> 01:00:24.030
Bryan: I don't think that's true Conor. Honestly, I'm sorry but I disagree.
I think John's opinion is the NIH is wrong and he is right. And frankly, I
think he's right, I think the NIH is wrong. And I think I pointed it out in
the multiple correspondence[s] that we sent. Now, can you win that? It's
the NIH's data. They get to say who gets it, who doesn't.

484
01:00:38.700 --> 01:00:43.170
Bryan: So if you buy that John has the right to the data, then he's not
done anything wrong, per se, by trying to publish this stuff.

486
01:00:48.750 --> 01:00:55.740

Conor T McLennan: But, I guess, my question is more around - you're saying that you wouldn't engage in this research direction.

Bryan: yes

487
01:00:55.740 --> 01:01:01.800
Conor T McLennan: And it's just not worth it. Then why did you submit another data access request?

488
01:01:02.940 --> 01:01:04.350
Bryan: Okay, I get what you're saying.

489
01:01:04.620 --> 01:01:10.320
Bryan: It's a fair question. The data access request was, I think, Dr. Ward just said August of [2020].

490
01:01:11.760 --> 01:01:14.160
Bryan: And all this stuff blew up in May of 21.

491
01:01:16.080 --> 01:01:23.670
Bryan: Now, not counting the September 2019 emails that was not replied to by the NIH until pretty much 2021.

492
01:01:24.810 --> 01:01:27.300
Bryan: So this is a timing issue, this was in between those two events.

494
01:01:30.510 --> 01:01:34.140
Conor T McLennan: Right, but it was definitely after the 2019 [NIH email] when it was flagged for inappropriate data use.

495
01:01:35.700 --> 01:01:37.710
Bryan: So here's our thinking.

496
01:01:37.740 --> 01:01:49.710
Bryan: We send a serious appeal to the NIH, and we're waiting for them to act on it and they don't. Then months and months pass, and then they keep approving our new applications, so we think we're in the clear.

497
01:01:50.850 --> 01:01:53.040
Bryan: I mean, what else could we have assumed at that point in time?

498
01:02:09.810 --> 01:02:11.010
Christopher A Mallett: I think at this point, unless Wendy and Conor have additional follow ups, Ben you'll take care of the transcript for review,

then we'll set out next steps. And I guess Wendy and Conor and I will talk
[to determine] if we need additional time or [if] other questions aren't
sufficiently answered on our end.

501
01:02:33.570 --> 01:02:35.250
Bryan: Thank you, I do appreciate your time.

502
01:02:36.780 --> 01:02:41.280
Bryan: And I do appreciate that you're taking the effort to understand the
issues.

503
01:02:42.630 --> 01:02:45.000
Bryan: I can tell by your questions, so thank you.

504
01:02:45.360 --> 01:02:46.770
Christopher A Mallett: Yeah and again our request, our charge as the
committee, is strictly focused on research ethics and research methodology.
We are not concerned about what a researcher is researching.

507
01:03:03.300 --> 01:03:13.500
Christopher A Mallett: We understand that there are politics involved here,
and that they are things that have hit because probably the topic is
sensitive in some areas, but it is not our focus.

508
01:03:14.070 --> 01:03:22.320
Christopher A Mallett: Whether you were looking at childcare, whether
looking at, you know, urban matters or whatever, that's been our charge and
that's what we've been reviewing, our line of inquiry.

509
01:03:23.010 --> 01:03:23.370
Bryan: Thank you.

510
01:03:26.970 --> 01:03:40.920
Benjamin J Ward: Thanks everyone for your time, I will try to get this
transcript corrected as quickly as possible and make sure that everyone has
a chance to review it. And then, Dr. Pesta, we'll let you know next steps,
after the committee has had a chance to go through their notes.

511
01:03:42.270 --> 01:03:43.470
Bryan: Thank you, thank you, everybody.

512
01:03:43.740 --> 01:03:44.010
Jay Carson: Thank you.

513

```
01:03:45.090 --> 01:03:45.960
Christopher A Mallett: Everybody take care.
```



*13.  Timeline of Data Access Requests for NIH-managed Data Sets*

**Data sets accessed from dbGaP**
    **Project 18007  Data set PHS000607 – DAR 67931**
- Date Dr. Pesta submitted request: 4/12/2018
- Date CSU approved request: 5/2/2018
- Date NIH approved request: DAR 67931 6/25/2018

    **Project 19090  Data set PHS000607 – DAR 70647**
- Date Dr. Pesta submitted request: 7/15/2018 – renewal request 8/29/2019
- Date CSU approved request: 7/20/2018, renewal 9/9/2019
- Date NIH approved request: DAR 70647-1 - 8/30/2018, renewal 70647-2 9/23/2019

    **Project 19747  Data set PHS000607 – DAR 73948**
- Date Dr. Pesta submitted request: 9/19/2018 - renewal request 12/3/2019,
- Date CSU approved request: 10/1/2018 for 73948-1, 12/13/2019 for 73948-2
- Date NIH approved request: DAR 73948-1 approved 12/10/2018    DAR renewal 73948-2 approved 2/20/2020

    **Project 24213  Data set PHS000607 – DAR 88567 (first to specifically list J. Fuerst as a collaborator)**
- Date Dr. Pesta submitted request: 12/17/2019
- Date CSU approved request: 12/23/2019
- Date NIH approved request: DAR 88567-1 approved 2/20/2020

    **Project 26271  Data set PHS00137 – No DAR approved**
- Date Dr. Pesta submitted request:  7/16/2020
- Date CSU approved request: Not approved
- Date NIH approved request: n/a


**North Carolina Add Health Data Set**
- Date Dr. Pesta submitted request: 6/4/2020
- Date CSU approved request: 6/24/2020
- Date of CSU IRB Submission: 8/18/2020
- Date of CSU IRB Approval: 9/1/2020


**Data accessed from NIMH Data Archive (NDA)**

    **ABCD Data set**
- Date Dr. Pesta submitted request: 8/1/2020
- Date CSU approved request: 8/12/2020
- Date NIH approved request: DAR 88567-1 approved 2/20/2020

*14. Respondent's Statement Regarding His Intelligence Research (9/4/2021)*

## Statement Regarding My Intelligence Research
### Bryan J. Pesta (9/4/21)

<u>CSU Background</u>

I started at CSU in 1986 as a freshman majoring in psychology. After graduating in 1990, I next earned a master's degree (1992) from CSU, also in psychology. In the mid-1990s, I taught in our psychology department first as an adjunct, and then as a term assistant professor. Around the year 2000, I migrated to our business college (where I also earned the MLRHR degree here at CSU). I was hired as a tenure-track assistant professor of management in 2005, became an associate professor in 2010, and became a full professor in 2016. With recent retirements, I am now the most senior member of my department.

I primarily teach human resource management and occasionally organizational behavior classes. As I transitioned to the business college, my doctoral training in cognitive psychology wasn't completely aligned with these disciplines, and I felt the need to change my research streams. One new and relevant stream I adopted regarded the topics of average (self-identified) race and ethnic group differences in intelligence (i.e., adverse impact), together with their causes. Of the 41 peer-reviewed publications I have, seven of them (17%) are on this topic. I have also served as an expert witness in federal court regarding adverse impact and other types of protected class (e.g., race) / employment law discrimination issues.

<u>Intelligence Research</u>

My interest in human intelligence started in 1990, when I took a "Human Abilities" course at CSU with Professor John Burns. I was fascinated by both the construct validity of general mental ability (g), its predictive power, and the fact that individual and group differences correlate so consistently with important life outcomes. My interest here was reinforced at the University of Akron, where I took extra classes in statistics and psychometrics for my PhD.

What I believe over a century of intelligence research has shown:

1. IQ scores are the single best predictors of important life outcomes (e.g., job performance, educational success).

2. Mean IQ scores vary by (self-identified) race/ethnicity. We've known this since World War I.

3. IQ tests are neither culturally nor psychometrically biased against minorities, at least in the USA. The dbGaP data we analyzed, for example, showed strict measurement invariance across different racial and ethnic groups.

4. The cause(s) of these test-score differences (i.e., nature, nurture, or both) remain unknown.

5. This subdiscipline does not suffer from the replication crisis that faces much of social science today. The group-difference effects here are frustratingly persistent across 100 years of study.

Race and IQ

If one grants that average race and ethnic group differences in psychometric intelligence exist, why would any non-racist person be interested in studying them? In my opinion, the problem with ignoring group differences is that we risk not maximizing human well-being for everyone.

Specifically, when power is defined as prediction accuracy, intelligence is the most powerful variable in social science. Moreover, many of the variables that IQ correlates with constitute obvious "sub-domains" of human well-being. Examples include education, health, income (SES) and crime. The well-being sub-domains, themselves, tend to be strongly intercorrelated. As such, a nexus of intercorrelated, well-being variables exists. For better or worse, IQ scores are a central and important node in this nexus.

For unknown reasons, race and ethnicity are also central nodes in this nexus, with certain minority groups falling strongly on the short end of multiple measures of well-being. Thus, ignoring IQ differences across groups, when they map reasonably well onto well-being differences, seems ostrich like. This is especially so given that measured cognitive ability differences can statistically explain much of these well-being differences. It therefore seems rather important for researchers to determine the causes of these behavioral differences. In fact, I think solving this puzzle would do more to increase global human well-being than would solving any other problem faced by social science.

In this domain, I strive to conduct research that is purely data versus theory driven. My work is published in respectable outlets. Indeed, I've been awarded CSU merit pay several times based on my research quality and output, which includes my publications on this topic. Finally, despite conducting controversial research, I have been an asset to our diverse student body for over two decades, and I am happy to secure minority-student testimonials for the committee's consideration. Please let me know.

Sincerely,

Bryan J. Pesta

*15.  Respondent's Statement Regarding Reporting for dbGaP Project #19090 (September 6, 2021)*

September 6, 2021

### Application #19090, Shifting Goalposts

Page 6, Paragraph 1 of Dr Ward's Binder focuses on Application #19090. The NIH calls us out for <u>not reporting</u> the Lasker et al. paper here:

> Additionally, Dr. Pesta did not report [the Lasker publication] in project progress reports. For example, the publication was not reported in the September 2019 project #19090 progress report…

Three paragraphs later, the NIH calls us out for <u>reporting</u> our preprint in Application #19090:

> The research, noted in the project close-out progress update and the reported preprint manuscript, was not described the project #19090 RUS. This is a violation of Term 1 of the DUC agreements, "research use will occur solely in connection with the approved research project described."

