# IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| BRYAN J. PESTA, | ) | CASE NO. 1:23-CV-00546-DAP |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | |
| | ) | |
| LAURA BLOOMBERG, in her official | ) | **MOTION FOR SUMMARY JUDGMENT** |
| and individual capacities; and HARLAN | ) | |
| M. SANDS, BENJAMIN WARD, | ) | |
| CHRISTOPHER MALLETT, CONOR | ) | |
| McLENNAN, and WENDY | ) | |
| REGOECZI, in their individual | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |

The Defendants hereby move this Court for summary judgment in their favor on all Counts of the Complaint because there are no issues of material fact which require a trial to a jury and the undisputed facts demonstrate that all Defendants are entitled to judgment as a matter of law.  The reasons for this Motion are fully set forth in the attached Brief.

Respectfully submitted,

*/s/ Karen L. Giffen*
Karen L. Giffen (0042663)
Kerin L. Kaminski (0013522)
PEREZ & MORRIS, LLC
1300 East Ninth Street, Suite 1600
Cleveland, Ohio 44114
Telephone:    216-621-5161
Facsimile:    216-621-2399
Email:    kgiffen@perez-morris.com
         kkaminski@perez-morris.com
***Counsel for all Defendants***

**CERTIFICATE OF SERVICE**

A copy of the foregoing was filed electronically on July 29, 2023. Notice of this filing will be sent to all parties through the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Karen L. Giffen
Karen L. Giffen (0042663)
**_Counsel for all Defendants_**

**BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

Dr. Bryan Pesta ("Pesta") claims he was the subject of an internal investigation and was terminated from his employment at Cleveland State University ("CSU") [1] in retaliation for exercising his rights under the First Amendment to the United States Constitution.[2] Pesta brought claims against six individual defendants - Harlan Sands (then President of CSU), Laura Bloomberg (then Provost of CSU), three individuals who served on investigation committee convened to review whether Pesta committed research misconduct, and one who supported the investigation committee (all "Individual Defendants"). Specifically, Pesta argues that he was retaliated against by the Individual Defendants because he published a research paper entitled "Global Ancestry and Cognitive Ability" in August of 2019 (the "Global Ancestry" paper) in which he and his coauthors contend that genetics plays a role in the mean differences in IQ scores between White and Black Americans.[3] Pesta claims that he was not terminated for misconduct, but rather, because Global Ancestry dealt with a controversial topic.

As demonstrated below, the undisputed facts show that the investigation of Pesta's misconduct and his termination were not motivated by the subject matter of the Global Ancestry paper.  Instead, the undisputed evidence shows that Pesta engaged in misconduct that included

---

[1] As previously determined in this case, CSU is immune from liability in this action.  Individual Trustees were originally Defendants but are no longer in the case.

[2] In Counts I and II of the Amended Complaint, Pesta asserts First Amendment retaliation against the Individual Defendants for initiating the investigation and then terminating his employment. Count III is a declaratory judgment claim against Individual Defendant Laura Bloomberg in her official capacity and is entirely derivative of the claims made in Counts I and II.

[3] Amended Complaint, at p. 3

1

violating the rules of the National Institutes of Health ("NIH"), violating several polices of CSU, and failing to uphold professional standards regarding research.  The NIH itself found that Pesta had violated its rules and standards.   Indeed, most of the misconduct that caused the investigation and Pesta's termination is conceded by Pesta. Pesta failed to truthfully and completely disclose to the NIH the exact nature of his intended research, how he would conduct the research and with whom he would work.  At every turn, Pesta and his coauthors attempted to mislead or avoid the scrutiny of the NIH and CSU and did so in breach of NIH and CSU policies and professional standards.

Pesta was afforded substantial opportunities to present his facts and defenses to the allegations of misconduct and did so to (1) the NIH, (2) an Investigation Committee of CSU made up of faculty members, (3) the Provost of CSU, (4) an Ad Hoc Committee of CSU faculty and administrators under the collective bargaining agreement, (5) his union, the American Association of University Professors ("AAUP"), and (6) the Ohio State Employee Relations Board ("SERB").  He was represented by counsel during each of the proceedings.  Every agency and entity rejected his arguments and found that he was properly investigated and terminated because he engaged in misconduct. The uncontroverted evidence shows that Pesta would have been terminated for his research misconduct no matter what the subject matter of his research.

CSU and the Individual Defendants agree with Pesta that the principles of academic freedom apply at CSU and to the subject matter of Pesta's research.  In fact, CSU's academic research misconduct policy provides,

> Cleveland State University *endorses the principle that its faculty and staff are entitled to full freedom in research* and to full freedom in the publication of the results of those research endeavors.  Corresponding with this principle of full freedom in research is the *obligation to maintain the highest standards of professional ethics*.[4]

---

[4] OAC 3344-28-02(A) (emphasis added)

Of course, as described in the policy, while academicians at CSU are afforded academic freedom to do research, their concomitant responsibility is to maintain standards of professional ethics. The former cannot exist without the latter.

Pesta maintains that he was involved in researching a topic that was controversial.  The fact that Pesta may have been involved in researching subjects that were controversial did not give him a free pass to engage in research misconduct.  CSU and the academic community have a valid interest in ensuring that academic research happens in a manner consistent with commonly accepted practices for proposing, conducting, and reporting research.  Pesta's failure in this regard was significant and supports his termination.

## II.     STATEMENT OF FACTS

### A.  CLEVELAND STATE UNIVERSITY

Cleveland State University is a public institution of higher education established by the state of Ohio.[5]  CSU offers more than 200 graduate and undergraduate programs amongst eight separate colleges.   One of those colleges is Monte Ahuja College of Business ("College of Business") where Pesta was employed as a tenured full professor.  The student enrollment for CSU is approximately 14,000 students.  It employs more than 500 full time faculty members in its eight colleges.[6]

Many of the policies and procedures that apply to CSU and its faculty may be found in Ohio Administrative Code at Chapter 3344.  The faculty at CSU is represented by the AAUP for purposes of collective bargaining. The manner and means by which CSU faculty members may be

---

[5] ORC Section 3345.011
[6] Affidavit of President Laura Bloomberg, at ¶ 3, attached hereto as Exhibit 1 ("Bloomberg Affidavit")

terminated is governed by the collective bargaining agreement between CSU and the AAUP, including the manner and means by which faculty members may be terminated.[7]

CSU is classified as an "R2: Doctoral Universities: High Research Activity" institution in the Carnegie Classification of Institutions of Higher Education, a well-recognized authority in American higher education. An R2 designation means that research is integral to the mission of CSU and that CSU fosters a conducive environment for inquiry and discovery.[8]  CSU has annual research and development expenditures of $55 million.  Thus, the integrity of the research conducted at CSU is crucial to its educational mission and its reputation and standing in the academic community.[9]

The Principal Investigator in any research project is the individual with primary responsibility for not only the preparation and conduct of the research but also to make sure it is done in compliance with applicable laws, regulations, policies, and agreements. There are several groups at CSU that monitor or assist research at CSU including the Office of Research Integrity and the Institutional Review Board ("IRB").[10]  The IRB is composed of faculty members who review and monitor research that involves human subjects. The IRB assures, both in advance and by periodic review, that appropriate steps are taken to protect the rights and welfare of humans participating as subjects in the research.  The Office of Research Integrity assists researchers in

---

[7] Relevant portions of the collective bargaining agreement are attached as Exhibit A to the Bloomberg Affidavit.

[8] Bloomberg Affidavit ¶5

[9] Bloomberg Affidavit ¶5

[10] Affidavit of Dr. Benjamin Ward at ¶¶1-23 attached hereto as Exhibit 2 ("Ward Affidavit"); Exhibit 5 to the Deposition of Brian Pesta ("Pesta Depo") is the complete Final Report including all attachments.  In this Motion the attachments to Exhibit 5 to the Pesta Depo shall be referred to as "Pesta Depo, Ex. 5, Attachment __."  See:  Data Use Certification Agreements Pesta Depo, Ex 5, Attachments 9 and 11."

managing aspects of research and ethical standards.[11]   In this case, Pesta was the Principal Investigator for the research that led to publication of the Global Ancestry paper.[12]   As such, it is undisputed that he had the primary responsibility to ensure that the research was conducted in compliance with applicable laws, regulations, policies, and agreements.

