## IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| BRYAN J. PESTA, | ) | CASE NO. 1:23-CV-00546-DAP |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | |
| | ) | |
| LAURA BLOOMBERG, in her official | ) | **AFFIDAVIT OF LAURA BLOOMBERG** |
| and individual capacities; and HARLAN | ) | |
| M. SANDS, BENJAMIN WARD, | ) | |
| CHRISTOPHER MALLETT, CONOR | ) | |
| McLENNAN, and WENDY | ) | |
| REGOECZI, in their individual | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |

STATE OF OHIO      )
                  )   SS
COUNTY OF CUYAHOGA )

Affiant, Laura Bloomberg, being first duly sworn, hereby deposes and states as follows:

1.      At times relevant to the case Pesta v. Cleveland State University, Case No. 1:23-CV-00546-DAP, I was employed by Cleveland State University and held the position of Provost and later as President. I am over the age of eighteen (18) and make this affidavit based on personal knowledge.

2.      As Provost, I was the "deciding official" under CSU's Research Misconduct Policy at OAC 3344-28-01, et seq., meaning I was the official who received the final report of the Investigation Committee, reviewed Dr. Pesta's various objections and rebuttals to the report and determined that Dr. Pesta's conduct warranted sanction including termination.

1

3.     Cleveland State University is a public institution of higher education established by the state of Ohio.  CSU offers more than 200 graduate and undergraduate programs amongst eight separate colleges.    One of those colleges is Monte Ahuja College of Business ("College of Business") where Pesta was employed as a tenured full professor.  The student enrollment for CSU is approximately 14,000 students.  It employs more than 500 full time faculty members in its eight colleges.

4.     The faculty at CSU is represented by the AAUP for purposes of collective bargaining. Certain of the terms and conditions of employment of CSU faculty are governed by the collective bargaining agreement between CSU and the AAUP, including the manner and means by which faculty members may be terminated. A copy of the Collective Bargaining Agreement is attached hereto as Exhibit __.

5.     CSU is classified as an "R2: Doctoral Universities: High Research Activity" institution in the Carnegie Classification of Institutions of Higher Education, a well-recognized authority in American higher education. An R2 designation means that research is integral to the mission of CSU and that CSU fosters a conducive environment for inquiry and discovery. CSU has annual research and development expenditures of $55 million.  Thus, the integrity of the research conducted at CSU is crucial to its educational mission and its reputation and standing in the academic community.  And CSU's relationship with the NIH and other federal agencies that are related to funding is crucial to its educational mission and its reputation and standing in the academic community.

6.     The Principal Investigator in any research project is the individual with primary responsibility for not only the preparation and conduct of the research but also to make sure it is done in compliance with applicable laws, regulations, policies and agreements Pesta was the

2

Principal Investigator for the research that led to publication of the Global Ancestry paper. As such, it is undisputed that he had the primary responsibility to ensure that the research was conducted in compliance with applicable laws, regulations, policies, and agreements.

7.      Although CSU received communications in late 2019 from persons outside of CSU complaining about Dr. Pesta's research and about his access to data from the NIH, CSU did not take action to formally investigate such claims until CSU received notification from the NIH in May 2021 that the NIH had determined that Dr. Pesta had violated NIH agreements and policies. NIH was in the best position to determine whether its own agreements and policies had been violated and whether access to its data sets had been proper. CSU was also a party to the agreement with NIH relating to Dr. Pesta's research and as such CSU's relationship with the NIH and other federal agencies, including both federal funding and data access was in jeopardy as a result of Dr. Pesta's conduct. An institution such as CSU has a significant interest in making sure that the research conducted through it auspices is performed in keeping with professional standards and in compliance with applicable law, policies and agreements.

8.      I received the Final Report of the Investigation Committee and carefully reviewed the report as well as underlying documents. I also carefully reviewed Dr. Pesta's rebuttal as well as the many other statements by Dr. Pesta, including the transcripts of his interviews with the Investigation Committee. I was informed that the sanction the NIH meted out against Pesta, namely a there year suspension, was the most serious sanction ever meted out by the NIH against a Principal Investigator.

9.      I concluded that Dr. Pesta had engaged in misconduct and issued my determination on January 13, 2022. CSU followed the collective bargaining agreement and convened an Ad Hoc Committee of faculty members and administrators to determine whether termination was

warranted. The Ad Hoc Committee unanimously agreed that termination was warranted, and I issued a letter of termination effective March 4, 2022.

10. Academic freedom is crucial to the mission of CSU. Indeed, it is crucial to all scientific and academic inquiry. All academicians who are engaged in research and publishing are by necessity engaged in a vigorous debate about their research subject. The peer review process itself involves subjecting the author's scholarly work and research to the scrutiny of other experts in the same field to check its validity and evaluate its suitability for publication. There are often vociferous disagreements and scholarly journals are filled with the record of such disagreements.

11. The subject matter of Dr. Pesta's research played no role whatsoever in my or CSU's decision to terminate his employment. The result of our inquiry would have been the same no matter what the subject of Dr. Pesta's research because the issue was not the subject of the research but whether Dr. Pesta had engaged in misconduct under CSU's and the NIH's policies.

