**IN THE U.S. DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| BRYAN J. PESTA | ) CASE NO. 1:23-cv-546 |
| | ) |
| *Plaintiff,* | ) |
| | ) **JUDGE: DAN AARON POLSTER** |
| v. | ) |
| | ) |
| LAURA BLOOMBERG, et al. | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**

**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Dated: August 30, 2024          Respectfully submitted,

<u>Frederick C. Kelly, Esq.</u>
Law Office of Frederick C. Kelly
*Attorney for Plaintiff Bryan J. Pesta*
One Harriman Square
Goshen, New York 10924
(845) 294-7945
fckellylaw@protonmail.com
Bar No. NY4377297

**DEFENDANTS' LIBERAL USE OF CONTESTED**

**AND ERRONEOUS STATEMENTS OF FACT –  AND PESTA'S**

**COUNTERSTAEMENT OF FACT**

Defendants spend the first twenty-six pages of a forty-page motion misstating the record before launching their flawed legal arguments.  They present a series of false assertions and half truths as the basis for their motion, many of which contain either no citations to the record or do not support the alleged facts presented to the court.  Most notably, Defendants assert numerous times that Pesta failed to disclose that he intended to study a genetic basis for racial differences in intelligence. e.g. *Defense Brief, pp. 12, 13, and 14.*  But the citations here simply do not support this false assertion. The first time it is made (at *Defense Brief p. 13*) they cite to the timeline at *page 131 of the Final Report*, which Defendant Ward had drawn up for the benefit of his fellow Defendants. *DKT, 56, pp. 154-155*. But Ward did not state there or at any other time that Pesta had failed to disclose his intention to study a genetic basis for racial differences in intelligence (which underlay the "Global Ancestry" paper).

In fact, Defendant Ward reluctantly admitted under oath that Pesta *did* disclose his intent to perform the study that underlay the "Global Ancestry" paper, to wit: "Correct. So then under the third request, I guess under the new DAR, he could conduct that research then." *DKT, 56, p. 182*; *see also pp. 158-159, 169.*[1] Defendant Ward then agreed with what Pesta has consistently maintained throughout the investigation by CSU and this ensuing litigation. *e.g. DKT. 38-5, pp. 86, 93*. And he should know: Defendant Ward is the expert within the Office of Research Integrity who was in charge of reviewing the regulations and making sure they were followed. *DKT. 53, pp. 166-167*.

---

[1] *See also, DKT. 38-12; DKT. 54, p. 140; and DKT. 53, pp. 117-120.*

Nor do any of the other citations Defendants offer from *pages 12-14* of their brief support this baseless allegation. They are to the Exhibit at *DKT. 38-7, DKT. 38-9, and DKT. 38-11. Defense Brief, p. 12, n. 45 and p. 14, n. 48.* But the Exhibit DKT. 38-7 is the DAR for Pesta's First Request; the Exhibit at DKT. 38-9 is the DAR for Pesta's Second Request, and the Exhibit DKT 38-11 is just the renewal DAR for the Second Request. Defendants make no reference whatsoever to the DAR for Pesta's Third Request, which is found at *DKT. 38-12.* So Defendants' argument is predicated on distorting and obscuring the full record before the court. This is sharp practice and comes perilously close to violating the duty of candor (if it does not already cross the line into that forbidden territory).

Why the sharp practice? Because what the NIH maintained, and what CSU rubber stamped by following this ideologically compromised agency (*DKT. 45 at ¶25, citing to https://www.city-journal.org/article/dont-even-go-there*), was that Pesta had violated his Second Request by studying issues he was allowed to research under his Third Request. That's correct – their stance is that absurd. *See DKT. 38-5, pp. 6, 17 and 21.*[2] The absurdity becomes apparent once one looks at the full record. Candor, therefore, is the very last thing Defendants can abide.

When Defendants are not actively misstating and obscuring the record, they insist on proceeding in haphazard fashion. Thus the first twenty-six pages of their brief are littered with irrelevant and discursive passages, comprised of unsupported and unsupportable assertions which never make it into the argument section. Take, for example, Defendants reference to CSU's Conflict of Issue policy. *Defense Brief, p. 2.* That issue suddenly arises at page 23, with scant citation to the *Misconduct Policy, §4* (*viz.* Ohio Administrative Code §3344-02-04).

---

[2] Note the NIH's own take on the matter at the Final Report/ DKT. 38-5, p.21: "The research you described in your close out report for project #19090 [the Second Request] is inconsistent with the approved RUS for project #19090, which is a violation of the DUC, <u>regardless of what was proposed in other research projects</u>."

*Defense Brief, p 23, n.112.* Defendants imply that if a CSU researcher uses more than $5,000 in research expenses, such expenditure implicates the Conflict of Issue policy. Of course, the argument is implied rather than clearly stated– and it is thereafter dropped from any further consideration in their brief. *See Defense Brief, pp. 24-40.*

It is dropped because it is a false inference and any argument that Pesta violated the Conflict of Interest policy cannot withstand scrutiny.  *Pesta Aff. ¶¶20-28*   The CSU investigation, such as it was, did not find that Pesta had ever intentionally violated the Conflict of Interest policy. *DKT. 38-5, pp. 6-8.*  And any such belated attempt to argue that there was a finding flatly contradicts what Defendant Mallet stated of Pesta in his deposition, which was that Pesta "was more than forthcoming and honest and open in our conversations." *DKT. 57, p. 170.* That means that when Pesta stated that he was not aware of how the conflict of interest policy could apply (*Final Report, DKT. 38-5, p. 106*), he earnestly meant what he said. It likewise means that when Pesta protested that

> At the outset, and in response to the dozens of allegations made against me in this investigation, I want to state (as I've done so repeatedly throughout this entire process), that to the extent any of my conduct departed from accepted practices or was otherwise incorrect, I did not "intentionally, knowingly, or recklessly" commit those actions. Specifically, I have never intentionally, knowingly, or recklessly misrepresented my intended use of dbGaP data, used that data to pursue unethical research activity, or improperly shared controlled-access data. I believe that the evidence presented to the committee does not show, nor can it be fairly construed to show, that I did anything with the clear and convincing required intent.
> *DKT. 38-5, p. 152.*

Pesta should have been taken at his word.  But Defendants insist on the farrago of false and irrelevant factual assertions, apparently in the hope of confusing the record.

To compound matters, this haphazard factual background drops from sight once Defendants belatedly mount their legal argument: from pages twenty-seven through forty of their

brief, Defendants offer but three citations to the record, which are dropped into footnotes. The first two (found at *Defense Brief, p. 33*) are to the *Warne Deposition, page 49*, which are cited for the truism that academics invite debate. The third and final citation to the record comes at *Defense Brief, p. 38*, where passing reference is made to Dr. Oakes' Affidavit "and the exhibits thereto." This footnote is cited for the proposition that Defendants have proffered an expert opinion that Pesta did engage in misconduct. But Defendants did not even bother to actually attach any exhibits to Dr. Oakes' affidavit. *See DKT. 47-3*. And if they had, passing mention to a rambling and diffuse forty-page report that materially contradicts Defendants' own testimony would hardly suffice. "An issue is deemed forfeited ... if it is merely mentioned and not developed." *United States v. Clark*, 469 F.3d 568, 569-70 (6th Cir. 2006); *see also United States v. Sandridge*, 385 F.3d 1032, 1035-36 (6th Cir. 2004) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (internal quotations and citation omitted)

Plaintiff protests that such infirm ground does not meet Defendants' burden of production. FRCP 56 (c)(1)(A) requires that party asserting that a fact cannot be genuinely disputed must support that assertion by "*citing to particular parts of materials in the record*." Yet after littering the first twenty-six pages with various contested facts or false assertions of fact (refuted in the accompanying Pesta Affidavit), Defendants cite almost nothing whatsoever in the sprawling legal argument that concludes their motion.

This vague argument predicated on such infirm ground is prejudicial to Pesta.   When Defendants assert, for example, that "Pesta was investigated for and fired because of his untrue statements to or his hiding information from NIH and CSU" and cite to nothing whatsoever for this statement (as they do at *Defense Brief p. 28*) we have no real idea of what they mean. Is this

a reference to Pesta's allegedly inaccurate[3] statements, as found by the Investigative Committee in CSU's Final Report? Or is it a reference to novel additional findings placed somewhere in Dr. Oakes's unattached forty-page report? Or is it a reference to the unfounded accusations Defense Counsel makes earlier in their brief, where they repeatedly and inaccurately claim that Pesta failed to disclose that he intended to study a genetic basis for racial differences in intelligence? *e.g. Defense Brief, pp. 12, 13, and 14.* It matters because the charges are not merely inconsistent, but contradictory. The notion that Pesta failed to disclose his intent to study a genetic basis for racial differences in intelligence is itself a novel fabrication in this lawsuit, as shown above.

Defendants are moving the goal posts, as they have done throughout their treatment of Pesta. *DKT. 38-5, pp. 33, 85, 118.*  This, in itself, is evidence of retaliatory animus. *Meriwether v Hartop*, 992 F3d 492, 514-515 (6th Cir. 2021). It would be one thing if, from the outset, Pesta had been accused of the five points[4] of misconduct set forth at pp. 6-8 of Defendants' *Final Report* (*DKT. 38-5*), and then if CSU immediately investigated these five allegations and determined them to be substantive; and thereafter clearly and coherently defended these five grounds as the just and rational cause of Pesta's termination. But nothing like that has occurred here.

