IN THE U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| BRYAN J. PESTA,<br><br>*Plaintiff*,<br><br>- against -<br><br>LAURA BLOOMBERG, in her individual and official capacity; and HARLAN M. SANDS, BENJAMIN WARD, CHRISTOPHER MALLETT, CONOR McLENNAN, and WENDY REGOECZI, in their individual capacities;<br><br>*Defendants*. | Case No. 1:23-cv-00546<br><br>JUDGE DAN AARON POLSTER<br><br>**DECLARATION OF PLAINTIFF BRYAN J. PESTA** |

I, Dr. Bryan J. Pesta, pursuant to 28 U.S.C. § 1746 and under the penalty of perjury declare as follows:

1. I am the Plaintiff herein, am of legal age and have personal knowledge of the matters set forth in this affidavit.

2. I submit the within to rebut the myriad false and / or misleading statements Defendants make in their motion for summary judgment.

3. Unfortunately, Defendants' misstatements are so voluminous that I must divide them into subsections here, and I thank the Court in advance for parsing through all this information.

**CSU's Five Findings Against Me**

4. Regarding the finding that I lied or mislead or falsified my DAR's to mask my interest in studying race / IQ gaps, the record is clear that my Third Request (DAR #19747) squarely focused on this topic. Even CSU's Research Integrity Officer, Dr. Ward, admitted to this fact in deposition. *Ward Deposition, p. 182*. The notion that I violated

the agreement for the Second Request (DAR #19090 - mental health) by conducting a study permitted by the Third Request (DAR #1947) is completely unsupportable.

5. I concede that my coauthors were only interested in conducting the race / IQ study, but this did not apply to me. In fact, I refused to collaborate with them unless we also studied other topics, such as those associated with my First Request (DAR#18007 - sex differences) and Second Request (DAR #19090 - mental health). This point is very clear in the record—see the "Final Report" (p. 26).

6. I respectfully submit that the Defendants' arguments about my alleged "sneakiness," are immaterial, given that my Third Request (DAR #19747) clearly focused on race / IQ gaps, and that this application was approved and renewed by both NIH and CSU.

7. The next finding against me was that I uploaded data to the Dutch server without "prior NIH approval." I did do this, but throughout this entire process I have consistently maintained that this was an honest error on my part, which it was — just as it was honest error on the part of everyone else in the Office of Research Integrity who had also reviewed the issue.

8. Defendants completely ignored several arguments I made illustrating that my omission regarding "NIH prior approval" neither harmed anyone nor rose to the level of research misconduct. Examples include (1) them equating "knowing" I did the upload with my "intent" to commit research misconduct; (2) my argument that no harm existed by my uploads, since other, independent researchers—approved by NIH—uploaded the same data to the same server for the same purpose (i.e., to estimate participant skin color -see Final Report, pp. 86-87 ); and (3) CSU's knowledge (early on in my investigation), that

the "foreign server," curated by Americans, was secure and deleted all uploaded data from anyone within one week. *See Ward Deposition, pp. 298-301*.

9. The next finding against me was that I violated NIH policy by how I reported (or did not) the "preprint" article featuring Hispanic IQ. My response at pp. 157-158 should suffice and I incorporate it by reference.

10. Moreover, as I explained to CSU (and even to the NIH!) several times, NIH reporting requirements differ depending upon whether one is <u>renewing</u> or <u>closing out</u> a DAR for the TCP data. This argument is renewed below in response to Dr. Oakes' expert report.

11. The fourth charge against me (not submitting my research proposal to CSU's IRB) is redundant and obscure. Regarding the former, note that this charge is a complete double-down on CSU's Charge 2; my data upload to the Dutch server.

12. It is undisputed that the NIH's website clearly and unambiguously states that local / CSU IRB is <u>not</u> required to access the TCP database. Even Dr. Ward, initially, expressed this fact to the investigative committee members (our Opposition, pp. 12-13).

13. Nonetheless, CSU ignored the fact that (1) I wasn't aware of my omission regarding the Dutch server until Bird et al. complained about it post facto, fully one year <u>after</u> I applied for the restricted access data (I was not psychic back then); (2) the NIH never charged me with failure to secure CSU IRB; (3) even complainant, Dr. Kent Taylor, retracted his claim that I needed IRB approval for these topics, when he realized he was wrong; and (4) the data I acquired were archival—versus involved me "running" actual human subjects to collect the data.

14. IRB is concerned with the protection of "human subjects" research. But under the CFR, "human subjects" research is a term of art, specifically defined at 45 CFR 46.102(e)(1).

