IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRYAN J. PESTA, | ) | CASE NO. 1:23-CV-00546-DAP |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | |
| | ) | |
| LAURA BLOOMBERG, et. al. | ) | **REPLY BRIEF IN SUPPORT OF** |
| | ) | **DEFENDANTS' MOTION FOR SUMMARY** |
| Defendants. | ) | **JUDGMENT** |

## I. Introduction

The Defendants moved this Court for summary judgment in their favor on all Counts of the Complaint ("Defendants' Motion"). Defendants offer this brief in reply to Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment ("Pesta's Brief"). Defendants incorporate by reference Defendants' Motion and Defendants' Brief in Opposition to Plaintiff's Motion for Summary Judgment.

In several places in the Pesta Brief it is claimed that Defendant's Motion should be denied because Defendants' Motion did not contain citations to the record in the legal argument portion of Defendants' Motion.[1] This argument wholly ignores that in the Statement of Fact section of Defendants' Motion, the facts stated are well supported by the record and those facts are simply repeated as needed in the legal argument. Pesta goes on to argue that Defendants "make no attempt to justify" the findings of the investigation of Pesta' misconduct.[2] Put simply, this argument is ridiculous.

---

[1] For example, see Pesta's Brief at p.5
[2] Pesta's Brief at p.5.

1

> **II. The Undisputed Evidence Shows that Pesta Withheld Information About His Research Contrary to the Requirements of the Data Use Certification ("DUC") Agreement, NIH Security Best Practices, and Commonly Accepted Research Practices**

Pesta hinges most of his arguments in opposition on the idea that because he referenced both race/ancestry and intelligence in his third Data Access Request to the NIH, he appropriately followed the DUC Agreement he signed.[3] Pesta is wrong.

Pesta does not dispute the underlying facts regarding his three requests to the NIH to access the TCP Data. Those Data Access Requests are set forth in the chart on page 12 of Defendants' Motion. The chart refers to the language actually used in the Data Access Requests submitted by Pesta.[4] Pesta concedes both that his first and second requests for the controlled access data did not state any purpose that had anything to do with studying race and intelligence and that he did not make use of the data for the purposes stated in his first two data requests.[5] It is only the third Data Access Request that references in any way both intelligence and race, which was the subject of Pesta's paper Global Ancestry and Cognitive Ability ("Global Ancestry Paper"). However, what Pesta told the NIH he was going to study in the third Data Access Request submitted on September 19, 2018 is not the same as the study he presented in the Global Ancestry Paper. In his third Data Access Request to the NIH, Pesta described his research study as follows:

> "Several recent studies have constructed polygenic scores (PGS) for various traits. . .Of significant concern is the transethnic validity of PGS.. . This situation potentially limits the utility of PGS for epidemiological research.
>
> However, the method of construction of PGS is a critical factor in determining transethnic validity. PGS which capture more common causal variants are expected to be more generalizable than ones which capture more tag variants. This is because linkage

---

[3] Pesta's Brief at p. 1
[4] See Pesta Depo Ex. 7 (the First DAR), Ex 9 and 11 (the Second DAR and progress report), Ex. 12 and 13 (the Third Dar and progress report). See also, Pesta Depo Ex. 10, prepared by Pesta that confirms the chart on page 12 of Defendant's Motion.
[5] See Pesta's Brief at p. 6.

disequilibrium decay, which reduces predictive validity across populations, is less of a problem. ***We propose to research the effect of PGS construction on the transethnic validity of PGS for two traits: educational attainment and schizophrenia***. We shall also discuss best practices for constructing and reporting PGS."[6]

This language should be contrasted with what Pesta told his CSU college administrators in his request for a sabbatical in September 2018, i.e., in the same time frame,

> "***The research question we want to address is why some people (and groups of people) are smarter than others***. The question is critical because intelligence appears to be 'the most powerful variable in social science'. . . Our strategy is first to use admixture analysis (based on the genomic data present in the NIH/NIMH data sets) for the participants in these various data sets. ***This technique essentially estimates a person's ancestry in terms of percentages across various ancestral groups.*** The next step would be to see if these ancestry estimates predict cognitive ability. In addition, we also seek to pit 'self-identified' (i.e., check a box) ancestry with genomic ancestry to which (if either) best predicts cognitive ability."[7]

