IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRYAN J. PESTA, | ) | Case No. 1:23-CV-00546 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DAN AARON POLSTER |
| v. | ) | |
| | ) | |
| LAURA BLOOMBERG, *et al.*, | ) | **OPINION & ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**I.**  **Introduction**

Before the Court are the following motions and related filings:

1) Plaintiff's memorandum in support motion for summary judgment (ECF Doc. 44);

2) Defendants' motion for summary judgment (ECF Doc. 47);

3) Defendants' brief in opposition to Plaintiff's motion for summary judgment (ECF Doc. 50);

4) Plaintiff's brief in opposition to Defendants' motion for summary judgment (ECF Doc. 64);

5) Plaintiff's amended reply (ECF Doc. 69-1); and

6) Defendants' reply (ECF Doc. 72).

For the reasons explained below, the Court DENIES Plaintiff's motion for summary judgment (ECF Doc. 44) and GRANTS Defendants' motion for summary judgment on Counts I and II. ECF Doc. 47.  Count III is dismissed with prejudice.

II.     **Procedural History**

Dr. Pesta filed his complaint on March 16, 2023. ECF Doc. 1. On May 22, 2023, Defendants filed a motion to dismiss. ECF Doc. 5. On July 14, 2023, the Court granted in part and denied in part Defendants' motion to dismiss. ECF Doc. 9. Specifically, under Rule 12(b)(1), the Court dismissed with prejudice Cleveland State University ("CSU") (Counts I, II, and III) and the individual Defendants in their official capacities (Counts I and II). *Id*. The Court denied the Defendants' remaining grounds to dismiss. *Id*. The following month, the Court amended its prior dismissal to be without prejudice, pursuant to Fed. R. Civ. P. 54(b). ECF Doc. 17. On September 22, 2023, Plaintiff filed an amended complaint and named the nine members who currently serve on the CSU Board of Trustees ("Trustees") as defendants in their official capacities. ECF Doc. 18. The following month, the Trustees moved for judgment on the pleadings. ECF Doc. 23. On January 3, 2024, the Court granted the Trustees' motion for judgment on the pleadings and dismissed them as parties. ECF Doc. 28.

The following counts from Plaintiff's amended complaint (ECF Doc. 18) remain pending: Counts I and II under 42 U.S.C. § 1983 and §1988 and Count III under 28 U.S.C. §§ 2201-2202. Count I alleges that CSU and the six individual Defendants retaliated against Plaintiff, in violation of the First Amendment, when they "caused an investigation and investigated Dr. Pesta" after the publication of his article. *Id*. at ¶ 125. Count II alleges that CSU and the six individual Defendants retaliated against Plaintiff, in violation of the First Amendment, when they fired him. *Id*. at ¶ 139. In Count III, Plaintiff seeks declaratory judgment as follows:

1) the hereditarian hypothesis "is worthy of study, but is presently under assault;"

2) individuals seeking to advance a hereditarian hypothesis "are entitled to academic freedom;"

3) CSU must extend full academic freedom to the Plaintiff and those who "advance a hereditarian hypothesis in the study of race, genetics, and intelligence;" and

4) CSU may not utilize any aspect of its post-article investigation "to interfere with Pesta's academic freedom."

ECF Doc. 18 at 29.

### III.  Abridged Statement of Facts

Shortly after receiving his Ph.D. in cognitive psychology, Pesta started working as a visiting assistant professor at CSU in 1998.  ECF Doc. 38 at 5.  He became an assistant professor of management and labor relations at the College of Business in 2001.  ECF Doc. 38 at 6.  He was awarded tenure in 2010 with the job title, "Associate Professor."  *Id.*  He was promoted to "Full Professor" in 2016.  Between 2008 and 2014, Pesta published thirteen papers, nine of which were related to intelligence and race/ancestry or some other subgroup.  All of these papers were published prior to Pesta being promoted to full professor.  In September 2018, Pesta sought and CSU approved sabbatical to do research related to intelligence and ancestry.  ECF Doc. 38 at 16, Ex. 4.