The Lasker paper is conceptually equivalent to our reported preprint. We ran the same key analyses in each manuscript, but the former featured African American participants whereas the latter featured Hispanic American participants.

The result is an impossible situation for us. Not reporting Lasker in #19090 was a violation according to the NIH, but so too would have been reporting it (i.e., given how the NIH reacted to the equivalent, preprint we did report in #19090).

16. *dbGaP Project #19090; Data Access Request #67931*

## Project Request

Project #19090 : DbGaP, Data Access Request, "Trajectories of Complex Phenotypes (#67931-1)," July 15, 2018



| Project name | DbGaP, Data Access Request, "Trajectories of Complex Phenotypes (#67931-1)," July 15, 2018 |
|---|---|
| Project ID | 19090 |
| Approved user name | Bryan Pesta |
| Institute affiliation | CLEVELAND STATE UNIVERSITY (Non-Profit) |
| Request ID | 70647-1 |
| Request date : 2018-07-15 | Renewal date : |

### Applicant Organization

| Legal Name : | CLEVELAND STATE UNIVERSITY | | | | | | |
|---|---|---|---|---|---|---|---|
| Department : | Management | | | Division : | | | |
| Street 1 : | 2121 Euclid Avenue | | | | | | |
| City : | Cleveland | State : | Oh | Zip : | | Country : | cuyahoga |

### PI Contact Information

| Name : | Bryan Pesta | | | Position : | Principal Investigator | | |
|---|---|---|---|---|---|---|---|
| Organization: | CLEVELAND STATE UNIVERSITY | | | | | | |
| Street 1 : | 1860 East 18th | | | | | | |
| City : | Cleveland | State : | oh | Zip : | 44114 | Country : | US |
| Phone : | 440-319-8947 | : | | Email : | b.pesta@csuohio.edu | | |

### SO Contact Information

| Name : | Lisa Franklin | | | Position : | Signing Official | | |
|---|---|---|---|---|---|---|---|
| Organization: | CLEVELAND STATE UNIVERSITY | | | | | | |
| Street 1 : | 2121 Euclid | | | | | | |
| City : | Cleveland | State : | Ohio | Zip : | 44115 | Country : | United States |
| Phone : | 2163346853 | : | | Email : | l.franklin@csuohio.edu | | |

### IT Director Contact Information

| Name : | Christopher DbGaP, Data Access Request, "Trajectories of Complex Phenotypes (#67931-1)," July 15, 2018 | | | Position : | IT director | | |
|---|---|---|---|---|---|---|---|
| Organization: | CLEVELAND STATE UNIVERSITY | | | | | | |
| Street 1 : | 2121 Euclid Avenue | | | | | | |
| City : | Cleveland | State : | Oh | Zip : | 44115 | Country : | US |
| Phone : | 2166879360 | : | | Email : | c.pokorny@csuohio.edu | | |

## Project Request


Project #19090 : DbGaP, Data Access Request, "Trajectories of Complex Phenotypes (#67931-1),"
July 15, 2018




### Approved Research Use Statement

Note: I've already received access to these data (#18007), but for different research questions.

Non-technical summary

In the USA, diagnosis rates for different mental disorders (e.g., schizophrenia, depression) vary across ethnic groups. Moreover, the rate differences have often been attributed to diagnostic bias (e.g., Escobar, 2012). Recent genomic research, however, implicates evolutionary causes for these effects in some cases. For example, analyzing polygenic scores both globally and in the USA, Guo et al. (2018) found evidence of natural selection for schizophrenia in context with European, African, and East Asian descent groups. As polygenic scores have questionable cross-ethnic validity, substantial uncertainty about such results exists. Therefore, I will utilize "Trajectories of Complex Phenotypes" to investigate the evolutionary hypothesis via admixture analyses. Specifically, I will employ admixture analysis to determine if global ancestry predicts mental health outcomes. I will also apply admixture mapping (Shriner, 2013) to determine which regions of the genome are most strongly associated with the outcomes.

RUS

Title: Using Admixture Analysis to Predict Psychological Disorders in an Admixed American Sample

Funding body: None

Keywords provided by the Applicant PI to describe the research project:

Ethnicity, Ancestry, Schizophrenia, Psychiatry, Mood / cognitive disorders

"Using Admixture Analysis to Predict Psychological
Disorders in an Admixed American Sample"

In the USA, diagnosis rates for different mental disorders (e.g., schizophrenia, depression) vary across ethnic groups. Moreover, the rate differences have often been attributed to diagnostic bias (e.g., Escobar, 2012). Recent genomic research, however, implicates evolutionary causes for these effects in some cases. For example, analyzing polygenic scores both globally and in the USA, Guo et al. (2018) found evidence of natural selection for schizophrenia in context with European, African, and East Asian descent groups. As polygenic scores have questionable cross-ethnic validity, substantial uncertainty about such results exists. Therefore, I will utilize "Trajectories of Complex Phenotypes" to investigate the evolutionary hypothesis via admixture analyses. Specifically, I will employ admixture analysis to determine if global ancestry predicts mental health outcomes. I will also apply admixture mapping (Shriner, 2013) to determine which regions of the genome are most strongly associated with the outcomes.
Finally, to maximize statistical power, I will use the full sample. Genotypic data will be used to ascertain ancestry.

I will leverage genotypic data to compute ancestry percentages and to identify regions of the genome where associations are prominent. The study will primarily involve regression analyses, looking at the association between ancestry and outcomes. I will also use SNP genotypes to create ancestry estimates, along with demographic data (e.g., age, sex, etc.) and neuropsychiatric data.

References:

Escobar, J. I. (2012). Diagnostic bias: Racial and cultural issues. Psychiatric Services, 63(9), 847-847.

Guo, J., Wu, Y., Zhu, Z., Zheng, Z., Trzaskowski, M., Zeng, J., & Yang, J. (2018). Global genetic differentiation of complex traits shaped by natural selection in humans. Nature communications, 9(1), 1865.

Shriner, D. (2013). Overview of admixture mapping. Current protocols in human genetics, 76(1), 1-23.

### Non-Technical Summary

In the USA, diagnosis rates for different mental disorders (e.g., schizophrenia, depression) vary across ethnic groups. Moreover, the rate differences have often been attributed to diagnostic bias (e.g., Escobar, 2012). Recent genomic research, however, implicates evolutionary causes for these effects in some cases. For example, analyzing polygenic scores both globally and in the USA, Guo et al. (2018) found evidence of natural selection for schizophrenia in context with European, African, and East Asian descent groups. As polygenic scores have questionable cross-ethnic validity, substantial uncertainty about such results exists. Therefore, I will utilize "Trajectories of Complex Phenotypes" to investigate the evolutionary hypothesis via admixture analyses. Specifically, I will employ admixture analysis to determine if global ancestry predicts mental health outcomes. I will also apply admixture mapping (Shriner, 2013) to determine which regions of the genome are most strongly associated with the outcomes.

### Collaborators

**Project Request**

Project #19090 : DbGaP, Data Access Request, "Trajectories of Complex Phenotypes (#67931-1),"
July 15, 2018



Change Log

Date                              Changed Details

## Project Request

Project #19090 : DbGaP, Data Access Request, "Trajectories of Complex Phenotypes (#67931-1),"
July 15, 2016



---

### Consent Group Information

phs000607.v3.p2 :  **Neurodevelopmental Genomics: Trajectories of Complex Phenotypes**

DAR  **70647**

Consent Group  1

Name  General Research Use (NPU)
Abbreviation  GRU-NPU
Request Date :

Use Limitation  Use of the data is limited only by the terms of the model Data Use Certification. Use of the data is limited to not-for-profit
organizations. Restricted to research on genotype-phenotype associations; and molecular phenotype (e.g., gene
expression; microRNA)-phenotype associations. Non-profit use only.

---

This dbGaP Authorized Access Project Request was prepared on 2016-07-20-05:00 UTC.

Page: 4

17. *dbGaP Project #19747; Data Access Request #73948*

## Project Request

Project #19747 : Effect of score construction method on transracial validity of PGS



| | | |
|---|---|---|
| **Project name** | | **Effect of score construction method on transracial validity of PGS** |
| Project ID | | 19747 |
| Approved user name | | Bryan Pesta |
| Institute affiliation | | CLEVELAND STATE UNIVERSITY (Non-Profit) |
| Request ID | | 73948-1 |
| Request date : 2018-09-19 | | Renewal date : |

### Applicant Organization

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Legal Name : | **CLEVELAND STATE UNIVERSITY** | | | | | | |
| Department : | | | | Division : | | | |
| Street 1 : | 2121 Euclid Avenue | | | | | | |
| City | : | Cleveland | State : | Oh | Zip : | | Country : cuyahoga |

### PI Contact Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name | : | **Bryan Pesta** | | Position : | Principal Investigator | | |
| Organization: | CLEVELAND STATE UNIVERSITY | | | | | | |
| Street 1 | : | 1860 East 18th | | | | | |
| City | : | Cleveland | State : | oh | Zip : | 44114 | Country : US |
| Phone | : | 440-319-8947 | : | Email : | b.pesta@csuohio.edu | | |

### SO Contact Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name | : | **Lisa Franklin** | | Position : | Signing Official | | |
| Organization: | CLEVELAND STATE UNIVERSITY | | | | | | |
| Street 1 | : | 2121 Euclid | | | | | |
| City | : | Cleveland | State : | Ohio | Zip : | 44115 | Country : United States |
| Phone | : | 2163346853 | : | Email : | l.franklin@csuohio.edu | | |

### IT Director Contact Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name | : | Christopher DbGaP, Data Access Request, "Trajectories of Complex Phenotypes (#67931-1)," July 15, 2018 | | Position : | MGR. IT Services | | |
| Organization: | CLEVELAND STATE UNIVERSITY | | | | | | |
| Street 1 | : | 2121 Euclid Avenue | | | | | |
| City | : | Cleveland | State : | Oh | Zip : | 44115 | Country : US |
| Phone | : | 2166879360 | : | Email : | c.pokorny@csuohio.edu | | |

This dbGaP Authorized Access Project Request was prepared on 2018-10-01-05:00 UTC.