### B.  BRYAN PESTA

After Bryan Pesta received his doctoral degree in cognitive psychology from the University of Akron in 1977, he was a Visiting Assistant Professor of Psychology in CSU's College of Arts and Sciences.[13]   He became an Assistant Professor of Management and Labor Relations at the College of Business in 2001.  He received tenure in 2010 and was then an Associate Professor. He was promoted to Full Professor in 2016.[14] Pesta testified that at the time he was awarded tenure and promoted to full professor, his superiors were primarily concerned about whether he published research.[15] For Pesta to obtain tenure and be promoted to full professor, Pesta was required to submit a list of his then existing research publications.  Both processes also involved review of his research publications by external reviewers.[16]

The Global Ancestry paper was not Pesta's first foray into researching the relationship between intelligence and race/ancestry.  Pesta testified that he began to publish in the intelligence and race/ancestry area in 2008 **before** he was awarded tenure at CSU.[17]   Of the thirteen papers Pesta published between 2008 and 2014, nine related to intelligence and race/ancestry or some other subgroup.  All the papers predated CSU's promotion of Pesta to full professor. Among the

---

[11] Ward Affidavit at 17-18
[12]  Pesta Depo V1, p. 87
[13] Deposition of Bryan Pesta, Volume 1, at p. 17 ("Pesta Depo V1"); Pesta Depo Ex. 1.
[14] Pesta Depo Ex. 1
[15] Pesta Depo V1, pp. 19-39
[16] Pesta Depo V1, p. 37
[17] Pesta Depo V1, pp. 34; Pesta Depo Ex. 1.

paper titles predating Pesta's promotion to full professor were: (1) "Putting Spearman's Hypotheses to Work: Job IQ as a Predictor of Employee Racial Composition"; (2) "Does IQ Cause Race Differences in Well-Being"; (3) "Only in America: Cold Winters Theory, Race, IQ and Well-Being"; and (4) "Black-White Differences on IQ and Grades: The Mediating Role of Elementary Cognitive Tasks."[18] Pesta testified regarding CSU's knowledge of his interest in this research subject,

> Q . . .[I]t appears to me then that at the time that you applied for tenure at CSU, both the internal reviewers at CSU and whatever external reviewers were employed to consider those questions were aware that you were interested in and publishing papers regarding intelligence and race or intelligence and some other population subgroup?
>
> A. Yes. I have a specific memory of ["Black-White differences on IQ and grades; The mediating role of elementary cognitive tasks"] being announced, congratulations, you got this high impact journal publication, at a department meeting way back then.[19]

The fact that Pesta was promoted and given tenure after CSU knew of his interest in what he argues is controversial is completely inconsistent with Pesta's claim that he was terminated because CSU did not like the fact that he was researching the subject of intelligence and race/ancestry.

In addition to promoting Pesta after he published research of the same type as contained in the Global Ancestry paper, CSU also granted Pesta a sabbatical to engage in the research required to publish the Global Ancestry paper itself. In September 2018, Pesta sought and was approved for a sabbatical from CSU to do research.[20] In his application for the sabbatical, Pesta wrote,

> "***The research question we want to address is why some people (and groups of people) are smarter than other*s.** The question is critical because intelligence appears to be 'the most powerful variable in social science'. . . Our strategy is first to use admixture analysis (based on the genomic data present in the NIH/NIMH data sets) for the participants in these various data sets. ***This technique essentially estimates a person's ancestry in terms of percentages across various ancestral groups.*** The next step would be to see if these ancestry estimates predict cognitive ability. In addition, we also seek to pit 'self-identified'

---

[18] Pesta Depo Ex. 1
[19] Pesta Depo V1, p 39
[20] Pesta Depo V1, pp. 56-60, Ex. 4

6

(i.e., check a box) ancestry with genomic ancestry to which (if either) best predicts cognitive ability."[21]

Unlike his representations to NIH, Pesta was quite clear in his six-month **paid** sabbatical request to CSU that he wanted to research the relationship between intelligence and race/ancestry. Pesta was granted the sabbatical by CSU to do the research. He was not interrogated by administrators about the subject matter of his research for the sabbatical and no one from CSU questioned the nature of his research.[22]

Pesta's obtaining tenure, promotion and a sabbatical to do the kind of research and to write the paper he now claims prompted his termination destroys any inference that the subject matter of his research was a motivating factor in the decision to investigate claims of research misconduct or his termination. Pesta simply has no evidence to support such a claim.

### C.  THE GLOBAL ANCESTRY PAPER

The Global Ancestry paper was published in an open-source journal, Psych, on August 30, 2019, when Pesta was Psych's editor.[23]  The data used in the Global Ancestry paper came from a controlled-access data set sometimes referred to as the Trajectories of Complex Phenotypes study ("TCP"). The TCP study is a large-scale study of child development that combines neuroimaging, diverse clinical and cognitive phenotypes, and genomics of approximately 10,000 children aged 8-21 in Philadelphia. The TCP data is available only through the database of Genotypes and Phenotypes (dbGaP) which is controlled and administered by NIH.[24]

---

[21] Pesta Depo V1, p. 59, Ex.4 and 52 thereto.
[22] Pesta Depo V1, p. 59
[23] Pesta Depo V1, pp. 44-46. Pesta was the founding editor of Psych. But his tenure there lasted only until late 2019 or early 2020 when he was fired as editor.
[24] Affidavit of Dr. Michael Oakes ("Oakes Affidavit"), ¶ 6, attached here to as Exhibit 3.

The NIH controls access to certain data, including the TCP, to protect the integrity of the research system whereby participants – past, present, and future – trust that their data will not be misused to harm them as individuals or as a group and to insure it is not used inconsistently with their consent to participate in the study.[25] The NIH requires that access to the TCP data be limited to academic institutions and Principal Investigators associated with those institutions.  To obtain access to the data, the Principal Investigator (here Pesta) must comply with certain requirements, including (1) submission of a Data Access Request ("DAR") that includes information regarding the intended research purpose, (2) timely renewal requests for continued access to the data, (3) agreement to be bound by a Data Use Certification Agreement ("DUC"), and (4) promise to adhere to various NIH best practices.[26]  Because the NIH has total control of the data, only the NIH can determine the circumstances under which access to the data will be granted.

The authors of the Global Ancestry paper were Pesta, John Fuerst ("Fuerst"), Emile Kirkegaard ("Kirkegaard"), and Jordan Lasker ("Lasker").[27]  Of the coauthors, only Pesta has a doctoral degree.  According to Pesta, Fuerst and Kirkegaard are self-taught.[28] Pesta was unaware whether either Fuerst or Kirkegaard held any degree or whether they were associated with any research institution (they were not).  At one point, Pesta believed that Fuerst had a bachelor's degree from CSU but he later learned that belief was incorrect.[29] Fuerst was enrolled at CSU as a non-degree student in a one-credit independent study class whose sole purpose was to conduct research projects under Pesta's direct supervision, and Fuerst reenrolled in the same independent

---

[25] Exhibit 2 to Oakes Affidavit
[26] Oakes Affidavit, ¶ 6.
[27] Pesta Depo, Ex. 3 thereto.
[28] Pesta Depo V1, p 163
[29] Pesta Depo, V1, p 162-163

study five consecutive semesters from spring 2019 to Spring 2021.[30] Fuerst took no other classes at CSU and neither applied for nor was accepted to any degree program at CSU.[31] Indeed, Fuerst was associated with CSU solely because he and Pesta wanted to do the research reflected in the Global Ancestry paper. Pesta had no prior experience obtaining controlled-access data, like the TCP data, from NIH.[32] Pesta did not know Lasker and does not know how he became involved in the project. It appears that Lasker's only role was to perform certain statistical analysis.[33]

Requests to obtain controlled access data from the NIH is controlled by the DUC. The parties to the DUC are the Principal Investigator (Pesta), his/her home institution (CSU), and the NIH.[34] It is undisputed that Pesta would not have access to the TCP data absent his affiliation with CSU.  Neither of Pesta's coauthors Kirkegaard or Fuerst had an affiliation with an institution that would have afforded them access to the TCP data.  They needed Pesta for that.[35] The DUC provides that the Principal Investigator named in the DAR and "any trainee or employee working on the proposed research project under the direct supervision of these individuals, shall become Approved Users of the requested dataset(s)."  The DUC further provides that "[r]esearch use will occur solely in connection with the research project as described in the DAR."[36]

According to Pesta, the genesis of the Global Ancestry research project began at a meeting between him and Fuerst in 2018.[37]  After their first meeting, Fuerst wrote to Pesta at Pesta's CSU email address telling him how to request the controlled access data from NIH. Again, neither Fuerst

---

[30] Letter of Provost Laura Bloomberg, Pesta Depo. Ex. 5, Attachment 21
[31] Ibid
[32] Pesta Depo, V1p 144
[33] Pesta Depo, V1, p 166
[34] Pesta Depo Exhibits 7, 9 and 11.
[35] Pesta Depo V1, p 144
[36] Pesta Depo Exhibits 7, 9 and 11
[37] Pesta Depo V1, p 241

nor Kirkegaard had prior experience getting controlled access data from NIH, yet Pesta appears to have relied upon them to write the proposals to the NIH.[38]

Fuerst told Pesta, "We wished to start with Trajectories of Complex Phenotypes since it does not require IRB approval and since the sample characteristic are ideal." Fuerst also explained,