FURTHER AFFIANT SAYS NAUGHT.

SWORN TO BEFORE ME and subscribed in my presence this 25th day of July 2024.

DAYRNICE CHAVIS
Notary Public
State of Ohio
My Comm. Expires
August 4, 2025

Notary Public

4

## ARTICLE 8

## SANCTION AND DISMISSAL

8.1     The Administration has the right to sanction a member of the bargaining unit up to and including termination of appointment, consistent with the requirements of just cause and the procedures outlined in this Article and the Grievance Procedure set forth in Article 9.

A.     The Administration shall initiate the procedure by informing the faculty member and the CSU-AAUP that charges have been brought.

B.     In determining an appropriate sanction, the Administration shall apply the principle of progressive discipline, including the proportionality of the sanction to the nature and impact of the offense. However, with respect to instances of serious misconduct, the Provost may, consistent with the requirements of just cause and the procedures outlined in this Article implement a sanction without first administering a lesser sanction.

C.     Sanctions covered by this Article include but are not limited to: written reprimands, early termination of appointment to the graduate faculty, suspensions without pay, and termination of appointment.  Sanctions may be imposed for just cause, including, but not limited to:

(1)     incompetence or dishonesty in teaching or scholarship;

(2)     neglect of duty;

(3)     personal conduct which substantially impairs the individual's fulfillment of his/her institutional responsibilities, including, but not limited to, drug or alcohol abuse, trafficking in illegal drugs, discrimination, harassment, or retaliatory conduct;

(4)     interfering with the normal operations of the University;

(5)     fraudulent credentials; or

(6)     conviction of a crime involving moral turpitude or conviction of a crime of violence as defined in Section 2901.01(9) of the Ohio Revised Code.

D.     If the Administration has reason to believe that an incident(s) has occurred that might constitute grounds for a sanction and believes that an investigation is warranted, then the Administration shall conduct an investigation.

Investigations shall be conducted and concluded in a timely manner.  Investigations may be either formal (which requires a written record of the details of the investigation and the resolution and reasons for same) or informal (which requires only a notation that the matter was investigated and resolved).  No investigation shall remain open indefinitely or continue beyond a reasonable duration necessary to secure evidence of misconduct or ongoing performance problems or to resolve the matter being investigated.  Any investigation shall be consistent with University policies in conducting investigations of misconduct.

E.    Allegations may be confidential or anonymous.  However, no sanction may be based solely upon confidential or anonymous allegations.

F.    For purposes of this Article, "University working days" shall be defined as Monday through Friday, exclusive of Saturdays, Sundays, formal holidays recognized by the University, and periods when the University is officially closed for business.

G.    The time periods and deadlines delineated in this Article may be extended by mutual agreement of the parties.

8.2    Sanctions Other than a Suspension or Termination of Appointment.

Prior to imposing a sanction other than a suspension or termination of appointment, a representative from Human Resources and the immediate supervisor (e.g., Department Chair, School Director, or Dean) shall meet with the member of the bargaining unit to discuss the allegation(s) against the bargaining unit member and provide the bargaining unit member a meaningful opportunity to respond.  The following procedures for the meeting shall be followed:

A.    The member of the bargaining unit shall have the right to be represented by the CSU-AAUP.

B.    At least five (5) University working days prior to the meeting, the Administration shall notify both the faculty member and the CSU-AAUP of the specific allegation(s) and provide all supporting evidence gathered at that point related to those allegation(s) that will be discussed during the meeting.  The Administration reserves the right to provide additional evidence within a reasonable time after obtaining the evidence.  The CSU-AAUP reserves the right to request additional time to review the additional evidence, if necessary.

C.    During the meeting, the matter may be resolved by dismissal of the allegation(s) or mutually acceptable resolution which may include remedial measures (e.g., performance improvement plan, training, etc.).  If the matter is not resolved, the faculty member and the CSU-AAUP shall be sent a written statement of the charges and the sanction imposed, as well as copies of the documents upon which the charges and sanction are based (if not already provided), within ten (10) University working days of the meeting.  The statement shall be signed by the administrator who imposed the sanction, with a copy provided to the Provost.

D.    A sanction that is not mutually acceptable may be grieved within ten (10) University working days at the grievance level above the administrator who imposed the sanction.

8.3    Sanctions that include a Suspension or Termination of Faculty Member's Appointment.

Only the Provost may impose a sanction that includes a suspension or termination of the faculty member's appointment.  Prior to imposing such a sanction, the following procedures shall apply:

A.    The member of the bargaining unit shall have the right to be represented by the CSU-AAUP.

B.    The Provost shall notify the faculty member and the CSU-AAUP in writing and provide all supporting evidence gathered at that point relating to the allegation(s) as well as the

6

proposed sanction.  Within three University working days following receipt of the notice, the faculty member may request a meeting with the Provost.  If a meeting is requested, the Provost shall meet with the faculty member and the CSU-AAUP to discuss reasons for the proposed action.