Even now, on this motion, Defendants make no attempt to justify the five specific findings they relied on to terminate Pesta — which we would expect them to do if the findings were made in good faith. The best they do is make passing mention of these findings in a single

---

[3] And *inaccurate* (rather than *untrue*) is the right word. We are not being coy here with a euphemism: the Final Report for Finding Nos. 1 and 3 waffled between whether Pesta's actions were "knowing" or "reckless." *DKT. 38-5, pp. 6-7.* And as shown above, Defendant Mallett testified that he found Pesta unfailingly honest. *DKT. 57, p. 170; cf.* Pesta's own protestations of innocence at *Final Report, DKT. 38-5,p. 152.*

[4] Naturally, the five discrete findings are actually labeled as *four* in the Final Report, which helps to confuse the matter. *DKT. 38-5, pp. 6-8.*  Then, too, Defendant Bloomberg added to the confusion by labeling the five findings as *three* in her Decisional Letter dated January 13, 2022.  *DKT. 38-5, p. 163.*

paragraph (*Defense Brief, p. 24*), which is buried deep in their motion.  This should forfeit the issue under *United States v. Clark*, *supra. and United States v. Sandridge*, *supra.*[5]

Defendants' error is compounded in another significant way: the additional grounds they raise on this motion consist of misstatements of fact and after-acquired evidence— after-acquired evidence which is, naturally, again distorted.

Keeping the documented record before us is therefore key to avoiding confusion by Defendants' misstatements and distortions. It shows that the stated reasons that Defendants have advanced for terminating Pesta had no basis in fact; did not actually motivate the defendant's challenged conduct, and were insufficient to warrant the challenged conduct. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) (quotations omitted).

Beginning in April of 2018, Pesta made not one request for the TCP database, but at least three that are relevant here. *DKT. 56, pp. 154, 156-158.*  In his First Request for TCP data (made in April of 2018), Pesta proposed to study sex differences in intelligence and brain volume. *DKT. 38, pp. 80-81 and DKT. 38-7.*  In his Second Request (made in July of 2018), Pesta proposed to study mental health outcomes and race. *DKT.38, pp. 92-94 and DKT. 38-9; DKT. 56,  p. 157*. But in his Third Request (made in September of 2018), Pesta quite clearly proposed studying racial differences in intelligence. *DKT. 56, pp. 158-159, 169 and DKT. 38-12*; *see also, DKT. 53, pp. 117—120*. The requests overlapped, such that the Third Request was open and approved at the same time as the Second Request. *Ward Dep, pp. 168-169, 180.*

---

[5] And even there, Defendants resort to obfuscation. Finding No.1, which was that Pesta had violated the DUC for his Second Request by studying a genetic basis for racial differences in intelligence, is vaguely translated as "the unauthorized use of controlled-access data." *Defense Brief, p. 24*. Finding No. 2, which in laymen's terms was Pesta's use of the Dutch server to predict skin and eye color (viz. "phenotyping"), becomes "violating the non-transferability terms of the NIH agreement." *Id*. Just so with the other findings: Defendants prefer vague references to concrete findings. Why?

Because specific findings can be (and have been) refuted, whereas vagaries allow Defendants the illicit luxury of moving goal posts. *Meriwether v Hartop* at 514-515.

On August 30, 2019, "Global Ancestry and Cognitive Ability" was published in the journal *Psych*.  It is undisputed that in Pesta's field of research, the question of whether there is in fact a genetic basis for the long documented racial differences in intelligence is "an open line of inquiry." *DKT. 38-5, p. 152; see also, DKT. 54, pp. 111-112*.  It is further undisputed that Pesta's contribution to this inquiry represents a landmark study in the field. *DKT. 45 at ¶23 and 45-1, pp. 21-22*.

But science in this area is susceptible to heavy political pressure and has been for decades. *e.g. DKT. 55, pp. 8, 11-12, 14, 19-25; see also, Jensen, A. (1998). Jensen on "Jansenism." Intelligence, 26, 181, pp. 197-198*.  Raise arguments in favor of what those in the field call the "hereditarian position" and one risks various forms of harassment, including protest and even assault at universities. It does not matter if one is an eminent Nobel Prize winner, as Dr. James Watson discovered to his dismay in 2007 and thereafter.  *DKT. 53, p. 322-323; see also, "Lab Severs Ties With James Watson, Citing 'Unsubstantiated and Reckless' Remarks," New York Times, 1/11/19*.[6]  In fact, even discussing other men's hereditarian research presents dangers and has caused some in the academy to lose their positions, such as Dr. Stephen Hsu at Michigan State University in 2020. *DKT. 52, pp. 17-29, 30-35*.

Consistent with this lamentable trend, in September of 2019, the "Bird et al." censors raised, both with CSU and NIH, a farrago of dubious allegations against Pesta.  Amongst other things, the "Bird et al." censors questioned: a) whether Pesta had violated the DUC for the Third Request (otherwise identified as "Project 19747") by researching a genetic basis for racial differences in intelligence; and b) whether Pesta's use of the Dutch server (to perform the

---

[6]  Retrieved at https://www.nytimes.com/2019/01/11/science/watson-dna-genetics.html

phenotyping evident in "Global Ancestry") violated NIH regulations.  *DKT. 38-5, pp. 14, 53; DKT. 46-1; DKT. 53, pp. 142-143; and DKT. 63, p. 297*.

The NIH immediately leapt into action and sent an email questioning Pesta about his use of the TCP database on September 19, 2019. *DKT. 46-1.*  In that email, the NIH laid special emphasis on Pesta's Third Request for the TCP database, inquiring how his research was consistent with that request. *Id.*  By contrast, the NIH made no reference to any of Pesta's other requests for the TCP database.  Furthermore, the NIH made no inquiry whatsoever about Pesta's use of the Dutch server.[7] The very next day (on September 20, 2019), Pesta answered the NIH, conclusively. *DKT. 46-2.*[8]  CSU did nothing of any substance then, although Defendant Ward, more than a year later, belatedly began to review the allegations against Pesta at some vaguely identified time in late 2020. *DKT. 56, p. 110-111*

Meanwhile, both CSU and NIH continued to process Pesta's applications and renewal applications for restricted data, for both the TCP database and other restricted databases.  *DKT. 38-5, p. 131; DKT. 56, pp 154-155; DKT. 53, pp. 148-152.*  This is crucial because when CSU, through the Office of Research Integrity, processed Pesta's renewals for the TCP database and sent them to the NIH, it was certifying the following:

> By approving and submitting the attached Data Access Request, [CSU through] the Institutional Signing Official provides assurance that relevant institutional policies and applicable federal, state, or local <u>laws and regulations</u>

---

[7] Defendants repeatedly refer to the Dutch server as the "foreign server," which makes it sound as though it might be operated in the Third World under questionable conditions. However, as Defendant Ward pointed out quite early (*Final Report, p. 37*), the Dutch server is located in the Netherlands.  Furthermore, although housed in the Netherlands, it is actually controlled or "curated" by a researcher stationed in the United States at Purdue University, Professor Susan Walsh. *DKT. 63, pp, 298-301 and DKT. 53-3.* And it is secure. Professor Walsh, "confirmed that data is not shared from its firewall-protected servers and uploaded files are deleted within seven days." *DKT. 53-3.*

[8] "Conclusively" is the right word. When the NIH belatedly came back on May 27, 2021, they tacitly accepted every argument Pesta had made, *for they did not find against him on even a single allegation they had initially pursued*. Instead, the NIH summarily convicted Pesta of misusing the TCP data on three separate grounds they had never even inquired about in their September 19, 2019, email to Pesta.

(if any) *have been followed*, including IRB approval if required." (emphasis
supplied)
*DKT. 38-11 (Renewal for Second Request) / Pesta Exhibit 11 at numbered page
3/pdf page 7.*
*DKT. 38-13(Renewal for Third Request) / Pesta Exhibit 13 at numbered page
3/pdf page 7.*

The "Institutional Signing Official" here was not Pesta, but Lisa Franklin in CSU's Office

of Research Integrity. *DKT. 63, pp. 253, 256, 261-262, 270.* The record shows that after

receiving these allegations regarding the Dutch server at some point in September of 2019, CSU

continued to approve Pesta's applications for the TCP database; specifically, CSU approved

Pesta's renewed access for the TCP on December 13, 2019, and December 23, 2019. *DKT. 38-5,*

*p. 131 and DKT. 53, pp. 148-152.* Moreover, CSU continued to approve Pesta's for other

restricted access data sets from the NIH on June 24, 2020, and August 12, 2020. *DKT. 38-5,*

*p.131 and DKT. 53, pp. 150-152.*

Thus, instead of calling a halt to Pesta's research because of his use of the Dutch server,

CSU verified the Pesta was in compliance with NIH regulations no less than four times *after*

being alerted to the fact that he had used the Dutch server for his research on the TCP,

specifically on December 13, 2019, December 23, 2019, June 24, 2020, and August 12, 2020.