    The reason why it does not seem necessary to obtain IRB approval is that analysis of the TCP database does not qualify as research involving "human subjects" as that term is defined in the CFR.

15. Neither I nor anyone on my team conducted any research where anyone obtained information or biospecimens through "intervention" or "interaction" with any individuals. The original study that produced the TCP may very well have included "intervention" and "interaction," but neither I nor my team undertook such actions using the already archived date in the TCP.

16. Notably, there was no finding by the committee that we did obtain any such information or biospecimens.

17. Nor did I or anyone one on my team obtain, use, study, or generate "private information or identifiable private specimens for his studies under 45 CFR 46.102(e)(5) and (6).  And again, the committee made no such finding that we had obtained, used, studied, or generated "private information or identifiable private specimens." *Cf. Final Report.  See also Ward Dep., p. 300.*

18. Once the initial study that produced the TCP was completed, the data becomes "archival" and different ethical considerations obtain.  *Ward Dep, pp. 274-275*.  Even Defendant Bloomberg shared this understanding of the TCP database as archival data, in contrast to the research done by the scientists who performed the original study that produced the TCP database. *Bloomberg Dep, p. 210*.

19. More tellingly, CSU itself admits in their own Opposition (p. 8) that "*Because the NIH has total control of the data, only the NIH can determine the circumstances under which access to the data will be granted.*" If this is true, why was CSU IRB approval needed in

the first place!? This was an argument I made throughout my investigation, yet CSU <u>completely</u> ignored it.

20. The final CSU finding regards the 501(C)(3) John and I created to both promote hereditarian research and to support John's education. Their assertion here is mind-numbing and vague.

21. No evidence exists that I intentionally violated (nor even merely disregarded) CSU's Conflict of Interest policy, which is apparently the key issue determining whether I did or did not commit research misconduct on this issue after Defendant Bloomberg simply read the Conflict of Interest policy into this finding.  *Bloomberg Dep, pp. 262-266*. interpreted  (see §IV. H  Compliance).

22. In fact, and in the record, when I requested that CSU's investigative committee explain how I might have violated this policy, they refused to do so.

23. Additionally, I (1) begged CSU more than once to state the policy that I may have violated by creating the non-profit (CSU completely ignored my pleas); (2) begged CSU to state how receiving private funds from private people interested in our research in any way harmed (and / or created a conflict of interest for) CSU; (3) inquired as to how John Fuerst using the funds to pay for <u>his</u> tuition, <u>his</u> uber rides and <u>1/2</u> the pizza we consumed was "on me;" and (4) how CSU's Conflict of Interest Policy (*applied post-facto to me*) was relevant, since **none** of my research featuring the TCP data was funded by a government agency.

24. In any event, CSU's Conflict of Interest Policy is attached hereto. As the court can see, it is a fairly complex policy, divided into five sections and spanning numerous subparts.  It is manifestly unfair to assert, in conclusory fashion, that I committed research misconduct

by violating this lengthy policy, without ever specifying how I did so, or what particular aspects of the policy were implicated.

25. Despite its complexity, we can say at the outset that the Conflict of Interest Policy <u>could not</u> serve as the basis for a charge of research misconduct against me because of the language of the policy at <u>§V(G)(2) (Compliance</u>), which provides that: "Intentional disregard for this policy, including non-adherence to the agreed upon management plan, shall constitute serious misconduct and may be the basis for an academic research misconduct inquiry."

26. This focus on "intentional disregard" of the policy is repeatedly stressed, for it also appears further up in the policy at *§IV. H (Compliance)*, which likewise holds that it is only "intentional disregard" of the policy that constitutes serious misconduct and which *may* form "the basis for an academic research misconduct inquiry."

27. There was no finding that I had intentionally disregarded the Conflict of Interest Policy. That finding is not made by the committee (*Final Report, p. 7-8*), and would have flatly contradicted what Defendant Mallet stated of me in his deposition, which was that I "was more than forthcoming and honest and open in our conversations" (*Mallet Dep, p. 170*), which means that when I stated that I was not aware of how the conflict of interest applied (*Final Report, p. 106*), I meant it.

28. More than that, the 501(c)(3) money was not captured by any specific application of the rules of the policy, which are found at §III (B), subparts (1), (2), (3) and (4).