The language that Pesta employed in the Global Ancestry Paper, published on August 30, 2019, included the following,

> "Using data from the Philadelphia Neurodevelopmental Cohort, we examined whether European ancestry predicted cognitive ability over and above both parental socioeconomic status (SES) and measures of eye, hair, and skin color. . .First, using multi-group confirmatory factor analysis, we verified that strict factorial invariance held between self-identified African and European-Americans. The differences between these groups, which were equivalent to 13.72 IQ points, were primarily due to difference in general cognitive ability ($g$), consistent with Spearman's hypothesis. ***. . . Results converge on genetics as a potential partial explanation for group mean differences in intelligence***."[8]

Clearly, the research purpose stated in Pesta's request for a sabbatical is much closer to the statement contained in Pesta's Global Ancestry Paper as opposed to what he described as his proposed use of the data to the NIH. Thus, the only conclusion is that in the third Data Access Request to the NIH he hid the true research purpose. As Defendants' expert Dr. Michael Oakes described, "[Pesta's proposed analysis for the third Data Access Request] did not endeavor to

---

[6] Pesta Depo Exhibits 12 and 13. (Emphasis added; citations omitted).
[7] Pesta Depo V1, p. 59, Ex.4 and 52 thereto (emphasis added).
[8] Pesta Depo Exhibit 3 at page 1 (B, N, r, d, n and p references omitted.)

explain differences in intelligence, e.g., by racial ancestry. For this request, Pesta is solely focused on the impact of different methods of PGS construction and the correlation of his various PGS's with mental health and cognitive outcomes. Any observed differences in estimated correlations in the proposed analyses using race would not be credibly compared since analyses by race would be independent of one another."[9]

Of course, differing statements by Pesta about the purposes of his request for the data and Dr. Oakes' expert view are not the only bases for determining that Pesta failed to comply with the DUC Agreement. The NIH said he failed to comply. And of course, it is the NIH that controls this data.

The NIH's conclusion in its August 17, 2021 letter to Pesta that he failed to properly restrict his research to the purposes approved by the NIH is well supported by the evidence. The NIH noted that in Pesta's close out report for his second Data Access Request he said, "For this DUC (#19090), we set out to conduct two main analyses. First, we examined the relation between polygenic scores for intelligence/education (eduPGS) and general cognitive ability. The ultimate goal is to see if eduPGS can help identify and understand intellectual handicaps."[10] Setting aside for the moment whether this statement accurately portrays the Global Ancestry Paper, Pesta reported the publication of the Global Ancestry Paper in his close out report of his second Data Access Request. His second Data Access Request had nothing to do with intelligence and race. He also did not report the Global Ancestry Paper in his report for his third Data Access Request.

In addition to those clearly planned omissions, and as noted by the NIH, Pesta also failed to provide accurate annual reports about what he was doing with the data.

The DUC Agreement provides,

"Through submission of the DAR, the **Principal Investigator also agrees to submit annual data use reports** to the appropriate NIH Data Access Committee describing the research use of the Approved users as described under 'Research Use Reporting' below.

---

[9] Dr. Oakes report was inadvertently omitted as an attachment to his affidavit filed with Defendants' Motion for Summary Judgment on July 29, 2024. Defendants submitted Dr. Oakes' report to both the Court and Plaintiff's Counsel in May, 2024. Dr. Oakes' report was also specifically appended to Defendants' Brief in Opposition to Plaintiff's Motion for Summary Judgment and is therefore part of the record and incorporated herein.

[10] Letter from the NIH dated August 17, 2021, Attachment 4 to Pesta Depo Exhibit 5; See also Exhibit 3 to Defendants' Brief in Opposition to Plaintiff's Motion for Summary Judgment.