To conduct the relevant research, Pesta relied on controlled access data from the Trajectories of Complex Phenotypes study ("TCP").  The TCP data is available only through the database of Genotypes and Phenotypes (dbGaP) which is controlled by the National Institutes of Health ("NIH").  The NIH controls access to certain data, including the TCP, to protect the integrity of the research system in which participants submit their data with the understanding that it will not be misused inconsistently with their consent to participate in the study.  ECF Doc. 50-1.  The NIH requires that access to the TCP data is limited to academic institutions and

Principal Investigators associated with those institutions.  It also requires the Principal Investigator to: 1) submit Data Access Requests that include information regarding the intended research purpose, 2) timely renew requests for continued access to the data, 3) agree to be bound by a Data Use Certification Agreement ("DUC"), and 4) promise to adhere to various NIH best practices.  ECF Doc. 50-1.

Pesta worked with several individuals to research the correlation between intelligence and ancestry – John Fuerst, Emile Kirkegaard and Jordan Lasker.  ECF Doc. 38-3 at 1.  Correspondence from Fuerst and Kirkegaard to Pesta suggests that the group was trying to cover-up the true reason for accessing the NIH data.  ECF Doc. 38-35 and ECF Doc. 38-38.  They refer to their data requests as "sneaky" and as "mask[ing] the nature of the study."  Pesta was the only one in this group who could access the TCP data through his association with CSU.

Pesta submitted three requests to the NIH for the TCP data:

1) April 12, 2018 – "Within sexes, differences in brain morphology and volume are related to differences in global cognitive performance as measured by cognitive tests.  However, while males and females differ significantly in brain morphology and volume, they differ minimally in general cognitive ability.  I will use the 'Trajectories of Complex Phenotypes' sample to investigate why this is the case."

2) July 15, 2018 – "Note: I've already received access to these data, but for different research questions.  In the USA, diagnosis rates for different mental disorders (e.g. schizophrenia, depression) vary across ethnic groups… Therefore, I will utilize 'Trajectories of Complex Phenotypes' to investigate the evolutionary hypothesis via admixture analysis to determine if global ancestry predicts mental health outcomes."

3) September 19, 2018 – "Several recent studies have constructed polygenic scores (PGS) for various traits.  Examples include education attainment and schizophrenia.  Of significant concern is the transethnic validity of the PGS, especially for relatively distant ancestry groups.  This situation potentially limits the utility of PGS for epidemiological research … We propose to research the effect of PGS construction on the transethnic validity of PGS for two traits: education attainment and schizophrenia.  We shall also discuss best practices for constructing and reporting PGS."

None of these requests disclosed that Pesta's primary research topic was a genetic basis for the relationship between intelligence and race/ancestry.  In fact, Pesta admitted that he didn't even review the data for his initial request related to sex differences or for his second request related to mental disorders.  ECF Doc. 38 at 73-75.

In August 2019, Pesta and his associates published an article entitled "Global Ancestry and Cognitive Ability" in an open-source journal, Psych, of which Pesta was editor.  ECF Doc. 38 at 12.  One of Pesta's premises in the Global Ancestry paper was that genetics played a role in the mean differences in general intelligence between White and Black Americans.  Pesta's article created controversy for the university.  In the aftermath, CSU students and faculty, along with non-affiliated individuals and groups, publicly criticized the article and petitioned CSU to discipline Professor Pesta.  ECF Doc. 18 at 8.  One notable critic was Dr. Kent Taylor, a UCLA Professor of Pediatric Medicine, who wrote President Sands and alleged that the article's "[u]se of NIH data for studies of racial differences in this way [was] both a violation of data use agreement and unethical."  *Id.* at 8-9.

After the Global Ancestry paper was published, the NIH investigated Pesta's use of the TCP data.  After completing its investigation, the NIH found that Pesta had violated NIH policies and agreements in the following ways:

1) Data requests were for studies of mental health outcomes, not intelligence;

2) Data was shared with an unapproved online forensic DNA phenotyping service; and

3) "Global ancestry and Cognitive Ability" was not reported at the time of project renewal.