Page: 1



## Project Request

Project #19747 : Effect of score construction method on transracial validity of PGS


db GaP
GENOTYPES and PHENOTYPES

## Approved Research Use Statement

Lee et al. (2018) recently reported low transethnic validity for their educational PGS. Because of this low validity, the authors concluded that, with respect to years of education, scores will be most useful for individuals of European descent. However, Lee et al. (2018) did not rigorously evaluate transethnic validity, and Lee et al.'s (2018) discussion omits important caveats; namely, the method of score construction and the criterion trait used. PGS created in a way that increases the ratio of tagged to causal variants will decrease transethnic validity. Moreover, a reduced trait heritability in one population will also decrease PGS validity.

In the case of Lee et al. (2018), the PGS for the transethnic validity analysis was constructed using a low p-value threshold of 1. This means that the authors included all SNPs associated with education, regardless of the significance of the association. Using all SNPs regardless of the strength of the association likely reduces validity, as it increases the proportion of non-causal SNPs. Moreover, the population specific heritability of the trait chosen (educational attainment), given the reference sample (elder African Americans), is unknown. This renders the results of Lee et al.'s (2018; and other similar analyses) uninterpretable, which therefore undermines the authors' claims.

We plan to systematically investigate the effect of PGS method construction and criterion trait on transethnic validity using the Trajectories of Complex Phenotypes dataset. We will focus on two traits: educational attainment / intelligence and schizophrenia. We would like to use the full cohort to maximize statistical power. The study will be a correlational analysis of the statistical association between various PGSs and cognitive ability. We will conduct analyses separately in White and African American samples. For these analyses, we will need cognitive data (all available) to create general and broad ability indexes, and demographic data (age, sex, etc.). We will also need SNP genotypes to create PGS scores and to control for genetic relatedness following the protocol of Lee et al. (2018).

References

Lee, J. J., Wedow, R., Okbay, A., Kong, E., Maghzian, O., Zacher, M., ... & Fontana, M. A. (2018). Gene discovery and polygenic prediction from a genome-wide association study of educational attainment in 1.1 million individuals. Nature genetics, 1.

Marigorta, U. M., & Navarro, A. (2013). High Trans-ethnic Replicability of GWAS Results Implies Common Causal Variants. PLoS Genetics, 9(6).

Ripke, S., Neale, B. M., Corvin, A., Walters, J. T., Farh, K. H., Holmans, P. A., ... & Pers, T. H. (2014). Biological insights from 108 schizophrenia-associated genetic loci. Nature, 511(7510), 421.

## Non-Technical Summary

Several recent studies have constructed polygenic scores (PGS) for various traits. Examples include educational attainment (Lee et al., 2018) and schizophrenia (Ripke, 2014). Of significant concern is the transethnic validity of PGS (Ntzani, Liberopoulos, Manolio, & Loannidis, 2011), especially for relatively distant ancestry groups. This situation potentially limits the utility of PGS for epidemiological research.

However, the method of construction of PGS is a critical factor in determining transethnic validity. PGS which capture more common causal variants are expected to be more generalizable than ones which capture more tag variants (Marigorta & Navarro, 2013). This is because linkage disequilibrium decay, which reduces predictive validity across populations, is less of a problem. We propose to research the effect of PGS construction on the transethnic validity of PGS for two traits; educational attainment and schizophrenia. We shall also discuss best practices for constructing and reporting PGS.

## Collaborators

## Change Log

Date                          Changed Details

## Project Request

Project #19747 : Effect of score construction method on transracial validity of PGS





### Consent Group Information

**phs000607.v3.p2 :** Neurodevelopmental Genomics: Trajectories of Complex Phenotypes

DAR : 73948

Consent Group : 1

Name : General Research Use (NPU)

Abbreviation : GRU-NPU

Request Date :

Use Limitation : Use of the data is limited only by the terms of the model Data Use Certification. Use of the data is limited to not-for-profit organizations. Restricted to research on genotype-phenotype associations; and molecular phenotype (e.g., gene expression; microRNA)-phenotype associations. Non-profit use only.

This dbGaP Authorized Access Project Request was prepared on 2019-10-01-05:00 UTC.

Page: 3

Page **144** of **170**

*18. Human Phenome Diversity Foundation, LLC 2019 Ohio 990 EZ tax form*

| efile Public Visual Render | ObjectId: 202011959349201866 - Submission: 2020-07-13 | | TIN: 84-2701983 |
|---|---|---|---|

**Short Form**

Form **990EZ**

**Return of Organization Exempt From Income Tax**

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

OMB No. 1545-1150

**2019**

Department of the Treasury
Internal Revenue Service

▶ Do not enter social security numbers on this form as it may be made public.

▶ Go to *www.irs.gov/Form990EZ* for instructions and the latest information.

Open to
Public
Inspection

**A For the 2019 calendar year, or tax year beginning 01-01-2019, and ending 12-31-2019**

**B** Check if applicable:
○ Address change
○ Name change
☑ Initial return
○ Final return/terminated
○ Amended return
○ Application pending

**C** Name of organization
HUMAN PHENOME DIVERSITY FOUNDATION

% BRYAN J PESTA

Number and street (or P. O. box, if mail is not delivered to street address) Room/suite
26845 CHAPEL HILL DR

City or town, state or province, country, and ZIP or foreign postal code
NORTH OLMSTED, OH 44070

**D** Employer identification number
84-2701983

**E** Telephone number
(440) 319-8947

**F** Group Exemption
Number ▶

**G** Accounting Method: ☑ Cash ○ Accrual Other (specify) ▶_____

**I** Website: ▶

**J** Tax-exempt status (check only one) - ☑ 501(c)(3) ○ 501(c)( ) ◀ (insert no.) ○ 4947(a)(1) or ○ 527

**H** Check ▶ ☑
required to attach Schedule B
(Form 990, 990-EZ, or 990-PF).

**K** Form of organization: ☑ Corporation ○ Trust ○ Association ○ Other _____

**L** Add lines 5b, 6c, and 7b to line 9 to determine gross receipts. If gross receipts are $200,000 or more, or if total assets (Part II, column (B) below) are $500,000 or more, file Form 990 instead of Form 990-EZ . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ $ 21,470

**Part I** Revenue, Expenses, and Changes in Net Assets or Fund Balances (see the instructions for Part I)

Check if the organization used Schedule O to respond to any question in this Part I . . . . . . . . . . . . . . . . . . . ○

| | | | |
|---|---|---|---|
| 1 | Contributions, gifts, grants, and similar amounts received . . . . . . . . . . . . . . . . . . | 1 | 21,470 |
| 2 | Program service revenue including government fees and contracts . . . . . . . . . . . . . . . | 2 | |
| 3 | Membership dues and assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | |
| 4 | Investment income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | |
| 5a | Gross amount from sale of assets other than inventory . . . . . . . | 5a | | |
| b | Less: cost or other basis and sales expenses . . . . . . . . . . . . | 5b | | |
| c | Gain or (loss) from sale of assets other than inventory (Subtract line 5b from line 5a) . . . . . . | 5c | 0 |
| 6 | Gaming and fundraising events | | |
| a | Gross income from gaming (attach Schedule G if greater than $15,000) | 6a | | |
| b | Gross income from fundraising events (not including $ _____ of contributions from fundraising events reported on line 1) (attach Schedule G if the sum of such gross income and contributions exceeds $15,000) . . | 6b | | |
| c | Less: direct expenses from gaming and fundraising events . . . . | 6c | | |
| d | Net income or (loss) from gaming and fundraising events (add lines 6a and 6b and subtract line 6c) | 6d | |
| 7a | Gross sales of inventory, less returns and allowances . . . . . . | 7a | | |
| b | Less: cost of goods sold . . . . . . . . . . . . . . | 7b | | |
| c | Gross profit or (loss) from sales of inventory (Subtract line 7b from line 7a) . . . . . . . . . . | 7c | 0 |
| 8 | Other revenue (describe in Schedule O) . . . . . . . . . . . . . . . . . . . . . . . . | 8 | |
| 9 | **Total revenue.** Add lines 1, 2, 3, 4, 5c, 6d, 7c, and 8 . . . . . . . . . . . . . . . . . ▶ | 9 | 21,470 |

| | | | | |
|---|---|---|---|---|
| Expenses | 10 | Grants and similar amounts paid (list in Schedule O) . . . . . . . . . . . . . . . . | 10 | |
| | 11 | Benefits paid to or for members . . . . . . . . . . . . . . . . . . . . | 11 | |
| | 12 | Salaries, other compensation, and employee benefits . . . . . . . . . . . . . . . | 12 | |
| | 13 | Professional fees and other payments to independent contractors . . . . . . . . . . . | 13 | 5,705 |
| | 14 | Occupancy, rent, utilities, and maintenance . . . . . . . . . . . . . . . . . . | 14 | |
| | 15 | Printing, publications, postage, and shipping . . . . . . . . . . . . . . . . . | 15 | 102 |
| | 16 | Other expenses (describe in Schedule O) . . . . . . . . . . . . . . . . . . | 16 | |
| | 17 | **Total expenses.** Add lines 10 through 16 . . . . . . . . . . . . . . . . . . ▶ | 17 | 5,807 |
| Net Assets | 18 | Excess or (deficit) for the year (Subtract line 17 from line 9) . . . . . . . . . . . | 18 | 15,663 |
| | 19 | Net assets or fund balances at beginning of year (from line 27, column (A)) (must agree with end-of-year figure reported on prior year's return) . . . . . . . . . . . . . . . | 19 | |
| | 20 | Other changes in net assets or fund balances (explain in Schedule O) . . . . . . . . . | 20 | |
| | 21 | Net assets or fund balances at end of year. Combine lines 18 through 20 . . . . . . . . | 21 | 15,663 |

**For Paperwork Reduction Act Notice, see the separate instructions.**    Cat. No. 10642I    Form **990-EZ** (2019)

— Page 2 —

Form 990-EZ (2019)

Page **2**

Part II   **Balance Sheets** (see the instructions for Part II)
Check if the organization used Schedule O to respond to any question in this Part II  . . . . . . . . . . . . . . . . . . . ☐

| | (A) Beginning of year | | (B) End of year |
|---|---|---|---|
| 22 Cash, savings, and investments . . . . . . . . . . . . . . . | 0 | **22** | 15,663 |
| 23 Land and buildings . . . . . . . . . . . . . . . . . . | | **23** | |
| 24 Other assets (describe in Schedule O) . . . . . . . . . . | | **24** | |
| 25 **Total assets** . . . . . . . . . . . . . . . . . . . | 0 | **25** | 15,663 |
| 26 **Total liabilities** (describe in Schedule O). . . . . . . . . . . . . | | **26** | |
| 27 **Net assets or fund balances** (line 27 of column (B) **must** agree with line 21) | 0 | **27** | 15,663 |