> "To apply for dbGap access a proposal is not needed. For Trajectories one might be.  I attached a proposal – nominally to test for sex differences in relation to brain differences in which a control for population structure would be included – above. This would represent a genuinely interesting replication study & *a sneaky way to request and possibly present the ancestry x cognitive outcome data*." [39]

That Pesta and his cohorts were willing to mislead the NIH about the true nature of their research was demonstrated by more than this one email exchange. Kirkegaard wrote to Pesta on April 12, 2018, immediately after Pesta told Kirkegaard and Fuerst that the first request for controlled access data to the NIH was made.  Kirkegaard said,

> "Cool. We may want to send some applications for other samples as soon as possible to see how difficult the IRB is to get. I reckon that if *we mask the nature of the study with usual medical terms, one can get away with a lot*.
>
> Getting samples for analyses that one doesn't publish (to preserve your reputation) are still useful because they allow us *to validate our beliefs privately*, which is useful because it will tell us how confident one can push ideas in other papers."[40]

Pesta responded to Kirkegaard, "Good idea, Do we wait for any feedback on this one, or just march on? I would obviously need you guys to do the write-ups again." At the end of this email exchange in April 2018, Pesta told Kirkegaard and Fuerst, "Let's switch discussion to the above/non-school email."  Pesta did not produce any emails from his home email address relating to this discussion and claims that he has none.[41]

---

[38] Pesta Depo Exhibit 35 (emphasis added)
[39] Pesta Depo Exhibit 35
[40] Pesta Depo Exhibit 38
[41] Pesta Depo Exhibit 38; Pesta Depo V1, p 240

In their own words, Pesta, Kirkegaard and Fuerst demonstrate that they were not interested in truthful and transparent communication with the NIH about why they wanted the TCP data. They wanted to be "sneaky" and to "mask the true nature of the study." Thus, the Global Ancestry paper coauthors intentionally misled the NIH, were aware of their malfeasance and any claim by Pesta that there was no honest error is belied by his own correspondence.

The Global Ancestry paper was not the only time Pesta and Fuerst were willing to mislead the NIH on the nature of their intended research. On June 4, 2020, Dr. Russell Warne[42], another researcher on this subject, wrote to Pesta to say the following,

> "Bryan,
>
> I'm writing to make a request that is very important.  I need [you to] remove my name from the genomics manuscript that was resubmitted to Intelligence.
>
> There are two reasons for this. The first is personal.  ***If someone found out that I was a front to gain access to the data and that I really had no hand in the creation, execution, or write-up of the study, then the effects could be drastically negative for me.  Even if our actions comply with the letter, but violate the spirit of the data access agreements, the risk of negative consequences would still be too great. I'm not sure that tenure would protect me from consequences of violating the data use agreement, and I have a family to worry abou**t. . . .*"[43]

Pesta and Fuerst refused to take Warne's name off the referenced paper until after it had been resubmitted to the scientific journal.[44]  Thus, once again, their actions were "sneaky."

---

[42] Pesta has declared Dr. Warne as an expert in support of his case. Dr. Warne's testimony is not admissible as expert opinion as he does not opine about research misconduct, rather he opines solely on the scientific validity of the Global Ancestry paper itself, an issue that is not relevant to resolving the instant dispute.  Dr. Warne produced the email quoted.

[43] Deposition of Dr. Warne ("Warne Depo"), Exhibit 12 (emphasis added)

[44] Warne Depo Exhibit 12.

### D.      SUBMISSION OF REQUESTS TO THE NIH FOR TCP DATA

These communications show Pesta and his co-authors true intentions, but Pesta made three

different requests to the NIH to access the TCP data that are never clear as to the purpose or the

people involved.  If the NIH approves access, it does so according to a one-year DUC that requires

any extension in time be supported by a renewal request.  The DUC states,

> "To assure that NIH policies and procedures for genomic data use are adhered to, Approved
> Users agree to provide to the NIMH Data Access Committee annual feedback on how these
> data have been used and ***any results that have been generated as a result of access to the
> data, including patents and publications*** . . .
>
> Annual Data Use Reports will provide information regarding potentially significant
> findings and publications or presentations that resulted from the use of the requested
> dataset(s), a summary of an plans for future research use, . . ." (emphasis added)

The following chart summarizes the dates of Pesta's requests for TCP data, the relevant portions

of the DARs relating to the research purpose and the reports Pesta made to the NIH about how the

data was used.[45]

| DATE OF REQUEST | PROJECT | PURPOSE (Non-Technical Summary) | Subsequent Reports to NIH |
|---|---|---|---|
| 4/12/18 | #18007 | Hereinafter "**Sex Differences Request**"<br><br>"Within sexes, differences in brain morphology and volume are related to differences in global cognitive performance as measured by cognitive tests. However, while males and females differ significantly in brain morphology and volume, they differ minimally in general cognitive ability. I will use the "Trajectories of Complex Phenotypes" sample to investigate why this is the case." | 6/28/19 Project close out requested by Pesta. No results or publications reported. |

---

[45] Pesta Depo Exhibits 7, 9, and 11.

| 7/15/18 | #19090 | Hereinafter "**Mental Disorders Request**"<br><br>"Note: I've already received access to these data (#18007), but for different research questions.<br><br>In the USA, diagnosis rates for different mental disorders (e.g. schizophrenia, depression) vary across ethnic groups. . .. Therefore, I will utilize 'Trajectories of Complex Phenotypes to investigate the evolutionary hypothesis via admixture analyses. Specifically I will employ admixture analysis to determine if global ancestry predicts mental health outcomes. . . .'" | 8/29/19<br>Pesta requests renewal but does not report any publications or results.<br><br>8/31/20<br>Pesta closes out #19090 and reports the Global Ancestry Paper[46] |
| --- | --- | --- | --- |
| 9/19/18 | #19747 | Hereinafter "**Reporting PGS Request**"<br><br>"Several recent studies have constructed polygenic scores (PGS) for various traits. Examples include education attainment and schizophrenia. Of significant concern is the transethnic validity of PGS, especially for relatively distant ancestry groups. This situation potentially limits the utility of PGS for epidemiological research. . . We propose to research the effect of PGS construction on the transethnic validity of PGS for two traits: education attainment and schizophrenia. We shall also discuss best practices for constructing and reporting PGS." | 12/3/19<br>Pesta requests renewal. No results or publications reported. |

Importantly, each project indicated use of the TCP data set, ***BUT*** none of them specifically disclosed that a genetic basis for the relationship between intelligence and race/ancestry was the primary research topic.[47]

---

[46] Pesta Depo Exhibit 10
[47] Pesta Depo Exhibit 5, Attachment 13, p 131.

Notably and consistent with his email communications with Kirkegaard and Fuerst, Pesta did not tell NIH he was actually interested in studying intelligence and race/ancestry.[48]  Pesta admits that there was no research and no publication relating to the Sex Differences Request.[49]  He also admits that there were no publications or research performed on the TCP data relating to the Mental Disorders Request. Indeed, the only research and publication using the TCP data was for the Global Ancestry paper that was not accurately described by any DAR filed by Pesta for any of the three requests but because it used the TCP data should have been reported with each.  Pesta submitted the Global Ancestry paper for publication in the journal he edited, Psych, on June 8, 2019.[50] Thus, it is fair to say that Pesta and his coauthors had generated "results" from their access to the TCP data no later than June 8, 2019. The Global Ancestry paper was accepted for publication in Psych on August 28, 2019, and published two days later August 30, 2019.[51]

Yet, Pesta did not report the Global Ancestry paper nor any findings or results when he made the renewal report for the Mental Disorders Request on August 29, 2019.  His explanation for this reporting failure is that the paper was not "published" until August 30, 2019. This argument ignores that the paper had been accepted for publication and that he was an editor of the publishing journal at the time.  It also ignores the directive of the NIH is to report feedback on how these data have been used and *any results that have been generated as a result of access to the data, including patents and publications*. . ."[52] Further, Pesta did not report the Global Ancestry paper when he made the renewal report for the Reporting PGS Request months later on December 3, 2019.[53]   In

---

[48] Pesta Exhibits 7, 9 and 11
[49] Pesta Depo V1, pp. 286-287
[50] Pesta Depo Exhibit 3
[51] Pesta Depo V1, pp. 52-53
[52] Pesta Depo Exhibits 7, 9, and 11
[53] Pesta Depo V1, pp. 124-128

fact, the only time he reported the Global Ancestry paper to NIH was when he closed out the Mental Disorders Request on August 31, 2020, a full year after the paper's publication.[54]  Of course, the Global Ancestry paper had nothing to do with diagnosis rates for different mental disorders (e.g. schizophrenia, depression) across ethnic groups which was the stated purpose of the research in the Mental Disorders Request.