C.  If the matter is not resolved within three University working days of the meeting or if a meeting is not requested, the Provost shall convene an Ad Hoc Committee comprised of three (3) members of the academic administration with tenured faculty status appointed by the Provost and three (3) members of the CSU-AAUP bargaining unit (which may include one member of the AAUP-LS bargaining unit) appointed by the President of the CSU-AAUP ("Ad Hoc Committee").  Within ten (10) University working days after the formation of the committee, or on a later date agreed to by the faculty member, CSU-AAUP and the Provost, the Ad Hoc Committee shall hold a hearing.  The Provost or the Provost's designee shall present the basis for the proposed suspension or termination at the hearing.  The faculty member shall have an opportunity to respond to the allegation(s) which form the basis for the proposed suspension or termination.  The CSU-AAUP may attend and may participate in the hearing.  Following the conclusion of the hearing, the Ad Hoc Committee shall issue its written recommendation no later than fifteen (15) University working days and shall provide a copy to the faculty member, the CSU-AAUP, and the Provost.

D.  If, after receiving the written recommendation of the Ad Hoc Committee, the Provost decides to implement a suspension or termination of appointment, the Provost shall do so within ten (10) University working days.

8.4  If an investigation by the Office of Institutional Equity is conducted and a determination is made based upon an allegation of sexual harassment, discrimination, sexual violence, or retaliation involving a bargaining unit member as a complainant or a respondent, and an Ad Hoc Committee hearing is convened under Section 8.3C of this Article, then the complainant (either a bargaining unit member or a student) may attend the hearing with one support person.  Following the conclusion of the hearing, the Ad Hoc Committee shall provide a copy of its written recommendation to the complainant at the same time as the Provost.  The proceeding before the Ad Hoc Committee and the action of the Provost shall constitute the appeal rights as set out in the Office for Institutional Equity procedures.

8.5  Temporary Relief with Pay of all or part of a Faculty Member's Academic Responsibilities

A.  **To Prevent Actual or Threatened Physical or Psychological Harm to the Faculty Member or Others.**  The Provost may temporarily relieve a bargaining unit faculty member of all or a portion of their academic responsibilities if the Provost deems this action to be necessary in an emergency to prevent immediate actual or threatened physical or psychological harm to the faculty member or others at the University.  Upon temporarily relieving a faculty member, the Provost shall provide written notice to the faculty member and the CSU-AAUP that the temporary removal is being implemented pursuant to this section, and shall include the reasons for the action.  As soon as possible, the Provost shall also meet with the CSU-AAUP, and if appropriate, as determined by the Provost, the faculty member, to discuss reasons for the action and the proposed duration.  Within three University working days following the meeting, the Provost shall issue a written notice to

7

the faculty member and the CSU-AAUP stating either (1) that the faculty member is restored to full duty either immediately or following agreed-upon measures; (2) that the temporary relief should be continued in order to protect the faculty member or others from harm; or (3) that the Provost is pursuing suspension or dismissal of the faculty member and that the faculty member shall remain on temporary relief pending the outcome of those proceedings.  The accused faculty member shall suffer no loss of pay or benefits during such a period of temporary relief of duties. Temporary relief shall not be considered a sanction for purposes of progressive discipline. The Provost may pursue discipline based on the conduct that led to the temporary relief.

B.  **To Prevent Irreparable Academic Harm to Students.**  The Provost may temporarily relieve a bargaining unit faculty member of all or a portion of their academic responsibilities if the Provost deems this action to be necessary in an emergency due to a faculty member's dereliction of duty (e.g., repeated absence from class, refusal to grade assignments/assessments, etc.) which, if allowed to continue, would cause irreparable academic harm to students.  Before temporarily relieving a faculty member, the Provost shall provide written notice to the faculty member and the CSU-AAUP of the reasons for the proposed action.  As soon as possible, the Provost shall also meet with the CSU-AAUP, and if appropriate the faculty member, to discuss reasons for the proposed action.  If, following the meeting, the faculty member disagrees with the proposed action, the Provost shall immediately convene an Ad Hoc Committee as described in Section 8.3C.  The Ad Hoc Committee will review the facts and circumstances and issue a written recommendation regarding the proposed action, and if so, the appropriate duration, and shall provide a copy to the faculty member, the CSU-AAUP, and the Provost.  The accused faculty member shall suffer no loss of pay or benefits during such a period of temporary relief of duties.  Temporary relief shall not be considered a sanction for purposes of progressive discipline. The Provost may pursue discipline based on the conduct that led to the temporary relief.

## ARTICLE 9

## GRIEVANCE AND ARBITRATION

9.1   GRIEVANCE PROCEDURE

The parties recognize and endorse the importance of establishing a prompt, fair and efficient mechanism for the orderly resolution of complaints and agree to make every effort to encourage the prompt settlement of such matters. Both parties encourage the resolution of complaints before they become formal grievances. All grievances concerning the application of this Agreement shall be settled in strict accordance with the procedures set forth in this article, and this procedure shall be the sole and exclusive method of disposing of such grievances.