*DKT. 38-5, p. 131 and DKT. 53, p. 151-152; see also DKT. 63, pp. 261-264.*

This was not an oversight committed by only one other person at CSU. For Pesta's

applications, the person in charge of signing and binding CSU to the NIH regulations was a

woman named Lisa Franklin. *DKT. 63, pp. 253, 256, 261-262, 270.* She was overseen by the

Director of CSU's Office of Research Integrity, Terri Kocevar/MaryTherese Kocevar. *DKT. 63,*

*pp. 277, 285, 287 and DKT. 53, pp. 169-171.* The documentary evidence in this case clearly

shows that Attorney Jack Kraszewski also had a part in reviewing Pesta's applications. *DKT 38-*

*15.*

But no one within the Office of Research Integrity — not Lisa Franklin, nor Terri Kocevar, nor Attorney Jack Kraszewski, nor anyone else—was ever disciplined or sanctioned for the errors that Defendant Ward now says were made in processing Pesta's applications. *DKT. 63, pp. 285, 287-288*. That's because as far as CSU was concerned, those were simply "honest errors" on the part of Lisa Franklin and those overseeing her. *Id.*  After all, as Defendant Ward himself allowed, many of the DUCs for restricted access data are rather confusing (*DKT.  63, p.282*); they are, to quote Defendant Ward "very detailed." *Id.*

We can safely add that even the NIH seems not to have realized that the Dutch server presented a deviation from their rules, which is why the NIH, too, continued to grant Pesta access to the TCP database (and other restricted access) even after his use of the Dutch server was raised with them. *DKT. 38-5, pp. 14-15 for Bird et al.'s complaint to the NIH; DKT. 38-5, p.53 and DKT. 53, pp. 142-143 for evidence that such accusations were raised with the NIH; and see DKT. 53, pp. 87-88 for evidence that the NIH continued to approve access for Pesta*. This, of course, only underscores how obscure the matter was, which weighs heavily against use of the Dutch server being construed as intentional or reckless research misconduct (a standard which does not include honest errors — *see Misconduct Policy at DKT. 38-31 at §2(A)*).

Nor did anyone from CSU's Office of Research Integrity regard Pesta's use of the Dutch server as cause to submit his research to the Institutional Review Board or "IRB." At CSU the IRB "exists *to interpret and apply the Federal Regulations pertaining to research involving human subjects* conducted by CSU Faculty, Staff, and/or Students. (accessible as of May 28, 2024, at www.csuohio.edu › sprs › irb).  But as Pesta shows in his accompanying affidavit, "human subjects" is a term of art under the CFR, specifically defined at 45 CFR 46.102(e)(1). *Pesta Aff. ¶¶14-18.*  Any analysis of the TCP database does not qualify as research involving

"human subjects" as that term is defined in the CFR.  Once the initial study that produced the TCP was completed, the data becomes "archival" and different ethical considerations obtain. *DKT. 63, pp. 274-275.*  Even Defendant Bloomberg shared this understanding of the TCP database as archival, in contrast to the research done by the scientists who performed the original study that produced the TCP database. *DKT. 53, p. 210.*

 In any event, whether Pesta engaged in "human subjects" research which, in hindsight, required IRB approval, should be an academic debate because even if he did, the point is so obscure that no one else could discern the matter either.  Under those circumstances, Pesta should be given the benefit of the doubt and CSU would mandate additional caution in the future for everyone involved.  Even the people who explicitly called for censoring Pesta later backed away from the allegation. *DKT. 38-5, pp. 62, 70-71 and DKT. 57, pp. 90-91.* And again, after being alerted to the fact that Pesta had used the Dutch server in September of 2019, the certifications that CSU's Office of Research Integrity provided to the NIH stated that "local laws and regulations (if any) have been followed, including IRB approval if required."  *DKT. 38-13.*

In fact, with regard to any possible IRB violations arising out of "human subjects research," we can add that even much later, in September of 2021, Defendant Ward was still of the opinion that Pesta did not need any IRB approval for his research with the TCP database:

> Q. Would you agree with me that on September 20th of 2021, Wendy Regoeczi asked you if Pesta received IRB approval from CSU?
> A.  Right.
> Q. And you responded no approvals obtained because and you cited the NIH policy saying the IRB was not required, right? [see Email at DKT. 63-1]
> A.  Right.
> Q. Fair to say that you were confused about this issue in September of 2021?
> A.   I guess what I stated was that NIH approval [was] not required and –
>
> Q. And you left it at that?

A.  And I left it at that.

*DKT.  63, pp. 271-272.*

That happens to be exactly what Pesta's position is and was throughout the investigation — no IRB approval was needed for his research of the TCP database. *e.g. DKT. 38-5, pp. 86, 90-92, 94-95, 158-159.*

On May 27, 2021, almost two full years later, the NIH suddenly announced that Pesta was found to have violated NIH regulations in three specific ways.  Significantly, the three grounds the NIH summarily identified in their May 27, 2021, letter are distinct from any of the inquiries the NIH had raised with Pesta in their September 19, 2019, email. *Cf. DKT. 46-1 with 38-5, pp. 17-18, 20-22.*

Moreover, violating the DUC for the Third Request by researching a genetic basis for racial differences in intelligence is not a finding the NIH made against Pesta (though it was the focal point of their initial inquiry see *DKT. 46-1*). Indeed, violating the DUC for the Third Request by researching the subject matter of "Global Ancestry" is not a finding that the NIH will ever make against Pesta, since he obviously did not violate it.  *DKT. 38-5, pp. 17-18, 20-22.*

Nevertheless, on or about June 9, 2021 CSU punished Pesta for the new violations alleged by the NIH, when Pesta was issued a "Letter of Reprimand" signed by Dr. C. Forrest Faison III (CSU's Senior Vice President, Research and Innovation) and Dr. Kenneth B. Kahn (Dean of CSU's College of Business).  *DKT. 53-2.*   The Letter of Reprimand for the NIH violations dealt Pesta a number of sanctions, including the denial of faculty merit raises for three years and the need to undergo CSU's "Responsible Code of Research" training prior to his next research study.

Despite already punishing Pesta, the CSU Defendants proceeded to conduct their own investigation. Defendants Ward, McLennan, Mallett, and Regoeczi embarked on investigation

rife with procedural and substantive deviations from CSU's Misconduct Policy at Ohio Administrative Code §§3344-28-01 et seq.[9], deviations which are all to Pesta's detriment (further particulars of which can be found at *DKT 44, pp. 30-33*). Said Defendants produced the Final Report (*DKT. 38-5*) which finds five discrete grounds of alleged misconduct.

These five grounds *do not* align with the NIH findings of May 27, 2021. In fact, Defendants Ward, McLennan, Mallett, and Regoeczi rejected one of the three findings made by the NIH in the May 27, 2021, letter: there is no finding that Pesta committed error by failing to report "Global Ancestry" on the renewal application for the Second Request (*DKT. 38- 5, pp. 6-8*), although that faulty conclusion had been reached by the NIH (it has apparently been resurrected by Defendants on this motion – *see Defense Brief, p. 29*).

Instead, Defendants Ward, McLennan, Mallett, and Regoeczi made the following findings:

1. Pesta violated the data use agreement for his Second Request for the TCP database by doing research he was permitted to do under the Third Request. *DKT. 38-5, p. 6.* [10] (*see also DKT. 54, pp. 138-139.*)

2. Pesta violated the terms of both his Second and Third Requests for the TCP database by running the data through the Dutch server to predict certain physical traits (phenotyping). *Id.*[11]

---

[9] The Misconduct Policy or "Policy" is found at *DKT. 38-31*.

[10] To wit, "Dr. Pesta violated the NIH DUC agreement (#19090, see Attachment 16) by using the dbGaP data to examine "intellectual ability" of subgroups of the U.S. population (see Lasker, Pesta, Fuerst, & Kirkegaard, 2019, "Global ancestry and cognitive ability," Psych, 1, 431-459) when the description of the research that Dr. Pesta submitted (and NIH approved) suggested that he would examine mental health outcomes… " *DKT. 38-5, p. 6.*

[11] To wit, "Dr. Pesta violated the non-transferability terms with the NIH DUC agreement for dbGaP projects (#19090 & #19747 see Attachment 17) by uploading controlled data or derivatives of controlled data in the form of coded Single Nucleotide Polymorphisms (SNPs) to an unapproved foreign online forensic DNA phenotyping service. The uploading of these controlled data or derivatives seriously deviates from common research practices and was done knowingly…" *DKT. 38-5, p. 6.*

3.  Pesta violated unspecified terms with the NIH by publishing *a separate paper* on Hispanic
    IQ *after* he had published "Global Ancestry and Cognitive Ability." *Id.*[12]

4.  Pesta violated CSU's regulations under the Institutional Review Board on protecting human
    subjects by using the Dutch server. *DKT. 38-5, pp. 6-7 and DKT. 54, p. 91.* [13]

5.  Pesta violated unspecified CSU regulations by using funds for research derived from a non-
    profit LLC. *DKT. 38-5, p. 7.*[14] *(NB: Defendant Bloomberg later testified that this must have
    been the Conflict of Interest Policy.  DKT. 53, pp. 262-266.  However, that was not what the
    Investigative Committee meant.  DKT. 57, p. 61)*

None of these findings hold water. They constitute a five-fold farce, which is probably

why Defendants avoid discussing them in detail on this motion. Moreover, Defendants moving

papers offer only the most passing references to Findings Nos. 3 and 5. These should be deemed

waived for purposes of this motion.  *United States v. Clark*, *supra.; United States v. Sandridge,

supra.*

We can begin with Finding No. 1. It flies in the face of the plain meaning of the DUC

Pesta was alleged to have violated, a point which becomes clear when one understands the

sequence of events and reads through the underlying documentation. If under the Second

Request, Pesta was supposed to be researching race and mental health, under the Third Request

Pesta was still permitted to research race and intelligence because the applications overlapped.