### The "Warne email" Defendants Cite to Prove my "Sneakiness"

29. CSU's Motion for Summary Judgment (p. 11) states (emphasis added by me):

> The Global Ancestry paper was not the only time Pesta and Fuerst were willing to mislead the NIH on the nature of their intended research. On June 4, 2020, Dr. Russell Warne42, another researcher on this subject, wrote to Pesta to say the following,

> "Bryan, I'm writing to make a request that is very important. I need [you to] remove my name from the genomics manuscript that was resubmitted to Intelligence.
>
> There are two reasons for this. The first is personal. If someone found out that I was a front to gain access to the data and that I really had no hand in the creation, execution, or write-up of the study, then the effects could be drastically negative for me. Even if our actions comply with the letter, but violate the spirit of the data access agreements, the risk of negative consequences would still be too great. I'm not sure that tenure would protect me from consequences of violating the data use agreement, and I have a family to worry about…
>
> **Pesta and Fuerst refused to take Warne's name off the referenced paper until after it had been resubmitted to the scientific journal.44 Thus, once again, their actions were "sneaky.**

30. The email chain CSU refers to here (Doc #42-12) plainly shows that CSU's claims are incorrect and / or misleading.

31. First, it is apparent that Doc #42-12 regards the Hispanic IQ paper (a/k/a "the Preprint"), for which CSU "convicted" me of publishing without permission, even though my name does not appear as an author of the officially published version of this paper.

32. It is also clear in this document that I served solely as a middleman. Nowhere in any of this email chain do I reply to either John Fuerst (JF) or Russell Warne (RW).

33. As such, I did not personally *refuse* to take RW's name off the paper.

34. It is also misleading to state that JF *refused* to take RW's name off the paper, in that (1) JF obviously has no power to force anyone to author a paper against his will, and (2) instead, JF simply wanted RW to postpone his decision until the Journal, *Intelligence*, decided to either accept or reject the Hispanic paper (CSU Document 42:12, p. 11). This is apparent in the very email chain CSU provided to "support" its "sneakiness" claim:

> [JF] … Dear Russell, We agree to remove you from the paper, unless you change your mind, but at a more expedient point in the process.
>
> See also, p.12:
>
> [JF] … Russell, Bryan and I resubmitted the TCP Hispanic paper the other day.
>
> As agreed, we left your name on. **However, in the unlikely event that it will be accepted, we will take your name completely off as agreed**. [Note. The journal, Intelligence, ultimately rejected the paper.]

35. It is also clear from this email chain that RW's request to remove his name from the Hispanic paper was not motivated by us being "sneaky," but by his concerns that he didn't contribute enough effort to justify co-authorship (CSU Document 42:12, p. 10):

    [RW] John,

    I don't care when my name is removed. If it makes it easier to remove it after the pending decision from Intelligence, then so be it.

    While I was part of the early talks ==and I did get dbgap access==, I did not do anything else. Even if the controversy weren't enough to give me cold feet, it still doesn't change the fact that I do not feel that I have contributed enough to warrant authorship.

    See also Doc # 42-12, p. 12):
    [JF] …That said, if the concern is genuinely or simply that you feel your authorship is not presently justified, why not contribute with the difficult review reply and the overhaul of the introduction and discussion!

36. Also critical in this email chain (but ignored by CSU) is why JF (in the first place) pressured RW to hold off removing his name until the Journal decided to either reject or accept the Hispanic paper. The reason is that RW had his own legitimate access to the TCP data (without any participation from me), through his own university (see the comment I highlighted in point # 30 above). See also Doc # 42-12, p. 11:

    [JF] My reason is practical. Both you and Bryan were identifiable to reviewers in the paper by virtue of the statement of [the TCP] data access.

37. Thus, if reviewers of the Hispanic paper demanded additional analyses on the restricted access side, JF and RW could do these legitimately by having RW submit a new DAR.

38. *This fact also indirectly proves that JF neither had the TCP data, nor was willing to violate NIH rules*. Why else would JF be so insistent on keeping RW on as coauthor on this paper? To wit, see also Doc # 42-12, p. 11:

    [JF] … Regarding data, the agreement was that if reviewers requested novel analyses which Bryan I and could not do then we I would somehow go through you as a backup.