> . . . .
> To assure that NIH policies and procedures for genomic data use are adhered to, ***Approved Users agree to provide to the NIMH Data Access Committee annual feedback on how these data have been used and any result that have been generated as a result of access to the data, including patents and publications.***
> . . .
> Annual Data Use Reports *will provide information regarding potentially significant findings and publications or presentations that resulted from the use of the requested dataset(s), a summary of any plans for future research use*. . ."[11]

Pesta failed to give the NIH appropriate data use progress reports on either his second or third Data Access Requests as described by the NIH.  Pesta's Brief does not dispute or explain these failures to comply with the reporting requirements of the NIH. It does not do so because Pesta admitted that he "screwed up" and did not report his activities properly to the NIH.[12]  In his deposition, Pesta offered a tortured explanation of why he did not report the Global Ancestry Paper to the NIH in any of his progress reports.  He said as to the second Data Access Request that he did not have to note the publication of the Global Ancestry Paper because it was not "published" until two days after he submitted the progress report.[13] Notably, the paper had been accepted for publication at the time, he was the editor of the journal that published the Global Ancestry Paper, and he also controlled when the progress report was submitted to the NIH. Further, Pesta testified that he did not report the Global Ancestry Paper on the progress report for his third Data Access Request because it was published after he received approval for the renewal of his second Data Access Request.[14]  Pesta's tortured interpretation of what he was supposed to report is directly contrary to the directives of the NIH in the DUC that it be timely informed of "how these data have been used" and "significant findings."  It is simply more evidence that Pesta was at worst intentionally trying to hide the true purpose of his research from the NIH or at best recklessly ignoring the requirements of the DUC Agreement.

Pesta also ignores the significant evidence of email correspondence between he and his coauthors that they intended to hide the true nature of their research from the NIH.  As described fully in Defendants' Motion and Defendants' Brief in Opposition to Plaintiff's Motion for

---

[11] Id.
[12] Pesta Depo., Exhibit 5, Attachment 7, p. 34 of 170.
[13] Pesta Depo, Vol 1, pp. 123-130
[14] Id..

5

Summary Judgment, he and his coauthors sought a "sneaky way to request and possibly present the ancestry x cognitive outcome data" and to "mask the nature of the study."[15] Given the significant evidence of Pesta's desire to hide the true nature of his research from the NIH and his repeated failures to do the required reporting, neither the Court, nor any trier of fact can reasonably conclude that Pesta did not knowingly, intentionally or recklessly hide information from the NIH.

Pesta argues that evidence of his correspondence with his coauthors is "after-acquired evidence" that cannot be used as a defense to liability under *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 353, 363-363 (1995). This evidence is not "after-acquired evidence" within the meaning of *McKennon*. In *McKennon*, the plaintiff brought a discrimination suit against her employer because she was terminated as part of a reduction in force. After the termination, the employer learned that the plaintiff had improperly copied several confidential documents, a terminable offense. The Court held that such evidence could be used at the remedial stage of the proceedings to reduce damages, but it did not foreclose a finding of liability. *McKennon* is inapposite because the evidence of Pesta's correspondence is not an independent basis for his termination. It is evidence of his and his coauthors efforts to mislead the NIH. This misconduct goes to the heart of why Pesta was terminated, not an independent reason for termination. It is admissible under Federal Evidence Rule 401 because such evidence has a tendency to make a material fact more or less probable than it would be without the evidence. Specifically, what were the intentions of Pesta and his coauthors in their dealing with the NIH. The undisputed evidence shows that Pesta violated the DUC Agreement by failing to inform the NIH of the nature of his research both in his original Data Access Requests and in his progress reports.

### III. CSU Properly Found that Pesta's Misconduct was Intentional, Knowing or Reckless

Generally, Pesta does not argue that he did not engage in misconduct but that to the extent any of his conduct departed from accepted practices, Pesta says he "did not 'intentionally, knowingly, or recklessly' commit those actions." According to Pesta, he should have been taken "at his word."[16] The charge to the Investigation Committee, then Provost Bloomberg, and the Ad Hoc Committee was to determine the facts and not to rely solely on Pesta's "word." For the reasons

---

[15] See Pesta Depo Exhibits 35 and 38.
[16] Pesta's Brief at p. 3

described in Section II above, it is clear that no one should have relied solely on the "word" of Pesta or his coauthors.