ECF Doc. 38-5 at 2-3.  The NIH also requested that CSU immediately destroy the data and its derivatives, contact the online phenotyping service concerning its use of the data, and to describe

5

how it would respond to the violations. ECF Doc. 38-26 at 4. But when CSU attempted to comply with NIH's directives, it learned that Pesta had stored the data on a personal computer in his home and had allowed Fuerst to improperly access the data. ECF Doc. 38-5 at 6-7. Pesta later admitted that he had been responsible for allowing Fuerst to access the data and that Fuerst had "gone a little bit rogue." ECF Doc. 38 at 39.

On July 11, 2021, Pesta formally appealed the decision of the NIH, and was represented by counsel during the appeal. On August 17, 2021, the NIH denied his appeal citing the following violations:

1) Researching matters that were not described in Pesta's Data Access Request;

2) Sharing controlled access data with an unauthorized entity;

3) Failing to provide accurate annual reports; and

4) Fuerst's refusal to confirm destruction of the TCP data.

The NIH suspended Pesta from accessing the controlled-access data sets for three years, the most serious sanction ever issued by the NIH. ECF Doc. 38-5 at 20-23.

In the Summer of 2021, CSU formed a committee of four professors, Mallet, McLennan, Regoeczi, and Ward, to investigate Pesta's violations of the NIH policies and agreements. ECF Doc. 38-5 at 4. Following their investigation, the committee issued a lengthy report finding that Pesta had violated the NIH DUC agreement by using unauthorized control access data, by publishing a research manuscript without NIH permission, by failing to receive IRB approval for a research project using data outside of data use permissions, and by using funds from the

Human Phenome Diversity Foundation, LLC[1] to purchase a computer and paying a research assistant. ECF Doc. 38-5 at 6-8.

Following the investigation committee's final report, Provost Laura Bloomberg reviewed Pesta's rebuttal and issued her recommendation – that he be dismissed from the university. ECF Doc. 38-19. Provost Bloomberg's letter points out four causes for which faculty termination was authorized under the parties' Collective Bargaining Unit ("CBA"):

1) Incompetence or dishonesty in teaching or scholarship;

2) Neglect of duty;

3) Personal conduct which substantially impaired [Pesta's] fulfillment of his responsibilities; and

4) Interfering with the normal operations of the University.

ECF Doc. 38-19 at 7.

Article 8 of the CBA between CSU and Pesta's union, the American Association of University Professors ("AAUP"), defines the process for sanction and dismissal of a faculty member. ECF Doc. 47-1 at 5. The CBA calls for an Ad Hoc Committee consisting of three bargaining unit members and three members of academic administration. The Ad Hoc Committee in this case held a hearing on January 28, 2022, at which Pesta was invited to present evidence. Pesta appeared and gave a PowerPoint presentation to the Ad Hoc Committee. ECF Doc. 38-21. He also provided a written response to Provost Bloomberg's letter. On February 28, 2022, the Ad Hoc Committee unanimously determined that Pesta's termination was warranted. ECF Doc. 38-23. Of significance, the Ad Hoc Committee noted:

---

[1] The Human Phenome Diversity Foundation was a private foundation started by Pesta and Fuerst to solicit donations to "support researchers who want to research this area" and "to help [Fuerst] further his education. ECF Doc. 38 at 58. Pesta and Fuerst used funds from this foundation to reimburse themselves for a personal computer, food they ate while they were working, Uber rides for Fuerst, and (possibly) Fuerst's tuition. ECF Doc. 38 at 59.

> Although the ad-hoc committee considered several differences in opinion between you and Dr. Pesta, some of which are noted below, we recognized that one key point of contention is whether the charges and proposed sanction infringe on Dr. Pesta's academic freedom. The 6 ad-hoc committee members were in unanimous agreement that any conclusions should be (and were) arrived at irrespective of the content of Dr. Pesta's research.

ECF Doc. 38-23 at 2.

Following the Ad Hoc Committee's determination approving Pesta's termination, Pesta requested that his union grieve the decision.  But the union denied his request, stating "[g]iven the level of due process that Dr. Pesta had throughout the process, his failure to rebut the charges, the seriousness of the charges and the overwhelming evidence against him, the Executed Committee determined that, on the merits, they would not be successful in arbitration." ECF Doc. 38-26 at 16-17.