Part III   **Statement of Program Service Accomplishments** (see the instructions for Part III)
Check if the organization used Schedule O to respond to any question in this Part III  .  . ☐

|  |  | Expenses<br>(Required for section<br>501(c)(3) and 501(c)(4)<br>organizations; optional for<br>others.) |
|---|---|---|
| What is the organization's primary exempt purpose?<br>Advance scientific research | | |
| Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses. In a clear and concise manner, describe the services provided, the number of persons benefited, and other relevant information for each program title. | | |
| **28** Hire scientists to perform research | | **28a** 0 |
| (Grants $  )                    If this amount includes foreign grants, check here . . . ▶ ☐ | | |
| **29** | | **29a** |
| (Grants $  )                    If this amount includes foreign grants, check here . . . ▶ ☐ | | |
| **30** | | **30a** |
| (Grants $  )                    If this amount includes foreign grants, check here . . . ▶ ☐ | | |
| **31** Other program services (describe in Schedule O) . . . . . . . . . . . . . . . . . . . . | | |
| (Grants $  )                    If this amount includes foreign grants, check here . . . ▶ ☐ | | **31a** |
| **32 Total program service expenses** (add lines 28a through 31a) . . . . . . . . . . . . ▶ | | **32** |

Part IV   **List of Officers, Directors, Trustees, and Key Employees** (list each one even if not compensated — see the instructions for Part IV)
Check if the organization used Schedule O to respond to any question in this Part IV.  . . . . . . . . . . . . ☐

| (a) Name and title | (b) Average hours per week devoted to position | (c) Reportable compensation (Forms W-2/1099-MISC) **(if not paid, enter -0-)** | (d) Health benefits, contributions to employee benefit plans, and deferred compensation | (e) Estimated amount of other compensation |
|---|---|---|---|---|
| Bryan J Pesta<br><br>President | 2.00 | 0 | | |
| John Fuerst<br><br>Vice President | 2.00 | 0 | | |
| | | | | |
| | | | | |
| | | | | |

Form **990-EZ** (2019)

— Page 3 —

Form 990-EZ (2019)                                                       Page 3

**Part V**   **Other Information** (Note the Schedule A and personal benefit contract statement requirements in the instructions for Part V.) Check if the organization used Schedule O to respond to any question in this Part V . . . . . . . ☐

| | | Yes | No |
|---|---|---|---|
| **33** | Did the organization engage in any significant activity not previously reported to the IRS? If "Yes," provide a detailed description of each activity in Schedule O . . . . . . . . . . . . . . . . . .   **33** | | No |
| **34** | Were any significant changes made to the organizing or governing documents? If "Yes," attach a conformed copy of the amended documents if they reflect a change to the organization's name. Otherwise, explain the change on Schedule O. See instructions. . . . . . . . . . . . . . . . . . . . . .   **34** | | No |
| **35a** | Did the organization have unrelated business gross income of $1,000 or more during the year from business activities (such as those reported on lines 2, 6a, and 7a, among others)? . . . . . . . . . .   **35a** | | No |
| **b** | If "Yes," to line 35a, has the organization filed a Form 990-T for the year? If "No," provide an explanation in Schedule O   **35b** | | |
| **c** | Was the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization subject to section 6033(e) notice, reporting, and proxy tax requirements during the year? If "Yes," complete Schedule C, Part III   **35c** | | |
| **36** | Did the organization undergo a liquidation, dissolution, termination, or significant disposition of net assets during the year? If "Yes," complete applicable parts of Schedule N . . . . . . . . . . .   **36** | | No |
| **37a** | Enter amount of political expenditures, direct or indirect, as described in the instructions. ▶ | **37a** | | |
| **b** | Did the organization file **Form 1120-POL** for this year? . . . . . . . . . . . . . . . .   **37b** | | No |
| **38a** | Did the organization borrow from, or make any loans to, any officer, director, trustee, or key employee or were any such loans made in a prior year and still outstanding at the end of the tax year covered by this return? . .   **38a** | | No |
| **b** | If "Yes," complete Schedule L, Part II and enter the total amount involved   **38b** | | |
| **39** | Section 501(c)(7) organizations. Enter: | | |
| **a** | Initiation fees and capital contributions included on line 9 . . . . . . . **39a** | | |
| **b** | Gross receipts, included on line 9, for public use of club facilities . . . . . **39b** | | |
| **40a** | Section 501(c)(3) organizations. Enter amount of tax imposed on the organization during the year under: section 4911 ▶    ; section 4912 ▶    ; section 4955 ▶ | | |
| **b** | Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations. Did the organization engage in any section 4958 excess benefit transaction during the year, or did it engage in an excess benefit transaction in a prior year that has not been reported on any of its prior Forms 990 or 990-EZ? If "Yes," complete Schedule L, Part I   **40b** | | No |
| **c** | Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations. Enter amount of tax imposed on organization managers or disqualified persons during the year under sections4912, 4955, and 4958 ▶ | | |
| **d** | Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations. Enter amount of tax on line 40c reimbursed by the organization ▶ | | |
| **e** | All organizations. At any time during the tax year, was the organization a party to a prohibited tax shelter transaction? If "Yes," complete Form 8886-T . . . . . . . . . . . . . . . . .   **40e** | | |
| **41** | List the states with which a copy of this return is filed. ▶ | | |
| **42a** | The organization's books are in care of ▶ John Fuerst         Telephone no. ▶ (919) 395-0565 | | |
| | Located at ▶ 26845 CHAPEL HILL DR   NORTH OLMSTED , OH        ZIP + 4 ▶ 44070 | | |

| | | Yes | No |
|---|---|---|---|
| **b** | At any time during the calendar year, did the organization have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? .   **42b** | | |

If "Yes," enter the name of the foreign country: ▶

See the instructions for exceptions and filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR).

| | | | |
|---|---|---|---|
| **c** | At any time during the calendar year, did the organization maintain an office outside the U.S.? . . .   **42c** | | |

If "Yes," enter the name of the foreign country: ▶

| | | | |
|---|---|---|---|
| **43** | Section 4947(a)(1) nonexempt charitable trusts filing Form 990-EZ in lieu of **Form 1041** – Check here . . . . . . . . ▶ ☐ | | |
| | and enter the amount of tax-exempt interest received or accrued during the tax year . . . . ▶ **43** | | |

| | | Yes | No |
|---|---|---|---|
| **44a** | Did the organization maintain any donor advised funds during the year? If "Yes," Form 990 must be completed instead of Form 990-EZ   **44a** | | No |
| **b** | Did the organization operate one or more hospital facilities during the year? If "Yes," Form 990 must be completed instead of Form 990-EZ   **44b** | | No |
| **c** | Did the organization receive any payments for indoor tanning services during the year? . . . . . .   **44c** | | No |
| **d** | If "Yes," to line 44c, has the organization filed a Form 720 to report these payments? *If "No," provide an explanation in Schedule O*   **44d** | | |
| **45a** | Did the organization have a controlled entity within the meaning of section 512(b)(13)? . . . . . .   **45a** | | No |
| **45b** | Did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? If "Yes," Form 990 and Schedule R may need to be completed instead of Form 990-EZ (see instructions) . . . . . . . . . . . . . . . . . . . . .   **45b** | | No |

Form **990-EZ** (2019)

———————————————— Page 4 ————————————————

Form 990-EZ (2019)                                                  Page 4

|  | | Yes | No |
|---|---|---|---|
| **46** Did the organization engage, directly or indirectly, in political campaign activities on behalf of or in opposition to candidates for public office? If "Yes," complete Schedule C, Part I. | **46** | | No |

**Part VI**   **Section 501(c)(3) Organizations Only**
All section 501(c)(3) organizations must answer questions 47- 49b and 52, and complete the tables for lines 50 and 51.
Check if the organization used Schedule O to respond to any question in this Part VI . . . . . . . . . . . . . . . . . . . ☐

|  | | Yes | No |
|---|---|---|---|
| **47** Did the organization engage in lobbying activities or have a section 501(h) election in effect during the tax year? If "Yes," complete Schedule C, Part II . . . . . . . . . . . . . . . . . . . . . . . . | **47** | | No |
| **48** Is the organization a school as described in section 170(b)(1)(A)(ii)? If "Yes," complete Schedule E . . | **48** | | No |
| **49a** Did the organization make any transfers to an exempt non-charitable related organization? . . . . . . | **49a** | | No |
| **b** If "Yes," was the related organization a section 527 organization? . . . . . . . . . . . . . . . . | **49b** | | |

**50** Complete this table for the organization's five highest compensated employees (other than officers, directors, trustees and key employees) who each received more than $100,000 of compensation from the organization. If there is none, enter "None."

| **(a)** Name and title of each employee | **(b)** Average hours per week devoted to position | **(c)** Reportable compensation (Forms W-2/1099-MISC) | **(d)** Health benefits, contributions to employee benefit plans, and deferred compensation | **(e)** Estimated amount of other compensation |
|---|---|---|---|---|
| NONE | | | | |
| | | | | |
| | | | | |
| | | | | |

**f** Total number of other employees paid over $100,000 . . . . . . . . . . . . . ▶

**51** Complete this table for the organization's five highest compensated independent contractors who each received more than $100,000 of compensation from the organization. If there is none, enter "None."

| **(a)** Name and business address of each independent contractor | **(b)** Type of service | **(c)** Compensation |
|---|---|---|
| NONE | | |
| | | |
| | | |
| | | |

**d** Total number of other independent contractors each receiving over $100,000. . . . . . . . . . ▶

**52** Did the organization complete Schedule A? **NOTE.** All section 501(c)(3) organizations must attach a completed Schedule A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐ **Yes** ☐ **No**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| Sign Here | Signature of officer | | | 2020-07-13 Date |
|---|---|---|---|---|
| | John Fuenst Vice President | | | |
| | Type or print name and title | | | |

| Paid Preparer Use Only | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| | Firm's name ▶ | | | Firm's EIN ▶ | |
| | Firm's address ▶ | | | Phone no. | |

May the IRS discuss this return with the preparer shown above? See instructions . . . . . . . . . ▶ ☐ Yes ☑ No

Form **990-EZ** (2019)

*19. Reference to Human Phenome Diversity Foundation Funding Support*

From preprint accessed at
https://www.biorxiv.org/content/biorxiv/early/2020/09/26/2020.09.24.312074.full.pdf

Dr. Pesta subsequently had his name removed from this paper.

bioRxiv preprint doi: https://doi.org/10.1101/2020.09.24.312074; this version posted September 26, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted bioRxiv a license to display the preprint in perpetuity. It is made available under aCC-BY-NC-ND 4.0 International license.