Fuerst and Pesta wanted to get more information on the skin, eye and hair color of the participants that generated the TCP data.[55]  To do so, they needed to do phenotyping, but they were unable to complete this analysis themselves.[56]  So, without the required permission of NIH, Pesta uploaded the controlled-access TCP data to an online website outside the United States that performed phenotyping services.[57] This sharing of the TCP data was not disclosed to NIH.  The DUC makes quite clear that transfers of data to unauthorized users is prohibited.[58]

## E.     NIH AND OUTSIDE COMPLAINTS

On September 19, 2019, CSU received a copy of a communication from the NIH to Pesta questioning his use of the TCP data set.  The questions posed by the NIH included a request for Pesta to explain how his use of the data in the Global Ancestry paper was consistent with the DARs that he had made to NIH and whether he had properly disclosed his collaborators to the NIH.[59] Pesta responded to the NIH inquiry on September 20, 2019.  At this stage, it was just questions raised and no findings.

---

[54] Ibid
[55] Pesta Depo V1, pp. 112-113.
[56] Ibid
[57] Ibid; Pesta Depo Exhibit 5, Attachment 7
[58] Pesta Depo Exhibits 7, 9 and 11
[59]  Correspondence between Pesta and the NIH, attached hereto as Exhibit 4.

Thereafter, CSU was contacted by several persons outside of CSU and the NIH, including from Kevin Bird, Jedidiah Carlson, Cathryn Townsend, Os Keyes, and Kent Taylor, who complained about Pesta's research generally and about his acquisition and use of the TCP data in particular.[60]  CSU prepared to, but took no action on any of these complaints primarily because the NIH was already investigating the matter and the NIH was in the best position to determine whether NIH rules and agreements had been violated.[61]

On May 17, 2021, the NIH sent a letter to both Pesta and CSU that it had completed its investigation.[62]  The NIH found that Pesta had violated NIH agreements and policies in the following ways:

1)  Data requests were for studies of mental health outcomes, not intelligence;

2)  Data was shared with an unapproved online forensic DNA phenotyping service; and

3)  "Global ancestry and cognitive ability" was not reported at the time of project renewal.[63]

As a result of its findings, the NIH requested that CSU immediately destroy the data and data derivatives, contact the online phenotyping service concerning their use of the data, and to describe how CSU was going to respond to the violations.[64]  CSU got permission from the NIH to segregate the data until Pesta was able to appeal the NIH decision. These actions were to be completed by June 27, 2021.[65]

---

[60]  Pesta Depo Exhibit 5, Attachments 2 and 3
[61]  Ward Affidavit at p. 19.
[62]  Pesta Depo Exhibit 5, Attachment 3
[63]  Ibid
[64]  Ibid
[65]  Ibid

In accordance with NIH directives, CSU requested that Pesta destroy the data or permit CSU to control segregation of the data.[66]  On June 24, 2021, Pesta informed CSU that the data was not housed on a CSU server but rather on a stand-alone personal computer in his home.[67]  This was the first time CSU was aware that Pesta had stored the data on his home computer because Pesta had reported on April 18, 2018, in response to questions from CSU about Pesta's first request for the TCP data (Sex Differences Request), that,

> "Conversely, I will be the only one who has access to data files which are restricted access, including genotypic data.  I will store these data on my CSU computer only, which is password and firewall protected. Finally, I will destroy the restricted data after the analysis is completed.
>
> I will be the only one who has access to these data.  They will be stored on my CSU computer, which is password and firewall protected."[68]

Neither of these statements was true as Pesta stored the data on his home computer and at minimum, Fuerst had access to the data.

Pesta asked for more time to destroy or transfer the data.[69] In the meantime, both Pesta and Ward attempted to contact Fuerst to get him to confirm whether he had any of the controlled-access data, whether the data had been deleted from his computer systems, and to sign a certification to that effect.[70] Fuerst took issue with the request and said the NIH had no right to request deletion of the data.  He refused to comply with the request by the deadline.[71]

---

[66] Pesta Depo Exhibit 15
[67] Ibid
[68] Ibid
[69] Pesta Depo Exhibit 16.
[70] Ward Affidavit ¶22; Email Exchange dated June 28 and June 30, attached hereto as Exhibit 5.
[71] Ibid.

On July 11, 2021, Pesta formally appealed the decision of NIH.[72]  He was represented by counsel in connection with the appeal.  On August 17, 2021, the NIH denied the appeal.[73] The NIH found the following violations:

1.  Researching matters that were not described in Pesta's Data Access Request;

2.  Sharing controlled access data with an unauthorized entity;

3.  Failing to provide accurate annual reports; and

4.  Fuerst's refusal to confirm destruction of the TCP data.[74]

The NIH concluded that each of the described violations was a serious violation of the DUC.[75] As a result, Pesta received a three-year suspension from access to controlled-access data sets, the most serious sanction ever meted out by the NIH.[76]

On August 20, 2021, Forest Faison, CSU's Senior Vice President for Research and Innovation wrote to Fuerst and told him that as NIH had rejected Pesta's appeal, Fuerst was no longer an authorized user of the data and Fuerst had to destroy all TCP data and data derivatives in his possession and certify in writing that he had done so.  Fuerst responded that he was in Spain, had little access to Wi-Fi or cell service and would respond to the NIH when he returned to the United States.  Faison asked for a simple yes or no answer as to whether Fuerst had destroyed all copies of the TCP data in his possession.[77]

On August 23, 2021, Fuerst responded. Although Fuerst said Pesta had deleted the TCP from Pesta's home computer over Fuerst's objection, Fuerst never answered the question of

---

[72] Pesta Depo Exhibit 5, Attachment 4
[73] Pesta Depo Exhibit 5, Attachment 4
[74] Ibid
[75] Ibid
[76] Ibid
[77] Email Exchange dated August 20-23, 202, attached hereto as Exhibit 6

18

whether he had another copy of the data and if so, whether it had been destroyed. Instead, he responded,

> As, I informed NIH, CSU, and Professor Pesta I am going through and presenting and publishing my manuscripts, which I spent a year on. While this should have no bearing on the investigation of Professional [sic] Pesta, that, and the affairs if [sic] CSU, are no longer my concern.
>
> If NIH wishes to inquire about something, they can directly contact me.
>
> As for CSU, [p]lease don't bother me again.
>
> John[78]

## F.    CSU'S INVESTIGATION AND TERMINATION DECISION

CSU's academic research misconduct policy is found at O.A.C., Chapter 3344-28-01, et. seq. (the "Code"). Academic research misconduct is defined as "fabrication, falsification, plagiarism, undisclosed conflicts of interest as defined in the policy for managing conflict of interest, or other practices that seriously deviate from those that are commonly accepted within the academic community for proposing, conducting or reporting research." It does not include honest error or honest differences in interpretations or judgments of data.[79]

The Code permits CSU to perform an investigation of allegations of research misconduct.[80] The investigation is conducted by a committee consisting of at least three individuals who do not have any conflicts of interest with the respondent or the case in question.[81] Following the NIH decision of May 17, CSU informed Pesta of its initiation of a formal investigation.[82] The members of the investigation committee are the Defendants Conor McLennan, Ph.D., Professor of

---

[78] Ibid
[79] OAC Sec. 3344-28-02(A).
[80] OAC Sec. 3344-28-06.
[81] OAC Sec. 3344-28-06(E)
[82] Pesta Depo V1, p. 62-65; Pesta Depo Exhibit 5.

Psychology and Interim Associate Dean for Faculty in the College of Sciences and Health Professions, Wendy Regoeczi, Ph.D., Professor and Chair of Criminology, Anthropology, and Sociology Department at Cleveland State University, and Christopher Mallett, Ph.D., Professor of Social Work at Cleveland State University ("Investigation Committee").  The Investigation Committee was supported by Dr. Ward of the Office of Research Integrity.[83]

The Investigation Committee had access to Pesta's correspondence with NIH, all the DARs, DUCs, and many other documents.[84]  Pesta and his attorney were given access to the same documents.[85]  Pesta was permitted to communicate his position, the facts and his defenses and arguments to the Investigation Committee at least eight times: 1)  Pesta 9/4/21 Statement regarding his intelligence research[86]; 2)  Pesta  9/6/21 Statement regarding report for TCP Project #19090[87]; 3) Pesta 9/7/21 Opening Statement[88]; 4) Pesta 9/7/21 interview[89]; 5) Pesta 10/11/21 interview[90]; 6) Pesta 10/11/21 response to testimony of non-NIH Complainants[91]; 7) Pesta 10/18/21 written interview supplement[92]; and 8) Pesta rebuttal to the Draft Report of the Committee.[93]

---

[83] Pesta Depo Exhibit 5
[84] Pesta Depo V1, p. 71-72.
[85] Ibid
[86] Pesta Depo Exhibit 5, Attachment 14
[87] Pesta Depo Exhibit 5, Attachment 15
[88] Pesta Depo Exhibit 5, Attachment 6 at p 26
[89]  Although Pesta was offered the opportunity for in-person interviews with the Investigation Committee, he declined.  Pesta Depo V1, p. 70. Transcripts of the interviews were maintained by the Committee and are attached to its Final Report at Pesta Depo Ex. 5, Attachments 7 and 12. Pesta's attorney was present for the first interview and was invited to be present during the second interview. Pesta Deposition Exhibit 5, Attachment 7, p. 28
[90] Pesta Depo Exhibit 5, Attachment 12
[91] Pesta Depo Exhibit 5, Attachment 11
[92] Pesta Depo Exhibit 5
[93] Pesta Depo Exhibit 5, Attachment 20