---

[12] To wit, "Dr. Pesta violated the agreement with NIH by publishing a research manuscript ("Genetics, ancestry, and intelligence among East Coast Hispanic and European Americans," posted 9-26-2020) using dbGaP data without permission." *DKT. 38-5, p. 6.*

[13] To wit, "Dr. Pesta violated the expectation for IRB approval for any research project that uses data in ways outside of an approved DUC agreement and data use permissions." *DKT. 38-5, pp. 6—7.*

[14] To wit, "Dr. Pesta seriously deviated from commonly accepted practices within the academic community for proposing, conducting, or reporting research by knowingly using funds from the Human Phenome Diversity Foundation, LLC (see 2019 Ohio 990 EZ tax form, Employer ID #84-2701983) to purchase a computer and pay for research assistant (J. Fuerst) transportation and meals without authorization or involvement with CSU's SPRS office (see 10-11-21 interview transcript with Dr. Pesta; and email from J. Fuerst to C. Faison, 8-23-21)." *DKT. 38-5, pp. 7-8.*

Of course, the Second Request did not interdict the later Third Request; instead, the Third Request expanded the scope of permission that had been granted under the Second Request. That is the only coherent way to read the NIH forms (*DKT. 56, p. 182 and DKT. 54, p. 140*), for the very language of the DUC in question reads, "New uses of these data outside those described in the DAR will require submission of a new DAR…." *DKT. 38-9.* But a new DAR, which permitted Pesta to conduct the research for "Global Ancestry," had been submitted and approved. The entire exchange from Ward's deposition is worth reviewing, for it sheds light on how shoddy the findings against Pesta are (including the findings by the allegedly honest and competent NIH). *DKT. 56, pp. 169-170, 178-182.*

Pesta had repeatedly stressed to the Investigative Committee that the Third Request had clearly communicated his intention to study racial differences in intelligence, *viz. DKT. 38-5, pp. 32, 86, 93.* Pesta was especially insistent on this point in the rebuttal he submitted to the Investigative Committee, demanding at one point: *"Could someone please acknowledge that at least #19747 (TCP) [viz. the Third Request], in plain language, clearly featured intelligence?" DKT. 38-5, p. 156.* The response of the Investigative Committee was simply to ignore Pesta – on this and every other point he had raised in his defense:

> Q. Do you recall answering any objections he [Pesta] raised in the rebuttal in your final report?
> 　　A. …No, we did not. I recall not responding to those, yes.
> Q. You would agree with me the committee did not respond to a single issue that Dr. Pesta raised in his rebuttal, correct?
> 　　A. Correct.
> *DKT. 54, p. 138.*

That might suffice for CSU. We respectfully submit it should not suffice for this court applying FRE 802(d)(2)(B). Pesta pointed out to Defendants Mallett, McLennan, and Regoeczi that his Third Request covered the research for "Global Ancestry." Not only did none of them

ever deny it, they failed to sustain the allegation that Pesta had violated the Third Request (*DKT. 38-5, pp. 6-8, 60-61, 86*) after a month's long investigation where they twisted every aspect of the Misconduct Code against him and diligently tried to find some evidence of misconduct. Their silence in the face of Pesta's argument should be deemed a tacit admission that the Third Request permitted Pesta to conduct the study that led to "Global Ancestry." FRE 802(d)(2)(B). Novel stances Defendants have belatedly taken in this litigation, whether put into the mouth of their counsel or expert, should not overcome these admissions.

Simply put, Finding No. 1 did not occur under the plain reading of the DUC in question. *Wexler v. White's Fine Furniture, Inc.*, *supra.*

Finding Nos. 2 and 4 are clearly erroneous for another reason (note that the use of the Dutch server is the underlying action that forms the basis for both findings — *see DKT. 54, p. 91*). Pesta admitted that the use of the Dutch server without prior permission was a mistake. *DKT. 38-5, pp. 36-38.*[15] But it was a minor mistake which clearly did not rise to the level of research misconduct because it was an honest error on Pesta's part — just as it was honest error on the part of everyone else at CSU's Office of Research Integrity who had oversight and responsibility for his research; and just as it was an honest error on the part of the NIH, which failed to discern the issue for almost two years. Under CSU's Misconduct Policy, honest errors

---

[15] The main complaint by the NIH appears to be that Pesta did not request permission to use the Dutch server ahead of time, *viz. NIH Letter of August 17, 2021:* "Use of such a service should have been disclosed to NIH so that NIH could evaluate whether its use was appropriate." *Reproduced at DKT.38-5, p. 21*. At deposition, Defendant McLennan conceded that he understood Pesta could very well have received permission to run the TCP derived data through the Dutch server if he had but asked the NIH ahead of time. *DKT. 54, pp. 133-134*. The danger attendant on transferring TCP data seems to be that the people who contributed to the original study were at risk of being identified. *DKT. 38-5, p. 14 and DKT. 63, pp 300-301*. But obviously, no one is actually identified by a prediction of skin or eye color alone. Thus, Defendants Ward, McLennan, Mallet and Bloomberg all testified that they could not point to anyone that had actually been identified by Pesta's use of the Dutch server. *DKT. 63, pp. 299-301; DKT. 54, p. 137; DKT. 57, p 139; and DKT. 53, p. 212*.

are not considered to be research misconduct. *DKT. 38-31 at §2(a); DKT. 56, pp. 53-54 and DKT. 54, p. 18.*

Defendants argue that it was Pesta, as the Principal Investigator, who had primary responsibility to ensure that his research was done in compliance with the applicable laws and regulations. Under their telling, CSU's Office of Research Integrity merely "assists" researchers like Pesta to "manage aspects of research and ethical standards." *Defense Brief p 5, apparently citing to Ward Affidavit at DKT. 47-2.*   To hear Defendants tell it, "…it is undisputed that he [Pesta] had the primary responsibility to ensure that the research was conducted in compliance with applicable laws, regulations, policies, and agreements." *Id.* [16]

But this false. Insofar as there is one party who had primary responsibility to ensure that Pesta's research was "conducted in compliance with applicable laws, regulations, policies, and agreements," that party was CSU, not Pesta. *Pesta Aff and DKTs. 38-8, 38-9 and 38-12.* Defendants, as they have done throughout their dealings with Pesta, are attempting to misread the plain language of the agreement. They do so because if Pesta's use of the Dutch server really was a serious mistake, it was a mistake not simply shared by the rest of CSU's Office of Research Integrity, but a mistake that was more the fault of that office under the plain language of the agreement.

Likewise, if the failure to secure IRB approval for Pesta's use of the Dutch server really was a serious mistake, it, too, was a mistake borne more by CSU and the Office of Research Integrity than Pesta. This point is not open to serious dispute, hence Ward's testimony:

> Q. And that was CSU's fault, right?
>
> A. We signed off on it, so.
> *DKT. 63, p. 284.*

---

[16] There is no citation for this assertion.  Perhaps Defendants meant to cite to the Bloomberg Aff at *DKT. 47-1*?  In any event the assertion is contradicted by the NIH's forms, as shown herein.

As shown above, Lisa Franklin was not the only one who would have committed "honest error" here. Defendant Ward also had no clear grasp of this issue, *after studying it for nearly a year*, when the committee asked him about the need for IRB approval on September 20, 2021. *DKT. 63, pp. 267-272 and DKT. 63-1*. But apparently, Defendants would have the court believe that Ward is entitled to honest errors, but Pesta is not.

Notably, the committee never determined that Pesta had knowingly and intentionally violated NIH regulations by using the Dutch server. *DKT. 54, pp. 135-137*. Where the committee's Final Report – adopted uncritically by the Provost Bloomberg— states that Pesta performed this act "knowingly," as at *Final Report, DKT. 38-5, pp. 6 and 164,* they mean nothing other than that Pesta was cognizant of the fact that he used the Dutch server, not that he deliberately violated the NIH regulations. *DKT. 54, pp. 135—137*. Of course, if such a state of mind confers guilt, it is guilt shared equally by Dr. Ward and the others in CSU's Office of Research Integrity, for they too came to conscious knowledge that Pesta had used the Dutch server, even as they continued to approve his standing to perform research with the NIH datasets. *DKT. 53, p. 151-152 and DKT. 63, pp. 261-264*.  Under their logic, to be consistent we must say that Lisa Franklin, Director Kocevar, and Attorney Kraszewski "knowingly" submitted false certifications to the NIH; and that Defendant Ward "knowingly" misled the other Defendants as to the need for IRB approval on September 20, 2021.  *DKT 63, pp. 271-272 and DKT. 63-1.*

Thus Finding Nos. 2 and 4 by the Investigative Committee are completely without merit. *Wexler v. White's Fine Furniture, Inc.*, *supra.*

Finally, we note that if even one of the five findings were faulty, Defendants would fail to carry their burden of showing that Pesta was justly fired or would have been fired. Defendant Bloomberg testified that she opted to terminate Pesta because of "the totality;" "the sum of a

whole body of violations." *DKT. 53, pp. 196-197.* But the "totality" is only the sum of its parts. When one or more of the findings falls away, "the totality" crumbles along with it.