**Blatant Factual Errors in CSU's Expert Report (Professor Oakes)**

39. As submitted by Defendant's counsel, I have reviewed the expert report provided by Professor J. Michael Oakes, dated May 21, 2024. Oakes' expert report contains frequent and blatant factual errors, which I document below [emphasis below supplied by me]:

40. <u>False Claim #1</u>: In myriad places in his report, Oakes alleges that I falsified my NIH applications by not listing my student, John Fuerst, as a "**collaborator**:"

> <u>Page 21</u>. "**Because Pesta represented himself as the sole principal investigator** in the data requests he was fully responsible for the content of all data requests and all analyses with the controlled data. Given the unapproved work of Lasker et al, Pesta misled the NIH. Put differently, **Pesta falsified NIH requests for controlled data**."
>
> <u>Page 27</u>. "**By not listing any collaborators** Pesta conveyed to the DAC that he alone had access to the controlled data. Of course this was not true."
>
> <u>Page 28</u>. "In any case, **in clear violation of the relevant DUC**, **Pesta permitted at least John Fuerst, a part-time CSU student, access to controlled data**."
>
> <u>Page 30</u>. "As PI of the project, author of the DARs, and signatory to the DUCs, Pesta is solely responsible for any and all ongoing research using controlled data by Fuerst or others, past, present, and future. **By inappropriately granting Fuerst access**, and not having a mechanism to destroy the data upon NIH access suspension/termination, **Pesta violated NIH policy**."
>
> <u>Pages 35-36</u>. "Dr. Mike Lauer, NIH's Deputy Director for Extramural Research, was spot on in his 27 May 2021 letter to Pesta. Lauer alerted CSU that Pesta, and thus CSU, were in violation of the DUC. Specifically: **Failure to secure controlled data from inappropriate third-party use (e.g., Fuerst)**."
>
>> <u>Note</u>. The NIH letter that Oakes refers to appears on Page 22 of Exhibit 5 (i.e., CSU's Final Report). See, specifically, my point (6) below on this issue.
>
> <u>Pages 14, 15, 18</u>. Oakes underscores his bogus argument above by stating that "**No collaborators were listed,**" for any of the first three applications I submitted for TCP.

41. <u>Oakes Claim #1 is Patently False</u>: When submitting my first three applications for the TCP data, I relied on various online NIH documents and / or tutorial videos for guidance. All these made clear distinctions between a "**collaborator**" and an "**approved user**." The NIH quotes and links below show that **Fuerst was never a "collaborator"** for any of my first three applications for the TCP dataset. Instead, **he was always an "approved user** (and thus didn't even need to be listed on the Data Access Request):

1. https://www.ncbi.nlm.nih.gov/projects/gap/cgi-bin/GetPdf.cgi?document_name=GeneralAAInstructions.pdf

"… Trainees and staff directly supervised by the PI, such as **graduate students**, postdoctoral fellows, and technicians, **do not need to be listed on the project request**."

2. https://www.ncbi.nlm.nih.gov/books/NBK570242/#DAreq_ControlledAcc.Overview\

"… generally speaking, a **collaborator is meant to include staff with an official appointment at your institution, and not supervised students and technical staff**..."

3. https://sharing.nih.gov/accessing-data/accessing-genomic-data/how-to-request-and-access-datasets-from-dbgap

"… Laboratory staff and trainees such as **graduate students** and postdoctoral fellows are not permitted to submit data access requests in dbGaP. However, they **may be part of projects using such data when the projects are overseen by an eligible user [Pesta]**."

4. https://dbgap.ncbi.nlm.nih.gov/aa/wga.cgi?page=DUC&view_pdf&stacc=phs000688.v1.p1

"… **trainees under the direct supervision of the PI are also Approved Users** and must abide by the terms laid out in the Data Use Certification Agreement ... **Collaborator**: **An individual who is** not under the direct supervision of the PI (e.g., **not a member of the PI's laboratory**) who assists with the PI's research project involving controlled-access data subject to the NIH GDS Policy."

5. Even in Defendant's "Final Report" (Exhibit 5), which was presumably supplied to Oakes as he prepared his report, Complainant Kevin Bird admits (p. 14): "**Pesta's DAR would therefore grant authorized access to himself and Fuerst**, who is also affiliated with the requesting institution…"

6. This point refers to Oakes' "Spot on" comment above regarding NIH Deputy Director Lauer's (May 27, 2021) email to Pesta [as cited above]. Even in Defendant's "Final Report" (Exhibit 5), which was presumably supplied to Oakes as he prepared his report, NIH Deputy Director Lauer therein states [*Exhibit 5, p. 22*]:

   … As the DUC states, the requester [Pesta] agrees that if access is approved, the PI named in the DAR and those named in the "Senior/Key person profile and **any trainee, employee, or contractor working on the proposed project under the direct oversight of these individuals, shall become approved users** of the requested datasets ...