This issue is particularly critical in connection with Pesta's transfer of the controlled access data to a server outside of the United States to do phenotyping. The DUC Agreement is crystal clear on this point. It provides,

> "The Requester and Approved Users agree to retain control over the data and further ***agree not to distribute data obtained through this Data Access Request to any entity or individual not covered in the submitted Data Access Request***."[17]

Notwithstanding Pesta's agreement not to give the data to a source not identified in his DAR and approved by the NIH, he did so and did not tell either the NIH or CSU. He admitted repeatedly that this was an error.[18] Pesta argues that this error was a "minor mistake." He cites no authority for this conclusion and of course he has no basis for this conclusion since he has no expertise in submitting requests for controlled access data.[19] The experts who looked at this issue, the NIH and Dr. Oakes disagree with Pesta's self-serving opinion that his error was minor. Moreover, all Pesta had to do to determine that he should tell NIH about what he intended to do with the data was read the DUC Agreement. Pesta also makes the argument that although he was the Principal Investigator, it was CSU's responsibility to discover that Pesta was using a foreign server.[20] This ignores that only Pesta and his co-authors knew their plan to send the data to a third party. CSU could not stop it or report it because Pesta hid it.

### IV. The Findings of the NIH, CSU's Investigation Committee, and Provost Bloomberg are not inconsistent

Pesta asserts that there are differences between the language employed by the NIH, CSU's Investigation Committee, and Provost Bloomberg regarding Pesta's misconduct and that such

---

[17] DUC Page 3 (emphasis added)
[18] See, e.g., Pesta Depo, Exhibit 5, Attachment 7, p. 36; See also, Pesta Depo, Vol I, p.178.
[19] See e.g., Pesta Depo, Vol 1, p 81.
[20] Pesta Brief, page 17

differences are inconsistent or show a "moving the goal posts" by CSU or the NIH[21]. Pesta's assertions are not supported by the evidence. First, the scope of the NIH and CSU investigations were not the same. Obviously, the NIH's concern was about NIH rules, regulations and agreements. While the CSU investigation overlapped because Pesta's failure to follow NIH rules was an issue of concern to CSU, CSU's investigation also concerned Pesta's violations of other CSU policies, including Pesta's relationship with his coauthor John Fuerst, his violation of CSU's IRB policy, his violation of CSU's conflict of interest policy, and his actions with respect to where the TCP data was stored[22]. Thus, there was no "moving of goal posts." Moreover, Pesta also asserts that there was no finding by the NIH with respect to Fuerst's failure to cooperate regarding the TCP data and therefore it should not have been considered by CSU. In NIH's letter of August 17, 2023, the NIH specifically said, "Additionally, as the PI, you are responsible for ensuring compliance with the DUC. That Mr. Fuerst is no longer affiliated with CSU yet retains a copy of the data and refuses to destroy it constitutes several violations of the DUC."[23]

There are also two other crucial errors in Pesta's analysis of the supposed "moving of goal posts." First, CSU's research misconduct policy specifically allows the Investigation Committee to inquire about issues that arise during the investigation that were not set forth in the original charge to the investigative committee.[24] Second, Pesta asserts that in considering whether to terminate Pesta, Provost Bloomberg could not take into consideration misconduct that was not found by the Investigation Committee. There is no authority for Pesta's position, and the collective bargaining agreement and associated policies specifically permit CSU to go beyond the factual

---

[21] Pasta's Brief at p. 5
[22] See Final Report of the Investigation Committee, Pesta Depo Ex. 5 and Provost Bloomberg's Decision, Attachment 21 to Pesta Depo Ex. 5.
[23] August 17, 2021 letter from the NIH to Bryan Pesta, Pesta Depo., Exhibit 5, Attachment 4.
[24] Research Misconduct Policy, OAC 3344-28-06(G)(2).

findings of the Investigation Committee.[25] Clearly Pesta's union agreed as they did not dispute the Provost's findings. Thus, the undisputed evidence shows ample bases for Pesta's termination and does not support the assertion that either CSU or the NIH improperly "moved the goal posts."