## IV.     Standard of Review

Summary judgment is appropriate when there exists no genuine dispute with respect to the material facts and, in light of the facts presented, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The court may look to the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits when ruling on the motion. Fed. R. Civ. P. 56(c).  The facts must be viewed in the light most favorable to the non-moving party and the benefit of all reasonable inferences in favor of the non-movant must be afforded to those facts.  Id.  The mere "scintilla of evidence" within the record that militates against the overwhelming weight of contradictory corroboration does not create a genuine issue of fact. *Bible Believers v. Wayne Cty.,* 805 F.3d 228 (6th Cir. 2015), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

8

V.  Law & Analysis

   A.  First Amendment Claims

Pesta's primary claim is that Defendants took adverse employment action in violation of the First Amendment. Pesta alleges that CSU impermissibly investigated him and terminated his employment due to the content of his Global Ancestry paper. To establish a prima facie case of First Amendment retaliation, Pesta must show that: 1) his speech was protected by the First Amendment; 2) he suffered an adverse employment action; and 3) the adverse action was motivated at least in part in response to the exercise of his constitutional rights. *Nailon v. Univ. of Cincinnati,* 715 F. App'x 509, 513-514 (6th Cir. 2017). The parties agree that Pesta's professional conduct was investigated and resulted in his termination, but that is where their agreement ends. Defendants argue there was no First Amendment violation and, on this point, the Court agrees.

Defendants claim Pesta was terminated, not because of the content of the Global Ancestry paper, but because he used his position as a CSU professor to improperly access and use data from the NIH. The NIH conducted an independent investigation and issued findings and sanctions against Pesta for his misconduct. ECF Doc. 38-5 at 2-3. After the NIH found that Pesta violated its agreements and policies, CSU conducted its own investigation which confirmed misconduct by Pesta. ECF Doc. 38-5 at 4. Following CSU's investigation and determination that Pesta's conduct warranted termination, an Ad Hoc Committee fully reviewed Pesta's conduct and approved his termination. ECF Doc. 38-23 at 2. Finally, Pesta's union refused to grieve his termination. ECF Doc. 38-26 at 16-17.

Pesta argues that CSU's reason for the investigation and termination of his employment was pretext for the *real* reason he was fired – the content of his Global Ancestry paper. But

9

Pesta's theory is not supported by the facts. The evidence submitted to the Court overwhelmingly supports Defendants' version of the events. In fact, Pesta admitted that he "screwed up" by failing to conduct his research in accordance with NIH's requirements. ECF Doc. 38-5 at 34-42.

Throughout much of his employment, CSU knew that Pesta was researching and publishing articles on the correlation between race and intelligence – the controversial subject of his Global Ancestry paper. In fact, CSU knew about Pesta's research *before* he was awarded tenure and promoted to full professor. ECF Doc. 38 at 11. If CSU intended to chill Pesta's First Amendment rights by controlling the content of his publications, why would they have granted him tenure and full professor *after* they were aware of this research? There is no direct evidence of a First Amendment violation, and Pesta hasn't even shown a close proximal correlation between CSU learning of the content of Pesta's research and its decision to investigate and terminate his position. Instead, the timing of CSU's investigation supports Defendants' representation that Pesta was fired due to his misconduct in accessing and using the NIH data. It was only after the NIH concluded that Pesta has committed serious misconduct that CSU began to investigate Pesta. Pesta has not identified any facts contradicting Defendants' position.

Rather than pointing to factual support for his theory – that he was fired due to the content of the Global Ancestry paper – Pesta attacks the NIH and CSU for permitting him to conduct his research and for their various findings during the investigations. For example, Pesta argues that his misconduct should have been overlooked because CSU and NIH continued to process his applications for access to restricted data after they could have realized that his conduct deviated from their rules. *See* ECF Doc. 64 at 11. But even if Pesta's numerous criticisms of the NIH and Defendants' review processes were valid, they do not prove that Pesta

was fired for exercising his First Amendment rights. Rather, the ample record before this Court shows that Pesta was fired because of his own misconduct associated with accessing restricted data from the NIH. The fact that NIH and CSU may have been able to stop Pesta sooner from misusing the NIH data, does not absolve Pesta from the wrongdoing.