More Research Needed

68

**Acknowledgements:** Drs. Gur, Hakonarson, and collaborators request that publications resulting from these data cite their original publication: [TBD]. Support for the collection of the data sets was provided by grant RC2MH089983 awarded to Raquel Gur and RC2MH089924 awarded to Hakon Hakonarson. All subjects were recruited through the Center for Applied Genomics at The Children's Hospital in Philadelphia. dbGaP accession phs000607.v1.p1

We also thank Jordan Lasker for advice on running the Multi-group Confirmatory Factor Analysis.

**Funding**: Funding for this project was provided by the Human Phenome Diversity Foundation

**Conflicts of Interest:** The authors declare no conflict of interest.

*20. Respondent's Rebuttal to Draft Report*

The Respondent's rebuttal was submitted on 12/2/2021 and provided to the Investigation Committee. On 12/3/2021, the Respondent provided a revised rebuttal document, stating that there were errors in the version sent on 12/2. The edits made by the respondent were to remove repeated text, and the original version of the rebuttal will be retained with other investigation records. After review of the rebuttal, the Investigation Committee made no changes to the investigation report.

**Rebuttal, 12/2/21**

Dear Dr. Ward,

At the outset, and in response to the dozens of allegations made against me in this investigation, I want to state (as I've done so repeatedly throughout this entire process), that to the extent any of my conduct departed from accepted practices or was otherwise incorrect, I did not "intentionally, knowingly, or recklessly" commit those actions. Specifically, I have never intentionally, knowingly, or recklessly misrepresented my intended use of dbGaP data, used that data to pursue unethical research activity, or improperly shared controlled-access data. I believe that the evidence presented to the committee does not show, nor can it be fairly construed to show, that I did anything with the clear and convincing <u>required</u> intent.

To the contrary, since the investigation began, I have cooperated fully with both CSU and the NIH in responding to concerns and remedying errors. It is troubling that in some instances, this cooperation and acknowledgment of mistakes is being used as evidence of a guilty state of mind.  Clearly, had I not cooperated with the investigation, I would be charged with insubordination or failure to take this investigation seriously. Thus, for what it's worth, and before discussing the issues:

> *I would like to first swear that I did not intentionally, knowingly, or recklessly do **anything** that the committee claims I did.*

**Academic freedom**: The report states that this investigation is not about academic freedom, yet it begins by essentially arguing that (1) my research is unethical per se, and (2) that my research is inappropriate because race is just a social construct. I am, of course, aware that self-identified race / ethnicity (SIRE) is just a social construct. To wit, SIRE was a central variable in Lasker et al., as we pitted it against "genetic ancestry" in our experimental design. In fact, this was the whole point of the study! Yet, the committee members seemingly did not realize this, which incidentally illustrates why I requested someone with expertise in genetics be on the committee (Dr. Ward denied the request).

The nature-nurture question respecting the cause of cognitive ability differences across SIRE groups is an open line of inquiry. Though I am agnostic, most experts in the field agree with a partial hereditarian model

(for surveys of experts, see, Rindermann, Becker, & Coyle, 2020; Warne, 2021). There is nothing sinister about this line of research. It has the potential to increase human well-being for all (Research Statement, 9/4/21).

Regardless, the investigation has been about my academic freedom from the beginning, as evidenced by the external complaints that triggered CSU's inquiry into all this. These were grumbles about "racist applications of genetic data (Bird et al., p. 3.37)," and how the research topic might "stigmatize people (Taylor, 7.32)," and how my work is "clearly outside what [I] should be doing (Taylor, 10.177)." Charges of racism are, quite rightfully, toxic. And because they are so toxic, they provide an easy avenue to shut down academic inquiry and destroy reputations. Charges of racism in our current moment are also, unfortunately, ubiquitous.

As a thought experiment, suppose John and I had done a second study using the exact same research design as featured in the Lasker et al. paper. Suppose also that all the other NIH issues (e.g., me uploading to the external server, etc.) still existed for this paper as well. Here, though, we changed our research topic from "race and intelligence" to "race and – "schizophrenia," or "diabetes," or "sleep deprivation," or "obesity," or "extraversion," or even "job satisfaction." If so, I would **never** have been charged with academic misconduct, and I believe everyone involved here knows this. This is not to excuse mistakes that I may have made or have admitted to in the reporting process. But it is impossible to separate the technical complaints from politically or ideologically motivated complainants.

Specifically, I may have reported the Lasker et al. paper on the wrong close out form (but see the counterargument below). I also uploaded data without approval (unwittingly) to an external server, but the NIH also approved this server for another, high-profile article. The NIH **obviously** would not have approved this use in other cases if data uploaded to the external server could be used to identify research participants. The logic here is plain.

At worst, the evidence points to honest mistakes regarding reporting and approval requirements. These errors were corrected as soon as I learned they were errors, and at no time did I, or anyone under my supervision, access data that was not approved for use under an NIH contract. Moreover, **at no time was any research participant in jeopardy of being harmed or identified**. I contend that had these errors occurred in any context but that of genetics and intelligence, there would have been **no** objections, and they would have been treated as paperwork errors.

My concern over the academic freedom component of this case—which I had largely set aside—became heightened after I was contacted by someone purporting to be a Washington Post reporter about this investigative committee's draft report (11/18/21). Specifically, the purported reporter asked me:

> Might you have time to chat a bit about CSUs decision to terminate your employment...sorry if my information is not accurate. This is just what I was told.

I am not sure how this person, whether they are a legitimate reporter or not, would have any information regarding my situation or this process. The fact that this person seemed to have inside information about my case, however, raises concerns over the integrity of the investigation and its commitment to confidentiality. It also highlights the politicized aspect of this investigation. The only reason that anyone (outside of those involved here) would take any interest in this is clickbait—the story involves painting someone as a racist.

The academic freedom aspect of this case also comes into play in the motive that the committee infers. The committee seems to presume that I intentionally, knowingly, or recklessly mislead the NIH into providing me with data, because I was afraid that NIH would not approve the data use because of the "controversial" nature of the project. But there is not, nor has there ever been, any evidence to support this motive. On the contrary, the evidence belies that supposed motive.

This late in my career, I am not all that ambitious about my research programs, although I think I would have been wise enough to realize that the risk here would not have been worth the reward (i.e., how would I get away with it?). Conversely, the NIH did approve one of our TCP applications (#19747; for the same dataset!) that was clearly on the topic of race and intelligence, so perhaps there was nothing to hide from:

> #19747: "…We will focus on two traits: **educational attainment** / **intelligence** and schizophrenia…For these analyses, we will need **cognitive data** (all available)."

If my intent were to deceive the NIH or CSU into granting me data use under false pretenses, this would be an odd way to do it.

Clearly, if the NIH believed that this data use was inappropriate it would have said so before approving it! Ironically, regarding faulty logic, the committee's default assumption is that if I did something, I did it knowingly, recklessly, or intentionally. The fallacy here is conflating an act (e.g., uploading to the external server) with the motive behind the act (e.g., recklessness versus honest oversight). I submit that the committee has no evidence that I have done anything recklessly, or anything unethical, either knowingly or intentionally. Again, if there is actual evidence to support my state of mind, I have not seen it.

The committee uses the NIH's denial of my appeal to bolster its arguments. But the NIH's decision does not speak to any intentional wrongdoing. Perhaps looking at each application in isolation, e.g., application #19090, and comparing it to the paper that was drafted might create the appearance that the application was misleading. But this atomistic view ignores reality. As I testified, the focus of the proposal changed after application #19090 was initially approved. To reflect that change in focus, and to comply with the applicable rules and regulations, I submitted application #19747.

I contend that this is significant evidence that there was no intent to deceive, or to be reckless in the representations made. Indeed, it certainly would have been reckless to proceed to use the data we received under application #19090 without clarifying. But that's what happened. We could speculate that perhaps application #19090 should have been amended to reflect the uses set forth in # 19747. Or perhaps it should

have been withdrawn and resubmitted. But submitting a second request to cover the use of the data after the focus of the project had been refined can hardly be called reckless.

The idea that, acting in concert with others, I intentionally misled the NIH and CSU to gain access to data to publish a paper with others to support alleged racist claims have more than a whiff of conspiracy theory to it. That this investigation was initiated by people who don't know me or have any connection to CSU seeking to score some political or ideological points by "taking down" an alleged racist, is on the other hand, evident from the documents and witness testimony.

**Instance 1: Unauthorized use of controlled-access data.**

1. Closing out #19090. By completely ignoring DUC #19747, the committee mistakes what happened here:

   > ...when the description of the research that Dr. Pesta submitted (and NIH approved) suggested that he would examine mental health outcomes [DUC #19090], Dr. Pesta violated the DUC agreement with NIH for use of the dataset..." ~~But, as discussed above, this conclusion ignores #19747.~~

As I explained to the NIH and well-documented by us, we conducted research on both schizophrenia and intelligence for an overlapping project on the transethnic validity of PGS. To cover different aspects of these projects, we submitted two relevant DUCs (#19090, #19747) for the same TCP dataset. When Vivian Wang from the NIH inquired about this in 2019, we explained that we felt both applications covered the intelligence project, but that even if #19090 did not, #19747 explicitly covered the intelligence component of the project. The NIH did not rebut this point. Nor did they say that our interpretation regarding #19090 (i.e., its application to intelligence) was incorrect. Instead, they thereafter approved all our newer applications.

Further, in closing out #19090 I was attempting to comply with NIH requirements as I understood them. Because of the timing, we had to report Lasker et al. when closing #19090, which featured mental health (by the way, low/very low intelligence is a mental health issue, but we were not explicit on this point in #19090). We did this because we did not want to be accused of failing to report relevant TCP research, which is why we also submitted fully three applications for this same dataset.

Upon closing out #19090, the NIH website asked us to list all publications resulting from use of the TCP data. So, we reported Lasker et al. here, even though it was more relevant to the (future) close out of #19747. However, I submit that even if I had **not** reported Lasker et al. on #19090 (i.e., If I instead decided to wait until the closeout of #19747 to report this paper), the NIH and CSU would have instead charged me with **not** reporting Lasker et al. (as if I was trying to hide something). This is a no-win situation for me.