During his first interview, Pesta made several admissions. First, he admitted that he failed to correctly report the Global Ancestry paper.[94]  Second, he admitted that he uploaded the TCP data to an external website without the permission of NIH.[95] Third, he admitted that he did not tell CSU about where he was going to store the data.[96] Fourth, he admitted that his research assistant Fuerst had "gone rogue."[97] Fifth, he admitted that he wished he had been more clear with NIH about the purposes for requesting the data.[98] Finally, Pesta left the Investigation Committee without a clear understanding of whether Fuerst did or did not still retain the protected NIH data. The following exchange between Pesta and the Investigation Committee is instructive:

> McLennan: So, Bryan just following up on that last question, which was how have you and your research team handled any confidentiality or anonymity concerns surrounding the data set.  So, my understanding is that John [Fuerst] still has the data set and it's not clear, with whom he's sharing it or what websites the data might be stored on. So he was part of the original team, and I understand [he's] no longer affiliated with CSU, but he gained access to the data set under your supervision at CSU. Is that right?
>
> Pesta: I, I agree with you Conor, I'm responsible for that, but I don't know that he still has the data.  I do know that he wants to publish more studies that do not have my name on

---

[94] "I had three applications for the same data, but I was screwed up and I reported the [Global Ancestry] paper in the one application that didn't mention intelligence, and so I think a lot of the issues arise from that." Pesta Depo, Exhibit 5, Attachment 7, p. 34.

[95] ". . And I apologize, I admit that I should have reported it in the first application, but it didn't occur to me. It was an oversight, and I didn't realize that was an issue until what, two years later, when Bird complained?" Pesta Depo, Exhibit 5, Attachment 7, p. 36.

[96] In response to the question of what he told CSU about the location of the TCP data, Pesta responded, "Okay I'm glad you asked that. Because initially, in the application it said I was going to run it on a CSU computer, and we started to do that. I had a CSU laptop, my laptop. But it wasn't powerful enough to process the data, so we bought a standalone desktop." Pesta Depo, Exhibit 5, Attachment 7, p. 39

[97] "Yeah, so I don't want to make it seem like John is the problem, and everything is John's fault, because I've made mistakes. But he's sort of gone a little bit rogue, and I suspect there's no way he would talk to any CSU people, but I could ask." Pesta Depo V1, p. 41. At another point in the interview, Pesta said regarding Fuerst, "Yeah, I suspect he's gonna try to publish data, even though the NIH says don't." Pesta Depo Exhibit 5, Attachment 7, p. 49.

[98] "But what specifically if I hypothetically were to do it again? I would have paid more attention to the applications. I would have reported the website that I wanted to upload data to. I would have been absolutely crystal clear that I was interested in, not only in, but that I was interested in looking at intelligence as a variable." Pesta Depo, Exhibit 5, Attachment 7, p.42

them, but you can do that without the data if the analyses are done. The only risk is if a reviewer wants additional analysis, you wouldn't have the data to do that.[99]

At another point in the interview, Pesta told the Investigation Committee regarding Fuerst, "Yeah, I suspect he's gonna try to publish data, even though the NIH says don't."[100] When asked whether publishing without permission would be a serious violation, Pesta said, "I would think that it's an extremely serious violation. I think it would lead to, ultimately, retraction. That's part of why I pulled out is, the NIH said you can't have the data. And if you can't have the data, you can't have the data." [101]

During the second interview, Pesta acknowledged that he did not disclose to the NIH that he would be imputing the phenotype information in his DARs.[102]  Pesta also explained why he believed Fuerst may still have the data, saying, "Well, I think his life's mission is to get his research published."[103]  Pesta admitted that he was uncertain of Fuerst's motives and actions and that Fuerst was unwilling to work with CSU or testify before the Investigative Committee. Despite this, Pesta admitted that he was still working with Fuerst to publish papers.[104]

The Investigation Committee during its second Pesta interview also asked about the Human Phenome Diversity Foundation ("HPDF").  HPDF is a private foundation started by Pesta and Fuerst to solicit donations to "support researchers who want to research this area" and "to help [Fuerst] further his education."[105]  Pesta acknowledged that he and Fuerst used funds from HPDF to reimburse themselves for the purpose of buying the computer they used at Pesta's home, the

---

[99] Pesta Depo Exhibit 5, Attachment 7
[100] Pesta Depo Exhibit 5, Attachment 7, p 49
[101] Ibid
[102] Pesta Depo Exhibit 5, Attachment 12, p. 92
[103] Ibid, at 99
[104] Ibid, at 107
[105] Pesta Depo V1, p 228-229

food they ate while they were working, Uber rides for Fuerst, and perhaps Fuerst's tuition.[106] When the Investigation Committee asked Pesta whether it was common practice to create a separate foundation to support one's research without CSU approval, Pesta said he did not know. [107] The tax returns for HPDF show that it took in more than $21,470 in 2019 and $65,395 in 2021. [108] There is no return for 2020 and Pesta claims not to know what the income or expenditures were for HPDF for that year.[109]

During this litigation, Pesta refused to provide counsel for Defendants financial information related to HPDF. As a result, Defendants subpoenaed information from KeyBank about the bank account maintained by HPDF. The documents produced by KeyBank show that HPDF had paid $8,054 in computer expenses and more than $2,000 in Uber or Lyft expenses.[110] HPDF was dissolved by Pesta and Fuerst in December 2023.[111] CSU's conflict of interest policies require disclosure of any conflict of interest valued at greater than $5,000.[112] Moreover, as a general matter, academicians are required to disclose when research is funded from outside sources. Pesta disclosed neither the HPDF to CSU nor the HPDF's financial support of the research published in the Global Ancestry paper.

On December 2, 2021, the Investigation Committee issued its draft report finding that Pesta had engaged in research misconduct and Pesta submitted his rebuttal.[113] On January 13, 2022, the Investigation Committee issued its Final Report finding by clear and convincing evidence that

---

[106] Pesta Depo V1, p. 232-233
[107] Pesta Depo V2, p110
[108]  Attached hereto as Exhibits 7 and 8
[109] Pesta Discovery Responses
[110] KeyBank Records, Exhibit 9
[111]  Pesta Depo V1, p 234
[112] OAC Sec. 3344-02-04
[113] Pesta Depo Exhibit 5, Attachment 20

Pesta had intentionally, knowingly, or recklessly committed research misconduct by (1) the unauthorized use of controlled-access data, (2) violating the non-transferability terms of the NIH agreement, (3) publishing a paper without the permission of NIH, (4) failing to submit his proposed research to CSU's IRB for exemption or approval, and (5) failing to disclose outside funding for the research.  The Investigation Committee also called into question Pesta's receipt of funds from HPDF and his collaboration with Fuerst.[114]

Thereafter, Provost Laura Bloomberg reviewed the Final Report as well as Pesta's rebuttal and issued her recommendation of termination.[115]  She agreed with the Investigation Committee's findings of fact and observed that:

> The NIH has noted these sanctions and identifies both you and, by extension, Cleveland State University, as being in violation of their policies. This, of course, has serious implications for our research reputation and success as a university.[116]

Provost Bloomberg found that Pesta had violated CSU's statement on Professional Ethics and Academic Responsibility, including the following:

> Responsibility to scholarship: The faculty member has the responsibility of being unfailingly honest in research and teaching, refraining from deliberate distortion or misrepresentation and taking regular precautions against the common causes of error.