Speaking through their expert, Dr. Oakes, Defendants next argue that Pesta had harmed the original participants who contributed to the TCP and even used the database in a manner inconsistent with their consents to participate in the study. *Defense Brief p. 8*. The allegations are implied rather than stated, however, and are another example of Defendants' moving the goal posts. *Meriwether v Hartop*, 514-515. Defendants ran a month's long investigation into Pesta's research for "Global Ancestry" and came forth with no findings that Pesta had harmed any participants from the TCP study; nor did they ever find that Pesta had violated the consents associated with the TCP. *DKT. 38-5, pp. 6-8*

After almost two years, the NIH, too, failed to ever determine that Pesta had ever harmed any participants, nor did they ever even raise the issue of Pesta violating the consents for the TCP study.  *DKT. 38-5, pp. 17-18, 20-22.*

Turning to the emails at *DKT. 38-35, DKT. 38-38 and DKT. 42-12*, Pesta must again object to Defendants' use of after-acquired evidence. *Defense Brief pp. 10-11*.

**POINT I: *GARCETTI* DOES NOT APPLY TO PESTA'S SPEECH IN "GLOBAL ANCESTRY" AFTER THE SIXTH CIRCUIT DECISION IN *MERIWETHER*.**

The issue here is whether the speech at issue was Pesta's "Global Ancestry" paper or the merely technical language of his DARs (and related DUCs), which are "non-ideological" and "ministerial" such that they might fall into the carve out which Defendants vaguely ascribe to the *Meriwether* court – without providing any specific cite. But the rule is that when determining the nature of the speech at issue, the court is to undertake its inquiry practically, rather than with a

"blinkered focus." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 529 (2022). And only a blinkered focus would permit Defendants to argue that it was Pesta's speech on the DARs or other technical minutia that was at issue.  At the very least the question is debatable — if the evidence is not so on one sides that the issue falls to Pesta as a matter of law.  If it is even debatable, then the well known standards of Rule 56 preclude a decision in favor of Defendants here.

When CSU belatedly interviewed the Bird et al. censors, they were immediately informed that what animated Pesta's critics was the hereditarian conclusion that Pesta had reached in "Global Ancestry." *DKT. 38-5, pp. 57, 58, and 64.* That was true, too, of the only other complainant that CSU interviewed, Dr. Kent Taylor. *DKT. 38-5, pp. 71, 74.*

It was not only such outside agitators who were concerned with the substance of "Global Ancestry." It later transpired that Defendants Defendants Mallet, McLennan, and Regoeczi were heavily concerned with Pesta's landmark scientific study.  *DKT. 57-1 and DKT. 57-2.*  Even as Defendants were assuring Pesta to his face that they were "not concerned about what a researcher is researching" and understood that although "there are politics involved here," he had no worries because such was "not our focus," (*DKT. 38-5, p. 129*), they were lying.  The political implications of Pesta's "Global Ancestry" were front and center in Defendants' own minds. *DKT. 57-1 and DKT. 57-2.*

And the tell-tale language at *Final Report at pp. 4-5 (DKT.38-5), which all three Defendants had sharpened precisely in order to send the message that no one should be researching the point of view that Pesta had arrived at,* was an obvious and transparent lie (*DKT. 63, pp. 244-247*), one that, respectfully, would have given pause to anyone actually concerned with assuring Pesta had received a fair hearing.  But Defendants Ward and Bloomberg let all this

pass because they, too, took issue with Pesta's hereditarian research, landmark science be damned.[17]

In the context of a university professor's speech on issues of pressing public concern, Defendants' focus on "Global Ancestry" implicates *Pickering*, not *Garcetti*.  *Meriwether v Hartop* at 503-504 and 508-509.

As to the speech in "Global Ancestry," Defendants make no argument that under *Pickering* their interest outweighs Pesta's interest. *Cf. Defense Brief, pp. 27-32*. And under *Pickering*, even with a blinkered focus on Pesta's language on the DARs and DUCs or other ministerial actions, they fail to carry the burden of showing false statements knowingly or recklessly made, as set forth below.


**POINT II: UNDER *PICKERING*, EVEN PESTA'S NON-IDEOLOGICAL AND MINISTERIAL MISTAKES CANNOT BE CONSIDERED FALSE OR RECKLESS IN LIGHT OF THE FACT THAT OTHERS AT CSU, INCLUDING DEFENDANT WARD, MADE THE SAME MISTAKES WITHOUT SUFFERING ANY PUNISHMENT.**

We are once again handicapped by the fact that Defendants make no reference to the record in this section of the brief and are left to guess at what evidence Defendants mean to argue. The best Defendants do is to vaguely state the following:

> …Pesta has admitted that he failed to disclose to the NIH that he intended to submit the NIH data to an outside website, that he failed to properly and timely report how he and his coauthors had made use of the data, and that his coauthor Fuerst was not forthcoming about what he had done with the TCP data and seemed to at worst thwart, or at best ignore the NIH's instructions about what to do with the data.
> *Defense Brief, p. 29.*

---

[17]  See evidence cited at Point III below.

There appear to be three things here. The first is clearly Pesta's use of the Dutch server (which corresponds with Finding Nos. 2 and 4 of the Final Report), but the latter two are vague. The second, failing to properly and timely report how Pesta had used the TCP data was an issue investigated by the CSU Defendants.  Specifically, the NIH had raised this issue (*DKT. 38-5, pp. 18 an 21*) and the Investigative Committee discussed it during Pesta's interview as shown at *DKT. 38-5, pp. 44-45*. But there was no finding of misconduct in this regard. *See DKT. 38-5, pp. 6-8*.  Apparently because it was so trivial, this was the one issue that the Investigative Committee would no sustain (although the NIH had harped on the matter).  The implicit admission is that such actions or inactions did not rise to the level of research misconduct under CSU's code.

The third, John Fuerst's refusal to cooperate with the CSU investigation, is not even conduct on the part of Pesta. And it, too, was an issue raised in the investigation (*DKT. 38-5,, pp. 40-42*), but resulted in no finding that Fuerst's actions were misconduct on the part of Pesta. *DKT. 38-5, pp. 6-8*. Again, the implicit admission is that there was no research misconduct attributable to Pesta under CSU's code.

With the latter two issues raised by Defendants (*Defense Brief, p. 29*), they are again moving the goal posts.  Their own five findings are such an obvious farce at this point that they need to go back and unearth earlier accusations that they had opted to pass over.  But this is not conclusive evidence in their favor, it is evidence of their retaliatory animus that should weigh against them. *Meriwether v Hartop* at 514-515.

As to the issue of Pesta's use of the Dutch server (or the alleged failure to secure IRB approval before using the Dutch server), it cannot be considered false or reckless by any reasonable factfinder because no one else at CSU with oversight of his research was even questioned, let alone punished for the same oversights. *DKT. 63, pp. 285, 287-288*. What is

honest error for the Director of the Office Research Integrity or for the Attorney who specialized in aiding the Office Research Integrity, or for Defendant Ward himself (*DKT. 63, pp. 271-271*), cannot be knowing malice or reckless disregard for Pesta. The argument should fail as matter of law.

**POINT III: THERE IS STRONG EVIDENCE THAT BOTH THE INVESTIGATION AND TERMINATION OF PESTA WERE MOTIVATED BY THE SPEECH IN "GLOBAL ANCESTRY," RATHER THAN ANY OF THE TECHNICAL VIOLATIONS TRUMPETED BY DEFENDANTS.**

Defendants' argument here proceeds by and large by lawyerly euphemisms and outright distortions.