7. Finally, even in their Motion for Summary Judgment (p. 9), CSU admits that John Fuerst was an approved user and not a collaborator:

   The DUC provides that the Principal Investigator named in the DAR and "**any trainee** or employee working on the proposed research project under the direct supervision of these individuals, **shall become Approved Users** of the requested dataset(s)."

42. <u>False Claim #2</u>: Oakes claims: "Highly cited peer-reviewed papers using the [TCP] data uniformly focused on mental health and cognitive outcomes **without regard to race or racial ancestry** and include … (thereafter Oakes provides a list of 10 publications that presumably support his allegation; pp. 10-11)." [*Note*. No page numbers appear on the publications I cite below]:

   1. Calkins et al (2014). The psychosis spectrum in a young US community sample: findings from the Philadelphia Neurodevelopmental Cohort…

**SEE**: "The psychosis spectrum group was disproportionately **non-European American** and had lower WRAT-4 Reading standard scores [*an IQ test*], parental education, and global functioning."

**SEE**: "Male gender, younger age, and **non-European American ethnicity** were significant predictors of spectrum status."

**SEE:** Table 1, which clearly features "**race / ethnicity**."

2. Robinson, et al (2015). The genetic architecture of pediatric cognitive abilities in the Philadelphia Neurodevelopmental Cohort…

**SEE**: "(a) The PNC participants were selected at random after **stratification by** sex, age and **ethnicity**."

**SEE**: "**these analyses were limited at the outset to the subset of participants who identified themselves as white non-Hispanic** (WNH; n=5,141)." [i.e., why exclude non-Whites if race was irrelevant to their study?]

3. Moore et al (2016). Characterizing social environment's association with neurocognition using census and crime data linked to the Philadelphia Neurodevelopmental Cohort...

**SEE**: "Conclusions… Our results are consistent with literature indicating that individual-level socio-demographic characteristics (e.g. **race** and gender) and aspects of familial social capital (e.g. parental education) have statistical relationships with neurocognitive performance [*i.e., IQ*]."

**SEE**: "Some limited amount of information on the home environment is typically collected from research participants, such as … **ethnicity proportions**… can be extrapolated based on their home address."

**SEE**: "Finally, some individual-level variables were obtained … These include … **race**."

**SEE**: Table 3 which clearly features "**race**."

4. Gur and Gur (2016). Sex differences in brain and behavior in adolescence: Findings from the Philadelphia Neurodevelopmental Cohort. Neuroscience & Biobehavioral Reviews…

Oakes is correct in that this paper makes no reference to race/ethnicity.

5. Calkins et al (2017). Persistence of psychosis spectrum symptoms in the Philadelphia Neurodevelopmental Cohort: a prospective two-year follow-up…

**SEE**: "Persistence of psychotic-like experiences in youths has also been **associated with** other forms of psychopathology14, 15, cannabis use, childhood trauma, developmental problems, **ethnic minority status**."

**SEE**: Table 2, which clearly features "**ethnicity**."

**SEE**: "In a series of investigations, we have found baseline psychosis spectrum status to be associated with … **minority ethnic group membership**."

**SEE**: "Although **ethnic minority status** was more common in the Persistent, Resilient and Emergent groups than in the Typically Developing, it was not a significant predictor of symptom persistence when correcting for other demographic and clinical features, including psychosis spectrum severity and global functioning. This finding appears inconsistent with other lines of evidence from non-US cohorts suggesting that **ethnic minority status** is a significant predictor of symptom persistence13. The experiences of **ethnic minority groups** in the US may differ in salient ways from those in other countries, yet some effects of being an **ethnic minority** could be similar. Ongoing follow-up of the Philadelphia Neurodevelopmental

Cohort sample will allow us to **further investigate** the stability of our current finding, as well as additional risk and protective **factors that may differentially impact ethnic groups**."

6. Merikangas, et al (2017). Parental age and offspring psychopathology in the Philadelphia Neurodevelopmental Cohort…

**SEE**: "Four models were run: 1) crude analyses; 2) adjustment for sociodemographic variables (age, sex, **race**, SES) ..."

**SEE**: "These rates differed slightly by age, **race**, and sex."

**SEE**: Table 1, which clearly features "**race**."

7. Scott et al (2017). Cognitive functioning of adolescent and young adult cannabis users in the Philadelphia Neurodevelopmental Cohort...

**SEE**: Table 3, which clearly features "**race**."

8. Shafee et al (2018). Polygenic risk for schizophrenia and measured domains of cognition in individuals with psychosis and controls…

Oakes is correct in that this paper makes no reference to race/ethnicity.