### V. There Is Insufficient Evidence of Improper Animus on the Part of Anyone Involved in the Investigation of Pesta's Misconduct

Some members of the Investigation Committee were concerned that Pesta's research might be inconsistent with the guidelines of the American Psychological Association, the governing body of Pesta's field of expertise.  The Investigation Committee acknowledged their concern and discussed whether and how to address this issue in their report.[26]  They determined that after acknowledging the issue, nothing more needed to be said because it should not and did not affect their consideration of Pesta's misconduct.  There is no evidence whatsoever that they acted inconsistently with this statement.  The testimony on deposition supports that it was not considered. In fact, the witnesses indicated they barely if at all reviewed the Global Ancestry Paper.[27]  Pesta asserts several times that the Investigation Committee members "lied" to Ben Ward about the reasons for inserting the "tell-tale language" in their Final Report. Defendants encourage the Court to examine the supposed support for Pesta's contention cited to by Pesta.  It simply isn't there.

### VI. The Purported Letter of Reprimand to Pesta and the Continued Permission of CSU and NIH for Pesta to Continue His Research While the Investigation Process Was Ongoing Do Not Foreclose CSU's and the NIH's Subsequent investigation of Pesta's Misconduct.

Pesta argues, again without authority, that the initial letter of reprimand he received precludes CSU's subsequent investigation into his misconduct.  Notably, the letter is undated[28].

---

[25] Letter of Provost Bloomberg dated January 13, 2022, Attachment 21 of Pesta Depo Exhibit 5.
[26]  Final Report, Pesta Depo Exhibit 5.
[27] Ward Depo at pp. 243-245.
[28] Pesta Depo, Exhibit 33

9

The author is no longer with CSU and importantly, Pesta does not remember ever receiving the undated letter.[29] So, whether it was received by him is undetermined. But assuming it was, CSU is permitted to take interim steps in cases involving research misconduct. And the fact that it may have done so does not preclude a subsequent investigation in accordance with the policy. The letter itself does not say it is a final determination and the letter was issued prior to giving Pesta an opportunity to be heard about the allegations of misconduct.

Pesta also argues, again without authority, that because both NIH and CSU permitted Pesta to continue his research while their investigations were ongoing somehow evidences that NIH and CSU believed the misconduct allegations were not serious. Pesta has argued at every step of this proceeding that the true motive of both CSU and NIH was to quash the subject matter of Pesta's research. If that was the true motive, CSU and the NIH would have jumped the gun and determined to terminate Pesta's ability to use the TCP data or terminate his employment with CSU prior to giving Pesta an opportunity to be heard regarding his conduct. Neither CSU nor NIH took that opportunity. The fact that neither CSU nor NIH acted precipitously is evidence that they were concerned not with the subject matter of Pesta's research but instead with whether he had engaged in misconduct.

## VII. Conclusion

The undisputed facts demonstrate that Pesta was terminated for engaging in serious misconduct. Pesta failed to comply with the requirements of the NIH and CSU about the nature of the research he intended, the funding sources for his research, how he would conduct such research, to whom he would provide the controlled access data, and how such data would be safely stored. Pesta had no constitutional right to violate the DUC Agreements or to violate CSU policies. As

---

[29] Pesto Depo, Vol. 1, at p. 228

stated in their Final Report and in Provost Bloomberg's letter of determination, the Defendants reasonably believed that Pesta engaged in serious and repeated misconduct, and they had no reason to believe he had a constitutional right to engage in that misconduct. *McElhaney v. Williams*, 81 F.4th 550, 553 (6th Cir. 2023). Nothing offered in Plaintiff's Brief in Opposition to the Motion for Summary Judgment changes these undisputed facts and Defendants are entitled to Summary Judgment as a matter of law.

Respectfully submitted,
*/s/ Karen L. Giffen*
Karen L. Giffen (0042663)
Kerin L. Kaminski (0013522)
PEREZ & MORRIS, LLC
1300 East Ninth Street, Suite 1600
Cleveland, Ohio 44114
Telephone: 216-621-5161
Facsimile: 216-621-2399
Email: kgiffen@perez-morris.com
kkaminski@perez-morris.com
**Counsel for all Defendants**

## **CERTIFICATE OF SERVICE**

I certify that on this 25th day of September 2024, a true and correct copy of *Defendants' Reply Brief in Support of the Motion for Summary Judgment*, was served via Electronic Mail upon the following party

Fredrick C. Kelly
One Harriman Square
Goshen, New York 10924
fckellylaw@protonmail.com
Counsel for Plaintiff

*/s/ Karen L. Giffen*
Karen L. Giffen (0042663)
**Counsel for Defendants**