Pesta's misconduct was fully investigated and condemned by the NIH. CSU conducted an independent investigation and also found wrongdoing warranting termination. An Ad Hoc Committee required by the CBA and Pesta's own union agreed with CSU's decision. At every step, Pesta was given the opportunity to defend his conduct, but failed to convince anyone that his termination was not warranted. The facts fully support Defendants' position that Pesta's termination was unrelated to the content of his Global Ancestry paper and did not violate Pesta's First Amendment rights.

Pesta was not fired because he exercised his right to free speech under the First Amendment. But even if CSU *had* fired him for publishing the Global Ancestry paper, it most likely still would not have run afoul of the First Amendment. "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 1960 (2006). As a public employee of CSU, Pesta's research and publications were part of his employee responsibilities. CSU was permitted to regulate the speech Pesta exercised in his capacity as a professor. *Id.* Pesta's research for the Global Ancestry paper was clearly related to his role as a professor. Otherwise, he would not have been permitted to access the NIH data. Accordingly, even if CSU had fired Pesta for publishing the Global Ancestry paper, it likely would have been

11

within its rights to do so. CSU had a legitimate interest in regulating Pesta's speech when he was speaking in his capacity as a CSU professor. *Id.*

As already stated, the facts do not support Pesta's allegation that he was retaliated against because of the content of his speech. Rather, he was fired due to his misconduct in accessing NIH data. Because Pesta has not shown any First Amendment violation, his claims based on the First Amendment (Counts I and II) fail as a matter of law. Defendants are entitled to summary judgment on these claims.

### B. Declaratory Judgment

The parties have also moved for summary judgment on Pesta's requests for declaratory judgment. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court must be faced with a "case of actual controversy" before granting declaratory relief. *Id*. The Sixth Circuit interprets this in line with the Article III case or controversy requirement. *TCI/TKR Cable v. Johnson*, 30 Fed. App'x 581, 583 (6th Cir. 2002) (citing *Brennan v. Rhodes*, 423 F.2d 706, 706-07 (6th Cir. 1970)). Determining whether a case presents an actual controversy or merely an attempt to obtain an advisory opinion is a "difficult task." *Id.* A case or controversy exists when the facts show "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune v. Genentech, Inc*., 549 U.S. 118, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co*., 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826 (1941)). A party has standing to bring a claim for declaratory relief if this "actual controversy" requirement is satisfied. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016) ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."); *see also Owens v. Ohio Cas. Ins. Co*., 2010 WL 11545632, at *2 (W.D. Ky.

Jan. 21, 2010) (granting an insurer's motion to dismiss a request for declaratory judgment on liability for lack of standing because there was no "actual controversy" between the parties).

Here, Pesta seeks declaratory judgment as follows:

1) the hereditarian hypothesis "is worthy of study, but is presently under assault;"

2) individuals seeking to advance a hereditarian hypothesis "are entitled to academic freedom;"

3) CSU must extend full academic freedom to the Plaintiff and those who "advance a hereditarian hypothesis in the study of race, genetics, and intelligence;" and

4) CSU may not utilize any aspect of its post-article investigation "to interfere with Pesta's academic freedom."

None of these statements are appropriate matters for declaratory judgment; they seek only advisory opinions from the Court. Pesta is no longer an employee of CSU. There would be absolutely no reason for this Court to issue opinions about the hereditarian hypothesis or how CSU must conduct its business. Because Count III of Pesta's amended complaint has failed to set forth a case or controversy, it is hereby dismissed with prejudice.

### VI. Conclusion

Because there are no genuine disputes of material fact on Counts I and II of Pesta's amended complaint, the Court GRANTS summary judgment in favor of Defendants (ECF Doc. 47) and DENIES summary judgment in favor of Plaintiff on those claims. ECF Doc. 44. Because Count III has not set forth a case or controversy appropriate for declaratory judgment, it is hereby dismissed with prejudice.

IT IS SO ORDERED.

Dated: October 7, 2024

*s/Dan Aaron Polster*
United States District Judge