The committee is simply wrong about the above issues. This is not academic misconduct, but instead reflects due diligence on our part. The paper trail clearly shows our intentions regarding this matter. Note, finally, that it took until May 27, 2021, almost two years after my correspondence with Dr. Wang, for the NIH to deem that #19090 (versus #19747) did not cover intelligence research. And by that point, I reasonably believed that we had remedied any problem by submitting #19747 and closing out #19090 on the appropriate schedule.

In sum, contrary to the committee's claim, there was no violation for "use of the dataset" because DUC #19747 obviously covered intelligence. The NIH's claim was instead a technical one about reporting Lasker et al. when closing DUC #19090 (mental health), instead of #19747 (intelligence). We clearly explained our rationale behind doing this, but the committee ignored it.

Could someone please acknowledge that at least #19747 (TCP), in plain language, clearly featured intelligence?

Regarding whom I shared dbGaP data with, John secured access only by registering for one-credit hour independent studies with me (by the way, the committee didn't mention that John has earned an undergraduate degree from CSU). This gave him a CSU affiliation under my supervision, which then granted him data access. If I needed the other co-authors (Emil, Jordan) to also access these data, I would have merely had them register for a CSU independent study, rather than commit fraud. It's odd to think that I would do the latter when doing the former would have been trivially simple (witness how easily John did this). As an aside, throughout this whole process, both with CSU and the NIH, I've been presumed guilty until I prove my innocence, and I am obligated to defend any / all allegations thrown at me from any source.

2. Violation of non-transferability terms. The committee also mistakenly concluded that I either intentionally, knowingly, or recklessly, violated the DUC non-transferability terms. They say "uploading of these controlled data or derivatives seriously deviates from common research practices *and was done knowingly*" [Italics added]. Certainly, I knowingly uploaded that data. But when I uploaded the data, we did not know there was any deviation, let alone a serious one, as our records attest (Pesta letter to Ward, December 3, 2020; Carson letter to Lauer, June 23, 2021). Nor could I have reasonably anticipated that this might be a deviation based on the information I had and my knowledge of what other researchers were doing. As previously noted, the NIH's language is ambiguous with respect to imputation servers. It is also conflicting across agreements. Additionally, I can document where numerous dbGaP DUC's from other researchers that do not report imputation servers. Again, it's obvious that the only difference here is that these studies do not feature controversial data. To the extent that the NIH and this institution profess to value free academic inquiry, this should be a distinction without a difference.

In fact, in its first inquiry (fall 2019), the NIH, knowing full well of Bird's et al.'s complaint about imputation servers, **did not raise the issue** to us as a concern. And, after we promptly replied to their

general inquiry, presumably to their satisfaction, they continued to approve our renewals and new applications. This is all well-documented.

Importantly, the NIH will suspend access "if the Requester is found to be no longer in agreement with the principles outline." However, the NIH did not do so here after reviewing Bird et al.'s complaint and our reply to their inquiry. This led us to believe that there were no DUC violations. This conclusion is not unreasonable.

Furthermore, we weren't alerted to a problem on this issue until the NIH finally replied to us, 1.5 years later, with a re-investigation (May 2021), and reaffirmation (August 2021). This was literally years after we used the imputation server in early 2019! Thus, prior to the summer of 2021, we did not know or realize that this was something that needed to be reported. How would there be a duty to secure local IRB approval, years prior, on an issue we weren't aware of until after the article's publication?

Committee members also completely ignored the fact that other dbGaP researchers have used the exact same external server for the same purpose (imputing skin color) -- with no penalty. This, however, is obviously important here, as one of our claims is that the NIH is being curiously inconsistent in the application of its rules (see above). Again, this appears like an academic freedom issue. Were these other prominent researchers "reckless" when they used this same external server in the same way that we did? Could someone please address this point?

Finally, considering the committee's narrative here, what would I gain by uploading to the server without (versus with) NIH approval? What would have been my motive?

## 2. **Instance 2: Publishing without NIH permission**.

This is another misunderstanding by the committee. First, note that my name has never appeared on a published version (versus preprint) of any of John's newer dbGaP research. It seems odd to face discipline because of published papers that are ultimately not mine. The committee, though, claims that John publishing his newer research was an NIH violation. In support of this, they say that the NIH denied permission for publication on 2/5/20. But this is incorrect.

Nowhere was John told not to publish already-completed manuscripts (versus conduct new analyses). Specifically, he asked the NIH (2/4/2020) two distinct questions: (1) if a completed manuscript can be prepared for submission, and (2) if he can pursue new research. Dr. Parsain addressed only the second question, saying, "You [John] can NOT use that particular data set for your research." It is notable here that this was based on a misunderstanding of John's position, as was subsequently pointed out to the NIH. John then followed up with another email to Dr. Parsain:

> Prof Pesta received a letter from Vivian Wong in late September, nearly five months ago, asking us about data usage. We replied as requested and did not hear back. After, dbgap re-approved one

of our relevant DUCs. The analyses for this specific paper were conducted prior to this odd notification, so this issue seems to be irrelevant.

Regardless, I wish to confirm before submitting that, in doing so, I am in no violation with dbgap policy. In absence of a reply detailing the violations, I will assume there are none and submit the paper.

If there are, however, could you detail the issue and provide policy references, so I know how to proceed.

Thank you for your time and help.

Dr. Parsain did not respond. So, John next contacted the JAAMH DAC Committee, and then NIH Science policy, again for guidance. No reply.

A clear reading here shows that Parsain never originally said John couldn't publish completed manuscripts (versus conduct new analyses). And, since no NIH policies exist against this, and given that the several NIH groups John contacted failed to reply, John concluded it was safe to publish. Surely if there were problems somebody would have said something. It is also significant—if not dispositive-- that in their second review this summer, the NIH did not even deem that this was a violation of their contract. Moreover, when John notified the NIH that he would continue with publication of already-completed manuscripts this summer (which he has recently done), the NIH did not object. The only group that *thinks* this is a violation is the investigative committee at CSU.

Despite all this, the committee argues that "The publishing of [John's] paper seriously deviates from common research practices and was done knowingly by Dr. Pesta, as evidenced in part by his action to remove his name from publication after the controversy and knowing he lacked permission to do so…". To correct the record, it was John, not I, who ultimately published the paper in *Mankind Quarterly*. Surely, though, even if I had done the opposite—kept my name on the paper—there would be a more serious charge (publishing without NIH approval) levied against me. Again, it seems like I can't win here.

Moreover, it never occurred to me that I likely should take my name off newer, unpublished papers until literally during my first interview with the committee (by the way, how was it that I "lacked permission to do so" here?). I perceived that committee members were hinting that I should do this, but I could be wrong. Nonetheless, I am contacting the NIH yet again for clarification. I am also attaching the full email exchange as a supplemental file here, so everyone can see the due diligence.

***In sum, I'm in the peculiar position where I could be disciplined for a paper that I didn't even publish because CSU felt that I violated NIH policy on an issue that the NIH was ok with...***

## 3. Instance 3: IRB approval.

The committee is completely wrong about this issue. They should please reconsider before further damaging me.

DbGaP does not require IRB (which is why DbGaP's website says that it "does not require IRB"). More importantly, by definition, the NIH would <u>never</u> approve research that deviates from its own NIH DUC. It doesn't matter what local IRB might conclude, the decision to approve is solely the NIH's. In other words, NIH approval <u>completely obviates</u> local IRB approval. This is not speculation, but rather deductive inference.

Thus, IRB was not needed for this research. Instead, *had I known this was an issue*, what I would have (rightly) done here is reengage the NIH, not CSU IRB! The point could be moot, though, as it was logically impossible for me to secure IRB approval on an issue I <u>didn't even know existed</u> until after the paper had been published.

**4. <u>Instance 4: Unauthorized research funding</u>**.

I act as one of two stewards over the HPDF fund. I do not own it. Thus, when the Fund receives donations, I do not personally receive them. I have, though, used a fraction of the funds to support my research, but I'm not aware of a specific CSU policy against this, nor did the committee cite one. If instead of creating a non-profit, I had received money from a "Gofundme" account, would I still be obligated to report this to CSU? I am honestly not sure of the answer here, and I can't imagine a CSU policy exists that covers this, which is probably why the committee did not cite one. So, in terms of policy violations, what am I being accused of here?

The foundation's funds were mostly used to cover John's educational expenses and in-class / out-of-class research expenses (laptop, Uber rides, CSU classes, attendance of a research conference, research meetings etc.). I can provide documentation of all this. As I mentioned in my second interview, the monies were also used to fund other researchers on related topics, as decided by John and I (albeit, mostly by John).

Was John also obligated to report this to CSU (I'm not sure I was even obligated to do this...), since he was a student, and not an employee? John and I have a 50/50 custodianship in the non-profit, so what does the committee conclude here from a legal standpoint (i.e., the different presumed duties and obligations owed to CSU if the non-profit is primarily for a student's benefit)? The issue is complex, and the committee can't even point to a single CSU policy number that I presumably violated. Yet, they rather confidently conclude that I am guilty here. I hope this issue remains open until we can find the answer.

**5. <u>Ohio ethics law:</u>** On Page 8 of the Draft Report, the committee quotes our CBA: "[Ohio law] prohibits a public official or employee from soliciting or accepting **compensation** from any source other than his or her public employer for the performance of his/her **public duties**."

The HPDF receives and distributes donations. Donations are not a form of compensation. Recipients of our donations don't do anything for consideration on their end, nor is there any type of employment relationship here. All the HPDF does is receive the donations and pass them on to the recipients.

We used a small fraction of these donations to pay for a research computer, business meetings, etc. How does the fund buying itself a computer for our use exemplify compensation? Finally, I'm curious whether conducting research is a "public duty"? Could we define the term before concluding I violated ethics law?

In sum, the committee's speculation here is rather sophomoric, although being accused of violating Ohio ethics law certainly has the potential to harm me.

**6. Research collaboration:**

The committee states:

> Dr. Pesta has been working with a research team since approximately 2016, which includes a former CSU student, J. Fuerst. Some of this team's efforts have been found to violate significant NIH data use policies and other areas described above...This shows a concerning pattern of collaboration with J. Fuerst (et al.) even when evidence to the contrary might dissuade more objective researchers from doing so... Dr. Pesta has knowingly collaborated with other individuals who have a track record for irresponsible use of data, including Emil Kirkegaard.