Provost Bloomberg also noted her concern about Pesta's professional relationship with Fuerst and the nondisclosure of external funds (the HPDF funds) used for CSU-affiliated research purposes. She wrote, "In both of these areas I find that you fail to understand or acknowledge the gravity of your responsibilities as a tenured full professor as it relates to the conduct of research."[117]

---

[114] Pesta Depo Exhibit 5
[115] Pesta Deposition Exhibit 5, Attachment 21
[116] Pesta or his counsel has suggested that since the individuals who participated in the TCP study were not disclosed because of any actions by Pesta and his coauthors there is no "damage" resulting from his behavior.  This ignores the very real damage to CSU's reputation as a research institution.
[117] Ibid

Provost Bloomberg noted that Pesta's conduct implicated four causes for which faculty termination is authorized by the collective bargaining agreement, specifically (1) incompetence or dishonesty in teaching or scholarship; (2) neglect of duty; (3) personal conduct which substantially impairs the individual's fulfillment of his/her institutional responsibilities; and (4) interfering with the normal operations of the University.[118] Provost Bloomberg considered the principle of progressive discipline and the proportionality of the sanction when she made her determination, "Given the seriousness of this research misconduct case and the fact that the harm extends beyond your personal reputation to taint the reputation of CSU as a whole, I find the offense warrants the most serious sanction be administered and that any lesser sanction would be disproportionate to the gravity of your conduct." Provost Bloomberg notified Pesta that she believed his conduct warranted dismissal.[119]

Article 8 of the Collective Bargaining Agreement between CSU and the AAUP defines the process for sanction and dismissal of a faculty member. [120]  The Agreement calls for the creation of an Ad Hoc Committee consisting of three bargaining unit members and three members of the academic administration. The Ad Hoc Committee in this case held a hearing on January 28, 2022, at which time Pesta was invited to appear and present his evidence.[121] Pesta gave a PowerPoint presentation to the Ad Hoc Committee.[122] Pesta also provided a nineteen-page written response to Provost Bloomberg's letter. On February 28, 2022, the Ad Hoc Committee unanimously determined that Pesta's termination was warranted.[123]  It specifically considered Pesta's contention

---

[118] Ibid
[119] Ibid
[120] Bloomberg Affidavit Exhibit A at Article 8
[121]  Pesta Depo Exhibit 23
[122]  Pesta Depo Exhibit 21
[123]  Pesta Depo Exhibit 23

that his academic freedom had been infringed.  The Ad Hoc Committee wrote, "The 6 ad-hoc committee members were in unanimous agreement that any conclusions should be (and were) arrived at irrespective of the content of Dr. Pesta's research." Following the Ad Hoc Committee's determination, Provost Bloomberg sent her letter terminating Pesta effective March 4, 2022.[124]

### G.    EVENTS FOLLOWING PESTA'S TERMINATION

Pesta requested that the AAUP grieve or appeal the termination decision.  The AAUP denied the request stating, "Given the level of due process that Dr. Pesta had throughout the process, his failure to rebut the charges, the seriousness of the charges, and the overwhelming evidence against him, the Executive Committee [of the AAUP] determined that, on the merits, they would not be successful in arbitration." [125] The AAUP also saw no procedural errors in connection with the handling of Pesta's case.[126] The AAUP did not grieve or appeal the termination decision notwithstanding Pesta's request that they do so.

Pesta subsequently filed an unfair labor practice charge with the State Employee Relations Board ("SERB") against the AAUP claiming it had failed to represent him in connection with his termination.[127]  Again, Pesta was represented by counsel in connection with his SERB charge.[128] SERB dismissed the charge on June 30, 2022 saying the charge was being dismissed for lack of probable cause to believe the statue had been violated. [129]

---

[124]  Ibid

[126] Pesta Depo Exhibit 26.
[127] Pesta Depo Exhibit 26.
[128] Pesta Depo Exhibit 25.
[129] Pesta Depo Exhibit 30

### III. ARGUMENT

### A. SUMMARY JUDGMENT SHOULD BE GRANTED IN THIS CASE

Summary judgment is appropriate in this case because the Individual Defendants meet the test of showing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wei Qiu v. Anderson Cty.*, No. 23-5888, 2024 U.S. App. LEXIS 8482, at *2-3 (6th Cir. Apr. 3, 2024). "Once the movant has met its burden of production, the non-movant cannot rest on the pleadings but must [in turn] 'cit[e] to particular parts of materials in the record' showing that there is a genuine dispute for trial." Fed. R. Civ. P. 56(c); *Johnson v. Victoria Fire*, No. 21-6083, 2023 U.S. App. LEXIS 7304, at *3-4 (6th Cir. Mar. 27, 2023). Pesta cannot meet his burden to avoid summary judgment.

Importantly, this Circuit has frequently found summary judgment appropriate in first amendment retaliation claims. *See, e.g.*, *Gruber v. Tenn. Tech. Bd. of Trs.*, No. 22-6106, 2024 U.S. App. LEXIS 11987, at *4 (6th Cir. May 16, 2024) (affirming the district court's grant of summary judgment based on the balance of interests favoring the administration). In *Li v. Jiang*, 673 F. App'x 470, (6th Cir. 2016), the 6th Circuit found that plaintiff set forth a prima facie case of first amendment retaliation but granted summary judgment in favor of defendants because the defendants "'demonstrate[d] by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct.'" *Id. At 475* (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)).

### B. THE CLAIM BASED ON FIRST AMENDMENT RETALIATION SHOULD NOT PROCEED.

To state a claim for First Amendment retaliation, the plaintiff must show "(1) that the speech was protected by the First Amendment; (2) [that he or she] suffered an adverse employment action; and (3) [that] the adverse action was motivated at least in part in response to the exercise

27

of [his or her] constitutional rights." *Nailon v. Univ. of Cincinnati*, 715 F. App'x 509, 513-514 (6th Cir. 2017) (citing *Savage v. Gee*, 665 F.3d 732, 738 (6th Cir. 2012)). In  *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court held that in a First Amendment retaliation case, a plaintiff must prove that the First Amendment activity was a "substantial" or "motivating" factor behind the adverse employment action. *Id.* at 287, 97 S.Ct. 568. If the plaintiff succeeds in proving that First Amendment activity was a substantial or motivating factor, the defendant-employer still prevails if by a preponderance of the evidence it demonstrates that it would have reached the same adverse employment decision "even in the absence of the protected conduct." *Id.*

Here, there is no dispute that at as to one of his counts, Pesta suffered an adverse employment action in being terminated from CSU, but Pesta cannot meet the other requirements of the cause of action.  Pesta was investigated for and fired because of his untrue statements to or his hiding information from NIH and CSU.  That speech is not actionable because it is not protected by the First Amendment.  Pesta has claimed that it was not his speech to the NIH that formed the basis for the investigation or his termination but rather he was terminated for the content of the Global Ancestry paper.

However, Pesta cannot meet his burden to show that that the investigation or his termination was motivated by the subject matter or opinions expressed in the article he published. Even if he could meet this requirement, in all events the evidence is overwhelming and undisputed that that CSU would have reached the same adverse employment decision even in the absence of any protected conduct. Therefore, summary judgment is proper in this case.

1. **Pesta, as a public employee, has no First Amendment protection for speech that relates to his inaccurate, dishonest or incomplete statements to the NIH and CSU pursuant to his official duties.**

Pesta's termination resulted from both his untrue and inaccurate statements to the NIH and to CSU and his failure to disclose required information to the NIH and CSU.  Again, Pesta has admitted that he failed to disclose to the NIH that he intended to submit the NIH data to an outside website, that he failed to properly and timely report how he and his coauthors had made use of the data, and that his coauthor Fuerst was not forthcoming about what he had done with the TCP data and seemed to at worst thwart, or at best ignore the NIH's instructions about what to do with the data. To prevail on his First Amendment retaliation claim, Pesta must establish that his inaccurate, dishonest or incomplete speech to the NIH is protected speech under the First Amendment. Such speech is not protected because Pesta was speaking pursuant to his official duties as a representative of a governmental body, namely CSU.

The threshold inquiry in a First Amendment retaliation case is to determine the nature of the speech at issue. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527, 142 S. Ct. 2407, 2423 (2022). When a public employee speaks "pursuant to [his or her] official duties," the employee does not speak as a citizen, but rather as the government—it is the government's own speech— and the First Amendment does not insulate the employee from employer discipline for such speech. *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 1960 (2006)) (plaintiff in the case was a district attorney who claimed that he had been passed up for a promotion for criticizing the legitimacy of a warrant.)

Thus, before protection can be afforded to Pesta's speech "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 228, 134 S. Ct. 2369,

2372 (2014). This inquiry is not whether the speech "*could* fit within the [employee's] job description," but rather whether the speech "is *actually* part of the job" that the public employee was entrusted to do. *Lindke v. Freed*, 601 U.S. 187, 201, 144 S. Ct. 756, 768 (2024).

Pesta as a CSU professor was conducting research as a CSU professor. In fact, absent being connected to the university, NIH would not have seriously entertained his request to see the TCP data. Pesta specifically used his position as a CSU professor to obtain that data from the NIH. That is the reason that his co-authors wanted him as part of the project, he was the only one with a university position from whom the NIH would consider a data request. Thus, when requesting the data and reporting his use of the data to the NIH, the actions which led to his termination, Pesta necessarily spoke pursuant to his official duties, not as a private citizen and therefore his speech was not protected. And of course, because Pesta was not accurate or truthful with the NIH about how and in what manner he was going to use the TCP data, CSU's reputation as a research institution was compromised. It was not just Pesta's reputation on the line. It was CSU's relationship with the federal government and reputation in the academic community.