Citing to nothing whatsoever, Defendants maintain that, "The most Pesta can show is that some members of CSU's faculty and administration disagreed with his research findings and did not consider these findings a valuable contribution to the body of research on human intelligence." *Defense Brief, p. 32.* But that is not true. In the first place, Defendants were apparently so put off by Pesta's research conclusions that they refused to engage with the substance of his work to even determine if they rationally agreed or disagreed with the findings. Thus, Defendant Mallett consistently maintained that he did not even read Pesta's paper (*DKT. 57, pp. 20, 21, 23, 25-26, 46, 68, and 70*), while Defendant McLennan, for his part, never did more than "skim" Pesta's paper (*DKT. 54, p.16.*) and admitted at deposition that he lacked a "good understanding" of the "content of [Global Ancestry] and the work that's in that paper." *DKT. 54, p. 24.*

But their willful blindness did not prevent them from signaling that they condemned Pesta's research (rather than simply disagreeing with its conclusions).  Defendants Mallet, McLennan and Regoeczi were confident that Pesta had in fact caused "harm" by the research which they had not bothered to understand.  *DKT. 54 pp. 50-51, 68-70, 73-75 and DKT. 57-1.* Defendants McLennan and Regoeczi were particularly self-righteous, expressing frustration at one point that Pesta had not condemned his own research, despite the best efforts of their Kafkaesque investigation. *DKT. 57-2 and DKT. 54 pp. 80 and 118.*

The academy is supposed to thrive on bona fide dispute.  "Education is a kind of continuing dialogue, and a dialogue assumes, in the nature of the case, different points of view.'" *Wieman v. Updegraff*, 344 U.S. 183, 197 (1952) (Frankfurter, J., *concurring*); *see also, Speech First, Inc. v. Schlissel*, 939 F.3d 756, 761 (6th Cir. 2019).  But not here, not when it comes to race, and not when Defendants Mallett, McLennan and Regoeczi are involved.  All three defendants were content to read Pesta's rival environmentalist, even as they were considering whether to openly condemn Pesta for his research on the same topic from an opposing point of view.  *DKT. 54 p. 80 and MDKT. 54-1 and DKT. 38-5, p. 59.*[18]

Then, too, Defendants Mallett, McLennan and Regoeczi lied to Defendant Ward about their reasons for inserting the tell-tale language in the *Final Report at pp. 4-5 (viz. DKT. 38-5, pp. 4-5; cf. DKT. 63, pp. 244-247).*  This shows that Defendants Mallet, McLennan, and Regoeczi intentionally violated Pesta's First Amendment rights.  They set out to do what Judge Clay had forbidden in *Bible Believers v. Wayne Cnty*, 805 F.3d 228, 234 (6th Cir. 2015): they used regulations to "destroy… freedom of speech." And when the regulations proved

---

[18] The research paper at *DKT. 54-1 (viz. "Bird, 2021")* shows that Mr. Bird himself has repeatedly acknowledged that there is in fact a black-white IQ gap, that such gap has been a subject of long ranging debate, *and even that his own preferred environmental explanation is not definitive. Id. at  Abstract and pp. 1, 2, 6, 7, and 9.*

insufficient, they simply bent the regulations in numerous ways and produced a farcical report showing alleged "research misconduct" which they cannot and do not defend.  Defendant Mallett even admitted, with admirable if belated candor, that a majority of the Investigative Committee simply did not proceed against Pesta impartially and fairly as required by the Misconduct Policy. *DKT. 57, pp. 39-40.*

But Defendants Mallet, McLennan, and Regoeczi acted with the tacit consent of Defendant Ward and Defendant Bloomberg.

Defendants Ward and Bloomberg, like Defendants Mallett, McLennan and Regoeczi, disliked Pesta's research in "Global Ancestry."  Ward's disavowal can be found at *DKT. 63, pp. 229-231*, and towing the party line is the best explanation for Ward's manifest failures.  His job as the Research Integrity Officer included ensuring that any variations of from CSU's Misconduct Policy provided "fair treatment" to Pesta. *DKT. 38-31 at §1(C).* Instead, Defendant Ward consistently acted against Pesta.

From the outset, Defendant Ward botched the review into Pesta's research by refusing to close three issues[19] at the earliest stage of the proceedings under Misconduct Policy §§3(C) and 4(C), which he was later unable to rationally defend as even colorable findings of misconduct under the Policy. *e.g. DKT. 56, pp 169-170, 178-182 (violation of Second Request by researching issues permitted by the Third Request); DKT. 63, pp. 271-272, 284 (use of Dutch server/phantom IRB violation).*  Had Ward honestly done his job under Misconduct Policy §§3(C) and 4(C), Pesta would never have been investigated for performing research he was permitted to do under the Third Request, nor for his use of the Dutch server, nor for the phantom IRB violation arising out of his use of the Dutch server.

---

[19] Which later became Finding Nos. 1, 2, and 4.

Defendant Ward not only botched the initial review under Misconduct Policy §§3(C) and 4(C), he proceeded to oversee an investigation where the rules were significantly bent against Pesta, including on such crucial matters as ignoring Pesta's fulfilment of his primary responsibility (*DKT. 56, pp. 12-13, 33-36*); skipping whole aspects of the Misconduct Policy without Pesta's consent (*DKT. 56, pp. 63-65, 67-68, 71, 113-114*), failing to formally interview the most significant complainant (*viz.* the NIH itself – *DKT. 56, p. 131*), failing to provide Pesta with the opportunity to question any of the witnesses against him (*DKT. 56, pp. 71-78*), failing to record *ex parte* interviews between his office and the NIH (*DKT. 56, p. 132-138*), and failing to even present Pesta with the evidence from that illicit *ex parte* interview in the Final Report before transmitting such tainted evidence to Provost Bloomberg for her decision.  *DKT. 38-5, pp. 1—162, which contain no reference to the ex parte interview.*[20]

As to Defendant Bloomberg, a reasonable fact finder would find that her own ideological commitments explain both her ready acceptance of the flawed conclusions proffered by the Investigative Committee and her own violations of the Misconduct Policy.

Defendant Bloomberg testified that she had "long held ideological commitments in favor of diversity." *DKT. 53, p. 21.* Moreover, Provost Bloomberg gave testimony indicating that she thinks Pesta's research was racist, which is to say morally flawed. *DKT. 53, pp. 22-24.* Her deposition at the above pages shows that Provost Bloomberg identified two factors that could signal racism in her mind: 1) research showing something that has been persistently debunked; and 2) research not supported by the Academy.

---

[20] In a footnote (*Defense Brief, p. 37 n. 133*), Defendants argue that deviations from an internal policy do not constitute a constitutional violation, which is true as far as it goes.  But here it does not go very far. Rather, the issue is whether numerous prejudicial deviations combined with the other evidence of animus point toward a First Amendment violation.  We  submit they can point nowhere else.

According to Provost Bloomberg's flawed interpretation of the data on intelligence testing, Pesta's research would meet these factors because she labors under the delusion that the fact that blacks have lower IQs than whites has been "repeatedly being challenged and debunked." *DKT. 53, p. 22 – see also p. 39*: "Do you consider Bryan Pesta to have undertaken research in an area that has been repeatedly debunked? A: Broadly, yes. Specifically I can't say for sure…" In a gross inconsistency, Provost Bloomberg maintained that she had read the transcript of Mr. Bird's interview. *DKT. 53, p. 343*. If she had done such reading, it is odd that she would imagine that the fact that blacks have lower IQs than whites has been "repeatedly being challenged and debunked," for Censor Bird repeatedly referenced the black-white intelligence gaps as established facts in his interview with CSU. *DKT. 38-5, pp. 57, 58 and 64.* Moreover, at *DKT. 53, p. 344*, Provost Bloomberg also indicated that she was aware that there was a nature-nurture debate on the causes of the racial differences in IQ (which is the debate between hereditarians and environmentalists). One does not look for, or debate, the possible causes of things that do not exist. This is simply Orwellian "double think" from an ideologically committed member who is towing the party line. But in any event, it shows that Bloomberg thinks that Pesta's research hit on the first factor she identified for the moral flaw of racism.

The second factor identified by which Defendant Bloomberg identifies "racism" is also clearly present in her mind. The *Final Report*, whose "findings and conclusions" Bloomberg adopted in whole (*DKT. 53, p. 78*) indicated that the predominant view within the Academy was that race was "a social construction" without any "scientific basis." *DKT. 38-5, p. 5.* Thus Pesta's research for "Global Ancestry" hits both criteria that Defendant Bloomberg thinks indicate the moral flaw of racism.

Defendant Bloomberg testified that she was charged with seeing that the Misconduct Policy was appropriately followed. *DKT. 53, pp. 162; 163-164*. Defendant Bloomberg can therefore be said to have inherited all of the defective aspects of the investigations.  She proved worthy of her bequest.  Defendant Bloomberg testified that she understood that Pesta had been denied the cross-examination safeguards of §§3(K) and 6(I) of the Misconduct Policy (*DKT. 53, pp. 294—296, 300—301, 308*), but essentially washed her hands of the matter because (reversing her earlier stand at *DKT. 53, pp. 162; 163-164*) the responsibility was now that of Dr. Ward. *DKT. 53, pp. 308—309.*

But following any rules that benefitted Pesta was clearly no interest of Defendant Bloomberg.  The Misconduct Policy at §6(J) provides that, "Any final report shall include the actual text or an accurate summary of the views of any individual(s) found to have engaged in misconduct, *as well as a description of any intermediate administrative actions taken by the university*."  (emphasis supplied).  Here, based on the findings by the NIH, CSU had already taken "intermediate administrative action" against Pesta with the Letter of Reprimand   Omitting it from the Final Report was a clear violation of §6(J) of the Misconduct Policy.  *DKT. 38-5.* That omission was particularly egregious because as Defendant Bloomberg was reviewing the Final Report, she confirmed with Defendant Ward that Pesta had already been disciplined for the findings made by the NIH with the "Letter of Reprimand" referenced above.  *DKT. 53, pp. 214-218 and DKT. 53-2.*

The Letter of Reprimand at *Ex 2 Bloomberg* raises a further issue going to the larger question of "fair adjudication" (§1(A)) and "fair treatment" (§1(C)) Pesta was to be accorded under the Misconduct Policy.  After laying out the penalties, Pesta was directed to undertake three things: 1) close out all open projects with the NIH's database and destroy all versions of the

data set; 2) submit any future studies involving human subjects data to the CSU Institutional

Review Board (IRB); and 3) complete a refresher training on CSU's CITI Training Course

Responsible Conduct of Research prior to his next research study, and to maintain currency of

that training every subsequent two years.  *DKT. 53-2.*  The Letter of Reprimand also states:

> Any further violations of data access agreement or behaviors that compromise research integrity will result in additional disciplinary actions in accordance with the CSU-AAUP Collective Bargaining Agreement, up to and include dismissal.