9. Barzilay, et al (2019). Association between traumatic stress load, psychopathology, and cognition in the Philadelphia Neurodevelopmental Cohort…

*Note*. I was unable to access this paper.

10. Kaczkurkin et al (2019). Evidence for dissociable linkage of dimensions of psychopathology to brain structure in youths…

**SEE**: Table 1, which clearly features "**race**."

43. <u>Oakes Claim #2 is obviously false</u>: In sum, I was able to access nine of the ten papers

Oakes cited above when he claimed:

> Highly cited peer-reviewed papers using [TCP] data uniformly focused on mental health and cognitive outcomes **without regard to race or racial ancestry** … (pp. 10-11).

However, of these nine papers, seven (78%) indeed focused largely, or at least partly, on

"race." The very papers that Oakes himself cites indeed show that his claims are false.

44. <u>False Claim #3</u>: Oakes claims I committed Academic Research Misconduct (i.e.,

<u>falsification</u>) by not notifying NIH of the Lasker et al. publication:

> <u>PP. 25-26</u>: Pesta misrepresents the NIH policy and the very DAR he agreed to. Pesta was obligated to report the actual publication of the Lasker et al paper, which occurred on 30 August 2019 on his 3 December 2019 renewal application for DUC #19747, but Pesta said nothing about it… Given the failure to at least report the Lasker et al paper, Pesta misled the NIH. Put differently, Pesta <u>falsified</u> reports to NIH.

Oakes then presents the following timeline to purportedly prove his claim:

| Page 18: | # Project | # | Submitted | Renewal | Closeout |
|---|---|---|---|---|---|
| | 18007 | 67931 | 4/12/2018 | N/A | 6/28/2019 |
| | 19090 | 70647 | 7/15/2018 | **8/29/2019** | 9/15/2020 |
| | 19747 | 73948 | 9/19/2018 | 12/03/2019 | 2/06/2021 |

Pages 23-24: The Lasker et al (2019) paper was:

> Submitted to the journal for review on 6/8/2019
>
> Accepted for publication on 8/28/2019
>
> Published online on **8/30/2019**

45. <u>Oakes Claim #3 is patently false</u>: Please see Plaintiff's Exhibit 10, which features more dates than those Oakes reported above. The additional dates are relevant because NIH reporting requirements differed depending on whether I was either **renewing** or **closing out** an application:

1. I **renewed** access to #19090 on 8/29/19. For renewals, NIH's website asked me to **list only publications or conference presentations** that resulted from my use of the data to date (see, Binder, p. 125, for an example of a renewal application).

   Regarding the reporting of publications: NIH defines the "official date of publication" as (https://sharing.nih.gov/faqs#/public-access-policy):

   > NIH determines the official date of publication for the public access policy based on information received from the publisher… **The official date of publication is listed in the PubMed citation display for a paper immediately after the journal title abbreviation** … An "epub ahead of print" date for a citation in PubMed is not considered the official date of publication, and these papers are still considered in press.

   It is undisputed that Lasker et al.'s "publication date" is 8/30/2019. As such, I appropriately did not report Lasker et al. in my renewal of #19090 on 8/29/2019.

2. Next in this chronology, I renewed #19747 on 12/3/2019 (Binder, p. 125). The *renewal* asked me to list any publications since my *last renewal* of the TCP data. However, and from Exhibit 10:

   > [12/3/2019] … BJP applied to *renew* #19747 (on race / IQ). Here, verbatim, NIH required BJP to report any "official publications" *since NIH last approved his use of the TCP data*. The last NIH approval, however, was for #19090 on 9/23/19 [*date not listed by Oakes*]. Since Lasker et al. was published prior to this date (i.e., 8/30/19), BJP appropriately did not report it for the *renewal* of #19747.

> <u>Note</u>. I would have been required to report Lasker et al. when *closing out* both #19090 (9/15/20) and #19747 (2/6/21). These dates, however, were well after both CSU and NIH complained (as early as 9/19/19) about the Lasker et al. paper, and I was already immersed in the investigation that would lead to my termination (i.e., at this time, NIH was obviously aware of the Lasker et al. paper).

46. Complying with NIH's data-access and reporting requirements can be confusing, apparently even to the NIH itself and the expert here. But the timeline above shows that my conduct on this issue does not even rise to the level of "honest error" let alone "intentionally falsifying records."