This whole argument is baseless. First, it is circular to use the source of this ongoing investigation (i.e., "Some of this team's efforts have been found to violate significant NIH data use policies and other areas described above") as evidence of what the committee hoped to establish in the first place (i.e., the violation of "significant NIH data use policies").

Second, the committee ignores the fact that my association with John was primarily via his being a **student in good standing at CSU**. To be specific, John, a CSU alumnus, was taking post-bac independent study classes with me, and the research papers under discussion were his class projects. My only association with Emil Kirkegaard was through John (although I did meet Emil once). This is well documented. Moreover, CSU claims to adhere to the Foundation for Individual Rights in Education's (FIRE) academic freedom policies. FIRE has made it clear that this research pursuit is a constitutionally guaranteed right, and that obstruction would be a violation of this right (See the FIRE letter to President Sands, October 7, 2020).

**7. Miscellaneous**

a. Pages 163 and 195 of the binder show me reporting the housing of the data on my home computer, versus at CSU. These were the ABCD and ADD Health applications I submitted in 2020. If similar documentation exists for my TCP applications, I could not find it. Nonetheless, clearly the NIH is ok with storing restricted-access data on home computers. Moreover, note that the NIH never even raised this issue (CSU did), and now it is resolved. It is also remarkable that although this

information (which certainly helps my case) was contained in the original binder supplied to the committee (i.e., pages 163, 195) nearly half a year ago, they either ignored it or did not read it.

b.  <u>"In fact, Dr. Pesta listed Mr. Kirkegaard as a member of "Bryan Pesta's Lab Institution: Cleveland State University Department of Management" on ResearchGate (p. 9).</u>

This is perhaps the best example of Bird et al. (and now the committee) throwing stuff at the wall. ResearchGate has a "lab" feature that researchers can use to link to colleagues across the world (Emil, for example, is in the Netherlands). Their website states: "A lab is a group of scientists, led by a senior researcher, who conduct experiments and research together on a specific topic." There is <u>zero</u> implication here that all members of a lab have the same affiliation, or that they even meet in some shared physical space. ResearchGate's use of the word "lab" is clearly not meant to be taken literally. If Emil was linked to CSU under this "lab" feature, <u>it was not me who did that</u> but ResearchGate. This whole thing reads like yet another conspiracy theory.

c.  <u>Common research practice</u>. Consider this quote from the committee's draft report (p. 8):

> It is <u>common research practice</u> for funds that support University researcher's efforts as employees of the institution do so through the SPRS office...by using [HPDF funds] for research purposes, including publishing with his CSU affiliation, without CSU's permission of knowledge, <u>seriously deviates</u> from <u>accepted practices</u>.

Before reaching these conclusions, wouldn't the committee have to show (clearly and convincingly) that I violated some law, rule, or regulation, etc.? How can I be guilty of academic misconduct on this point if the committee cannot even produce a policy number that they think I violated? Is there really a rule that all received research monies must go through SPRS? What if the monies were donations from a non-profit, or a Gofundme account (versus a research grant)? I do not know the answers here. I suspect the committee does not either.

Without citing a policy number, is the committee instead saying that simply because my research practice was not "common," it was therefore also a serious deviation from "accepted" practices, which was therefore also "academic misconduct"? This seems like an incredibly slippery slope. At any rate, just violating "common research practice" is an unfairly low bar to use when deciding whether I committed academic misconduct.

### CONCLUSION

For two of the four allegations ("Instances") against me here, the committee can't even cite a policy number that I supposedly violated.

Nonetheless, I know what's likely going to happen. The administration will ignore all this and default solely to the committee's report. But the committee is flatly wrong on most issues, and sophomoric on others. I hope the administration realizes this before I am further damaged.

Finally, I have seen this before. I have seen several colleagues (for the perfect example, see, https://www1.udel.edu/educ/gottfredson/reprints/2009academicfreedom.pdf) have their careers ruined simply because they researched this topic. If that's the intent here, I will pursue all available, appropriate options to defend my (already-tainted) reputation, my career, and my academic freedom.

<div align="center">References</div>

Warne, R. T. (2021). Between-Group Mean Differences in Intelligence in the United States Are > 0% Genetically Caused: Five Converging Lines of Evidence. The American Journal of Psychology, 134(4), 480–501.

Rindermann, H., Becker, D., & Coyle, T. R. (2020). Survey of expert opinion on intelligence: Intelligence research, experts' background, controversial issues, and the media. *Intelligence*, *78*, 101406.

CONFIDENTIAL

*21. Notice of Institutional Decision*

 Office of
the Provost

January 13, 2022

Dear Dr. Pesta:

I am writing in follow-up to the report of the Cleveland State University (CSU) faculty committee charged with investigating allegations that you engaged in research misconduct in your role as a tenured, full professor in the Monte Ahuja College of Business at CSU. The work of this committee, comprised of other CSU tenured faculty members, was conducted pursuant to the University's Research Misconduct Policy (sections 3344-28-01-3344-28-10 of the Administration Code). The committee's report has been submitted to me for decision and action.

The committee based their findings on extensive review of existing correspondence and documentation, interviews with complainants as well as testimony provided by you on two separate occasions. For both of your testimonies you were provided a written transcript and given the opportunity to correct errors of fact or omission. These transcripts are included as attachments to the committee's report, as are two additional written documents from you: an opening written statement provided prior to your initial interview with the committee in September, 2021 and your written rebuttal to the draft report.

Based on the totality of the evidence gathered and the timeline of events they constructed from this evidence, this committee of your peers determined there is clear and convincing evidence that you committed four specific instances of research misconduct:

1. Unauthorized use of National Institutes of Health (NIH) controlled-access data from the database of Genotypes and Phenotypes (dbGaP);
2. Publishing research findings despite NIH explicitly stating that you and your colleagues did not have approval to do so;
3. Failure to receive IRB approval for use of NIH data that went beyond what was outlined in a Data Use Certification (DUC) Agreement; and
   Unauthorized research funding for Cleveland State University (CSU)-related research efforts without CSU approval (e.g., by College Dean or Sponsored Programs and Research Services).

Additionally, and prior to this internal CSU investigation of research misconduct, the National Institutes of Health (NIH) conducted their own investigation and found that you:

- Violated the data use certification (DUC) agreement for dbGaP project #19090 by using the data to examine "intellectual ability" when the description of the research that [you] submitted suggested that you would examine mental health outcomes.

OFFICE OF THE PROVOST
2121 Euclid Avenue, AC 333
Cleveland, Ohio 44115-2214

Campus Location
2300 Euclid Avenue, AC 333
Cleveland, Ohio

T 216.687.3588
F 216.687.9290
W csuohio.edu/provost

- Violated non-transferability terms for dbGaP projects #19090 and 19747 by uploading controlled data or derivatives of controlled data in the form of "coded" Single Nucleotide Polymorphisms (SNPs) to an unapproved online forensic DNA phenotyping service.
- Violated the DUC clause regarding research use reporting by not reporting the publication of Lasker J, Psych Aug. 2019, 1(1), 431-459; https://doi.org/10.3390/psych1010034 at the time of project renewal.

As a consequence of these NIH findings, your current access to dbGaP has been revoked and you have been banned from accessing any NIH controlled access datasets for a period of three years. This is the most serious and longest ban NIH has ever issued on a controlled access dataset. When asked about your suspension, a senior NIH attorney confirmed this, stating: "*I can confirm that with the exception of Dr. Pesta's period of suspension, NIH has not previously suspended an investigator's access to controlled access resources on the basis of violations of the Data Use Certification Agreement and/or Data Access Request for longer than 6 months*". The NIH has noted these sanctions and identifies both you and, by extension, Cleveland State University, as being in violation of their policies. This, of course, has serious implications for our research reputation and success as a University.

Upon learning of the outcome of the NIH investigation you appealed the NIH decision on all three counts. The NIH reviewed your appeal and upheld their decision on all three counts. Further, the NIH considers your co-author (and student, at the time) to be in continued violation of the DUC.

This matter is now before me for decision pursuant to sections 3344-28-06(K)(5) and 3344-28-10 of the Research Misconduct Policy.

Based on my review of the NIH investigation, this faculty committee's own investigation and all the supporting documentation included in the report, including materials you provided, I concur with the committee's findings. In arriving at this conclusion, I considered carefully your own testimony to the committee. In some parts of your testimony I note that you acknowledge committing the violation. I do not know if these violations were committed knowingly or recklessly. I do not distinguish between these two states of mind in interpreting the actions of a tenured full professor who should be well informed about appropriate research practices prior to seeking to serve as a Principal Investigator on a research project. In other parts of your testimony you provide a rationale that the violation was either overblown or it was simply not your fault. I do not find those excuses compelling and therefore find you responsible for the four violations listed above for the same reasons as the committee. I adopt and incorporate their findings and conclusions in whole.

In considering possible sanctions, I reviewed both the AAUP Collective Bargaining Agreement and the CSU Administrative Code, Statement on Professional Ethics and Academic

2 | P a g e

Responsibility. I considered carefully your assertion that this inquiry violates your academic freedom, a privilege afforded to you as a tenured full professor and a privilege that I fervently uphold. I also considered carefully the responsibilities that accompany the privilege of being a tenured faculty member.

My review of the evidence in this case weighed against our Administrative Policies and CSU-AAUP Collective Bargaining Agreement convinces me that this matter does not involve a question of academic freedom. This is a question of violating ethical conduct expectations and the standard procedures of research. You have violated the core research integrity guidelines that you agreed to follow by virtue of completing Principal Investigator (PI) training at CSU and subsequently identifying yourself as a PI on proposals for external funding. You have violated the standards of research integrity that we uphold in both our research policies and CSU's tenure standards which you, by virtue of accepting tenure at Cleveland State University, have also pledged to follow.