In *Garcetti v Ceballos*, 126 S.Ct. 1951, the Supreme Court said,

> When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom. See, *e.g., Waters v. Churchill,* 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion) ("[T]he government as employer indeed has far broader powers than does the government as sovereign"). Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Cf. *Connick, supra,* at 143, 103 S.Ct. 1684 ("[G]overnment offices could not function if every employment decision became a constitutional matter")

Moreover, the Supreme Court has made it quite clear that where there is proof of false statements knowingly or recklessly made by a teacher, a teacher's false statements will not be protected by the First Amendment. *Pickering v. Bd. of Ed. of Tp. High School Dist.* 205, Will

Cnty., Illinois, 391 U.S. 563, 574, 88 S.Ct. 1731, 1738, 20 L.Ed.2d 811 (1968). Pesta's false and evasive data requests and reporting to the NIH is not, and should not be, protected speech under the First Amendment.

The Fourth, Sixth, and Ninth Circuit Courts of Appeal, have held that *Garcetti* does not apply to most professors' activities regarding teaching and scholarship, meaning a professor will have greater protection under the First Amendment when engaged in teaching and scholarship. However, each of those Circuits have articulated circumstances where *Garcetti* should apply even to teaching and scholarship activities. For example, in *Adams v. Trustees of the University of North Carolina-Wilmington*, the Fourth Circuit observed, "[t]here may be instances in which a public university faculty member's assigned duties include a specific role in declaring or administering university policy . . ." 640 F.3d 550, 563 (4th Cir. 2011) and "[i]n that circumstance, *Garcetti* may apply to the specific instances of the faculty member's speech carrying out those duties." *Id.*

Similarly, in *Demers v. Austin*, the Ninth Circuit enumerated types of speech to which *Garcetti* would apply even if it had something to do with scholarship or teaching. These included proposals "to allocate one additional teaching credit for teaching a large class instead of a seminar, to adopt a dress code that would require male teachers to wear neckties, [and] to provide a wider range of choices in the student cafeteria." 746 F.3d 402, 415 (9th Cir. 2014). Recently, in *Meriwether v Hartop,* 992 F.3d 492 (6th Cir. 2021), the Sixth Circuit, reviewing a grant of the state's motion to dismiss, acknowledged that *Garcetti*'s carve-out does not apply to "non-ideological ministerial task[s]" in classrooms, such as calling roll at the beginning of class.

There was nothing ideological about Pesta's failure to be accurate, honest and forthright with the NIH about the nature of his research and how he would be using the NIH's data in that research.  There is no public interest in being untruthful or evasive with the NIH. Here, Pesta was

31

terminated for failing to follow NIH guidelines, breaching his agreements with NIH, and failing to follow CSU policies on how research is conducted, reported, and monitored. This speech did not take up matters of public concern. Pesta's speech was thus not protected by the First Amendment. As such, Pesta's claims against the Individual Defendants fail as a matter of law and the case should be dismissed.

> **2.  There is no evidence that the investigation or Pesta's termination was motivated by the subject matter of the Global Ancestry paper and therefore summary judgment is proper.**

Pesta claims that the protected speech in which he engaged was not his dealings with the NIH or CSU relating to the TCP data, but rather the subject matter of the Global Ancestry paper. If so, Pesta's claims fail because there is no evidence that the investigation or his termination was motivated by the subject matter of the Global Ancestry paper.  To survive summary judgment, Pesta *must* show that the subject matter of his research was a substantial or motivating factor in his termination. *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009).

Throughout this case, Pesta has emphatically maintained that his exploration of race-based differences in intelligence is a controversial subject and that because it is controversial, CSU wanted to silence him by terminating his employment.  However, merely showing that his research is controversial is not enough to meet the high burden of demonstrating that the subject matter of the research was a substantial or motivating factor in his termination.  The most Pesta can show is that some members of CSU's faculty and administration disagreed with his research findings and did not consider these findings a valuable contribution to the body of research on human intelligence.  But this position ignores that *all* academic research is controversial.  Indeed, Pesta's own expert agreed that controversy, namely vigorous debate about what is true and provable, is at

the heart of all academic research.[130] Pesta's expert agreed that when you are a scientist in academia, you are in it to engage in debate, and you are inviting other academicians to debate you and many of them may not agree with you.[131]

Here, the Investigation Committee noted the controversy at the beginning of their Final Report, saying the following,

> "Nevertheless, and as noted, after acknowledging the gravity of these controversies, the Committee members approached this investigation without regard to the research topics at hand.  Instead, the Committee members focused on the policies, regulations contractual agreements, professional research ethics, and commonly accepted academic research practices in our determination of misconduct.  Content matter aside, the focus of the Committee investigation was on the process, decision and acts that Dr. Pesta pursued in his research."

Thus, the fact that some of the Individual Defendants disagreed with Pesta's research conclusions or did not think his research made a valuable contribution is insufficient to show that the subject matter of Pesta's research or his research findings was a motivating or substantial factor leading to his termination.

Other than this contention that certain Individual Defendants did not agree with Pesta's research findings, Pesta can produce no evidence that the Individual Defendants had as a substantial or motivating factor leading to his termination, the subject matter of Pesta's research as opposed to the clear and convincing evidence of Pesta's misconduct.  There is no evidence that Pesta was treated differently from other persons, let alone evidence that Pesta was treated differently from other persons who did not engage in protected activity. Indeed, even though Pesta has had dozens of opportunities to do so, he has failed to produce any evidence of disparate

---

[130] Warne Depo at p 49
[131] *Ibid*

treatment. Neither Pesta's faculty colleagues nor his union believed that Pesta had been disparately treated regarding his research misconduct.

A mere possibility of causation is likewise not enough to carry Pesta's burden of proof. If all that is presented by Pesta regarding motivation is pure speculation or conjecture, or even if the probabilities that it was based on the subject matter are at best evenly balanced, it becomes the duty of the court to find that as a matter of law the case should not proceed. *Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). A motivating factor has been found in the Sixth Circuit to mean "one without which the action being challenged simply would not have been taken." *Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010) (citing *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002)). Accordingly, the Sixth Circuit has analyzed a "motivating factor" as but-for causation...." *Sensabaugh v. Halliburton*, 937 F.3d 621, 629 (6th Cir. 2019) (citing *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007)).[3]

Causation in claims of First Amendment retaliation may be considered a two-part inquiry: A plaintiff must show that the adverse action (1) was proximately caused by a defendant's acts, *Siggers–El v. Barlow,* 412 F.3d 693, 702 (6th Cir. 2005), and (2) was "motivated in substantial part by a desire to punish an individual for exercise of a constitutional right," *Thaddeus–X v Blatter,* 175 F.3d 378, 386 (6th Cir. 1999). In some cases, temporal proximity between the protected speech and the adverse employment action can begin to show the requisite causation requirement. Here, however, Pesta cannot show temporal proximity. CSU had been aware of Pesta's research interests involving intelligence and race/ancestry for more than a dozen years before his termination. During that time, CSU awarded Pesta tenure and promoted him to full professor based in part on his research and even gave him a sabbatical to research and write the very paper he now claims is the reason for his termination. Therefore, there is no temporal

proximity between Pesta's allegedly protected speech involving research of race and intelligence and his termination.  The only temporal proximity that exists is Pesta's research misconduct and his termination.  A total "lack of temporal proximity alone can" doom a claim that a plaintiff's speech motivated an adverse action, unless the plaintiff uncovers smoking-gun evidence of this motivation. *Anders v Cuevos,* 984 F.3d 1166, 1177 (6th Cir. 2021). Here, there is no smoking-gun evidence.

Even if temporal proximity were to exist in this case, Pesta would still need more to survive summary judgment. *Vereecke v Huron Valley School District*, 609 F.3d 392, 400 (6th Cir 2010); (*Tuttle v Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) ("the law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."). Here, there is nothing more to show a causal connection between Pesta's allegedly protected activity, namely the subject matter of his research, and his termination. Thus, his claim fails because he has not and cannot show that the subject matter of his research was a substantial or motivating factor in the decision to terminate him for misconduct.

### 3. Investigating alleged wrongdoing cannot form the basis of a retaliation claim in this case

In addition to all the other reasons set forth in this Motion, the claim for retaliation because CSU investigated alleged misconduct by Pesta must be dismissed.  An employer's decision to investigate complaints of wrongdoing does not, by itself, constitute retaliation. *Ruiz-Fane v. Tharp*, 545 F. Supp. 3d. 543, 557-58. Rather, the plaintiff must produce sufficient evidence to raise an inference that the adverse action would not have occurred absent the protected action. *Id.* at 557 (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). "Factors relevant to causation are 'evidence that defendant treated the plaintiff differently from similarly situated

employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights.'" *Id.* (citing *Nguyen* at 563).   Neither are present in this case.

In *Ruiz-Fane*, this Court found that the employer's investigation of the plaintiff was based on a formal complaint against the plaintiff, and the employer was merely following its own protocol when investigating the complaint. *Id.* at 558. The investigation in that case also occurred nearly seven months after the alleged protected activity, which this Court found insufficient to establish temporal proximity between the investigation and the protected activity. *Id.* Similarly, here, CSU was following its own protocol by investigating a formal complaint of research misconduct against Pesta. Complaints by outsiders, including the NIH, began in September 2019. CSU did not begin its investigation until July 2021, only after the NIH made its findings of wrongdoing by Pesta.