And:

> If you fail to complete these steps, Cleveland State University will not approve your future research studies and you may be subject to further sanctions up to and include dismissal for violating Article 8.113(1) of the CSU-AAUP 2017-2020/21 contract.

> *DKT. 53-2.*

There was surely a promise in CSU's Letter of Reprimand that if Pesta abided by the terms it

contained, he would not be subject to any further discipline.

Yet Pesta was later subjected to the most severe sanctions possible, even though, as

Defendant Bloomberg admitted at her deposition, she was not aware of any violations Pesta had

committed after June 9, 2021.  *DKT. 53, p. 233.*[21]

In fact, Pesta was sanctioned even though Defendant Bloomberg could not defend her

decision to endorse the five discrete charges sustained by the Investigative Committee, instead

taking refuge in what she repeatedly referred to as "the totality" of Pesta's alleged misdeeds.

---

[21] In her usually obscure style, Defendant Bloomberg attempted to muddy the waters here by claiming that perhaps Pesta had failed to comply with the first of the steps outlined in the Letter of Reprimand, which was the obligation to destroy all datasets from the NIH.  But laborious questioning over *DKT. 53, pp. 234—248 and DKT. 53-3* showed this to be mistaken.  The truth eventually comes out thus: "Q. No, that's not my question.  My question is, as you sit here today, do you maintain that Pesta failed to comply with the three steps outlined in the undated June 9th letter?  A.  No."  *Id. pp. 247-248.*

*DKT. 53, pp. 169, 185, 196-197, 200-201, 203, 204.*  A representative quote: "By the time it got to my desk, I was looking at the totality of information, not specific things."  *DKT. 53, p. 169.*

This is error.  If one is charged with research misconduct at CSU, that must mean specific things — specific, discrete instances of, as stated in §2(A) of the Policy, "fabrication, falsification, plagiarism, undisclosed conflicts of interest as defined in the policy for managing conflict of interest, or other practices that seriously deviate from those that are commonly accepted within the academic community for proposing, conducting, or reporting research."

It cannot mean, as Defendant Bloomberg wishes it to mean, anything as vague as, "having what I would consider an entirely odd relationship with a student" (*DKT. 53, p. 201*), nor "saying he did some things as if the professor can remove themselves from what the student is responsible for when they don't even have to be named as a collaborator because they're a student."  *DKT. 53, p. 201.*

At one point Defendant Bloomberg even maintained that she did not need to know the meaning of the DUC before stripping Pesta of tenure and firing him.  *DKT. 53, pp. 88-89.*  She forthrightly maintained this surprising stance, despite the fact that her own Decisional Letter cited violation of the DUC as a primary reason for the severe sanction she was visiting on Pesta.  *DKT. 38-5, p. 163.*  Furthermore, she gave answers which can charitably be described as *incoherent* when pressed as to how a scholar using the TCP could modify a DAR and conduct a different study than what he had originally proposed.  *DKT. 53, pp 98—100.*

In short, Defendant Bloomberg had simply not bothered to understand the allegations and findings against Pesta before firing him based on same.  *DKT. 53, pp. 139-140, 145-146.*  Indeed, she flatly admitted that she did not know whether the upload of data to the Dutch website which the "Bird et al." censors had complained about at *p. 14 of the Final Report* (*DKT. 38-5*)

was the same conduct which the Investigative Committee had sustained as misconduct against Pesta *at p. 6 of the Final Report.*[22]  But then Defendant Bloomberg did not even understand her own findings.  She denied, for example, that she concurred in finding that Pesta had violated CSU's IRB policies by uploading to the foreign server.  *DKT. 53, p. 164-165.*  Instead, she said that her concern was "the deviation from the DUC."  *Id.*

But that is at odds with what the Investigative Committee found: they presented the deviation from the DUC and the IRB violation (albeit based on the same conduct of uploading to the Dutch server) as two separate violations, labeling them respectively "Instance 1 of 4" and "Instance 3 of 4."  *Final Report, pp. 6—7.*  When Defendant Bloomberg stated that she concurred "with the committee's findings" and "adopt[ed] and incorporate[d] their findings and conclusions in whole" (*DKT. 38-5, p. 164*), she clearly did not understand what she was doing. Obviously, she did not care, so long as she got the "racist."

The entire matter should shame CSU, and Defendant Bloomberg in particular.  In her Decisional Letter, Defendant Bloomberg claimed to "fervently uphold" Pesta's right to academic freedom.  *DKT. 38-5, p. 165.*  But exactly how fervent Defendant Bloomberg was is shown by the following deposition testimony:

> Q. By the way, you don't simply do whatever the NIH wants you to do at CSU, do you?
>
> A. Well, they own the data, they provide the federal funding, they are the governing body for that research, so yes.
>
> *DKT. 53, p. 101.*

---

[22] It was and the committee understood as much.  *DKT. 54, p. 91.*  There is no excuse why the Provost could not grasp this as well.

Defendant Bloomberg's candor here is commendable.  Her utter betrayal of free speech rights in the face of a compromised and irrational regulatory agency is anything but.  There is simply no provision for this kind of obeisance in the Misconduct Policy itself.  In fact, such regulatory obeisance is nothing but treason to the First Amendment.  As Justice Jackson noted long ago, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion…." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  The sweep of that language surely includes high and petty officials in the NIH, especially those who seem to be enforcing viewpoint discrimination at that agency in the name of prescribed orthodoxies left over from the Warren court.

So there is no evidence, except for the copious evidence set forth above.

Again citing to nothing whatsoever, Defendants next make the bland assertion that all academic research is controversial. *Defense Brief, p. 32.*  If so, it is not all controversial to the same extent. The record here shows that only the hereditarian position provokes riots and assaults on campuses, and has for decades. *DKT. 55, pp. 8, 11-12, 14, 19-25; see also, Jensen, A. (1998). Jensen on "Jansenism." Intelligence, 26, 181, pp. 197-198.*   The record shows that only the hereditarian position has led to calls for ouster or led to men being fired. *DKT. 55, p. 37 and DKT. 52, pp. 17-29, 30-35.*  Dr. Warne's testimony is not to the contrary. One does not debate a position by shouting it down or assaulting a professor for hosting a dissident speaker, as happened when Charles Murray visited Middlebury; nor does one "debate" Pesta's conclusions by attempting label them as "racist," which is an infantile way of simply calling his motives into question.  Years ago, Alexander Meikeljohn had the answer for this type of behavior:

> …vituperation which fixes attention on the defects of an opponent's character
> or intelligence and thereby distracts attention from the question of policy under

> discussion may be forbidden as a deadly enemy of peaceable assembly. Anyone who persists in it should be expelled from the meeting, and, if need be, the police should give help in getting it done.
>
> Meikeljohn,, "*The First Amendment is an Absolute*," Supreme Court Review (1961), 245–266, at 260.

Defendants next argue that there is no evidence Pesta was treated differently from other persons who did not engage in protected activity. They should say no evidence, except that provided by the disparate treatment of Lisa Franklin, Director Kocevar, Attorney Kraszewki, and Defendant Ward himself.

Lastly, they argue that CSU had been aware of Pesta's research for more than a dozen years before his termination. *Defense Brief, p. 34*.  This is another falsehood. Pesta's "Global Ancestry" was his first foray into the powder keg topic of the genetics behind race / IQ gaps. *Pesta Aff ¶54.*   In fact, he had published at least one paper that would place him in the *environmentalist* camp. *Pesta Aff ¶55.*[23]   Under the intellectual climate which has been dominant for the last several decades, one can freely research racial differences in intelligence, but it is the hereditarian viewpoint that generates censorship efforts.  Censor Bird, for example, has a keen interest in the topic of racial differences in intelligence.  *DKT. 52, pp. 31-33 and DKT. 54-1*.  But he was enthusiastically embraced by Defendants (*DKT. 54, p. 80 and DKT. 38-5, p. 59*), precisely because he acts as a volunteer censor for the *environmentalist* side of the debate. That is the politically safe side, the one embraced by the courts themselves for over seventy years. Try mounting the hereditarian side of the debate and one quickly draws accusations of "moral treachery" (especially in universities).

Moreover, no one had ever complained before the "Bird et al." censors spurred the NIH to act.  *Pesta Aff ¶60.*   As de Tocqueville noted long ago, free speech in a mass society becomes

---

[23] Because what honest intellect only looks at an issue from only one side?

most endangered when a man finds himself condemned; prior to going into print he imagines he

has support, but once "condemned loudly," he finds himself alone.   Alexis de Tocqueville,

<u>Democracy in America</u>, Part II, Chapter 7 "The Omnipotence of the Majority in the United

States and Its Effects," Lawrence translation (Anchor Books, Doubleday & Co., 1969), p. 254-

56.

Thus, it was not until the complaints of "Bird et al." and later, the NIH, that Pesta was

beset. That, of course, was when he needed the redoubt of academic freedom. But Defendants

were quick to place Pesta outside the pale.