47. Finally, Oakes also wildly speculates that I was nonetheless obligated to report the Lasker et al. paper **before** it was officially published:

> **Page 24**: As for publication, it is widely if not universally accepted scholarly practice to report accepted but not yet officially published papers as "in press," such that the citation for the paper to NIH would be …
>
> … This [sic] because scholars want credit for their hard work as soon as it is defensible to garner it, which is at the time of acceptance. The well-recognized and oft discussed scholarly culture of "publish or perish" is tied to this understanding, especially among full-rank professors. Full-rank professors, Deans, and Provosts welcome such citations in their reviews of junior faculty and routinely count In Press papers as meaningful progress; in other words, such work count as publications for promotion …

However, I do not share Oakes' apparent desire for immediate validation whenever I publish something. To wit, I was a full professor at CSU. Even assuming I *published nothing after tenure*, I would still not be fired (at least presumably, except for the instant case).

48. At CSU, the only penalty for a full professor who doesn't "publish enough" is that he or she must teach additional classes each semester. Specifically, in the College of Business at CSU, tenured professors must publish at least three manuscripts every five years or be forced to teach more classes. As per my CV (Exhibit 1), I absolutely did not need "another publication" to avoid the penalty of having to teach more classes each semester.

49. Dr. Oakes makes much of the fact that I was allegedly the editor at the time Lasker et al. was published in *Psych*. But by the time the Lasker et al. paper was published on 8/30/19, I

was no longer the editor of the journal *Psych*. We appear to have parted ways no later than late June of 2019, based on the emails from Professor Warne at DKT. 42-6.

50. Dr. Oakes, like Defendant Bloomberg in her affidavit at DKT. 47-1, indicates that primary responsibility for ensuring compliance with the NIH regulations rested with me. This is not true. While I did share in ensuring compliance, the documentary evidence of the DUC and the "GDS Best Practices" form (DKT. 38-8) places ultimate responsibility with CSU.

**Misleading Statements Regarding My Prior Research in this Area**

51. Defendants' Motion for Summary Judgment (pp. 5-6) states (emphasis added by me):

> Pesta testified that he began to publish in the intelligence and race/ancestry area in 2008 before he was awarded tenure at CSU. *Of the thirteen papers Pesta published between 2008 and 2014, nine related to intelligence and race/ancestry* **or some other subgroup**. All the papers predated CSU's promotion of Pesta to full professor. Among the paper titles predating Pesta's promotion to full professor were: (1) "Putting Spearman's Hypotheses to Work: Job IQ as a Predictor of Employee Racial Composition"; (2) "Does IQ Cause Race Differences in Well-Being"; (3) "Only in America: Cold Winters Theory, Race, IQ and Well-Being"; and (4) "Black-White Differences on IQ and Grades: The Mediating Role of Elementary Cognitive Tasks.

52. There are gross inaccuracies in Defendants' claims here, perhaps caused by confusion during my deposition on this issue. For example, Defendants count included two articles I published in 2016, which is outside the time frame they specified above. Moreover, Defendants' count excluded two book chapters that I published between 2008-2014.

53. The correct count is that I published 15 articles between 2008 and 2014.

54. None of these 15 articles featured NIH restricted-access data, nor focused on the explosive topic of whether DNA can mediate race differences on IQ tests. To wit, no one internal or external to CSU ever complained about any of my earlier papers.

55. Moreover, in one of the papers Defendants cite above (#3, "Cold Winters Theory"), I used non-genetic data to actually argue against the hereditarian hypothesis.

56. CSU implies that nine of these 13 [actually 15] articles (69%) [60%] focused on race and IQ, but they apparently included in their count any article looking at race/ancestry **or** "some other subgroup" [as I emphasized in bold above].

57. These other subgroups did not constitute "powder-keg topics," again in stark contrast to the genes/race/IQ focus of the Lasker et al. paper.

58. To reach their count of 9/13 [actually 9/15], CSU apparently included my studies on IQ and democrat versus republican voters; religious versus non-religious CSU students, and low versus high-performing CSU MBA students.

59. In fact, of the 15 papers I published between 2008 and 2014, only two (13%, vs. CSU's claim of 69% above) focused on race /IQ gaps. Again, none of these articles featured genetic / NIH restricted access data. I append below citations for these 15 articles, plus brief summaries of each.

60. Finally, I would like to stress that prior to the Bird et all complaints and then the NIH, no one of any substance had complained about my research in Lasker et al. /ak/a "Global Ancestry."