CSU's Administrative Code, statement on Professional Ethics and Academic Responsibility states the following (emphasis added):

> *The basic functions of the university are the advancement and dissemination of knowledge, the development of critical intelligence in the young, and the education of citizens and professional workers for the society of which the university is a part.*
>
> *The indispensable condition for the successful discharge of these functions is an atmosphere of intellectual freedom. Unless a faculty member is free to pursue the quest for knowledge and understanding, wherever it may lead, and to report and discuss the findings, whatever they may be, the university faculty member cannot properly perform their work. It is imperative, therefore, that the university maintains an atmosphere of intellectual freedom and that faculty members uphold that freedom by their own actions.*
>
> *To make that freedom operational, it is equally imperative that the university establish democratic mechanisms for meaningful faculty participation in the governance of the institution. Freedom entails responsibilities. **It is incumbent upon the faculty member to accept the responsibilities which are concomitant with the freedom…. Those responsibilities are: to students, to scholarship, to colleagues, to the university, and to the larger community which the university serves.***
>
> *Responsibility to scholarship: The faculty member has the responsibility of **being unfailingly honest in research and teaching, refraining from deliberate distortion or misrepresentation and taking regular precautions against the common causes of error**.*
>
> *Responsibility to the institution: **A faculty member has the duty to ensure that the regulations of the university are designed to achieve the university's goals as well as being in accord with the principles of academic freedom. Recognizing the importance of order within the institution, the faculty member observes the regulations of the***

3 | P a g e

> **university,** *but in no way abdicates the right to attempt to reform those regulations by any appropriate orderly means.*

Based on the research actions identified in this investigatory report and your rationale for them. your academically negligent relationship with your student co-author, your failure to disclose your financial relationship with the Human Phenome Diversity Foundation that both supported equipment for your CSU-affiliated research and that of your student co-author (a foundation which both you and the student direct), I conclude that you have acted with either willful dishonesty or an unacceptable level of incompetence in your scholarship. You have neglected your duties and obligations as a tenured full professor, failed to uphold the standard of excellence expected of a scholar at your faculty rank, and you have conducted your research activities in a manner that negatively impacts your reputation as a tenured full professor of Cleveland State University. By extension, your violations of research standards also negatively impact CSU's reputation as an R2 institution.

On this last point regarding harm to the institution that employs you I have included additional context here regarding two particular elements of this case that I find particularly troubling: your professional relationship with [student co-author], and nondisclosure of external funds for CSU-affiliated research purposes. In both these areas I find that you fail to understand or acknowledge the gravity of your responsibilities as a tenured full professor as it relates to the conduct of research.

**Your relationship with [student co-author] and use of external funds**
At several points in your testimony you respond to questions about the protected access dataset and your work with [student co-author]. Specifically, the following exchanges occur:

> **Committee member A (CM-A):** *So, on June 24, 2021, Dr. Ward wrote to you: "your email message to Teri Kocevar dated April 18th, 2018 included the statement 'I will be the only one who has access to these data, they will be stored on my CSU computer, which is password and firewall protected."*

> **Bryan Pesta (BP):** *I initially wanted to run it on the CSU laptop, provided to CSU by me, but it wasn't powerful enough, so we bought a desktop and ran it off that at my house.*

> **BP:** *Even though I have four authors in that Lasker paper, only [student co-author] has access to confidential data".*

> **Committee member B (CM-B):** *So, from my perspective, during our last interview when you said "unless he stole it, I didn't give him his own copy, that was the first I hear of the claim that [student co-author] never had access to the data. In some of this paperwork trail….it was always the case that you felt [student co-author] could access the data, because he was under your supervision and only you and he could access the data.*

> **BP:** *He had access to the data only at my house with me present.*

**CM-B**: *I'm just still not sure how it would be possible for him to have the data if he only was able to access it under your supervision at your house in this computer?*

**BP:** *I don't know.*

**CM-B:** *So, my understanding is that [student] still has the data set and it's not clear with whom he's sharing it or what websites the data might be stored on.*

**BP**: *I agree with you. I'm responsible for that, but I don't know that he still has the data…..he's sort of gone a little bit rogue and I suspect there's no way he would talk to any CSU people.*

**CM-A:** *You describe [student co-author] as sort of going rogue here lately, can you just explain a little bit about what you mean?*

**BP**: *I suspect he's gonna try to publish the data, even though the NIH says don't.*

**CM-A:** *CSU is still trying to get confirmation from [student co-author] that he destroyed his copy of the data.*

**BP:** *Yeah, he won't do that. His take is he wants to go through the NIH and appeal further and not through CSU.*

It is important to note here for context, that based on your own testimony this was not just any student with whom you connected, but one whose CSU student status was arranged by you specifically for purposes of conducting this research. Specifically, you write in your rebuttal statement: "…*To be specific, [student co-author] was a CSU alumnus who was taking post-bac independent study classes with me and the research papers under discussion were his class projects*". CSU records show that [student co-author] never graduated with a degree from CSU. He earned a Bachelor's degree at another university before enrolling at CSU as a non-degree Psychology graduate student in the 2001 – 2002 academic year. Between 2005 and 2008, [student co-author] was enrolled at CSU as a Post-Baccalaureate student pursuing a B. S. in Biology. Most recently, he enrolled as a non-degree student in BUS 293, an independent study course under your supervision, for 1 credit each semester for five semesters between Spring 2019 and Spring 2021.

Further, you acknowledge that you and [student co-author] also have a "50/50 custodianship" role in the Human Phenome Diversity Foundation (HPDF), a non-profit organization that you presumably founded. In addition to acknowledging that HPDF funds were used to purchase the home computer on which you and [student co-author] conducted your research, in your rebuttal you stated the following:

> *I act as one of two stewards over the HPDF fund. I do not own it. Thus, when the Fund receives donations, I do not personally receive them. I have, though, used a fraction of the funds to support my research, but I'm not aware of a specific CSU policy against this……The Foundations' funds were mostly used to [student co-author's] educational*

*expenses and in-class/out-of-class research expenses (laptop, Uber rides, CSU classes, attendance at a research conference, research meetings, etc).....the monies were also used to fund other researchers on related topics, as decided by [student co-author] and I (albeit, mostly by [student co-author].*

In your testimony you stated that "*I don't regret HPDF. I think it's fine. I don't think it's linked to CSU at all. But granted, [committee member] makes a good point about the computer and the Uber rides, but there is nothing explicitly linking my 501c3 to Cleveland State*".

I believe any reasonable professor would realize that your conflation of your position as a tenured full professor at CSU with your role as a "custodian" of a non-profit organization whose funds supported your research projects as well as Uber rides for your student (and co 501c3 custodian) to your home constituted a real or perceived violation of our CSU Conflict of Interest Policy and should, at a minimum, have been disclosed for additional review.

You were the supervising professor for this student's independent study and you co-led a 501c3 together that funded a personal computer for you and materials, transportation and conferences for the student as you worked together on a research project for which you received permission to use a controlled access NIH dataset based on your status as a tenured full professor at Cleveland State University. You—and not the student co-author-- were the PI and responsible party on this research project, and you were the scholar who wrote this to Teri Kocevar in our research office:

*I will be the only one who has access to these data, they will be stored on my CSU computer, which is password and firewall protected.*

We know now that this statement did not reflect your ultimate actions. Your subsequent decisions led to your failure to protect a controlled access dataset that included information about a most vulnerable population: children. This failure led to you receiving the most severe penalty and longest data access ban that the NIH has ever issued.

You have not demonstrated concern or acknowledged full responsibility for your actions or the actions of a student who was under your direct supervision and receiving credit for an independent study with you.

### Disciplinary Decision

The CSU-AAUP Collective Bargaining Agreement stipulates that... "*If the Chief Academic Officer of the University believes that the conduct of a faculty member is sufficient to justify sanction or dismissal, then the Chief Academic Officer may bring charges against a faculty member. The Chief Academic Officer shall initiate the procedure by informing the faculty member and the CSU-AAUP that charges have been brought. Sanction or dismissal of a faculty member may occur for just cause*" (Article 8. 1).

The CSU-AAUP Collective Bargaining Agreement Article 8 identifies 6 just cause areas that may lead to "Sanction or dismissal of a faculty member". Your actions are implicated in four of the six causes listed (in bold), based on the facts established in the committee report:

6 | Page

(1) **incompetence or dishonesty in teaching or scholarship;**
(2) **neglect of duty;**
(3) **personal conduct which substantially impairs the individual's fulfillment of his/her institutional responsibilities;**
(4) **interfering with the normal operations of the University;**
(5) fraudulent credentials; or
(6) conviction of a crime involving moral turpitude or conviction of a crime of violence as defined in Section 2901.01 (9) of the Ohio Revised Code.

The CSU-AAUP Collective Bargaining Agreement states

*In determining sanction or dismissal, the Chief Academic Officer shall take into consideration that principle of progressive discipline and the proportionality of the sanction or dismissal to the nature and impact of the offense. However, with respect to instances of misconduct that are of such a serious nature as to require immediate action, the University reserves the right, consistent with the requirements of just cause and the procedures outlines in this Agreement, to implement a suspension of other sanction without first administering a lesser sanction.(Article 8 1 B (5)).*

Given the seriousness of this research misconduct case and the fact that the harm extends beyond your personal reputation to taint the reputation of CSU as a whole, I find the offense warrants the most serious sanction be administered and that any lesser sanction would be disproportionate to the gravity of your conduct. Based on my review of the all the evidence provided, including your own testimony, I am hereby notifying you that I find your misconduct warrants dismissal from the University.

Article 8 in the CSU-AAUP CBA defines the process for sanction and dismissal. Specifically, Article 8.2 of the CBA requires the convening of an ad hoc committee. The ad hoc committee will be "comprised of three members of the bargaining unit and three members of the academic administration with tenured faculty status appointed jointly by the President of the CSU–AAUP and the University's Chief Academic Officer." The committee shall convene a hearing within ten days of the issuance of this letter unless the parties agree to a later date. At the hearing, I or my designee will present the basis for the proposed discipline. You will have an opportunity to respond to the charges that are the basis for the proposed disciplinary action. The CSU-AAUP has a right to attend and participate in the ad hoc committee hearing. Following the ad hoc committee hearing, committee has 15 working days to issue their recommendation. In accordance with Article 8.3 of the CBA, if upon receiving the advice of the ad hoc committee, I decide to implement disciplinary action, I will do so not later than ten days from receipt of the recommendation of the ad hoc committee.

I have attached here a copy of Article 8 of the Collective Bargaining Agreement and have notified the CSU-AAUP of my decision.

Sincerely,

Laura Bloomberg, Ph.D.
Provost and Senior Vice President for Academic Affairs

CC:

Kenneth Kahn, Dean, Monte Ahuja College of Business
Timothy DeGroot, Chair, Department of Management
Donald Allensworth-Davies, President, CSU -AAUP
Meredith Bond, Interim Vice President for Research and Innovation
Benjamin Ward, Research Integrity Officer, Office of Research
Sonali Wilson, General Counsel, Office of General Counsel