Several cases in this Circuit and District have held that the employer's investigation of a formal complaint does not amount to First Amendment retaliation because an investigation does not constitute an adverse employment action. *See, e.g., Rudd v. City of Norton Shores*, No. 22-1229, 2023 U.S. App. LEXIS 14474, at *22 (6th Cir. June 8, 2023); *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 625 (6th Cir. 2013); *Dendinger v. Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006); *Driggers v. City of Owensboro*, 110 F. App'x 499, 509-511 (6th Cir. 2004); *Wilson v. City of Shaker Heights*, No. 1:16CV02186, 2017 U.S. Dist. LEXIS 182124, at *18 (N.D. Ohio Nov. 1, 2017).[132]

**4.  Even if Pesta could meet all the requirements for a retaliation claim, his claims should not survive summary judgment because the same decision would have been reached regardless of the content of his publication.**

---

[132] Other circuits have reached the same holding as courts in the Sixth Circuit. *See, e.g., Couch v. Bd. of Trs. of the Mem'l Hosp.*, 587 F.3d 1223, 1243 (10th Cir. 2009)

If a plaintiff succeeds in proving a prima facie case, the defendant-employer may yet prevail by way of affirmative defense if it can prove by a preponderance of the evidence that it "would have reached the same" adverse employment decision "even in the absence of the protected conduct." *Vereecke,* 609 F.3d at 400 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v Doyle,* 429 U.S. 274, 285, 97 S.Ct. 568 (1977). A defendant should prevail at summary judgment if the defendant shows that a reasonable factfinder either would have to reject the plaintiff's claim on the merits or accept defendant's affirmative defense. *See, e.g., Eckerman v. Tenn. Dep't of Safety,* 636 F.3d 202, 207–08 (6th Cir.2010) (applying *Mt. Healthy* to First Amendment retaliation suit in summary judgment context); *McCue v. Bradstreet,* 807 F.3d 334, 344–47 (1st Cir.2015) (same).

In some ways this case is remarkably simple. It was the NIH that made the initial determination that Pesta had violated the NIH's own rules and Pesta's agreement with the NIH. The NIH reaffirmed its decision after affording Pesta an opportunity to be heard on the matter through appeal.  There is no evidence that CSU or the Individual Defendants somehow controlled the behavior and conclusions of the NIH.  Although CSU was aware that the NIH is in the best position to determine whether its rules and agreements have been followed,  CSU began its own process to determine whether Pesta had engaged in misconduct and again gave Pesta many opportunities to be heard on the matter.[133]  In that process, Pesta essentially admitted most of the

---

[133] Pesta has argued at various points in this litigation that CSU did not follow certain of its procedures regarding Pesta's termination. Notably, Pesta did not assert a Due Process claim under Section 1983 in his Amended Complaint. Moreover, the Sixth Circuit has consistently stated that a violation of internal rules, such as the university's own rules governing hearings, "does not establish a cognizable constitutional violation." *Hall v. Med. Coll. Of Ohio,* 742 F.3d 299, 309 (6th Cir. 1984); see also, *Nuovo v. The Ohio State Univ.,* 726 F.Supp.2d 829, 853 (S.D. Ohio 2010)("The Sixth Circuit has consistently stated that a violation of internal rules, such as a university's own rule governing hearings 'does not establish a cognizable constitutional violation'"); *Purisch v. Tennessee Tech. Univ.,* 76 F.3d 1414, 1423 (6th Cir.1996) (Violation of a state's formal procedure . . does not in and of itself implicate constitutional due process concerns"). Importantly, none of the alleged variations from CSU's procedures altered Pesta's ability to communicate with and present his evidence to the decision makers at CSU.  *See, also, Jung-Hoon Yoon v. Garg*, 5th Cir. No. 23-20519, 2024 U.S. App. LEXIS 13818, at *11-13 (June

conduct about which the NIH complained, or he failed to provide explanations for his behavior and decisions other than he did not mean to do anything wrong.  Of course, this latter contention by Pesta is belied by his communications with his coauthors of the Global Ancestry paper that they set out to mislead the NIH and to avoid scrutiny by either NIH or CSU at every turn. Pesta's position in this case appears to be that CSU and the Individual Defendants should have ignored the specific findings by the NIH about the use of its own data even though Pesta failed to provide a credible rebuttal to those allegations.

Pesta has failed to produce any evidence whatsoever that his conduct did not amount to misconduct. Indeed, although given an opportunity to do so, Pesta provided no expert opinion that his dealings with the NIH was proper or that his dealings did not amount to misconduct.[134] Essentially, Pesta has offered no evidence to rebut CSU's and the Individual Defendant's contention that Pesta would have been fired for his conduct without regard to the subject matter of his research. Clearly, a reasonable factfinder would accept that Pesta would have been terminated for his misconduct regardless of the subject matter of his research.

## C.  THE DEFENDANTS HAVE QUALIFIED IMMUNITY FOR ALL ACTIONS TAKEN IN THIS CASE AND THEREFORE SUMMARY JUDGMENT IS PROPER

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S. Ct. 2074, 2085 (2011). "When properly applied, [qualified immunity] protects 'all but the plainly

---

6, 2024) (holding that a university's failure to follow its research misconduct rules does not give rise to a constitutional violation if the plaintiff was given—and took—the opportunity to rebut the allegations of misconduct).

[134] Importantly, the Individual Defendants did provide an expert opinion that Pesta did engage in research misconduct and that such misconduct was sufficiently egregious to warrant dismissal. See Oakes Affidavit and exhibits thereto.

incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 337, 106 S. Ct. 1092, 1094 (1986)). Under this doctrine, a court may not award damages against a government official in his or her personal capacity when in performing a discretionary function, the government official's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982); *Yerkes v. Ohio State Highway Patrol*, No. 22-3030, 2022 U.S. App. LEXIS 35260, at *18 (6th Cir. Dec. 19, 2022).

The Sixth Circuit recently held, "Overcoming the invocation of qualified immunity requires a plaintiff to . . . show both that (1) officials violated his constitutional rights, and (2) that the right was clearly established at the time of the challenged conduct." *McElhaney v. Williams*, 81 F.4th 550, 553 (6th Cir. 2023) As set forth above, Pesta had no constitutional right to violate his data-use agreements with the NIH or to violate CSU policies. The Individual Defendants reasonably believed that Pesta's conduct with the NIH and CSU was research misconduct and they had no reason to believe he had a constitutional right to engage in that misconduct. Moreover, the individual members of the Investigation Committee and Dr. Ward, who are also Individual Defendants, exercised no discretion in terminating Pesta and there is no evidence that they exercised such discretion. As such, they enjoy qualified immunity. *See Yerkes v. Ohio State Highway Patrol*, No. 22-3030, 2022 U.S. App. LEXIS 35260, at *18 (6th Cir. Dec. 19, 2022) (holding non-decisionmakers are entitled to qualified immunity, citing several First Amendment retaliation cases in Sixth Circuit holding the same). They not only exercised no discretion, but they were also not decision makers and cannot be held liable as decision makers.

Accordingly, the Individual Defendants are entitled to qualified immunity and the claims against them should be dismissed.

## IV.    CONCLUSION

Pesta's claim for First Amendment retaliation fails.  The undisputed facts demonstrate that CSU investigated and Pesta's employment was not terminated because of his publication of the Global Ancestry paper and that to the extent speech formed any part of the basis for his termination, the speech involved was not protected by the First Amendment. The uncontroverted evidence shows that Pesta was terminated for serious misconduct. Pesta failed to truthfully or completely disclose to the NIH and CSU the exact nature of the research that he intended, how he would conduct the research, and the persons with whom he would conduct the research.  At every turn, Pesta and his coauthors attempted to mislead or avoid the scrutiny of the NIH and CSU and did so in breach of NIH and CSU policies and professional standards.

The undisputed evidence shows that Pesta was afforded literally dozens of opportunities to demonstrate he did not engage in serious wrongdoing, and he was represented by counsel during each of the crucial stages of the proceedings.  There is no evidence that the subject matter of Pesta's research was a substantial or motivating cause of his termination.  Indeed, the undisputed evidence shows that Pesta would have been terminated for his misconduct without regard to the subject matter of that research. CSU and the academic community have a valid interest in ensuring that academic research happens in a manner consistent with commonly accepted practices for proposing, conducting, and reporting research.  Pesta's failure in this regard was significant and supports his termination.  Because there is no genuine issue of material fact, and the Individual Defendants are entitled to summary judgment as a matter of law.

**CERTIFICATE OF SERVICE**

A copy of the foregoing was filed electronically on July 29, 2023. Notice of this filing will be sent to all parties through the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Karen L. Giffen
Karen L. Giffen (0042663)
**Counsel for all Defendants**