**POINT IV: THE INVESTIGATION IN THIS CASE WAS KAFKAESQUE AND IN THIS
CONTEXT CONSTITUTES A FIRM BASIS FOR FIRST AMENDMENT
RETALIATION.**

The chief issue here was identified by Judge Kozinski: whether the actions

were 'reasonably likely to deter employees from engaging in protected activity.'"   *Dahlia v.

Rodriguez*, 735 F.3d 1060, 1079 (9th Cir. 2013), *quoting Coszalter v. City of Salem,* 320 F.3d

968, 976 (9th Cir.2003).  Even early on in the investigation, that is, before Pesta had realized that

the Ward and his Investigative Committee were simply ignoring Pesta's arguments entirely

(*DKT. 38-5, p. 156*), Pesta had already indicated that he had been intimidated to such an extent

that he had withdrawn from research in the area.  *DKT. 38-5, pp. 34, 42.*  It was a retreat that was

confirmed as the Kafkaesqu investigation wore on (*DKT. 38-5*) and Pesta began to see how

unfair the process was.  *DKT. 38-5, p. 85-86*, 93-94, 103.  But of course wearing Pesta down was

the whole point.  *DKT. 57-2.*

We might say, with *Joseph v. Leavitt*, 465 F.3d 87, 91 (2nd Cir. 2006), that "We agree that an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies *in a reasonable manner*." But this investigation was anything but reasonable, as shown above.

**POINT V: THERE IS NO EVIDENCE, INCLUDING THE AFTER-ACQUIRED EVIDENCE, THAT DEMONSTARATES THAT A REASONABLE FACT-FINDER WOULD HAVE REACHED THE SAME CONCLUSION AND INVESTIGATED AND THEN TERMINATED PESTA.**

This is once again an argument handicapped by Defendants' failure to cite to the record in derogation of FRCP 56 (c)(1)(A): there is no citation to any evidence for this argument, with nothing even attached the Dr. Oakes Affidavit referenced in the footnote. *Defense Brief, p. 34.*

To the extent that their arguments now rely on the NIH findings (*Defense Brief, p. 37*), we remind the court that pursuant to CSU's Misconduct Policy, it was obligated to conduct its own investigation and come to its own conclusions, not simply parrot the NIH. *DKT. 56, pp. 172-174; see also, DKT. 52, pp 44, 51-57.* If anything, the fact that Defendant Ward understood that the NIH had turned to disregarding the plain meaning of its own DUCs should have heightened Defendants' sense of responsibility to come to their own findings. The obligation to be scrupulously fair to Pesta should have been foremost in Defendant Bloomberg's mind, for she betrayed knowledge of both Charles Murray's travails and the plight of Dr. Hsu at Michigan State, both of whom are respected academics who have been unfairly attacked (in Murray's case quite literally) merely for discussing the hereditarian position. Furthermore, CSU had already punished Pesta for the NIH's findings.

Nor did Pesta admit "most of the conduct about which the NIH complained," nor "fail to provide explanations for his behavior" (*Defense Brief, pp. 37-38 – see DKT. 38-5, p. 152 for Pesta's actual stance, in contrast to the half-truth Defendants' proffer*); and the fact that the CSU Defendants simply ignored all of Pesta's proof in the past (*DKT. 54, p. 138*) is a poor argument for the present.

To the extent that Defendants mean to reference *DKTs. 47-5,  47-6 and 42-12* for the proposition that Pesta and his "Global Ancestry" co-authors "set out to mislead the NIH and to avoid scrutiny by either NIH or CSU at every turn (*Defense Brief, p. 38*), Plaintiff reiterates his objection to the introduction of such after-acquired evidence.  It is a bar to certain damages or relief, not a defense to liability. *McKennon v. Nashville Banner Pub. Co*., 513 U.S. 352, 362-63 (1995).  Furthermore, even it use as a limitation on damages would involve the court in making factual determinations.   *Stout v. Berry Ins. Group*, S.D.Ohio No. 1:17-CV-155, 2021 WL 3634711, *7–8.

Nor is it even material: there is no coherent argument that either the NIH or CSU was misled in light of Pesta's Third Request, which is why neither the NIH, nor the CSU Final Report ever found that that Pesta had violated the DUC for the Third Request by studying the subject matter of "Global Ancestry."

**POINT VI: QUALIFIED IMMUNITY PROTECTS NEITHER THE MALICIOUS, NOR THE PLAINLY INCOMPETENT.**

This is once again an argument handicapped by Defendants' failure to cite to the record in derogation of FRCP 56 (c)(1)(A).  Yet if Defense Counsel wished to argue in earnest that, "The Individual Defendants reasonably believed that Pesta's conduct with the NIH and CSU was

research misconduct and they had no reason to believe he had a constitutional right to engage in that misconduct," (*Defense Brief, p. 39*), they might at least have proffered an affidavit from each Defendant stating as much. But that effort has escaped them.

There is nothing whatsoever from Defendants Mallet, McLennan, and Regoeczi even in the record. Nor could there be. The five fold farce that is their conclusion as to Pesta's alleged "research misconduct" cannot be rationally defended and said Defendants have abandoned any attempt to do so here. Any attempt to belatedly ambush Pesta on reply would violate the cannon that a party may not on reply supply the defects of their moving papers. *Meriwether v. Hartop*, 992 F3d 492, 518 (6th Cir. 2021); *Sanborn v. Parker*, 629 F3d 554, 579 (6th Cir. 2010).

Nor is Defendant Ward entitled to qualified immunity. Although an affidavit from him is attached, it fails to attest to his good faith. *DKT. 42-2.*  And Defendant Ward's errors are in a sense much more fundamental and go to the heart of the Pesta's mistreatment, as set forth above. So too with Defendant Bloomberg, who likewise never attests to her own good faith.  *DKT.  47-1.*  Moreover, one does not countenance and even commit numerous deviations of the Misconduct Policy *en route* to upholding farcical findings if one is acting in good faith. The most charitable interpretation of Defendants Bloomberg and Ward would be that they were plainly incompetent, rather than malicious. But either way they join Defendants Mallet, McLennan and Regoeczi and should be denied qualified immunity: "The individual defendants may pick their poison: they are either plainly incompetent or they knowingly violated the Constitution." *Business Leaders in Christ v. Univ. of Iowa*, 991 F.3d 969, 990 (8th Cir. 2021) (*J. Kobes, concurring in part/dissenting in part*).   Either way, there is no qualified immunity.

Finally, holding Defendants Ward, Mallett, McLennan and Regoeczi liable does not violate the  holding in *Yerkes v. Ohio State Highway Patrol, No. 22-3030, 2022 U.S. App. LEXIS*

*35260, at \*18 (6th Cir. Dec.19, 2022)*.  In that case, the defendants had essentially done nothing more  than report the alleged policy violations, which they were probably required to do anyway. Here, Defendants Ward, Mallett, McLennan and Regoeczi had wide-ranging discretion about who to talk to, what questions to ask, whether to let Pesta cross-examine, and what to find. Throughout the process, Pesta raised his objections, both technical and substantive, and they chose to ignore them.  *e.g. DKT. 38-5, pp. 85-88, 152-156*.  Their role was not just that of investigator — but *de facto* prosecutors.  There is at least an genuine issue of fact regarding what they did in the process and they should not be able to rely on *Yerkes* for the proposition that unless they are the final decision maker and sign the termination, they escape liability.

Liability in Section 1983 cases is typically analogized to tort cases, where those who contribute to the fault are thereby exposed to liability.  Notably, even *Yerkes* noted that there are many Sixth Circuit cases holding defendants liable who did not perform the final act necessary for the violation or were not the ultimate decision makers, e.g. *Harris v. Bornhorst*, 513 F.3d 503, 518–19 (6th Cir. 2008) (Prosecutor may be held liable for retaliation where she made statements to the Marine Corps leading the Corps to deny the plaintiff's application); *Paige v. Coyner*, 614 F.3d 273, 281–82 (6th Cir. 2010) (Official may be held liable for retaliation where she gave false information to the plaintiff's employer, causing the plaintiff to be terminated from her position); *King v. Zamiara*, 680 F.3d 686, 697–98, 702–03 (6th Cir. 2012) (Prison guards may be held liable for retaliation where they set in motion a chain of events leading to the plaintiff's change in security status); *Sykes v. Anderson*, 625 F.3d 294, 311–316 (6th Cir. 2010) (Police officers may be held liable for malicious prosecution where evidence demonstrated that they influenced/participated in the decision to prosecute the plaintiffs, though they did not make the final decision themselves).

As for Defendant Sands, Defense Counsel fail to raise any reference to his part at all, even in passing. Neither will Pesta at this point, except to note that his absence from the moving papers precludes summary judgment in his favor.

## CONCLUSION

For the above reasons, Plaintiff Dr. Pesta respectfully submits that Defendants should be denied summary judgment.

Dated: August 30, 2024          Respectfully submitted,

<u>Frederick C. Kelly, Esq.</u>
Law Office of Frederick C. Kelly
*Attorney for Plaintiff Bryan J. Pesta*
One Harriman Square
Goshen, New York 10924
(845) 294-7945
fckellylaw@protonmail.com
Bar No. NY4377297