---

I, Dr. Bryan J. Pesta, pursuant to 28 U.S.C. § 1746, declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 30, 2024.

                                                */s/ Bryan J. Pesta*  
                                                Bryan J. Pesta

Appendix

Brief Summaries of Articles I've Published Between 2008-2014

1. Pesta, B., & Poznanski, P. (2014). Only in America: Cold Winters Theory, race, IQ and well-being. Summary: Using non-genetic data, we show that temperature across the 50 US states predicts each state's IQ level. This finding is inconsistent with hereditarianism. **Note. This paper indeed focuses on race / IQ gaps.**

2. Pesta, B., & McDaniel, M. (2014). State IQ, well-being, and racial composition as predictors of U.S. presidential election outcomes. Summary: We show that presidential election results for each of the 50 US states can be predicted by the state's IQ and percent minority composition (vs IQ gaps therein). **Note. This paper does not focus on race / IQ gaps.**

3. Bertsch, S. & Pesta, B. (2014). Generating active learning. Summary: This paper relates to the study of human memory. **Note. This paper has nothing to do with IQ.**

4. McDaniel, M., Pesta, B., & Banks, G. (2012). Job performance and the aging worker. Summary: This book chapter focuses on how growing older affects job performance. **Note. This paper has nothing to do with IQ.**

5. Pesta, B., Bertsch, S., McDaniel, M., Mahoney, C., & Poznanski, P. (2012). Differential epidemiology: IQ, neuroticism, and chronic disease by the 50 U.S. states. Summary: We show that a US state's health levels can be strongly predicted by each state's IQ and level of Neuroticism. **Note. This paper does not focus on race / IQ gaps.**

6. Palmieri, P., Peterson, L., Pesta, B. & Saettone, D. (2011). Safety culture as a contemporary healthcare construct: theoretical review, research assessment, and translation to human resource management. Summary: This book chapter focuses on the construct of "Safety Culture" in hospital settings. **Note. This paper has nothing to do with IQ.**

7. Pesta, B., & Scherer, R. (2011). The assurance of learning tool as predictor and criterion in business school admissions decisions: New use for an old standard? Summary: We show that the assessment criteria CSU's uses for its graduate MBA students possess high validity, and parts of it may be helpful in admissions decisions as well. **Note. This paper has nothing to do with IQ.**

8. Bommer, W., Pesta, B., & Barnes, S. (2011). Nonverbal emotion recognition and performance: Differences matter differently. Summary: We test whether skill at perceiving non-verbal cues predicts performance criteria. **Note. This paper has nothing to do with IQ.**

9. Pesta, B., McDaniel, M., & Bertsch (2010). We can't get no (life) satisfaction: Comment on Oswald and Wu. Summary: This is an editorial we published that was critical of a different author's study on the Well-being of the 50 U.S. states. **Note. This paper does not focus on race / IQ gaps.**

10. Pesta, B., McDaniel, M., & Bertsch, S. (2010). Toward an index of well-being for the 50 U.S. States. Summary: We created an index of well-being for each of the 50 US states, part of which comprised each state's overall IQ level. **Note. This paper does not focus on race / IQ gaps.**

11. Pesta, B. (2009). Revisiting disparate impact claims under the ADEA: A brief review and statistical primer. Summary: A statistical primer on how to determine if a selection-method creates disparate impact. **Note. This paper has nothing to do with IQ.**

12. Bertsch, S., & Pesta, B. (2009). The Wonderlic Personnel Test and elementary cognitive tasks as predictors of religious sectarianism, scriptural acceptance, and religious questioning. Summary: We show that IQ scores can predict how religious someone is or is not. **Note. This paper does not focus on race / IQ gaps.**

13. Pesta, B., & Poznanski, J. (2009). The inspection time and over-claiming tasks as predictors of MBA student performance. Summary: We show that IQ scores indeed predict success for students in CSU's MBA program. **Note. This paper does not focus on race / IQ gaps.**

14. Pesta, B., Bertsch, S., Poznanski, P., & Bommer, W. (2008). Sex differences on elementary cognitive tasks despite no differences on the Wonderlic Personnel Test. Summary: We show that small sex differences may exist on IQ tests that primarily measure the "speed of information uptake." **Note. This paper does not focus on race / IQ gaps.**

15. Pesta, B., & Poznanski, P. (2008). Black-White differences on IQ and grades: The mediating role of elementary cognitive tasks. Summary: We show IQ test scores statistically explain race gaps for student GPAs. **Note. This paper indeed focuses on race / IQ gaps.**